UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AUGUST WILDMAN, *et al.*,

              Plaintiffs,

      v.

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al.*,

              Defendants.

**MEMORANDUM AND ORDER**
21-CV-04400 (HG) (RML)

**HECTOR GONZALEZ**, United States District Judge:

**Table of Contents**

INTRODUCTION ........................................................................................................................ 3

PROCEDURAL BACKGROUND................................................................................................ 4

BACKGROUND .......................................................................................................................... 5

LEGAL STANDARD................................................................................................................... 11

  A.  Motion to Dismiss for Failure to State a Claim ................................................................ 11

  B.  JASTA/ATA ...................................................................................................................... 12

      1.  "Act of International Terrorism" Element.................................................................... 12

      2.  "General Awareness" Element ..................................................................................... 13

      3.  "Substantial Assistance" Element ................................................................................ 16

DISCUSSION ............................................................................................................................... 19

  I.  The Complaint Sufficiently Alleges FTOs Committed, Planned, or Authorized the
      Attacks Which Injured Plaintiffs ...................................................................................... 19

  II.  The Complaint Fails to Allege Sufficiently that Deutsche Bank Either Had "General
      Awareness" or Provided "Substantial Assistance" .......................................................... 21

    A.  General Awareness ......................................................................................................... 21

      i.  Deutsche Bank's "Laundromats".................................................................................. 21

ii.   Al Zarooni and Mazaka ................................................................. 24

iii.  Imran Yakub Ahmed ................................................................. 29

iv.  Mamoun Darkazanli and Mamdoubh Mahmud Salim ................................ 30

v.  Samir Azizi ................................................................................. 30

vi.  National Iranian Oil Company ("NIOC") and the National Iranian Tanker Company ("NITC") ................................................................ 33

B.  Substantial Assistance ...................................................................... 34

III.  The Complaint Fails to Allege Sufficiently that Standard Chartered Either Had "General Awareness" or Provided "Substantial Assistance" ............................... 37

A.  General Awareness .......................................................................... 37

i.  Standard Chartered's "Laundromats" ................................................. 37

ii.  Al Zarooni and Mazaka ................................................................. 38

iii.  Samir Azizi ................................................................................. 40

iv.  Hikmatullah Shadman ................................................................... 40

v.  NIOC and NITC .......................................................................... 41

vi.  Mustafa Ahmed al-Hisawi, Abdul Baqi Bari, and Viktor Bout ................... 41

vii.  Fatima Fertilizer Company Limited and Pakarab Fertilizers Limited ............ 42

B.  Substantial Assistance ...................................................................... 45

IV.  The Complaint Fails to Allege Sufficiently that Danske Bank Either Had "General Awareness" or Provided "Substantial Assistance" ............................................. 47

A.  General Awareness .......................................................................... 47

i.  Danske Bank's "Estonian Laundromat" ............................................. 47

ii.  Swefin ...................................................................................... 49

B.  Substantial Assistance ...................................................................... 50

V.  The Complaint Fails to Allege Sufficiently that Placid Express Either Had "General Awareness" or Provided "Substantial Assistance" ............................................. 52

   A.   General Awareness ................................................................................ 52

   B.   Substantial Assistance ........................................................................... 53

VI. The Complaint Fails to Allege Sufficiently that Wall Street Exchange Either Had
     "General Awareness" or Provided "Substantial Assistance" ............................................. 56

   A.   General Awareness ................................................................................ 56

   B.   Substantial Assistance ........................................................................... 58

VII. Plaintiffs' RICO Claim ............................................................................... 60

CONCLUSION ................................................................................................. 61

## INTRODUCTION

Before the Court is an action brought by or on behalf of Americans who were killed or
injured by terrorist attacks in Afghanistan between 2011 and 2016 ("Relevant Period"), and their
close family members (collectively "Plaintiffs").  Plaintiffs bring a claim under the civil liability
provision of the Anti-Terrorism Act, 18 U.S.C. § 2333, as amended by the Justice Against
Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016), against Deutsche Bank
Aktiengesellschaft and Deutsche Bank Trust Company Americas (together, "Deutsche Bank");
Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Bank (Pakistan)
Limited (together, "Standard Chartered"); Danske Bank A/S ("Danske Bank");[1] Placid NK
Corporation ("Placid Express"); and Wall Street Exchange LLC ("Wall Street Exchange")
(collectively "Defendants"), for allegedly aiding and abetting the terrorist organization
responsible for the terrorist attacks.

---

[1]     Danske Markets, Inc. was originally named as a Defendant in the Complaint, but was
dismissed on July 26, 2022, pursuant to a stipulation of dismissal.  *See* ECF No. 69

Presently before the Court are Defendants' motions to dismiss the Complaint pursuant to Rule 12(b)(6), which the Court consolidates for the purposes of this Order.[2]  ECF Nos. 43, 47, 51, 53, 78.  For the reasons set forth below, the motions are granted.

## PROCEDURAL BACKGROUND

On August 5, 2021, Plaintiffs brought suit against Defendants pursuant to the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), alleging that Defendants aided and abetted terrorist attacks by providing financial services to individuals and organizations who, in turn, helped finance terrorist attacks against American military members and civilians in Afghanistan during the Relevant Period.  ECF No. 1.  The Complaint alleges two counts, both for violations of the ATA.  ECF No. 38 ¶¶ 2025–43.

On October 29, 2021, all Defendants, except Wall Street Exchange, filed letters requesting a pre-motion conference before filing motions to dismiss the complaint for violating Rule 8(a), failing to state a claim, and for various jurisdictional deficiencies.  ECF Nos. 25, 27, 28, 29.  On December 7, 2021, the Court held a pre-motion conference and it directed Plaintiffs to file a more succinct amended complaint that would address the deficiencies raised by Defendants in their pre-motion letters and provide the "best iteration of the factual allegations that support [Plaintiffs'] claims."  *See* ECF No. 70 (transcript of December 7, 2021, conference).  The Court also set a briefing schedule for those Defendants' motions to dismiss.  *Id.*, ECF Text

---

[2]    Also before the Court are:  (i) all Defendants' motions to dismiss the Complaint for failing to meet Rule 8(a)'s requirement of a "short and plain statement;" (ii) motions by Deutsche Bank AG, Standard Chartered PLC, SCB Pakistan, Danske Bank, and Wall Street Exchange to dismiss for failure to allege personal jurisdiction under 12(b)(2); and (iii) Wall Street Exchange's motion to dismiss for insufficient service of process under 12(b)(5).  Because the Court grants Defendants' motions to dismiss for failure to state a claim, it does not reach the merits of these other arguments.

Order (Dec. 7, 2021).  On February 15, 2022, Plaintiffs filed their amended complaint, which failed to comply with the Court's earlier directive to file a shorter, more focused pleading.  ECF No. 35.  After requesting leave to file a second amended complaint "to address formatting errors, fix typos, and harmonize headers," ECF No. 36, which was consented to by Defendants, ECF No. 37, Plaintiffs filed their second amended complaint on February 26, 2022.  ECF No. 38 ("Am. Compl." or "Complaint").

On June 1, 2022, all Defendants, except Wall Street Exchange, filed their motions to dismiss.  ECF Nos. 43, 47, 51, 53.  Thereafter, Plaintiffs filed their briefs in opposition, ECF Nos. 58, 59, 60, 61.  Defendants then filed their reply briefs.  ECF Nos. 63, 64, 65, 66.[3]

## BACKGROUND

According to the Complaint, which is assumed to be true for purposes of these motions, Defendants "knowingly facilitate[ed] transfers of hundreds of millions in USD to . . . terrorists." Am. Compl. ¶ 6.  In their 596-page Complaint, Plaintiffs describe a complex "international criminal network" (the "Syndicate") which carried out terrorist attacks on Americans during the Relevant Period.  *Id.* ¶ 5.  This Syndicate was organized and led by al-Qaeda and included the Haqqani Network and other organizations which were designated Foreign Terrorist Organizations ("FTOs")[4] at the time of the attacks, as well as other non-FTO organizations, such

---

[3]     Wall Street Exchange appeared on September 30, 2022, ECF No. 73, alleging improper service and entered an appearance "for the limited purpose of filing a motion to dismiss," ECF No. 75 at 1.  On November 1, 2022, Wall Street Exchange filed its motion.  ECF No. 78. Plaintiffs filed their brief in opposition on November 29, 2022.  Wall Street Exchange filed its reply on December 9, 2022.

[4]     *See Foreign Terrorist Organizations*, U.S. DEP'T OF STATE, https://www.state.gov/foreign-terrorist-organizations/ (last visited December 29, 2022)

as the Taliban and D-Company.  *Id.* ¶ 89.  Plaintiffs allege that "[e]ach attack was committed, planned, and/or authorized by at least one FTO:  al-Qaeda," and many attacks were "committed directly by al-Qaeda."  *Id.* ¶ 85.  Later in the Complaint, Plaintiffs describe specific acts of international terrorism, all of which were "committed by the Taliban, including its Haqqani Network, or jointly committed by the Taliban and al-Qaeda."  *Id.* ¶¶ 1098–2024.  To further add to this complexity, the Complaint additionally alleges that during the Relevant Period, the Syndicate "depended upon the regular, substantial, and comprehensive support provided by Iran's Islamic Revolutionary Guard Corps," or the IRGC, "primarily acting through IRGC's Lebanese Hezbollah Division . . . and . . . Qods Force," *id.* ¶ 90, as well as support from the so-called Russian mafia, *id.* ¶ 139.[5]  Hezbollah became a FTO in 1997, but the IRGC and the Qods Force were not designated FTOs during the Relevant Period.  *Id.* ¶¶ 91, 266 (noting that both organizations became FTOs in 2019, after the attacks in the Complaint had occurred).  The Russian mafia has never been designated a FTO.  *See id.* ¶¶ 298–311; *see also Foreign Terrorist Organizations*, *supra* n.3.  The Complaint further describes a number of "Syndicate agents, operatives, fronts, and cut-outs who served al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and their Syndicate allies, as well as their affiliated Hezbollah and Qods Force allies."  *Id.* ¶ 111.

Nowhere in the Complaint do Plaintiffs allege that Defendants worked directly with any of the FTOs at the time of the attacks.  Rather, Plaintiffs allege that Defendants worked with a number of other individuals and organizations who were, sometimes tangentially, involved with

---

[5]     The Complaint does not clearly define the "Russian mafia" except to allege that it was made up of "groups," the foremost of which was the "Solntsevskaya Group."  *Id.* ¶ 299.  The Complaint does not specify whether the Solntsevskaya Group ever did business with Defendants, and no other Russian mafia-related group is identified in the Complaint.

the "international criminal network" that supported the FTOs.  *Id.* ¶¶ 89–363 (discussing the alleged network of FTOs and other criminal organizations).  Plaintiffs are much less clear about which specific individuals or entities Defendants actually provided financial services to.  For example, Plaintiffs will claim that a Defendant provided financial services to "Khanani and the Khanani MLO," if that Defendant provided services to one of Khanani's front companies, or even if they provided services to a separate person or entity who did business with a front company.  *See, e.g.*, *id.* ¶ 538 (describing how an unidentified Danske Bank customer had a relationship with an alleged Khanani front company to support the claim that "Danske Bank enabled syndicate terror finance").  This is not an insignificant distinction, as one of the factors the Court must evaluate here is how attenuated a Defendant's relationship is with the principal FTO that committed the attacks.  *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019).  Despite the lack of specificity in the Complaint, the Court has identified the following named individuals or organizations that Plaintiffs allege one or more Defendants provided financial services to in violation of the ATA:

- <u>Mazaka General Trading</u>:  Plaintiffs allege Deutsche Bank, Am. Compl. ¶¶ 391–408, Danske Bank, *id.* ¶¶ 534–45, and Standard Chartered, *id.* ¶¶ 458–72, provided services to Dubai-based Mazaka General Trading LLC ("Mazaka").

- <u>Al Zarooni Exchange</u>:  Plaintiffs allege Deutsche Bank, *id.* ¶¶ 391–408, and Standard Chartered, *id.* ¶¶ 458–72, provided services to Dubai-based Al Zarooni Exchange ("Al Zarooni").

- <u>National Iranian Oil Company and National Iranian Tanker Company</u>:  Plaintiffs allege Deutsche Bank, *id.* ¶¶ 432–34, and Standard Chartered, *id.* ¶¶ 488–90, provided services

to the Iran-based National Iranian Oil Company ("NICO") and the National Iranian

Tanker Company ("NITC").

- <u>Samir Azizi</u>:  Plaintiffs allege Deutsche Bank, *id.* ¶¶ 410–30, and Standard Chartered, *id.* ¶¶ 473–79, provided services to Samir Azizi.

- <u>Imran Yakub Ahmed</u>:  Plaintiffs allege Deutsche Bank provided services to Imran Yakub Ahmed.  *Id.* ¶ 431.

- <u>Mamoun Darkazanli and Mamdouh Mahmud Salim</u>:  Plaintiffs allege Deutsche Bank provided services to Mamoun Darkazanli and Mamdouh Mahmud Salim.  *Id.* ¶¶ 435–43.

- <u>Hikmatullah Shadman</u>:  Plaintiffs allege Standard Chartered provided services to Hikmatullah Shadman.  *Id.* ¶¶ 480–87.

- <u>Mustafa Ahmed al-Hisawi</u>:  Plaintiffs allege Standard Chartered provided services to Mustafa Ahmed al-Hisawi.  *Id.* ¶¶ 491–97.

- <u>Victor Bout</u>:  Plaintiffs allege Defendant Standard Chartered provided services to Victor Bout.  *Id.* ¶¶ 498–99.

- <u>Abdul Baqi Bari</u>:  Plaintiffs allege Standard Chartered provided services to Abdul Baqi Bari.  *Id.* ¶¶ 500–04.

- <u>Fatima Fertilizer Company Ltd., and Pakarab Fertilizers Ltd.</u>:  Plaintiffs allege Standard Chartered provided services to the Pakistan-based Fatima Fertilizer Company Ltd. ("Fatima"), and Pakarab Fertilizers Ltd. ("Pakarab").  *Id.* ¶¶ 505–32.

- <u>Swefin</u>:  Plaintiffs allege Placid Express provided services to Swedish-based Swefin.  *Id.* ¶¶ 546–61.

- <u>Prime Currency Exchange Ltd</u>: Plaintiffs allege Placid Express provided services to New Zealand-based Prime Currency Exchange Ltd. ("Prime Currency"). *Id.* ¶ 565.

- <u>Farzam Mehdizadeh</u>: Plaintiffs allege Wall Street Exchange provided services to Farzam Mehdizadeh. *Id.* ¶¶ 946–49.

Plaintiffs also make numerous conclusory allegations without providing any facts that would, for example, allow the Court to identify any additional individuals or entities to whom Defendants provided services. *See, e.g.*, Am. Compl. ¶¶ 356, 392–94, 406, 445, 471, 466, 538–40, 666, 567–71, 592, 668–71, 933–42, 1037 (a non-exhaustive list of examples where Plaintiffs make conclusory allegations regarding Defendants' interactions with networks or organizations that are not described clearly or with sufficient specificity). Plaintiffs allege, for example, that Deutsche Bank "directly conspired with known Russian mafia money launderers," but do not provide any additional details like their names, which would allow the Court to infer that they were, in fact, "known" criminals. *Id.* ¶ 356. At the same time, the Complaint provides a myriad of facts which appear irrelevant to this case. *Id.* ¶¶ 283–86, 298–311, 318–50, 367–71, 375–89, 406–08, 411–412, 423, 428–29, 448–453 (a non-exhaustive list of areas where Plaintiffs have provided facts not clearly relevant to this case).[6] For example, the Complaint goes into intricate

---

[6]     Although the Court is not reaching the question of whether the Complaint should be dismissed under Rule 8, the Complaint nevertheless appears to fail to meet Rule 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." The Complaint's combination of irrelevant factual allegations and unclear definitions regarding the parties involved is a paradigmatic example of failing to "clearly state what each defendant did or failed to do and why [plaintiff] is entitled to the relief [sought]." *Tasaka v. Bayview Loan Servicing, LLC*, No. 17-cv-7235, 2021 WL 84232, at *3 (E.D.N.Y. Jan. 11, 2021). This sort of "[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

detail describing other aspects of the Russian mafia.  *See, e.g.*, *id.* ¶¶ 298–311.  Plaintiffs, however, never allege that the two named individuals associated with the Russian mafia in the Complaint—Semyon Mogilevich and German Gorbuntsov—ever directly received services from any of the Defendants.  *Id.*

Despite its length—173,603 words spread out over 596 pages and 2,045 paragraphs—the Complaint is less a novel, and more a series of vignettes describing a wide range of criminal activity.  While these vignettes often go into great detail about the complex interplay between different criminal players, and how those criminals or terrorists contributed to Plaintiffs' injuries, none of them sufficiently allege that any Defendant was ever aware of any of these connections, or that the alleged assistance Defendants provided "substantially" helped these criminal players cause Plaintiffs' injuries.  Due to the sheer volume of information set forth in the Complaint, the Court will not detail each and every "value chain"[7] alleged in the Complaint.  However, the following description is a good example of the sort of activity set forth in the Complaint and demonstrates why the Complaint fails to establish the necessary nexus between any Defendant and the alleged terrorist acts that injured Plaintiffs.  The Complaint alleges the existence of the "Afghanistan-to-Russia Opium Pipeline."  *Id.* ¶¶ 128, 215, 240, 242, 306, 615, 706.  According to the Complaint, opium is grown by the Taliban in Afghanistan, *id.* ¶ 308; exported by al-Qaeda, the Haqqani Network, and D-Company, *id.*; smuggled into and through Iran with the help of General Gholamreza Baghbani of Iran's Islamic Revolutionary Guard Corps Qods Force, *id.* ¶

---

[7]     The term "value chain" is never explicitly defined in the Complaint, but it appears to refer to the causal chain linking Defendants' services to Plaintiffs' injuries.  *See, e.g.*, *id.* ¶ 210.

362; and ultimately winds up in the hands of the Russian mafia.[8]  *Id.* ¶ 306.  "Russian weapons,

explosives, and freshly laundered money" then "flow[] back to al-Qaeda and the Taliban," *id.*, in

what the Complaint styles as the "Syndicate-Russian Mafia Opium Joint Venture."  *Id.* ¶ 305.

Defendants only come in at the very end of this story, by allegedly helping to facilitate the

movement of the Russian mafia's "freshly laundered money."  *Id.* ¶ 306.

## LEGAL STANDARD

### A.  Motion to Dismiss for Failure to State a Claim

   "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.*  "When determining the

sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual

allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached

to the Complaint as an exhibit or incorporated in it by reference, to matters of which judicial

notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had

knowledge and relied on in bringing suit."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d

Cir. 1993); *see also Benny v. City of Long Beach*, No. 20-cv-1908, 2021 WL 4340789, at *7

(E.D.N.Y. Sept. 23, 2021).  While the Court must draw all reasonable inferences in favor of the

---

[8]    It is implied, but never stated, that the Russian mafia then turns the opium into heroin,
which it then presumably sells in Russia, Central Asia, and Europe.

non-moving party, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a plausible claim. *Iqbal*, 556 U.S. at 678.

**B.      JASTA/ATA**

JASTA was enacted in 2016 to amend Section 2333 of the ATA so that civil litigants would have "the broadest possible basis to seek relief against those who have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *Siegel*, 933 F.3d at 223 n.5 (internal quotation marks omitted); *see also Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020), *motion to certify appeal granted*, No. 19-cv-5394, 2020 WL 6700121 (E.D.N.Y. Nov. 13, 2020).  In pursuit of that goal, JASTA authorizes claims against institutions that, even if they did not directly violate the ATA, aided and abetted the violations of others who did so.  JASTA is explicit that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "provides the proper legal framework for how [aiding-and-abetting] liability should function in th[is] context."  JASTA § 2(a)(5).  As stated in *Halberstam*, these elements are:  "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must *knowingly* and *substantially* assist the principal violation."  705 F.2d at 477 (emphasis added).

**1.      "Act of International Terrorism" Element**

In the six years since JASTA was enacted, courts in this circuit have detailed what is needed to satisfy each *Halberstam* element in the context of a JASTA claim.  The first element

12

requires that plaintiffs be injured by "an act of international terrorism[9] committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization." 18 U.S.C. § 2333(d)(2).  FTOs are designated by the Secretary of State in accordance with the Immigration and Nationality Act.  *See* 8 U.S.C. § 1189; *Foreign Terrorist Organizations*, *supra* n.3.

### 2.  "General Awareness" Element

The second element requires that a defendant have been "generally aware that it was thereby playing a role in [the FTO's] violent or life-endangering activities."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (internal quotation marks omitted); *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021) ("The 'general awareness' element requires the defendant to be 'generally aware' of its role in 'an overall illegal or tortious activity at the time that [it] provides the assistance.'") (quoting *Halberstam*, 705 F.2d at 477).  To be "generally aware," a defendant "need not know of or intend to bring about the specific attacks at issue."  *Freeman v. HSBC Holdings PLC*, No. 18-cv-7359, 2021 WL 76925, at *5 (E.D.N.Y. Jan. 7, 2021).  Nor do the attacks at issue need to have been committed, planned, or authorized by a defendant's direct customer.  *See Honickman*, 6 F.4th at 499 n.15.  Instead, what is required is that a defendant's customer or the services they are providing be "*so closely intertwined* with [the FTO's] violent terrorist activities that one can reasonably infer that [a defendant] was

---

[9]       An Act of "international terrorism" under the ATA "means activities that—(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State . . . ; (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States." 18 U.S.C. § 2331(1). JASTA incorporates § 2331(1)'s definition of "international terrorism." 18 U.S.C. § 2333(d)(2).

generally aware [that] while it was providing . . . services to those entities that it was playing a role in unlawful activities from which [the FTO's] attacks were foreseeable." *Id.* at 499 (emphasis added). The scienter requirement for aiding and abetting is higher than "the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Linde*, 882 F.3d at 329–30; *see also Siegel*, 933 F.3d at 224; *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 229 (E.D.N.Y. 2020), *reconsideration denied*, No. 18-cv-7359, 2020 WL 4481944 (E.D.N.Y. Aug. 4, 2020).

Plaintiffs insist that *Honickman* establishes a "general awareness" standard that is less stringent than this, and that general awareness can be sufficiently established if a plaintiff plausibly alleges "the defendant was generally aware of its role in an 'overall illegal activity' that foreseeably risked *terrorism*."[10] ECF No. 61 at 24. *See also*, ECF No. 58 at 14; ECF No. 59 at 20; ECF No. 60 at 10. The Court is not persuaded that *Honickman* did anything but restate the standard in *Siegel* and previous cases. *Honickman* is in fact explicit on this point: The question is not whether a defendant was generally aware of its role in illegal activity that foreseeably risked terrorism *in general*, but whether defendant was aware of its role in "overall illegal activity from which *the act that caused the plaintiff's injury* was foreseeable." *Honickman*, 6 F.4th at 496 (emphasis added).

---

[10]     Specifically, Plaintiffs argue that the fact that a defendant's support "occurred several years before the attacks in this case . . . may have been relevant to general awareness before *Honickman*, because courts frequently treated the question as whether the defendant was aware that it was playing a role in terrorist acts. But after *Honickman*, the question is whether the defendant was generally aware of its role in an 'overall illegal activity' that foreseeably risked terrorism." *Id.*

It is not enough for a defendant to be aware "of the organization's connection to terrorism." *Linde*, 882 F.3d at 330; *see also Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019) (concluding that evidence that a bank knowingly provided financial services to a FTO alone is insufficient to satisfy JASTA's scienter requirement). Nor is it sufficient for a defendant to be aware it is providing services which violate financial regulations. *See Siegel*, 933 F.3d at 225–26 (holding that plaintiff's allegations that defendant-bank helped an organization known to support FTOs to violate financial regulations, was an "insufficient basis for liability under JASTA because the plaintiffs have failed to allege that [the defendant] knowingly assumed a role in [the FTO's] terrorist activities"). Nor is it even sufficient for a defendant to knowingly violate laws which were designed to prevent terrorist activity. *See Freeman*, 465 F. Supp. 3d at 230 ("[I]t is not enough for a defendant-bank to be aware that its conduct violates the law—even one intended to prevent terrorism—or that the organization or entity to which it is providing financial services supports terrorist organizations; the bank must be aware that through its own conduct, whether legal or illegal, it is assuming a role in actual terrorist activity."). *See also O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2020 WL 906153, at *6 (S.D.N.Y. Feb. 25, 2020) ("[A]llegations that Defendants knowingly violated laws that were designed principally to prevent terrorist activity do not allege plausibly a general awareness that Defendants had assumed a role in a [FTO's] *act* of international terrorism.") (emphasis in original). Rather, there must be a sufficient nexus between the services the defendant provided and the terrorist acts ultimately committed, planned, or authorized by the FTO that would support the plausible inference the defendant was generally aware it played a role in those acts.

### 3. "Substantial Assistance" Element

The third element requires a defendant to have *knowingly* and *substantially* assisted the principal act of international terrorism. "As a threshold matter, . . . [the] substantial assistance element requires that [defendant's] assistance be *knowing*." *Honickman for Est. of Goldstein v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 268 (E.D.N.Y. 2020) (emphasis in original), *aff'd sub nom.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). The "knowledge component 'is designed to avoid' imposing liability on 'innocent, incidental participants.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (quoting *Halberstam*, 705 F.2d at 485 n.14). Whether a defendant has actual knowledge that it is substantially assisting a FTO is intertwined with the general awareness element. *Honickman*, 6 F.4th at 499–500 (satisfying the "knowledge component" in the third element does not "require [a defendant] to 'know' anything more about [a principal's] unlawful activities than what she knew for the general awareness element"). Innocent or inadvertent assistance is insufficient. *Kaplan*, 999 F.3d at 864.

Because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987), "a complaint is allowed to contain general allegations as to a defendant's knowledge." *Kaplan*, 999 F.3d at 864. At the same time, plaintiffs cannot simply make conclusory statements, but must include "allegations of the facts or events they claim give rise to an inference of knowledge." *Id.*

In determining whether a plaintiff has adequately pled that a defendant has provided "substantial assistance," courts weigh six factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483–84).

16

### a.    Nature of the Act

Assessing the first factor, "the nature of the act encouraged," involves examining "whether the alleged aid . . . would be important to the nature of the injury-causing act," in the same way that verbal encouragement of "physical acts of violence" may be important to a principal's commission of battery.  *Honickman*, 6 F.4th at 500 n.17 (citing *Halberstam*, 705 F.2d at 484).

### b.    Amount of Assistance

The second factor, "the amount of assistance," involves examining whether plaintiffs pled "factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO."  *Honickman*, 6 F.4th at 500 (citing *Kaplan*, 999 F.3d at 866).  In determining whether such an inference can be made, "[t]he inquiry should focus on the amount and type of aid the defendant provided."  *Id.*

### c.    Presence or Absence

The third factor, a defendant's "presence or absence" at the time of the attacks, is self-explanatory; it is rarely the dispositive factor, as plaintiffs rarely allege defendants were present at the time of the attacks.  *See, e.g.*, *Honickman*, 432 F. Supp. 3d at 269 ("[Defendant] was not 'present' during the time of the attacks"); *Siegel*, 933 F.3d at 225 ("[A]s the plaintiffs themselves allege, [defendant] was not 'present' at the time of the . . . [a]ttacks.").  However, courts do sometimes examine whether a defendant's assistance was ongoing at the time the attacks occurred.  *Siegel*, 933 F.3d at 225 (finding it crucial that defendant had ceased providing the assistance at issue ten months before the attacks occurred).

### d. Relation to the Principal

The fourth factor, "defendant's relation to the principal," requires an evaluation of how attenuated the relationship is between the defendant and the FTO. "[A] direct relationship between the defendant and the FTO is not required to satisfy this factor," however, it also "should not be so attenuated." *Honickman*, 6 F.4th at 501 (citing *Siegel*, 933 F.3d at 220–21) (finding that the relationship between defendant and FTO was too attenuated).

### e. State of Mind

The fifth factor looks at whether a defendant's "state of mind" "involved an intent to finance or otherwise promote or carry out terrorist acts." *Freeman*, 465 F. Supp. 3d at 234. This factor, like the threshold requirement that a defendant's assistance is knowing, is also satisfied if a plaintiff satisfies the "general awareness" element. *See Siegel*, 933 F.3d at 225 (finding that this factor "[requires] plaintiffs [to] allege that [defendant] knowingly assumed a role in [the FTO's] terrorist activities or otherwise knowingly or intentionally supported [the FTO]").

### f. Duration

The sixth and final factor, "the period of defendant's assistance," looks at how long a defendant was providing the assistance at issue. While longer relationships may be more indicative of substantial assistance, "[a] lengthy relationship [does] . . . not necessarily [bespeak] . . . assistance in terrorism." *Freeman*, 465 F. Supp. 3d at 234 (finding "[a defendant's] 25 years of providing banking services" insufficient to establish assistance in terrorism).

18

## DISCUSSION

I.    **The Complaint Sufficiently Alleges FTOs Committed, Planned, or Authorized the Attacks Which Injured Plaintiffs**

As a threshold matter, Plaintiffs must plead that they were injured by "an act of international terrorism committed, planned, or authorized *by an organization that had been designated as a foreign terrorist organization*" at the time of the attacks.  18 U.S.C. § 2333(d)(2) (emphasis added).[11]

While the Complaint contains allegations of terrorist attacks on 156 Americans, not every attack was committed by the same set of actors.  Of the 156 injured Americans, 83 were injured by designated FTOs at the time of the attack, usually al-Qaeda, thus satisfying this threshold requirement.  However, many individuals were injured in the attacks "committed by the Taliban" alone,[12] Am. Compl. ¶¶ 1107–11, 1159–63, 1303–07, 1321–25, 1533–36, 1567–71, 1604–08, 1686–90, 1740–44, 1806–10, 1868–72, 1944–47, and a few were injured by the Haqqani

---

[11]    The first *Halberstam* element requires that Plaintiffs be (i) injured by an act of "international terrorism" which was (ii) committed by an FTO.  None of the Defendants challenge that Plaintiffs' injuries were caused by acts of "international terrorism."  The Court is also satisfied that Plaintiffs' injuries were caused by acts of international terrorism—the injuries are alleged to have been caused by "violent acts . . . [in] violation of the criminal laws of the United States" that appear "intended . . . to intimidate or coerce a civilian population [or] influence" government policy and that "occur[ed] . . . outside the . . . United States."  18 U.S.C. § 2331(1).

[12]    The Complaint notes that "[u]nless Plaintiffs specifically indicate otherwise, Plaintiffs' references to 'the Taliban' . . . mean '*the Taliban (including its Haqqani Network)*,'" as the "Haqqani Network and the Taliban are inseparable."  Am. Compl. ¶ 89 n.9 (emphasis added).  The Court cannot treat them as "inseparable" as it pertains to this analysis, however, as the Secretary of State has listed the Haqqani Network as a FTO, as required by the ATA, but not the Taliban.  Fortunately, when Plaintiffs detail each of the attacks, they are explicit when the Haqqani Network was one of the groups who committed the attack.  Thus, for the attacks "committed by the Taliban," where the Haqqani Network is not listed, the Court will assume the attack was committed by the Taliban alone.

Network before it was labeled a FTO, *id.* ¶¶ 1873–77, 1954–58.[13]

Defendants argue that attacks committed by the Taliban alone, or the Haqqani Network before 2012, would not satisfy the threshold requirement of the ATA. ECF No. 44 at 5–6; ECF No. 48 at 5 n.4; ECF No. 52 at 17; ECF No. 54 at 5–6. Plaintiffs appear to recognize this deficiency and argue that while al-Qaeda did not *commit* all of the attacks, it "authorized and planned the Taliban's attacks on U.S. forces." Am. Compl. ¶ 364. The Second Circuit has not yet ruled on what it means to have "planned" or "authorized" a terrorist attack in this context, but the District of Columbia Circuit has in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022). There, the court found that, because the FTO at issue—Hezbollah—provided "weaponry, training, and knowledge" to the organization that carried out the attack—Jaysh al-Mahdi—it could be said that Hezbollah helped "plan" the attack. *Id.* at 218. In addition, the *Atchley* court found that "allegations that Hezbollah exerted religious, personal, and operational authority over Jaysh al-Mahdi show that it 'authorized' the attacks as well." *Id.* at 219.

The Court does not need to decide whether Plaintiffs have sufficiently alleged that a FTO committed, planned, or authorized the attacks, as it finds that the Complaint should be dismissed for failing to meet the other two *Halberstam* elements. However, the Court assumes, without deciding, for the purposes of this decision, that the District of Columbia Circuit correctly gave the terms "planned" and "authorized" the broadest possible reading, in recognition that Congress explicitly enacted JASTA to provide "civil litigants with the broadest possible basis . . . to seek relief." JASTA § 2(b), *see also Atchley*, 22 F. 4th at 215. Assuming that is the correct standard,

---

[13]    The Taliban has never been designated a FTO, and the Haqqani Network was not designated one until 2012. *See Foreign Terrorist Organizations*, U.S. Dep't State, https://www.state.gov/foreign-terrorist-organizations (last accessed December 29, 2022).

Plaintiffs have sufficiently alleged that al-Qaeda "planned" the attacks by, *inter alia*, designing and assembling the improvised explosive devices ("IEDs") used by the Taliban, Am. Compl. ¶¶ 381–96, and by running training camps for the Taliban in Pakistan and Afghanistan, *id.* ¶¶ 372–80. Plaintiffs also have sufficiently alleged that al-Qaeda "authorized" the attacks when they "issued a series of *fatwas* directed toward the Taliban, conferring religious permission for them to attack Americans in Afghanistan." *Id.* ¶¶ 365–71.

## II. The Complaint Fails to Allege Sufficiently that Deutsche Bank Either Had "General Awareness" or Provided "Substantial Assistance"

The Complaint does not plausibly allege that Deutsche Bank aided and abetted terrorist attacks in Afghanistan because it fails to plead sufficiently the "general awareness" or "substantial assistance" elements of a JASTA claim.

### A. General Awareness

Plaintiffs fail to establish plausibly that Deutsche Bank was "generally aware" it was aiding and abetting the principals responsible for the terrorist attacks allegedly linked to Deutsche Bank. *Id.* ¶¶ 736–837, 1098–2024.

#### i. Deutsche Bank's "Laundromats"[14]

The Complaint alleges that Deutsche Bank "helped its Syndicate customers raise, wash, and transfer tens of millions of U.S. Dollars through its Russian Laundromat and German Laundromat, [and] Deutsche Bank assumed an active operational role in al-Qaeda and its

---

[14] As alleged in the Complaint, a so-called "Laundromat" is a banking service that facilitates money laundering; here, Plaintiffs allege that Deutsche Bank's Laundromats helped FTOs and others convert rubles and other currencies into dollars. *Id.* ¶ 355. This would often be done via "mirror trades"—a type of transaction where bonds or shares are bought in one currency and sold in another, in effect converting assets from one currency into another. *Id.* ¶ 355 n.281.

Syndicate affiliates." *Id.* ¶ 362. The Complaint, however, alleges insufficient facts to establish that Deutsche Bank was generally aware of its role in the attacks at the time it allegedly provided its assistance. *See Conn. Nat'l Bank*, 808 F.2d at 962 (noting that to establish defendant's state of mind plaintiff must plead facts or events that give rise to an inference of knowledge). The Complaint attempts to establish general awareness by relying on public sources, many of which were published *after* the attacks at issue had occurred. *See, e.g.*, Am. Compl. ¶¶ 118 n.37, 212 n.89, 267 n.114, 367 n.209, 286 n.251, 294 nn.260–61, 368 n.289, 415 n.305, 453 nn.316–318, 485 n.319, 505 n.324, 507 n.327, 545 n.354 (a non-exclusive list of cited public sources which were published after the attacks had occurred). Public sources published *after* the attacks had occurred "do not plausibly support an inference that [a defendant] had the requisite general awareness *at the time* that it provided [the] banking services" at issue. *Honickman*, 6 F.4th at 501 (emphasis added); *cf. Kaplan*, 999 F.3d at 864 (finding that public statements satisfied the general awareness element where FTO at issue made public statements identifying the individuals the bank was providing services to as affiliates *prior* to the attacks which injured plaintiffs).

The Complaint implicitly concedes these deficiencies, but attempts to explain away this flaw by stating that "Plaintiffs believe discovery is likely to reveal that Khanani directly or indirectly aided the creation, operation, or refinement, of one or more of Deutsche Bank's Laundromats, including, but not limited to, the Bank's 'Russian Laundromat.'" Am. Compl. ¶ 356 n.283. However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. In other words, an assertion that Plaintiffs may be able to provide the necessary allegations after discovery is not sufficient to survive a motion to dismiss, the pleadings themselves must state a plausible claim. *Id.*; *see also,*

*e.g.*, *Pub. Free Will Corp. v. Verizon Commc'ns Inc.*, No. 15-cv-6354, 2017 WL 1047330, at *5

(E.D.N.Y. Mar. 17, 2017) (finding plaintiff's argument that it could "plead the two remaining

elements only after discovery" insufficient to survive a motion to dismiss).

      Looking only at the factual allegations in the Complaint, Plaintiffs have, at most, pled

that Deutsche Bank knowingly set up and ran Laundromats in Russia and Germany—in other

words, it was aware the services it provided were being used by other organizations to launder

money from potentially criminal activities. Setting up a Laundromat in itself, even if illegal, is

insufficient to establish Deutsche Bank's general awareness of its role in Syndicate terrorist

attacks in Afghanistan. For example, in *Freeman v. HSBC Holdings PLC*, a court in this district

held that allegations that a defendant was "aware that its conduct violates the law—even one

intended to prevent terrorism," was insufficient to plausibly plead "general awareness."

*Freeman*, 465 F. Supp. 3d at 230; *see also Siegel*, 933 F.3d at 225–26 (finding allegations that

defendant helped another bank violate "banking regulations despite knowing that [bank]

supported terrorist organizations" were insufficient to plead plausibly "general awareness");

*O'Sullivan*, 2020 WL 906153, at *6 (finding allegations that bank violated law designed

"principally to prevent terrorist activity" were insufficient to plead plausibly "general

awareness").

      Here, the Complaint alleges that "Deutsche[] [Bank's] embrace of a profits-at-any-price

approach [and] its extreme tolerance for risks" led Deutsche Bank to engage in "risky, complex

and *possibly* illegitimate forms of finance." Am. Compl. ¶¶ 366, 368, 371 (emphasis added). An

allegation of financial improprieties, absent factual allegations which would permit the Court to

infer Deutsche Bank was aware those improprieties were connected foreseeably to Syndicate

attacks in Afghanistan, is insufficient to establish plausibly JASTA's "general awareness" element.

The fact that the alleged Laundromat was established in Russia, which according to the Complaint is one of the most "notorious environments for financial crime in the world," does not change this analysis. *Id.* ¶ 214. The Complaint alleges Russia was a "global epicenter for money laundering on behalf of violent actors," including "organized crime" and "rogue states." *Id.* ¶¶ 212–13. It does not explain how, in such an ecosystem, Deutsche Bank would be able to differentiate services which, for example, supported organized crime in Latin America as opposed to supporting al-Qaeda in carrying out terrorist acts. *Id.* ¶¶ 212–13. Indisputably, having any role in this ecosystem is deplorable—but JASTA only provides for civil liability where a plaintiff can establish general awareness of a defendant's role in the specific terrorist attacks which caused her injury. *See Siegel*, 933 F.3d at 224 (the fact that defendant-bank's customer was financing terrorism did not satisfy the "general awareness" element for defendant because it was only a small piece of its customer's complex financial offerings).

### ii. Al Zarooni and Mazaka[15]

Plaintiffs further allege that Deutsche Bank was generally aware of the role its Laundromats played in financing FTO attacks in Afghanistan because some of the Laundromats' customers were affiliates of known FTOs. Am. Compl. ¶ 393 (alleging that Russian Laundromat transactions "were ordinarily routed through [Deutsche Bank] accounts held in the name of Al

---

[15] Given the overlapping nature of many of the allegations in the Complaint regarding Al Zarooni and Mazaka, this portion of the decision, while focused primarily on Deutsche Bank, will also address the Al Zarooni- and Mazaka-related allegations as to Standard Chartered, Am. Compl. ¶¶ 458–72, and Danske Bank, *id.* ¶¶ 534–45.

Zarooni, Mazaka, or other Khanani-related accounts,"[16] and that "Khanani, [acted] as al-Qaeda's, the Taliban's, and the Haqqani Network's agent"). *Id*. ¶¶ 471, 393.

As discussed earlier, a defendant does not need to have a direct relationship with the FTO that injured plaintiff to support a finding of general awareness by that defendant of its role in the FTO's violent activities. *Honickman*, 6 F.4th at 501 ("[A] direct relationship between the defendant and the FTO is not required."). For example, in *Kaplan*, the defendant-bank had banking relationships with individuals and entities who were not FTOs themselves, but were *contemporaneously known* to be "integral parts of" Hezbollah, the FTO that caused plaintiffs' injuries. *Kaplan*, 999 F.3d 862–63. There, the court found that because Hezbollah had released public statements claiming a relationship with the individual and entities who were customers of the defendant-bank, the fact that those customers were not FTOs themselves was not enough to defeat the "general awareness" element. *Id*. at 863–64. However, the relationship also cannot be "so attenuated" as to make an inference of general awareness implausible. *Honickman*, 6 F.4th at 501. In *Siegel*, for example, the defendant-bank had a business relationship with another bank, and that *other* bank had a relationship with *a number* of FTOs or FTO affiliates, including those that caused the plaintiffs' injuries. 933 F.3d at 220–21. The *Siegel* court found that relationship was too attenuated to establish general awareness. *Id.* at 224.

Here, Al Zarooni and Mazaka are simply too far removed from al-Qaeda or the Haqqani Network to give rise to an inference of general awareness on the part of Deutsche Bank. Al Zarooni and Mazaka were Dubai-based "front companies" that provided currency exchange

---

[16]     The Complaint never names any other Khanani-related entities that did business with Deutsche Bank. The Court thus focuses its analysis only on the two organizations named in the Complaint.

services.[17] Am. Compl. ¶¶ 460–62, 672. They were allegedly "controlled by" Khanani, but exactly how is unspecified. *Id.* ¶¶ 250, 540. Khanani controlled a number of other entities, eleven of which are mentioned by name in the Complaint,[18] *id.* ¶ 250, which he established in the 1990s "for the primary purpose of laundering the transnational organized crime profits, *mostly but not entirely* from opium," *id.* ¶ 248 (emphasis added). The Complaint refers to these organizations collectively as the Khanani Money Laundering Organization ("Khanani MLO").

A large portion of the Complaint is spent describing the Khanani MLO. *See, e.g.*, *id.* ¶¶ 7, 247–79. The Khanani MLO served a "narco-terrorist clientele," which included "Syndicate members, [as] collectively, . . . Khanani's largest group of clients." *Id.* ¶ 260. It does not say, however, that Syndicate members were even a majority of the clients served by the Khanani MLO. The Khanani MLO apparently worked through a "web of companies spanning the globe" where it did not "segregate terrorist customers' money but, instead, co-mingled the funds into one pot of money," including money from legitimate sources and perhaps legitimate clients. *Id.* ¶¶ 7, 275. It would then reinvest this pot of legitimate and illegitimate money into legal "commercial and real estate ventures" in order to "clean" the money. *Id.* ¶ 276.

Again, the Complaint is overflowing with details about the alleged connections between the Khanani MLO and the Syndicate, *id.* ¶¶ 7, 247–79, but then provides scant allegations that any of the Defendants, including Deutsche Bank, was contemporaneously aware of these

---

[17] The only specific actions the Complaint alleges Al Zarooni and Mazaka engaged in are "mirror trades," where bonds or shares are bought in one currency and sold in another. Am. Compl. ¶ 396.

[18] The Complaint only alleges that two of those entities, Al Zarooni and Mazaka, ever did any business with any of the Defendants.

connections.  *Id*. ¶¶ 764–89.  Specifically, the Complaint fails to allege that Defendants were aware of any connections between Al Zarooni or Mazaka and the Khanani MLO or the Syndicate during the period Defendants were providing them routine banking services.

First, the Complaint fails to provide factual allegations from which the Court could even infer that Defendants were contemporaneously aware that either company was controlled by Khanani.[19]  In their opposition, Plaintiffs dispute this contention.  They argue that the "complaint cites sources as early as 2001 identifying Khanani and his company as suspected terrorist money launderers."  ECF No. 59 at 24.  However, none of the public sources cited by Plaintiffs link Khanani to the two companies Defendants did business with—Al Zarooni or Mazaka.  *See* Am. Compl. ¶¶ 672–73, 683.  At best, they link Khanani to a completely different business, Khanani and Kalia International, which the Complaint does not link to Defendants.  *Id.* ¶ 672.  The Court cannot find an independent source linking Khanani to Al Zarooni until November 2015,[20] and Mazaka until October 2016.[21]  There are no factual allegations linking any Defendant to either organization after these respective dates.  The Complaint only provides one example of services provided by Deutsche Bank—"mirror trades and/or one-legged trades" made by Mazaka through

---

[19]     The Complaint is unclear as to what exactly Khanani's role was in the front companies mentioned in the Complaint.  At times they are referred to as "Khanani-related," *id*. ¶¶ 250, 278, 393, 471, 689, 1034, or "notoriously linked," *id*. ¶ 538, which does not necessarily imply ownership or control.  Other times they are referred to as explicitly controlled by Khanani.  *Id*. ¶¶ 682, 688.

[20]     U.S. DEPARTMENT OF THE TREASURY, Press Center, *Treasury Sanctions The Khanani Money Laundering Organization* (Nov. 12, 2015), https://home.treasury.gov/news/press-releases/jl0265 (last accessed December 29, 2022).

[21]     U.S. DEPARTMENT OF THE TREASURY, Press Center, *Treasury Sanctions Individuals and Entities as Members of the Altaf Khanani Money Laundering Organization* (Oct. 11, 2016), https://home.treasury.gov/news/press-releases/jl0574 (last accessed December 29, 2022).

its Deutsche Bank accounts between 2013 and 2014.  Am. Compl. ¶ 396.  These trades

concluded at least a year before any publicly available information linked Mazaka to Khanani.

However, even if Plaintiffs did plausibly plead that Defendants were aware of

connections between the Khanani MLO and Al Zarooni or Mazaka, which they have not, the

Court would still find that insufficient to establish that Defendants were "generally aware" of

their role in Syndicate attacks in Afghanistan.  This is because the Complaint itself concedes that

the Khanani MLO financially supported a myriad of organizations *in addition to* the FTOs which

caused Plaintiffs' injuries.  *Id.* ¶ 248.  Much like the defendant in *Siegel*—whose customer was

doing business with a FTO, but also with many other legitimate and illegitimate individuals and

entities at the same time, 933 F.3d at 224,—the complexity of the Khanani MLO does not permit

the Court reasonably to infer that any connection to this far-flung network satisfies the "general

awareness" element.  While the services provided by Defendants could have supported al-Qaeda

or the Haqqani Network, the Complaint concedes it could just as easily have supported "narco-

terrorists operating in Mexico, Colombia, and China,"  Am. Compl. ¶ 261, or legitimate business

ventures, *id.* ¶ 275–76.  Given the breadth of organizations and activities supported by the

Khanani MLO, as conceded in the Complaint, *see id.* ¶¶ 260–64, the Court cannot infer that Al

Zarooni or Mazaka were "so closely intertwined with [al-Qaeda or the Haqqani Network's]

violent terrorist activities that one can reasonably infer [Defendants were] . . . generally aware

while . . . [they were] providing banking services to those entities that . . . [they were] playing a

role in unlawful activities from which [Syndicate] attacks [in Afghanistan] were foreseeable."

*Honickman*, 6 F.4th at 499.

Plaintiffs attempt to get around this fatal deficiency in their pleading by arguing that it

"was obvious from the *geographies* of the banks upon which . . . [Al Zarooni or Mazaka] relied

to conduct the transaction" which transactions were connected to al-Qaeda and the Haqqani Network and which were not.  Am. Compl. ¶ 262 (emphasis added).  This is nothing more than rank speculation, since the wide range of geographies that the Complaint then specifies as suspicious—Afghanistan, Pakistan, the U.A.E., Russia, Estonia, Germany—makes this far from obvious.  *Id*. ¶¶ 205–45, 260.  For example, the Complaint points to "Germany as a hub for financial and logistical activities designed to facilitate terrorist attacks in the U.S., Europe, and the Middle East," despite the "commitment of the German government to anti-terrorism."  *Id*. ¶¶ 232 n.94, 232–38.  The Court cannot infer plausibly that Defendants were "generally aware" of their role in Syndicate attacks in Afghanistan simply because one of their customers transferred money from one of these countries to another or to the United States.  Over half a billion people live in these countries, and their combined GDP in 2020 was over five trillion dollars.[22]  The Court does not find it reasonable to label such a sizable portion of the global economy suspicious enough that doing business there would establish general knowledge of aiding and abetting terrorist attacks.

### iii.    Imran Yakub Ahmed

The Complaint alleges, "[o]n information and belief . . . that Deutsche Bank knowingly aided the transactions with Imran Yakub Ahmed and the Ahmed Cell that enabled the Syndicate's VAT Finance Scheme."  Am. Compl. ¶ 431.  It provides no additional detail linking Deutsche Bank to Ahmed.  This is simply not enough.  "[M]ere conclusory statements [of this sort], do not suffice" to state a plausible claim.  *Iqbal*, 556 U.S. at 678.

---

[22]    *See* U.S. CENTRAL INTELLIGENCE AGENCY, World Factbook, www.cia.gov/the-world-factbook (last accessed December 29, 2022).

### iv. Mamoun Darkazanli and Mamdoubh Mahmud Salim

The Complaint further alleges that Deutsche Bank provided banking services to Mamoun Darkazanli and Mamdoubh Mahmud Salim, who were "al-Qaeda supporters, operatives, and fundraisers who were each a member of al-Qaeda's notorious cell in Hamburg, Germany." Am. Compl. ¶ 435. Plaintiffs allege that Deutsche Bank provided banking services to these individuals "[f]rom 1995 through at least 2001." *Id.* ¶ 437. The Complaint lays out additional "financial transactions" by Darkazanli and Salim through "at least September 2003," but does not specify whether those transactions involved Deutsche Bank in any way. *Id.*

All of these transactions occurred over eight years before any of the alleged terrorist acts. Thus, there is no way that based on these allegations the Court can infer plausibly that Deutsche Bank was "generally aware of [its] role as part of an overall illegal or tortious activity *at the time that [it] provide[d] the assistance*." *Halberstam*, 705 F.2d at 477 (emphasis added). The gap in time is too wide to find that the terrorist acts that caused Plaintiffs' injuries were a foreseeable result of Deutsche Bank's alleged assistance nearly a decade earlier. *See Honickman*, 6 F.4th at 496 (finding that "[f]oreseeability is . . . central to the *Halberstam* framework").

### v. Samir Azizi

The Complaint also alleges that Deutsche Bank provided services to Samir Azizi, who conducted "large-scale VAT fraud" and repatriated that money back to FTOs like al-Qaeda. Am. Compl. ¶¶ 128, 288–94. He did this "by regularly purchasing mobile phones in the United States and then reexporting them to Afghanistan" "through Europe and Dubai." *Id.* ¶¶ 420–21. Along the way he would "seek a refund of the VAT that they falsely claimed to have paid in another country" for those cell phones, "causing governments to issue [VAT] refunds that they should not" have issued. *Id.* ¶ 282. Azizi then "use[d] global financial institutions to convert the Euros

obtained through the VAT fraud into USD . . . ; and (3) transfer the resulting USD back to [FTOs] to support attacks against Americans in Afghanistan." *Id*. ¶ 287.

Again, the Complaint alleges that Defendants Deutsche Bank and Standard Chartered were only involved tangentially in Azizi's VAT fraud. The Complaint alleges that from the "mid-2000s through 2015, Azizi used Deutsche Bank accounts . . . to enable the Syndicate's VAT Finance Scheme," and identifies specific transactions made by Azizi from 2007 to 2012, which allegedly show him transferring money to Syndicate "fronts, shell companies, operatives, agents, or business partners." [23] *Id.* ¶¶ 413, 417, 352. The Complaint does not provide any additional factual allegations that would permit the Court to infer that these transactions are connected to FTOs. In terms of services provided, the Complaint alleges that Azizi held

---

[23]     The Complaint does not provide any additional detail linking these transactions to FTOs. However, upon further examination, the companies listed appear to be the companies controlled or owned by Mr. Azizi himself, not separate organizations linked to al Qaeda or the Haqqani network. The information appears to be pulled from a working paper, which itself notes that any connection between Mr. Azizi's VAT fraud and terrorism are "not further supported by third-party evidence[,] rather . . . only by the sworn statement of the German prosecutor that in turn (allegedly) rests on facts not presented in court [referring to Mr. Azizi's 2015 extradition]." *See* Richard T. Ainsworth, *VAT Fraud and Terrorist Funding—The Azizi Extradition Allegations Part II*, Law & Economics Working Paper No. 15-29, at 1 (Sept. 24, 2015) https://www.bu.edu/law/files/2015/12/UpdatedAinsworthR09242015.pdf. As such, it is unclear exactly how the specific transactions made by Azizi from 2007 to 2012 which are referenced in the Complaint demonstrate his "total estimated transfers to al-Qaeda,." when the paper those transactions were pulled from belies this very assertion   Am. Compl. ¶ 417.
    The Court notes that although the working paper is not explicitly cited in the Complaint, it may still consider an extrinsic document "where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Here, Plaintiffs clearly relied heavily on Dr. Ainsworth's working paper, as the figures appear to be pulled directly from it. Thus, the Court finds that the working paper is sufficiently "integral to the complaint" and may be considered in determining the motions.

31

accounts at Deutsche Bank and made "trades" via those accounts, both seemingly routine banking services.[24]  *Id ¶* 417.

Once again, however, the Complaint does not allege sufficient facts permitting the reasonable inference that Deutsche Bank was aware that Azizi was connected to international terror at the time it provided him with routine banking services.  The earliest public source linking Azizi to the Syndicate appears to be his 2015 arrest and extradition.  *Id*. ¶¶ 291–92.  The Complaint does not allege that Deutsche Bank (or Standard Chartered for that matter) provided services after that date.  The Complaint does cite a number of earlier public sources discussing the possible connections between VAT fraud and terror financing, in general, but none that identifies Azizi as a perpetrator.  *See, e.g.*, *id*. ¶¶ 280–86.

That Azizi was using the supposed sale of cell phones as a means of perpetrating VAT fraud does not change this analysis.[25]  For one, while cell phones can be used to provide "operational advantages for terrorists," *id.* ¶ 420, they have a wide variety of other non-nefarious uses.  Even more to the point, the Complaint does not allege that either Deutsche Bank or Standard Chartered was involved in, or aware of, these cell phone purchases.  Rather, it merely alleges that Azizi deposited the money that he made through VAT fraud in his Deutsche Bank and Standard Chartered accounts, transferred money to and from those accounts, and received

---

[24]  Plaintiffs argue "that knowingly providing services that benefit terrorist bombers can never be routine," noting that, "ordinary banking transactions often enabled Syndicate violence." ECF No. 61 at 23 n.5.  *See also* ECF No. 58 at 26; ECF No. 60 at 19.  The Court reads this allegation as a concession that the services themselves were largely similar or identical to the ordinary (*i.e.*, "routine") banking services provided to other customers.

[25]  Plaintiffs argue that "cell phone exports to Afghanistan were the definitive red flag of all red flags for suspected VAT fraud-related transactions because cell phones purchased in the United States . . . provide enormous operational advantages for terrorists."  Am. Compl. ¶ 420.

financial advice regarding how to invest the money in those accounts. *Id.* ¶¶ 413–14, 476–77. Plaintiffs plead no facts which would permit the Court to infer that either Deutsche Bank or Standard Chartered was aware of its role in Azizi's "cell phone pipeline," let alone that Defendants were "generally aware" of their role in al-Qaeda or the Haqqani Network's terror attacks in Afghanistan.

> ### vi. National Iranian Oil Company ("NIOC") and the National Iranian Tanker Company ("NITC")

The Complaint alleges that Deutsche Bank and Standard Chartered, *see infra*, Section III.A.v, provided banking services to NIOC and NITC. According to the Complaint, these are government-owned Iranian companies that allegedly "have been led by an agent or cut-out for the IRGC, including its Hezbollah Division and Qods Force, and [have] served as a central hub of Hezbollah and Qods Force fundraising and logistics, which value has flowed through to al-Qaeda and the Taliban, including its Haqqani Network, to facilitate attacks against Americans in Iraq," Am. Compl. ¶ 341, and Afghanistan, *id.* ¶ 345.

Despite devoting ten pages of the Complaint to describing the connections between Iran, al-Qaeda, and the Taliban, *id.* ¶¶ 318–45, Plaintiffs only devote three short paragraphs attempting to connect, in wholly conclusory fashion, NIOC or NITC to Deutsche Bank. *Id.* ¶¶ 432–34. Plaintiffs allege that "[Standard Chartered and Deutsche Bank][26] knew that NIOC and NITC served as a front for Iranian terrorism through the IRGC's Hezbollah Division and Qods Force" and that each "caused tens of millions in U.S. Dollars each year to flow through illicit transactions with NIOC and NITC, into Hezbollah and Qods Force accounts, which funded al-

---

[26]     The Complaint alleges that Deutsche Bank "regularly facilitated NIOC and NITC transactions in the same manner as the [Standard Chartered] Defendants." Am. Compl. ¶ 432.

Qaeda's and the Taliban's terrorist campaign against Americans in Afghanistan." *Id.* ¶¶ 433–34 (as to Deutsche Bank); *id.* ¶ 489 (as to Standard Chartered).

Plaintiffs, however, provide no factual allegations supporting these bald conclusory statements that Defendants knew of the nexus between NIOC and NITC and the terrorist acts alleged in the Complaint. Again, "mere conclusory statements[] do not suffice" to state a plausible claim that Deutsche Bank (or Standard Chartered) was "generally aware" of the alleged role NIOC and NITC played financing international terror. *See Iqbal*, 556 U.S. at 678.

**B.     Substantial Assistance**

Beyond not establishing "general awareness," Plaintiffs have also failed to show that Deutsche Bank provided "substantial assistance" under the six *Halberstam* factors, which the Court analyzes as follows:

i.   **Nature of the act encouraged**. The Complaint alleges that Deutsche Bank provided a lax regulatory environment which facilitated money laundering and VAT fraud, ultimately allowing money to flow to FTOs. While "[f]inancial support is 'indisputably important' to the operation of a terrorist organization," the allegations here are too vague, and connection between the alleged support and the terrorist attacks at issue is too attenuated, to support a finding of substantial assistance. *Gonzalez v. Google LLC*, 2 F.4th 871, 905 (9th Cir. 2021) (quoting *Halberstam*, 705 F.2d at 488).

ii.  **Amount and kind of assistance**. The Complaint alleges that $59,326,477 flowed from Deutsche Bank. Am. Compl. ¶ 352. Of this amount, $49,787,832 involved trades made by Mazaka "between 2013 and 2014." *Id.* ¶ 396. An estimated $8.7

million involved transfers made by Azizi.[27]  *Id.* ¶¶ 416–17.  Finally, the Complaint

alleges $970,585 worth of "transactions" made by Darkazanli and Salim.[28]  *Id.* ¶ 439.

However, the Complaint does not allege any facts that would allow the Court to infer

that the alleged nexus between these banking services and the terrorist activity is

plausible.  The Complaint does not give any concrete values for any of the other

named organizations or individuals, is vague and imprecise about exactly what

services were provided, and the only specific examples provided appear to be routine,

arms-length financial transactions.  The Complaint, therefore, does not "permit a

reasonable inference that the defendant recognized the money it transferred to its

customers would be received by the FTO," *Honickman*, 6 F.4th at 500, and thus does

not support a finding of substantial assistance.

    iii.  **Presence at the time of the tortious conduct**.  The Complaint does not allege

        Deutsche Bank was "present" at the time of the attacks.  This factor does not support

        a finding of substantial assistance.

    iv.  **Relationship.**  In terms of named organizations, the Complaint alleges Deutsche

        Bank provided financial services, possibly even financial services which helped

        facilitate money laundering, to Al Zarooni, Mazaka, Ahmed, Darkazanli, Salim, and

        Azizi.  The Complaint is not clear what services were provided to NIOC and NITC, if

---

[27]  The Complaint is not clear how Deutsche Bank was involved in these transactions, but
the Court assumes that they were trades made through Azizi's Deutsche Bank accounts.

[28]  The Complaint does allege additional transactions, *see, e.g.*, *id.* ¶ 434 ("Deutsche Bank . .
. caused tens of millions in U.S. Dollars each year to flow through illicit transactions with NIOC
and NITC . . . ."), but the Court finds that allegation too vague and unspecific to support a
finding of substantial assistance.

any.  For the same reasons these relationships, as discussed above, are too attenuated to give rise to an inference of general awareness they are also too attenuated to support a finding of substantial assistance.

v. **State of mind**.  Because there is insufficient evidence that Deutsche Bank acted with general awareness that it supported terrorist acts, *see supra* Section II.A, this factor does not support a finding of substantial assistance.

vi. **Duration.**  The Complaint provides conclusory allegations that Deutsche Bank provided services to "Khanani" for eight years, from 2008 to 2016, and Azizi for five years, from 2007 to 2012.  Am. Compl. ¶¶ 392–93.  It broadly alleges Deutsche Bank provided services to the other named organizations or individuals during the Relevant Period, but does not provide any allegations that would permit the Court to make this inference.  The Court, therefore, does not find these allegations are enough to support a finding of substantial assistance.  *See Freeman*, 465 F. Supp. 3d at 235 (finding 25 years of providing banking services inadequate to support a finding of "substantial assistance").

Therefore, taking all the factors into account, the Court find that on balance the Complaint insufficiently alleges that Deutsche Bank provided "substantial assistance" under the six *Halberstam* factors.

*        *        *

Because Plaintiffs fail to allege plausibly the "general awareness" or "substantial assistance" elements against Deutsche Bank, the Complaint as to Deutsche Bank is dismissed.

36

III.     **The Complaint Fails to Allege Sufficiently that Standard Chartered Either Had "General Awareness" or Provided "Substantial Assistance"**

Plaintiffs' Complaint does not plausibly allege that Standard Chartered aided and abetted terrorist attacks in Afghanistan because it fails to plead sufficiently the "general awareness" or "substantial assistance" elements of a JASTA claim. *Id.* ¶¶ 839–920.

A.     **General Awareness**

Plaintiffs fail to establish plausibly that Standard Chartered was "generally aware" it was aiding and abetting the principals responsible for the terrorist attacks allegedly linked to Standard Chartered. *Id.* ¶¶ 868–920, 1098–2024.

i.     **Standard Chartered's "Laundromats"**

With respect to the so-called Laundromats, the Complaint alleges that "Standard Chartered Bank operated as a Laundromat that willingly serviced terrorist financiers." *Id.* ¶ 450. As with Defendant Deutsche Bank, *see supra* Section II.A.i, conclusory allegations that Standard Chartered was operating a Laundromat, Am. Compl. ¶¶ 447–57, are insufficient to permit the Court to infer that Standard Chartered was generally aware of the role it was playing in financing terrorism in Afghanistan.

Plaintiffs provide no additional factual allegations that would allow the Court to make a different inference. In fact, the Complaint provides far fewer details about Standard Chartered's alleged Laundromat than it does for other Defendants.   Rather than alleging specific violations that could be connected to the terrorist attacks at issue here, it alludes to a much broader set of "violations of U.S. counter-terrorist finance laws, regulations, and norms." *Id.* ¶ 447.  Rather than providing specific evidence, it cites to a plethora of public sources, some of which were published *after* the Relevant Period, and none of which linked Standard Chartered to FTO or

FTO affiliates. *Id.* ¶¶ 451–52. While the sources cited certainly establish that Standard Chartered has violated financial regulations in the past, such evidence is insufficient to allege plausibly that it was generally aware of its role in terrorist attacks in Afghanistan. *See Freeman*, 465 F. Supp. 3d at 230 ("[I]t is not enough for a defendant-bank to be aware that its conduct violates the law—even one intended to prevent terrorism—or that the organization or entity to which it is providing financial services supports terrorist organizations; the bank must be aware that through its own conduct, whether legal or illegal, it is assuming a role in actual terrorist activity.").

### ii.    Al Zarooni and Mazaka

The Complaint next alleges that "Standard Chartered Bank provided financial services to Khanani's companies, including Al Zarooni Exchange and Mazaka." *Id.* ¶ 458. Once again, for the reasons established for Deutsche Bank, *see supra* Section II.A.ii, the fact that Standard Chartered had a routine banking relationship with either of Khanani's alleged front companies—Al Zarooni or Mazaka—before 2016 is insufficient to infer plausibly that Standard Chartered was generally aware it was aiding and abetting terrorist attacks in Afghanistan.

Here, Plaintiffs do not plead any additional factual allegations from which it can plausibly be inferred that Standard Chartered had anything more than a routine banking relationship with Al Zarooni and Mazaka. At most, the Complaint alleges that Al Zarooni and Mazaka had accounts at Standard Chartered and used those accounts to "facilitate USD-denominated transactions," most likely mirror-trades. Am. Compl. ¶ 461.

The Court is not persuaded that general awareness is established by Plaintiffs' additional allegation regarding a senior compliance employee at Standard Chartered Bank, Dubai ("SCB Dubai Employee-1"). *Id.* ¶¶ 466–67. The Complaint claims that SCB Dubai Employee-1 was

aware by 2012 that "Standard Chartered Bank's relationship with Khanani[29] risked terrorism because the SCB Defendants' provision of financial services to Khanani did, in fact, fund Syndicate terrorists in Afghanistan and Pakistan through 2016," but provides no further factual support for this claim. *Id.* ¶ 467.

There are several issues with this claim. First, Standard Chartered Bank, Dubai ("SCB Dubai") is not one of the Standard Chartered Defendants, *see* ECF No. 10 (Voluntary Dismissal of SCB Dubai), and the Complaint does not explain what role, if any, SCB Dubai Employee-1 had in any of the named Standard Chartered Defendants. The Complaint does not elaborate how Employee-1 let SCB Dubai know of his or her conclusions, or whether anyone at SCB Dubai let the other Standard Chartered Defendants know. "While a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." *Stern v. State Univ. of N.Y.*, No. 16-cv-5588, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018) (quoting *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 645 (S.D.N.Y. 2018)). Even setting these deficiencies aside, claiming, without factual support, that an unnamed individual within an affiliate of the Standard Chartered Defendants named here was generally aware of the connections between Standard Chartered and terrorist attacks in Afghanistan is no less of a conclusory allegation than simply claiming Standard Chartered itself was aware. "[M]ere conclusory statements[] do not suffice," however, to state a plausible claim that Standard Chartered was "generally aware" of the role Al Zarooni

---

[29]     The Complaint does not specify whether this refers to a direct relationship with Khanani, a relationship with one of his front companies, or a relationship with one of his associates in the Khanani MLO.

or Mazaka played in financing international terror, let alone Standard Chartered's role in al-

Qaeda and the Haqqani Network's attacks in Afghanistan. *See Iqbal*, 556 U.S. at 678.

### iii.     Samir Azizi

For the same reasons established for Deutsche Bank, *see supra* Section II.A.v, allegations

that Standard Chartered provided routine banking services to alleged VAT fraudster Azizi before

his extradition in 2015 are insufficient to establish that Standard Chartered was generally aware

of the role it was playing in financing terrorism in Afghanistan.  Here, Plaintiffs provide no

details beyond what they alleged with regards to Deutsche Bank—that Azizi held accounts at

Standard Chartered before his arrest and received routine banking services.  As such, the

Complaint does not plead sufficient facts that would permit the Court to infer that Standard

Chartered was "generally aware" of its role in international terrorism when it did business with

Azizi.

### iv.     Hikmatullah Shadman

The Complaint further alleges that Standard Chartered provided banking services to

Hikmatullah Shadman, who was allegedly "a notorious Haqqani Network-aligned warlord in

Afghanistan."  Am. Compl. ¶ 480.  Plaintiffs allege that Shadman had Standard Chartered

accounts from "2008 through November 2012" when the U.S. seized his bank accounts for

aiding the Haqqani Network.  *Id*. ¶ 483.  Plaintiffs do not allege Standard Chartered provided any

services to Shadman after the U.S. initiated proceedings against him in 2012.

The Complaint also does not allege any facts from which it could be inferred that

Standard Chartered knew, prior to 2012, that Shadman was associated with the Haqqani

Network.  *Cf. Kaplan*, 999 F.3d at 862–63 (finding defendant-bank liable because FTO had

released public statements claiming a relationship with individual and entities who were

customers of defendant-bank before their attacks).  Without additional allegations, the Complaint

fails to allege that Standard Chartered was aware of any connections between Shadman and

terror attacks in Afghanistan during the period he maintained accounts at the bank.

### v.      NIOC and NITC

The Complaint additionally alleges that Standard Chartered provided banking services to

NIOC and NITC "in the same manner" as Deutsche Bank.  Am. Compl. ¶ 432.  It alleges no

additional facts specific to Standard Chartered.  The Court has already determined, *see supra*

Section II.A.vi, that these allegations are conclusory statements that are insufficient to establish

general awareness.  As already noted, "mere conclusory statements[] do not suffice" to state a

plausible claim that Standard Chartered was "generally aware" of the alleged role NIOC and

NITC played in financing international terror.  *See Iqbal*, 556 U.S. at 678.

### vi.      Mustafa Ahmed al-Hisawi, Abdul Baqi Bari, and Viktor Bout

The Complaint goes on to allege that Standard Chartered provided banking services to:

(i) Mustafa Ahmed al-Hisawi, "al-Qaeda's paymaster and key financial planner," Am. Compl. ¶

491; (ii) Abdul Baqi Bari, "the 'right hand' of Jalaluddin Haqqani," *id.* ¶ 500; and (iii) Viktor

Bout, a "notorious Russian arms dealer," *id.* ¶ 498.  These individuals are alleged to have done

business with Standard Chartered.  Bari and al-Hisawi maintained bank accounts at Standard

Chartered.  *Id.* ¶¶ 491–97, 500–04.  The nature of the business relationship with Bout is less

clear—the Complaint only alleges that Standard Chartered had a relationship with Bout, but the

exact nature of that relationship is not described.  *Id.* ¶¶ 498–99.  There are no allegations

suggesting that the services provided by Standard Chartered to any of these individuals were anything but routine banking services.

While the connection between these individuals and the FTOs is clearer than for many of the other named individuals in the Complaint, Standard Chartered points out that it "ceased doing business with these three individuals years before the attacks." ECF No. 65 at 4 (emphasis omitted). Plaintiffs do not dispute this point.[30] Thus, based on the allegations before the Court, there is no basis from which to infer that Standard Chartered was "generally aware of [its] role as part of an overall illegal or tortious activity *at the time that [it] provided the assistance*." *Halberstam*, 705 F.2d at 477 (emphasis added). The span of time between when Standard Chartered provided services to these three individuals[31] and the attacks at issue is too attenuated to allow for the inference that "the act[s] that caused the plaintiff[s'] injur[ies] w[ere] [a] foreseeable" result of that assistance. *Honickman*, 6 F.4th at 496.

### vii. Fatima Fertilizer Company Limited and Pakarab Fertilizers Limited

The Complaint further alleges that Standard Chartered provided "foreign exchange and export finance services," Am. Compl. ¶ 505, and "letters of credit," *id.* ¶¶ 1076, 1081—both routine banking services—to two fertilizer companies in Pakistan: Fatima and Pakarab. *Id.* ¶¶ 505–32. The Complaint asserts that Fatima considered Standard Chartered one of the "major

---

[30] Plaintiffs' only rebuttal is to insist that such a temporal connection is no longer necessary after *Honickman*. ECF No. 61 at 24. The Court has already explained why this is incorrect, *supra* Section B.2, when discussing the "General Awareness" element.

[31] The latest year that Plaintiffs allege Standard Chartered provided services to Hisawi is 2003, *id.* ¶ 496, Bout is 2008, *id.* ¶ 499, and Bari is 2006, *id.* ¶ 502. The earliest attack alleged in the Complaint occurred in 2011. *Id.* ¶ 1.

bankers of the company," but does not assert it was the only bank that did business with Fatima. *Id*. ¶ 526.

According to the Compliant, a small portion, around one percent, of calcium ammonium nitrate fertilizer produced by these companies was eventually used by FTOs, particularly the Haqqani Network, to build IEDs. *Id.* ¶ 515. IEDs made with fertilizer, some of which were made with fertilizer sold by Fatima and Pakrarab, were in turn used to cause grievous injuries, including in "nearly every IED and suicide bomb attack in this case." *Id*. ¶ 403.

While Plaintiffs have drawn a line from the fertilizer produced by Fatima and Pakarab to IEDs used in Afghanistan, that by itself does not establish that Standard Chartered was generally aware of the role it was playing in terror attacks by providing routine banking services to those companies. Plaintiffs do not allege that Fatima and Pakarab directly supplied FTOs with fertilizer—they supplied fertilizer to Pakistani farmers and fertilizer dealers, some of which was eventually smuggled into Afghanistan to produce IEDs. *Id.* ¶¶ 513–14.

Plaintiffs' reliance on *Atchley*, 22 F.4th 204, as support for their assertion that they have pled a sufficient nexus between Standard Chartered and the terrorists acts they link to Fatima and Pakarab is unconvincing. In *Atchley*, "terrorist group Jaysh al-Mahdi . . . openly controlled Iraq's Ministry of Health . . . and used it as a vehicle for terrorist activity." 22 F.4th at 209. Despite that knowledge, "defendants, aware of Jaysh al-Mahdi's command of the Ministry, secured lucrative medical-supply contracts with the Ministry by giving corrupt payments and valuable gifts to Jaysh al-Mahdi." *Id*. Here, there is no allegation that either Fatima or Pakarab was "controlled" by a FTO, or that they did business directly with any FTO. Rather, what Plaintiffs allege is that a miniscule percentage of the otherwise legitimate product produced by Fatima and Pakarab was ultimately used by terrorists. Simply because a product of a company

43

receiving banking services from a defendant-bank can be used in terrorist activity is not enough to establish that the bank customer is "so closely intertwined with [the FTO's] violent terrorist activities that one can reasonably infer that [the defendant-bank] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [FTO] attacks were foreseeable." *Honickman*, 6 F.4th at 499 (citations and quotation marks omitted).

   This analysis does not change even if Standard Chartered was made aware of how Fatima and Pakarab's product was being misused. The Complaint alleges that in 2013 a senior U.S. military official informed Standard Chartered about how Fatima and Pakarab's product was being used by FTOs. Am. Compl. ¶¶ 529–30. However, even if Standard Chartered was made aware of the fact that a small portion of Fatima and Pakarab's products was being misused—not by Fatima and Pakarab, but by other individuals after it had been purchased—that in and of itself is insufficient to establish that Standard Chartered was generally aware of the role it was playing in terrorist activities. *See Siegel*, 933 F.3d at 224 (HSBC had "little reason to suspect that it was assuming a role in [al-Qaeda's] terrorist activities," because HSBC's customer was a legitimate business and was never publicly identified as a terrorist affiliate to al-Qaeda); *Honickman*, 432 F. Supp. 3d at 268 (allegations showing defendant might have known about a possible nexus between its customer and the FTO that caused plaintiffs' injuries insufficient to establish general awareness). Fertilizer may be a key material component of terrorist attacks, but that does not mean that providing routine banking services to fertilizer companies necessarily establishes that Standard Chartered was generally aware of the role it was playing in those terrorist attacks.

**B.**     **Substantial Assistance**

As with Deutsche Bank, Plaintiffs have also failed to show that Standard Chartered provided "substantial assistance" under the six *Halberstam* factors, which the Court analyzes as follows:

i.   **Nature of the act encouraged**.  The Complaint alleges that Standard Chartered provided routine banking services to individuals and organizations that in turn helped transfer money to FTOs.  Am. Compl. ¶¶ 458–504.  While "[f]inancial support is 'indisputably important' to the operation of a terrorist organization," the allegations here are too vague, and the connection between the alleged support and the terrorist attacks at issue is too attenuated, to support a finding of substantial assistance. *Gonzalez*, 2 F.4th at 905 (quoting *Halberstam*, 705 F.2d at 488).

ii.  **Amount and kind of assistance**.  As noted earlier, the Complaint largely alleges that Standard Chartered provided routine banking services to individuals and organizations.  As to the amount of assistance, the Complaint alleges that Standard Chartered provided "more than $130,000,000" to FTOs.  Am. Compl. ¶ 446. However, the Complaint does not allege any facts that would allow the Court to infer that the alleged nexus between these banking services and the terrorist activity is plausible.  The only specific factual allegations involve transfers by Hisawi, all of which occurred years before the attacks that injured Plaintiffs.  *Id.* ¶¶ 493–95.  The Complaint, therefore, does not "permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO," *Honickman*, 6 F.4th at 500, and thus does not support a finding of substantial assistance.

45

iii. **Presence at the time of the tortious conduct**.  The Complaint does not allege Standard Chartered was "present" at the time of the attacks.  This factor does not support a finding of substantial assistance.

iv. **Relationship.**  The Complaint alleges that years before the attacks at issue, Standard Chartered had relationships with three individuals affiliated with FTOs—al-Hisawi, Bari, and Bout.  Am. Compl. ¶¶ 496, 499, 502.  These relationships are too temporally attenuated to the attacks at issue to support a finding of substantial assistance.  In addition, the Complaint alleges that Standard Chartered had routine banking relationships with Al Zarooni, Mazaka, Fatima, Pakarab, Azizi, and Shadman.  *Id.* ¶¶ 458, 461, 505, 1076, 1081.  The Complaint fails to establish what services, if any, were provided to NIOC and NITC.  *Id.* ¶ 432.  For the same reasons these relationships are too attenuated to support a reasonable inference of general awareness, *see supra* Section III.A, they are also too attenuated to support a finding of substantial assistance.

v. **State of mind**.  Because there are insufficient allegations that Standard Chartered acted with general awareness that it supported terrorist acts, *see supra* Section III.A, this factor does not support a finding of substantial assistance.

vi. **Duration.**  The Complaint alleges specific multi-year relationships with Hisawi, Bout, and Bari—although these relationships all ended years before the attacks that injured Plaintiffs.  Am. Compl. ¶ 446.  The Complaint further alleges that Shadman held an account at Standard Chartered for four years, only one of which overlapped with the Relevant Period.  *Id.* ¶ 481.  The Complaint alleges a six-year banking relationship with Fatima and Pakarab, three of which overlapped with the Relevant

46

Period. *Id.* ¶ 446. The Complaint only provides vague and conclusory allegations as to the duration of the relationships with Al Zarooni, Mazaka, Azizi, NIOC and NITC. *Id*. The Court finds this factor, at best, weakly supports this element.

Taking all the factors into account, the Court finds that on balance the Complaint insufficiently alleges that Standard Chartered provided "substantial assistance" under the six *Halberstam* factors.

*       *       *

Because Plaintiffs fail to allege plausibly the "general awareness" or "substantial assistance" elements against Standard Chartered, the Complaint as to Standard Chartered is dismissed.

## IV.   The Complaint Fails to Allege Sufficiently that Danske Bank Either Had "General Awareness" or Provided "Substantial Assistance"

Plaintiffs' Complaint does not plausibly allege that Danske Bank aided and abetted terrorist attacks in Afghanistan because it fails to plead sufficiently the "general awareness" or "substantial assistance" elements of a JASTA claim.

### A.   General Awareness

Plaintiffs fail to establish plausibly that Danske Bank was "generally aware" it was aiding and abetting the principals responsible for the terrorist attacks allegedly linked to Danske Bank. Am. Compl. ¶¶ 921–30, 1098–2024.

#### i.   Danske Bank's "Estonian Laundromat"

For the same reasons established for Deutsche Bank, *see supra* Section II.A.i, and Standard Chartered, *see supra* Section III.A.i, allegations that Danske Bank was operating a Laundromat in Estonia do not allege sufficient facts from which the Court can reasonably infer

that Danske Bank was generally aware of the role it was allegedly playing in financing terrorism in Afghanistan.

Here, Plaintiffs' additional factual allegations attempting to connect Danske Bank's so-called Estonian Laundromat to terror attacks in Afghanistan are insufficient to establish an inference of "general awareness."  The most specific allegation the Complaint provides is that "[a] customer of Danske Bank's Estonia branch, which purportedly had 'hidden owners,' exchanged millions with the Dubai-registered company Mazaka General Trading, an entity notoriously linked to Khanani."  Am. Compl. ¶ 538.  The Complaint further alleges that a German newspaper article noted that funds flowed into "[Mazaka's] account at Danske Bank," *id*. ¶ 540 (alteration in Complaint).[32]  As noted earlier when discussing the allegations made against Deutsche Bank and Standard Chartered, *see supra* Sections II.A.ii & III.A.ii, even if Danske Bank did have a direct relationship with Mazaka, that in and of itself does not support a plausible inference of "general awareness."  Here, the Complaint is not even clear whether Danske Bank had a direct relationship with Mazaka, let alone a FTO or even a FTO affiliate.

Danske Bank's recent guilty plea in a completely separate fraud case does not change this analysis.  While Danske Bank may have engaged in fraud, the Complaint has not established a nexus linking the fraud in that case to the terrorist acts which caused Plaintiffs' injuries in Afghanistan in this case.  Again, to "allege plausibly a general awareness that [a] Defendant[] . . . assumed a role in a [FTO's] *act* of international terrorism" requires more than merely showing that defendant knowingly violated other laws—even those designed to prevent terrorist activity.

---

[32]     Despite Plaintiff's edit, the article cited does not make it clear whether Mazaka was actually the owner of the Danske Bank account discussed in the article, or whether Mazaka was exchanging money with the Danske Bank account, but did not own it.  *Id*. ¶ 540

*O'Sullivan*, 2020 WL 906153, at *6 (emphasis in original); *see also Freeman*, 465 F. Supp. 3d at 230 (quoting *O'Sullivan*). The alleged connections between Danske Bank's services and the terror attacks in Afghanistan are far too attenuated to give rise to a plausible inference that Danske Bank had general awareness of the alleged role it was playing in international terrorism.

### ii. Swefin

For the same reasons discussed earlier with respect to Deutsche Bank and Standard Chartered, *see supra* Sections II.A.v & III.A.iii, allegations that Danske Bank provided routine banking services to individuals or organizations who committed VAT fraud are insufficient to establish that Danske Bank was generally aware of the role it allegedly played in financing terrorism in Afghanistan.

Here, Plaintiffs' factual allegations connecting Danske Bank to VAT fraudsters are insufficient to establish a plausible inference of "general awareness." The Complaint alleges that "Danske [Bank] set up an account for . . . *later convicted* VAT fraudsters" who were Swefin customers. Am. Compl. ¶ 547 (emphasis added). It does not specify, however, who those fraudsters are, making it impossible for the Court to determine how that relationship might have given rise to a general awareness connecting those individuals to terrorism. The Complaint does name one organization, "Danish-owned company Swefin," *id.* ¶ 548, "a payment platform" that "operated as a way . . . to hide their cash flows from the authorities," *id.* ¶ 550. The Complaint alleges the account was set up by an unnamed 23-year-old Lithuanian man who opened the account without ever visiting the bank. *Id.* ¶ 556. It further notes that these types of accounts are "diverted, *typically* through a series of shell companies, to fund terrorism," *id.* ¶ 559 (emphasis added); that "*[t]hese types* of VAT fraud schemes have been linked to terrorist finance," *id.* ¶ 558 (emphasis added); and that "VAT fraud *in Denmark* accounted for approximately $12

million in terrorist finance," *id.* ¶ 560 (emphasis added). The Complaint, however, fails to allege any specific connection between Swefin's Danske Bank accounts and terrorist financing. Broadly alleging that this *type* of activity, even if questionable or illegal, has been linked to terrorist financing in the past does not give rise to a plausible inference that Danske Bank was generally aware of any links to terrorist financing here.

### B. Substantial Assistance

Once again, Plaintiffs have also failed to show that Danske Bank provided "substantial assistance" under the six *Halberstam* factors, which the Court analyzes as follows:

i. **Nature of the act encouraged**. The Complaint alleges that Danske Bank provided a lax regulatory environment that facilitated money laundering and VAT fraud, ultimately allowing money to flow to FTOs. *Id.* ¶¶ 543–45. While "[f]inancial support is 'indisputably important' to the operation of a terrorist organization," the allegations here are too vague, and the connection between the alleged support and the terrorist attacks at issue is too attenuated, to support a finding of substantial assistance. *Gonzalez*, 2 F.4th at 905 (quoting *Halberstam*, 705 F.2d at 488).

ii. **Amount and kind of assistance**. The Complaint does not allege how much money, if any, actually flowed from Danske Bank to international terrorism. The Complaint does allege that "the Khanani MLO obtained more than $700,000 through Danske [Bank]'s Global Laundromat." Am. Compl. ¶ 539. However, as discussed *supra* Section IV.A, even if this is true, given that the Khanani MLO funneled money to a wide variety of criminal organizations, Am. Compl. ¶¶ 261–65, the allegation is insufficient to permit the Court to determine even an approximate estimate of how much of that money, if any, supported terror attacks in Afghanistan. The Complaint,

therefore, does not "permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO," *Honickman*, 6 F.4th at 500, and thus does not support a finding of substantial assistance.

iii. **Presence at the time of the tortious conduct**. The Complaint does not allege Danske Bank was "present" at the time of the attacks. This factor does not support a finding of substantial assistance.

iv. **Relationship.** In terms of named organizations, the Complaint alleges routine banking relationships with 1) either the alleged Khanani front company Mazaka or a company that did business with Mazaka, and 2) Swefin, a payment platform that, at most, engaged in the types of transactions from which money may have eventually flowed to FTOs. Am. Compl. ¶¶ 540, 548. For the same reasons these relationships are too attenuated to give rise to an inference of general awareness, they are also too attenuated to support a finding of substantial assistance.

v. **State of mind**. Because there is insufficient evidence that Danske Bank acted with general awareness that it supported terrorist acts, *see supra* Section IV.A, this factor does not support a finding of substantial assistance.

vi. **Duration.** Because the Complaint is too vague on the question of which organizations Danske Bank did business with as part of its so-called Estonian Laundromat, it is impossible for the Court to determine the duration of those relationships. The Complaint only specifies that Danske Bank had a relationship with Mazaka, or a company doing business with Mazaka, for four months in 2014. Am. Compl. ¶ 540. All the specific allegations referring to Swefin all took place in 2009 and 2010. *Id.* ¶¶ 546, 548–49, 553. The Court does not find these periods of time

sufficient to support a finding of substantial assistance. *See Freeman*, 465 F. Supp. 3d at 234.

Taking all the factors into account, the Court finds that on balance the Complaint insufficiently alleges that Danske Bank provided "substantial assistance" under the six *Halberstam* factors.

*      *      *

Because Plaintiffs fail to allege plausibly the "general awareness" or "substantial assistance" factors against Danske Bank, the Complaint as to Danske Bank is dismissed.

**V.    The Complaint Fails to Allege Sufficiently that Placid Express Either Had "General Awareness" or Provided "Substantial Assistance"**

The Complaint does not plausibly allege that Placid Express aided and abetted terrorist attacks in Afghanistan because it fails to plead sufficiently the "general awareness" or "substantial assistance" elements of a JASTA claim.

**A.    General Awareness**

Plaintiffs fail to establish plausibly that Placid Express was "generally aware" it was aiding and abetting the principals responsible for the terrorist attacks allegedly linked to Placid Express. Am. Compl. ¶¶ 931–45, 1098–2024.

The claims against Placid Express relate to two named customers of the Defendant—Al Zarooni and Prince Currency Exchange Ltd.[33]  *Id.* ¶¶ 564–65.  Plaintiffs first allege, in

---

[33]    Plaintiffs also refer to a "partner company" of non-party Placid Express Middle East LLC, which "shares multiple phone numbers with a U.S.-sanctioned company directly owned by multiple Khanani family members." *Id.* ¶ 566.  The Complaint, however, does not specify what type of relationship this partner company had with Placid Express or any impropriety with regard to it.

52

conclusory fashion, that Al Zarooni "claimed a relationship" with Placid Express, but never directly allege that Defendant did any business with Al Zarooni. *Id.* ¶ 564. Once again, for the same reasons established for the previously discussed Defendants,[34] the fact that Placid Express had a routine business relationship with an alleged Khanani front company—Al Zarooni—before that company was publicly identified as an affiliate of the Khanani MLO is insufficient to establish plausibly that Placid Express was "generally aware that it was thereby playing a role in [a FTO's] violent or life-endangering activities." *Linde*, 882 F.3d at 329 (internal quotation marks omitted).

Plaintiffs further allege that Prime Currency Exchange Ltd. ("Prime Currency"), another currency remitter that was owned and operated by Khanani's brother and then by another Khanani associate, had "an agency agreement with Placid Express." Am. Compl. ¶ 565. The Complaint provides no other allegations regarding this relationship and how it connects Placid Express to terrorist activity. Thus, the Complaint has pled insufficient facts to establish plausibly that Placid Express was generally aware of any connections between Prime Currency and terrorist attacks in Afghanistan.

### B. Substantial Assistance

Once again, as with the other Defendants, Plaintiffs have also failed to establish that Placid Express provided "substantial assistance" under the six *Halberstam* factors, which the Court analyzes as follows:

---

[34]    *See* Deutsche Bank, *supra* Section II.A.i; Standard Chartered, supra Section III.A.i; Danske Bank, supra Section IV.A.i.

i. **Nature of the act encouraged**. It is unclear from the Complaint what amount and type of aid Placid Express provided to Al Zarooni, as Plaintiffs only allege that Al Zarooni claimed a relationship with Placid Express, not what that relationship was. *Id*. ¶ 565. This allegation is too vague to support a finding of substantial assistance. Regarding Prime Currency, the Complaint only appears to allege that Placid Express provided it with standard remitting services, the same as it would have provided to any other customer. *Id.* ¶ 565. While "[f]inancial support is 'indisputably important' to the operation of a terrorist organization," the allegations here are too vague, and the connection between the alleged support and the terrorist attacks at issue is too attenuated, to support a finding of substantial assistance. *Gonzalez*, 2 F.4th at 905 (quoting *Halberstam*, 705 F.2d at 488).

ii. **Amount and kind of assistance**. The Complaint does not specify how much money was allegedly remitted. Rather, it merely states that Prime Currency "remitted over $100 million to Pakistan using Placid Express *and other unnamed money changers* between 2009 and 2013." Am. Compl. ¶ 565 (emphasis added). It is unclear how much of that alleged amount was actually remitted by Placid Express. The Complaint, therefore, does not "permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO," *Honickman*, 6 F.4th at 500, and thus does not support a finding of substantial assistance.

iii. **Presence at the time of the tortious conduct**. The Complaint does not allege Placid Express was "present" at the time of the attacks. This factor does not support a finding of substantial assistance.

54

iv. **Relationship.** The closest relationship that the Complaint alleges between Placid Express and the principal FTO is a business relationship with Al Zarooni and Prime Currency, two alleged Khanani front companies. As discussed previously, this is simply too attenuated to support a finding of substantial assistance. *See supra* Sections II.A.ii, III.A.ii, IV.A.

v. **State of mind**. Because there is insufficient evidence that Placid Express acted with general awareness that it supported terrorist acts, *see supra* Section V.A, this factor does not support a finding of substantial assistance.

vi. **Duration.** Because the Complaint is unclear exactly what relationship Placid Express had with Al Zarooni, it is impossible for the Court to determine the duration of that unspecified relationship. This factor, therefore, does not support a finding of substantial assistance as to Al Zarooni. The Complaint does allege that Placid Express had a four-year, standard remitter relationship with Prime Currency "between 2009 and 2013." Am. Compl. ¶ 565. Only two of these years overlap with the Relevant Period, which the Court does not find is sufficient to support a finding of substantial assistance. *See Siegel*, 933 F.3d at 225 (finding a 25-year relationship insufficient).

Taking all the factors into account, the Court finds that on balance the Complaint insufficiently alleges that Placid Express provided "substantial assistance" under the six *Halberstam* factors.

\*      \*      \*

55

Because the Complaint fails to allege plausibly the "general awareness" or "substantial assistance" factors against Placid Express, the Complaint as to Placid Express is dismissed. [35]

## VI. The Complaint Fails to Allege Sufficiently that Wall Street Exchange Either Had "General Awareness" or Provided "Substantial Assistance"

The Complaint does not plausibly allege that Wall Street Exchange aided and abetted terrorist attacks in Afghanistan because it fails to plead sufficiently the "general awareness" or "substantial assistance" elements of a JASTA claim.

### A. General Awareness

Plaintiffs fail to establish plausibly that Wall Street Exchange was "generally aware" it was aiding and abetting the principals responsible for the terrorist attacks allegedly linked to Wall Street Exchange. Am. Compl. ¶¶ 572–90, 946–63.

The Complaint claims "[o]n information and belief" that Wall Street Exchange was "launder[ing] money for Khanani and Khanani's money-laundering organization." *Id*. ¶ 948. However, it provides just one concrete example of how Wall Street Exchange knew it was "allowing the Khanani MLO to transfer and wash U.S. Dollars for the Syndicate's benefit." *Id*. ¶ 582. Specifically, it alleges that Canadian authorities "found evidence of international wire transfers via Wall Street Exchange" in the home of Farzam Mehdizadeh, who the Complaint alleges was a "Canadian agent of Khanani" charged with money laundering in 2017. *Id*. ¶ 947. There is no allegation that these wire transfers were anything but routine business transactions

---

[35]     Once again, Plaintiffs attempt to get around these deficiencies by arguing that "[d]iscovery will likely reveal significant additional relationships between Placid Express and Khanani, the Khanani MLO, and the Syndicate.'" Am. Compl. ¶ 571. As the Court has already noted, an assertion that Plaintiffs may be able to provide the necessary allegations after discovery is not a sufficient basis to survive a motion to dismiss, the pleadings themselves must state a plausible claim. *Iqbal*, 556 U.S. at 678–79; *Pub. Free Will*, 2017 WL 1047330, at *5.

between Mehdizadeh and Wall Street Exchange, a currency remitter that handles 1.5 million similar transactions each year. ECF No. 79 at 2.

All of the transactions were alleged to have occurred prior to Mehdizadeh's 2016 arrest. Am. Compl. ¶¶ 947–48. The Complaint does not allege how many wire transfers Mehdizadeh made via Wall Street Exchange or provide even an approximate dollar value of how much money was exchanged. The Complaint also does not allege that Mehdizadeh made any wire transfers through Wall Street Exchange after his arrest, nor does it allege any facts from which the Court could infer that Wall Street Exchange knew, prior to his 2016 arrest, "that Mehdiz[a]deh was laundering money . . . for Khanani and the Khanani MLO." Id. ¶ 949. The Complaint therefore does not plead sufficient facts to permit a reasonable inference that Wall Street Exchange was aware that Mehdizadeh was connected to either money laundering or international terror at the time it provided him with routine remitter services.

The Complaint additionally alleges that "[a]n Assistant Commissioner of the Australian Federal Police told an Australian investigative journalism television program that Khanani's money laundering operation was run through currency exchanges, and Wall Street Exchange was one that Khanani used." [36] Id. ¶ 579. As Plaintiffs acknowledge, the Commissioner did not claim that Wall Street Exchange knew it was being used for this purpose, and so this does not

---

[36] *See* Linton Besser, *Money Exchange With Links to Dubai Government Identified as Hub for Billion-Dollar Laundering Empire*, ABC NEWS AUSTRALIA (Feb. 5, 2018 2:00 PM), https://www.abc.net.au/news/2018-02-06/khanani-network-laundered-money-through-wall-street-exchange/9398148 ("AFP Assistant Commissioner David Stewart has told Four Corners the money laundering operation run by Altaf Khanani—who is now in jail in Florida—ran its international transfers through multiple currency exchanges. 'Wall Street Exchange … was another one that was being used,' he confirmed."). Once again, the Court notes that this article is not directly cited in the Complaint. However, given that the Complaint appears to rely on it, the Court finds that the article is sufficiently "integral to the complaint" to warrant the Court's consideration. *See Chambers*, 282 F.3d at 153.

establish a showing of general awareness. *See* ECF No. 86. Not only that, but the interview was published in 2018, two years after the attacks at issue had occurred, and so would not have put Wall Street Exchange on notice during the Relevant Period. Again, public sources published after the attacks had occurred "do not plausibly support an inference that [a defendant] had the requisite general awareness at the time that it provided [the] . . . services" at issue. *Honickman*, 6 F.4th at 501.

### B.      Substantial Assistance

Plaintiffs have also failed to show that Wall Street Exchange provided "substantial assistance" under the six *Halberstam* factors, which the Court analyzes as follows:

i.    **Nature of the act encouraged**. The Complaint alleges that Wall Street Exchange provided an alleged Khanani agent, Mehdizadeh, with routine remitting services. Am. Compl. ¶ 947. While "[f]inancial support is 'indisputably important' to the operation of a terrorist organization," here the allegations are too vague, and the connection between the alleged support and the terrorist attacks at issue is too attenuated, to support a finding of financial assistance. *Gonzalez*, 2 F.4th at 905 (quoting *Halberstam*, 705 F.2d at 488).

ii.    **Amount and kind of assistance**. The Complaint does not specify how much money was remitted by Mehdizadeh. It does allege, in conclusory fashion, that Wall Street Exchange "allowed the Khanani MLO to transfer millions if not billions of dollars using Wall Street Exchange's facilities." Am. Compl. ¶ 951. Again, "mere conclusory statements do not suffice" to state a plausible claim. *Iqbal*, 556 U.S. at 678. The Complaint, therefore, does not "permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by

the FTO," *Honickman*, 6 F.4th at 500, and thus does not support a finding of substantial assistance.

iii. **Presence at the time of the tortious conduct**. The Complaint does not allege Wall Street Exchange was "present" at the time of the attacks. This factor does not support a finding of substantial assistance.

iv. **Relationship.** The only connection the Complaint draws between Wall Street Exchange and the principal FTOs is that one of its customers, Mehdizadeh, to whom Wall Street Exchange provided standard remitting services, was an "agent of Khanani and Khanani's money-laundering organization." Am. Compl. ¶ 947. The Complaint, however, does not provide any additional information beyond this conclusory allegation that would allow the Court to understand Mehdizadeh's connections—and thus Wall Street Exchange's connections—to either Khanani or international terror. This alleged relationship is therefore too vague to support a finding of substantial assistance.

v. **State of mind**. Because there is insufficient evidence that Wall Street Exchange acted with general awareness that it supported terrorist acts, *see supra* Section VI.A, this factor does not support a finding of substantial assistance.

vi. **Duration.** The Complaint alleges that Mehdizadeh was a customer of Wall Street Exchange. Am. Compl. ¶ 947. It does not provide any additional information about the length of that relationship. Thus, the allegations in the Complaint are too vague to support a finding of substantial assistance.

Taking all the factors into account, the Court finds on balance that the Complaint insufficiently alleges that Wall Street Exchange provided "substantial assistance" under the six *Halberstam* factors.

*    *    *

Because the Complaint fails to allege plausibly the "general awareness" or "substantial assistance" factors against Wall Street Exchange, the Complaint as to Wall Street Exchange is dismissed.[37]

## VII.   Plaintiffs' RICO Claim

Plaintiffs additionally allege an "Aiding-And-Abetting Liability, RICO Predicate" in Count Two of the Complaint. Am. Compl. ¶¶ 2034–43. Plaintiffs fail to cite any legal support for this claim.

Although no court in this circuit has yet ruled on this theory of liability, two District of Columbia district courts have rejected reading a RICO theory of liability into the ATA. After noting that "[t]he ATA imposes aiding-and-abetting liability for 'an injury arising from *an act* of international terrorism committed, planned, or authorized' by a FTO," the court found in *Atchley* that "it would be quite unnatural to read [the ATA's] statutory language, as plaintiffs do, to mean that the 'act' causing injury was not the particular attack in which a plaintiff was injured, but

---

[37]    Plaintiffs again attempt to get around these deficiencies by arguing that "[d]iscovery will likely reveal significant additional relationships between Wall Street Exchange, on the one hand, and Khanani, the Khanani money laundering organization, and the Syndicate, on the other." Am. Compl. ¶ 590. As the Court has already noted, an assertion that Plaintiffs may be able to provide the necessary allegations after discovery is not sufficient to survive a motion to dismiss, since the pleadings themselves must state a plausible claim. *See Iqbal*, 556 U.S. at 678–79; *Pub. Free Will*, 2017 WL 1047330, at \*5.

instead a collection of hundreds of attacks spanning [many] years." 474 F. Supp. 3d 194, 212 (D.D.C. 2020), *rev'd on other grounds*, *Atchley*, 22 F.4th 240; *see also Cabrera v. Black & Veatch Special Projects Corps.*, No. 19-cv-3833, 2021 WL 3508091, at \*25–26 (D.D.C. July 30, 2021) (rejecting RICO theory of liability under ATA/JASTA for same reasons as in *Atchley*). The Court finds this reasoning persuasive, and thus concludes that Plaintiffs' RICO claim is not a valid theory of liability under the ATA.

## CONCLUSION

For the foregoing reasons, and because Plaintiffs have already had an opportunity to amend their Complaint, Defendants' motions to dismiss are granted with prejudice.[38] *Miller v. Brightstar Asia, Ltd*., 43 F.4th 112, 126 (2d Cir. 2022).

SO ORDERED.

/s/ Hector Gonzalez
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
December 29, 2022

---

[38] Not only have Plaintiffs already amended their Complaint, but they amended it after Defendants raised the same deficiencies the Court identifies in this order in their pre-motion conference letters and at the December 7, 2021, status conference. *See* ECF Nos. 25, 27, 28, 29, 70. Thus, the Court finds that "any attempt to re-plead would [] be futile." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 309 (2d Cir. 2022); *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).