# No. 22-132

## United States Court of Appeals for the Second Circuit

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY,
TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER,
PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FEDERICK C. BENSON,
BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER,

*(caption continued on inside cover)*

Appeal from the United States District Court
Eastern District of New York (No. 1:19-cv-11876-AKH)

## JOINT APPENDIX VOL. 1 (JA1-300)

Brian T. Frawley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for the Danske Bank Defendants*

Sharon L. Nelles
Andrew J. Finn
Bradley P. Smith
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for the Standard Chartered Bank
Defendants*

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
202-629-3530

*Attorneys for Plaintiffs-Appellants*

David G. Januszewski
Sheila C. Ramesh
Sesi V. Garimella
Isabella Abelite
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000

*Attorneys for the Deutsche Bank
Defendants*

MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS
BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS,
DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA,
DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS
NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND,
AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE
MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL,,
RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE
CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER,
TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO
D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN
CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD,
PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN
COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS
COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE,
PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE
DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS,
LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES
DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA
DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ,
FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY
AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT
FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE,
KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE,
PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE,
INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH
DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS,
JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA
MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS,
CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM,
DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION
RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH HIS
NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS NEXT FRIEND,
STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, MICHAEL FESTUS
FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH HIS NEXT FRIEND, KARA
GIBSON, KARA GIBSON, JESSICA ANNE BENSON, JOANNA GILBERT, EMMITT DWAYNE
BURNS, JANICE CARUSO, PAUL EDWARD GOINS, III, PATRICIA GOINS, DANA RAINEY,
L. C. D., BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW

GOLLNITZ, TYLER GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK
GORDON, ADRIAN KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN
CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY
ANDERSON, GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN,
DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY HARDISON,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA HARDISON, SHEILA
RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER,
BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM SAMUEL HARTSWICK, ALEX
HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY
LOUISE HORNS, BENJAMIN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN
ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE
ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M.
HUNTER, KENNA HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT,
SHELBY IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT,
CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND, CHARLOTTE
LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE,
PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT FRIEND, KENT ALAN
SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS, TRENT LORNE SKEENS, Z. R. S.,
BY AND THROUGH HER NEXT FRIEND, KENT ALAN SKEENS, BRIAN CHRISTOPHER
JERGENS, TERENCE LONNIE JONES, JOHN C. MCCARTHY, ALISON R. POHN, KEVIN
KING, STEPHANIE ANN MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY
AND THROUGH HER NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN
LAMBKA, JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR,
MEREDITH LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA
LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT FRIEND
MIRANDA LANDRUM, JAMES R. LANDRUM, JANET LANDRUM, MIRANDA LANDRUM,
HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR., ALEXANDER LAU, DAVID WILLIAM
HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID
WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM
HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN
SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR
MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G.
MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ
HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L.
MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT
FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE
PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK
CHARLES MCEVOY, JANICE H. PROCTOR, LUANN VARNEY, SHANNON K. MCNULTY,
JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J.
METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA

KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS, NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L. OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS, TRACY ANNE HERRING, ADAN PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ, B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ, S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY, KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS W. PETERS, G.R.P., BY AND THROUGH HIS NEXT FRIEND, ASHLEY PETERS, CHRISTINE H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS, BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ, SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J. SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN

SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY, LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS, GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS, LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE, GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY, FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN, NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE, CHRISTOPHER MICHAEL VAN ETTEN, CATHERINE KIMBERLY VAUGHN KRYZDA, C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L. WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN, KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART LAMAR PERRY, AARON WILLIAM PRESCOTT,

Plaintiffs - Appellants,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND

ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST, KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R., BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY STRANGE, KEVIN WILLIAMS,

       Plaintiffs,

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

       Defendants - Appellees,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN BRANCH, DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH, PLACID NK CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE LLC,

       Defendants.

_____

# TABLE OF CONTENTS

## Volume 1

Docket Entries ..................................................................................... 1

Stipulation and Notice of Voluntary Dismissal Without Prejudice as to Certain of the Named Defendants (Doc. 10) ............................................ 62

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) .............. 66

## Volume 2

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) (cont'd) ............................................................................................ 301

## Volume 3

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) (cont'd) ............................................................................................ 601

    Exhibit A to Corrected Amended Complaint (Doc. 38-1) .......................... 674

Declaration of Brian T. Frawley in Support of Danske Bank Defendants' Motion to Dismiss (Doc. 45) ................................................................. 698

    Exhibit 1: Chart of Attacks (Doc. 45-1) ...................................... 700

    Exhibit 3: Article in *Corriere Della Sera* (Doc. 45-3) ............................. 710

    Exhibit 4: Article in *Süddeutsche Zeitung* (Doc. 45-4) .............................. 714

    Exhibit 5: Article in *Business Recorder* (Doc. 45-5) .................................. 721

Declaration of Sheila C. Ramesh in Support of Deutsche Bank Defendants' Motion to Dismiss (Doc. 49) ............................................................. 727

    Exhibit 1: Transcript from December 7, 2021 pre-motion conference (Doc. 49-1) ................................................................ 729

Declaration of Andrew J. Finn in support of Standard Chartered Bank Defendants' Motion to Dismiss (Doc. 55) ............................................ 751

    Exhibit 1: U.S. Department of State list of Foreign Terrorist Organizations (Doc. 55-1) ....................................................... 753

Exhibit 2: Written Agreement by and Among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004) (Doc. 55-2) ..............................769

Exhibit 3: Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah, *United States* v. *Sum of $70,990,605*, No. 1:12-cv-01905 (D.D.C. Feb. 22, 2019) (Doc. 55-3).................................................................................783

Exhibit 4: Verified Complaint for Forfeiture in Rem, *United States* v. *Sum of $70,990,605*, No. 12-cv-1905 (D.D.C. Nov. 20, 2012) (Doc. 55-4).................................................................................789

Exhibit 5: Adam Luck, *Whistleblower Says Bank Has Blood on Its Hands: RAF Veteran Claims Standard Chartered Helped Iran Terrorists, Ahead of Court Battle*, THIS IS MONEY (Sept. 7, 2019) (Doc. 55-5) .........................................................807

Exhibit 6: Richard Holmes, et al., *Standard Chartered's Iran Problems Didn't Go Away*, BUZZFEED NEWS (Sept. 21, 2020) (Doc. 55-6).................................................................................816

Excerpts of Exhibit 8: Amended Complaint, *Zobay* v. *MTN Grp Ltd.*, No. 21-cv-03503 (E.D.N.Y. Feb. 9, 2022) (Doc. 55-8) .....................834

Stipulation and Order of Voluntary Dismissal as to Danske Markets Inc. (Doc. 69) ................................................................................841

Plaintiffs' Notice of Appeal (Doc. 92) ..................................................843

APPEAL,ACO

# U.S. District Court
## Eastern District of New York (Brooklyn)
### CIVIL DOCKET FOR CASE #: 1:21-cv-04400-HG-RML

Wildman et v. Deutsche Bank Aktiengesellschaft

Assigned to: Judge Hector Gonzalez

Referred to: Magistrate Judge Robert M. Levy

Cause: 28:1331 Fed. Question: Tort Action

Date Filed: 08/05/2021

Date Terminated: 01/03/2023

Jury Demand: Plaintiff

Nature of Suit: 360 P.I.: Other

Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 08/05/2021 | 1 | COMPLAINT against All Defendants filing fee $ 402, receipt number ANYEDC-14724917 Was the Disclosure Statement on Civil Cover Sheet completed -YES,, filed by R.X.C., by and through his next friend, August Wildman, Joanna Gilbert, William Anthony Murach, P.A.D., by and through her next friend, Kelli Dodge, Robert Martin Kahokulani Vickers Sr., K.K., by and through her next friend, Abby Knapp-Morris, K.F., by and through his next friend, Stephanie Jane Fisher, James L. Daniels, John F. Ellis, Sarah Tiffany Peterson, H.R., by and through her next friend, Randy Ristau, Mary Border, A.C., by and through his next friend, Nicole Cox, Matthew J. Diaz, Lawrence Marta, Kevin Trimble, Kent Alan Skeens, Jeremy J. Metzger, H.C., by and through her next friend, Nicole Cox, Brian Anthony Williams, Michael White, Freddie Dewey Sutton, Erica M. Roland, Miranda Landrum, Makahea Xhelili, Lorria Welch, Dennis W. Peters, Adam Samuel Hartswick, G.S., by and through his next friend, Georganne M. Siercks, Kelli Dodge, Kristine Anne Zitny, M.G.C., by and through his next friend, August Wildman, Suzanne Renae Martinez, Andrea Roe, Victoria Jane Reeves, Brian Lambka, Joe Torian, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Creighton David Osborn, Joshua Michael Prescott, Daniel Matias Cabrera, A.L.S., by and through his next friend, Natalie Schmidt, Scott Regelin, Christa L. Osborn, Christopher J. Rosebrock, Terence Lonnie Jones, Robert Martin Kahokulani Vickers Jr., Marion Ruth Hopkins, Ryan Gregory Timoney, Nicole Cox, K.L., by and through his next friend, David William Haalilio Lau, Natasha Buchanan, Daniel Griffin, Katherine Abreu-Border, Esta Smith, Phillip J. Schmidt, Paul Provost, Sophie Daniels, Marie Sentina Mielke, Joelle R. Ellis, Lona L. Bosley, C.D., by and through his next friend, Helena Davis, Nicole D'Augustine, Kathleen Perry, Kayla Marie Daehling, Jose Luis Martinez Hernandez, Brian Christopher Jergens, Adrian Kie-Alun Sherrod, Sarah Melinda Schwallie, Janice Caruso, Judith L. Ashley, Bethany Rose Wesley, Katelyn Marie Strange, Amanda Newman, Thomas Mullins, Kristie Surprenant, James Wayne Worley, Tiffany Louise Horns, Kevin Williams, Kevin King, James R. Landrum, Daniel Mark Robinson, Abrill Renee Williams, Tyler Gollnitz, Michael Iubelt, Maggie Mae Bilyeu, Joyce Ann Tulloch, A.G., by and through her next friend, Julie Green, Cleveland Davis, Joey J. Hunter Sr., Michael Collins, Monte Douglas Nichols, Kristin Caracciolo, Q.G., by and through his next friend, Kara Gibson, Brian Edward Ellis, Patricia Goins, Luke Spehar, Kenna Hunter, Taylor Marta, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Ashley Peters, Matt Griffin, William Michael Burley, Tammie Sue Schoonhoven, Robert L. Dunning, individually and on behalf of the Estate of Tomoe |

Dunning, K.R., by and through her next friend, Melissa Rodriguez, Rodney Riley, Holly Marie Harpe, Cameron Jay Stuart, Tracey Marie Prescott, Angela Marie Harper, Keyko D. Clark, Barbara A. Roland, Pamela E. Alexander Bell, Erich Martin Ellis, Gloria Diane Trelfa, John A. Provost, T.M.C., by and through his next friend, Timothy Norman Carner, Nancy Marie Mullen, Sherry A. Skeens, Cheryl Atwell, Spenser J. Fernandez, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Jeanne M. Nichols, G.A.S., by and through his next friend, Kent Alan Skeens, Michelle Carolina Rotelli, Thomas Anthony Fogarty, Jacob Richard Prescott, J.H., by and through his next friend, Eric M. Hunter, Barry Welch, Annie L. McBride, Joseph Troy Hulsey Jr., Emily Torian, Shirene Regelin, Annette Spehar, Julie K. Martin, Judith Sara Darrough, D.C.M., by and through his next friend, Alexandra Dorian McClintock, Gertrude Provost, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, Jennifer D'Augustine, Jammie Joann Smith, John L. Fant, Adan Perez, Frederick Allen Tolon, Colleen Whipple, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Vanessa Marie Anzures, Alison R. Pohn, Brandon Tyler Schmidt, Wendy Shedd, Charles Wesley Strange III, Charles Essex, Carol Griffin, Bradley Dylan Ivanchan, Michelle Joy Kapunaheleokalani Yarborough, Hannah Mason, Phouthasith Douangdara, Julia Ott, Connor Alexian Pladeck-Morgado, Katy Stuart, Andrea N. Ratzlaff, Catherine Elm Boatwright, Christopher Michael Van Etten, Talisa Shervon Williams, N.J.D., by and through her next friend, Kayla N. Diaz, Patricia Shirley Hughes, Helena Davis, Adriana Wakeling, Chris Lee Zimmerman, Jean S. Landphair, Hortense Kainoa Wainani Vickers, Trecia Brock Hood, Holly Lau Abraham, Ramiro Cardoza, Jr, Michele Kulesa, Carey Greggory DuVal, Federick C. Benson, Maria Cardoza, Charles Wesley Strange, B.C., by and through his next friend, Holly Conrad, Nicholas Joseph Francis Perez, L.R.P., by and through her next friend, Julianne Good Perry, Michelle Lee Rauschenberger, Cordaro Devone Clark, Theresa Karlson, Garry Lee Sparks, Brian M. Martin, Angel R. Roldan, G.W.P., by and through his next friend, Julianne Good Perry, Kirk W. Daehling, J.A.L., by and through his next friend, Charlotte Loquasto, Thomas Smedinghoff, Deborah Jean Peters, Jonathan L Ashley, III, Stephanie Jane Fisher, Conchetta Michell Diaz, C.E.S., by and through her next friend, Charles Wesley Strange, Scott Peter Provost, Hayley Anderson, LeeAnn Schmidt, James Earl Ellis, Leroy Wingkit Lau Jr., Anthony Perez, Dan Olmstead, Nicole Ann Robles, Erica Fox, Kayla N. Diaz, Natalie Schmidt, Darilyn Perez, A.T.P., by and through her next friend, Stewart Lamar Perry, Suzi L. Fernandez, Luann Varney, Joey J. Hunter II, Samantha G. Roldan, G.B.L., by and through his next friend, Miranda Landrum, Louise P. Conlon, Elizabeth A. Martin, Michael Festus Fox, Colby Anderson, Miriam A. Mullen, Mary R. Hammerbacher-Nichols, Justina Hardison, Abby Knapp-Morris, William A. Burley, Brittani Marie Carner, Clarence Williams Jr., D.R., by and through his next friend, Melissa Rodriguez, Corteize Clark, Mark T. Smedinghoff, Bob Surprenant, Debra Ann Perez, Erin Riedel, Brittany Taylor Townsend, JD Prosser, Nicholas Walter Robinson IV, Joseph Duarte, Douglas A. Landphair, Jonathan Cleary, Mark G. Worley, Jeffrey L. White Sr., Rodolfo Rodriguez Sr., Catherine Kimberly Vaughn Kryzda, Nancy R. Wilson, Jose Alberto Morgado, G.R.P., by and through his next friend, Ashley Peters, Jacob Louis Spehar, Dana Rainey, Benjamin Horsley, Songmi Kietzmann, Daniel Edward Stamper Jr., A.M.S., by and through her next friend, Tammie Sue Schoonhoven, Joan M. Smedinghoff, Christopher Scott Schoonhoven, Zachary Douglas Sparks, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, John C. McCarthy, Francisco Javier Briseno Gutierrez, Rodzie Efren Rodriguez, Joshua Anthony Sams, Kara Gibson, Meghan Janet Hollingsworth, Timothy Norman Carner, August Wildman, Adam Matthew Jayne, Brian Harper, Catherine Mullins, Tracy Anne Herring, Joy Coy, Mary Beth Smedinghoff, Stewart Lamar Perry,

**JA2**

Marissa Brown, Chester R. McBride Sr., Dennis John Elm, Eric Daniel Lund, Travis Scott Green, Glenda Green, Summer Reeves Dunn, Mona G. Betzen, Bruce K. Nichols, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, Michelle Zimmerman, Joseph Roger Deslauriers, Patrick Spehar, Katlyn M. Osborn, Georganne M. Siercks, Mallory Taylor Williams, Victor Raymond Ellis, Chet Murach, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Adam Daehling, Z.R.S., by and through her next friend, Kent Alan Skeens, Stephanie Ann Miller, Anna Maria Banzer, Cedric Frank Gordon, Anthony M. Diaz, Cedric Donshae Gordon Sr., Anthony D'Augustine, Paula K. White, Jimmy Smith, John Terry Pittman Sr., N.J.A.D., by and through his next friend, Kayla N. Diaz, Douglas Nichols, George B. McClintock, Lieselotte R. Roldan, Edward Klein, M.G.N., by and through her next friend, Bruce K. Nichols, Kevin Honaker, Katrina M. Reeves, DeLaynie K. Peek, Jonathan Leigh Ashley, IV, Nathan Ewell Torian, Regina C. Smedinghoff, Diane Timoney, V.I., by and through her next friend, Shelby Iubelt, Donna Lee Elm, Frances P. Diaz, E.G., by and through her next friend, Julie Green, Gail Provost, Spencer Dana Provost, Vivian Perry, Aaron William Prescott, Jedidiah Daniel Morgan, Samantha Daehling, Christine Rangel, Jennifer Katherine Reeves, S.N.P., by and through her next friend, Christine H. Phillips, Kathleen Lynn Alexander, Ayzia J. Jayne, David William Haalilio Lau, Charlotte Loquasto, Alexander Lau, Erik Sparks, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Brandon Nichols, Andrea Kessler, Joshua Nicholas Sust, Lisa Deslauriers, G.F., by and through his next friend, Erica Fox, S.L.L.B., by and through her next friend, Natasha Buchanan, Cassie Marie Richardson, Charlotte Ann Reeves, Jessica Anne Benson, Catherine G. Martin, Summer Breanne Sutton, Michelle Rose McEvoy, Mark K. Roland, Janice H. Proctor, Donald Edward Newman Sr., Betty Darlene Black, Mark Matthew Kaleinani Vickers, Jordan Lambka, B.R.L., by and through her next friend, Miranda Landrum, Christopher Powers, John Means, Matthias P. Roldan, C.F., by and through his next friend, Stephanie Jane Fisher, John Horsley, Robert Cabrera, Patricia D'Augustine, Gregory Timoney, Zackary Welch, Angela Kahler, Tammy Olmstead, M.L., by and through her next friend, David William Haalilio Lau, Alberto D. Diaz, Louis Provost, Kyle White, James Russell Ellis, Lucas Daniels, Eric M. Hunter, Sheeshta Marie Perry, Shannon K. McNulty, Eric Morgado, Robin Elizabeth Akers, Randy Ristau, K.H., by and through her next friend, Eric M. Hunter, Margaret Elm Campbell, William R. Nevins, Robert Alexander Dove, Thomas Elmer Wickliff, Mitchell L. Stambaugh, Karyn Stone Marta, Kristina Brown, London Jacinda Belel, Hamide Lau, Paige Erlanger, MaryJane G. Medeiros, Brandon Korona, Sofia Kessler, Tamara Elaine Horns, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Precious Clark, Suzanne Ristau, Garrett Layne Funk, L.C.D., by and through his next friend, Bridgett L. DeHoff, Adolf Olivas, Julie Green, Jason Wayne Gibson, Ricardo J. Perez-Ramos, April Cleary, Daniel Lee Brown, L.A.E.L.B., by and through her next friend, Natasha Buchanan, Jane Sparks, Kimberly Metcalf, Seth Wakeling, Daniel Owen Hughes, Brennan Cox, Jordan L. Sibley, Brenda Daehling, Mary Jane Vickers, Luis Briseno, Kade M. Osborn, Peyton Cooney, Melissa Rodriguez, Bethany Rose Mullins Randall, A.P., by and through her next friend, Darilyn Perez, Gregory W. Worley, Heather Frances Daniels, Ida Belle Pittman, Cody Worley, Larry D. Horns, Cynthia Jeffries Richmond, Alex Jason Rozanski, B.C.D., by and through his next friend, Kelli Dodge, Suni Chabrow, Gillian Leigh Cabrera, Emmitt Dwayne Burns, Jan Marie Hurnblad Sparks, Samantha Shervon Williams, Patrick Charles McEvoy, Corbin Cabrera, Sheila Ristaino, Robert Charles Darrough, Kirk Andrew Gollnitz, Julianne Good Perry, Ramiro Cardoza, Sr, Cynthia Nichols, Paul Elmer Jayne, Kathleen McEvoy, B.M., by and through his next friend, Darilyn Perez, Ross Cox, Erin Nicole Goss, Meredith Landphair, Vance Marshall Keliiolani Vickers,

**JA3**

| | | Derrick Anthony Davis, T.G., by and through her next friend, Julie Green, William J. Mullen, Shawn Patrick Griffin, Paul Edward Goins III, Deborah Fern Schoonhoven, Holly Conrad, Alexandra Dorian McClintock, Anna Morgan, Michelle Riley, Martha Carolina Smith, Janet Landrum, Christine H. Phillips, Beverly Mills, Julie Ann Ellis, Clarence Joseph Metcalf, Baily Zimmerman, Maximo Diaz, Shelby Iubelt, Jordan T. Ashley, Samuel Robert Shockley, Brian Provost, Joyce Patricia Paulsen, Matthew Elm, James Bell, Harriet Sutton, Nathan Jeremy Rimpf, Lisa Martinusen, Cynthia Carol Campbell, Tammie Maria Ashley, Ronald Paul Hopkins, Alex Henigan, Trent Lorne Skeens, Liseth Martinez-Arellano. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Deutsche Bank AG, # 3 Summons to Deutsche Bank AG, New York, # 4 Summons to Deutsche Bank AG, Dubai, # 5 Summons to Deutsche Bank Trust Company, # 6 Summons to Deutsche Bank UK, # 7 Summons to Standard Chartered Bank, # 8 Summons to Standard Chartered Bank PLC, # 9 Summons to Standard Chartered Bank Limited, # 10 Summons to Standard Chartered Bank, Dubai, # 11 Summons to Standard Chartered Bank Pakistan, # 12 Summons to Danske Bank AS, # 13 Summons to Danske Markets Inc., # 14 Summons to Placid Express, # 15 Summons to Wall Street Exchange, # 16 Exhibit A) (Kay-Oliphant, Eli) (Entered: 08/05/2021) |
|---|---|---|
| 08/05/2021 | 2 | NOTICE of Appearance by Eli Johnson Kay-Oliphant on behalf of All Plaintiffs (notification declined or already on case) (Kay-Oliphant, Eli) (Entered: 08/05/2021) |
| 08/05/2021 | | Case Assigned to Judge Kiyo A. Matsumoto and Magistrate Judge Robert M. Levy. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Davis, Kimberly) (Entered: 08/05/2021) |
| 08/05/2021 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (Davis, Kimberly) (Entered: 08/05/2021) |
| 08/05/2021 | 4 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made, if any. (Davis, Kimberly) (Entered: 08/05/2021) |
| 08/05/2021 | | Your proposed summons was not issued for one of the following reasons: **If multiple defendants, there must me a rider attached to the summons with the name and addresses of all defendants included.,**<br><br>Please correct and resubmit using Proposed Summons/Civil Cover Sheet. (Davis, Kimberly) (Entered: 08/05/2021) |
| 08/10/2021 | 5 | Proposed Summons. by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee |

JA4

Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by

**JA5**

and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through her next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her

**JA6**

next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Kay-Oliphant, Eli) (Entered: 08/10/2021)

| Date | | Description |
|---|---|---|
| 08/12/2021 | 6 | SUMMONS ISSUED as to Danske Bank A/S, Danske Markets Inc., Deutsche Bank AG, Dubai Branch, Deutsche Bank AG, New York Branch, Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas, Deutsche Bank UK, Placid NK Corporation, Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered Bank Limited, Standard Chartered Bank, Dubai Main Branch, Standard Chartered PLC, Wall Street Exchange LLC. (Tavarez, Jennifer) (Entered: 08/12/2021) |
| 09/16/2021 | 7 | NOTICE of Appearance by Brian Thomas Frawley on behalf of Danske Bank A/S, Danske Markets Inc. (aty to be noticed) (Frawley, Brian) (Entered: 09/16/2021) |
| 09/16/2021 | 8 | Corporate Disclosure Statement by Danske Bank A/S, Danske Markets Inc. identifying Corporate Parent DANSKE BANK A/S for Danske Markets Inc.. (Frawley, Brian) (Entered: 09/16/2021) |

| 09/16/2021 | 9 | NOTICE of Appearance by Amanda Shami on behalf of Danske Bank A/S, Danske Markets Inc. (aty to be noticed) (Shami, Amanda) (Entered: 09/16/2021) |
|---|---|---|
| 10/04/2021 | 10 | NOTICE of Voluntary Dismissal by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, |

**JA8**

Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T.

**JA9**

Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch *without prejudice, with Stipulation* (Kay-Oliphant, Eli) (Entered: 10/04/2021)

| 10/05/2021 | 11 | NOTICE of Appearance by David G. Januszewski on behalf of Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas (aty to be noticed) (Januszewski, David) (Entered: 10/05/2021) |

| | | |
|---|---|---|
| 10/05/2021 | 12 | NOTICE of Appearance by Sheila Chithran Ramesh on behalf of Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas (aty to be noticed) (Ramesh, Sheila) (Entered: 10/05/2021) |
| 10/05/2021 | 13 | NOTICE of Appearance by Sesi V. Garimella on behalf of Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas (aty to be noticed) (Garimella, Sesi) (Entered: 10/05/2021) |
| 10/05/2021 | 14 | Corporate Disclosure Statement by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas identifying Corporate Parent DB USA Corporation, Corporate Parent Deutsche Bank Aktiengesellschaft, Corporate Parent Deutsche Bank Trust Corporation, for Deutsche Bank Trust Company Americas. (Januszewski, David) (Entered: 10/05/2021) |
| 10/05/2021 | 15 | MOTION for Extension of Time to File *a Response to the Complaint* by Danske Bank A/S, Danske Markets Inc.. (Attachments: # 1 Proposed Order) (Frawley, Brian) (Entered: 10/05/2021) |
| 10/06/2021 | | ORDER granting 15 Motion for Extension of Time to File. Upon consent of both parties, Defendants shall answer, submit a pre-motion letter, orotherwise respond to the complaint by **October 29, 2021**. Ordered by Judge Kiyo A. Matsumoto on 10/6/2021. (Urquiola, Rebecca) (Entered: 10/06/2021) |
| 10/06/2021 | 16 | NOTICE of Appearance by Claire Delelle on behalf of Placid NK Corporation (aty to be noticed) (Delelle, Claire) (Entered: 10/06/2021) |
| 10/06/2021 | 17 | Corporate Disclosure Statement by Placid NK Corporation (Delelle, Claire) (Entered: 10/06/2021) |
| 10/06/2021 | 18 | MOTION to Appear Pro Hac Vice *of Matthew Leddicotte* Filing fee $ 150, receipt number ANYEDC-14909936. by Placid NK Corporation. (Attachments: # 1 Affidavit in Support of Motion to Admit Counsel Pro Hac Vice, # 2 Certificate of Good Standing - District of Columbia, # 3 Proposed Order) (Leddicotte, Matthew) (Entered: 10/06/2021) |
| 10/06/2021 | 19 | MOTION to Appear Pro Hac Vice *of Michael Thomas Mahaffey* Filing fee $ 150, receipt number ANYEDC-14910163. by Placid NK Corporation. (Attachments: # 1 Affidavit in Support of Motion to Admit Counsel Pro Hac Vice, # 2 Certificate of Good Standing - District of Columbia, # 3 Proposed Order) (Mahaffey, Michael) (Entered: 10/06/2021) |
| 10/07/2021 | 20 | NOTICE of Appearance by Andrew Finn on behalf of Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC (aty to be noticed) (Finn, Andrew) (Entered: 10/07/2021) |
| 10/07/2021 | 21 | Corporate Disclosure Statement by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC identifying Corporate Parent Standard Chartered PLC, Other Affiliate Standard Chartered Holdings Limited for Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited. (Finn, Andrew) (Entered: 10/07/2021) |
| 10/07/2021 | 22 | NOTICE of Appearance by Bradley P. Smith on behalf of Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC (aty to be noticed) (Smith, Bradley) (Entered: 10/07/2021) |

| | | |
|---|---|---|
| 10/07/2021 | | ORDER granting 18 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*. Ordered by Magistrate Judge Robert M. Levy on 10/7/2021. (Marino, Janine) (Entered: 10/07/2021) |
| 10/07/2021 | | ORDER granting 19 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*. Ordered by Magistrate Judge Robert M. Levy on 10/7/2021. (Marino, Janine) (Entered: 10/07/2021) |
| 10/07/2021 | 23 | NOTICE of Appearance by Matthew Sterrett Leddicotte on behalf of Placid NK Corporation (notification declined or already on case) (Leddicotte, Matthew) (Entered: 10/07/2021) |
| 10/07/2021 | 24 | NOTICE of Appearance by Michael Mahaffey on behalf of Placid NK Corporation (notification declined or already on case) (Mahaffey, Michael) (Entered: 10/07/2021) |
| 10/29/2021 | 25 | Letter *Requesting Pre-Motion Conference* by Placid NK Corporation (Delelle, Claire) (Entered: 10/29/2021) |
| 10/29/2021 | 26 | NOTICE of Appearance by Ryan Sparacino on behalf of All Plaintiffs (aty to be noticed) (Sparacino, Ryan) (Entered: 10/29/2021) |
| 10/29/2021 | 27 | Letter MOTION for pre motion conference by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas. (Januszewski, David) (Entered: 10/29/2021) |
| 10/29/2021 | 28 | Letter MOTION for pre motion conference by Danske Bank A/S, Danske Markets Inc.. (Frawley, Brian) (Entered: 10/29/2021) |
| 10/29/2021 | 29 | Letter MOTION for pre motion conference by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC. (Finn, Andrew) (Entered: 10/29/2021) |
| 11/01/2021 | | ORDER granting 25 27 28 29 Motions for Pre Motion Conference. The parties shall appear telephonically for a pre-motion conference on **December 7, 2021 at 1:00 pm**. Plaintiffs shall file a response, if any, to Defendants' 25 27 28 29 letters requesting a pre-motion conference by November 19, 2021. The parties shall dial into the conference by calling 1-888-684-8852 and entering the following access code: 1312089. Ordered by Judge Kiyo A. Matsumoto on 11/1/2021. (Ahn, Lois) (Entered: 11/01/2021) |
| 11/02/2021 | 30 | MOTION to Appear Pro Hac Vice , *Ryan R. Sparacino* Filing fee $ 150, receipt number ANYEDC-14992592. by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, |

**JA12**

Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau

**JA13**

Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph

**JA14**

Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch. (Kay-Oliphant, Eli) (Entered: 11/02/2021)

| 11/02/2021 | | ORDER granting 30 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*. Ordered by Magistrate Judge Robert M. Levy on 11/2/2021. (Marino, Janine) (Entered: 11/02/2021) |
| --- | --- | --- |
| 11/19/2021 | 31 | Letter *in Response to Pre-Motion Letter filed by Deutsche Bank (D.I. 27)* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian |

Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather

**JA16**

Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph

**JA17**

Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Kay-Oliphant, Eli) (Entered: 11/19/2021)

| | | |
|---|---|---|
| 11/19/2021 | 32 | Letter *in Response to Pre-Motion Letter filed by Standard Chartered Bank (D.I. 29)* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his |

next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S.

Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his

**JA20**

|  |  |  |
|---|---|---|
|  |  | next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Kay-Oliphant, Eli) (Entered: 11/19/2021) |
| 11/19/2021 | 33 | Letter *in Response to Pre-Motion Letter filed by Danske Bank (D.I. 28)* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, |

**JA21**

Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez

Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by

**JA23**

| | | |
|---|---|---|
| | | and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Kay-Oliphant, Eli) (Entered: 11/19/2021) |
| 11/19/2021 | 34 | Letter *in Response to Pre-Motion Letter filed by Placid Express (D.I. 25)* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias |

**JA24**

Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol
Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory
DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm
Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine
Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles
Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto,
Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn,
Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael
Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph
Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson,
Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-
Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia
Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra
Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana
Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark
Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah
Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis
W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr.,
Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next
friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne
Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland,
Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie
Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent
Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and
through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley
Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and
through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry
Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda
Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C.,
by and through her next friend, Nicole Cox, H.R., by and through her next friend,
Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather
Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe,
Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by
and through his next friend, Charlotte Loquasto, J.H., by and through his next friend,
Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L.
Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann
Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice
H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel
Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy
J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison,
Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian,
Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy,
John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan
Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez
Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua
Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann
Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott,
Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison,
K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by
and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend,
Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and

through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler,

**JA26**

|  |  | Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Kay-Oliphant, Eli) (Entered: 11/19/2021) |
| 12/07/2021 |  | Minute Entry for proceedings held before Judge Kiyo A. Matsumoto: Pre Motion Conference held on 12/7/2021. Appearances: David Januszewski, Esq. for the Deutsche Bank Defendants; Andrew Finn, Esq. for the Standard Chartered Bank Defendants; Brian Frawley, Esq. for the Danske Bank Defendants; Claire DeLelle, Esq. and Michael Mahaffey, Esq. for Defendant Placid NK Corporation d/b/a Placid Express; Ryan Sparacino, Esq. for Plaintiffs.<br><br>The parties discussed Defendants' anticipated motions to dismiss. As discussed on the record, Plaintiffs shall file their amended complaint, joining any additional plaintiffs, by **Tuesday, February 15, 2022**. Plaintiffs' counsel is directed to send two bound courtesy copies of the amended complaint to Chambers via FedEx or messenger.<br><br>Should Defendants choose to move forward with their motions to dismiss, Defendants shall serve, but not file, their motion papers on or before **Friday, March 18, 2022**. Plaintiffs shall serve, but not file, their opposition papers by **Friday, May 13, 2022**. Defendants shall serve their reply papers on or before **Friday, June 3, 2022**, and on that date, the parties shall file via ECF, in a logical order, the fully briefed motions to dismiss. The parties are reminded to review Chambers Practices to ensure their compliance with Chambers individual rules for motion practice. The parties are also reminded to send two bound courtesy copies of all papers related to the motions to dismiss to Chambers. Courtesy copies should be sent via FedEx or messenger. (Court Reporter Denise Parisi.) (Ahn, Lois) (Entered: 12/07/2021) |
| 02/15/2022 | 35 | AMENDED COMPLAINT against All Defendants, filed by R.X.C., by and through his next friend, August Wildman, Joanna Gilbert, William Anthony Murach, P.A.D., by and through her next friend, Kelli Dodge, Robert Martin Kahokulani Vickers Sr., K.K., by and through her next friend, Abby Knapp-Morris, K.F., by and through his next friend, Stephanie Jane Fisher, James L. Daniels, John F. Ellis, Sarah Tiffany Peterson, H.R., by and through her next friend, Randy Ristau, Mary Border, A.C., by and through his next friend, Nicole Cox, Matthew J. Diaz, Lawrence Marta, Kevin Trimble, Kent Alan Skeens, Jeremy J. Metzger, H.C., by and through her next friend, Nicole Cox, Brian Anthony Williams, Michael White, Freddie Dewey Sutton, Erica M. Roland, Miranda Landrum, Makahea Xhelili, Lorria Welch, Dennis W. Peters, Adam Samuel Hartswick, G.S., by and through his next friend, Georganne M. Siercks, Kelli Dodge, Kristine Anne Zitny, M.G.C., by and through his next friend, August Wildman, Suzanne Renae Martinez, Andrea Roe, Victoria Jane Reeves, Brian Lambka, Joe Torian, Sarah Peters- |

Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Creighton David Osborn, Joshua Michael Prescott, Daniel Matias Cabrera, A.L.S., by and through his next friend, Natalie Schmidt, Scott Regelin, Christa L. Osborn, Christopher J. Rosebrock, Terence Lonnie Jones, Robert Martin Kahokulani Vickers Jr., Marion Ruth Hopkins, Ryan Gregory Timoney, Nicole Cox, K.L., by and through his next friend, David William Haalilio Lau, Daniel Griffin, Katherine Abreu-Border, Esta Smith, Phillip J. Schmidt, Paul Provost, Sophie Daniels, Marie Sentina Mielke, Joelle R. Ellis, Lona L. Bosley, C.D., by and through his next friend, Helena Davis, Nicole D'Augustine, Kathleen Perry, Kayla Marie Daehling, Jose Luis Martinez Hernandez, Brian Christopher Jergens, Adrian Kie-Alun Sherrod, Sarah Melinda Schwallie, Janice Caruso, Judith L. Ashley, Bethany Rose Wesley, Katelyn Marie Strange, Amanda Newman, Thomas Mullins, Kristie Surprenant, James Wayne Worley, Tiffany Louise Horns, Kevin King, James R. Landrum, Daniel Mark Robinson, Abrill Renee Williams, Tyler Gollnitz, Michael Iubelt, Maggie Mae Bilyeu, Joyce Ann Tulloch, A.G., by and through her next friend, Julie Green, Cleveland Davis, Joey J. Hunter Sr., Michael Collins, Monte Douglas Nichols, Kristin Caracciolo, Q.G., by and through his next friend, Kara Gibson, Brian Edward Ellis, Patricia Goins, Luke Spehar, Kenna Hunter, Taylor Marta, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Ashley Peters, Matt Griffin, William Michael Burley, Tammie Sue Schoonhoven, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, K.R., by and through her next friend, Melissa Rodriguez, Rodney Riley, Holly Marie Harpe, Cameron Jay Stuart, Tracey Marie Prescott, Angela Marie Harper, Keyko D. Clark, Barbara A. Roland, Pamela E. Alexander Bell, Erich Martin Ellis, Gloria Diane Trelfa, John A. Provost, T.M.C., by and through his next friend, Timothy Norman Carner, Nancy Marie Mullen, Sherry A. Skeens, Cheryl Atwell, Spenser J. Fernandez, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Jeanne M. Nichols, G.A.S., by and through his next friend, Kent Alan Skeens, Michelle Carolina Rotelli, Thomas Anthony Fogarty, Jacob Richard Prescott, J.H., by and through his next friend, Eric M. Hunter, Barry Welch, Annie L. McBride, Joseph Troy Hulsey Jr., Emily Torian, Shirene Regelin, Annette Spehar, Julie K. Martin, Judith Sara Darrough, D.C.M., by and through his next friend, Alexandra Dorian McClintock, Gertrude Provost, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, Jennifer D'Augustine, Jammie Joann Smith, John L. Fant, Adan Perez, Frederick Allen Tolon, Colleen Whipple, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Vanessa Marie Anzures, Alison R. Pohn, Brandon Tyler Schmidt, Wendy Shedd, Charles Wesley Strange III, Charles Essex, Carol Griffin, Bradley Dylan Ivanchan, Michelle Joy Kapunaheleokalani Yarborough, Hannah Mason, Phouthasith Douangdara, Julia Ott, Connor Alexian Pladeck-Morgado, Katy Stuart, Andrea N. Ratzlaff, Catherine Elm Boatwright, Christopher Michael Van Etten, Talisa Shervon Williams, N.J.D., by and through her next friend, Kayla N. Diaz, Patricia Shirley Hughes, Helena Davis, Adriana Wakeling, Chris Lee Zimmerman, Jean S. Landphair, Hortense Kainoa Wainani Vickers, Trecia Brock Hood, Holly Lau Abraham, Ramiro Cardoza, Jr, Michele Kulesa, Carey Greggory DuVal, Federick C. Benson, Maria Cardoza, Charles Wesley Strange, B.C., by and through his next friend, Holly Conrad, Nicholas Joseph Francis Perez, L.R.P., by and through her next friend, Julianne Good Perry, Michelle Lee Rauschenberger, Cordaro Devone Clark, Theresa Karlson, Garry Lee Sparks, Brian M. Martin, Angel R. Roldan, G.W.P., by and through his next friend, Julianne Good Perry, Kirk W. Daehling, J.A.L., by and through his next friend, Charlotte Loquasto, Thomas Smedinghoff, Deborah Jean Peters, Jonathan L Ashley, III, Stephanie Jane Fisher, Conchetta Michell Diaz, C.E.S., by and through her next friend, Charles Wesley

**JA28**

Strange, Scott Peter Provost, Hayley Anderson, LeeAnn Schmidt, James Earl Ellis, Leroy Wingkit Lau Jr., Anthony Perez, Dan Olmstead, Nicole Ann Robles, Erica Fox, Kayla N. Diaz, Natalie Schmidt, Darilyn Perez, A.T.P., by and through her next friend, Stewart Lamar Perry, Suzi L. Fernandez, Luann Varney, Joey J. Hunter II, Samantha G. Roldan, G.B.L., by and through his next friend, Miranda Landrum, Louise P. Conlon, Elizabeth A. Martin, Michael Festus Fox, Colby Anderson, Miriam A. Mullen, Mary R. Hammerbacher-Nichols, Justina Hardison, Abby Knapp-Morris, William A. Burley, Brittani Marie Carner, Clarence Williams Jr., D.R., by and through his next friend, Melissa Rodriguez, Corteize Clark, Mark T. Smedinghoff, Bob Surprenant, Debra Ann Perez, Erin Riedel, Brittany Taylor Townsend, JD Prosser, Nicholas Walter Robinson IV, Joseph Duarte, Douglas A. Landphair, Jonathan Cleary, Mark G. Worley, Jeffrey L. White Sr., Rodolfo Rodriguez Sr., Catherine Kimberly Vaughn Kryzda, Nancy R. Wilson, Jose Alberto Morgado, G.R.P., by and through his next friend, Ashley Peters, Jacob Louis Spehar, Dana Rainey, Benjamin Horsley, Songmi Kietzmann, Daniel Edward Stamper Jr., A.M.S., by and through her next friend, Tammie Sue Schoonhoven, Joan M. Smedinghoff, Christopher Scott Schoonhoven, Zachary Douglas Sparks, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, John C. McCarthy, Francisco Javier Briseno Gutierrez, Joshua Anthony Sams, Kara Gibson, Meghan Janet Hollingsworth, Timothy Norman Carner, August Wildman, Adam Matthew Jayne, Brian Harper, Catherine Mullins, Tracy Anne Herring, Joy Coy, Mary Beth Smedinghoff, Stewart Lamar Perry, Marissa Brown, Chester R. McBride Sr., Dennis John Elm, Eric Daniel Lund, Travis Scott Green, Glenda Green, Summer Reeves Dunn, Mona G. Betzen, Bruce K. Nichols, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, Michelle Zimmerman, Joseph Roger Deslauriers, Patrick Spehar, Katlyn M. Osborn, Georganne M. Siercks, Mallory Taylor Williams, Victor Raymond Ellis, Chet Murach, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Z.R.S., by and through her next friend, Kent Alan Skeens, Stephanie Ann Miller, Anna Maria Banzer, Cedric Frank Gordon, Anthony M. Diaz, Cedric Donshae Gordon Sr., Anthony D'Augustine, Paula K. White, Jimmy Smith, John Terry Pittman Sr., N.J.A.D., by and through his next friend, Kayla N. Diaz, Douglas Nichols, George B. McClintock, Lieselotte R. Roldan, Edward Klein, M.G.N., by and through her next friend, Bruce K. Nichols, Kevin Honaker, DeLaynie K. Peek, Jonathan Leigh Ashley, IV, Nathan Ewell Torian, Regina C. Smedinghoff, Diane Timoney, V.I., by and through her next friend, Shelby Iubelt, Donna Lee Elm, Frances P. Diaz, E.G., by and through her next friend, Julie Green, Gail Provost, Vivian Perry, Aaron William Prescott, Jedidiah Daniel Morgan, Samantha Daehling, Christine Rangel, Jennifer Katherine Reeves, S.N.P., by and through her next friend, Christine H. Phillips, Kathleen Lynn Alexander, Ayzia J. Jayne, David William Haalilio Lau, Charlotte Loquasto, Alexander Lau, Erik Sparks, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Brandon Nichols, Andrea Kessler, Joshua Nicholas Sust, Lisa Deslauriers, G.F., by and through his next friend, Erica Fox, Cassie Marie Richardson, Charlotte Ann Reeves, Jessica Anne Benson, Catherine G. Martin, Summer Breanne Sutton, Michelle Rose McEvoy, Mark K. Roland, Janice H. Proctor, Donald Edward Newman Sr., Betty Darlene Black, Mark Matthew Kaleinani Vickers, Jordan Lambka, B.R.L., by and through her next friend, Miranda Landrum, Christopher Powers, John Means, Matthias P. Roldan, C.F., by and through his next friend, Stephanie Jane Fisher, John Horsley, Robert Cabrera, Patricia D'Augustine, Gregory Timoney, Zackary Welch, Angela Kahler, Tammy Olmstead, M.L., by and through her next friend, David William Haalilio Lau, Alberto D. Diaz, Louis Provost, Kyle White, James Russell Ellis, Lucas Daniels, Eric M. Hunter, Sheeshta Marie Perry, Shannon K. McNulty, Eric Morgado, Robin Elizabeth Akers, Randy Ristau, K.H., by and through

**JA29**

| | | her next friend, Eric M. Hunter, Margaret Elm Campbell, William R. Nevins, Robert Alexander Dove, Thomas Elmer Wickliff, Mitchell L. Stambaugh, Karyn Stone Marta, Kristina Brown, London Jacinda Belel, Hamide Lau, Paige Erlanger, MaryJane G. Medeiros, Brandon Korona, Sofia Kessler, Tamara Elaine Horns, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Precious Clark, Suzanne Ristau, Garrett Layne Funk, L.C.D., by and through his next friend, Bridgett L. DeHoff, Adolf Olivas, Julie Green, Jason Wayne Gibson, Ricardo J. Perez-Ramos, April Cleary, Daniel Lee Brown, Jane Sparks, Kimberly Metcalf, Seth Wakeling, Daniel Owen Hughes, Brennan Cox, Jordan L. Sibley, Brenda Daehling, Mary Jane Vickers, Luis Briseno, Kade M. Osborn, Peyton Cooney, Melissa Rodriguez, Bethany Rose Mullins Randall, A.P., by and through her next friend, Darilyn Perez, Gregory W. Worley, Heather Frances Daniels, Ida Belle Pittman, Cody Worley, Larry D. Horns, Cynthia Jeffries Richmond, Alex Jason Rozanski, B.C.D., by and through his next friend, Kelli Dodge, Suni Chabrow, Gillian Leigh Cabrera, Emmitt Dwayne Burns, Jan Marie Hurnblad Sparks, Samantha Shervon Williams, Patrick Charles McEvoy, Corbin Cabrera, Sheila Ristaino, Robert Charles Darrough, Kirk Andrew Gollnitz, Julianne Good Perry, Ramiro Cardoza, Sr, Cynthia Nichols, Paul Elmer Jayne, Kathleen McEvoy, B.M., by and through his next friend, Darilyn Perez, Ross Cox, Erin Nicole Goss, Meredith Landphair, Vance Marshall Keliiolani Vickers, Derrick Anthony Davis, T.G., by and through her next friend, Julie Green, William J. Mullen, Shawn Patrick Griffin, Paul Edward Goins III, Deborah Fern Schoonhoven, Holly Conrad, Alexandra Dorian McClintock, Anna Morgan, Michelle Riley, Martha Carolina Smith, Janet Landrum, Christine H. Phillips, Beverly Mills, Julie Ann Ellis, Clarence Joseph Metcalf, Baily Zimmerman, Maximo Diaz, Shelby Iubelt, Jordan T. Ashley, Samuel Robert Shockley, Brian Provost, Joyce Patricia Paulsen, Matthew Elm, James Bell, Harriet Sutton, Nathan Jeremy Rimpf, Lisa Martinusen, Cynthia Carol Campbell, Tammie Maria Ashley, Ronald Paul Hopkins, Alex Henigan, Trent Lorne Skeens, Liseth Martinez-Arellano. (Attachments: # 1 Exhibit Exhibit A) (Kay-Oliphant, Eli) (Entered: 02/15/2022) |
| 02/23/2022 | 36 | Letter MOTION for Leave to File Document *Corrected Amended Complaint (Dkt. No. 35)* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon |

Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L.

**JA31**

Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr.,

| | | |
|---|---|---|
| | | Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch. (Attachments: # 1 Exhibit 1, # 2 Exhibit A, # 3 Exhibit 2, # 4 Exhibit 3) (Kay-Oliphant, Eli) (Entered: 02/23/2022) |
| 02/24/2022 | | ORDER. The Court is in receipt of 36 . Defendants are directed to advise the Court, **by close of business February 25, 2022**, whether they consent to all the changes proposed by Plaintiffs in the corrected Amended Complaint, including the additional language in footnotes 159 and 174. *See* ECF No. [36-4]. Ordered by Judge Kiyo A. Matsumoto on 2/24/2022. (Ahn, Lois) (Entered: 02/24/2022) |
| 02/25/2022 | 37 | Letter *responding to the Court's February 24, 2022 Order* by Danske Bank A/S, Danske Markets Inc., Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas, Placid NK Corporation, Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC (Frawley, Brian) (Entered: 02/25/2022) |
| 02/25/2022 | | ORDER. Having been advised by Defendants 37 that they consent to all the changes proposed by Plaintiffs in the corrected Amended Complaint, the Court grants Plaintiffs' 36 Motion for Leave to File corrected Amended Complaint. Plaintiff shall file the corrected Amended Complaint by **March 1, 2022**. Ordered by Judge Kiyo A. Matsumoto on 2/25/2022. (Ahn, Lois) (Entered: 02/25/2022) |
| 02/26/2022 | 38 | AMENDED COMPLAINT *(Corrected)* against All Defendants, filed by R.X.C., by and through his next friend, August Wildman, Joanna Gilbert, William Anthony Murach, P.A.D., by and through her next friend, Kelli Dodge, Robert Martin Kahokulani Vickers Sr., K.K., by and through her next friend, Abby Knapp-Morris, K.F., by and through his next friend, Stephanie Jane Fisher, James L. Daniels, John F. Ellis, Sarah Tiffany Peterson, H.R., by and through her next friend, Randy Ristau, Mary Border, A.C., by and through his next friend, Nicole Cox, Matthew J. Diaz, Lawrence Marta, Kevin Trimble, Kent Alan Skeens, Jeremy J. Metzger, H.C., by and through her next friend, Nicole Cox, Brian Anthony Williams, Michael White, Freddie Dewey Sutton, Erica M. Roland, Miranda Landrum, Makahea Xhelili, Lorria Welch, Dennis W. Peters, Adam |

Samuel Hartswick, G.S., by and through his next friend, Georganne M. Siercks, Kelli Dodge, Kristine Anne Zitny, M.G.C., by and through his next friend, August Wildman, Suzanne Renae Martinez, Andrea Roe, Victoria Jane Reeves, Brian Lambka, Joe Torian, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Creighton David Osborn, Joshua Michael Prescott, Daniel Matias Cabrera, A.L.S., by and through his next friend, Natalie Schmidt, Scott Regelin, Christa L. Osborn, Christopher J. Rosebrock, Terence Lonnie Jones, Robert Martin Kahokulani Vickers Jr., Marion Ruth Hopkins, Ryan Gregory Timoney, Nicole Cox, K.L., by and through his next friend, David William Haalilio Lau, Natasha Buchanan, Daniel Griffin, Katherine Abreu-Border, Esta Smith, Phillip J. Schmidt, Paul Provost, Sophie Daniels, Marie Sentina Mielke, Joelle R. Ellis, Lona L. Bosley, C.D., by and through his next friend, Helena Davis, Nicole D'Augustine, Kathleen Perry, Kayla Marie Daehling, Jose Luis Martinez Hernandez, Brian Christopher Jergens, Adrian Kie-Alun Sherrod, Sarah Melinda Schwallie, Janice Caruso, Judith L. Ashley, Bethany Rose Wesley, Katelyn Marie Strange, Amanda Newman, Thomas Mullins, Kristie Surprenant, James Wayne Worley, Tiffany Louise Horns, Kevin Williams, Kevin King, James R. Landrum, Daniel Mark Robinson, Abrill Renee Williams, Tyler Gollnitz, Michael Iubelt, Maggie Mae Bilyeu, Joyce Ann Tulloch, A.G., by and through her next friend, Julie Green, Cleveland Davis, Joey J. Hunter Sr., Michael Collins, Monte Douglas Nichols, Kristin Caracciolo, Q.G., by and through his next friend, Kara Gibson, Brian Edward Ellis, Patricia Goins, Luke Spehar, Kenna Hunter, Taylor Marta, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Ashley Peters, Matt Griffin, William Michael Burley, Tammie Sue Schoonhoven, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, K.R., by and through her next friend, Melissa Rodriguez, Rodney Riley, Holly Marie Harpe, Cameron Jay Stuart, Tracey Marie Prescott, Angela Marie Harper, Keyko D. Clark, Barbara A. Roland, Pamela E. Alexander Bell, Erich Martin Ellis, Gloria Diane Trelfa, John A. Provost, T.M.C., by and through his next friend, Timothy Norman Carner, Nancy Marie Mullen, Sherry A. Skeens, Cheryl Atwell, Spenser J. Fernandez, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Jeanne M. Nichols, G.A.S., by and through his next friend, Kent Alan Skeens, Michelle Carolina Rotelli, Thomas Anthony Fogarty, Jacob Richard Prescott, J.H., by and through his next friend, Eric M. Hunter, Barry Welch, Annie L. McBride, Joseph Troy Hulsey Jr., Emily Torian, Shirene Regelin, Annette Spehar, Julie K. Martin, Judith Sara Darrough, D.C.M., by and through his next friend, Alexandra Dorian McClintock, Gertrude Provost, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, Jennifer D'Augustine, Jammie Joann Smith, John L. Fant, Adan Perez, Frederick Allen Tolon, Colleen Whipple, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Vanessa Marie Anzures, Alison R. Pohn, Brandon Tyler Schmidt, Wendy Shedd, Charles Wesley Strange III, Charles Essex, Carol Griffin, Bradley Dylan Ivanchan, Michelle Joy Kapunaheleokalani Yarborough, Hannah Mason, Phouthasith Douangdara, Julia Ott, Connor Alexian Pladeck-Morgado, Katy Stuart, Andrea N. Ratzlaff, Catherine Elm Boatwright, Christopher Michael Van Etten, Talisa Shervon Williams, N.J.D., by and through her next friend, Kayla N. Diaz, Patricia Shirley Hughes, Helena Davis, Adriana Wakeling, Chris Lee Zimmerman, Jean S. Landphair, Hortense Kainoa Wainani Vickers, Trecia Brock Hood, Holly Lau Abraham, Ramiro Cardoza, Jr, Michele Kulesa, Carey Greggory DuVal, Federick C. Benson, Maria Cardoza, Charles Wesley Strange, B.C., by and through his next friend, Holly Conrad, Nicholas Joseph Francis Perez, L.R.P., by and through her next friend, Julianne Good Perry, Michelle Lee Rauschenberger, Cordaro Devone Clark, Theresa Karlson, Garry Lee Sparks, Brian M. Martin, Angel R. Roldan, G.W.P., by and through his next

friend, Julianne Good Perry, Kirk W. Daehling, J.A.L., by and through his next friend, Charlotte Loquasto, Thomas Smedinghoff, Deborah Jean Peters, Jonathan L Ashley, III, Stephanie Jane Fisher, Conchetta Michell Diaz, C.E.S., by and through her next friend, Charles Wesley Strange, Scott Peter Provost, Hayley Anderson, LeeAnn Schmidt, James Earl Ellis, Leroy Wingkit Lau Jr., Anthony Perez, Dan Olmstead, Nicole Ann Robles, Erica Fox, Kayla N. Diaz, Natalie Schmidt, Darilyn Perez, A.T.P., by and through her next friend, Stewart Lamar Perry, Suzi L. Fernandez, Luann Varney, Joey J. Hunter II, Samantha G. Roldan, G.B.L., by and through his next friend, Miranda Landrum, Louise P. Conlon, Elizabeth A. Martin, Michael Festus Fox, Colby Anderson, Miriam A. Mullen, Mary R. Hammerbacher-Nichols, Justina Hardison, Abby Knapp-Morris, William A. Burley, Brittani Marie Carner, Clarence Williams Jr., D.R., by and through his next friend, Melissa Rodriguez, Corteize Clark, Mark T. Smedinghoff, Bob Surprenant, Debra Ann Perez, Erin Riedel, Brittany Taylor Townsend, JD Prosser, Nicholas Walter Robinson IV, Joseph Duarte, Douglas A. Landphair, Jonathan Cleary, Mark G. Worley, Jeffrey L. White Sr., Rodolfo Rodriguez Sr., Catherine Kimberly Vaughn Kryzda, Nancy R. Wilson, Jose Alberto Morgado, G.R.P., by and through his next friend, Ashley Peters, Jacob Louis Spehar, Dana Rainey, Benjamin Horsley, Songmi Kietzmann, Daniel Edward Stamper Jr., A.M.S., by and through her next friend, Tammie Sue Schoonhoven, Joan M. Smedinghoff, Christopher Scott Schoonhoven, Zachary Douglas Sparks, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, John C. McCarthy, Francisco Javier Briseno Gutierrez, Rodzie Efren Rodriguez, Joshua Anthony Sams, Kara Gibson, Meghan Janet Hollingsworth, Timothy Norman Carner, August Wildman, Adam Matthew Jayne, Brian Harper, Catherine Mullins, Tracy Anne Herring, Joy Coy, Mary Beth Smedinghoff, Stewart Lamar Perry, Marissa Brown, Chester R. McBride Sr., Dennis John Elm, Eric Daniel Lund, Travis Scott Green, Glenda Green, Summer Reeves Dunn, Mona G. Betzen, Bruce K. Nichols, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, Michelle Zimmerman, Joseph Roger Deslauriers, Patrick Spehar, Katlyn M. Osborn, Georganne M. Siercks, Mallory Taylor Williams, Victor Raymond Ellis, Chet Murach, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Adam Daehling, Z.R.S., by and through her next friend, Kent Alan Skeens, Stephanie Ann Miller, Anna Maria Banzer, Cedric Frank Gordon, Anthony M. Diaz, Cedric Donshae Gordon Sr., Anthony D'Augustine, Paula K. White, Jimmy Smith, John Terry Pittman Sr., N.J.A.D., by and through his next friend, Kayla N. Diaz, Douglas Nichols, George B. McClintock, Lieselotte R. Roldan, Edward Klein, M.G.N., by and through her next friend, Bruce K. Nichols, Kevin Honaker, Katrina M. Reeves, DeLaynie K. Peek, Jonathan Leigh Ashley, IV, Nathan Ewell Torian, Regina C. Smedinghoff, Diane Timoney, V.I., by and through her next friend, Shelby Iubelt, Donna Lee Elm, Frances P. Diaz, E.G., by and through her next friend, Julie Green, Gail Provost, Spencer Dana Provost, Vivian Perry, Aaron William Prescott, Jedidiah Daniel Morgan, Samantha Daehling, Christine Rangel, Jennifer Katherine Reeves, S.N.P., by and through her next friend, Christine H. Phillips, Kathleen Lynn Alexander, Ayzia J. Jayne, David William Haalilio Lau, Charlotte Loquasto, Alexander Lau, Erik Sparks, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Brandon Nichols, Andrea Kessler, Joshua Nicholas Sust, Lisa Deslauriers, G.F., by and through his next friend, Erica Fox, S.L.L.B., by and through her next friend, Natasha Buchanan, Cassie Marie Richardson, Charlotte Ann Reeves, Jessica Anne Benson, Catherine G. Martin, Summer Breanne Sutton, Michelle Rose McEvoy, Mark K. Roland, Janice H. Proctor, Donald Edward Newman Sr., Betty Darlene Black, Mark Matthew Kaleinani Vickers, Jordan Lambka, B.R.L., by and through her next friend, Miranda Landrum, Christopher Powers, John Means, Matthias P. Roldan, C.F., by and through his next friend, Stephanie Jane Fisher,

| | | |
|---|---|---|
| | | John Horsley, Robert Cabrera, Patricia D'Augustine, Gregory Timoney, Zackary Welch, Angela Kahler, Tammy Olmstead, M.L., by and through her next friend, David William Haalilio Lau, Alberto D. Diaz, Louis Provost, Kyle White, James Russell Ellis, Lucas Daniels, Eric M. Hunter, Sheeshta Marie Perry, Shannon K. McNulty, Eric Morgado, Robin Elizabeth Akers, Randy Ristau, K.H., by and through her next friend, Eric M. Hunter, Margaret Elm Campbell, William R. Nevins, Robert Alexander Dove, Thomas Elmer Wickliff, Mitchell L. Stambaugh, Karyn Stone Marta, Kristina Brown, London Jacinda Belel, Hamide Lau, Paige Erlanger, MaryJane G. Medeiros, Brandon Korona, Sofia Kessler, Tamara Elaine Horns, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Precious Clark, Suzanne Ristau, Garrett Layne Funk, L.C.D., by and through his next friend, Bridgett L. DeHoff, Adolf Olivas, Julie Green, Jason Wayne Gibson, Ricardo J. Perez-Ramos, April Cleary, Daniel Lee Brown, L.A.E.L.B., by and through her next friend, Natasha Buchanan, Jane Sparks, Kimberly Metcalf, Seth Wakeling, Daniel Owen Hughes, Brennan Cox, Jordan L. Sibley, Brenda Daehling, Mary Jane Vickers, Luis Briseno, Kade M. Osborn, Peyton Cooney, Melissa Rodriguez, Bethany Rose Mullins Randall, A.P., by and through her next friend, Darilyn Perez, Gregory W. Worley, Heather Frances Daniels, Ida Belle Pittman, Cody Worley, Larry D. Horns, Cynthia Jeffries Richmond, Alex Jason Rozanski, B.C.D., by and through his next friend, Kelli Dodge, Suni Chabrow, Gillian Leigh Cabrera, Emmitt Dwayne Burns, Jan Marie Hurnblad Sparks, Samantha Shervon Williams, Patrick Charles McEvoy, Corbin Cabrera, Sheila Ristaino, Robert Charles Darrough, Kirk Andrew Gollnitz, Julianne Good Perry, Ramiro Cardoza, Sr, Cynthia Nichols, Paul Elmer Jayne, Kathleen McEvoy, B.M., by and through his next friend, Darilyn Perez, Ross Cox, Erin Nicole Goss, Meredith Landphair, Vance Marshall Keliiolani Vickers, Derrick Anthony Davis, T.G., by and through her next friend, Julie Green, William J. Mullen, Shawn Patrick Griffin, Paul Edward Goins III, Deborah Fern Schoonhoven, Holly Conrad, Alexandra Dorian McClintock, Anna Morgan, Michelle Riley, Martha Carolina Smith, Janet Landrum, Christine H. Phillips, Beverly Mills, Julie Ann Ellis, Clarence Joseph Metcalf, Baily Zimmerman, Maximo Diaz, Shelby Iubelt, Jordan T. Ashley, Samuel Robert Shockley, Brian Provost, Joyce Patricia Paulsen, Matthew Elm, James Bell, Harriet Sutton, Nathan Jeremy Rimpf, Lisa Martinusen, Cynthia Carol Campbell, Tammie Maria Ashley, Ronald Paul Hopkins, Alex Henigan, Trent Lorne Skeens, Liseth Martinez-Arellano. (Attachments: # 1 Exhibit A) (Kay-Oliphant, Eli) (Entered: 02/26/2022) |
| 04/08/2022 | 39 | SUMMONS Returned Executed by R.X.C., by and through his next friend, August Wildman, Joanna Gilbert, William Anthony Murach, P.A.D., by and through her next friend, Kelli Dodge, Robert Martin Kahokulani Vickers Sr., K.K., by and through her next friend, Abby Knapp-Morris, K.F., by and through his next friend, Stephanie Jane Fisher, James L. Daniels, John F. Ellis, Sarah Tiffany Peterson, H.R., by and through her next friend, Randy Ristau, Mary Border, A.C., by and through his next friend, Nicole Cox, Matthew J. Diaz, Lawrence Marta, Kevin Trimble, Kent Alan Skeens, Jeremy J. Metzger, H.C., by and through her next friend, Nicole Cox, Brian Anthony Williams, Michael White, Freddie Dewey Sutton, Erica M. Roland, Miranda Landrum, Makahea Xhelili, Lorria Welch, Dennis W. Peters, Adam Samuel Hartswick, G.S., by and through his next friend, Georganne M. Siercks, Kelli Dodge, Kristine Anne Zitny, M.G.C., by and through his next friend, August Wildman, Suzanne Renae Martinez, Andrea Roe, Victoria Jane Reeves, Brian Lambka, Joe Torian, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Creighton David Osborn, Joshua Michael Prescott, Daniel Matias Cabrera, A.L.S., by and through his next friend, Natalie Schmidt, Scott Regelin, Christa L. Osborn, Christopher J. |

**JA36**

Rosebrock, Terence Lonnie Jones, Robert Martin Kahokulani Vickers Jr., Marion Ruth Hopkins, Ryan Gregory Timoney, Nicole Cox, K.L., by and through his next friend, David William Haalilio Lau, Natasha Buchanan, Daniel Griffin, Katherine Abreu-Border, Esta Smith, Phillip J. Schmidt, Paul Provost, Sophie Daniels, Marie Sentina Mielke, Joelle R. Ellis, Lona L. Bosley, C.D., by and through his next friend, Helena Davis, Nicole D'Augustine, Kathleen Perry, Kayla Marie Daehling, Jose Luis Martinez Hernandez, Brian Christopher Jergens, Adrian Kie-Alun Sherrod, Sarah Melinda Schwallie, Janice Caruso, Judith L. Ashley, Bethany Rose Wesley, Katelyn Marie Strange, Amanda Newman, Thomas Mullins, Kristie Surprenant, James Wayne Worley, Tiffany Louise Horns, Kevin Williams, Kevin King, James R. Landrum, Daniel Mark Robinson, Abrill Renee Williams, Tyler Gollnitz, Michael Iubelt, Maggie Mae Bilyeu, Joyce Ann Tulloch, A.G., by and through her next friend, Julie Green, Cleveland Davis, Joey J. Hunter Sr., Michael Collins, Monte Douglas Nichols, Kristin Caracciolo, Q.G., by and through his next friend, Kara Gibson, Brian Edward Ellis, Patricia Goins, Luke Spehar, Kenna Hunter, Taylor Marta, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Ashley Peters, Matt Griffin, William Michael Burley, Tammie Sue Schoonhoven, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, K.R., by and through her next friend, Melissa Rodriguez, Rodney Riley, Holly Marie Harpe, Cameron Jay Stuart, Tracey Marie Prescott, Angela Marie Harper, Keyko D. Clark, Barbara A. Roland, Pamela E. Alexander Bell, Erich Martin Ellis, Gloria Diane Trelfa, John A. Provost, T.M.C., by and through his next friend, Timothy Norman Carner, Nancy Marie Mullen, Sherry A. Skeens, Cheryl Atwell, Spenser J. Fernandez, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Jeanne M. Nichols, G.A.S., by and through his next friend, Kent Alan Skeens, Michelle Carolina Rotelli, Thomas Anthony Fogarty, Jacob Richard Prescott, J.H., by and through his next friend, Eric M. Hunter, Barry Welch, Annie L. McBride, Joseph Troy Hulsey Jr., Emily Torian, Shirene Regelin, Annette Spehar, Julie K. Martin, Judith Sara Darrough, D.C.M., by and through his next friend, Alexandra Dorian McClintock, Gertrude Provost, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, Jennifer D'Augustine, Jammie Joann Smith, John L. Fant, Adan Perez, Frederick Allen Tolon, Colleen Whipple, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Vanessa Marie Anzures, Alison R. Pohn, Brandon Tyler Schmidt, Wendy Shedd, Charles Wesley Strange III, Charles Essex, Carol Griffin, Bradley Dylan Ivanchan, Michelle Joy Kapunaheleokalani Yarborough, Hannah Mason, Phouthasith Douangdara, Julia Ott, Connor Alexian Pladeck-Morgado, Katy Stuart, Andrea N. Ratzlaff, Catherine Elm Boatwright, Christopher Michael Van Etten, Talisa Shervon Williams, N.J.D., by and through her next friend, Kayla N. Diaz, Patricia Shirley Hughes, Helena Davis, Adriana Wakeling, Chris Lee Zimmerman, Jean S. Landphair, Hortense Kainoa Wainani Vickers, Trecia Brock Hood, Holly Lau Abraham, Ramiro Cardoza, Jr, Michele Kulesa, Carey Greggory DuVal, Federick C. Benson, Maria Cardoza, Charles Wesley Strange, B.C., by and through his next friend, Holly Conrad, Nicholas Joseph Francis Perez, L.R.P., by and through her next friend, Julianne Good Perry, Michelle Lee Rauschenberger, Cordaro Devone Clark, Theresa Karlson, Garry Lee Sparks, Brian M. Martin, Angel R. Roldan, G.W.P., by and through his next friend, Julianne Good Perry, Kirk W. Daehling, J.A.L., by and through his next friend, Charlotte Loquasto, Thomas Smedinghoff, Deborah Jean Peters, Jonathan L Ashley, III, Stephanie Jane Fisher, Conchetta Michell Diaz, C.E.S., by and through her next friend, Charles Wesley Strange, Scott Peter Provost, Hayley Anderson, LeeAnn Schmidt, James Earl Ellis, Leroy Wingkit Lau Jr., Anthony Perez, Dan Olmstead, Nicole Ann Robles, Erica Fox, Kayla N. Diaz, Natalie Schmidt, Darilyn Perez, A.T.P., by and

**JA37**

through her next friend, Stewart Lamar Perry, Suzi L. Fernandez, Luann Varney, Joey J. Hunter II, Samantha G. Roldan, G.B.L., by and through his next friend, Miranda Landrum, Louise P. Conlon, Elizabeth A. Martin, Michael Festus Fox, Colby Anderson, Miriam A. Mullen, Mary R. Hammerbacher-Nichols, Justina Hardison, Abby Knapp-Morris, William A. Burley, Brittani Marie Carner, Clarence Williams Jr., D.R., by and through his next friend, Melissa Rodriguez, Corteize Clark, Mark T. Smedinghoff, Bob Surprenant, Debra Ann Perez, Erin Riedel, Brittany Taylor Townsend, JD Prosser, Nicholas Walter Robinson IV, Joseph Duarte, Douglas A. Landphair, Jonathan Cleary, Mark G. Worley, Jeffrey L. White Sr., Rodolfo Rodriguez Sr., Catherine Kimberly Vaughn Kryzda, Nancy R. Wilson, Jose Alberto Morgado, G.R.P., by and through his next friend, Ashley Peters, Jacob Louis Spehar, Dana Rainey, Benjamin Horsley, Songmi Kietzmann, Daniel Edward Stamper Jr., A.M.S., by and through her next friend, Tammie Sue Schoonhoven, Joan M. Smedinghoff, Christopher Scott Schoonhoven, Zachary Douglas Sparks, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, John C. McCarthy, Francisco Javier Briseno Gutierrez, Rodzie Efren Rodriguez, Joshua Anthony Sams, Kara Gibson, Meghan Janet Hollingsworth, Timothy Norman Carner, August Wildman, Adam Matthew Jayne, Brian Harper, Catherine Mullins, Tracy Anne Herring, Joy Coy, Mary Beth Smedinghoff, Stewart Lamar Perry, Marissa Brown, Chester R. McBride Sr., Dennis John Elm, Eric Daniel Lund, Travis Scott Green, Glenda Green, Summer Reeves Dunn, Mona G. Betzen, Bruce K. Nichols, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, Michelle Zimmerman, Joseph Roger Deslauriers, Patrick Spehar, Katlyn M. Osborn, Georganne M. Siercks, Mallory Taylor Williams, Victor Raymond Ellis, Chet Murach, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Adam Daehling, Z.R.S., by and through her next friend, Kent Alan Skeens, Stephanie Ann Miller, Anna Maria Banzer, Cedric Frank Gordon, Anthony M. Diaz, Cedric Donshae Gordon Sr., Anthony D'Augustine, Paula K. White, Jimmy Smith, John Terry Pittman Sr., N.J.A.D., by and through his next friend, Kayla N. Diaz, Douglas Nichols, George B. McClintock, Lieselotte R. Roldan, Edward Klein, M.G.N., by and through her next friend, Bruce K. Nichols, Kevin Honaker, Katrina M. Reeves, DeLaynie K. Peek, Jonathan Leigh Ashley, IV, Nathan Ewell Torian, Regina C. Smedinghoff, Diane Timoney, V.I., by and through her next friend, Shelby Iubelt, Donna Lee Elm, Frances P. Diaz, E.G., by and through her next friend, Julie Green, Gail Provost, Spencer Dana Provost, Vivian Perry, Aaron William Prescott, Jedidiah Daniel Morgan, Samantha Daehling, Christine Rangel, Jennifer Katherine Reeves, S.N.P., by and through her next friend, Christine H. Phillips, Kathleen Lynn Alexander, Ayzia J. Jayne, David William Haalilio Lau, Charlotte Loquasto, Alexander Lau, Erik Sparks, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, Brandon Nichols, Andrea Kessler, Joshua Nicholas Sust, Lisa Deslauriers, G.F., by and through his next friend, Erica Fox, S.L.L.B., by and through her next friend, Natasha Buchanan, Cassie Marie Richardson, Charlotte Ann Reeves, Jessica Anne Benson, Catherine G. Martin, Summer Breanne Sutton, Michelle Rose McEvoy, Mark K. Roland, Janice H. Proctor, Donald Edward Newman Sr., Betty Darlene Black, Mark Matthew Kaleinani Vickers, Jordan Lambka, B.R.L., by and through her next friend, Miranda Landrum, Christopher Powers, John Means, Matthias P. Roldan, C.F., by and through his next friend, Stephanie Jane Fisher, John Horsley, Robert Cabrera, Patricia D'Augustine, Gregory Timoney, Zackary Welch, Angela Kahler, Tammy Olmstead, M.L., by and through her next friend, David William Haalilio Lau, Alberto D. Diaz, Louis Provost, Kyle White, James Russell Ellis, Lucas Daniels, Eric M. Hunter, Sheeshta Marie Perry, Shannon K. McNulty, Eric Morgado, Robin Elizabeth Akers, Randy Ristau, K.H., by and through her next friend, Eric M. Hunter, Margaret Elm Campbell, William R. Nevins, Robert Alexander Dove, Thomas

|  |  | Elmer Wickliff, Mitchell L. Stambaugh, Karyn Stone Marta, Kristina Brown, London Jacinda Belel, Hamide Lau, Paige Erlanger, MaryJane G. Medeiros, Brandon Korona, Sofia Kessler, Tamara Elaine Horns, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Precious Clark, Suzanne Ristau, Garrett Layne Funk, L.C.D., by and through his next friend, Bridgett L. DeHoff, Adolf Olivas, Julie Green, Jason Wayne Gibson, Ricardo J. Perez-Ramos, April Cleary, Daniel Lee Brown, L.A.E.L.B., by and through her next friend, Natasha Buchanan, Jane Sparks, Kimberly Metcalf, Seth Wakeling, Daniel Owen Hughes, Brennan Cox, Jordan L. Sibley, Brenda Daehling, Mary Jane Vickers, Luis Briseno, Kade M. Osborn, Peyton Cooney, Melissa Rodriguez, Bethany Rose Mullins Randall, A.P., by and through her next friend, Darilyn Perez, Gregory W. Worley, Heather Frances Daniels, Ida Belle Pittman, Cody Worley, Larry D. Horns, Cynthia Jeffries Richmond, Alex Jason Rozanski, B.C.D., by and through his next friend, Kelli Dodge, Suni Chabrow, Gillian Leigh Cabrera, Emmitt Dwayne Burns, Jan Marie Hurnblad Sparks, Samantha Shervon Williams, Patrick Charles McEvoy, Corbin Cabrera, Sheila Ristaino, Robert Charles Darrough, Kirk Andrew Gollnitz, Julianne Good Perry, Ramiro Cardoza, Sr, Cynthia Nichols, Paul Elmer Jayne, Kathleen McEvoy, B.M., by and through his next friend, Darilyn Perez, Ross Cox, Erin Nicole Goss, Meredith Landphair, Vance Marshall Keliiolani Vickers, Derrick Anthony Davis, T.G., by and through her next friend, Julie Green, William J. Mullen, Shawn Patrick Griffin, Paul Edward Goins III, Deborah Fern Schoonhoven, Holly Conrad, Alexandra Dorian McClintock, Anna Morgan, Michelle Riley, Martha Carolina Smith, Janet Landrum, Christine H. Phillips, Beverly Mills, Julie Ann Ellis, Clarence Joseph Metcalf, Baily Zimmerman, Maximo Diaz, Shelby Iubelt, Jordan T. Ashley, Samuel Robert Shockley, Brian Provost, Joyce Patricia Paulsen, Matthew Elm, James Bell, Harriet Sutton, Nathan Jeremy Rimpf, Lisa Martinusen, Cynthia Carol Campbell, Tammie Maria Ashley, Ronald Paul Hopkins, Alex Henigan, Trent Lorne Skeens, Liseth Martinez-Arellano. Wall Street Exchange LLC served on 9/28/2021, answer due 10/19/2021. (Kay-Oliphant, Eli) (Entered: 04/08/2022) |
| 05/13/2022 | 40 | NOTICE of Appearance by Tejinder Singh on behalf of All Plaintiffs (aty to be noticed) (Singh, Tejinder) (Entered: 05/13/2022) |
| 05/23/2022 |  | Case Reassigned to Judge Hector Gonzalez. Judge Kiyo A. Matsumoto no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Mahoney, Brenna) (Entered: 05/23/2022) |
| 05/24/2022 | 41 | NOTICE of Appearance by Isabella Abelite on behalf of Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas (aty to be noticed) (Abelite, Isabella) (Entered: 05/24/2022) |
| 05/31/2022 | 42 | Letter MOTION for Leave to File Document *Pursuant to the Briefing Schedule set on December 7, 2021, and the Court's Individual Practices* by Danske Bank A/S, Danske Markets Inc.. (Frawley, Brian) (Entered: 05/31/2022) |
| 05/31/2022 |  | MOTION for Leave to File Document *Pursuant to the Briefing Schedule set on December 7, 2021, and the Court's Individual Practices* 42 is GRANTED. Ordered by Judge Hector Gonzalez on 5/31/2022. (Duffy, Matthew) (Entered: 05/31/2022) |
| 06/01/2022 | 43 | MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* by Danske Bank A/S, Danske Markets Inc.. (Frawley, Brian) (Entered: 06/01/2022) |

| 06/01/2022 | 44 | MEMORANDUM in Support re 43 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* filed by Danske Bank A/S, Danske Markets Inc.. (Frawley, Brian) (Entered: 06/01/2022) |
|---|---|---|
| 06/01/2022 | 45 | AFFIDAVIT/DECLARATION in Support re 43 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* filed by Danske Bank A/S, Danske Markets Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Frawley, Brian) (Entered: 06/01/2022) |
| 06/01/2022 | 46 | CERTIFICATE OF SERVICE by Danske Bank A/S, Danske Markets Inc. re 45 Affidavit in Support of Motion, 44 Memorandum in Support, 43 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2) dated March 18, 2022* (Shami, Amanda) (Entered: 06/01/2022) |
| 06/01/2022 | 47 | MOTION to Dismiss *Plaintiffs' Corrected Amended Complaint Pursuant to Federal Rules of Civil Procedure 8, 12(b)(2), and 12(b)(6)* by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas. (Januszewski, David) (Entered: 06/01/2022) |
| 06/01/2022 | 48 | MEMORANDUM in Support re 47 MOTION to Dismiss *Plaintiffs' Corrected Amended Complaint Pursuant to Federal Rules of Civil Procedure 8, 12(b)(2), and 12(b)(6)* filed by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas. (Januszewski, David) (Entered: 06/01/2022) |
| 06/01/2022 | 49 | AFFIDAVIT/DECLARATION in Support re 47 MOTION to Dismiss *Plaintiffs' Corrected Amended Complaint Pursuant to Federal Rules of Civil Procedure 8, 12(b)(2), and 12(b)(6)* filed by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas. (Attachments: # 1 Exhibit 1 - December 7, 2021 Transcript) (Ramesh, Sheila) (Entered: 06/01/2022) |
| 06/01/2022 | 50 | CERTIFICATE OF SERVICE by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas re 48 Memorandum in Support, 47 MOTION to Dismiss *Plaintiffs' Corrected Amended Complaint Pursuant to Federal Rules of Civil Procedure 8, 12(b)(2), and 12(b)(6)*, 49 Affidavit in Support of Motion, (Garimella, Sesi) (Entered: 06/01/2022) |
| 06/01/2022 | 51 | MOTION to Dismiss for Failure to State a Claim by Placid NK Corporation. (Delelle, Claire) (Entered: 06/01/2022) |
| 06/01/2022 | 52 | MEMORANDUM in Support re 51 MOTION to Dismiss for Failure to State a Claim filed by Placid NK Corporation. (Delelle, Claire) (Entered: 06/01/2022) |
| 06/01/2022 | 53 | MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC. (Finn, Andrew) (Entered: 06/01/2022) |
| 06/01/2022 | 54 | MEMORANDUM in Support re 53 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* filed by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC. (Finn, Andrew) (Entered: 06/01/2022) |
| 06/01/2022 | 55 | AFFIDAVIT/DECLARATION in Support re 53 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* |

| | | |
|---|---|---|
| | | filed by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Finn, Andrew) (Entered: 06/01/2022) |
| 06/01/2022 | 56 | CERTIFICATE OF SERVICE by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC re 55 Affidavit in Support of Motion, 53 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)*, 54 Memorandum in Support, (Finn, Andrew) (Entered: 06/01/2022) |
| 06/01/2022 | 57 | CERTIFICATE OF SERVICE by Placid NK Corporation re 52 Memorandum in Support, 51 MOTION to Dismiss for Failure to State a Claim (Mahaffey, Michael) (Entered: 06/01/2022) |
| 06/01/2022 | 58 | MEMORANDUM in Opposition re 44 Memorandum in Support, 43 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* filed by All Plaintiffs. (Kay-Oliphant, Eli) (Entered: 06/01/2022) |
| 06/01/2022 | 59 | MEMORANDUM in Opposition re 48 Memorandum in Support, 47 MOTION to Dismiss *Plaintiffs' Corrected Amended Complaint Pursuant to Federal Rules of Civil Procedure 8, 12(b)(2), and 12(b)(6)* filed by All Plaintiffs. (Kay-Oliphant, Eli) (Entered: 06/01/2022) |
| 06/01/2022 | 60 | MEMORANDUM in Opposition re 52 Memorandum in Support, 51 MOTION to Dismiss for Failure to State a Claim filed by All Plaintiffs. (Kay-Oliphant, Eli) (Entered: 06/01/2022) |
| 06/01/2022 | 61 | MEMORANDUM in Opposition re 53 MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)*, 54 Memorandum in Support, filed by All Plaintiffs. (Kay-Oliphant, Eli) (Entered: 06/01/2022) |
| 06/01/2022 | 62 | CERTIFICATE OF SERVICE by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adam Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda |

Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez

Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through her next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by

| | | |
|---|---|---|
| | | and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch re [61] Memorandum in Opposition, [59] Memorandum in Opposition, [60] Memorandum in Opposition, [58] Memorandum in Opposition (Kay-Oliphant, Eli) (Entered: 06/01/2022) |
| 06/03/2022 | 63 | REPLY in Support re [47] MOTION to Dismiss *Plaintiffs' Corrected Amended Complaint Pursuant to Federal Rules of Civil Procedure 8, 12(b)(2), and 12(b)(6) //Memorandum of Law in Support of Deutsche Bank AG and Deutsche Bank Trust Company Americas' Motion to Dismiss Plaintiffs' Corrected Amended Complaint* filed by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas. (Januszewski, David) (Entered: 06/03/2022) |
| 06/03/2022 | 64 | REPLY in Support re [51] MOTION to Dismiss for Failure to State a Claim filed by Placid NK Corporation. (Delelle, Claire) (Entered: 06/03/2022) |
| 06/03/2022 | 65 | REPLY in Support re [53] MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* filed by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC. (Finn, Andrew) (Entered: 06/03/2022) |
| 06/03/2022 | 66 | REPLY in Support re [43] MOTION to Dismiss *the Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(6), and 12(b)(2)* filed by Danske Bank A/S, Danske Markets Inc.. (Frawley, Brian) (Entered: 06/03/2022) |
| 06/08/2022 | 67 | Letter *Requesting Oral Argument on the SCB Defendants' Motion to Dismiss the Amended Complaint* by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC (Finn, Andrew) (Entered: 06/08/2022) |
| 06/17/2022 | 68 | Letter *requesting oral argument on Deutsche Bank's pending Motion to Dismiss Plaintiffs' Corrected Amended Complaint* by Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas (Januszewski, David) (Entered: 06/17/2022) |
| 07/06/2022 | 69 | STIPULATION of Dismissal *as to Danske Markets Inc.* by August Wildman (Kay-Oliphant, Eli) (Entered: 07/06/2022) |

| 07/26/2022 | | Order Dismissing Party as per Stipulation filed at docket entry No. 69 . Party Danske Markets Inc. terminated. Ordered by Judge Hector Gonzalez on July 26, 2022. (Neptune, Pierre) (Entered: 07/26/2022) |
|---|---|---|
| 08/04/2022 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on December 7, 2021, before Judge Matsumoto. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 8/25/2022. Redacted Transcript Deadline set for 9/4/2022. Release of Transcript Restriction set for 11/2/2022. (Parisi, Denise) (Entered: 08/04/2022) |
| 08/18/2022 | 71 | NOTICE of Appearance by Seth D. Ard on behalf of Aaron William Prescott, Katherine Abreu-Border, Abrill Renee Williams, Adolf Olivas, Alberto D. Diaz, Alex Henigan, Amanda Newman, Andrea Kessler, Angel R. Roldan, Anna Maria Banzer, Annette Spehar, Anthony M. Diaz, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Baily Zimmerman, Barbara A. Roland, Barry Welch, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Mary Border, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brian Lambka, Brian M. Martin, Luis Briseno, William Michael Burley, William A. Burley, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cynthia Carol Campbell, Catherine Elm Boatwright, Catherine G. Martin, Catherine Mullins, Charles Wesley Strange, Charles Wesley Strange III, Chet Murach, Chris Lee Zimmerman, Christine Rangel, Christopher J. Rosebrock, Clarence Joseph Metcalf, Cleveland Davis, Colleen Whipple, Michael Collins, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Cynthia Nichols, Dana Rainey, Daniel Griffin, Daniel Owen Hughes, Dennis John Elm, Dennis W. Peters, Diane Timoney, Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Freddie Dewey Sutton, Garry Lee Sparks, George B. McClintock, Gregory Timoney, Hamide Lau, Heather Frances Daniels, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James Russell Ellis, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jean S. Landphair, Jeanne M. Nichols, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Joan M. Smedinghoff, Joanna Gilbert, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John F. Ellis, John Horsley, Jose Alberto Morgado, Joshua Michael Prescott, Joy Coy, Joyce Patricia Paulsen, Judith Sara Darrough, Julia Ott, Julie K. Martin, Kade M. Osborn, Angela Kahler, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kevin Honaker, Kevin King, Kevin Trimble, Keyko D. Clark, Kimberly Metcalf, Kirk W. Daehling, Kristine Anne Zitny, Leroy Wingkit Lau Jr., Lisa Martinusen, Luann Varney, Lucas Daniels, Luke Spehar, Margaret Elm Campbell, Marie Sentina Mielke, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Mary R. Hammerbacher-Nichols, Matt Griffin, Matthew Elm, Matthew J. Diaz, Meredith Landphair, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miriam A. Mullen, Mitchell L. Stambaugh, Monte Douglas Nichols, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Dan Olmstead, |

**JA45**

| | | |
|---|---|---|
| | | Tammy Olmstead, Paige Erlanger, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Gran, DeLaynie K. Peek, Phillip J. Schmidt, Precious Clark, JD Prosser, Randy Ristau, Regina C. Smedinghoff, Erin Riedel, Robert Charles Darrough, Robert Martin Kahokulani Vickers Jr., Robin Elizabeth Akers, Rodney Riley, Andrea Roe, Ryan Gregory Timoney, Sarah Melinda Schwallie, Shannon K. McNulty, Shawn Patrick Griffin, Sheila Ristaino, Sherry A. Skeens, Songmi Kietzmann, Stephanie Ann Miller, Summer Breanne Sutton, Suni Chabrow, Suzanne Ristau, Tamara Elaine Horns, Taylor Marta, Thomas Anthony Fogarty, Thomas Mullins, Thomas Smedinghoff, Tracey Marie Prescott, Tracy Anne Herring, Trecia Brock Hood, Gloria Diane Trelfa, Wendy Shedd, August Wildman, William J. Mullen, William R. Nevins, Zachary Douglas Sparks, Zackary Welch (aty to be noticed) (Ard, Seth) (Entered: 08/18/2022) |
| 09/23/2022 | 72 | Letter *Notice of Supplemental Authority* by Standard Chartered Bank, Standard Chartered Bank (Pakistan) Limited, Standard Chartered PLC (Attachments: # 1 Supplemental Authority) (Finn, Andrew) (Entered: 09/23/2022) |
| 09/30/2022 | 73 | NOTICE of Appearance by Stephen Michael Baldini on behalf of Wall Street Exchange LLC (aty to be noticed) (Baldini, Stephen) (Entered: 09/30/2022) |
| 09/30/2022 | 74 | Corporate Disclosure Statement by Wall Street Exchange LLC identifying Corporate Parent United Fintech Solutions LLC, Corporate Parent Emirates Post Group for Wall Street Exchange LLC. (Baldini, Stephen) (Entered: 09/30/2022) |
| 09/30/2022 | 75 | Letter MOTION for pre motion conference by Wall Street Exchange LLC. (Baldini, Stephen) (Entered: 09/30/2022) |
| 09/30/2022 | 76 | Letter *re: Supplemental Authority* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adam Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., |

by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by

**JA47**

and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marsh, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott

| | | Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Singh, Tejinder) (Entered: 09/30/2022) |
|---|---|---|
| 10/03/2022 | 77 | Corporate Disclosure Statement by Wall Street Exchange LLC identifying Corporate Parent United Fintech Solutions LLC, Corporate Parent Emirates Post Group for Wall Street Exchange LLC. (Baldini, Stephen) (Entered: 10/03/2022) |
| 10/04/2022 | | ORDER: In lieu of a pre-motion conference, see ECF Nos. 75 , Defendant Wall Street Exchange LLC is permitted to file its motion to dismiss by NOVEMBER 1, 2022. Plaintiffs shall file their opposition to the motion by NOVEMBER 29, 2022. Defendant shall file its reply, if any, by DECEMBER 9, 2022. Ordered by Judge Hector Gonzalez on 10/4/2022. (MD) (Entered: 10/04/2022) |
| 11/01/2022 | 78 | MOTION to Dismiss by Wall Street Exchange LLC. (Attachments: # 1 Certificate of Service) (Baldini, Stephen) (Entered: 11/01/2022) |
| 11/01/2022 | 79 | MEMORANDUM in Support re 78 MOTION to Dismiss filed by Wall Street Exchange LLC. (Attachments: # 1 Certificate of Service) (Baldini, Stephen) (Entered: 11/01/2022) |
| 11/01/2022 | 80 | AFFIDAVIT/DECLARATION in Support re 78 MOTION to Dismiss / *Choudhary Declaration* filed by Wall Street Exchange LLC. (Attachments: # 1 Certificate of Service) (Baldini, Stephen) (Entered: 11/01/2022) |
| 11/01/2022 | 81 | AFFIDAVIT/DECLARATION in Support re 78 MOTION to Dismiss / *Ahnish Declaration* filed by Wall Street Exchange LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Certificate of Service) (Baldini, Stephen) (Entered: 11/01/2022) |
| 11/01/2022 | 82 | CERTIFICATE OF SERVICE by Wall Street Exchange LLC re 80 Affidavit in Support of Motion, 79 Memorandum in Support, 81 Affidavit in Support of Motion, 78 MOTION to Dismiss (Baldini, Stephen) (Entered: 11/01/2022) |
| 11/23/2022 | 83 | MOTION for pre motion conference *regarding Plaintiffs' motion for order authorizing alternative service of process upon Wall Street Exchange LLC* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp- |

Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C.,

**JA50**

by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her

next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch. (Kay-Oliphant, Eli) (Entered: 11/23/2022)

| | | |
|---|---|---|
| 11/29/2022 | 84 | MEMORANDUM in Opposition re 78 MOTION to Dismiss filed by All Plaintiffs. (Attachments: # 1 Certificate of Service) (Singh, Tejinder) (Entered: 11/29/2022) |
| 12/01/2022 | 85 | Letter *in Response to Pre-Motion Letter (D.I. 83)* by Wall Street Exchange LLC (Baldini, Stephen) (Entered: 12/01/2022) |
| 12/07/2022 | 86 | NOTICE by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, |

Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau

**JA53**

Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph

**JA54**

| | | |
|---|---|---|
| | | Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch *of Withdrawal of Allegation* (Kay-Oliphant, Eli) (Entered: 12/07/2022) |
| 12/09/2022 | 87 | REPLY in Support re 78 MOTION to Dismiss filed by Wall Street Exchange LLC. (Attachments: # 1 Certificate of Service) (Baldini, Stephen) (Entered: 12/09/2022) |
| 12/15/2022 | 88 | Letter *re: recent developments relating to Danske Bank* by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, |

Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.B., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L.

**JA56**

Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through his next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marta, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer

Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch (Singh, Tejinder) (Entered: 12/15/2022)

| | | |
|---|---|---|
| 12/28/2022 | 89 | Letter *responding to plaintiffs' December 15, 2022 letter* by Danske Bank A/S (Frawley, Brian) (Entered: 12/28/2022) |
| 12/29/2022 | 90 | MEMORANDUM & ORDER: Defendants' motions to dismiss 43 , 47 , 51 , 53 , 78 are GRANTED. The Complaint as to Defendants is dismissed. The Clerk of Court is respectfully directed to close this case. See attached Order for further details. Ordered by Judge Hector Gonzalez on 12/29/2022. (MD) (Entered: 12/29/2022) |
| 12/29/2022 | | ORDER: In light of the Court granting Defendants' motions to dismiss, *see* ECF No. 90 , Plaintiffs' motion for a pre motion conference 83 is dismissed as moot. Ordered by Judge Hector Gonzalez on 12/29/2022. (MD) (Entered: 12/29/2022) |
| 01/03/2023 | 91 | ORDERED and ADJUDGED that Defendants motions to dismiss are granted with prejudice. Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 126 (2d Cir. 2022).signed by Jalitza Poveda on behalf of Brenna B. Mahoney, Clerk of Court on 1/3/2023. (JM) (Entered: 01/05/2023) |
| 01/27/2023 | 92 | NOTICE OF APPEAL as to 91 Judgment, 90 Order on Motion to Dismiss,,,, Order on Motion to Dismiss for Failure to State a Claim,,,,, by A.C., by and through his next friend, Nicole Cox, A.G., by and through her next friend, Julie Green, A.L.S., by and through his next friend, Natalie Schmidt, A.M.S., by and through her next friend, |

Tammie Sue Schoonhoven, A.P., by and through her next friend, Darilyn Perez, A.R.S., by and through her next friend, Tammie Sue Schoonhoven, A.T.P., by and through her next friend, Stewart Lamar Perry, Aaron William Prescott, Abby Knapp-Morris, Katherine Abreu-Border, Abrill Renee Williams, Adam Daehling, Adam Matthew Jayne, Adam Samuel Hartswick, Adan Perez, Adolf Olivas, Adrian Kie-Alun Sherrod, Adriana Wakeling, Alberto D. Diaz, Alex Henigan, Alex Jason Rozanski, Alexander Lau, Alexandra Dorian McClintock, Alison R. Pohn, Amanda Newman, Andrea Kessler, Andrea N. Ratzlaff, Angel R. Roldan, Angela Marie Harper, Anna Maria Banzer, Anna Morgan, Annette Spehar, Annie L. McBride, Anthony D'Augustine, Anthony M. Diaz, Anthony Perez, April Cleary, Jonathan L Ashley, III, Jonathan Leigh Ashley, IV, Jordan T. Ashley, Tammie Maria Ashley, Ashley Peters, Cheryl Atwell, Ayzia J. Jayne, B.C., by and through his next friend, Holly Conrad, B.C.D., by and through his next friend, Kelli Dodge, B.M., by and through his next friend, Darilyn Perez, B.R.L., by and through her next friend, Miranda Landrum, Baily Zimmerman, Barbara A. Roland, Barry Welch, London Jacinda Belel, James Bell, Pamela E. Alexander Bell, Benjamin Horsley, Federick C. Benson, Bethany Rose Mullins Randall, Bethany Rose Wesley, Betty Darlene Black, Maggie Mae Bilyeu, Bob Surprenant, Mary Border, Bradley Dylan Ivanchan, Brandon Korona, Brandon Nichols, Brandon Tyler Schmidt, Brenda Daehling, Brennan Cox, Brian Anthony Williams, Brian Christopher Jergens, Brian Edward Ellis, Brian Harper, Brian Lambka, Brian M. Martin, Brian Provost, Luis Briseno, Brittany Taylor Townsend, Marissa Brown, Bruce K. Nichols, William Michael Burley, William A. Burley, C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda, C.D., by and through his next friend, Helena Davis, C.E.S., by and through her next friend, Charles Wesley Strange, C.F., by and through his next friend, Stephanie Jane Fisher, Corbin Cabrera, Daniel Matias Cabrera, Gillian Leigh Cabrera, Robert Cabrera, Cameron Jay Stuart, Cynthia Carol Campbell, Maria Cardoza, Ramiro Cardoza, Jr, Ramiro Cardoza, Sr, Carey Greggory DuVal, Brittani Marie Carner, Carol Griffin, Cassie Marie Richardson, Catherine Elm Boatwright, Catherine G. Martin, Catherine Kimberly Vaughn Kryzda, Catherine Mullins, Cedric Donshae Gordon Sr., Cedric Frank Gordon, Charles Essex, Charles Wesley Strange, Charles Wesley Strange III, Charlotte Ann Reeves, Charlotte Loquasto, Chester R. McBride Sr., Chet Murach, Chris Lee Zimmerman, Christa L. Osborn, Christine H. Phillips, Christine Rangel, Christopher J. Rosebrock, Christopher Michael Van Etten, Christopher Powers, Christopher Scott Schoonhoven, Clarence Joseph Metcalf, Clarence Williams Jr., Cleveland Davis, Cody Worley, Colby Anderson, Colleen Whipple, Michael Collins, Conchetta Michell Diaz, Connor Alexian Pladeck-Morgado, Cordaro Devone Clark, Corteize Clark, Creighton David Osborn, Cynthia Jeffries Richmond, Cynthia Nichols, D.C.M., by and through his next friend, Alexandra Dorian McClintock, D.R., by and through his next friend, Melissa Rodriguez, Dana Rainey, Daniel Edward Stamper Jr., Daniel Griffin, Daniel Lee Brown, Daniel Mark Robinson, Daniel Owen Hughes, Darilyn Perez, David William Haalilio Lau, Deborah Fern Schoonhoven, Deborah Jean Peters, Debra Ann Perez, Dennis John Elm, Dennis W. Peters, Derrick Anthony Davis, Diane Timoney, Donald Edward Newman Sr., Donna Lee Elm, Douglas A. Landphair, Douglas Nichols, E.G., by and through her next friend, Julie Green, Edward Klein, Elizabeth A. Martin, Emily Torian, Emmitt Dwayne Burns, Eric Daniel Lund, Eric M. Hunter, Eric Morgado, Erica Fox, Erica M. Roland, Erich Martin Ellis, Erik Sparks, Erin Nicole Goss, Esta Smith, Frances P. Diaz, Freddie Dewey Sutton, Frederick Allen Tolon, G.A.S., by and through his next friend, Kent Alan Skeens, G.B.L., by and through his next friend, Miranda Landrum, G.F., by and through his next friend, Erica Fox, G.R.P., by and through his next friend, Ashley Peters, G.S., by and through his next friend, Georganne M. Siercks, G.W.P., by and

**JA59**

through his next friend, Julianne Good Perry, Gail Provost, Garrett Layne Funk, Garry Lee Sparks, Georganne M. Siercks, George B. McClintock, Gertrude Provost, Glenda Green, Gregory Timoney, Gregory W. Worley, Francisco Javier Briseno Gutierrez, H.C., by and through her next friend, Nicole Cox, H.R., by and through her next friend, Randy Ristau, Hamide Lau, Hannah Mason, Harriet Sutton, Hayley Anderson, Heather Frances Daniels, Helena Davis, Holly Conrad, Holly Lau Abraham, Holly Marie Harpe, Ronald Paul Hopkins, Hortense Kainoa Wainani Vickers, Ida Belle Pittman, J.A.L., by and through his next friend, Charlotte Loquasto, J.H., by and through his next friend, Eric M. Hunter, Jacob Louis Spehar, Jacob Richard Prescott, James Earl Ellis, James L. Daniels, James R. Landrum, James Russell Ellis, James Wayne Worley, Jammie Joann Smith, Jan Marie Hurnblad Sparks, Jane Sparks, Janet Landrum, Janice Caruso, Janice H. Proctor, Jason Wayne Gibson, Jean S. Landphair, Jeanne M. Nichols, Jedidiah Daniel Morgan, Jeffrey L. White Sr., Jennifer D'Augustine, Jennifer Katherine Reeves, Jeremy J. Metzger, Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison, Jessica Anne Benson, Jimmy Smith, Joan M. Smedinghoff, Joanna Gilbert, Joe Torian, Joelle R. Ellis, Joey J. Hunter II, Joey J. Hunter Sr., John A. Provost, John C. McCarthy, John F. Ellis, John Horsley, John L. Fant, John Means, John Terry Pittman Sr., Jonathan Cleary, Jordan L. Sibley, Jordan Lambka, Jose Alberto Morgado, Jose Luis Martinez Hernandez, Joseph Duarte, Joseph Roger Deslauriers, Joseph Troy Hulsey Jr., Joshua Anthony Sams, Joshua Michael Prescott, Joshua Nicholas Sust, Joy Coy, Joyce Ann Tulloch, Joyce Patricia Paulsen, Judith L. Ashley, Judith Sara Darrough, Julia Ott, Julianne Good Perry, Julie Ann Ellis, Julie Green, Julie K. Martin, Justina Hardison, K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.F., by and through her next friend, Stephanie Jane Fisher, K.H., by and through her next friend, Eric M. Hunter, K.K., by and through her next friend, Abby Knapp-Morris, K.L., by and through his next friend, David William Haalilio Lau, K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers, K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers, K.R., by and through her next friend, Melissa Rodriguez, Kade M. Osborn, Angela Kahler, Kara Gibson, Karyn Stone Marks, Katelyn Marie Strange, Kathleen Lynn Alexander, Kathleen McEvoy, Kathleen Perry, Katlyn M. Osborn, Katrina M. Reeves, Katy Stuart, Kayla Marie Daehling, Kayla N. Diaz, Kelli Dodge, Kenna Hunter, Kent Alan Skeens, Kevin Honaker, Kevin King, Kevin Trimble, Kevin Williams, Keyko D. Clark, Kimberly Metcalf, Kirk Andrew Gollnitz, Kirk W. Daehling, Kristie Surprenant, Kristin Caracciolo, Kristina Brown, Kristine Anne Zitny, Kyle White, L.A.E.L.B., by and through her next friend, Natasha Buchanan, L.C.D., by and through his next friend, Bridgett L. DeHoff, L.R.P., by and through her next friend, Julianne Good Perry, Larry D. Horns, Lawrence Marta, LeeAnn Schmidt, Leroy Wingkit Lau Jr., Lieselotte R. Roldan, Lisa Deslauriers, Lisa Martinusen, Liseth Martinez-Arellano, Lona L. Bosley, Lorria Welch, Louis Provost, Louise P. Conlon, Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley, Luann Varney, Lucas Daniels, Luke Spehar, M.G.C., by and through his next friend, August Wildman, M.G.N., by and through her next friend, Bruce K. Nichols, M.L., by and through her next friend, David William Haalilio Lau, Makahea Xhelili, Mallory Taylor Williams, Margaret Elm Campbell, Marie Sentina Mielke, Marion Ruth Hopkins, Mark G. Worley, Mark K. Roland, Mark Matthew Kaleinani Vickers, Mark T. Smedinghoff, Martha Carolina Smith, Suzanne Renae Martinez, Mary Beth Smedinghoff, Mary Jane Vickers, Mary R. Hammerbacher-Nichols, MaryJane G. Medeiros, Matt Griffin, Matthew Elm, Matthew J. Diaz, Matthias P. Roldan, Maximo Diaz, Meghan Janet Hollingsworth, Melissa Rodriguez, Meredith Landphair, Michael Festus Fox, Michael Iubelt, Michael White, Michele Kulesa, Michelle Carolina Rotelli, Michelle Joy Kapunaheleokalani Yarborough, Michelle Lee Rauschenberger, Michelle

| | | |
|---|---|---|
| | | Riley, Michelle Rose McEvoy, Michelle Zimmerman, Beverly Mills, Miranda Landrum, Miriam A. Mullen, Mitchell L. Stambaugh, Mona G. Betzen, Monte Douglas Nichols, N.J.A.D., by and through his next friend, Kayla N. Diaz, N.J.D., by and through her next friend, Kayla N. Diaz, Nancy Marie Mullen, Nancy R. Wilson, Natalie Schmidt, Natasha Buchanan, Nathan Ewell Torian, Nathan Jeremy Rimpf, Nicholas Joseph Francis Perez, Nicholas Walter Robinson IV, Nicole Ann Robles, Nicole Cox, Nicole D'Augustine, Dan Olmstead, Tammy Olmstead, P.A.D., by and through her next friend, Kelli Dodge, Paige Erlanger, Patricia D'Augustine, Patricia Goins, Patricia Shirley Hughes, Patrick Charles McEvoy, Patrick Spehar, Paul Edward Goins III, Paul Elmer Jayne, Paul Provost, Paula K. White, DeLaynie K. Peek, Peyton Cooney, Phillip J. Schmidt, Phouthasith Douangdara, Precious Clark, JD Prosser, Q.G., by and through his next friend, Kara Gibson, R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda, R.X.C., by and through his next friend, August Wildman, Randy Ristau, Regina C. Smedinghoff, Ricardo J. Perez-Ramos, Erin Riedel, Robert Alexander Dove, Robert Charles Darrough, Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning, Robert Martin Kahokulani Vickers Jr., Robert Martin Kahokulani Vickers Sr., Robin Elizabeth Akers, Rodney Riley, Rodolfo Rodriguez Sr., Rodzie Efren Rodriguez, Andrea Roe, Ross Cox, Ryan Gregory Timoney, S.L.L.B., by and through her next friend, Natasha Buchanan, S.N.P., by and through her next friend, Christine H. Phillips, S.P., by and through her next friend, Ricardo J. Perez-Ramos, Samantha Daehling, Samantha G. Roldan, Samantha Shervon Williams, Samuel Robert Shockley, Sarah Melinda Schwallie, Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte, Sarah Tiffany Peterson, Scott Peter Provost, Scott Regelin, Seth Wakeling, Shannon K. McNulty, Shawn Patrick Griffin, Sheeshta Marie Perry, Sheila Ristaino, Shelby Iubelt, Sherry A. Skeens, Shirene Regelin, Sofia Kessler, Songmi Kietzmann, Sophie Daniels, Spencer Dana Provost, Spenser J. Fernandez, Stephanie Ann Miller, Stephanie Jane Fisher, Stewart Lamar Perry, Summer Breanne Sutton, Summer Reeves Dunn, Suni Chabrow, Suzanne Ristau, Suzi L. Fernandez, T.G., by and through her next friend, Julie Green, T.M.C., by and through his next friend, Timothy Norman Carner, Talisa Shervon Williams, Tamara Elaine Horns, Tammie Sue Schoonhoven, Taylor Marta, Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown, Terence Lonnie Jones, Theresa Karlson, Thomas Anthony Fogarty, Thomas Elmer Wickliff, Thomas Mullins, Thomas Smedinghoff, Tiffany Louise Horns, Timothy Norman Carner, Tracey Marie Prescott, Tracy Anne Herring, Travis Scott Green, Trecia Brock Hood, Gloria Diane Trelfa, Trent Lorne Skeens, Tyler Gollnitz, V.I., by and through her next friend, Shelby Iubelt, Vance Marshall Keliiolani Vickers, Vanessa Marie Anzures, Victor Raymond Ellis, Victoria Jane Reeves, Vivian Perry, Wendy Shedd, August Wildman, William Anthony Murach, William J. Mullen, William R. Nevins, Z.R.S., by and through her next friend, Kent Alan Skeens, Zachary Douglas Sparks, Zackary Welch. Filing fee $ 505, receipt number ANYEDC-16353524. (Singh, Tejinder) (Entered: 01/27/2023) |
| 01/30/2023 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 92 Notice of Appeal, Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 01/30/2023) |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

AUGUST WILDMAN, *et al*.,

                Plaintiffs,

      v.

DEUTSCHE BANK AKTIENGESELLSCHAFT,
DEUTSCHE BANK UK, DEUTSCHE BANK AG,
DUBAI BRANCH, DEUTSCHE BANK AG, NEW
YORK BRANCH, DEUTSCHE BANK TRUST
COMPANY AMERICAS, STANDARD
CHARTERED BANK, STANDARD CHARTERED
PLC, STANDARD CHARTERED BANK LIMITED,
STANDARD CHARTERED BANK (PAKISTAN)
LIMITED, STANDARD CHARTERED BANK,
DUBAI MAIN BRANCH, DANSKE BANK A/S,
DANSKE MARKETS INC., PLACID NK
CORPORATION d/b/a PLACID EXPRESS, and
WALL STREET EXCHANGE LLC,

                Defendants.

**1:21-cv-04400 (KAM) (RML)**

## STIPULATION AND NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE AS TO CERTAIN OF THE NAMED DEFENDANTS

WHEREAS Plaintiffs' Complaint names as defendants, *inter alia*, "Deutsche Bank AG", "Deutsche Bank UK", "Deutsche Bank AG, Dubai Branch", and "Deutsche Bank AG, New York Branch"; and

WHEREAS, counsel for Deutsche Bank AG has confirmed to counsel for Plaintiffs that there is no entity "Deutsche Bank UK", although there is a "Deutsche Bank AG, London Branch", and so stipulates; and

**JA62**

WHEREAS, counsel for Deutsche Bank has confirmed to counsel for Plaintiffs that branches of Deutsche Bank AG are not separate and distinct legal entities from Deutsche Bank AG, and so stipulates; and

WHEREAS, Plaintiffs' Complaint names as defendants, *inter alia*, "Standard Chartered Bank Limited" and "Standard Chartered Bank, Dubai Main Branch"; and

WHEREAS, counsel for Standard Chartered Bank has confirmed to counsel for Plaintiffs that "Standard Chartered Bank Limited" is not an entity within the Standard Chartered group of companies, and so stipulates; and

WHEREAS, counsel for Standard Chartered Bank has confirmed to counsel for Plaintiffs that there is no entity "Standard Chartered Bank, Dubai Main Branch" but rather the Standard Chartered entity that operates in Dubai is Standard Chartered Bank, and so stipulates; and

WHEREAS, Plaintiffs and the defendants who are parties to this Stipulation and Notice ("Stipulating Defendants") agree that no defenses of the Stipulating Defendants to the claims in this action, including but not limited to defenses based upon lack of personal or subject matter jurisdiction, lack of standing, improper venue or a defendant having been improperly named, is prejudiced or waived by the execution of, agreement to, or filing of this stipulation, and so stipulate.

WHEREFORE, PLEASE TAKE NOTICE that pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiffs hereby voluntarily dismiss all claims in this action, without prejudice, as to Defendants Deutsche Bank UK; Deutsche Bank AG, Dubai Branch; Deutsche Bank AG, New York Branch; Standard Chartered Bank Limited; and Standard Chartered Bank, Dubai Main Branch.

**JA63**

No Defendant has served an answer or motion for summary judgment in this action. Accordingly, Plaintiffs' dismissal of the action as to these Defendants is effective upon filing of this notice.

Dated:  October 4, 2021

/s/
Ryan R. Sparacino (*pro hac vice* forthcoming)
Eli J. Kay-Oliphant
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*

**Stipulated and Agreed**

CAHILL GORDON & REINDEL LLP

By:/s/
David G. Januszewski
32 Old Slip
New York, NY  10005
Tel: (212) 701-3352
djanuszewski@cahill.com

*Counsel for Defendants Deutsche Bank AG*
*and Deutsche Bank Trust Company Americas*

SULLIVAN & CROMWELL LLP

By:/s/
Andrew J. Finn
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
finna@sullcrom.com

*Counsel for Defendants Standard Chartered Bank,*
*Standard Chartered PLC, and Standard Chartered Bank*
*(Pakistan) Limited*

**JA64**

<u>**CERTIFICATE OF SERVICE**</u>

I, Eli J. Kay-Oliphant, hereby certify that on October 4, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send notification of such public filing to all counsel registered to receive such notice.

<u>/s/ Eli J. Kay-Oliphant</u>

**JA65**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUGUST WILDMAN, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M.G.C. BY AND THROUGH HIS NEXT FRIEND AUGUST WILDMAN, R.X.C. BY AND THROUGH HIS NEXT FRIEND AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, JD PROSSER, GLORIA DIANE TRELFA, JONATHAN L. ASHLEY III, JONATHAN LEIGH ASHLEY IV, JORDAN T. ASHLEY, TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER, PAMELA E. ALEXANDER BELL, JAMES BELL, LONDON JACINDA BELL, ANDREA ROE, FREDERICK C. BENSON, BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER, MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISEÑO GUTIERREZ, LUIS BRISEÑO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, WILLIAM MICHAEL BURLEY, MICHAEL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, CYNTHIA CAROL CAMPBELL, RAMIRO CARDOZA JR., RAMIRO CARDOZA SR., MARIA CARDOZA, BRITTANI MARIE CARNER, T.M.C. BY AND THROUGH HIS NEXT FRIEND TIMOTHY NORMAN CARNER, TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN CLEARY, B.C. BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD, PEYTON COONEY, A.C. BY AND THROUGH HIS NEXT FRIEND NICOLE COX, BRENNAN COX, H.C. BY AND THROUGH HER NEXT FRIEND NICOLE COX, NICOLE COX, ROSS COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE, PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, | **AMENDED COMPLAINT UNDER THE ANTI-TERRORISM ACT (18 U.S.C. § 2333)**<br><br>JURY TRIAL DEMANDED<br><br><br>No. 1:21-CV-4400-KAM-RML |

i

**JA66**

KAYLA MARIE DAEHLING, KIRK W.
DAEHLING, SAMANTHA JEAN MCNAMARA,
HEATHER FRANCES DANIELS, JAMES L.
DANIELS, LUCAS DANIELS, SOPHIE DANIELS,
JUDITH SARA DARROUGH, ROBERT CHARLES
DARROUGH, C.D. BY AND THROUGH HIS
NEXT FRIEND HELENA DAVIS, HELENA
DAVIS, JOSEPH ROGER DESLAURIERS, LISA
DESLAURIERS, ALBERTO D. DIAZ, ANTHONY
M. DIAZ, FRANCES P. DIAZ, KAYLA N. DIAZ,
MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D. BY
AND THROUGH HIS NEXT FRIEND KAYLA N.
DIAZ, N.J.D. BY AND THROUGH HER NEXT
FRIEND KAYLA N. DIAZ, B.C.D. BY AND
THROUGH HIS NEXT FRIEND KELLI DODGE,
KELLI DODGE, P.A.D. BY AND THROUGH HER
NEXT FRIEND KELLI DODGE, PHOUTHASITH
DOUANGDARA, ROBERT ALEXANDER DOVE,
JOSEPH DUARTE, SARAH PETERS-DUARTE,
INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF CURTIS JOSEPH DUARTE, JOY
COY, ROBERT L. DUNNING, INDIVIDUALLY
AND ON BEHALF OF THE ESTATE OF TOMOE
DUNNING, CAREY GREGGORY DUVAL, ERICH
MARTIN ELLIS, JAMES RUSSELL ELLIS, JAMES
EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS,
VANESSA MARIE ANZURES, BRIAN EDWARD
ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND
ELLIS, CATHERINE ELM BOATWRIGHT,
MARGARET ELM CAMPBELL, DENNIS JOHN
ELM, DONNA LEE ELM, MATTHEW ELM,
CHRISTINE RANGEL, CHARLES ESSEX,
MARION RUTH HOPKINS, JOHN L. FANT,
STEPHANIE JANE FISHER, C.F. BY AND
THROUGH HIS NEXT FRIEND STEPHANIE JANE
FISHER, K.F. BY AND THROUGH HIS NEXT
FRIEND STEPHANIE JANE FISHER, THOMAS
ANTHONY FOGARTY, ERICA FOX, G.F. BY
AND THROUGH HIS NEXT FRIEND MICHAEL
FESTUS FOX, MICHAEL FESTUS FOX, JASON
WAYNE GIBSON, KARA GIBSON, Q.G. BY AND
THROUGH HIS NEXT FRIEND KARA GIBSON,
JESSICA ANNE BENSON, JOANNA GILBERT,
EMMITT DWAYNE BURNS, JANICE CARUSO,
PAUL EDWARD GOINS III, PATRICIA GOINS,
DANA RAINEY, L.C.D. BY AND THROUGH HIS

NEXT FRIEND BRIDGETT L. DEHOFF, KIRK
ANDREW GOLLNITZ, TYLER GOLLNITZ,
CONCHETTA MICHELL DIAZ, CEDRIC
DONSHAE GORDON SR., CEDRIC FRANK
GORDON, ADRIAN KIE-ALUN SHERROD,
KRISTIN CARACCIOLO, SUNI CHABROW,
PAIGE ERLANGER, COLBY ANDERSON,
HAYLEY ANDERSON, A.G. BY AND THROUGH
HER NEXT FRIEND TRAVIS SCOTT GREEN,
A.G. BY AND THROUGH HER NEXT FRIEND
TRAVIS SCOTT GREEN, E.G. BY AND
THROUGH HER NEXT FRIEND TRAVIS SCOTT
GREEN, GLENDA GREEN, JULIE GREEN, T.G.
BY AND THROUGH HER NEXT FRIEND TRAVIS
SCOTT GREEN, TRAVIS SCOTT GREEN, CAROL
GRIFFIN, DANIEL GRIFFIN, MATT GRIFFIN,
SHAWN PATRICK GRIFFIN, SHEILA RISTAINO,
JERRY HARDISON, INDIVIDUALLY AND ON
THE BEHALF OF THE ESTATE OF TERESA
HARDISON, JUSTINA HARDISON, HOLLY
MARIE HARPE, ANGELA MARIE HARPER,
BRIAN HARPER, JOSEPH TROY HULSEY JR.,
ADAM SAMUEL HARTSWICK, ALEX HENIGAN,
KEVIN HONAKER, LARRY D. HORNS, TAMARA
ELAINE HORNS, TIFFANY LOUISE HORNS,
BENJAMIN HORSLEY, JOHN HORSLEY,
SONGMI KIETZMANN, KATHLEEN LYNN
ALEXANDER, DANIEL OWEN HUGHES,
PATRICIA SHIRLEY HUGHES, KRISTINE ANNE
ZITNY, BETTY DARLENE BLACK, JOEY J.
HUNTER II, JOEY J. HUNTER SR., ERIC M.
HUNTER, J.H. BY AND THROUGH HIS NEXT
FRIEND KENNA HUNTER, KENNA HUNTER,
K.H. BY AND THROUGH HER NEXT FRIEND
KENNA HUNTER, NICHOLAS WALTER
ROBINSON IV, MICHAEL IUBELT, SHELBY
IUBELT, V.I. BY AND THROUGH HER NEXT
FRIEND SHELBY IUBELT, CHARLOTTE
LOQUASTO, J.A.L. BY AND THROUGH HIS
NEXT FRIEND CHARLOTTE LOQUASTO,
BRADLEY DYLAN IVANCHAN, ADAM
MATTHEW JAYNE, AYZIA J. JAYNE, PAUL
ELMER JAYNE, G.A.S. BY AND THROUGH HIS
NEXT FRIEND KENT ALAN SKEENS, KENT
ALAN SKEENS, SHERRY A. SKEENS, TRENT
LORNE SKEENS, Z.R.S. BY AND THROUGH HER

NEXT FRIEND KENT ALAN SKEENS, BRIAN
CHRISTOPHER JERGENS, TERENCE LONNIE
JONES, JOHN C. MCCARTHY, ALISON R. POHN,
KEVIN KING, STEPHANIE ANN MILLER,
EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K.
BY AND THROUGH HER NEXT FRIEND ABBY
KNAPP-MORRIS, BRANDON KORONA, BRIAN
LAMBKA, JORDAN LAMBKA, DOUGLAS A.
LANDPHAIR, JEAN S. LANDPHAIR, MEREDITH
LANDPHAIR, B.R.L. BY AND THROUGH HER
NEXT FRIEND MIRANDA LANDRUM, G.B.L. BY
AND THROUGH HIS NEXT FRIEND MIRANDA
LANDRUM, JAMES R. LANDRUM, JANET
LANDRUM, MIRANDA LANDRUM, HOLLY LAU
ABRAHAM, LEROY WINGKIT LAU JR.,
ALEXANDER LAU, DAVID WILLIAM HAALILIO
LAU, HAMIDE LAU, K.L. BY AND THROUGH
HIS NEXT FRIEND DAVID WILLIAM HAALILIO
LAU, M.L. BY AND THROUGH HER NEXT
FRIEND DAVID WILLIAM HAALILIO LAU,
VIVIAN PERRY, MICHELLE LEE
RAUSCHENBERGER, JAMMIE JOANN SMITH,
ERIC DANIEL LUND, KARYN SUE STONE,
LAWRENCE MARTA, TAYLOR MARTA, BOB
SURPRENANT, KRISTIE SURPRENANT, BRIAN
M. MARTIN, CATHERINE G. MARTIN,
ELIZABETH A. MARTIN, JULIE K. MARTIN,
JOSE LUIS MARTINEZ HERNANDEZ, LISETH
MARTINEZ-ARELLANO, CHESTER R. MCBRIDE
SR., ANNIE L. MCBRIDE, ALEXANDRA DORIAN
MCCLINTOCK, D.C.M. BY AND THROUGH HIS
NEXT FRIEND ALEXANDRA DORIAN
MCCLINTOCK, GEORGE B. MCCLINTOCK,
JOYCE PATRICIA PAULSEN, KATHLEEN
MCEVOY, MICHELLE ROSE MCEVOY,
PATRICK CHARLES MCEVOY, JANICE H.
PROCTOR, LUANN VARNEY, SHANNON K.
MCNULTY, JOHN MEANS, CLARENCE JOSEPH
METCALF, KIMBERLY METCALF, JEREMY J.
METZGER, THERESA KARLSON, ANNA MARIA
BANZER, ANDREA KESSLER, SOFIA KESSLER,
ERIC MORGADO, JOSE ALBERTO MORGADO,
CONNOR ALEXIAN PLADECK-MORGADO,
ANNA MORGAN, JEDIDIAH DANIEL MORGAN,
MIRIAM A. MULLEN, NANCY MARIE MULLEN,
WILLIAM J. MULLEN, CATHERINE MULLINS,

THOMAS MULLINS, BETHANY ROSE MULLINS
RANDALL, CHET MURACH, WILLIAM
ANTHONY MURACH, WILLIAM R. NEVINS,
DERRICK ANTHONY DAVIS, DONALD
EDWARD NEWMAN SR., AMANDA NEWMAN,
MARY R. HAMMERBACHER-NICHOLS,
BRANDON NICHOLS, CYNTHIA NICHOLS,
DOUGLAS NICHOLS, MONTE DOUGLAS
NICHOLS, NICOLE ANN ROBLES, BRUCE K.
NICHOLS, JEANNE M. NICHOLS, M.G.N. BY
AND THROUGH HER NEXT FRIEND BRUCE K.
NICHOLS, ADOLF OLIVAS, CHRISTA L.
OSBORN, CREIGHTON DAVID OSBORN, KADE
M. OSBORN, KATLYN M. OSBORN, JULIA OTT,
NANCY R. WILSON, ROBIN ELIZABETH
AKERS, TRACY ANNE HERRING, ADAN PEREZ,
ANTHONY PEREZ, DEBRA ANN PEREZ,
NICHOLAS JOSEPH FRANCIS PEREZ, B.M. BY
AND THROUGH HIS NEXT FRIEND DARILYN
PEREZ, RICARDO J. PEREZRAMOS, A.P. BY
AND THROUGH HER NEXT FRIEND RICARDO J.
PEREZRAMOS, DARILYN PEREZ RAMOS, S.P.
BY AND THROUGH HER NEXT FRIEND
RICARDO J. PEREZRAMOS, A.T.P. BY AND
THROUGH HER NEXT FRIEND STEWART
LAMAR PERRY, G.W.P. BY AND THROUGH HIS
NEXT FRIEND JULIANNE GOOD PERRY,
JULIANNE GOOD PERRY, KATHLEEN PERRY,
L.R.P. BY AND THROUGH HER NEXT FRIEND
JULIANNE GOOD PERRY, STEWART LAMAR
PERRY, ASHLEY PETERS, DEBORAH JEAN
PETERS, DENNIS W. PETERS, G.R.P. BY AND
THROUGH HIS NEXT FRIEND ASHLEY PETERS,
CHRISTINE H. PHILLIPS, S.N.P. BY AND
THROUGH HER NEXT FRIEND CHRISTINE H.
PHILLIPS, BETHANY ROSE WESLEY, JOHN
TERRY PITTMAN SR., IDA BELLE PITTMAN,
AARON WILLIAM PRESCOTT, JACOB RICHARD
PRESCOTT, JOSHUA MICHAEL PRESCOTT,
TRACEY MARIE PRESCOTT, JUDITH L.
ASHLEY, LOUISE P. CONLON, MEGHAN JANET
HOLLINGSWORTH, MARYJANE G. MEDEIROS,
SARAH TIFFANY PETERSON, BRIAN PROVOST,
GAIL PROVOST, GERTRUDE PROVOST, JOHN
A. PROVOST, LOUIS PROVOST, PAUL
PROVOST, SCOTT PETER PROVOST, LONA L.

BOSLEY, ANDREA N. RATZLAFF, HANNAH
MASON, SUMMER REEVES DUNN,
CHARLOTTE ANN REEVES, JENNIFER
KATHERINE REEVES, VICTORIA JANE
REEVES, JOYCE ANN TULLOCH, MALLORY
TAYLOR WILLIAMS, SCOTT REGELIN,
SHIRENE REGELIN, CASSIE MARIE
RICHARDSON, CYNTHIA JEFFRIES RICHMOND,
MICHELLE RILEY, RODNEY RILEY, NATHAN
JEREMY RIMPF, CHRISTOPHER POWERS,
HALIE RISTAU, RANDY RISTAU, SUZANNE
RISTAU, DANIEL MARK ROBINSON, RODOLFO
RODRIGUEZ SR., DEREK RODRIGUEZ,
K.R. BY AND THROUGH HER NEXT FRIEND
MELISSA RODRIGUEZ, MELISSA RODRIGUEZ,
BARBARA A. ROLAND, ERICA M. ROLAND,
MARK K. ROLAND, ANGEL R. ROLDAN,
LIESELOTTE R. ROLDAN, MATTHIAS P.
ROLDAN, SAMANTHA G. ROLDAN,
CHRISTOPHER J. ROSEBROCK, ALEX JASON
ROZANSKI, JOSHUA ANTHONY SAMS,
COLLEEN WHIPPLE, A.L.S. BY AND THROUGH
HIS NEXT FRIEND NATALIE SCHMIDT,
BRANDON TYLER SCHMIDT, LEEANN
SCHMIDT, NATALIE SCHMIDT, PHILLIP J.
SCHMIDT, SHEESHTA MARIE PERRY, A.M.S.
BY AND THROUGH HER NEXT FRIEND
TAMMIE SUE SCHOONHOVEN, A.R.S. BY AND
THROUGH HER NEXT FRIEND TAMMIE SUE
SCHOONHOVEN, CHRISTOPHER SCOTT
SCHOONHOVEN, DEBORAH FERN
SCHOONHOVEN, TAMMIE SUE
SCHOONHOVEN, SARAH MELINDA
SCHWALLIE, SAMUEL ROBERT SHOCKLEY,
SPENSER J. FERNANDEZ, SUZI L. FERNANDEZ,
JORDAN L. SIBLEY, LOWELL BRENT SIBLEY,
INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF FORREST B. SIBLEY, G.S. BY AND
THROUGH HIS NEXT FRIEND GEORGANNE M.
SIERCKS, G.S. BY AND THROUGH HIS NEXT
FRIEND GEORGANNE M. SIERCKS,
GEORGANNE M. SIERCKS, JOAN M.
SMEDINGHOFF, MARK T. SMEDINGHOFF,
MARY BETH SMEDINGHOFF, REGINA C.
SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN
MARIE HURNBLAD SPARKS, ERIK SPARKS,

GARRY LEE SPARKS, JANE SPARKS, ZACHARY
DOUGLAS SPARKS, LISA MARTINUSEN,
MARIE SENTINA MIELKE, ANNETTE SPEHAR,
JACOB LOUIS SPEHAR, LUKE SPEHAR,
PATRICK SPEHAR, MITCHELL L. STAMBAUGH,
CHARLES WESLEY STRANGE III, CARLY
ELIZABETH STRANGE, CHARLES WESLEY
STRANGE, KATELYN MARIE STRANGE,
GARRETT LAYNE FUNK, JOSHUA NICHOLAS
SUST, ERIN NICOLE GOSS, TRECIA BROCK
HOOD, WENDY SHEDD, FREDDIE DEWEY
SUTTON, HARRIET SUTTON, SUMMER
BREANNE SUTTON, DIANE TIMONEY,
GREGORY TIMONEY, RYAN GREGORY
TIMONEY, FREDERICK ALLEN TOLON, ESTA
SMITH, JIMMY SMITH, EMILY TORIAN, JOE
TORIAN, NATHAN EWELL TORIAN, BRITTANY
TAYLOR TOWNSEND, KEVIN TRIMBLE,
CHRISTOPHER MICHAEL VAN ETTEN,
CATHERINE KIMBERLY VAUGHN KRYZDA,
C.C.V. BY AND THROUGH HER NEXT FRIEND
CATHERINE KIMBERLY VAUGHN KRYZDA,
R.C.V. BY AND THROUGH HIS NEXT FRIEND
CATHERINE KIMBERLY VAUGHN KRYZDA,
ROBERT MARTIN KAHOKULANI VICKERS JR.,
ROBERT MARTIN KAHOKULANI VICKERS SR.,
HORTENSE KAINOA WAINANI VICKERS,
K.N.V. BY AND THROUGH HIS NEXT FRIEND
HORTENSE KAINOA WAINANI VICKERS,
K.E.F.V. BY AND THROUGH HER NEXT FRIEND
HORTENSE KAINOA WAINANI VICKERS,
K.M.G.V. BY AND THROUGH HER NEXT
FRIEND HORTENSE KAINOA WAINANI
VICKERS, MARK MATTHEW KALEINANI
VICKERS, MARY JANE VICKERS, VANCE
MARSHALL KELIIOLANI VICKERS, MAKAHEA
XHELILI, MICHELLE JOY
KAPUNAHELEOKALANI YARBOROUGH,
BARRY WELCH, LORRIA WELCH, ZACKARY
WELCH, JEFFREY L. WHITE SR., KYLE WHITE,
MICHAEL WHITE, PAULA K. WHITE,
MICHELLE CAROLINA ROTELLI, MARTHA
CAROLINA SMITH, THOMAS ELMER
WICKLIFF, BRIAN ANTHONY WILLIAMS,
CLARENCE WILLIAMS JR., ABRILL RENEE
WILLIAMS, SAMANTHA SHERVON WILLIAMS,

vii

**JA72**

TALISA SHERVON WILLIAMS, MONA G.
BETZEN, CODY WORLEY, GREGORY W.
WORLEY, JAMES WAYNE WORLEY, MARK G.
WORLEY, BAILY ZIMMERMAN, CHRIS LEE
ZIMMERMAN, MICHELLE ZIMMERMAN,
DANIEL LEE BROWN, KRISTINA BROWN,
DANIEL EDWARD STAMPER JR., CAMERON
STUART, KATY STUART, ADRIANA
WAKELING, SETH WAKELING,

                Plaintiffs,

    v.

DEUTSCHE BANK AKTIENGESELLSCHAFT,
DEUTSCHE BANK TRUST COMPANY
AMERICAS, STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC, STANDARD
CHARTERED BANK (PAKISTAN) LIMITED,
DANSKE BANK A/S, DANSKE MARKETS INC.,
PLACID NK CORPORATION d/b/a PLACID
EXPRESS, and WALL STREET EXCHANGE LLC,

                Defendants.

## COMPLAINT UNDER THE ANTI-TERRORISM ACT

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

THE DEFENDANTS ..................................................................................................... 7

    A.    The Deutsche Bank Defendants ..................................................................... 7

    B.    The Standard Chartered Bank Defendants .................................................. 11

    C.    The Danske Bank Defendants ...................................................................... 16

    D.    Placid Express .............................................................................................. 17

    E.    Wall Street Exchange ................................................................................... 18

JURISDICTION AND VENUE .................................................................................. 18

FACTUAL ALLEGATIONS ...................................................................................... 20

I.    DESIGNATED FOREIGN TERRORIST ORGANIZATIONS COMMITTED, PLANNED, AND AUTHORIZED THE ATTACKS THAT INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS ................................................................................ 20

    A.    After 9/11, Al-Qaeda Organized And Led A Terrorist Syndicate Comprising Its Affiliates, Including The Taliban, The Haqqani Network, Lashkar-E-Taiba, D-Company, To Attack Americans In Afghanistan, Which Was Substantially Aided By Iran's Hezbollah Division and Qods Force ................................................. 21

    B.    Al-Qaeda, The Haqqani Network, Hezbollah And The Qods Force Financed And Armed Terrorists Targeting Americans In Afghanistan Through Global Terrorist Finance And Logistics Networks That Relied On Access To The U.S. Financial System ................................................................................ 31

    C.    Al-Qaeda Leader Sirajuddin Haqqani Served Both Al-Qaeda And The Taliban, Including Its Haqqani Network, Optimized The Syndicate's Transnational Terrorist Enterprise And Partnerships With Other FTOs, Including Hezbollah And The Qods Force, And Facilitated The FTOs' Shared Terrorist Campaign Targeting Americans In Afghanistan .......................................... 48

    D.    Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Relied Upon A Transnational Network Of Terrorist Finance And Logistics Cells Operating In Afghanistan, Pakistan, The U.A.E., Russia, And Europe To Finance And Arm Syndicate Terrorist Attacks Against Americans In Afghanistan ............................................................................................ 60

E.     Iran's Islamic Revolutionary Guard Corps, Acting Through Its Hezbollah Division And Qods Force, Materially Supported The Syndicate's Terrorist Attacks Against Americans In Afghanistan By Regularly Supplying Funds, Arms, Communications Equipment, Training, And Logistical Support To Al-Qaeda, The Taliban, Including Its Haqqani Network, And D-Company ................... 84

F.     Al-Qaeda Authorized And Planned The Terrorist Attacks That Killed And Injured Plaintiffs ..................................................................................................... 124

G.     Al-Qaeda Committed Terrorist Attacks That Killed And Injured Plaintiffs, Often In Joint Cells With The Taliban, The Haqqani Network, And Lashkar-E-Taiba ................................................................................................................. 137

II.  DEFENDANTS ASSISTED THE SYNDICATE ............................................................ 141

A.     The Syndicate Relies on an International Criminal Network to Access Funds ........ 141

B.     Deutsche Bank Enabled Syndicate Terrorist Finance ...................................... 179

B.     Standard Chartered Bank Enabled Syndicate Terrorist Finance ............................. 211

C.     Standard Chartered Bank Enabled Syndicate CAN Fertilizer Bomb Logistics ........ 229

D.     Danske Bank Enabled Syndicate Terrorist Finance ................................................. 242

E.     Placid Express Enabled Syndicate Terrorist Finance ................................................ 248

F.     Wall Street Exchange Enabled Syndicate Terrorist Finance .................................... 249

III. DEFENDANTS WERE GENERALLY AWARE THAT THEY WERE PLAYING A ROLE IN ILLEGAL ACTIVITY FROM WHICH TERRORIST VIOLENCE WAS A FORESEEABLE RISK .......................................................................................................... 253

A.     Defendants Knew That Their Provision Of U.S.-Linked Financial Services To Syndicate Fronts, Operatives, Agents, And Partners Had A Close Link To Syndicate Terrorism ............................................................................................... 255

B.     Defendants Knew That Operating Laundromats For Customers In High-Risk Terrorist Finance Jurisdictions Foreseeably Aided Terrorism .................................. 260

C.     Defendants Knew The U.S. and U.K. Governments Opposed Conduct Like Their Own ................................................................................................................. 276

D.     Defendants Possessed Sufficient Data To Prevent The Syndicate From Using Their Services For Terrorist Fundraising, Finance, and Logistics Operations ........ 277

E.     Defendants Knew Transactions In High-Terrorist-Finance-Risk Jurisdictions That Used "Buffers," "Shell Companies," Or "Intermediaries" Foreseeably Aided Syndicate Terrorist Fundraising, Finance, And Logistics Operations .......... 281

F.      Defendants Knew Altaf Khanani Was A Notorious Terrorist Financier Of, And Agent For, Al-Qaeda, The Taliban, The Haqqani Network, Lashkar-E-Taiba, Jaish-E-Mohammed, And D-Company ...................................... 283

G.      Defendants Knew Terrorists Regularly Used Tax Fraud, Including VAT Fraud, Schemes To Finance Attacks ............................................................ 291

H.      Defendants Knew Terrorists Regularly Used Capital Flight Schemes To Finance Attacks ................................................................................................ 296

I.      Defendants Knew Of The Close Link Between Narcotics-Related Transactions And Syndicate Violence ...................................................... 296

J.      Defendants Knew Of Al-Qaeda's, The Haqqani Network's, Hezbollah's, And The Qods Force's Role ............................................................................ 299

K.      Defendants Knew That Their Transactions Were Not Routine .............................. 299

L.      Defendants Knew That Even If Their Transactions Were Ostensibly Routine, Such Transactions Still Aided Terrorist Attacks ........................................ 301

M.      Defendants Knew That They Served Terrorists Who Did Not "Trick" Them ......... 302

N.      Defendants Knew That Their Transactions With Fronts, Operatives, Cut-Outs, Agents, Or Orbits Of The IRGC, Including Hezbollah And The Qods Force, Foreseeably Aided The Syndicate's Terrorist Attacks Against Americans In Afghanistan ...................................................................................................... 307

IV. EACH DEFENDANT KNEW THEY WERE AIDING THE SYNDICATE'S CAMPAIGN OF TERROR IN AFGHANISTAN ............................................................. 314

A.      Deutsche Bank Knew It Was Aiding Terrorists ......................................... 314

B.      Standard Chartered Bank Knew It Was Aiding Terrorists ........................ 348

C.      Danske Bank Knew It Was Aiding Terrorists ........................................... 382

D.      Placid Express Knew It Was Aiding Terrorists ........................................ 385

E.      Wall Street Exchange Knew It Was Aiding Terrorists ............................. 387

V. DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL ............................................ 389

A.      Defendants Provided Support Tailored To The Violence At Issue Here ................. 390

B.      The Amount Of Money, And Concealment Of The Same, Were Both Significant .................................................................................................. 395

C.      Defendants Had Culpable Mental States ................................................. 397

    D.       Defendants Had A Close Relationship To The Tortfeasors...................................... 408

    E.       The Duration Of Support Was Long.......................................................... 409

VI. DEFENDANTS' ASSISTANCE TO THE SYNDICATE HAD A SUBSTANTIAL
NEXUS TO THE UNITED STATES.......................................................................... 410

    A.       Deutsche Bank's Assistance To The Syndicate Had A Substantial Nexus To
The United States................................................................................ 410

    B.       Standard Chartered Bank's Terrorist Finance Routed To Al-Qaeda, The
Haqqani Network, Lashkar-e-Taiba, and D-Company Through Its Laundromat
Had A Substantial Nexus To The United States.......................................... 422

    C.       Danske Bank's Assistance To The Syndicate Had A Substantial Nexus To
The United States................................................................................ 432

    D.       Placid Express's Assistance To The Syndicate Had A Substantial Nexus To
The United States................................................................................ 434

    E.       Wall Street Exchange's Assistance To The Syndicate Had A Substantial
Nexus To The United States ................................................................. 434

VII.       THE SYNDICATE USED DEFENDANTS' ASSISTANCE TO COMMIT
ATTACKS THAT KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF
INTERNATIONAL TERRORISM THAT WERE COMMITTED, PLANNED, AND
AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK............................ 435

CLAIMS FOR RELIEF ................................................................................................. 590

JURY DEMAND ........................................................................................................... 594

PRAYER FOR RELIEF ................................................................................................. 594

## INTRODUCTION

1.      Plaintiffs are American service members and civilians who were killed or wounded in Afghanistan between 2011 and 2016, as well as their families. While these men and women worked to rebuild Afghanistan, they were attacked by a terrorist syndicate led by al-Qaeda and the Haqqani Network, the most extreme faction of the Taliban (collectively the "Syndicate"). The Syndicate organizations share anti-American terrorist objectives, which they pursue by jointly planning and committing terrorist attacks, as well as sharing resources (including but not limited to financial resources) and knowhow.[1]

2.      The factual allegations in this complaint are based on information from witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence and financial-intelligence reporting, congressional testimony and reports, press accounts, Defendants' own statements, and Plaintiffs' recollections.

3.      Plaintiffs have one extra source, which Plaintiffs lacked before, that is unique, precise, and eliminates any plausible basis to doubt Plaintiffs' terrorist finance allegations against Deutsche Bank and Standard Chartered Bank: a complete, "final" version of the confidential investigative summary prepared by an elite Western law enforcement agency that had direct access to Samir Azizi himself, and his bank records (the "Final Azizi Memo").[2]

4.      As memorialized in the Final Azizi Memo, one or more members of the Azizi Cell "generally confessed" and "cooperat[ed] with the investigation." The Final Azizi Memo

---

[1] The factual allegations in this complaint are based on information from witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence and financial-intelligence reporting, congressional testimony and reports, press accounts, Defendants' own statements, and Plaintiffs' recollections.

[2] Given al-Qaeda and the Taliban's long history of intimidating witnesses, Plaintiffs paraphrase the substance – but not the math – from this confidential law enforcement summary.

erases any possible doubt that Deutsche Bank and Standard Chartered Bank, through their combined services to Azizi and the al-Qaeda fundraising cell he led, helped route tens of millions, if not more than $100 million, in value to al-Qaeda, and Azizi and the Azizi Cell appear to have been one of the most prolific fundraisers for al-Qaeda in its history.

5.      The Syndicate's operations are far-reaching and expensive. Accordingly, the Syndicate relies on an international criminal network to generate money and then move that money back to Afghanistan and Pakistan, where it can be used to pay for terrorist personnel and infrastructure, and also to purchase weapons, explosives, and other matériel. The Syndicate's preferred currency for these transactions is the U.S. Dollar ("USD"), because it is stable and can be spent anywhere. That makes access to the international financial system—and especially to the U.S. banking system—critically important to the Syndicate's operations.

6.      Defendants are Deutsche Bank, Standard Chartered Bank, Danske Bank, Placid Express, and Wall Street Exchange. Defendants played critical roles in criminal terrorist finance by knowingly facilitating transfers of hundreds of millions in USD to the terrorists. Defendants did so through a variety of mechanisms.

7.      All Defendants worked with the world's most notorious and successful money launderer, Altaf Khanani, and his Khanani Money Laundering Organization ("Khanani MLO"). Khanani was a Pakistani national charged by the Pakistani authorities in 2008 with money laundering who then fled to Dubai and set up a worldwide money laundering operation servicing terrorist groups, organized crime outfits, and drug cartels. Through a web of companies spanning the globe, Khanani received, moved, concealed, and repatriated Syndicate funds to and from Afghanistan. It is a matter of public record that Defendants did business with Khanani's

organization, helping the Syndicate acquire *at least* tens of millions of dollars during the relevant time period.

8.     Defendants also provided financial services to Iran's terrorist-funding proxies, the Islamic Revolutionary Guard Corps and the Qods Force. These entities provided financial and logistical support to Syndicate terrorists specifically to enable terrorist violence against Americans in Afghanistan. Defendants supported Iran's terrorist proxy war by helping people and entities acting on Iran's behalf move money in violation of critical counterterrorism sanctions.

9.     Defendants also assisted other criminal organizations that were known to play a role in the Syndicate's unlawful terrorist activities. These included: the Russian Mafia, which had a symbiotic relationship with the Syndicate originally developed through selling Syndicate opium and laundering the proceeds into USD; Syndicate-trained cells that committed fraud in Europe, which converted the proceeds into USD and repatriated them to the Syndicate; and other Syndicate operatives and financiers. All of these transactions helped the Syndicate finance its ongoing campaign of terrorist violence against Americans in Afghanistan.

10.     In addition to these financing activities, Standard Chartered Bank played a role in terrorist bombmaking by knowingly assisting two Pakistani fertilizer companies that produced critically important precursor materials for the Syndicate's improved explosive devices ("IEDs"). Standard Chartered engaged in this conduct even after the mainstream media reported that these companies' products were used in the vast majority of IEDs in Afghanistan, and even after the head of the United States's project to curb deaths from IEDs personally visited Standard Chartered in New York to implore the bank to take action. In effect, Standard Chartered knowingly financed the production of Syndicate IEDs.

11.     Plaintiffs' claims for relief sound in aiding and abetting under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). The elements of this cause of action are: (1) the attacks that injured the plaintiffs must have been committed, planned, or authorized by a designated Foreign Terrorist Organization ("FTO"); (2) the defendant must have provided assistance, either directly or indirectly, to the organizations that committed the attack; (3) the defendant must have been generally aware at the time it provided the assistance that it was playing a role in an overall illegal activity, from which the attacks that injured the plaintiffs were a foreseeable consequence; and (4) the assistance the defendant provided must have been "substantial," as that term is used in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). Each of these elements is met in this case.

12.     Part I, *infra*, explains that the attacks that injured Plaintiffs were almost all committed by the FTO al-Qaeda, either alone or in conjunction with one or more other FTOs. Some attacks were committed by the Taliban, including its Haqqani Network, which was designated an FTO on September 19, 2012. Every attack after that date was committed by an FTO—and the attacks committed before that date were "planned" or "authorized" by al-Qaeda, and therefore satisfy this element.

13.     Part II, *infra*, describes the assistance Defendants provided to the Syndicate. It explains how each Defendant processed transactions for an international ring of criminals that raised, laundered, and repatriated money for the Syndicate. The money came from drug sales, fraud schemes, protection rackets, and other criminal activity; it was used to finance terrorist violence against Americans in Afghanistan. Part II also describes the role Standard Chartered Bank played in the Syndicate's fertilizer bomb enterprise.

14.     Parts III and IV, *infra*, describe Defendants' knowledge, which went well beyond "general awareness" of a role in unlawful activity. Plaintiffs allege that Defendants knowingly and intentionally participated in criminal terrorist finance. Thus, Part III lays out facts that were public knowledge, which every Defendant knew at the time, that alerted them all to the risks of their conduct. These are the sorts of public facts that every reasonable financial institution would have understood. Part IV provides additional Defendant-specific allegations of awareness. Plaintiffs believe that discovery will show even more facts establishing knowledge because Defendants are sophisticated financial institutions that had the ability to look at both public and non-public information for suspicious indicators attached to their customers, those customers' counterparties, and the transactions those customers were executing.

15.     Part V, *infra*, explains why Defendants' assistance was substantial under *Halberstam*. The inquiry looks to: the nature of the act assisted, *i.e.*, terrorism; the amount, which was tens of millions of dollars that we know about for sure, and discovery is likely to reveal hundreds of millions more; the defendant's state of mind, which was culpable here; and the duration of the assistance, which was many years, all against the backdrop of an ongoing campaign of horrific violence against Americans in Afghanistan.

16.     Part VI, *infra*, explains how even Defendants' conduct that occurred overseas had a substantial nexus to the United States.

17.     Finally, Part VII, *infra*, describes the terrorist attacks that injured Plaintiffs and their family members—including who planned and committed the attacks, and the injuries they caused.

18.     For several reasons, the allegations in this complaint are quite detailed, and take a fair amount of space. First, this case involves multiple Defendants that engaged in partially

overlapping and partially distinct misconduct, and several Defendants supported terrorism in multiple ways. It takes space to describe each of Defendants' misconduct in detail, and to show how these various terror-financing schemes operated and also reinforced each other. Second, the allegations in this case are complex. As described in greater detail below, terrorists use a variety of schemes to raise and move money around the world, and a variety of means to carry out sophisticated attacks on Americans. It takes space to expose the many ways that criminal conduct causes funds to flow back to the Syndicate, and to explain how the various Syndicate organizations collaborate and reinforce each other's terrorist agendas. Third, the allegations in this Complaint are serious, and so Plaintiffs have meticulously sourced them to make it clear that their claims for relief are not based on speculation or mere negligence, but instead on plausible allegations of grievous misconduct. It takes space to lay out those sources. Finally, this case involves a large number of Plaintiffs, and it takes space to describe the attacks that killed or injured them or their loved ones, and their relationships to the attack victims.

19.     The upshot of those detailed allegations is that this Complaint will show that this is a paradigmatic case for aiding-and-abetting liability under JASTA, which provides "civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b) (emphasis added). Defendants provided exactly that sort of support to the Syndicate, and Congress wanted every such defendant to be held to account for the violence it subsidized.

## THE DEFENDANTS

**A.      The Deutsche Bank Defendants**

20.      Defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank," "Deutsche," or "DB") is one of the largest banks in the world, with more 100,000 employees and agents in 62 countries. Deutsche Bank is a publicly traded German financial institution whose principal place of business is in Frankfurt, Germany ("DB Frankfurt"). Its stock trades in the U.S. (NYSE: DB).

21.      Defendant Deutsche Bank AG London ("DB London") is Deutsche Bank's branch in London, and is registered as the UK establishment of Deutsche Bank AG. DB London offers banking services to corporate and institutional clients.  DB London and its employees in London are agents and representatives of Deutsche Bank AG.

22.      Defendant Deutsche Bank AG does business in New York under the name Deutsche Bank Securities, Inc., which is Deutsche Bank's branch in New York. Deutsche Bank Securities, Inc. offers banking services to corporate and institutional clients only, primarily U.S. Dollar (or "USD") clearing for international wire payments and letters of credit. Since 1972, Deutsche Bank has operated as a foreign bank branch in New York, New York pursuant to a license issued by the state of New York. Deutsche Bank was first registered to do business in the State of New York on January 19, 1972, under the name Cyrus J. Lawrence & Sons Incorporated, Deutsche Bank Securities Inc. assumed its current name as the survivor entity of a merger on September 28, 1993.

23.      Deutsche Bank's USA PATRIOT Act certification applies to Deutsche Bank Securities, Inc.. It states that "Deutsche Bank AG, New York Branch is a resident of the United States at … 60 Wall Street, New York, NY 10005."

24.      Defendant Deutsche Bank Trust Company Americas ("DBTCA") is a wholly owned subsidiary of Deutsche Bank Trust Corporation, which is a wholly owned subsidiary of

Defendant Deutsche Bank. DBTCA is a New York State chartered bank regulated by NYDFS, and it resides in New York.

25.     Deutsche Bank Securities, Inc., DBTCA, and Deutsche Bank AG's employees and representatives in New York (collectively, "Deutsche Bank New York" or "DB New York") serve as one of the largest U.S. Dollar correspondent banks in the world.

26.     Defendant Deutsche Bank AG, Dubai Branch ("DB Dubai") is an Emirati financial institution that serves as Deutsche Bank's branch in Dubai, United Arab Emirates.  DB Dubai and its employees in Dubai are agents and representatives of Deutsche Bank AG.

27.     Defendant Deutsche Bank Ltd, also known as Deutsche Bank LLC, ("Deutsche Bank Russia" or "DB Moscow") is a wholly owned subsidiary of Deutsche Bank. DB Moscow serves Deutsche Bank's customers in Russia, primarily in connection with their U.S. Dollar-related transaction needs. DB Moscow is a Russian corporation, and it resides in Moscow, Russian Federation.

28.     Deutsche Bank regularly reached into the United States to assert its interests in U.S. court. For example, Deutsche Bank used "foreclosure mills" to illegally file foreclosure lawsuits in American courts against U.S. service members who were deployed to Iraq and Afghanistan in violation of the Servicemembers Civil Relief Act.

29.     Deutsche Bank does extensive business throughout the United States and holds significant assets in the United States. Deutsche Bank operates, through DB New York (including DBTCA), one of the largest USD-clearing banks in the world. Significant Deutsche Bank Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Deutsche Bank's branches in the United States.

30.     Deutsche Bank, DB London, DB Dubai, and DB Moscow acted as an agent for Deutsche Bank Securities, Inc. and DBTCA in order to promote Deutsche Bank Securities, Inc.'s and DBTCA's transactions to generate more income for both.

31.     Deutsche Bank, DB London, DB Dubai, and DB Moscow **acted for the benefit** of Deutsche Bank Securities, Inc. and DBTCA.  Deutsche Bank, DB London, DB Dubai, and DB Moscow, including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E., followed a top-down, globally integrated business model, which DB and its personnel call "One Bank."   Under DB's "One Bank" strategy, each such DB Defendant aggressively promoted Deutsche Bank Securities, Inc. and DBTCA to their global customer base regardless of transaction type in order to cause more income to flow to Deutsche Bank Securities, Inc. and DBTCA through the fees both earned through Deutsche Bank's referral business model.

32.     Every DB Defendant knew that the purpose of Deutsche Bank's "One Bank" policy was to structure a two-part, mutually profitable relationship, through which Deutsche Bank, DB London, DB Dubai, and DB Moscow, on the one hand, and DBTCA and Deutsche Bank Securities, Inc., on the other, each realized billions in net income from 2001 through 2017 directly attributable to the former's collective service as "One Bank" designed to refer business to DBTCA and Deutsche Bank Securities, Inc.

33.     Deutsche Bank, DB London, DB Dubai, and DB Moscow, including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E., **served as the agent** in Deutsche Bank's "One Bank" model.[3]

---

[3] Unless otherwise indicated, whenever Plaintiffs refer to "One Bank" in this Complaint, Plaintiffs mean this particular group of DB Defendants (including any combination thereof), acting in the capacity of an agent to Deutsche Bank Securities, Inc. and DBTCA as principals.

34.     Deutsche Bank Securities, Inc. and DBTCA **served as principals** in Deutsche Bank's "One Bank" model.

35.     Deutsche's "One Bank" comprised DB's vast global network of branches, subsidiaries and affiliates, all of whom collectively constituted the "One [Deutsche] Bank" and restructured DB's entire global business from the late 1990s through 2003 to move to its "One Bank" concept, which was centered on generating as much banking and security-related transaction fee income as was possible through intensive, top-down global collaboration and cross-selling.  As a result, the above-described agent/principal relationship keyed the business models of both Deutsche Bank, on the one hand, and Deutsche Bank Securities, Inc. and DBTCA, on the other, all of whom purpose-built their entire business models around the interplay between Deutsche Bank (as agent) and Deutsche Bank Securities, Inc. and DBTCA (as principal for relevant securities and banking transactions, respectively).

36.     Deutsche Bank, DB London, DB Dubai, and DB Moscow **acted with the knowledge and consent** of Deutsche Bank Securities, Inc. and DBTCA.  From 2001 through 2017, Deutsche Bank Securities, Inc. and DBTCA regularly revealed their knowledge of, and consent to, Deutsche's Bank's, DB London's, DB Dubai's, and DB Moscow's global Laundromat strategy, with which Deutsche Bank Securities, Inc. and DBTCA were familiar through their receipt of data, formally and informally, from each of the other DB Defendants.

37.     Deutsche Bank designed and pursued its "One Bank" policy from 2001 through 2017 to route as much business as possible to the "One Bank's" two key affiliates in the United States: Deutsche Bank Securities, Inc. and DBTCA.

38.     As such, Deutsche Bank Securities, Inc. and DBTCA knew, through a litany of communications channels including, but not limited to, the information that Deutsche Bank

10
**JA87**

Securities, Inc. and DBTCA learned from Deutsche's Bank's, DB London's, DB Dubai's, and DB Moscow's officers, directors, employees, and agents, including those employed by such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E.

39.     Deutsche Bank, DB London, DB Dubai, and DB Moscow including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E., **acted under some degree of control** of Deutsche Bank Securities, Inc. and DBTCA, each of whom regularly exercised a certain amount of control Deutsche Bank, DB London, DB Dubai, and DB Moscow including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E.

**B.      The Standard Chartered Bank Defendants**

40.     Defendant Standard Chartered Bank ("Standard Chartered" or "SCB") is one of the largest banks in the world, with more than 1,700 branches in more than 60 countries. SCB is a publicly traded United Kingdom financial institution whose principal place of business is in London, England, and whose stock trades in the United States (ADR: SCBFY), United Kingdom (Ticker: STAN), and Hong Kong (Ticker: 2888.HK).

41.     Since 1976, SCB has operated as a foreign bank branch in New York, New York pursuant to a license issued by the state of New York.

42.     Defendant Standard Chartered PLC ("SCB London") is the parent of SCB New York, SCB Dubai, and SCB Pakistan, as defined below, and is based in London, England.

43.     Defendant Standard Chartered Bank Ltd. ("SCB New York") is SCB's branch in New York. SCB New York offers banking services to corporate and institutional clients only, primarily U.S. Dollar clearing for international wire payments and letters of credit. As one regulator found, SCB New York "primarily conducts a U.S. dollar clearing business, which

clears approximately $190 *billion* per day for its international clients."[4] SCB New York "also engages in corporate lending, project and structured finance, trade finance, cash management, foreign exchange trading, and wire transfer services."[5] SCB New York is one of the largest USD-clearing banks in the world.

44.     Standard Chartered's USA PATRIOT Act certification applies to SCB New York, and also "covers … Standard Chartered Bank Branches and Subsidiaries" including, among others, Standard Chartered's branches and subsidiaries in Dubai, ("U.A.E."), and Karachi, Pakistan, and states that Standard Chartered is a resident of the United States at 1095 Avenue of the Americas, New York, NY 10036.

45.     Defendant Standard Chartered Bank has agents and representatives based in Dubai, U.A.E. ("SCB Dubai").

46.     Defendant Standard Chartered Bank (Pakistan) Limited ("SCB Pakistan") is Standard Chartered's branch in Pakistan and is based in Karachi, Pakistan.

47.     Defendants Standard Chartered, SCB London, SCB New York, SCB Dubai, and SCB Pakistan are, collectively, "Standard Chartered Bank" or "the SCB Defendants," and each is individually an "SCB Defendant."

48.     SCB does extensive business throughout the United States and holds significant assets in the United States. Significant SCB transactions alleged in this Complaint, totaling millions of dollars, were executed by and through SCB's branches in the United States.

49.     Since the 1980s, Standard Chartered Bank's core business model has been to serve as the correspondent bank and clearing bank for USD-denominated transactions in high-

---

[4] 2012 Consent Order at 6.

[5] *Id.*

risk emerging markets, with a particular emphasis on facilitating cross-border transactions in the Middle East and Asia. As the Economist explained in 2012, "[a]lthough its purely American operations are negligible, Standard Chartered's wholesale franchise rests on providing a financial bridge between the 70 countries in which it does operate, much of it denominated in dollars that must pass through America's financial system."[6]

50.     This business strategy required that Standard Chartered Bank branches, subsidiaries, and affiliates work closely with, and ordinarily seek to route transactions through, SCB New York. Standard Chartered Bank specialized as a USD-focused bank that emphasizes cross-border trade finance[7] work in "emerging markets" in the Middle East and Asia. As an "emerging-markets specialist" bank, Standard Chartered Bank's core business is processing USD-denominated transactions because the U.S. Dollar is the currency of choice, or otherwise used to backstop transactions, in most emerging markets around the world, most of all those in the Middle East and Asia with a long history of trade in goods where the markets are traditionally USD-denominated, *e.g.*, petroleum-based products.

51.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan acted as an agent for SCB New York in order to promote SCB New York's transactions to generate more income for both.

52.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan **acted for the benefit** of SCB New York.  Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan, including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E.,

---

[6] Economist, *Standard Chartered:My Dollar, My Rules* (Aug. 11, 2012), 2012 WLNR 16987066.

[7] "Trade finance" refers to products and financial instruments offered by banks that companies use to support international trade and commerce, which enable importers and exporters to conduct business through trade by making transactions feasible. The role of trade finance is to introduce a third-party, like SCB, to a transaction to eliminate the payment risk and supply risk.

followed a top-down, globally integrated business model, which SCB and its personnel, like their counterparts at Deutsche Bank, often call "One Bank."[8]  Under SCB's "One Bank" strategy, each such SCB Defendant aggressively promoted SCB New York to their global customer base regardless of transaction type in order to cause more income to flow to SCB New York through the fees both earned through Standard Chartered's referral business model.

53.     Every SCB Defendant knew that the purpose of Standard Chartered's "One Bank" policy was to structure a two-part, mutually profitable relationship, through which Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan, on the one hand, and SCB New York, on the other, each realized billions in net income from 2001 through 2017 directly attributable to the former's collective service as "One Bank" designed to refer business to SCB New York.

54.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan, including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E., **served as the agent** in Standard Chartered's "One Bank" model.

55.     SCB New York **served as the principal** in Standard Chartered's "One Bank" model.

56.     Standard Chartered's "One Bank" comprised SCB's vast global network of branches, subsidiaries and affiliates, all of whom collectively constituted the "One Bank" and restructured SCB's entire global business from the late 1990s through 2003 to move to its "One Bank" concept, which was centered on generating as much banking and security-related transaction fee income as was possible through intensive, top-down global collaboration and cross-selling.  As a result, the above-described agent/principal relationship keyed the business

---

[8] Unless otherwise indicated, whenever Plaintiffs refer to SCB's "One Bank" in this Complaint, Plaintiffs mean this particular group of SCB Defendants (including any combination thereof), acting in the capacity of an agent to SCB New York as principal.

models of both Standard Chartered, on the one hand, and SCB New York, on the other, all of whom purpose-built their entire business models around the interplay between Standard Chartered (as agent) and SCB New York (as principal for relevant securities and banking transactions, respectively).

57.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan **acted with the knowledge and consent** of SCB New York.  From 2001 through 2017, SCB New York regularly revealed their knowledge of, and consent to, Standard Chartered's, SCB London's, SCB Dubai's, and SCB Pakistan's global Laundromat strategy, with which SCB New York were familiar through their receipt of data, formally and informally, from each of the other SCB Defendants.

58.     Standard Chartered designed and pursued its "One Bank" policy from 2001 through 2017 to route as much business as possible to the "One Bank's" key affiliate in the United States: SCB New York.

59.     As such, SCB New York knew, through a litany of communications channels including, but not limited to, the information that SCB New York learned Standard Chartered's, SCB London's, SCB Dubai's, and SCB Pakistan's officers, directors, employees, and agents, including those employed by such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E.

60.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E., **acted under some degree of control** of SCB New York, who regularly exercised a certain amount of control over Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E.

### C.    The Danske Bank Defendants

61.     Defendant Danske Bank A/S (or "Danske Bank") is one of the largest banks in the world, with approximately 180 branches in 12 countries. Danske Bank is publicly traded on the Nasdaq Nordic exchange in Copenhagen, Denmark, under "DK0010274414." Its principal place of business is in Copenhagen, Denmark.

62.     Danske Bank has operated bank branches and/or subsidiaries in New York since 1985. According to Danske Bank's USA PATRIOT Act certification regarding correspondence accounts from 2011, Danske Bank operated a New York branch as of that date. Danske Bank's 2018 USA PATRIOT Act certification does not disclose a New York branch, but does disclose that Danske Bank maintains at least one correspondent account with a U.S. bank or U.S. broker-dealer in securities.

63.     Danske Bank's USA PATRIOT Act certification discloses Danske Bank's branches in Finland, Germany, Sweden, the United Kingdom, Poland, Norway, Ireland, Lithuania, Estonia, Latvia, Luxembourg, and Russia. It also states that Danske Bank has authorized Robert I. Bodian, Esq., of Mintz Levin Cohn Ferris Glovsky and Popeo P.C., to accept service of legal process on behalf of Danske Bank, at 666 Third Avenue, New York, NY, 10017.

64.     Defendant Danske Markets Inc. ("Danske New York") is Danske Bank's New York subsidiary and agent. Danske New York is a registered U.S. broker-dealer which provides U.S. Dollar clearing for international wire payments and letters of credit, and foreign exchange and interest rate derivatives transactions as agent for Danske Bank A/S. Danske New York is incorporated in Delaware and has its principal place of business in New York. Danske New York has operated in New York since at least 2001.

65.     On information and belief, Danske New York facilitated USD-related transactions by Danske Bank's branches in Finland, Germany, Sweden, the United Kingdom, Poland, Norway, Ireland, Lithuania, Estonia, Latvia, Luxembourg, and Russia and, among other things, provided the above-described aid to al-Qaeda and the Haqqani Network through, among others, financial services provided to: (1) Altaf Khanani, and/or (2) the al-Qaeda and Haqqani Network VAT fraud schemes, both of which aided al-Qaeda's and the Haqqani Network's finance and logistics schemes in support of the attack campaign in Afghanistan from 2006 through 2017 by routing millions in U.S. Dollar value from the United States to such terrorists through Danske New York's and Danske Bank's combined Laundromat from 2008 through 2018.

66.     Defendants Danske Bank and Danske New York are, collectively, "Danske Bank" or "the Danske Bank Defendants," and each is individually a "Danske Bank Defendant."

67.     Danske Bank does extensive business throughout the United States and holds significant assets in the United States. Significant Danske Bank Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Danske Bank's branches and/or its correspondent accounts in the United States.

**D.      Placid Express**

68.     Defendant Placid NK Corporation d/b/a Placid Express ("Placid Express") is a licensed U.S.-based money transmitter that focuses its business on facilitating U.S. Dollar transactions between the United States and customers in mostly high-risk geographies overseas, including, but not limited to, Pakistan, India, Nepal, and Bangladesh.

69.     Placid Express is a Delaware corporation and United States as well as Global Headquarters are at 7210 37th Avenue, Jackson Heights, NY 11372.

70.     Placid Express does extensive business throughout the United States and holds significant assets in the United States. Significant Placid Express Laundromat transactions

alleged in this Complaint, totaling millions of dollars, were executed by and through Placid Express's facilities in the United States. All Placid Express's conduct alleged herein occurred, in whole or in part, within this District.

### E.    Wall Street Exchange

71.    Defendant Wall Street Exchange ("Wall Street Exchange") is a licensed U.A.E.-based money transmitter that focuses its business on facilitating U.S. Dollar transactions between the United States and customers in mostly high-risk geographies overseas.

72.    Wall Street Exchange is a U.A.E. corporation and is headquartered in Dubai. Wall Street Exchange is not an organ of U.A.E., and its employees are not government employees; rather it is an ordinary commercial money remitter based in U.A.E. with a significant international presence. The U.A.E. government does not directly own Wall Street Exchange; the owner of Wall Street Exchange is Emirates Post Group, which is itself a corporation separate from the government, owned by the U.A.E. government.

73.    Wall Street Exchange does extensive business throughout the United States and holds significant assets in the United States. Significant Wall Street Exchange Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Wall Street Exchange's facilities in the United States. Wall Street Exchange's United States commercial activities (including transactions initiated and executed by and through facilities in the United States) form the core of the allegations against Wall Street Exchange. All Wall Street Exchange's conduct alleged herein occurred, in whole or in part, within this District.

## JURISDICTION AND VENUE

74.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 2338.

75.     This Court has personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

76.     Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because each of Standard Chartered Bank's, Deutsche Bank's, Danske Bank's, Placid Express's, and Wall Street Exchange's conduct (and that of each affiliated Defendant) had a substantial nexus to the U.S. and to New York, including the transfer of USD from the U.S. to bank accounts abroad to finance and arm al-Qaeda, the Taliban (including its Haqqani Network), and their Syndicate allies.

77.     Each Defendant has also entered the United States voluntarily, maintained a physical presence here, and have claimed the benefit of U.S. law by initiating legal actions in this Court and/or the Supreme Court of New York.

78.     Each Defendant has also purposefully availed itself of U.S. jurisdiction to commit their tortious acts, including processing transactions for the terrorists that injured Plaintiffs through each Defendant's affiliated New York, or through such Defendant's correspondent account transactions with a bank in New York.

79.     Certain defendants, including Deutsche Bank Securities, Inc., DBTCA, Standard Chartered Bank Ltd., Danske Markets Inc., and Placid Express also have their principal place of business in New York, and are therefore subject to general jurisdiction.

80.     As financial institutions with branches in the United States, Defendants are also charged with knowledge of U.S. law, including the Congressional finding, incorporated in Section 2(a)(6) of JASTA, that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of

terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities."

81.     Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendant Placid Express resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

## I.     DESIGNATED FOREIGN TERRORIST ORGANIZATIONS COMMITTED, PLANNED, AND AUTHORIZED THE ATTACKS THAT INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS

82.     This Section provides important background about the Syndicate, and also alleges that FTOs committed, planned, and/or authorized the attacks that injured Plaintiffs.

83.     For background, Section I.A. describes the Syndicate and its members; Section I.B. describes the Syndicate's global terrorist finance network; Section I.C. describes the special role played by Sirajuddin Haqqani, a leader in al-Qaeda, the Taliban, and its Haqqani Network; and Section I.D. describes the geographies from which the Syndicate raised funds and other resources during the relevant time period.

84.     Section I.E describes the role that the Islamic Revolutionary Guard Corps played in supporting Syndicate violence.

85.     The attacks in this case occurred between 2011 and 2016. Each attack was committed, planned, and/or authorized by at least one FTO: al-Qaeda. Most of the attacks in this case were committed directly by al-Qaeda, working either alone or in joint cells with other Syndicate members.

86.     Some of the attacks in this case were committed by the Taliban, including its Haqqani Network. The Haqqani Network was designated an FTO on September 19, 2012. Thus, after that date, each and every Taliban attack was also committed by an FTO.

87.    For attacks that were: (1) committed only by the Taliban; and (2) carried out prior to September 19, 2012, Plaintiffs allege that those attacks were authorized and planned by the FTO al-Qaeda.

88.    Al-Qaeda's critical role in committing, planning, and/or authorizing the attacks that injured Plaintiffs is described in Sections I.F and I.G.

**A.    After 9/11, Al-Qaeda Organized And Led A Terrorist Syndicate Comprising Its Affiliates, Including The Taliban, The Haqqani Network, Lashkar-E-Taiba, D-Company, To Attack Americans In Afghanistan, Which Was Substantially Aided By Iran's Hezbollah Division and Qods Force**

89.    At all relevant times, al-Qaeda led a joint venture of terrorists in Afghanistan and Pakistan, which included al-Qaeda (designated an FTO in 1999), the Taliban (part of which, the Haqqani Network, was designated an FTO in September 2012),[9] Lashkar-e-Taiba ("LT") (a designated FTO since 2001), Jaish-e-Mohammad ("JEM") (a designated FTO since 2001), and D-Company (the leader of which, Dawood Ibrahim, has been a Specially Designated Global Terrorist ("SDGT") since 2003). This joint venture has been described by the U.S. government as al-Qaeda's "Syndicate."

90.    Since 2001, al-Qaeda and its Syndicate allies, including the Taliban, also depended upon the regular, substantial, and comprehensive support provided by Iran's Islamic Revolutionary Guard Corps ("IRGC" or "Guard Corps"), including the IRGC's Lebanese Hezbollah Division ("Hezbollah Division" or "Hezbollah") and the IRGC's Qods Force ("Qods

---

[9] Unless Plaintiffs specifically indicate otherwise, Plaintiffs' references to **"the Taliban"** in this Complaint mean "**the Taliban (including its Haqqani Network).**" The Taliban and the Haqqani Network are inseparable when it comes to matters of terrorism. For example, the leader of the Haqqani Network, Sirajuddin Haqqani, has publicly commented that the Haqqani Network and the Taliban are inseparable, as have other Taliban leaders. Sirajuddin Haqqani also served on the Quetta Shura, which was the Taliban's governing council. Now, Haqqani is the most powerful Taliban terrorist in Afghanistan, and is, according to some, Afghanistan's top terrorist.

Force" or "IRGC-QF"),[10] which the IRGC, including Hezbollah and the Qods Force, regularly provided to al-Qaeda, the Taliban, and their allies in order to further their shared agreement to attack and kill Americans in Afghanistan to drive the United States out of the Middle East.

91.    At all relevant times, Iran's IRGC (an FTO since 2019) provided an unending flow of funds, weapons, communications and transportation support, training, false papers, and nearly every manner of support possible to al-Qaeda and the Taliban to support the Syndicate's terror against Americans in Afghanistan, primarily acting through the IRGC's Hezbollah Division (an FTO since 1997) and the IRGC's Qods Force (a Specially Designated Global Terrorist since 2007, and an FTO since 2019).

92.    The Syndicate's – and Hezbollah's and the Qods Force's – purpose is to plan and commit terrorist attacks in Afghanistan and Pakistan using the expertise and resources of its members, which excel at planning and committing suicide bombings, IED attacks, kidnappings, and insider attacks, as further reinforced by the world's leading global terrorist sponsors, Hezbollah and the Qods Force (both of whom had decades-long alliances with al-Qaeda).

93.    By 2006, the Syndicate's IRGC-backed plan was in full bloom, as was the pipeline of Hezbollah- and Qods Force-provided aid to al-Qaeda and the Taliban to support attacks against Americans in Afghanistan and Iraq. This aid was delivered through transactions conducted by a range of notorious Hezbollah and Qods Force fronts in Europe, the Middle East, and Asia that were often routed through Dubai.  The IRGC, through Hezbollah and the Qods

---

[10] Unless Plaintiffs specifically indicate otherwise, Plaintiffs' references to **"the IRGC"** in this Complaint mean "**the IRGC (including its Hezbollah Division and Qods Force).**"  The IRGC's three components – the Regular IRGC, Hezbollah Division, and Qods Force are inseparable concerning matters of terrorism.  For example, Hezbollah operatives swear an oath of allegiance to the Grand Ayatollah, who is the head of the IRGC, while the IRGC, in turn, finances, arms, and directs Hezbollah.

Force, also regularly participated in joint cell attacks against Americans in Iraq, and on occasion jointly committed attacks with al-Qaeda and/or the Taliban in Afghanistan.

94.     In Afghanistan, the Syndicate's attacks were intended to intimidate and coerce the U.S. government (and other Coalition countries) to withdraw Coalition personnel from Afghanistan. The terrorists also sought to intimidate the elected (and U.S.-backed) recognized government of Afghanistan. The Syndicate also used violence to intimidate and coerce the civilian population of Afghanistan to abide by a severe form of Islamic Sharia law.

95.     As a thumbnail sketch, members of the Syndicate, and the IRGC terrorists that supported them, played the following roles:

(i)     **Al-Qaeda** led the Syndicate; committed attacks against U.S. and Coalition forces; created the philosophical, religious, and moral framework for the Syndicate's violence; set strategic priorities; and provided resources including training, manpower, weapons, funds, connections, strategic insight, and notoriety.

(ii)    **The Taliban, including its Haqqani Network**, committed attacks against U.S. and Coalition forces; provided resources, manpower, and protection in Afghanistan; and collaborated closely with al-Qaeda; indeed, many senior Taliban leaders (including Sirajuddin Haqqani, the leader of the Taliban's Haqqani Network), were simultaneously al-Qaeda *and* Taliban operatives; these dual-hatted terrorists, or "polyterrorists," cemented ties between al-Qaeda and the Taliban, and facilitated joint planning and attacks.

(iii)   **Lashkar-e-Taiba** was a Pakistani terror group that provided funding and weapons to al-Qaeda; recruited terrorists, especially suicide bombers, to participate in al-Qaeda attacks; and embedded its own terrorists in joint al-Qaeda/Taliban cells.

(iv)    **Jaish-e-Mohammad** was a Pakistani terror group that recruited terrorists, especially suicide bombers, to join al-Qaeda and Taliban attacks, and also paid out so-called "martyr payments" to the families of al-Qaeda's suicide bombers; such payments constituted a critical financial incentive for suicide attacks, and therefore a powerful subsidy to al-Qaeda's suicide bombing program.

(v)     **D-Company** was a transnational criminal organization headed by Dawood Ibrahim, an SDGT and SDN who had been internationally infamous since the 1990s as "India's Bin Laden," and had been described as the second-wealthiest gangster in the world after notorious cocaine Kingpin Pablo Escobar; D-Company provided narco-terrorist expertise

to the Syndicate terrorist groups, enabling them to access funds from transnational drug crime and other illicit activities including money laundering.

(vi)   **Hezbollah and the Qods Force**, were both parts of Iran's IRGC that, while not members of the Syndicate, nevertheless provided essential support to every Syndicate member including, but not limited to, al-Qaeda, the Taliban, Lashkar-e-Taiba, and D-Company; for each of these FTOs and/or SDGTs, the IRGC instructed, and resourced, Hezbollah's and the Qods Force's regular deliveries of tens of millions of U.S. Dollars' worth of funds, bounty payments (for killing Americans), bombs, guns, missiles, communications gear, training, transportation assistance, and narcotics-related aid from the IRGC, through Hezbollah and the Qods Force, to the Syndicate, through its constituent member.

96.    The existence of the Syndicate, as well as al Qaeda's leading role, have been

repeatedly acknowledged by senior U.S. government officials.  Examples include:

(i)    <u>Secretary of State Hillary Clinton, July 2009</u>: "[W]e had an intensive strategic review upon taking office[.] And we not only brought the entire [U.S.] government together, but we reached out to friends and allies . . . [T]hat strategic review … conclude[d] that al-Qaeda [was] supported by and use[d] its extremist allies like elements within the Taliban . . . to be proxies for a lot of its attacks . . . So the Taliban . . . [was] part of a kind of terrorist syndicate with al-Qaeda at the center[.]"[11]

(ii)   <u>Secretary of State Hillary Clinton, December 2009</u>: "[W]e have increasingly come to see these organizations not as separate independent operators that occasionally cooperate with one another, but as part of a syndicate of terrorism. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially. And at the head of the table, like an old Mafia kind of diagram, sits al Qaeda."[12]

(iii)  <u>Secretary of Defense Robert Gates, January 2010</u>: "Defense Secretary Robert M. Gates said [] that Al Qaeda was using proxy terrorist groups to orchestrate attacks in . . . Afghanistan as part of a broader strategy to destabilize the region ,.. [and] said Al Qaeda had formed a 'syndicate' of terrorist groups with Taliban factions in Afghanistan and Pakistan . . . [Gates said,] 'What we [saw] [was] that the success of any one of these groups [led] to new capabilities and a new reputation for all,' [and] '[a] victory for one [was] a victory for all.' US intelligence officials [] said that jihadi groups in the region [were] cooperating more closely than ever . . . Gates said all of the factions were working under the umbrella of Al Qaeda."[13]

---

[11] *Sec. of State Hillary Clinton*, NBC News: Meet the Press (July 26, 2009).

[12] S. Hr'g 111-479, at 24.

[13] *Gates Casts Qaeda As Terror Syndicate*, Wash. Post (Jan. 21, 2010), 2010 WLNR 1263055 ("*Gates Casts Qaeda As Terror Syndicate*").

(iv)  Secretary of Defense Robert Gates, May 2010: "[T]he creation of the syndicate of terrorist organizations that [were] working with each other, al Qaeda, the Taliban in Pakistan, the Taliban in Afghanistan, the Haqqani Network" [consisted of] "five or six of these groups that [were by May 2010] really working together and a success for one [was] a success for all . . . And so this problem [became] more complex as these groups [got] closer and cooperated operationally in a way that [the U.S.] really [had not] seen … significantly before 2007, 2006."[14]

(v)  Under Secretary of Defense for Policy Michele Flournoy, April 2011: "We view al Qaeda, Haqqani, the Taliban, these are all part of a syndicate of groups that help each other. The Pakistanis tend to make finer distinctions between them—you know, not being . . . tolerant to some, like al Qaeda, but otherwise tolerating others. We are trying to work with them to shift that perspective and shift that calculus."[15]

97.  Others, including foreign governments,[16] terrorism experts,[17] and prominent journalists[18] have all agreed that al-Qaeda and its allies formed a syndicate of terrorists.

---

[14] *John King Presents: Full Interview with Secretary of Defense Robert Gates*, CNN (May 8, 2010), 2010 WLNR 27823364.

[15] Hindustan Times, *Pakistan Must Meet Certain Expectations on Counter-Terrorism* (Apr. 22, 2011).

[16] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[17] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Weekly Standard (July 4, 2011) ("*The al Qaeda – Taliban Connection*"); Gretchen Peters, *Haqqani Network Financing: The Evolution Of An Industry* 32, Combatting Terrorism Ctr. (July 2012) ("Peters, *Haqqani Network Financing*"); Seth G. Jones, *In the Graveyard of Empires: America's War in Afghanistan* 332 (W.W. Norton & Co. 2010) ("*Graveyard of Empires*"); Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé"); *Al-Qaeda In Afghanistan and Pakistan: An Enduring Threat*, Hr'g Before the U.S. House Committee On Foreign Affairs, Subcommittee On Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156, at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260; Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO: Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108; Walter Laquer and Christopher Wall, *The Future of Terrorism* 153 (St. Martin's Press 2018) ("Laquer and Wall, *Future of Terrorism*").

[18] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009) ("*The Front*").

98. As these sources indicate, al-Qaeda led the Syndicate and worked jointly with its inseparable ally, the Taliban, with whom al-Qaeda had been essentially fused since before 9/11 and has remained so ever since. The overlap between the organizations meant that al-Qaeda often played a key role in attacks by the Taliban, including its Haqqani Network. As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin. This is by design. Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition. Al Qaeda was always a joint venture."[19]

99. Al-Qaeda's Syndicate strategy was consistent with its broader corporate approach to Islamist terror. Indeed, "Al Qaeda became the first terrorist organization to sponsor other terrorist organizations."[20]

100. After 9/11, U.S. and European counter-terrorist finance scholars and practitioners widely concluded that al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force each depended upon some variant of Osama bin Laden's visionary international corporate model for enabling attack by such FTOs, and their proxies, against Americans in Afghanistan and Iraq:

(i) Dr. Matthew Levitt, 2003: "Al-Qaeda successfully built an entrenched and sophisticated international logistical and financial support network of the kind that eventually facilitated the attacks of September 11. There is no question that Hezbollah is engaged in exactly the same infrastructure-building today. Given our experience in September 2001 it should be abundantly clear that we ignore such activity, and the acute security threat it represents, at our peril."[21]

(ii) Martin S. Navias, 2007: "Such a wide range of international operations" "would not have been possible without bin Laden's knowledge of the functioning of contemporary

---

[19] *The al Qaeda – Taliban Connection*.

[20] Jodi Vittori, *Terrorist Financing and Resourcing* 62 (Palgrave Macmillan 2011) ("Vittori, *Terrorist Financing*").

[21] Dr. Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on Post-Modern Terrorism (Sept. 8, 2003), https://tinyurl.com/5pdjpkza.

international banking and financial practices" "firstly as a financial entrepreneur" reflected by the title of his first "CIA profile" in 1996: "Islamic Extremist Financier."[22]

(iii) <u>Dr. Jodi Vittori, 2011:</u> "Al Qaeda, more than any other terrorist group in history, has been compared to a transnational corporation and described using standard business terms, such an organization with 'franchises' and 'subcontractors,' the 'Ford Foundation of Terrorism,' with [] bin Laden as its 'CEO' and 'al Qaeda' akin to a brand name."[23]

101. True to its corporate model, al-Qaeda followed a "franchise" model,[24] under which the Taliban (including its Haqqani Network), LT, and JEM operated as al-Qaeda "franchises," and D-Company, Hezbollah and the Qods Force each operated as "partners" to multiple terrorist organizations.[25] As Professor Gurulé observed, al-Qaeda "used its substantial financial resources to establish links, leverage support and maintain the loyalty of more than 20 militant jihadist groups globally" and "provided financial assistance to these terrorist surrogates to underwrite specific jihadi operations, purchase weapons, and train thousands of their members at al Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[26]

---

[22] Martin S. Navias, "Global Terror and International Finance in the Immediate Aftermath of 9/11," *in* Christopher Ankersen (ed.), *Understanding Global Terror* 172-3 (Polity 2007).

[23] *Id.* at 74-75; *see also id.* ("Much of this derives from the fact that al Qaeda was designed from inception along a business-oriented model, with much of the leadership of al Qaeda, including Usama bin Laden himself, with backgrounds in business and economics."). Other knowledgeable commentators, including investigative journalist Nick Kochan, have agreed that al-Qaeda resembles a multinational corporation capable of cooperation across borders, with a business-like mentality toward its infrastructure and operations. Kochan, *The Washing Machine*, at 69-70.

[24] "The term 'franchise' has been extensively used to describe al Qaeda-associated groups, in which terrorist organizations have made a formal or informal agreement to join the overall al Qaeda organization. This provides al Qaeda extra manpower, financing and logistics networks, while the smaller organization accepts the al Qaeda brand name." Vittori, *Terrorist Financing*, at 100.

[25] Vittori, *Terrorist Financing*, at 100.

[26] Gurulé, *Unfunding Terror*, at 73.

102.    Through decades of terrorist operations, al-Qaeda developed a comprehensive infrastructure designed to route money anywhere in the world al-Qaeda and its allies needed resources. According to Martin S. Navias, a terrorism researcher at King's College in London, in the 1990s, "international terrorist organizations" "such as al-Qaida" – and similarly, Hezbollah Division and the Qods Force – "developed … a well-oiled and sophisticated machine for":

> generating funds and [] exploiting loopholes in the … international banking system for purposes of moving these funds around the world in support of cell sustenance and the propagation of terrorist activities.  Counterterrorist finance … therefore… aim[ed] [to] block[] terrorist fund generation capabilities and prevent[] the movement across borders of these illicit monies.[27]

103.    After 9/11, counter-terrorist finance practitioners broadly recognized  that "[t]he key point about al-Qaeda financing [was] its global nature and its sophistication" because "Al-Qaeda ha[d] cells in Africa, the Middle East, Asia, Europe, and North America" and "carried out operations in Africa, the Middle East, Asia, and North America and therefore, for structural and operational reasons, require[d] funds to be raised and delivered globally."[28]

104.    The imports of al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's application of bin Laden's transnational corporate model are that: (1) al-Qaeda, the Haqqani Network, and other FTOs, like Hezbollah, regularly pursued fused terrorist finance and logistics strategies, *e.g.*, joint al-Qaeda and Haqqani Network cells in Europe, Afghanistan, or Pakistan,  and/or allied terrorist finance and logistics strategies, *e.g.*, Hezbollah and the Haqqani Network collaborating to smuggle Taliban opium through cooperation between their respective global cells and financiers for the shared purpose of routing funds, arms, and fighters to terrorist cells targeting Americans in Afghanistan and Iraq; and (2)  al-Qaeda and other FTOs, like

---

[27] Navias, *Understanding Global Terror*, at 172-3.

[28] *Id.* at 183.

Hezbollah, collaborated in Afghanistan, Pakistan, and key surrounding areas, like the U.A.E., to carry out terrorist attacks against Americans in Afghanistan and Iraq during the relevant period.

105.    One of the most important developments in anti-American terrorism after 9/11 was the nearly universal reliance amongst Islamist terrorist groups, Shiite and Sunni alike, on the use of **"polyterrorist"** financial, logistical, operational, attack planning, and leadership operatives, fronts, cut-outs, funders, and partners in order to support the global latticework of cells necessary to successfully attack and kill Americans in Afghanistan and Iraq. As Matthew Levitt, who would later become a senior-counter terrorism official at Treasury, explained in 2003

106.    As Juan C. Zarate, formerly of Treasury, recalled in his book, *Treasury's War*: "Treasury's [counter-terror] strategy" "aimed at targeting networks of key financial actors and nodes in the terrorist support system" in order "to make it harder for individuals who were financing terrorists to access the formal financial system."[29] According to Mr. Zarate, "[Treasury's] analyses therefore focused on the networks of actors and institutions providing the financial backbone to terrorist enterprises. Interestingly, we found that there were all-purpose financiers who would give to multiple causes—'polyterror' supporters."[30]

107.    After 9/11, al-Qaeda and its affiliates, such as the Taliban, and their terrorist allies the IRGC, including the IRGC's Hezbollah Division and Qods Force, all embraced a corporate-inspired strategy that was these FTOs' analogue to a joint venture between two multinational corporations and depended, most of all, on their deployment of polyterrorists who served multiple allied organizations at the same time.

---

[29] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*").

[30] *Id.*

108.     After 9/11, FTOs commonly embraced polyterrorists for the same reason multinational corporations commonly operate a joint venture (or "JV"), even sometimes doing so with competitors:  because when people are conducting an enormous, long, and expensive trans-national enterprise that depends on personnel, intelligence, money, goods, and collaboration across borders, having a leader who can serve in both organizations, understands both, and is accepted by both, creates unique, and dynamic value that facilitates far greater profits to flow to the people behind the collaboration.  For the Syndicate terrorists targeting Americans in Afghanistan, that meant, among other things, a higher attack tempo, more sophisticated weapons, and more dead and maimed Americans, including Plaintiffs and their loved ones.

109.     FTOs and JVs both rely on so-called "polyperformers" (polyterrorists for FTOs, and senior JV officials in the corporate example) to cause dramatic value growth for their respective organizations by improving their group's operational efficiency, communications, and – every one of which, on its own, would be a big deal but, collectively, constituted nothing less than a revolutionary new terrorism model that posed a far greater threat, from a counter-terrorism first principles perspective, than did the pre-9/11 counter-terror model, which assumed most terrorists only belong to one group.  For the Syndicate FTOs and their terrorist allies targeting Americans in Afghanistan, such benefits translated to an accelerated attack tempo, more collaborative leadership dynamics, enhanced recruiting, new fundraising streams, and better cover and concealment for terrorist operatives deployed in high-risk areas, *e.g.*, Afghanistan, Iraq, the U.A.E., and other locations where U.S. forces, or their allies, could quickly kill or detain a terrorist who threatened America or its allies.

110.     Plaintiffs outline the aspects of the Syndicate's global financial, logistical, and operational leadership, networks, strategies, and key geographies that directly facilitated al-

30

**JA107**

Qaeda and Taliban (including Haqqani Network) attacks in Afghanistan.  Throughout, Plaintiffs

also explain the structures through which the Standard Charted Bank Defendants' and Deutsche

Bank Defendants' substantial assistance to Hezbollah and the Qods Force flowed through to

these IRGC entities to their Syndicate allies and facilitated terrorist attacks against Americans in

Afghanistan from 2006 through 2021.[31]

### B. Al-Qaeda, The Haqqani Network, Hezbollah And The Qods Force Financed And Armed Terrorists Targeting Americans In Afghanistan Through Global Terrorist Finance And Logistics Networks That Relied On Access To The U.S. Financial System

111.    Defendants collectively engaged in illicit transactions that directly or indirectly

aided nearly every significant senior al-Qaeda, Haqqani Network, Hezbollah, and Qods Force

leader, fundraiser, logistician, and partner who supported the Syndicate's terrorist campaign in

Afghanistan from nearly every major hub of Syndicate terrorist finance and logistics.  To provide

the context for those specific Syndicate agents, operatives, fronts, and cut-outs who served al-

Qaeda, the Haqqani Network, Lashkar-e-Taiba, and their Syndicate allies, as well as their

affiliated Hezbollah and Qods Force allies, Plaintiffs first identify these terrorist groups' core

fundraising and logistics strategies relevant to the specific terrorist fundraising, logistics, and

operations schemes alleged by Plaintiffs, and describe how al-Qaeda's, the Haqqani Network's,

Hezbollah's, and the Qods Force's use of complex transnational financial and criminal strategies

after 9/11 supported their campaign against Americans in Afghanistan and Iraq.   Plaintiffs then

identify certain key geographic hubs from which the particular al-Qaeda, Haqqani Network, D-

---

[31] Even though Plaintiffs were injured between 2011 and 2017, most Defendants assisted the Syndicate for even longer than this six-year period, with most having aided al-Qaeda and the Taliban since shortly after 9/11 (if not prior to that date).  Most Defendants' decades-long services to the Syndicate did not happen in a vacuum, but occurred against a backdrop of continually escalating violence in Afghanistan.

Company, Hezbollah, and/or Qods Force operative, agent, cell, cut-out, or front at issue in this Complaint supported terrorist attacks against Americans in Afghanistan.

112.    "Money is the 'lifeblood' of al Qaeda" "and other likeminded terrorist groups."[32] As Professor Jimmy Gurulé, who previously served in a senior counter-terrorist-finance-facing role at Treasury, publicly explained in his 2008 book, *Unfunding Terror*:  "[a]l Qaeda and its global network of affiliated terrorist organizations cannot successfully implement their deadly agenda without financial resources" and therefore "[d]isrupting and dismantling terrorist financing networks is essential to combat terrorism."[33]

113.    "Once the scope of al Qaeda's global reach is fully understood," according to Professor Gurulé, "it becomes eminently clear that the Islamist militant group needs vast sums of money to sustain and support its global terrorist ties."[34]  According to Professor Gurulé,

(i)       "Money [was] central to the growth and development of al Qaeda's network," (at 21);

(ii)       "The ability to raise and transfer funds to [al-Qaeda's allies] [was] essential to sustaining terrorist operations" in Afghanistan after 9/11;

(iii)      "Money [was] critical to sustaining al Qaeda's global presence and successfully waging its global jihad," (at 73);

(iv)      "Money [was] critical to financing al Qaeda's terrorist operations (operational costs) as well as sustaining its organizational infrastructure (organizational costs)," (at 21);

(v)       "Simply stated, depriving al Qaeda of funding [was] as important as targeting the operational terror cells themselves" (at 22).

114.    On September 22, 2001, President Bush announced Executive Order 13224, publicly stating that "banks and financial institutions around the world" were "on notice" that

---

[32] Gurulé, *Unfunding Terror*, at 21.

[33] *Id.*

[34] *Id.* at 89.

they must "freeze or block terrorists' ability to access funds in foreign accounts" to protect Americans from terrorist attacks committed by al-Qaeda and its affiliates.

115.    On September 28, 2001, the U.N. Security Council adopted Resolution 1373, which made it mandatory for member states to adopt broad prohibitions against terrorist finance in response to 9/11.  According to Juan C. Zarate, the former assistant Treasury secretary for terrorist finance, "[t]his resolution was significant because it was not limited to Al Qaeda or the Taliban"; instead, "[i]ts scope was intentionally broad," which "ensure[d] that the international community" adopted "broad measures" "to go after terrorist financing" and "shape[d] the financial regulatory and diplomatic environment" because "[b]anks" "knew that the world was watching and that there was a steep reputational price to pay for falling outside the lines of legitimacy as they were being redrawn."[35]   Most responsible global financial institutions and money remitters cared about their reputations and so heeded this approach.  (Defendants did not.)

116.    Beginning in the months after 9/11, and continuing ever since, Treasury unleashed a comprehensive financial assault on al-Qaeda and the Taliban, in effect using sanctions, the financial system, and the power of U.S. financial markets and the U.S. Dollar to operate *both* as a key **counter-terrorism strategy**, *i.e.*, choke off the al-Qaeda's and the Taliban's access to transnational terrorist finance, logistics, communications, and safe havens, and a vital **counter-terrorism tactic**, *i.e.*, pursue a range of actions from formal (*e.g.*, impose aggressive, sweeping, sanctions), semi-formal (*e.g.*, public speeches and pronouncements) and informal (*e.g.*, private messaging to stakeholders who are potentially aiding terrorists, like a bank servicing Hezbollah and Qods Force fronts who coordinate key finance or logistics operations,

---

[35] Zarate, *Treasury's War*, at 33.

or a fertilizer company knowingly servicing Haqqani Network customers who purchase key bomb parts like fertilizer.

117.    Under Treasury's post-9/11 offensive against al-Qaeda and the Taliban, including its Haqqani Network, countering the flow of terrorist finance through financial institutions and money remitters became a core consideration of most governmental and financial stakeholders in the international community.  The U.S. "led the way in combating terrorist financing through" "an 'aggressive, multifaceted approach,'"[36] under which Treasury aggressively pursued a comprehensive approach that, among other things, emphasized to banks and remitters the tight nexus between money laundering and terrorism.

118.    For example, the Bush Administration  "ordered America's banks to disclose information to the government on suspected money laundering that might be used to provide financing to terrorists"[37] and, in so doing, prioritized that such banks share data with the U.S. government regarding suspected anti-money laundering (or "AML") violations specifically because of the foreseeably close nexus between AML violations, on the one hand, and al-Qaeda and/or Taliban finance and/or logistics after 9/11, on the other, as long as the AML violations occurred featured one or more data points that alerted Defendants that the AML violation could foreseeably be in furtherance of an al-Qaeda and/or Taliban linkage to terror.  Such data points known to Defendants and alleged specifically throughout this Complaint concerning each terrorist customer, including features that suggest possible terrorist finance, including, but not limited to: (i) customer identity; (ii) geography; (iii) transaction type; (iv) transaction amount; (v)

---

[36] Jayesh D'Souza, *Terrorist Financing, Money Laundering, and Tax Evasion* 45 (CRC Press 2012) ("D'Souza, *Terrorist Financing*")

[37] Robert Kuttner, *Financial Hardball and Financial Beanbag*, American Prospect Blogs (Jan. 13, 2020), 2020 WLNR 1155456.

counterparties (including their agents and banks); and (vi) a host of other factors such as specific prior warnings from a U.S., European, U.N., and/or Israeli official to a bank or corporation that was aiding al-Qaeda and/or Taliban-related terrorist finance or logistics.

119.    From 2001 through 2016, al-Qaeda and its allies, including the Haqqani Network, Hezbollah, and the Qods Force, followed a globalized strategy that ignored borders and read like something that might be followed by a "Multi-National Corporation" for terror, with al-Qaeda being the most aggressive practitioner of a model that all followed.[38]

120.    After 9/11, the borderless, MNC-style approach to terror – practiced by Hezbollah, the Qods Force, the Haqqani Network, and most of all al-Qaeda – obliterated pre-9/11 terrorism theories that suggested FTOs were only substantially supported by allies who were in-country or a nearby geography.

121.    After 9/11, al-Qaeda and its allies, including the Haqqani Network, Hezbollah, and the Qods Force, operated much like a global corporation (such as most Defendants) that had vast footprints, numerous distinct products, thousands of personnel, and facilities distributed in dozens of countries worldwide that required global supply chains, financial muscle, and

---

[38] At all times, al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force – FTOs all – ordinarily deployed substantially similar tactics and tradecraft in comparison to one another to accomplish their respective transnational terrorist finance, logistics, operations, communications, transportation, propaganda, and attack operations.  This trend endured in the decades after 9/11 for numerous historical, practical, relationship or other reasons that included, but were not limited, each such FTO's:  **(i) joint terrorist training and common terrorist doctrines**, *e.g.*, al-Qaeda and Hezbollah's long-standing tactical cross-pollination through joint training facilitated by the IRGC, including its Qods Force; **(ii) long-term economic and logistical alliances concerning key funding and weapons streams**, *e.g.*, Hezbollah's and the Qods Force's narcotics venture with al-Qaeda and the Haqqani Network; and **(iii) leadership emphasis,** including, but not limited to, that of Usama bin Laden (al-Qaeda), Sirajuddin Haqqani (al-Qaeda; Taliban, including its Haqqani Network), Hassan Nasrallah (IRGC, including its Hezbollah Division), and Qassem Soleimani (IRGC, including its Qods Force).

communications abilities, and at all times supported attacks against Americans in Afghanistan

and Iraq through cells and lanes of effort that:

(i)     were "**geographically dispersed**,"[39] which supported each FTO's attacks against Americans in Afghanistan and Iraq from al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's cells in dozens of countries on six continents, including, but not limited to: the United States, Canada, Mexico, Colombia, Panama, Brazil, Venezuela, Germany, Denmark, the Netherlands, Spain, the U.K., France, Nigeria, South Africa, the U.A.E., Qatar, Lebanon, Syria, Iraq, Iran, Cyprus, Estonia, Latvia, Russia, Afghanistan, Pakistan, Malaysia, Thailand, China, and Australia;

(ii)    were "**functionally dispersed**,"[40] which facilitated each FTO's attacks against Americans in Afghanistan and Iraq from every mode of cell, function, operative, and partner, including, but not limited to, their own – and one another's – financiers, logisticians, black market traders, and recruiters;

(iii)    were **U.S. Dollar-focused** and emphasized stockpiling as much American currency as possible in as many geographies as possible to support as many functions as possible, which aided each FTO's ability to sustainably finance the networks necessary to facilitate terrorist attacks against Americans in Afghanistan and Iraq after 9/11;[41] and

(iv)    leveraged **relationships with corporate and financial partners specifically known for lacking ethics**, like Defendants, which afforded each FTO benefits by allowing such FTOs to better conceal their operatives, fundraising, or U.S. Dollar transfers, *e.g.*, when

---

[39] Vittori, *Terrorist Financing*, at 147 (while "no terrorist organization ha[d] ever 'gone global' to the theoretical extent of a [Trans-National Corporation]," "al Qaeda represent[ed] the closest [] so far" because "[l]ike a hypothetical [Trans-National Corporation], al Qaeda operate[d] globally, with cells or supporters on all continents except Antarctica, including the most developed countries, … and the most collapsed").

[40] *Id.* (al-Qaeda was "[n]ot only" "geographically dispersed, but also *functionally dispersed*": al-Qaeda and its allies "[r]esourc[ed]" attacks against Americans from "across [the] spectrum of the[ir] organization[s] – financing, tangible goods, training, recruitment, and logistics – [which] occur[red] *throughout the world* and use[d] *multiple nodes*") (emphasis added).

[41] Al-Qaeda and its allied did so by maximizing their own (and their allies') U.S. Dollar reserves through and 6-, 7-, and 8-figure U.S. Dollar balances, and similarly-sized U.S. Dollar cash transfers, through banks and remitters like Defendants. Like corporations, from 2001 through 2020, these terrorist groups prioritized stockpiling large balances of U.S. currency by, among other ways, cooperating with their Syndicate allies (in the case of Syndicate members) in addition to Hezbollah and the Qods Force (for assistance with money laundering, narcotics, and other financial matters). Under this strategy, "Al Qaeda [and] the Taliban," including its Haqqani Network, "use[d] conventional banks to transfer money to underwrite their global terrorist activities" "because" banks "offer[ed] a broad range of financial services, rapid transaction security, and wide geographic availability." Gurulé, *Unfunding Terror*, at 181.

SCB Dubai helped a Hezbollah front conceal its conduct, or when DBTCA facilitated an al-Qaeda cell's VAT fraud.

122.    Al-Qaeda led the Syndicate's transnational financial efforts just as it led the planning and commission of attacks:  in the leadership role as the parent corporation, but working closely as an ally or agent, of its Syndicate franchises (*e.g.*, the Haqqani Network) and partners (*e.g.*, D-Company, Hezbollah, and the Qods Force).

123.    For example, al-Qaeda (alongside the Haqqani Network) has traditionally managed the Afghan Taliban's opium activities outside of Afghanistan, including, but not limited to, the export, sale, laundering, and repatriation of drug profits back to al-Qaeda and the Taliban (including the Haqqani Network) to support terrorist operations.  Historically, al-Qaeda and the Haqqani Network extracted commissions, ranging from ten percent (10%) to twenty percent (20%) on the income derived from the opium they managed for the Taliban, and through such close alliances, each Syndicate member funded the shared terror enterprise.

124.    After 9-11, al-Qaeda and the Taliban (including its Haqqani Network) – like their Islamist allies Hezbollah and the Qods Force – depended upon a latticework of transnational terrorist financial and logistical cells, partners, cut-outs, and agents on every continent but Antarctica.  Similarly, and also like their Islamist allies Hezbollah and the Qods Force, al-Qaeda and the Taliban (including its Haqqani Network) relied upon cooperative "joint cell" or "fusion" approaches in which terrorist organizations fused with others into hybrid cells, funding streams, logistical pipeline, transportation routes, and the like, which was led by Syndicate polyterrorists like Sirajjudin Haqqani.

125.    Ever since 9/11, and continuing through today, al-Qaeda and the Taliban, including its Haqqani Network, have depended upon the totality of the terrorists' global relationships to sustain the high attack tempo against Americans in Afghanistan that was

necessary to eventually drive the U.S. out in 2021 and achieve a key goal for every affiliated terrorist, including, but not limited to: (i) al-Qaeda; (ii) the Taliban, including its Haqqani Network; (iii) Hezbollah; and (iv) the Qods Force.

126.     As Dr. Jodi Vittori explained, "[u]nder" the post-9/11 "[Trans-National Corporation] structure" these Islamist terrorist allies "create[d] an alliance network of sympathetic groups that provide[d] the parent organization its true regional or global reach," which "was a tactic first developed by al Qaeda," for whom the global hubs strategy "remain[ed] *its primary means to maintain a high operational tempo*, even while its leadership ha[d] limited mobility and communications on the Pakistan-Afghanistan border."[42]

127.     In 2012, the Treasury Department stated that the Syndicate's "financial networks [were] *instrumental in funneling money for terrorist operations* [in Afghanistan]"[43]

128.     The Syndicate's strategy for both sides of the terrorist finance coin – illicit fundraising and illicit fund transfer – depended upon its ability to maintain a diversified international financial portfolio befitting the global transnational enterprise it was.  This meant that al-Qaeda and the Taliban, including its Haqqani Network, prioritized several streams of illicit fundraising, including the protection money it obtained from corrupt corporations, the income it derived from the Afghanistan-to-Russia Opium Pipeline, funds raised through fraud schemes (particularly large-scale VAT frauds), and overseas donations, to name four examples.

129.     For every strategy, al-Qaeda and the Taliban, including its Haqqani Network, stretched its financial resources the most – and killed the most Americans – via a balanced and diversified global financial portfolio, for which the terrorists needed the institutional services of

---

[42] Vittori, *Terrorist Financing*, at 160 (emphasis added).

[43] Press Release, U.S. Dep't of Treasury, *Treasury Targets Money Exchange House Operator for Supporting the Taliban* (Feb. 26, 2013).

both global financial institutions and money remitters. In his 2013 book, *Treasury's War*, Mr. Zarate explained how "stemming terrorist financing" "play[ed] an important role in stemming terrorism itself for three fundamental reasons: [1] it makes it harder, costlier, and risker for terrorists to raise and move money; [2] it forces terrorist leaders to make tough budget decisions; and [3] it **constricts the global reach of their organizations**."[44]

130.   After 9/11, counter-terrorist finance practitioners universally understood that there was a direct, no-steps linkage between al-Qaeda, Taliban (including Haqqani Network), Hezbollah and/or Qods Force terrorist finance or logistics activities anywhere worldwide and such terrorists' allied strategies to attack Americans in Afghanistan and Iraq. As a result, any bank or remitter that suggested at the time (or now) that a terrorist finance or logistics-related transaction by al-Qaeda, the Taliban (including its Haqqani Network), Hezbollah, and/or the Qods Force require multiple links in a chain before such aid facilitated terrorist attacks against Americans in Afghanistan or Iraq was followed an approach that directly conflicted with U.S. counter-terror finance policy after 9/11 and universal counter-terrorist finance norms broadly practiced by responsible banks and remitters throughout the world since 2001. Former Treasury official Juan Zarate, for example, confirmed that such views were the foundation of U.S. strategies to protect against al-Qaeda and the Taliban after 9/11.[45]

131.   Moreover, as terrorist finance scholar Jayesh D'Souza explained in his 2012 book, *Terrorist Financing, Money Laundering, and Tax Evasion*, "[t]here [was] consensus," after

---

[44] Juan Zarate, *Treasury's War: The Unleashing Of A New Era Of Financial Warfare* 29 (PublicAffairs 2013) (emphasis added) ("Zarate, *Treasury's War*").

[45] *Id.* ("When a counter-terror-finance effort is successful, it ostracizes known financiers from the formal financial and commercial worlds and deters fundraisers, donors, and sympathizers from giving support and money to terrorist groups. … If done well, a campaign to disrupt terrorist financing not only stops attacks, but can change the strategic reach and trajectory of the enemy's network.").

9/11, "that the heart of terrorism [was] its financing," "stopping the flow of funds to terrorist groups [was] like sticking a dagger into the heart of the problem," and it was "evident" that "al-Qaeda" embodied "[t]he international nature of financial crime."[46]

132.    In this Complaint, Plaintiffs refer to terrorist financing and its composite activities—money laundering, tax fraud, and tax evasion—as "financial crime" consistent with broad post-9/11 practice.[47]

133.    Key NATO allies have confirmed al-Qaeda's and the Haqqani Network's global strategy for facilitating attacks against Americans in Afghanistan and Iraq through cell activities on six continents.  For example, the United Kingdom publicly confirmed in 2007 that al-Qaeda and its affiliates had "attacked over 25 countries and killed thousands," which the U.K. concluded was supported by al-Qaeda's global web of fundraising, logistical and operational cells operating on six continent, under which the al-Qaeda's and the Haqqani Network's "financing" was "equally international with funds very often [] raised in one country, used for training in a second, for procurement in a third and for terrorist acts in a fourth."[48]

134.    Through each FTO's globally integrated terrorist networks – which also benefited from cross-pollination amongst each other – al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force ensured that the Syndicate capitalized on any chances presented by a complicit bank, remitter, or corporation.  As a result, preventing terrorist attacks against Americans in Afghanistan and Iraq meant stopping al-Qaeda, Haqqani Network, Hezbollah, and Qods Force financiers from finding entry points into the global financial system, and, most of all, U.S.

---

[46] D'Souza, *Terrorist Financing*, at 27.

[47] *Id.*

[48] *Id.*

markets. For this reason, after 9/11, any bank or remitter that operated as a "Laundromat" affirmatively chose to support terror no differently than if it directly delivered money to al-Qaeda, the Haqqani Network, Hezbollah, or the Qods Force. According to Professor Gurulé, "[t]he international economic sanctions regime established" after 9/11 were "the *sole vehicle for truly global action against the twin threats of al Qaeda and the Taliban*."[49]

### 1. Al-Qaeda And The Haqqani Network Relied Upon Transnational Crime As A Key Source Of Terrorist Finance

135. Al-Qaeda and the Haqqani Network, like their allies Hezbollah and the Qods Force, operated transnational terrorist finance and logistics enterprises in order to fund, arm, and logistically support anti-American terrorists in Afghanistan and Iraq from a constellation of terrorist cells worldwide scattered across six continents, including but not limited, to such groups' cells in Europe, Asia, and the Middle East. Every specific terrorist operative, agent, cut-out, or front identified in this Complaint hails from these cells, or otherwise aided them.

136. It would not be proper to suggest that the terrorist logistics, financial, and/or operational activities of al-Qaeda, the Taliban (including its Haqqani Network), other Syndicate members, or their Islamist allies like Hezbollah and the Qods Force, segregated their cells such that financial, logistical, and operational activities by one cell in one region does not benefit the broader linked terrorist campaigns in Afghanistan and Iraq. To the contrary, al-Qaeda's, the Taliban's (including its Haqqani Network's), Hezbollah's, and the Qods Force's income derived from criminal activity in Afghanistan, Pakistan, the U.A.E., Iraq, Iran, Russia, Asia, the Americas, and Europe directly funded Syndicate terrorist attacks against Americans in Afghanistan and Iraq. According to Dr. Kimberley L. Thachuk, "the large amounts of money

---

[49] *Id.* at 233.

realized through criminal activity allow[ed] [Syndicate] terrorist criminal enterprises to prosper, increase their numbers, and buy matériel in support of terrorist plots."[50]

137.    From 9/11 to 2016, al-Qaeda's, the Taliban's (including its Haqqani Network's), Hezbollah's, and the Qods Force's, transnational finance and logistics activities depended upon the groups' complete fusion of crime with terrorist finance worldwide.  According to Christopher Brown, a terrorism analyst at the Hudson Institute, to prevent attacks it was vital to "target the logistical foundation on which [terrorism] operates," meaning "the means and methods by which the groups communicate, are financed, manage transportation and supply operations. …Whether it is the Russian [M]afia supplying weapons, the Chinese Triads distributing al Qaeda-grown heroin or banks knowingly laundering criminal and terrorist funds, these international criminal organizations *form the logistical base that makes it possible for the terrorists to operate*."[51]

138.    The U.S. government also repeatedly recognized the foreseeably close linkage between transnational crime in Afghanistan, Pakistan, the Middle East, Russia, and Europe, on the one hand, and terrorist violence against Americans in Afghanistan and Iraq committed by proxies of al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, on the other.

139.    Indeed, al-Qaeda's, the Taliban's (including its Haqqani Network's), Hezbollah's, and the Qods Force's operations went beyond "nexus" to the point of achieving a complete "fusion" with transnational organized criminal organizations, like the Russian Mafia, as a single cohesive entity on the subject matters upon which these terrorists cooperated with their criminal allies, often through the same people.  For example, Altaf Khanani was a Syndicate member who

---

[50] Dr. Kimberley L. Thachuk, *Terrorist Criminal Enterprises: Financing Terrorism through Organized Crime* 22 (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) ("Thachuk, *Terrorist Criminal Enterprises*").

[51] Christopher Brown (Transitions to Democracy Project at the Hudson Institute), *Plan B on Terror*, Washington Times (July 10, 2005), *2005* WLNR 10855164.

helped move its money working closely with the Russian mafia and Defendants. Moreover, after 9/11, there was often a complete "fusion" between terrorist groups like the Syndicate and transnational organized crime groups like the Russian Mafia:

> [A]cross many terrorist organizations, [] there is a ***complete fusion*** of terrorist and criminal activity. ***There is not a "nexus" between the two worlds; they are one and the same.*** … [C]ompelling examples [show] how ***criminal activity is inseparable from every aspect of terrorist organizations*** and their behavior. … [T]here are many implications of the ***fusion of these two world***s. [including that] … [w]e cannot understand the phenomenon of terrorist criminal enterprises when analysis takes place in separate [lanes]. …[52]

140.     Counter-terrorism professionals recognize that, because "[t]errorism [] steadily gangsterized over the past several decades," "[f]inancing terrorist operations []," "including" "pay[ing] clandestine operatives and" "purchas[ing] [] weapons and explosives, require[d] the types of transactions that only illicit operations [could] satisfy" and, "[a]s such, the evolution to terrorist criminal enterprises" "not only enabled many terrorist groups to survive and expand, but it also" "afforded them added resiliency and mobility."[53]

141.     Al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's shared "fusion" strategy obliterated the distinction between organized crime and terrorist criminal enterprise operations in geographies that posed a high risk of terrorist finance and logistics in support of attacks in Afghanistan and Iraq, including, but not limited to, Afghanistan, Pakistan, the U.A.E., Iraq, Iran, Russia, and parts of Europe, the Americas, Asia and Africa, where "[t]errorist criminal enterprises differ from conventional organized crime only in their

---

[52] Christopher A. Kojm, Foreword in *Terrorist Criminal Enterprises: Financing Terrorism Through Organized Crime* viii-ix (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) (emphasis added).

[53] Dr. Kimberley L. Thachuk and Dr. Rollie Lal, *Terrorist Criminal Enterprises: Financing Terrorism through Organized Crime* 1-3 (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) (emphasis added) ("Thachuk and Lal, *Terrorist Criminal Enterprises*").

motivations for making and spending illicit funds.  Otherwise, the criminal modus operandi is the same."[54]  As a result, according to one terrorism scholar, one must view "terrorist criminal enterprises as the cohesive threat that they are."[55]

142.    At all relevant times, the Syndicate, acting through al-Qaeda and the Taliban (including its Haqqani Network), was entrenched throughout Afghanistan's and Pakistan's economies and established as a transnational terrorist enterprise that was known for its universal employment of mafia-like tactics in all transactions.  The Syndicate's collective use of front companies and associated bank accounts reflected such scale.

143.    By 2008, the Syndicate had a monopoly on (or, at a minimum, a share of all transactions in) each core aspect of the criminal marketplace in the Afghanistan/Pakistan border regions stretching into the geographic strongholds of each group in Afghanistan and Pakistan, respectively.  The Syndicate's effective participation in all criminal profits in these areas extended to organized money laundering, smuggling, criminal extortion rackets, and drugs.[56]

144.    With respect to narcotics, because of the Syndicate's control over various chokepoints in the Afghan opium industry, including agricultural supply, labor pool, protection rackets, control over the chemicals necessary for industrial-scale processing, and the export and smuggling routes outside of Afghanistan, even the financial activities of non-Syndicate drug warlords directly funded the Syndicate, because the Syndicate charged a "tax" on every drug deal and every drug lord in Afghanistan and Pakistan.  Indeed, the Taliban (including its Haqqani

---

[54] *Id.* at 7.

[55] Thachuk and Lal, *Terrorist Criminal Enterprises,* at 193.

[56] Like any other transnational organization that earns income from various streams of goods and services, the Syndicate's level of control over the illicit economy in Afghanistan and Pakistan varied depending on the subject matter.  In some industries, such as narcotics, smuggling, and protection rackets, the Syndicate maintained a functional monopoly in Afghanistan and Pakistan. For other aspects of the illicit economy, e.g., illegal mining,

Network), established elaborate procedures to collect "taxes" from every criminal actor in their geography, and was highly effective at doing so.

145.    From 2008 through 2016, the Syndicate's members collectively controlled or contested most of Afghanistan and Pakistan, with respect to geography, population, and areas of economic activity.  In those areas, Syndicate control of criminal economies was so complete that any illicit transaction was likely to fund the Syndicate or benefit a Syndicate front.

146.    The Syndicate's tentacles, however, spread far outside of geographies in Afghanistan and Pakistan that the Syndicate contested or controlled.  This was assured by the Syndicate's practice of extracting "donations" or "taxes" from any and all significant players in the Afghani and Pakistani criminal marketplace in areas the Syndicate controlled *or contested* including, most of all, the  narcotics infrastructure, black marketeers selling dual-use goods, *hawala*[57] brokers who move money between (and within) Afghanistan and Pakistan, and notorious money launderers who set up overseas structures dependent on large banks to help al-Qaeda and the Haqqani Network transfer their overseas profits back to accounts controlled by al-Qaeda, the Haqqani Network, and their Syndicate allies.

147.    The customary "donation" or "tax" was ten percent (10%) to twenty percent (20%) of the criminal's profit from the transaction.[58]  In this way, the Syndicate leveraged its mafia-like practices to ensure that all major criminal revenue streams in Afghanistan and

---

[57] A *hawala* is an old form of money transfer. In a nutshell, a person hands money to one *hawala* operator, for the benefit of a second person near a second *hawala* operator somewhere else in the world. The second person can immediately get the money from the second operator, and the two *hawala* operators square the transaction between themselves. *Hawala* networks rely on trust between operators, and therefore often involve close-knit structures like extended families or communities.

[58] These numbers are separate from the customer 2.5% contributions often made as *Zakat*, which is a form of contribution long relied upon by al-Qaeda, the Taliban (including its Haqqani Network), and every other member of the Syndicate.

Pakistan directly or indirectly funded the Syndicate's attacks against Americans in Afghanistan. Since the Syndicate controlled or contested nearly all of Afghanistan, and much of Pakistan, by 2009, its geographic reach was substantial and included most of the geographies in Afghanistan and Pakistan in which Defendants conducted business or engaged in sales or transaction-related activity, ensuring the Syndicate's ability to collect its standard "taxes," directly or indirectly, from most illicit activity in most parts of Afghanistan and Pakistan.

148.    The Syndicate also extracted significant income from the "taxes" it imposed on criminal activity in the U.A.E., as well as amongst Pakistani and Afghan diaspora in Europe, the Middle East, and Asia.

149.    Al-Qaeda and the Haqqani Network also followed long-standing al-Qaeda doctrine that called for jihadists to achieve monopolies in key industries operating in their geographies to leverage such monopolistic power as a vehicle for terrorist fundraising, finance, and logistics.  For example, when bin Laden was based in Sudan before 9/11, he famously supported al-Qaeda operations through a host of activities that leveraged al-Qaeda and its affiliates' monopoly on various Sudanese agricultural industries to support terrorist operations.

> **2.    The U.S. Financial System Was Key To Syndicate Operations And The U.S. Dollar Was The "Gold Standard" For The Syndicate's And IRGC's Terrorist Fundraising And Finance**

150.    The U.S. Dollar was, and is, the "gold standard" of Syndicate terrorist finance throughout the Middle East and Asia, including in Afghanistan, Pakistan, and the U.A.E.  Like any other large transnational enterprise that is dependent upon purchasing key parts through commercial markets, the Syndicate and its constituent members sought to improve their operational efficiencies – *e.g.*., buy more bomb parts and pay for more terrorists – by strategically maximizing the value of their currency holdings.  No other currency provides the terrorists with the overall advantages of the U.S. Dollar.

151.     Al-Qaeda and the Haqqani Network, as managers for the Syndicate's transnational finances, employed a blended terrorist finance strategy in which they used large global financial institutions, regional Pakistani banks, and *hawalas*.  In most large cross-border transactions, large global financial institutions played a role in the movement of U.S. Dollars even when the final disbursement of the money was handled by a *hawala* broker.  In this way, global financial institutions that could access the U.S. financial system, *e.g.*, Defendants, played an especially vital role in al-Qaeda and the Haqqani Network's ability to repatriate their illicit income, which typically was USD-denominated, and came in large, chunky amounts from dozens of countries.  This made it harder to initially move the payments through a regional bank or the *hawala* system, since both tended to work best for smaller-scale transfers (*e.g.*., 5-figure or 6-figure) rather than bulk 7- and 8-figure USD cash transfers that were common in the Syndicate's opium trade.

152.     While al-Qaeda and the Haqqani Network could – and did – use regional Pakistani banks to raise and launder millions of dollars for direct use in terrorist operations throughout Afghanistan, it also used global financial institutions to accomplish the industrial-scale global profit repatriation from its transnational criminal enterprise, including narcotics.

153.     Apart from the U.S. Dollar's universally recognized status as the world' reserve currency, the Dollar is independently the currency of choice for every major global narcotics cartel, including the Syndicate and its agent, the Russian Mafia.

154.     Syndicate terrorists, including members of al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, prioritized terrorist fundraising and finance strategies that targeted U.S. Dollars, which the terrorists knew, like their corporate counterparts, provided the greatest return on their terrorist finance investment.

155.    After 9/11, a common strategy emerged amongst Syndicate terrorist financiers who required U.S. Dollars given their geographic, commercial, or operational needs, but sought to avoid interacting with American banks that were rigorously following post-9/11 financial rules:  partner with a European or Middle Eastern bank notorious for laundering money and possessing a branch in the United States, and use the European or Middle Eastern banking partner's Laundromat, and U.S. branch, to source U.S. Dollars while leveraging the intentionally built-to-fail compliance systems at the European or Middle Eastern bank being used.

156.    The Syndicate's widespread protection money rackets show how the Syndicate leveraged financial institutions and money remitters to obtain the U.S. Dollars that turbocharged the power of its key terrorist fundraising schemes.  From the mid-2000s through present day, the Syndicate has operated a nation-wide protection money scheme throughout Afghanistan, and much of Pakistan, through which it earned vast sums of money each year to fund attacks against Americans in Afghanistan.  The Syndicate's ability to access the international financial system and conduct U.S. Dollar-denominated transactions magnified the potency of its protection money rackets by, among other things, providing the mechanisms by which to manage and distribute the enormous cash flow from payments made by corporations and contractors doing business in Afghanistan and Pakistan.

**C.    Al-Qaeda Leader Sirajuddin Haqqani Served Both Al-Qaeda And The Taliban, Including Its Haqqani Network, Optimized The Syndicate's Transnational Terrorist Enterprise And Partnerships With Other FTOs, Including Hezbollah And The Qods Force, And Facilitated The FTOs' Shared Terrorist Campaign Targeting Americans In Afghanistan**

157.    From 2006 through today, Sirajuddin Haqqani was one of deadliest terrorists in the world, responsible for more finance, logistics, attack planning, and leadership activities in furtherance of the al-Qaeda/Taliban attack campaign targeting Americans in Afghanistan than

almost any other terrorist in the world. Indeed, Sirajuddin was the single most important al-Qaeda leader after 9/11 aside from bin Laden himself (and only one remains alive).

158. Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

159. By 2008, Sirajuddin Haqqani was simultaneously: (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, it's terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

160. On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" and the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura" in 2012.[59]

161. When the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a SDGT, it noted that he "has also acted on behalf of al-Qa'ida

---

[59] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008); Pub. L. 112-168, 126 Stat. 1299, § 2(a)(8) (Aug. 10, 2012).

and has been linked to al-Qa'ida military operations."[60] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.

### 1. Sirajuddin Haqqani Was A Key Al-Qaeda/Taliban Leader

162.    By joining al-Qaeda management, Sirajuddin Haqqani achieved a level of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the terrorists' campaign, through Sirajuddin's service on behalf of the Syndicate as a dual-hatted al-Qaeda/Taliban terrorist.

163.    Whenever Sirajuddin Haqqani acted as a dual-hatted (al-Qaeda/Taliban) polyterrorist and simultaneously providing polyterrorist financial, logistical, operational, attack planning, and leadership services to aid al-Qaeda and the Taliban, such conduct comported with bin Laden's programmatic emphasis since the 1980s, which strongly encouraged al-Qaeda terrorists to join other allied groups, and vice versa, in order to grow the al-Qaeda brand and develop more affiliate relationships for one primary purpose: killing Americans. Indeed, by design, al-Qaeda operatives were often members of other Pakistan-based al-Qaeda affiliates, most commonly, the Haqqani Network and Lashkar-e-Taiba.

### 2. Sirajuddin Haqqani Helped Lead Al-Qaeda's And The Taliban's Global Transnational Terrorist Enterprise To Facilitate Syndicate Attacks Against Americans In Afghanistan

164.    Sirajuddin Haqqani's polyterrorist status matters because Sirajuddin was one of the key al-Qaeda terrorists who led Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012, which relied upon Sirajuddin and the Haqqani Network to help al-Qaeda leverage every transnational relationship

---

[60] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

that the Haqqani family, or al-Qaeda's other non-Haqqani leaders, maintained with other FTOs, including Hezbollah and the Qods Force, to drive the U.S. out of Afghanistan. Throughout the decade after the peak of the anti-American attacks in Afghanistan from 2010 through 2012, and continuing until the fall of Kabul, Sirajuddin's polyterrorist services directly or indirectly strengthened the assistance provided by *every* FTO and SDGT identified in this Complaint.

### i. Sirajuddin Haqqani Leveraged His Unique Biography To Serve As A Transnational Terrorist Consensus Builder Who Erected Bridges Between FTOs

165. When Plaintiffs were attacked, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda, the Taliban (including its Haqqani Network), and the IRGC (including its Hezbollah Division and Qods Force).

166. Aside from his reputation for being an al-Qaeda terrorist and mobster, Sirajuddin Haqqani also benefited from his unique biographical narrative, which gave Sirajuddin what amounted to a Syndicate "terrorist superpower"—the demonstrated ability to equally inspire (through respect, fear, or both) the global community of al-Qaeda and Taliban operatives, financiers, fundraisers, logisticians, attack planners, agents, and corrupt allies in the international financial and corporate communities (including Defendants) who were necessary for the Syndicate to succeed in its terrorist campaign against Americans in Afghanistan.[61]

167. Like his father Jalaluddin, Sirajuddin Haqqani was also famous for his pragmatism in defense of his extremism and was a "consensus builder" in the organizational and

---

[61] For his entire life, Sirajuddin Haqqani was continually exposed to the leaders of al-Qaeda (*e.g.*, bin Laden) and the Taliban (*e.g.*, Sirajuddin's father, Jalaluddin), who groomed Sirajuddin for leadership form a young age and encouraged Sirajuddin's development of his comprehensive al-Qaeda and Taliban terrorist skillset, which afforded the Syndicate an unparalleled ability to integrate nearly every aspect of al-Qaeda's and the Taliban's global terrorist superstructure supporting Syndicate attacks against Americans in Afghanistan from 2006 to 2021.

partnership sense who strove to cut deals with potential allies who shared his desire to attack Americans in Afghanistan. Sirajuddin was willing to do deals and make trades with people, groups, and governments whom he may otherwise wish to kill if the deal in question made it more likely that al-Qaeda and the Taliban, including its Haqqani Network, could kill Americans in Afghanistan.

> ii. **Sirajuddin Haqqani Facilitated Close Collaboration Between Al-Qaeda, The Taliban, And The IRGC That Funded, Armed, And Supported Attacks Against Americans In Afghanistan**

168. Sirajuddin Haqqani ranked among the Syndicate's most important transnational leaders and played a vital role in harmonizing al-Qaeda's various strategies and tactics and optimizing al-Qaeda and Taliban network efficiencies with each other, and with Syndicate partners like the IRGC. Thus, for example, if an al-Qaeda operative needed to smuggle $500,000 in a duffle bag into Afghanistan (before it fell), Sirajuddin could ensure that the Haqqani Network facilitated an efficient, safe, and reliable smuggling solution for its al-Qaeda partner so that the al-Qaeda cash could help fund attacks against Americans in Afghanistan. Similarly, if a Qods Force "security" operative needed secure travel into Paktika Province (a Haqqani Network stronghold), Sirajuddin's pragmatic alliances meant that the Qods Force terrorist could contact someone from the Haqqani clan and make the necessary arrangements.

169. When Plaintiffs were injured between 2011 and 2017, Sirajuddin Haqqani served as the top dual-hatted al-Qaeda/Taliban terrorist responsible for ensuring the close collaboration between al-Qaeda, the Taliban, and their IRGC allies, including Hezbollah and the Qods Force. This role comported with the Haqqani Network's most important, long-standing core competency: its ability to fund terrorism through the operation of the Haqqani Network as a

transnational terrorist mafia family (that is part of the Taliban), which profited from, among other things, illicit cross-border income through activities like narcotics trafficking.

170.     Acting as a dual-hatted leader serving both al-Qaeda and the Taliban, Sirajuddin Haqqani (and certain of his family members) coordinated key aspects of both groups' key transnational-facing aspects of the Syndicate's terrorist campaign in Afghanistan and, in coordinating with other al-Qaeda and affiliated terrorists.  Each below attack campaign or type constituted an act of international terrorism committed by al-Qaeda, the Taliban, including its Haqqani Network, that was aided by the IRGC, including Hezbollah and the Qods Force.

(i)      **Kabul Attack Network Attacks.**  Sirajjudin Haqqani planned and authorized the Syndicate attacks that targeted Kabul – which Sirajuddin Haqqani personally viewed as a tactical priority – that were committed by joint al-Qaeda/Taliban/Lashkar-e-Taiba cells known as the Kabul Attack Network, including such joint cell's IED and suicide bomb attacks in Kabul and the surrounding provinces.

(ii)     **Fertilizer Bomb Attacks.**  Alongside al-Qaeda, Sirajjudin Haqqani planned and authorized al-Qaeda's fertilizer bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's strategy for:  (a) sourcing fertilizer; (b) purchasing and transporting fertilizer; (c) operating al-Qaeda bombmaking factories hosted at Sirajjuddin's personal network of joint al-Qaeda-Haqqani Network terrorist camps in Pakistan; and (d) deploying fertilizer bombs as IEDs and suicide bombs to attack Americans in Afghanistan.

(iii)    **Suicide Bomb Attack**s.  Sirajjudin Haqqani planned and authorized al-Qaeda's suicide bombing campaign, including, but not limited to, al-Qaeda's and the Taliban, including its Haqqani Network's, shared strategy for:  (a) planning the targets for suicide bomber attacks in Afghanistan; (b) sourcing suicide bombers through al-Qaeda's and the Haqqani Network's long-standing allies, Lashkar-e-Taiba and Jaish-e-Mohammed; and  (c) coordinating the "suicide bomber infrastructure" of camps, madrassas, ratlines, and safehouses, which relied heavily upon al-Qaeda and Haqqani Network resources and polyterrorists like Sirajjuddin.

(iv)     **Kidnapping Attacks.**  Sirajuddin Haqqani planned and authorized kidnappings.

(v)      **Transnational Terrorist Finance and Logistics.**  Sirajuddin Haqqani planned and authorized al-Qaeda's and the Taliban's, including its Haqqani Network's, transnational terrorist logistics, including, but not limited to:

      a.  <u>al-Qaeda and the Taliban's transnational financial operations</u> necessary to the success of their: (i) criminal funding efforts, *e.g.*, money laundering, protection rackets, and tax fraud); (ii) fundraising and money movement, *e.g.*, diaspora donations, banking relationships; and/or "tax" collection from the criminal underworld of their diaspora globally, *e.g.*, logistics, communications in the U.A.E., Pakistan, Afghanistan, and Europe; and

      b.  <u>al-Qaeda's and the Haqqani Network's transnational-logistics operations</u> in Afghanistan, Pakistan, and the U.A.E., which ensured that the Syndicate and all its members benefited from a reliable terrorist supply chain, for which Sirajuddin also collaborated with the IRGC, including Hezbollah and the Qods Force, which materially supported the Syndicate's terrorist attacks against Americans in Afghanistan.

(vi)  **Coordination Between FTOs.** Sirajuddin Haqqani led two FTOs (al-Qaeda and the Haqqani Network) and was responsible for, or supervised those who were responsible for (like his brother Anas) managing al-Qaeda's and the Taliban's (including its Haqqani Network's) relationships with a broad international alliance of allied terrorists, including, but not limited to: (a) the IRGC, including Hezbollah and the Qods Force; and (b) the Pakistani Taliban, Lashkar-e-Taiba, and Jaish-e-Mohammed, each members of the Syndicate.

171.    Sirajuddin Haqqani played the roles above from 2006 through 2021, and his above-described activities directly relied upon Defendants' provision of financial services to, among others, the al-Qaeda, Taliban, and/or IRGC (including Hezbollah and Qods Force) agents, operatives, fronts, cut-outs, funders, and partners set forth in this complaint.

172.    For example, every Defendant directly facilitated Altaf Khanani's laundering activities on behalf of the Taliban, which regularly flowed hundreds of thousands, if not millions, of precious U.S. Dollars from Defendants' New York branches through Altaf Khanani and into accounts and companies ultimately owned or controlled by Sirajuddin Haqqani, which supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources that operationalized Sirajuddin's above-described terrorist schemes on behalf of al-Qaeda and the Taliban relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan.

173.    In addition to their assistance to the terrorists through Khanani, most Defendants also knowingly facilitated one or more other non-Khanani-related value streams to Syndicate members or their IRGC benefactors that directly facilitated more attacks by aiding Sirajuddin Haqqani's leadership of the Syndicate's terrorist campaign.

174.    For example, the Standard Chartered Bank and Deutsche Bank Defendants, each knowingly helped notorious fronts for the IRGC conduct transactions that facilitated IRGC terrorist finance and logistics operations that supported al-Qaeda and Taliban attacks against Americans in Afghanistan.

175.    Similarly, the Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants also enabled the activities of the Haqqani Network's VAT fraud cells in the U.S., Europe, Afghanistan, and the U.A.E., which flowed millions of precious U.S. Dollars each year from Defendants' New York branches through the Haqqani Network's VAT fraud cells worldwide, into accounts and companies ultimately owned or controlled by Sirajuddin Haqqani, which supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources that operationalized Sirajuddin's above-described terrorist schemes on behalf of al-Qaeda and the Taliban relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan.

###     3.    Sirajuddin Haqqani Facilitated Al-Qaeda's And The Taliban's Mafia-Like Transnational Criminal Activities, Transactions, And Partnerships That Funded, Armed, And Logistically Supported Syndicate Terrorist Attacks Against Americans In Afghanistan

176.    From 2006 through 2021, Sirajuddin Haqqani was also a key contributor to the fundraising and logistics pipelines upon which al-Qaeda and the Taliban depended to facilitate attacks against Americans in Afghanistan. He did so by facilitating the flow of hundreds of millions of U.S. Dollars' worth of funds, weapons, and logistical support every year from the

resources, cells, financiers, logisticians, and fronts controlled by the cells, operatives, and partners supporting al-Qaeda's, the Haqqani Network's, and the IRGC's, including Hezbollah's and the Qods Force's, global networks, through which these FTOs flowed the value, arms, logistics, and personnel necessary to wage their successful two-decade campaign against Americans in Afghanistan.

177.    Sirajuddin Haqqani's father, Jalaluddin served as "the godfather" "to the Taliban and Al Qaeda" who also "dominated" the Afghanistan/Pakistan border "[f]or more than 20 years." Once Sirajuddin Haqqani replaced his father as head of the Haqqani family's transnational terrorist mafia, i.e., the Haqqani Network, on or about 2008, Sirajuddin quickly set out to modernize the large global criminal empire his father had already established by growing the Haqqani's ambitions, deployment of violence, economic output, criminal reach, and terrorist results. As an American who was directly threatened by Sirajuddin explained in 2021, "Siraj Haqqani [was] the terrorist version of Tony Soprano."[62] While the foregoing quote occurred last year, similar characterizations of Sirajuddin Haqqani were commonplace in the U.S., Afghanistan, and Pakistan from 2008 through 2017, when every Defendant directly aided him.

178.    Sirajuddin Haqqani ensured that al-Qaeda and the Taliban were run with the ruthless efficiency of a mafia organization, like the Haqqani Network had always been under his leadership.[63] Indeed, as Sirajuddin surged through the al-Qaeda and Taliban leadership ranks

---

[62] *Quoted in* FOX: Tucker Carlson Tonight, *Biden Puts Pressure on Companies to Force Vaccines; Biden's Drone Strike Killed the Wrong People; Fighting Continues against the Taliban* (Sept. 11, 2021), 2021 WLNR 29808500. Sirajuddin's father, Jalaluddin served as "the godfather" "to the Taliban and Al Qaeda" who also "dominated" the Afghanistan/Pakistan border "[f]or more than 20 years." Matthew Carney (Reporter, Australian Broadcasting Corporation), *Program Transcript*, Four Corners (Feb. 23, 2009), 2009 WLNR 3496892.

[63] Greg Miller, *U.S. Eyes A Haven For Militants In Pakistan*, Washington Post (Dec. 17, 2010) ("[C]onsidered part of the Taliban insurgency, and a key ally of al-Qaeda," the Haqqani Network

form 2006 through 2015, so did the Syndicate's operation as a global terrorist mafia, which aided the Syndicate's terror campaign to force the United States out of Afghanistan.

179.    Through his use of mafia activities to facilitate attacks against Americans in Afghanistan, Sirajuddin Haqqani personified how al-Qaeda and the Taliban pragmatically (from the terrorists' perspective) reinvested their illicit transnational profits to facilitate terrorist attacks against Americans in Afghanistan and create a "virtuous cycle" by aiding the Syndicate's ability to obtain more money from illicit schemes, which, in turn, created new cash flows and funded more attacks.[64]  For example, the Haqqani Network's mafia-like practices materially improved the flow of income to each member of the Syndicate from its transnational narcotics income streams because Sirajuddin Haqqani ensured that the Syndicate's customers knew that: (i) they must always pay on time, and in full; and (ii) if they failed to do so, Sirajuddin and his family of terrorist sociopaths would hunt them down, torture them, murder them, and then torture and murder their entire family, which was widely known to be Sirajuddin's usual approach to resolve a criminal underworld-related dispute.

**4.    Today, Sirajuddin Haqqani Is Now The Most Powerful Al-Qaeda And Taliban Terrorist In The World And Effectively Controls The "Islamic Emirate Of Afghanistan" Through His Responsibility For The "Islamic Emirate's" Weapons, Fighters, Intelligence, And Logistics, And Transnational "Security" Relationships**

180.    For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans (he still is).

---

sought "to oust U.S.-led forces from provinces on [Afghanistan]'s eastern edge" after 9/11 "and exert mafia-style control.").

[64] Sirajuddin Haqqani calibrated the Syndicate's illicit transnational activities alongside its terrorist attack operations so that both fueled the other in a "virtuous cycle" for al-Qaeda's attack tempo—more funds paid for more attacks, which additional attacks further increased the coercive power of the terrorists to extract even greater sums of money, which in turn paid for even more weapons, and so on.

181.    Even though he was (and remains) an FBI-Most-Wanted mass murderer with a reputation for savagery that was extreme even by Islamist standards, the *New York Times's* editorial board shamefully elected to publish an op-ed authored by Sirajuddin himself, titled "What We, the Taliban, Want,"[65] on February 20, 2020.  Sirajuddin's op-ed was pure terrorist propaganda designed to persuade an American audience that the Taliban, including its Haqqani Network, had turned a more "inclusive" and "peaceful" page.  Other than its title and the fact that Sirajuddin wrote it, the *Times* opinion piece was propaganda and of no value.

182.    Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the terrorists' successful campaign on Kabul in August 2021.

183.    Sirajuddin Haqqani and his uncle Khalil Haqqani are now two of the world's most powerful terrorists and operate the transnational criminal organization calling itself the "Islamic Emirate of Afghanistan."  As the *Daily News & Analysis* summarized in September 2021:

(i)     The Taliban "formed" its new terror regime "on the lines of the Iranian model."

(ii)    It is "clearly visible" to outside observers "that leaders of the Haqqani Network terrorist outfit" "dominate the new Afghan cabinet."

(iii)   "Sirajuddin Haqqani is the new Afghan interior minister" even though he also serves as "the head of Haqqani Network, an Islamist terrorist mafia with close links to" "al-Qaeda" and remains "a designated global terrorist" according to "the FBI."

(iv)    "Khalil Haqqani, brother of Jalaluddin Haqqani and uncle of Sirajuddin is the new minister for refugees. He too is a Specially Designated Global Terrorist with close ties to al-Qaeda."[66]

---

[65] Sirajuddin Haqqani, *What We, the Taliban, Want*, New York Times (Feb. 20, 2020).

[66] Daily News & Analysis, *DNA Explainer: Decoding New Afghanistan Government And What It Means For India* (Sept. 8, 2021), 2021 WLNR 29468221.

184.    Through its Rewards for Justice Program, the FBI is currently "offering a reward of up to $10 million for information leading directly to the arrest of Sirajuddin Haqqani," whom the FBI described "a senior leader of the Haqqani network," who "maintain[ed] close ties to the Taliban and al Qaeda."[67]

185.    According to more than one expert consulted by Plaintiffs, Sirajuddin Haqqani is probably the most powerful and important al-Qaeda and Taliban terrorist in the world – regardless of his paper title in the "Islamic Emirate of Afghanistan."  Sirajuddin won the victory that eluded bin Laden and his own father alike, and now effectively controls the "Islamic Emirate's" weapons, fighters, intelligence, logistics, and transnational "security" relationships through his own positions, or those of his family members or Haqqani Network allies.

186.    When Plaintiffs or their loved ones were attacked from 2011 through 2016, the biggest threat facing Sirajuddin Haqqani was that of instant death from above courtesy of an American drone strike against him while he plotted attacks in Afghanistan from the safety of his compound deep inside Pakistan.  Today, the most immediate threat facing Sirajuddin is no longer (but should be) the risk of a Predator strike.  Instead, Sirajuddin concerns himself with spreading his terrorist recruitment propaganda through media engagements he hosts at the former Afghan government's Ministry of Interior subject to three rules:  no women, no Jews, and no photos.[68]

---

[67] Federal Bureau of Investigation, *Sirajuddin Haqqani*, Rewards for Justice Program, online at https://www.fbi.gov/wanted/terrorinfo/sirajuddin-haqqani (last accessed Feb. 13, 2022).

[68] Sirajuddin Haqqani's first two rules are both offensive and need no explanation.  His third rule, however, notably reflects Sirajuddin's awareness that he will be at dire risk the rest of his life considering he has more American blood on his hands than any other terrorist alive today other than bin Laden's original number 2, Ayman al-Zawahiri, and regardless of the recent United States withdrawal from Afghanistan, if history has taught one lesson, it's that the United States eventually always gets its justice, and therefore, Sirajuddin does not want anyone to ever take or publish any photo or drawing of him, or even to describe his appearance or clothing.

**D. Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Relied Upon A Transnational Network Of Terrorist Finance And Logistics Cells Operating In Afghanistan, Pakistan, The U.A.E., Russia, And Europe To Finance And Arm Syndicate Terrorist Attacks Against Americans In Afghanistan**

187.    After 9/11, al-Qaeda and its affiliates, including the Taliban and Haqqani Network, greatly intensified bin Laden's long-standing transnational, corporate-collaborative approach.  Al-Qaeda and the Haqqani Network – which often represented other Syndicate members, like the Taliban, overseas – needed far more resources to sustain its ever-growing jihad against Americans in Afghanistan and looked to their cells around the world for critically needed financial and logistical support.  As al-Qaeda and the Haqqani Network did so, the Syndicate's burgeoning commercial enterprises after 9/11 only heightened the importance of its members' ability to access the global financial system through banks and remitters.  Defendants conducted business in an environment in which participants understood that certain geographies carried a substantially elevated risk of terrorist finance.

188.    Al-Qaeda and the Haqqani Network, however, did not limit the funding and resourcing of their terrorist campaign to activities in the extreme-risk Afghanistan-Pakistan-U.A.E. terrorist finance triangle.  Both groups also relied upon critical financial and logistical support from cells and on-the-ground terrorists in Russia, Central Asia, and Europe, including Estonia (a key location for the Syndicate's opium trade) and Germany (a long-standing al-Qaeda financial and logistical hub).

189.    Al-Qaeda and the Haqqani Network relied upon cells in Europe to fund, finance, and logistically support al-Qaeda's terrorist campaign in Afghanistan.  As Dr. Jodi Vittori explained in her 2011 book, *Terrorist Financing and Resourcing*, "the relative sanctuary that al Qaeda enjoy[ed] in both the developed world" "provided the organization the critical breathing

60

**JA137**

room it needed to recover" as demonstrated by how "al Qaeda-associated cells in Europe continue[d] to be uncovered."[69]

190.    Indeed, supporting the terrorist campaign in Afghanistan was typically the primary reason most al-Qaeda and Haqqani Network cells were created in the first place.  After 9/11, according to Professor Gurulé, al-Qaeda's and the Haqqani Network's "ability to raise and transfer funds" between their cells around the world was "essential to sustaining" the "terrorist operations" conducted by al-Qaeda and its affiliates in Afghanistan because the continued flow of funds from cells around the world was "critical to sustaining al Qaeda's global presence and successfully waging its global jihad."[70]  Plaintiffs briefly outline these geographies below.

### 1.    Afghanistan, Pakistan, And The U.A.E.

191.    From 2001 through 2021, Afghanistan, Pakistan, and the U.A.E. served as an integrated finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide.  Indeed, all three geographies were widely known throughout this time as "Top 10" overall geographies with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.

192.    With respect to Afghanistan, Pakistan, and the U.A.E., Defendants' support for al-Qaeda's and the Haqqani Network's transnational terrorist enterprises occurred in an economic, regulatory, and business context in Pakistan, Afghanistan, and the U.A.E. in which all three countries were essentially *one interlocking hub* of terrorist fundraising, finance, logistics,

---

[69] Vittori, *Terrorist Financing*, at 154.

[70] Gurulé, *Unfunding Terror*, at 73.

operations, and planning. As Haqqani Network expert Gretchen Peters explained in 2009, transactions in these three countries played a key role funding and arming al-Qaeda and Haqqani Network terrorists targeting Americans in Afghanistan:

> Eight years after 9/11, the single greatest failure in the war on terror [was] … the spectacular incapacity … to disrupt the flow of money that [kept] [the Syndicate's] networks afloat. … ***The trading zone that groups Afghanistan, Pakistan, and the UAE [was] the financial world's Wild West***, where there [were] disincentives to going legal. … Since 2001, the UAE, Pakistan, and Afghanistan [] adopted or [] drafted laws banning money laundering … However, there [was] … no effort to go after those appearing to break the law. … Drug money … often bounc[ed] through Russia and South Africa and usually passing through Dubai, the flashy free-trade emirate that [was] a hub for money laundering and underground banking. … ***If you [were] a drug smuggler, it would be hard to find a more accommodating region to launder your money***.[71]

193.    From 2001 through 2016, Afghanistan, Pakistan, and the U.A.E. were extremely permissive environments for terrorist fundraising and finance. Throughout this time, all three countries were plagued by robust flows of "dirty money" from terrorist-controlled transnational criminal organizations. In all three places, according to Haqqani Network expert Gretchen Peters, it was "important to recognize that none of the money-laundering mechanisms being used in South Asia and the Gulf [were] the least bit unusual."[72] "[T]errorist financiers did not create this system, … [t]hey simply stepped into the mechanisms we ha[d] created to make it easy to shift money across borders."[73]

194.    Syndicate agents, operatives, and fronts in Afghanistan, Pakistan, and the U.A.E. were regularly open and obvious about their U.S. Dollar-related transactions in a manner that made the Syndicate terrorism risk apparent from the face of the transaction materials alone.

---

[71] Gretchen Peters, *Seeds of Terror: How Drugs, Thugs, and Crime Are Reshaping the Afghan War* 167-69 (Picador 2009) (emphasis added) ("Peters, *Seeds of Terror*").

[72] *Id.* at 176-77.

[73] *Id.* at 177.

195.    For example, in 2009, prominent local traders in Afghanistan admitted to *Euromoney* that terrorist operatives and agents regularly leveraged the global financial system to conduct U.S. Dollar-denominated transactions that were obviously intended to aid the Taliban (including its Haqqani Network) based upon simple details appearing on the face of the transaction itself, including, but not limited to, large, round, lump-sum U.S. Dollar-denominated deals.[74]  Indeed, according to *Euromoney*, traders openly admitted that: (1) Syndicate terrorist finance "hot money flows into and out of Kabul all the time"; (2) ordinary business people reviewing the transactions always "***always [knew] if [it was] headed for the Taliban as it [was] always in big sums, often $100,000 or more***"; (3) the Syndicate conducted transfers of "[a]t least" "$1 million" if not "[m]aybe much more"; (4) it was "clear that" "trades [were] made that might benefit aggressor forces" (*i.e.*, the Syndicate); and (5) Afghans were familiar with how to use the global financial system and found that it was "not hard to get banking right."[75]

### i.    Al-Qaeda And Haqqani Network Terrorist Finance

196.    **Afghanistan and Pakistan.**  From the 2000s through 2016, Pakistan was notorious as one of the highest-risk terrorist finance and logistics geographies in the world.  As the *Guardian* reported in 2007, "[f]oreign money [was] fuelling the tide of Islamist violence washing across northern Pakistan, according to diplomats, analysts and money laundering experts," and terrorist finance was enabled by "Pakistan's notoriously lax financial system," which "help[ed] [Islamists] to move the money into the country."[76]

---

[74] Elliot Wilson, *Afghanistan: Making Money in Kabul Markets*, Euromoney (Sept. 1, 2009), 2009 WLNR 26664795.

[75] *Id.* (emphasis added).

[76] Declan Walsh, *Faith, Charity and the Money Trail to Pakistan's Islamist Militants; Religious Donations Fuel Boom in Islamic Schools and Get Money to Extremists*, Guardian (Aug. 21, 2007), 2007 WLNR 28283961 ("Guardian, *Faith, Charity and the Money Trail*").

197.     In 2010, international affairs commentator Fareed Zakaria explained that: (1) "Pakistan" "remain[ed] a terrorist hothouse even as jihadism [was] losing favor elsewhere"; (2) "From its founding, the Pakistani government has supported and encouraged jihadi groups, creating an atmosphere that has allowed them to flourish"; (3) "For a wannabe terrorist shopping for help, Pakistan [was] a supermarket" through which groups like "al-Qaeda, Jalaluddin [and] Siraj Haqqani's network" and their allies "operate[d] openly via front groups throughout the country" and did not "have any difficulty getting money and weapons."[77]

198.     From 2001 through 2016, Afghanistan-related transactions also posed extreme red flags for terrorist finance and logistics similar to those in Pakistan. The *Economist Intelligence Unit* – a popular due diligence resource that was regularly read by Defendants' employees – observed in 2006 that "[t]he [Afghanistan] banking system was another casualty of the war, having collapsed after the mujahideen seized power" in the 1990s.[78] After 9/11, the country's "financial sector's primitive state mean[t] that its [] economic role [was] limited," and "[t]he financial sector's development [was] also [] hampered by the lack of a sound legal basis for the industry."[79] Afghanistan presented the ultimate-in-risk banking culture, which had grown rapidly since the Afghan Parliament enacted the banking law in 2004.

199.     From the mid-2000s through 2016, Afghanistan regularly ranked first or second in in global risk ratings, usually vying with Iraq or Somalia, "a trio of failed states in the wrong sort of league of their own."[80] A financial services industry observer commented in 2009, "[i]t's

---

[77] Fareed Zakaria, *Terrorism's Supermarket*, Washington Post (May 10, 2010).

[78] EIU ViewsWire, *Afghanistan: Financial Services* (Aug. 18, 2006), 2006 WLNR 26662236.

[79] *Id.*

[80] Elliot Wilson, *Afghanistan: No Country for Bankers*, Euromoney (Sept. 1, 2009), 2009 WLNR 26664799.

little wonder then that being a banker in a state run – at least in rural areas – by heroin barons, gangsters and Taliban zealots is a nervy business."[81]

200.     Afghanistan and Pakistan also featured pervasive criminal monopolies, which the Syndicate leveraged to fund operations.  From 2008 through 2016, the overlap between Syndicate members having monopolistic control over the entire criminal marketplace in their areas of operation in Afghanistan and Pakistan, and resulting fusion with terroristic violence, meant that risky commercial transactions that enabled criminal activities relating to Afghanistan and Pakistan, or facilitated the sale of key bomb precursors ingredients like CAN fertilizer, posed a uniquely high risk to enable terrorist violence because it was virtually certain that the end customer was either a Syndicate-affiliated terrorist or a criminal organization that directly funded the Syndicate through its criminal enterprise by paying a percentage of its criminal profits to the Syndicate as "taxes."  For this reason, from 2008 through 2016, each Defendant understood that any substantial transnational financial crime involving Afghanistan and/or Pakistan foreseeably would financially support, directly or indirectly, attacks by Syndicate terrorists against Americans in Afghanistan.

201.     From 2008 through 2016, the Syndicate's dominance of al-Qaeda-allied terrorists in the underworld in eastern Afghanistan and bordering Pakistan was so complete that it was functionally impossible to engage in any illicit transaction, including money laundering, narcotics trafficking, or criminal rackets along the Afghan/Pakistan border, or relating to products or money flowing out of Afghanistan and Pakistan, without enriching the Syndicate because Syndicate members, including but not limited to, the Taliban (including its Haqqani

---

[81] *Id.*

Network), D-Company (including Altaf Khanani), and others either ran the criminal enterprise themselves, or "taxed" those who did and shared such tax proceeds with the Syndicate.

202. Al-Qaeda and Haqqani Network terrorist finance routed to agents, operatives, or fronts in Pakistan and Afghanistan directly supported terrorist attacks against Americans in Afghanistan. As al-Qaeda scholar Seth Jones told the *Guardian* at the time: "Without significant funding from abroad, especially the Gulf states, we would be nowhere near the current level of Islamist militancy," estimating that "[w]e're talking about tens if not hundreds of millions of dollars" funneled to the Syndicate from overseas sources in order to support attacks in Afghanistan and Pakistan.[82] In the same *Guardian* article, U.S. Undersecretary of State Nicholas Burns confirmed that "[t]here's a lot of financing, money that gets laundered through banks that support these terrorist groups," referencing the Syndicate's use of bank accounts to use laundered money to support terrorist operations.[83]

203. **The U.A.E.** Defendants operated in a financial services environment in which the "cross-pollination of criminality between Afghanistan and Dubai" facilitated financial activity in which "billions of dollars" of proceeds from corrupt economic activities were "funneled from Afghanistan … to Dubai," which "outflows" "played a part in … facilitating the resurgence of the Taliban."[84] Similar "Pakistan to Dubai" interactions also supported the Syndicate.[85]

204. Al-Qaeda and Haqqani Network terrorist finance routed to agents, operatives, or fronts in the U.A.E. directly supported terrorist attacks against Americans in Afghanistan. For

---

[82] Guardian, *Faith, Charity and the Money Trail*.

[83] *Id.*

[84] *Id.* at 85.

[85] Timothy L. O'Brien, *U.S. Focusing on Dubai as a Terrorist Financial Center*, N.Y. Times (Oct. 5, 2003).

example, according to Dr. Kimberley L. Thachuk, the Syndicate's use of transnational criminal strategies, banks, and money remitters combined to make Dubai an epicenter of Syndicate funding, financing, and logistical activities in direct support of attacks against Americans in Afghanistan because Syndicate "funds" were "moved" to "Dubai" so that the Syndicate's "criminal cash" was "used to pay for weapons and other needed supplies" to conduct attacks.[86]

ii.    **Al-Qaeda And Haqqani Network Terrorist Logistics**

205.    **Afghanistan and Pakistan.**  Defendants operated in a banking, corporate, and governance climate in Afghanistan and Pakistan where it was widely understood that al-Qaeda, the Haqqani Network, and other Syndicate members:  (1) viewed Afghanistan and Pakistan – correctly – as among the most favorable possible environments to obtain explosives and other supplies for their bomb-making enterprise; (2) universally found it easy to raise and distribute money and purchase bombs and bomb components; and (3) often operated through open and obvious fronts when acquiring bomb materials or other goods vital to the bomb campaign.

206.    Al-Qaeda and Haqqani Network terrorist logistics routed to agents, operatives, or fronts in Afghanistan and Pakistan directly supported terrorist attacks against Americans.

207.    **The U.A.E.**  As it was for some Defendants, the U.A.E. was always a useful logistics hub for al-Qaeda and the Haqqani Network because it offered easy access to Russia, Europe and the Middle East via land, water, and air, and al-Qaeda and Haqqani Network terrorist logisticians, sometimes working with Lashkar-e-Taiba.

208.    Al-Qaeda and Haqqani Network terrorist logistics routed to the agents, operatives, or fronts in U.A.E. directly supported terrorist attacks against Americans in Afghanistan.  For example, on June 21, 2011, the Treasury Department designated Fazl Rabbi as someone who

---

[86] Thachuk, *Terrorist Criminal Enterprises*, at 15.

"committed, pose[d] a significant risk of committing, or support[ed] acts of terrorism."[87] Similarly, in designated Khalil Haqqani as an SDGT, Treasury found that he leveraged activities in Dubai to provide fundraising and logistics support to al-Qaeda and Taliban, including Haqqani Network, operations in Afghanistan.[88]

209.    The notorious conditions in Afghanistan, Pakistan, and the U.A.E. described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Afghanistan, Pakistan, and/or the U.A.E., such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Afghanistan, Pakistan, and/or the U.A.E. and, through such FTO's Afghan, Pakistani, and/or U.A.E. intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

210.    The Afghanistan/Pakistan/U.A.E.-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York.   Examples of the FTO-related value chains that operationalized Defendants'

---

[87] Federal Register (June 28, 2011), https://www.govinfo.gov/content/pkg/FR-2011-06-28/pdf/2011-16185.pdf.

[88] *Id.*

provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(i)  **Value Chains That Supported FTO Leaders**. Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Afghanistan-, Pakistan-, and U.A.E.-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on all three jurisdictions to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(ii)  **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of U.A.E.-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of U.A.E.-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(iii)  **Value Chains That Supported FTO Operatives**. The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' facilitation of the U.A.E.-related transactions enabled the transactions by Syndicate VAT fraud cells in Europe, like the Ahmed and Azizi Cells, which repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through U.A.E.-related transactions. Similarly, the Standard Chartered Bank and Deutsche Bank Defendants provided services to a host of on-the-ground Syndicate operatives in Afghanistan, Pakistan, and the U.A.E., which ordinarily entailed routing U.S. Dollars to such operatives through their Laundromat-related transactions. When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks against Americans in Afghanistan.

(iv)  **Value Chains That Supported FTO Partners.** The Standard Chartered Bank Defendants aided the Syndicate by facilitating the activities of the Haqqani Network's corporate co-conspirators, Fatima Fertilizer and PakArab Fertilizers, which transactions depended upon the SCB Defendants providing an array of U.S. Dollar services to Fatima and Pakarab, that, on information and belief, ordinarily involved transactions in at least Pakistan and/or the U.A.E. (and sometimes both), and facilitated the Haqqani Network's ability to maintain a robust supply of CAN fertilizer for al-Qaeda's CAN fertilizer bombing campaign in Afghanistan. When

they did so, the SCB Defendants aided the Haqqani Network's supply chain by leveraging unique-to-the-U.S.A.-market features, including the purchasing power and reliability afforded by the ability to denominate transactions in U.S. Dollars, and the improved concealment that attaches when the SCB Defendants combined the credibility provided by U.S. financial institutions and concealment afforded by the U.A.E.'s and Pakistan's opaque systems, in turn, all of which facilitated Syndicate attacks on Americans in Afghanistan.

### 2. Russia

211.    From 2001 through 2021, Russia served as a key finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide. Indeed, Russia was widely known throughout this time as a "Top 10" overall geography with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.

212.    Russia was a global epicenter for money laundering on behalf of violent actors, including Syndicate members al-Qaeda and the Haqqani Network (who represent the Taliban's opium interests in Russia).  Thus, Russian "dirty money" transactions posed a foreseeable risk of aiding al-Qaeda and Taliban (including Haqqani Network) terrorist finance and logistics.

213.    Andrew Rennemo worked as an intelligence analyst at the Treasury Department and explained that the Russian financial marketplace served as "one of the world's largest exporters of dirty money,"[89] which status it maintained at all relevant times.  According to Mr. Zarate, the former assistant secretary of the Treasury for terrorist finance:

> *Russia had been a center of money laundering and illicit financial activity for years*, with a baking system unaccustomed to the anti-money-laundering strictures of most of the world.  The Financial Action Task Force had blacklisted Russia in 1999 for its lack of anti-money-laundering laws and measures.  Organized crime, the global arms trade, corruption at the highest levels, and a willingness to do

---

[89] Andrew Rennemo, *Russia's Crafty Financial Crimes Have Become A Foreign Policy Problem*, Press Release by Center for the National Interest, States News Service (Apr. 28, 2019).

business with rogue states *made the Russian commercial and financial system a problematic intersection of illicit financial flows*.[90]

214. When Defendants conducted financial transactions with Russian-related counterparties, Defendants knew that they operated in one of the most notorious environments for financial crime in the world. As a former American trader in Moscow explained to the *New Yorker*, Russia was "the wild, wild East":

> If you wanted to be competitive, *you had to do a lot of things that were not done in the developed world, because it was Russia*. It was a very aggressive sales mentality, which was going on across the board across all the Russian banks.[91]

215. Defendants doing business in Russia also had to contend with two unique – and notorious – facts about the Russian financial services marketplace: (1) the Russian Mafia's notorious decades-long service as one of al-Qaeda's narcotics-related finance agents; and (2) the Russian Mafia's decades-long opium joint venture with most of the Syndicate, which managed the Afghanistan-to-Russia Opium Pipeline, also called the northern route, through an OPEC-style cartel. Because of both notorious aspects of Russia's economy, suspect transactions relating to Russian customers, banks, or remitters, were known to, and did, pose an elevated risk of funding al-Qaeda, the Haqqani Network, and their allies.

216. Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics routed to agents, operatives, or fronts in Russia directly supported terrorist attacks against Americans in Afghanistan. For example, according to an unclassified FBI report, the FBI concluded that the Russian Mafia served as a key long-standing commercial ally of al-Qaeda and the Taliban in Afghanistan by purchasing large amounts of Afghan opium from them and then laundering the Syndicate's resulting profits as their agent, paying them back in guns and laundered money.

---

[90] Zarate, *Treasury's War*, at 159 (emphasis added).

[91] Caesar, *Moscow Laundromat* (emphasis added).

217.    The notorious conditions in Russia described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Russia, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Russia and, through such FTO's Russian intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

218.    The Russia-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(v)     **Value Chains That Supported FTO Leaders**.  Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Russia-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on the U.S. and Russia to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(vi)    **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Russia-related

transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of U.A.E.-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(vii)   **Value Chains That Supported FTO Operatives**.  The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' facilitation of Russia-related transactions enabled the easy flow of the Syndicate's U.S. Dollar profits through its transnational schemes, including through nearly every financier and agents identified in this Complaint, which regularly repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Russia-related transactions.  When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated their attacks against Americans in Afghanistan.

(viii)   **Value Chains That Supported FTO Partners.**  Each Defendant aided the Syndicate by facilitating the Russia-related transactions, which depended upon each Defendant's ability to offer an array of U.S. Dollar services, on behalf of, or for the benefit of, al-Qaeda's key transnational partners in the narcotics trade, including, but not limited to, Dawood Ibrahim and D-Company (both of whom have been designated by the U.S. for their relationship with al-Qaeda), and the Standard Chartered Bank Defendants also aided the Syndicate by facilitating the Russia-related transactions of Viktor Bout (the "Merchant of Death" who served nearly every FTO who participated in the Afghanistan campaign), all of which significantly funded and resourced the Syndicate's supply chains and facilitated its attacks on Americans in Afghanistan.

### 3.   Cyprus

219.   From 2001 through 2021, Cyprus served as a central finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC.  Indeed, Cyprus was widely known throughout this time as a "Top 10" overall geography with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.

220.    American enforcement actions confirm Cyprus's key role in the global terrorist architecture of many FTOs.  When the Treasury Department invoked its so-called "Section 311" powers under the Patriot Act for the first time in 2004, doing so to shut down First Merchant Bank in Cyprus, which the Treasury Department publicly announced had laundered narcotics money for terrorists; in response, commentators credited Treasury's decision to media coverage that raised awareness that al-Qaeda was known to be using Cyprus to launder money to support terrorist attacks against Americans in Afghanistan.

221.    When Syndicate financiers like Altaf Khanani needed to source U.S. Dollars, they sometimes conducted transactions in, or related to, Cyprus (or involving Cypriot banks) as part of the value chain sometimes used by Syndicate financiers, like Altaf Khanani, to help al-Qaeda and the Taliban illicitly source U.S. Dollars form New York banks, through Cyprus-related transactions, ultimately supplying resources to aid the terrorist campaign against American in Afghanistan.  This section therefore briefly outlines Cyprus's role in the Afghanistan campaign.

222.    Cyprus was, and is, a global epicenter for money laundering on behalf of al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and other Syndicate allies, as well as the IRGC, including its Hezbollah Division and Qods Force because, simply put, everyone prefers washing their dirty money there if they have the chance to do so.[92]

---

[92] Cyprus's size meant that each FTO that facilitated terrorist finance or logistics-related transfers through Cyprus had to be mindful of the maxim "pigs get fat, hogs get slaughtered," meaning that Cyprus's small size and financial system made it less suitable for large-scale value transfers, or transfers where the terrorists needed better cover or concealment, such as that provided by a corrupt bank, like Defendants, or corporate ally.  For such mega-transactions, the terrorists typically preferred to use a combination of banks in Dubai and Europe as backdoors to access the U.S. financial system in order to obtain the U.S. Dollars that al-Qaeda, the Taliban, and the IRGC all craved above all other currencies to maximize the lethality of their terrorist campaign against Americans in Afghanistan.

223.    Al-Qaeda has long relied upon Cyprus as a key financial and logistical hub for al-Qaeda and its affiliates, including its Haqqani Network and Lashkar-e-Taiba, to source the funds, arms, and logistical resources needed to fund, arm, and sustain their shared terrorist campaign against Americans in Afghanistan.

224.    Al-Qaeda operatives confirmed the terrorist group's use of Cyprus as a geography for planning and logistical purposes and Cyprus-related companies, banks, and remitters as a cog in al-Qaeda and its allies' financial networks.  Al-Qaeda operatives have also conducted, or attempted to conduct, terrorist attacks from Cyprus and within Cyprus.

225.    Geographically, Cyprus was, and is, almost perfectly situated to be equidistant to nearly every major theater in which al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba operated and targeted Americans.  From Cyprus, these groups' agents and operatives could easily travel, ship goods, or send money to Afghanistan, Pakistan, the U.A.E., Europe, or any other location worldwide that al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba leveraged to support the Syndicate's attacks in Afghanistan.

226.    In addition to Cyprus's ideal location (from al-Qaeda's and the Haqqani Network's perspective), and notoriously lax anti-money-laundering/counter-terrorist-finance environment, al-Qaeda and the Haqqani Network preferred Cyprus as an operational, financial, and logistical hub for another reason:  Cyprus's large diasporas from Afghanistan, Pakistan, and other key geographies.

227.    Al-Qaeda's terrorist playbook emphasizes locating terrorist cells within the diaspora of countries from which al-Qaeda and its affiliates draw most of their members because such geographies afforded natural "cover" to al-Qaeda and Haqqani Network cells operating there, and provided a ready-made community of targets (*i.e.*, the members of the diaspora who

reside in the overseas geography in question) whom the terrorist could attempt to recruit and, failing that, "tax" as part of al-Qaeda and the Haqqani Network's strategy to use criminal rackets to fund the terrorist campaign against Americans in Afghanistan.

228.    Al-Qaeda and the Haqqani Network also had a significant intelligence need for a large presence in Cyprus:  it was a key hub for many of their Afghan and Pakistani enemies, including Afghan groups that opposed al-Qaeda and the Taliban.  Al-Qaeda and the Haqqani Network have always hewed to a "keep your friends close, but your enemies closer" strategy that, in particular, emphasized infiltrating their opponents' organizations and geographies for intelligence purposes and to "turn" people to their cause.

229.    Like its al-Qaeda and Taliban allies, the IRGC, including its Hezbollah Division and Qods Force, have also long relied on Cyprus for the same purposes and for the same reasons.

230.    The notorious conditions in Cyprus described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Cyprus, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Cyprus and, through such FTO's Cypriot intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

231.    The Cyprus-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which

Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(ix) **Value Chains That Supported FTO Leaders**. Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Cyprus-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's use of Cyprus-related transactions to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(x) **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Cyprus-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of Cyprus-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(xi) **Value Chains That Supported FTO Operatives**. On information and belief, the Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' Cyprus-related transactions facilitated the terrorist finance schemes operated by al-Qaeda's VAT fraud cells in Europe, including the Ahmed and Azizi Cells, which repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Cyprus-related transactions. When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks against Americans in Afghanistan.

(xii) **Value Chains That Supported FTO Partners.** On information and belief, the Standard Chartered Bank Defendants aided the Syndicate by facilitating Viktor Bout's support for al-Qaeda and the Taliban through transactions that depended upon

77

**JA154**

on transactions that included a USD-to-Cyprus component.[93] When they did so, the SCB Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks on Americans in Afghanistan.

## 4. Germany

232. From 2001 through 2021, Germany served as a central finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC. Indeed, Germany was widely known throughout this time as a "Top 10" overall geography with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.[94]

233. Within weeks of 9/11, the U.S. government and virtually every media outlet in the world had reported that al-Qaeda maintained a web of German associates, bank accounts, and front companies, which al-Qaeda had used to support several 9/11 hijackers. Most infamously, it was widely known throughout the world in the aftermath of 9/11 that lead hijacker Mohamed Atta had resided in Hamburg, Germany prior to the attack, where he maintained a "no show" job with a fake German company and used German banks.

234. Responding to President Bush's call to action by foreign banks against terrorist finance, including Deutsche Bank, then-German Chancellor Gerhard Schroeder publicly backed

---

[93] Among other reasons, Bout's transnational terrorist logistics support for his FTO clients, including al-Qaeda, required that Bout often move large amounts of U.S. Dollars involving Russian intermediaries between Bout and his terrorist clients, and Cyprus has long been a preferred location for such transfers amongst the Russian diaspora, as well as with Russian organized crime.

[94] Germany's inclusion in this list does not reflect the commitment of the German government to anti-terrorism, merely al-Qaeda's, the Taliban's, and the IRGC's decades-long preference for using Germany as a hub for financial and logistical activities designed to facilitate terrorist attacks in the U.S., Europe, and the Middle East.

up the American request, and called on banks and remitters to do whatever they could to interdict terrorist finance in Germany that benefited al-Qaeda and its affiliates, stating:

> I understand that many people equate bank secrecy with the Magna Carta of internal security, but that's not the case. … He who wants to fight money laundering and dry out the financing sources of international terrorism – something we have to do – must talk about how to get at these finance sources.[95]

235.    Al-Qaeda, and the Haqqani Network, both used Germany as a hub for finance and logistics From 2001 through 2016.  By 2008, "Germany ha[d] served as the base of operations for some of the [deadliest] terrorists associated with al Qaeda,"[96] which role has endured since.

236.    Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics routed to agents, operatives, or fronts in Germany directly supported terrorist attacks against Americans in Afghanistan.  For example, Coalition special forces found direct evidence that a joint al-Qaeda and Haqqani Network cell operating in Germany (*i.e.*, the Azizi Cell) directly funded the operations of joint al-Qaeda-Haqqani Network-Lashkar-e-Taiba cells in Afghanistan.

237.    The notorious conditions in Germany described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Germany, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Germany and, through such FTO's

---

[95] Stephen Graham, *German Probe Focuses on Finances*, AP Online (Sept. 26, 2001).

[96] Gurulé, *Unfunding Terror*, at 80.

German intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

238. The Germany-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(xiii) **Value Chains That Supported FTO Leaders**. Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Germany-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on Germany and the U.S. to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(xiv) **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Germany-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of Germany-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(xv) **Value Chains That Supported FTO Operatives**. The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' Germany-related transactions facilitated the terrorist finance schemes operated by al-Qaeda's VAT fraud cells in Europe, including the Ahmed and Azizi Cells, which repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Germany-related transactions, and the Deutsche Bank Defendants also aided the Syndicate by facilitating the

Germany-related transactions of Mamoun Darkazanli and Mamdouh Mahmud Salim of al-Qaeda's infamous "Hamburg Cell." When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks against Americans in Afghanistan.

(xvi) **Value Chains That Supported FTO Partners.** Each Defendant aided the Syndicate by facilitating the Germany-related transactions, which depended upon each Defendant's ability to offer an array of U.S. Dollar services, on behalf of, or for the benefit of, al-Qaeda's key transnational partners in the narcotics trade, including, but not limited to, Dawood Ibrahim and D-Company (both of whom have been designated by the U.S. for their relationship with al-Qaeda), which significantly funded and resourced the Syndicate's supply chains and facilitated its attacks on Americans in Afghanistan.

### 5.    Estonia

239.    From 2001 through 2021, Estonia served as a key finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide. While Estonia, unlike the other geographies, was not one of the "Top 10" overall geographies (out of more than 200 nations) from which al-Qaeda, the Taliban, and/or the IRGC could prepare for worldwide attacks, Estonia was absolutely in the Top 10 for these groups with respect to one of the Syndicate's most important funding streams:  Afghan opium.

240.    Estonia bordered Russia, sat on the "northern route" of the Afghanistan-to-Russia Opium Pipeline, and was a vital geography for al-Qaeda and the Haqqani Network in Europe.

241.    Befitting Estonia's status as a critical geography for al-Qaeda's and the Haqqani Network's drugs, arms, and money pipeline, both groups operated cells there at all times.

242.    Given Estonia's importance to the Afghanistan-to-Russia Opium Pipeline, Defendants knew that transactions raising a risk of financial crimes like money laundering also foreseeably risked aiding al-Qaeda and the Haqqani Network.  For example, due diligence publications regularly alerted Defendants to the significant presence of Islamist terrorist cells and operations in Estonia.

243.     Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics routed to agents, operatives, or fronts in Estonia directly supported terrorist attacks against Americans in Afghanistan.  For example, in 2019, Estonia extradited Haji Abdul Satar Abdul Manaf, who was a Haqqani Network operative who led a cell in Estonia that, among other things, helped manage the Syndicate's narco-trafficking operations to fund attacks against Americans in Afghanistan.

244.     The notorious conditions in Estonia described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Estonia, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Estonia and, through such FTO's German intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

245.     The Estonia-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

   **(xvii)  Value Chains That Supported FTO Leaders**.  Each Defendant aided Sirajuddin
           Haqqani and al-Qaeda's use of Estonia-related transactions to support terrorist

logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on Estonia and the U.S. to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(xviii) **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Estonia-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of Estonia-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(xix) **Value Chains That Supported FTO Operatives**. The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' facilitation of Estonia-related transactions enabled the easy flow of the Syndicate's U.S. Dollar profits through its transnational schemes, including through decades of Russia Mafia laundering activity in Estonia, which regularly repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Russia-related transactions identified in this Complaint, which, on information and belief, often involved Estonia as well. When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated their attacks against Americans in Afghanistan.

(xx) **Value Chains That Supported FTO Partners.** Each Defendant aided the Syndicate by facilitating the Estonia-related transactions, which depended upon each Defendant's ability to offer an array of U.S. Dollar services, on behalf of, or for the benefit of, al-Qaeda's key transnational partners in the narcotics trade, including, but not limited to, Dawood Ibrahim and D-Company (both of whom have been designated by the U.S. for their relationship with al-Qaeda), which significantly funded and resourced the Syndicate's supply chains and facilitated its attacks on Americans in Afghanistan.

**E.      Iran's Islamic Revolutionary Guard Corps, Acting Through Its Hezbollah Division And Qods Force, Materially Supported The Syndicate's Terrorist Attacks Against Americans In Afghanistan By Regularly Supplying Funds, Arms, Communications Equipment, Training, And Logistical Support To Al-Qaeda, The Taliban, Including Its Haqqani Network, And D-Company**

246.      The SCB Defendants and Deutsche Bank Defendants did not limit their aid to al-Qaeda and the Taliban, including its Haqqani Network: both banks also provided routed millions of U.S. Dollars each year from the early 2000s through on or about 2015.  To lay the foundation for Plaintiffs' allegations concerning the SCB Defendants' and Deutsche Bank Defendants' substantial assistance to al-Qaeda and the Taliban, including its Haqqani Network, through such Defendants' illicit deals with known Hezbollah and Qods Force fronts in, among other places, the U.S., U.A.E., Europe, South Africa, and Russia, Plaintiffs first outline how the IRGC, including its Hezbollah Division and Qods Force, facilitated anti-American terror worldwide. Plaintiffs then allege in detail how the IRGC directly supported Syndicate terrorist attacks against Americans in Afghanistan since 2006, using every means of material support traditionally supplied by Hezbollah and the Qods Force to the IRGC's terrorist proxies, including funds, weapons, training, equipment, and logistical support.

**1.      The Islamic Revolutionary Guard Corps Has Long Supported Anti-American Terrorism As Part Of Iran's Foreign Policy**

247.      Iran has been designated as a State Sponsor of Terrorism since 1984.[97]  Iran has remained designated continuously since then.

---

[97] Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).

248.     The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States' role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[98]  Since the Iranian Revolution, Iran has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

249.     Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-Qaeda is well-documented.[99]  Iran's support for such groups is especially prevalent in areas where Iran abstains from open conflict.  As a result of Iran's consistent and longstanding support of anti-American terrorism, the U.S. State Department formally designated Iran as a State Sponsor of Terrorism in 1984.[100]  It has maintained that designation at all times since.[101]  In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[102]

250.     Iran carries out its support of terrorism largely through the IRGC.

---

[98] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*"), http://jcpa.org/killing-americans-allies-irans-war/.

[99] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011) ("*Iran's Balancing Act*").

[100] *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Sec'y of State George P. Shultz designating Iran); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state. gov/j/ct/list/c14151.htm.

[101] *Id.*

[102] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

251.    The IRGC "has a relatively strict command-and-control protocol and answers directly to the Supreme Leader, Ayatollah Ali Khamenei."[103]  The Supreme Leader serves as head of the IRGC and routinely employs the IRGC to further Iran's global terrorist agenda.

252.    As the U.S. Treasury Department noted in 2010 when it designated certain IRGC officials pursuant to Executive Order 13224, "Iran also uses the . . . IRGC . . . to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups."[104]

253.    Iran is politically and ideologically hostile to the United States and its allies. Enmity toward America is foundational for the Iranian regime in general, and most of all, for Grand Ayatollah Khamenei, who is the effective leader of the IRGC, including Hezbollah Division and the Qods Force, both of which report to him personally.  At a 2005 rally, Khamenei explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him.  . . .  The saying 'Death to America' is for this purpose."[105]

### i.    Islamic Revolutionary Guard Corps (Regular IRGC)

254.    The IRGC was established to safeguard the revolution, meaning, to pursue violence inside of Iran, *i.e.*, terrorism against its own people, and external to Iran, *i.e.*, terrorism

---

[103] *Iran's Balancing Act* at 10.

[104] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

[105] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

against the United States and Israel, whom the IRGC considered to be the "Great Satan" and "Little Satan," respectively. As Monika Gill, a defense researcher, explained in an analysis published by NATO in 2020: "The aphorism that 'war made the state and the state made war' applies to the IRGC; war made the Guard and the Guard made war."[106]

255.     Under Article 176 of the Iranian Constitution, as widely interpreted, the IRGC's stated mission is to facilitate terrorist attacks against the United States and Israel.[107]

256.     To execute its constitutionally-mandated function to terrorize Americans to export Iran's Islamic Revolution, the IRGC often acts through its lead terrorist agent, Lebanese Hezbollah – a designated Foreign Terrorist Organization since 1997 – which Iran funds, arms, and logistically supports. Through Hezbollah, Iran provides material support and resources for acts of international terrorism targeting the United States and its overseas interests.[108]

257.     As a result of the IRGC's consistent and longstanding support of anti-American terrorism, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to

---

[106] Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Defence Strategic Communications: The Official Journal of the NATO Strategic Communications Centre of Excellence, at 97 (Autumn 2020) ("Gill, *Capitalism, Communications, and the Corps*").

[107] Article 176 provides that Iran's "security policies" sought to "preserv[e] the Islamic revolution" (*i.e.*, export Iran's Islamist revolution abroad through proxy terrorism), through the "[e]xploitation of materialistic and intellectual resources of the country" (*i.e.*, Iranian funds, arms, and training for terror proxies), "for facing the internal and external threats" (meaning, to target the United States for terrorist violence). Article 176 is widely understood, in Iran and worldwide, to explicitly enshrine the IRGC's anti-American terrorist mission into Iran's constitution because the IRGC is directed to "fac[e]" (*i.e.*, target) "the" (*i.e.*, an identified object) "external threats" (*i.e.*, the U.S. and Israel).

[108] Federal courts have repeatedly held that Hezbollah is an agent of the IRGC, including the Qods Force. *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 (D.D.C. 2018), *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53-55 (D.D.C. 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the

Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control

Act (22 U.S.C. § 2780). The United States has maintained that designation at all times since.

258.    On October 29, 1987, President Ronald Reagan issued Executive Order 12613

based upon his finding "that the Government of Iran is actively supporting terrorism as an

instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action

against U.S.-flag vessels." Exec. Order 12813, 52 Fed. Reg. 4194D (Oct. 30, 1987).

259.    In 1990, the IRGC transferred activities outside of Iran to its subordinate branch,

the Qods Force, which translates to "Jerusalem Force," in reference to the IRGC's desire to

destroy the state of Israel and take back Jerusalem.

260.    On March 15, 1995, President Clinton announced that "the actions and policies of

the Government of Iran constitute an unusual and extraordinary threat to the national security …

of the United States. …" Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).

261.    On August 21, 1997, President Clinton issued Executive Order 13059 to

consolidate and clarify Executive Orders 12957 and 12959, and comprehensively prohibit trade

intended to benefit, among other things, the IRGC, including its Hezbollah Division and Qods

Force. Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997). (That same year, the U.S. also

designated Iran's lead terror agent, Hezbollah, as an FTO.)

262.    In 1998, Brigadier General Qassem Soleimani was appointed head of the Qods

Force, a role in which he served continuously until his death in a U.S. airstrike in 2020.

263.    The Department of Treasury implemented regulations pursuant to these Executive

Orders which, in general, broadly prohibit any economic transactions with any entities that are

controlled by the Government of Iran. 31 C.F.R. § 560.304 (defining "Government of Iran"), 31

C.F.R. § 560.313 (defining "entity owned or controlled by the Government of Iran"); 31 C.F.R.

§ 560.314 (defining "United States person").

264.    In 2007, the U.S. State Department described Iran as "the most active state

sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the

Middle East because of its continued support for violent groups."[109]

265.    The IRGC, including its Hezbollah Division and Qods Force, has a long and well-

documented history of assassinations, kidnappings, bombings, and arms dealing.  It also

regularly trains foreign terrorist proxies whose attacks promote Iran's political goals, often

working side-by-side with Hezbollah.

266.    On April 15, 2019, the U.S. State Department designated the IRGC, including its

Qods Force, as a Foreign Terrorist Organization.[110]  Announcing the designation, President

Trump explained that "the IRGC actively participates in, finances, and promotes terrorism as a

tool of statecraft."[111]  According to the State Department's public statement explaining the

designation, the IRGC had "been directly involved in terrorist plotting; its support for terrorism

[was] foundational and institutional, and it [had] killed U.S. citizens."[112]  Through the IRGC's

support for terrorist organizations in the region, the IRGC "made a clear choice not only to fund

and equip, but also to fuel terrorism, violence, and unrest across the Middle East."[113]

---

[109] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[110] *See* 84 Fed. Reg. 15,278-01 (Apr. 15, 2019).

[111] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019).

[112] U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019).

[113] *Id.*

267.    When the State Department designated the IRGC as an FTO, Secretary of State

Michael R. Pompeo officially confirmed the following points concerning U.S. policy:

(i)     "[The IRGC's FTO designation] is the first time that the United States has
        designated a part of another government as an FTO."

(ii)    "[T]he Iranian regime's use of terrorism as a tool of statecraft makes it
        fundamentally different from any other government."

(iii)   "For 40 years, the [IRGC] has actively engaged in terrorism and created,
        supported, and directed other terrorist groups."

(iv)    "The IRGC" "regularly violates the laws of armed conflict; it plans, organizes,
        and executes terror campaigns all around the world."

(v)     "The IRGC institutionalized terrorism shortly after its inception, directing horrific
        attacks against the Marine barracks [] in 1983 and the U.S. embassy annex in
        1984 alongside the terror group it midwifed, Lebanese Hizballah."

(vi)    "[The IRGC's] operatives have worked to destabilize the Middle East from Iraq to
        Lebanon to Syria and to Yemen."

(vii)   "The IRGC … supports: Lebanese Hizballah, Palestinian Islamic Jihad, Hamas,
        Kata'ib Hizballah, among others, all of which are already [FTOs]."

(viii)  "[The IRGC's FTO] designation makes clear … that [the] Iranian regime not only
        supports terrorist groups, but engages in terrorism itself."

(ix)    "[The IRGC's FTO] designation [] brings unprecedented pressure on [IRGC]
        terror campaign [leaders]… like Qasem Soleimani … [who] doles out the
        regime's profits to terrorist groups across the region and around the world."[114]

268.    As the world's worst sponsor of terrorism, Iran is unique.  It is not a "normal"

country, but a place where the IRGC, including its Hezbollah Division and Qods Force, rely

upon their corporate allies to directly enable violence in an open and shocking manner.[115]

---

[114] Secretary of State Michael R. Pompeo, U.S. Department of State, *Remarks to the Press* (Apr.
8, 2019) (emphasis added).

[115] According to Ambassador Mark D. Wallace, the CEO of United Against Nuclear Iran
("UANI"): "International organizations must also realize that their relationship with Iran is not
just … 'business as usual,' … Put bluntly, Iran is in violation of many of its international treaty

269. The IRGC's terrorist doctrine emphasizes the reliance upon charities, corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers for the IRGC, including its Hezbollah Division and Qods Force.

270. IRGC operatives follow sophisticated tradecraft designed to maximize the IRGC's ability to route funds, materials, and arms obtained through IRGC fronts, including Hezbollah and Qods Force fronts, through Hezbollah to IRGC proxies like the Taliban in Afghanistan and Jaysh al-Mahdi in Iraq.

271. One such tactic known as the IRGC's **"Orbit" Strategy**, pursuant to which the IRGC, including its Hezbollah Division and the Qods Force, ordinarily structures transactions so that the IRGC is behind one side, one step removed, but fully in control. This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC, including its Hezbollah Division and Qods Force, did not directly benefit from an otherwise suspect transaction because the counterparty itself was "not IRGC."

272. In 2020, NATO confirmed the IRGC's "Orbit" Strategy in an analysis by Monika Gill, a defense scholar who closely the IRGC, which NATO published in *Defence Strategic Communications*, "[t]he official journal of the NATO Strategic Communications Centre of Excellence."[116] According to Ms. Gill's study of the IRGC's terrorist finance and logistics strategies, the IRGC's practices while exercising control of Iran's heavy construction industry show the IRGC's "Orbit" strategy as being part of their terrorist tradecraft, because the entire

---

obligations, and it should not be treated like a member in good standing of international bodies." Statement of the Honorable Mark D. Wallace, CEO United Against Nuclear Iran before the U.S. U.S. House of Representatives Committee on Foreign Affairs, *Iran Sanctions*, Congressional Testimony via FDCH (May 17, 2012) (emphasis added) ("Wallace May 17, 2012 Testimony"), 2012 WLNR 10405070.

[116] *Id.*

point of the strategy is to enable a future accomplice – like a company that gets caught red-handed – to protest that there is no direct linkage between them and the IRGC:

> The IRGC-CF is comprised of a complex network of Orbit 1 companies and Orbit 2 companies. In Orbit 1 companies, the IRGC-CF is directly represented on the board of directors, whilst in Orbit 2 companies, there **appears to be no direct representation and therefore, seemingly no links** to the IRGC-CF. Whilst Orbit 2 companies appear independent of the IRGC, they maintain ties to the directly affiliated companies, and therefore remain under indirect IRGC influence. Baharahn Gostar Kish for example, is an information technology and communications company that has no formal links to the IRGC-CF, with no IRGC members on the board of directors.  However, two board members represent Baharahn and Mowj Nasr Gostar, which are both Orbit 1 companies, **meaning that the company still effectively falls under the IRGC economy**.[117]

273.    When NATO published Ms. Gill's "Orbit" Strategy discussion, NATO essentially vouched for her conclusions because NATO would not have published an article that NATO believed to contain implausible or conclusory assertions.[118]

### ii.    Hezbollah

274.    Hezbollah is a Lebanon-based terrorist group that has pledged fealty to Iran's Supreme Leader.  The IRGC has long used Hezbollah (in collaboration with the Qods Force), to establish, expand, and oversee nationwide terror campaigns targeting Americans in the Middle East, doing so in Afghanistan, Iraq, Lebanon, Yemen, Syria, Israel, and elsewhere.

---

[117] *Id.* at 101-102 (emphasis added).

[118]  On information and belief, NATO would have only published Ms. Gill's study of the IRGC if the professional staff at NATO, on behalf of NATO, believed that such article:  (1) accurately characterized the facts to avoid misleading the contemplated primary audience or making any assertions that are implausible, *e.g.*, a government official working for NATO to defend the U.S. and Europe from, *inter alia*, terrorism; (2) offered reasonable opinions worthy of consideration by responsible parties; and (3) strengthened NATO's ability to fight terrorism, as that was NATO's primary mission for the two decades after 9/11.

275.     Hezbollah "first emerged as a militia in opposition to the 1982 Israeli invasion of Lebanon,"[119] when the IRGC established Hezbollah as a subordinate part of the IRGC known as the IRGC's "Hezbollah Division,"[120] which IRGC status Hezbollah has maintained ever since.

276.     Hezbollah was and is the IRGC's, including the Qods Force's, lead terrorist proxy throughout the world, including in the U.S., Europe, and Dubai, serving, in effect, as the IRGC's external terrorist operations arm in conjunction with the Qods Force.

277.     Articles 150 and 154 of the Iranian Constitution enshrines Hezbollah's anti-American terrorist mission by ordering the IRGC to specifically target Americans in order to export Iran's Islamic Revolution.  Article 150 empowers the IRGC with the responsibility for "guarding the revolution and its achievements," (meaning, exporting the Islamist revolution),[121] while Article 154 confirms that Iran "supports the just struggles of the *mustad'afun* [downtrodden] against the *mustakbirun* [oppressors] in every corner of the globe."  Thus, Iran's

---

[119] Marc Lindemann (Captain, New York National Guard), *Laboratory of Asymmetry: The 2006 Lebanon War and the Evolution of Iranian Ground Tactics*, Military Review (May 1, 2010), 2010 WLNR 28507137 ("Lindemann, *Laboratory of Asymmetry*").  "Although Iran was engaged in the Iran-Iraq War at the time of the Israeli occupation, Iran's [IRGC] took the lead in organizing, training, and equipping Hezbollah. … 2,500 members of the IRGC [] enter[ed] Lebanon and set up training camps among the Shi'ite population in the Beqa'a Valley … Training at the IRGC camps became a prerequisite for membership in Hezbollah." *Id.*

[120] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, Combating Terrorism Center at West Point, CTC Sentinel, Vol. 3, No. 11 (Nov. 2010) ("Knights, *The Evolution of Iran's Special Groups in Iraq*").

[121] Under Iran's revolutionary doctrine, the Iranian government posits that it must always remain on the attack with respect to its promotion of insurgents against the Great Satan because, if Iran were to fall back (according to this paranoid theory), the U.S. would overrun Iran. Consequently, inside Iran and around the world, people familiar with Iran and the IRGC understand that references to "guarding the revolution" are *not* defense, but rather, are *offensive* because, under the paranoid Iranian view, the only way to "guard the revolution" is to go on the attack outside of Iran, through proxy terror campaigns.  Any suggestion to the contrary is, quite literally, IRGC terrorist propaganda.

constitution directly embraces Hezbollah proxy terror (*i.e.*, "the just struggles of the downtrodden") targeting the United States (*i.e.*, "against the oppressors").[122]

278.    Richard Armitage, the Deputy Secretary of State under President George W. Bush, has described Hezbollah as the 'A-Team of Terrorists,'"[123] and former CIA director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable organization."[124]

279.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[125]  Hezbollah also frequently functions as a terrorist proxy for the IRGC committing and orchestrating terrorist attacks abroad with the IRGC's, including the Qods Force's, support.  Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[126]

---

[122] When the Iranian government references "the oppressors" without any specification as to whom, that ***exclusively*** means only two countries:  the United States and Israel.  This is so because the Iranian regime was founded in direct opposition us and our ally, and Iran's founding documents mention no other hostile actor beyond the U.S. and Israel.  Any suggestion to the contrary is, literally, Iranian propaganda designed for a western audience.

[123] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003).

[124] *Current and Future Worldwide Threats to the National Security of the United States:  Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George J. Tenet).

[125] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[126] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

280.    In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[127]

281.    Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[128] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); Khobar, Saudi Arabia (1996); Iraq (2005-present); and Yemen (2012-present).

282.    On January 25, 1995, the United States designated Hezbollah as a Specially Designated Terrorist.

283.    On October 8, 1997, the United States designated Hezbollah as an FTO, and it has retained that designation ever since.

284.    Hezbollah is, and has always been widely understood in the U.S., Europe, Middle East, and Asia to be Iran's purpose-built anti-American and anti-Israeli Arabic Shiite terrorist division, which the IRGC designed to integrate within the IRGC's terror architecture, including, but not limited to, its financial, operational, and logistics networks in order to ensure that Hezbollah was inseparable from the Regular IRGC and Qods Force and always remained a

---

[127] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

[128] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

formal part of the IRGC. The IRGC built Hezbollah this way because the IRGC wanted to be able to control Hezbollah's every move while simultaneously maintaining the fiction that Hezbollah were merely "resistance" fighters. The IRGC's ploy was key to facilitating its worst terrorist plots because the IRGC's primary purpose when it created its Hezbollah Division was to secure the IRGC's plausible deniability on a structural level by interposing a buffer – Hezbollah – between the IRGC and the Americans whom the IRGC wanted to murder.

285. The IRGC has long relied on Hezbollah to aid the Qods Force's efforts to supply al-Qaeda and Taliban terrorists who were targeting Americans in Afghanistan and Iraq:

(i) The IRGC has relied upon Hezbollah and the Qods Force to aid attacks against Americans by al-Qaeda and the Taliban ever since the early 1990s (in the case of al-Qaeda) and/or shortly after 9/11 (in the case of the Taliban).

(ii) Before 9/11, the IRGC, al-Qaeda, and their respective affiliates, worked together to broker combined Islamist terrorist training activities at Taliban sites in Afghanistan, during which time terrorists from Hezbollah, the Qods Force, al-Qaeda, the Taliban, Hamas, and Palestinian Islamic Jihad trained, prayed, and studied together in order to develop the long-term skills and relationships that bin Laden demanded under his corporate "always be closing" model of terror, which emphasized cross-pollination with every possible Islamist terrorist group as long as such group wanted to help al-Qaeda and its allies kill Americans.[129]

(iii) After 9/11, al-Qaeda, the IRGC, and their respective affiliates, intensified their transnational terrorist alliance; the IRGC acted primarily through its Hezbollah and Qods Force operatives distributed in cells worldwide, while al-Qaeda and the Taliban, for their part, acted primarily through al-Qaeda-related "polyterrorists" who served both al-Qaeda and the Taliban, including its Haqqani Network, *e.g.*, Sirajuddin Haqqani, Anas Haqqani, and Khalil Haqqani (al-Qaeda/Taliban), Dawood Ibrahim (D-Company/al-Qaeda), Altaf Khanani (All).

---

[129] *See*, *e.g.*, Hal Bernton, Mike Carter, David Heath and James Neff, *Going To Camp*, Seattle Times (Aug. 4, 2002) ("By [1998], al-Qaida training was formalized. There was even a textbook, available in Arabic, French and other languages. … Trainees practiced with small arms, assault rifles and grenade launchers provided by the Taliban …. They learned about explosives and land mines. Representatives of terrorist groups, including Hamas, Hezbollah and Islamic Jihad, gave lectures on their organizations."), 2002 WLNR 2584645.

286.     It would be improper to suggest that the IRGC's Hezbollah Division is not a part of the IRGC, does not benefit from IRGC funds and resources, and/or does not help flow through such IRGC resources to IRGC terrorist proxies like the Taliban.  Every relevant IRGC-related leader, division, and doctrine has always reflected the universal understanding amongst Iran-led terrorists that Hezbollah was a part of the IRGC and benefited accordingly:

(i)     **IRGC Structure.**   The IRGC embedded Hezbollah within the IRGC as the IRGC's Hezbollah Division when the IRGC created Hezbollah in the 1980s, maintained the IRGC's "Hezbollah Division" within the IRGC ever since.[130]

(ii)    **Direct IRGC Funding.**  The IRGC directly funds its Hezbollah Division like its Qods Force, as they are two sides of the same IRGC external terror coin.  As the Defense Intelligence Agency ("DIA") concluded with "high confidence" in 2010, "Iran has methodically cultivated a network of sponsored terrorist surrogates capable of conducting effective, plausibly deniable attacks against … the United States," and the DIA "judge[d]" that "Tehran provide[d] support to terrorist and militant groups to support Iran's strategic interests in each situation."[131]  DIA concluded: "[e]lements of Iran's Islamic Revolutionary Guard Corps []have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities."[132]

(iii)   **Hezbollah Founder Statements.**  Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) confirmed that "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[133]

(iv)    **Common IRGC Terrorist Tradecraft.**  The IRGC, including its Hezbollah Division and Qods Force, long practiced common terrorist tradecraft[134] across every component of the IRGC (regular, Hezbollah Division, and Qods Force) – including the use of

---

[130] *See*, *e.g.*, Knights, *The Evolution of Iran's Special Groups in Iraq*.

[131] Defense Intelligence Agency, *Unclassified Report on Military Power of Iran* (Apr. 2010).

[132] *Id*.

[133] *Killing Americans and Their Allies*.

[134] "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage.  Terrorists and clandestine intelligence operatives both practice tradecraft.

Hezbollah as the cell leader and Qods Force as cell funder and logistician – and every geography in which the IRGC or any of its proxies operate.[135]

(v)  **Emphasis on Joint Hezbollah/Qods Force Cells.**  IRGC doctrine ordinarily calls for Hezbollah and Qods Force terrorists to be co-located out of joint cells when conducting IRGC terrorist operations outside of Iran.  The IRGC's joint cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being deployed inside of Iran but specifically to target Americans.  The common practice of Hezbollah and the Qods Force nearly always following the joint cell model when they are within striking distance of American –*i.e.*, when the IRGC perceives its odds of success, and risk of danger, to both be at the highest level – also confirms the Hezbollah-IRGC integration.

(vi)  **Hezbollah's Public Declarations.**  Like the IRGC, Hezbollah considers itself a part of the IRGC.  In 1985, "Hezbollah publicly acknowledged its reliance on Iran," and publicly pledged their loyalty to the IRGC.[136]

(vii)  **Hezbollah Operatives' Loyalty Oaths to IRGC.**  Hezbollah operatives swear a personal oath of loyalty to Iran's Supreme Leader (and head of the IRGC), Ayatollah Khamenei, and personally pledge to carry out their terrorist missions in his name.

### iii.    The Qods Force

287.    The IRGC has a special foreign division called the Qods Force.  The U.S. State Department has observed that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for

---

[135] The IRGC's tradecraft rules governing the IRGC, Hezbollah Division and the Qods Force, are ironclad, inflexible, widely known, and universally applied worldwide, befitting the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization.  IRGC tradecraft emphasizes concealment and cover above all else.

[136] In its 1985 Statement, Hezbollah publicly proclaimed, among other things:  "We view the Iranian regime as the vanguard and new nucleus of the leading Islamic State in the world. We abide by the orders of one single … leadership, represented by 'WaIi Faqih' [rule of the jurisprudent] and personified by [Grand Ayatollah] Khomeini," who led Iran's Islamic Revolution and, as such, also served as the head of the IRGC and Hezbollah's sworn leader.

cultivating and supporting terrorists abroad."[137]  The Qods Force is the driving force behind Iran's activities in Afghanistan, as well as in Iraq and elsewhere in the region.

288.    Major General Qassem Soleimani, who was the chief of the Qods Force for more than twenty years, oversaw the Qods Force's support for terrorist groups to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace him.

289.    In October 2007, the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 for providing material support to the Taliban and other terrorist organizations, including Hezbollah and terrorist groups in Iraq.[138]  The U.S. Treasury Department also designated multiple Qods Force members as Specially Designated Nationals pursuant to Executive Order 13224, based on their activities in Afghanistan.[139]

290.    Announcing the Qods Force's SDGT-related designations, the Treasury Department confirmed in its official press release that "[t]he Qods Force":

(i)     "provide[d] material support to the Taliban, Lebanese Hizballah, Hamas, [and] Palestinian Islamic Jihad";

(ii)    "[was] the [IRGC's] primary instrument for providing lethal support to the Taliban";

(iii)   "provide[ed] weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan";

(iv)    "support[ed] Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support";

---

[137] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

[138] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[139] *Id.*

(v)     "operate[d] training camps for Hizballah in Lebanon" "and" "trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran";

(vi)    "provide[d] roughly $100 to $200 million in funding a year to Hizballah and" "assisted Hizballah in rearming in violation of UN Security Council Resolution 1701"; and

(vii)   "provide[d] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target[ed] and kill[ed] Coalition [] forces."[140]

291.    In light of the foregoing, Treasury confirmed, on behalf of the U.S. government, that "[t]hrough Qods Force material support to the Taliban, we believe Iran [was] seeking to inflict casualties on U.S." "forces" in Afghanistan.[141]

292.    The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani was the chief of the Qods Force for more than twenty years and oversaw the Qods Force's support for Hezbollah and its proxies to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace Soleimani.

293.    The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

294.    The Qods Force's leader until his death, Qassem Soleimani, infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem

---

[140] *Id.* (emphases added).

[141] *Id.* ("Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.").

Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan." Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained Jaysh al-Mahdi terrorists in Baghdad and elsewhere launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured advanced rockets and explosively formed penetrators ("EFP") built by Hezbollah with IRGC-sourced components, which caused the U.S. government to protest Iranian terrorist activity in Iraq.

295.    The Qods Force provides weapons, funding, and training for terrorist operations targeting American citizens, including by supporting terrorist organizations such as al-Qaeda, the Taliban, and the Haqqani Network.  Iran's Supreme Leader and central government are aware of and encourage those acts.  As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") concluded:  "Iran's use of weapons smuggling networks is fairly predictable and meant to shape the manner in which foreign countries deal with Iran."[142]  For that reason, the Qods Force varies the quantity, rate, and types of weapons provided to its proxy terrorist organizations depending on the amount of pressure Iran wants to exert on a particular country.  Applying pressure against the United States by funding and supplying terrorist proxies in the Middle East and Central Asia is thus an official component of Iran's foreign policy.

296.    The Qods Force operates a broad global network of front companies, often co-located with Hezbollah.  Indeed, in recognition of the central role of cover to IRGC doctrine, the IRGC created the Qods Force's Unit 400, which was tasked with the mission of facilitating the IRGC's, including Hezbollah's and the Qods Force's, terrorist finance and logistics activities through illicit commercial transactions conducted by an international network of Qods Force

---

[142] Eric Parks, *Iranian Weapons Smuggling Activities in Afghanistan* at 9, JIEDDO J2 Open Source Augmentation and Analysis Cell (Sept. 3, 2009) ("*JIEDDO Report*").

front companies, which depended on the Qods Force maintaining a close working relationship with transnational criminal organizations, *e.g.*, the Khanani MLO or the Russian Mafia.[143]

297.    The U.S. State Department designated the Qods Force as a FTO in April 2019, along with the IRGC.[144]

### 2.    The IRGC Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine The U.S. Mission There

298.    While Americans worked to rebuild post-war Afghanistan, they were attacked by Taliban and al-Qaeda terrorists.  The IRGC, including its Hezbollah Division and Qods Force, sponsored those terrorist attacks in an effort to undermine American foreign policy in Afghanistan.  To that end, the IRGC, including Hezbollah and the Qods Force, supported the Taliban (including its Haqqani Network) by, among other things, training Taliban terrorists how to attack Americans effectively and paying terrorists who killed U.S. forces.  The IRGC, including Hezbollah and the Qods Force, also provided the Taliban with sophisticated weapons that it used to kill and injure thousands of Americans.

299.    The IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda was equally potent.  That support dates back decades and has included money, weapons, training, logistical assistance, and safe harbor for key al-Qaeda leaders.  In 2007, Osama bin Laden himself referred to Iran as al-Qaeda's "main artery for funds, personnel, and

---

[143] *See*, *e.g.*, Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly Blitz (Bangladesh) (Dec. 4, 2021) ("Unit 400 has a network of facilitators and proxies, including elements in organized crime syndicates. These individuals collect information, make preliminary logistical preparations, and carry out operations if necessary. These individuals sometimes are trained inside Iran and sometimes in the Quds Force's training camps across the globe.  Unit 400 has various front companies that both provide cover and money for this terrorist entity to operate. Two companies, Arash Zoobin, and Aria Navid, are used to secretly transfer weapons for Unit 400. Besides, the IRGC uses its vast network of front companies, religious or charitable organizations around the world to recruit facilitators."), 2021 WLNR 39679934.

[144] *See* 84 Fed. Reg. 15278-01 (Apr. 15, 2019).

communication." The IRGC's, including its Hezbollah Division's and Qods Force's, longstanding decision to back al-Qaeda despite sectarian differences between the two reflected Iran's overriding desire to foment anti-American terrorism around the world. That decision, like the one to provide material support to the Taliban, paid dividends. the IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda's activities in Afghanistan substantially contributed to the terrorist violence that killed and injured Americans there.

300. The IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda complemented its support for the Taliban because of the close relationship between the two terrorist groups. Although al-Qaeda and the Taliban were nominally separate groups, they acted together in a terrorist "syndicate" that planned and authorized terrorist violence throughout Afghanistan. That syndicate – which involved mafia-style meetings between leaders of the syndicate's various members – provided a superstructure that organized and facilitated a range of terrorist attacks in Afghanistan. By funneling material support to multiple members of that syndicate, the IRGC, including its Hezbollah Division and Qods Force, ensured that its policy of sponsoring anti-American terrorism in Afghanistan achieved maximum effect.

301. The IRGC's conspiracy succeeded. The U.S. substantially completed its withdrawal from Afghanistan on or about August 2021, which was one of the four primary objects of the conspiracy. Afghanistan was also, along with Iraq, one of the two central theaters where both the IRGC, including its Hezbollah Division and Qods Force, and its Sunni allies al-Qaeda and the Taliban, regularly collaborated in a two-way manner, sharing resources, personnel, smuggling routes, financiers (in-country and around the world), and sometimes even jointly committing attacks with one another.

302.     The public reaction of the IRGC, including its Hezbollah Division and Qods Force, to the U.S. withdrawal from Afghanistan confirms that the terrorists believe they achieved one of the objects of the conspiracy:

303.     Iran's support for multiple components of this "syndicate" ensured that its support had maximum effect.  Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other – and vice versa.  Iran recognized those interrelationships and so spread its support across multiple parts of the Afghan terror syndicate. In doing so, Iran was able to achieve its intended effect:  wide-ranging terrorist attacks against Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the syndicate.

### i.     The IRGC Provided Material Support to Al-Qaeda

304.     Iran has supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan.  As Judge Daniels found, "[i]n 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."[145]  "Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[146]

305.     "In 1993, in a meeting in Khartoum, Sudan, arranged by Ah Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC

---

[145] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *11 (findings of fact).
[146] *Id*.

Brigadier General Mohammad Baqr Zolqadr, a multipurpose member of the Iranian terrorist structure."[147]

306.    "At the 1993 Khartoum conference, representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism."[148]

307.    "Imad Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s, and Mughniyah became a major connection point between Iran and al Qaeda."[149] "Osama bin Laden had been a guerilla fighter in Afghanistan and it was Mughniyah who made bin Laden into an accomplished terrorist."[150]

308.    "The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hizballah training camps operated by Mughniyah and the IRGC in Lebanon and Iran. Among other tactics, Hizballah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hizballah also gave the al Qaeda operatives training in intelligence and security."[151]

309.    "Another al Qaeda group traveled to the Bekaa Valley in Lebanon to receive training in explosives from Hizballah, as well as training in intelligence and security."[152]

---

[147] *Id.* (internal citations and quotations omitted).

[148] *Id.* (internal citations and quotations omitted).

[149] *Id.*

[150] *Id.* (internal citations and quotations omitted).

[151] *Id.* (internal citations and quotations omitted).

[152] *Id.* (internal citations and quotations omitted).

310. "Iran's *Charge d'Affaires* in Khartoum, Sudan, Majid Kamal, an IRGC commander, coordinated the training expeditions; Kamal had performed the same function in Beirut, Lebanon, in the early 1980s during the formation of Hizballah."[153]

311. Under its alliance with al-Qaeda, Iran also regularly hosted Zawahiri during al-Qaeda's formative years. As Judge Daniels previously found, "[a]s a result of the creation of this terrorist alliance, al Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS [Iran's Ministry of Intelligence and Security], including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi."[154]

312. "The creation of the Iran–Hizballah-al Qaeda terrorist alliance was followed by a string of terrorist strikes directly against the U.S. and its allies," leading to the first World Trade Center attack in 1993, the Khobar Towers bombing in 1996, the African embassy bombings in 1998, the USS Cole attack in 2000, and 9/11.[155]

313. As a result of the foregoing, Iran was the proximate and but-for cause of al-Qaeda's embrace of suicide bombing as a tactic. Qods Force and Hezbollah agents acting at Iran's direction originally instructed al-Qaeda in the theological, technological, and tactical aspects of suicide bombing as a terrorist strategy based upon Iran's and Hezbollah's own successful use of suicide bombers during Iran's war against Iraq and during the joint Iranian/Hezbollah terrorist campaign against Americans in Lebanon in 1983, in which Hezbollah terrorists used suicide bombers to kill hundreds of Americans serving in Lebanon.

---

[153] *Id.* at *12 (internal citations and quotations omitted).

[154] *Id.* (internal citations and quotations omitted).

[155] *Id.*

314.    When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West, particularly the United States."[156]  A court in this District subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.[157]

315.    The 9/11 Commission has also confirmed that there was solid and substantial proof of Iran's repeated willingness to support terrorist proxies targeting Americans in the Middle East, including Sunnis with whom the Iranians are normally hostile, which had been demonstrated by Iranian assistance to a litany of terrorists, including 9/11 hijackers.[158]

316.    After 9/11, senior al-Qaeda leadership, sheltering in Iran under the patronage and with the counsel of Qods Force operatives, explicitly modeled their post-9/11 organization and tactics on the approach of Hezbollah and the Qods Force.

317.    While al-Qaeda was re-building itself in Iran after 9/11, the Iranians were busy rejecting U.S. and allied requests to stop aiding al-Qaeda.  For example, on or about 2002 or 2003, Iran rejected a lawfully issued extradition request by the Jordanian government for Zarqawi on the preposterous grounds that Zarqawi – whom the Iranians knew well – was not Jordanian but, rather, Syrian.  Similarly, in a 2003 face-to-face meeting in Geneva, Switzerland, then-U.S. ambassador

---

[156] Indictment at 3, *United States v. Bin Laden*, No. 1:98-cr-00539-LAK (S.D.N.Y. filed Nov. 5, 1998), Dkt. 1, *available at* https://fas.org/irp/news/1998/11/indict1.pdf.

[157] *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

[158] *See, e.g., The 9/11 Commission Report* at 60 ("[T]he evidence of Iranian involvement" in the June 1996 truck bomb attack against Americans in Khobar Tower in Saudi Arabia was "strong" and there were "also signs that al Qaeda played some role.") (July 1, 2004); *see also id.* at 240-241 (significant Iranian transportation and logistical support for 9/11 attackers).

to Iraq Ryan Crocker implored Iranian officials to cease their support for al-Qaeda's terrorism targeting Americans in the Persian Gulf, which request the Iranians refused. By then, al-Qaeda had demonstrated its usefulness to Iran with respect to its ability to kill Americans, and Iran was already sheltering and supporting al-Qaeda's military leader, Saif al-Adel (who was also al-Qaeda's manager for Zarqawi's activities in Iraq) in his Qods Force-provided Tehran safe house.

318.    The Iranians rebuffed U.S. outreach because they had already reached a secret deal with al-Qaeda. Following the 9/11 attacks on the United States and subsequent routing of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, Iran met with senior al-Qaeda leaders who had fled Afghanistan into Iran to offer military aid to support al-Qaeda's fight against America. Iran hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002. As part of this initial offer of support, Iran pledged to provide funds and logistical support to facilitate the development of terrorist activities targeting Americans in countries bordering Iran. While the focus at the time was on Afghanistan, all involved expected the U.S. to eventually move into Iraq and for their shared terrorist enterprise to follow us there.

319.    Under this secret deal between Iran and al-Qaeda after 9/11, Iran intensified its material support for al-Qaeda's terrorist campaign against Americans around the world. Through the secret deal between Iran and al-Qaeda and the assistance that the former provided to the latter thereafter, Iran was the proximate and but-for cause of al-Qaeda's survival as a terrorist organization after 9/11 and the al-Qaeda linked terrorist attacks against Americans in Iraq, including Plaintiffs, that inevitably followed.

320.    Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by

Iran.  For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving assistance that Iran had been providing to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "**main artery for funds, personnel, and communication**."[159]

321.    Zawahiri also emphasized close strategic cooperation between al-Qaeda and Iran, following a pragmatic approach under which al-Qaeda focused on expanding its presence in Iran. Like bin Laden, Zawahiri agreed that al-Qaeda could not survive and thrive without the support it received from Iran.  In a letter reportedly written by Zawahiri, al-Qaeda thanked Iran for the Qods Force's support in setting up al-Qaeda's terrorist network in Yemen in 2008 and stated, in effect, that al-Qaeda could not have established its franchise in Yemen without the IRGC's assistance.

322.    The U.S. government has also recognized the close partnership between Iran and al-Qaeda after the secret deal between the two.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between Iran and al-Qaeda.[160]  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families"

---

[159] October 18, 2007 translated letter from Osama bin Laden to Karim at 1, *Bin Laden's Bookshelf*, Office of the Director of National Intelligence (2016) (emphasis added).  In March 2016, the Office of the Director of National Intelligence declassified items that had been obtained by U.S. special operators in the May 2011 raid on bin Laden's compound, including this letter.  *See* Bin Laden's Bookshelf, Office of the Director of National Intelligence.

[160] Press Release, U.S. Treasury Dep't, *Treasury Targets Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011).

and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities." The Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia."[161] Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shiite Muslims elsewhere in the Middle East.

323.    The U.S. Treasury Department has repeatedly recognized the link between al-Qaeda and Iran in making SDGT designations under Executive Order 13224. In February 2012, the agency designated the Iranian Ministry of Intelligence and Security ("MOIS") as a terrorist-sponsoring entity for, among other things, supporting al-Qaeda.[162] In 2014, the agency likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."[163]

324.    The close relationship between al-Qaeda and Iran has continued in recent years. In 2017, the U.S. State Department explained, "Since at least 2009, Iran has allowed [al-Qaeda] facilitators to operate a core facilitation pipeline through the country, enabling [al-Qaeda] to move funds and fighters to South Asia and Syria."[164] It further accused Iran of remaining unwilling to bring to justice or identify al-Qaeda members in its custody.[165] The next year, the agency reaffirmed those conclusions and reiterated Iran's close relationship with al-Qaeda.[166]

---

[161] *Id.*

[162] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012).

[163] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[164] U.S. State Dep't, *Country Reports on Terrorism 2016* at Iran Section (July 2017).

[165] *Id.*

[166] *Country Reports on Terrorism 2017* at Foreword.

325.     Iran also supported al-Qaeda through its proxy, Lebanese Hezbollah.  As the *Washington Post* reported at the time in 2002, Iran's lead terrorist proxy, Lebanese Hezbollah, was "increasingly teaming up with al Qaeda on logistics and training for terrorist operations, according to U.S. and European intelligence officials and terrorism experts."[167]  "The new cooperation … includes coordination on explosives and tactics training, money laundering, weapons smuggling and acquiring forged documents, according to knowledgeable sources.  This new alliance, even if informal, has greatly concerned U.S. officials in Washington and intelligence operatives abroad who believe the assets and organization of Hezbollah's formidable militant wing will enable a hobbled al Qaeda network to increase its ability to launch attacks against American targets."[168]

326.     The "collaboration" between Iran (through Lebanese Hezbollah) and al-Qaeda "illustrate[d] what analysts [said] [was] an evolving pattern of decentralized alliances between terrorist groups and cells that share[d] enough of the same goals to find common ground: crippling the United States, and forcing the U.S. military out of the Middle East and Israel out of Palestinian territory.  'There's a convergence of objectives,' said Steven Simon, a former National Security Council terrorism expert."[169]  As the *Washington Post* reported, "[a]lthough cooperation between al Qaeda and Hezbollah may have been going on at some level for years, the U.S. war against al Qaeda [] hastened and deepened the relationship. U.S. officials believe that after al Qaeda was driven from Afghanistan, leader Osama bin Laden sanctioned his operatives to ally themselves

---

[167] Dana Priest and Douglas Farah, *Terror Alliance Has U.S. Worried; Hezbollah, Al Qaeda Seen Joining Forces*, Washington Post (June 30, 2002), 2002 WLNR 15332564.

[168] *Id*.

[169] *Id*.

with helpful Islamic-based groups, said a senior administration official with access to daily intelligence reports."[170] The *Post* concluded:

> European and U.S. intelligence operatives on the ground in Africa and Asia said they have been trying to convince headquarters of the new alliances but have been rebuffed. "We have been screaming at them for more than a year now, and more since September 11th, that these guys all work together," an overseas operative said. "What we keep hearing back is that it can't be because al Qaeda doesn't work that way. ***That is [expletive]***. Here, on the ground, these guys all work together as long as they are Muslims. There is no other division that matters."[171]

327. Al-Qaeda's alliance with Iran's lead terrorist proxy, Lebanese Hezbollah, continued at all relevant times and proved the intelligence operatives on the ground had been right all along. For example, in 2012, the Council on Foreign Relations reported that "al-Qaeda ha[d] stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[172]

328. On or about August 7, 2020, on the anniversary of the Iran/al-Qaeda bomb attack against U.S. embassies in Africa, Israeli commandos acting at the request of the United States killed al-Qaeda's number 2 leader, Abu Muhammad al-Masri, in a covert mission in Tehran.[173] Masri was in Iran as a guest of the Iranian government and was permitted to freely plan attacks against the United States from an Iranian-provided safe-haven in Tehran. The timing of the attack was not a coincidence, but a rather a professional slap in the terrorists' face extended by the U.S. and Israeli governments to Iran and al-Qaeda, as the latter allies suffered an embarrassing and catastrophic loss on the anniversary of one of their greatest terrorist triumphs.

---

[170] *Id.*

[171] *Id.*

[172] *al-Qaeda (a.k.a. al-Qaida, al-Qa`ida)*, Council on Foreign Relations (June 6, 2012).

[173] Goldman at al., *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*.

329.     The mafia-style "syndicate" of which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam formed a part, made attacks by each group more lethal.  Iran's mutually reinforcing support for al-Qaeda, AQI, and AI therefore made each group more effective.

330.     By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families.  Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members.  Moreover, al-Qaeda was closely intertwined with al-Qaeda-in-Iraq and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda planned and authorized the Sunni attacks in which it did not directly participate.  Material support and resources provided to al-Qaeda thus also flowed to al-Qaeda-in-Iraq and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

### ii.     The IRGC Provided The Taliban With Weapons, Explosives, and Lethal Substances

331.     Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the Taliban.  Many of the weapons Iran provided were designed to be particularly effective against U.S. and allied forces operating in Afghanistan.  For example, Iran provided the Taliban with anti-tank mines, long range rockets, explosively formed penetrators, suicide vehicle-borne improvised explosive devices, rocket-propelled grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. and allied forces.

332.     U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Afghanistan, many of which bore markings of Iranian origin.  A purported April 2007 military-intelligence summary (as published online) reported that "Iranian officials" were sending "to Afghanistan explosive devices and vehicles ready to be used as SVBIEDs [suicide

vehicle-borne improvised explosive devices].”[174]  A purported U.S. government document from August of that year (as published online) also reported that the Afghanistan National Police had found evidence of a planning meeting for 25 suicide attacks in which it was stated that “[t]he materials for the bombs will be supplied by Iran Government . . . .”

333.    When the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 in October 2007, it specifically documented Iran’s frequent shipments of weapons to the Taliban over at least the prior year.  A purported December 2007 military-intelligence summary (as published online) further reported that explosive samples in suicide vests seized from four suicide bombers “tasked by Taliban/Al-Qaeda leaders” with carrying out a suicide attack in Helmand Province were found to be a 92% probability of a match against a suspected sample of Iran-sourced C4.

334.    In January 2008, a raid by Afghan Police in Farah Province discovered 130 mines, of which the Afghan Police concluded 60 were Iran-made.[175]  That same month the U.S. Ambassador to Afghanistan stated that “[t]here is no question that elements of insurgency have received weapons from Iran.”[176]

335.    A purported June 2008 U.S. State Department cable (as published online) detailed multiple instances of Iran transferring arms to the Taliban in 2007 and 2008 and concluded that analyses of the weaponry “indicate the Taliban had access to Iranian weaponry produced as recently as 2006 and 2007.”  Similarly, Afghan forces discovered a large cache of Iran-made

---

[174] *Afghanistan War Logs:  Anti-aircraft Missiles Clandestinely Transported From Iran Into Afghanistan – US Report*, The Guardian (July 25, 2010) (“*Anti-aircraft Missiles Clandestinely Transported*”); *see also Afghanistan War Logs: Afghan Government Seeking to Maintain Friendly Relations With Iran,* The Guardian (July 25, 2010) (referencing Iranian-made weapons recently found in Kandahar Province).

[175] *JIEDDO Report* at 10.

[176] Brian Bennett, *Iran Raises the Heat in Afghanistan*, Time (Feb. 22, 2008).

explosives hidden near the Bakhshabad Dam in Farah Province in March 2009. That same month, a purported military-intelligence summary (as published online) indicated that Taliban commanders had obtained portable surface-to-air missiles that originated in Iran.

336. In May 2009, 44 bricks of Iran-made explosives and dozens of Iran-made mortars were discovered in a Taliban stronghold in Helmand Province. Also in May 2009, Afghanistan border police intercepted a shipment crossing the Iranian border with dozens of anti-tank mines bound for Afghan militants. And in September 2009, a purported military-intelligence summary report (as published online) claimed that the Taliban had received "six very powerful anti-tank mines from Iran" to target ISAF forces or important Afghan Police Officers. That same year, the U.S. State Department reported that, "[s]ince at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107mm rockets, and plastic explosives."[177]

337. By 2011, Taliban terrorists were using Iran-made and -sourced long-range rockets to attack Coalition targets in Afghanistan. In February 2011, British forces intercepted more than four dozen 122-milimeter rockets in Nimruz Province near the Iranian border, which gave the terrorists roughly double the range to attack Coalition targets. British Foreign Secretary William Hague stated that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."[178] The *Wall Street Journal* similarly reported that U.S. officials "said the rockets' markings, and the location of their discovery, give them a 'high degree' of confidence that they came from the Revolutionary

---

[177] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[178] Julian Borger & Richard Norton-Taylor, *British Special Forces Seize Iranian Rockets In Afghanistan*, The Guardian (Mar. 9, 2011).

Guard's overseas unit, the Qods Force."[179]  General Petraeus later confirmed that the Qods Force

had supplied these rockets to a "known Taliban facilitator."[180]  The U.S. Department of

Defense's 2011 Report on Progress Toward Security and Stability in Afghanistan similarly stated

that "[f]orensics teams examined the rockets and confirmed an Iranian point of origin."[181]

338.    In June 2015, Iran hired smugglers to ferry supplies across the Iranian border and

deliver them to Taliban units in Afghanistan.  These Iran-supplied weapons included 82mm

mortars, light machine guns, AK-47 rifles, rocket-propelled grenades, and materials for making

roadside bombs.

339.    Iran also provided EFPs to the Taliban.  EFPs are specially shaped charges, first

used by Hezbollah in Lebanon, which typically employ a manufactured concave copper disk and

an explosive-packed liner.  Thus, when Iran "smuggled [EFPs] to Afghan insurgents for use

against U.S. Forces,"[182] Iran supplied the Taliban with a particularly lethal form of support.

Indeed, Iran and Hezbollah designed EFPs to defeat armored vehicles like the ones used by

Coalition forces in Afghanistan.  Those EFPs gave the Taliban a sophisticated anti-American

weapon that it could not have obtained or deployed effectively on its own.

340.    The Taliban began using EFPs against Coalition forces in 2007.  A purported May

2007 U.S. State Department cable (as published online) reported on increased IED attacks and

noted that recent attacks had been successful against armored ISAF vehicles, which indicated an

---

[179] Jay Solomon, *Iran Funnels New Weapons to Iraq and Afghanistan*, Wall St. J. (July 2, 2011).

[180] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/ content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[181] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 107 (Apr. 2011).

[182] *JIEDDO Report* at 1.

Iran-supplied EFP. Just days later another purported cable (as published online) reported that two EFPs had been discovered in April 2007 in Herat Province. Through the summer of 2007, at least four EFPs were discovered in Herat Province, near other Iranian arms shipments.

341. A purported September 2007 cable (as published online) stated that British forces "in Farah Province, Afghanistan intercepted an arms convoy they had been tracking from inside Iran," which included EFPs "of Iranian origin." One week later, another purported cable (as published online) reported that, according to the U.K. Ambassador to NATO, Stewart Eldon, analysis of the munitions "showed a clear link to Iran and weapons the Iranian Revolutionary Guard Corps Qods Force has sent to insurgents in Iraq." In 2008, the United Kingdom obtained proof that Iran was supplying the components for these EFPs.

342. By 2007, the JIEDDO concluded that Iran was attempting to "inflict psychological damage" on the United States by smuggling EFPs "to Afghan insurgents for use against U.S. Forces."[183]

343. In Afghanistan, Iranian EFPs earned the nickname "Dragons" because their explosive force was concentrated in the direction of the designated target rather than blasting in all directions and dispersing the impact.[184] Unlike ordinary mines that cause only minor damage to U.S. military vehicles, a Dragon "superbomb" can completely destroy a military Humvee or tank.[185] According to one Taliban commander, "If you lay an ordinary mine, it will only cause

---

[183] *JIEDDO Report* at 3.

[184] Kate Clark, *Taliban Claim Weapons Supplied By Iran*, The Telegraph (Sept. 14, 2008).

[185] *Id.*

minor damage to Humvees or one of their big tanks.  But if you lay a[n] [Iranian] Dragon, it will destroy it completely."[186]

344.     On information and belief, many Plaintiffs, or their family members, were severely injured or killed in terrorist attacks using Iran-supplied EFPs.

345.     Iran also provided the Taliban with rockets and similar weapons that were particularly effective against U.S. and Coalition forces.  A purported April 2007 military-intelligence summary (as published online), for example, reported that Iran had purchased anti-aircraft missiles from Algeria in late 2006 and then smuggled them from Mashhad, Iran – where the Fourth Corps of the Qods Force is headquartered – into Afghanistan.[187]  A purported Afghanistan Police Report from the next month (as published online) claimed that Iran intelligence sources issued three anti-aircraft launchers and ammunition to a Taliban commander.  A purported March 2009 military intelligence summary (as published online) included intelligence reports of portable surface-to-air missiles arriving in Afghanistan from Iran.  Similarly, a purported July 2009 military-intelligence summary (as published online) included reports of two dozen "Stinger" style surface-to-air missiles smuggled from Iran into Afghanistan.

346.     According to a purported September 2009 military-intelligence summary (as published online), Taliban terrorists used an Iran-made rocket-propelled grenade launcher to shoot down Coalition helicopters.  The launcher was marked "Made In Iran."  The launcher was particularly effective because, unlike some other launchers, the Iran-made launcher had a scope that could be adjusted for targeting and was more accurate for shooting helicopters.

---

[186] Steven O'Hern, *Iran's Revolutionary Guard: The Threat That Grows While America Sleeps* at 112 (Potomac Books, 1st ed. 2012) (internal quotations and citation omitted); Kate Clark, *Taliban claim weapons supplied by Iran*, The Telegraph (Sept. 14, 2008).

[187] *Anti-aircraft Missiles Clandestinely Transported*.

### iii. The IRGC Provided The Taliban With Lodging, Training, Expert Advice or Assistance, Safehouses, Personnel, and Transportation

347.    Iran also provided members of the Taliban and affiliated terrorist groups with lodging, training, expert advice or assistance, safe harbor, and transportation.  Iran taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces. Without the training from Iran and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

348.    According to a purported June 2006 military-intelligence summary (as published online), two members of the Iranian Intelligence Secret Service had arrived in Parwan Province to help Taliban members "in carrying out terrorist attacks against the [Afghanistan] governmental authorities and the [Coalition] members, especially against the Americans forces."[188]  A purported military-intelligence summary later that year (as published online), reported that injured Taliban terrorists were evacuating to Tehran for shelter.[189]

349.    Iran also trained Taliban fighters at camps within Iran.  For example, a purported April 2007 military intelligence summary (as published online) reported that "Iranian officials train" members of the Taliban at an Iranian base in Birjand, Iran, near the Afghanistan border.[190] A similar purported June 2007 military intelligence summary (as published online) claimed that the IRGC was training roughly 300 foreign fighters in Iran, presumably to fight in Afghanistan.

350.    A purported military-intelligence summary (as published online) from May 2008 claimed that a Taliban commander had traveled to Iran for training and returned with 40 trained

---

[188] *Afghanistan War Logs: US Claims Iran Spies Helping Insurgents to Attack Coalition Forces,* The Guardian (July 25, 2010).

[189] *Afghanistan War Logs: Iranians Alleged to Be Sheltering Wounded Taliban Fighters in Tehran*, The Guardian (July 25, 2010).

[190] *Anti-aircraft Missiles Clandestinely Transported.*

terrorists.  Similarly, a military-intelligence summary (as published online) from July 2008 referenced "trained fighters moving in from Iran."  And a purported military-intelligence summary (as published online) from October 2009 likewise reported on the return of a Taliban commander from training "in an Iran army barracks."

351.    Iran provided Taliban terrorists with specialized training on how best to deploy Iran-supplied weapons against U.S. and Coalition forces.  A purported December 2008 military-intelligence summary (as published online) reported on a group of 40 insurgents "who allegedly were trained in an Iranian Military base" who had plans to attack the capital of Farah Province using weapons that "Iran Intelligence could have provided."  According to a purported April 2009 military-intelligence summary (as published online), Iran was recruiting Taliban terrorists for training in Iran on shooting down Coalition helicopters.  And another purported April 2009 military-intelligence summary (as published online), reported on the return of a Taliban commander after receiving IED-manufacturing training in Iran.

352.    A March 21, 2010 article in London's *The Sunday Times* reported extensively on Iranian security officials training Taliban recruits to "ambush" Coalition forces, attack checkpoints, and use guns and IEDs.  The *Times* interviewed two Taliban commanders – from Wardak and Ghazni province – who had traveled to Iran with groups of Taliban terrorists for training, which improved their ability to launch lethal attacks on Coalition forces.  According to the commanders, Iran paid for this travel and training.  One commander who received training in Iran observed that the Taliban's and Iran's "religions and . . . histories are different, but our target is the same — we both want to kill Americans."[191]

---

[191] Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Times (Mar. 21, 2010).

353.    By 2009, U.S government officials were openly accusing the IRGC of training the Taliban.  In an August 2009 report, ISAF Commander General Stanley McChrystal explained that "the Iranian Qods Force is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents."[192]  He confirmed again in May 2010 that Iran was training Afghan fighters in Iran.[193]  In its 2009 Country Reports on Terrorism, the U.S. State Department reported:  "Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons . . . ."[194]  Similarly, in 2012 it explained: "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."[195]

354.    Iran's training of Taliban terrorists has not diminished.  By 2015, the IRGC was operating at least four Taliban training camps within Iran.

355.    Iran also facilitated the Taliban's attacks by allowing the Taliban to establish offices in Iran to serve as bases for planning terrorist attacks.  For example, Iran permitted a senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with Afghanistan and Pakistan.  In or about 2014, the Taliban also opened an office in Mashhad, Iran, where the Fourth Corps of the Qods Force is headquartered.[196]  As of January 2019, the Taliban maintained an office in Tehran, Iran.[197]

---

[192] Quoted by Sajjan M. Gohel, in *Iran's Ambiguous Role in Afghanistan* at 13, CTC Sentinel (March 2010).

[193] *Killing Americans and Their Allies*.

[194] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[195] U.S. State Dep't, *Country Reports on Terrorism 2012* at 196 (May 2013).

[196] Oved Lobel, *Afghanistan:  The Forgotten Front Against Iran*, Australia/Israel & Jewish Affairs Council (Nov. 16, 2018).

[197] *Iran and the Taliban:  A Tactical Alliance?*

356.    Iranian fighters also conducted attacks alongside Taliban terrorists.  In an October 2016 Taliban attack in Farah Province, four senior Iranian commandos were killed, and many of the other Taliban dead were taken across the border to Iran for burial.

357.    Mohammad Arif Shahjahan, the governor of Farah Province in western Afghanistan, told Radio Free Afghanistan in 2017 that Taliban leaders had been traveling frequently to Iran, where they received protection and support.[198]  He reported that Qods Force operatives had recently met with and advised the Taliban in Farah Province.[199]

358.    Iran's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. forces and Coalition forces.  The Taliban and affiliated terrorist groups in Afghanistan used Iran's training to kill or injure Plaintiffs or their family members.

### iv.    The IRGC Provided The Taliban With Financial Support

359.    Iran has also supported the Taliban financially.  On an annual basis, Iran provided large cash payments to the Taliban.  For example, a purported February 2005 military intelligence summary (as published online) reported that the IRGC delivered 10 million Afghanis (worth roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.[200]

360.    Iran also directly paid Taliban insurgents to kill U.S. forces.  Another purported February 2005 military-intelligence summary (as published online) reported on a Taliban group that was being paid by the Iranian government $1,740 for each Afghanistan soldier killed and

---

[198] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

[199] *Id.*

[200] *Afghanistan War Logs:  Iran Smuggles Money into Afghanistan to Fund Insurgents, says US Report*, The Guardian (July 25, 2010).

$3,481 for each Government of Afghanistan official killed. The report further explained that the group would begin attacking U.S. forces if the attacks on Afghans were successful.[201] Iran paid Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000 for each destroyed American military vehicle. In one specific example, Taliban fighters received $18,000 from Iran as a reward for an attack in 2010 than killed several Afghan forces and destroyed an American armored vehicle.[202]

361.    Iran also provided funding to individual Taliban commanders, often as they were returning to Afghanistan from training in Iran. A purported May 2008 military-intelligence summary (as published online) reported on a Taliban leader returning from training in Iran "along with a considerable amount of money." A purported May 2009 U.S. State Department Cable (as published online) stated that the IRGC may provide Taliban Commander Mullah Sangin with financial support to engage Coalition forces, including U.S. contractors.

362.    Iran has also supported the Taliban's finances by supporting its ability to traffic narcotics, which Taliban terrorists use "to finance their acts of terror and violence."[203] As the U.S. Treasury Department explained when it designated Iranian Qods Force General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker in March 2012, General Baghbani allowed Afghan narcotics traffickers to smuggle opiates through Iran, facilitated the smuggling of chemicals necessary to produce heroin from Iran into Afghanistan, and helped "facilitate

---

[201] *Afghanistan War Logs: Iran Offers Reward for Each Afghan Official and Solider Killed, According to Coalition Report*, The Guardian (July 25, 2010).

[202] Miles Amoore, *Iran pays the Taliban to Kill US Soldiers*, The Times (Sept. 5, 2010).

[203] Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban Shadow Governor of Helmand Afghanistan as Narcotics Trafficker* (Nov. 15, 2012).

shipments of opium into Iran."[204]  General Baghbani also had narcotics traffickers deliver weapons on his behalf to the Taliban.[205]

363.    As reported in a 2015 *Wall Street Journal* article, a Taliban commander described Iran's financial support of the Taliban in the form of recruiting and paying individual terrorists. The commander explained that he had been detained for working illegally in Iran when he was approached by the IRGC and offered double his previous salary – to be paid by Iran – if he fought with the Taliban in Afghanistan.[206]  And in 2017, officials in Ghor Province accused Iran of financing a Taliban offensive that briefly enabled the Taliban to overtake a key district.[207]

## F.    Al-Qaeda Authorized And Planned The Terrorist Attacks That Killed And Injured Plaintiffs

364.    Since at least the mid-2000s, al-Qaeda authorized and planned the Taliban's attacks on U.S. forces in Afghanistan in several ways.

365.    **Authorization.** Al-Qaeda provided critical religious authorization for Taliban attacks on U.S. forces. As noted above, in 1998 Osama bin Laden himself directed all Muslims to kill Americans at every opportunity. In the ensuing years, senior al-Qaeda leaders issued a series of *fatwas* directed toward the Taliban, conferring religious permission for them to attack Americans in Afghanistan.

366.    After bin Laden was killed in May 2011 (about three months prior to the first attack on Plaintiffs), the Taliban confirmed his religious and moral authority over their Afghan jihad, stating: "Osama Bin Laden You were the *sheikh of the Umma*, a zealous man, and *the*

---

[204] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking Through Iran* (Mar. 7, 2012).

[205] *Id.*

[206] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[207] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

*scholar and imam of the nation at the level of Jihad* and the fighting of the enemies and their minions. You were *our* sheikh, *our* imam and *role model*, the hero and miracle of our times, unique among your peers, pious and highly sensible."[208]

367.　Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban (including Haqqani Network) members. Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[209]

368.　Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in Syndicate, which involved periodic mafia-style meetings in which al-Qaeda, the Taliban, and other members of the syndicate (such as Lashkar-e-Taiba) would confer about geographies and targets to attack.[210] The Syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the syndicate's individual members. Among other things, the Syndicate specifically approved: (1) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding provinces; (2) the campaign of suicide attacks against Americans throughout Afghanistan; (3) the Taliban's campaign of using anti-American IED and suicide attacks specifically in Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces and P2K; (4) the Taliban's "surge" in Kandahar and Helmand from 2010 through 2012; and (5) the Syndicate's use of, and later aggressive focus on, CAN fertilizer bomb attacks specifically targeting Americans.

---

[208] Al-Somood, *Bin Laden Is Alive O Dead Ones And The Cowards Should Not Dare Close Their Eyes* (July 1, 2011) (emphasis added).

[209] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019) ("*Al Qaeda Growing Stronger*").

[210] *See The al Qaeda – Taliban Connection*.

369.    Al-Qaeda's messages of authorization were particularly influential with respect to suicide bombings. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans all over the world."[211] Afghan terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible. Al-Qaeda trumpeted that success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[212] With al-Qaeda's authorization, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006. Thereafter, suicide bombings remained a cornerstone of the Taliban's strategy.

370.    As a result, al-Qaeda's role in that suicide-bombing trend was pivotal and was the but-for cause of each Taliban suicide bomb attack.

371.    Al-Qaeda also authorized the Taliban's use of IED attacks against Americans in Afghanistan, and bin Laden regularly called for terrorists to attack Americans with IEDs.

372.    **Planning.** Al-Qaeda also planned the Taliban's terrorist attacks against Americans in Afghanistan. Working through its Syndicate partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as

---

[211] *Osama bin Laden: Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

[212] Brian Glyn Williams, *Suicide Bombings in Afghanistan* at 5, Jane's Islamic Affairs Analyst (Sept. 2007).

regional terrorist attacks, particularly in Afghanistan."[213] Two terrorism scholars explained al-Qaeda's syndicate-related shuras as follows:

> The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. . . . It established a number of shuras to *coordinate strategy, operations, and tactics* against the West and regional allied governments. In particular, al-Qaeda fighters have been involved in *planning and carrying out suicide attacks, developing improved explosive devices, and helping conduct operations* against high-value targets.[214]

373.    Al-Qaeda training provided another key mechanism through which that planning occurred. Before the September 11 attacks, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans. At all relevant times, these al-Qaeda camps trained terrorists in the al-Qaeda signature of turning fertilizer into bombs.

374.    By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan, many of which were also affiliated with Sirajuddin Haqqani.[215]

375.    The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly "hosted by the Taliban."[216] One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles. On information

---

[213] *Resilient al-Qaeda* at 3.

[214] *Id*. at 3-4.

[215] Def. Intelligence Agency, *Intelligence Information Report: Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))* (Apr. 16, 2008) (listing training camps and some of the terrorists there).

[216] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

and belief, this camp trained terrorists in how to make CAN fertilizer bombs and included an on-site al-Qaeda CAN fertilizer bomb factory.

376.    Working jointly with polyterrorist Sirajuddin Haqqani, al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its suicide bomber attacks. As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," "through operations [that al-Qaeda] planned together with Sirajuddin Haqqani."[217]

377.    Al-Qaeda also planned the Taliban's attacks by devising the operational scheme for them. Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates those activities. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the groups' respective leaders conceived during a meeting in Pakistan in early spring 2003.[218] Another Gitmo detainee files similarly documented "joint operations meeting[s]" where the participants, which included al Qaeda, Taliban and LT commanders "decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations."[219] Together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[220]

---

[217] *Resilient al-Qaeda* at 9.

[218] *The al Qaeda – Taliban Connection*.

[219] *Id.* (brackets in original)

[220] *Id.*

378.     Al-Qaeda also taught the Taliban effective terrorist tradecraft. Through its relationship with al-Qaeda, the Taliban "developed or acquired new commercial communications gear and field equipment," as well as "good tactical, camouflage, and marksmanship training."[221] They also "share[d] communication and transportation routes, coordinate[d] attacks, and even utilize[d] the same explosive and suicide-bomber networks."[222] The Taliban's (including its Haqqani Network's) effective terrorist tradecraft was essential to its ability to execute al-Qaeda's nationwide CAN fertilizer bomb campaign, which depended upon sophisticated logistics, communications, smuggling, storage, and other technical skills that the Taliban only acquired through its relationship with al-Qaeda.

379.     All these activities were part of al-Qaeda's planning of the Taliban's CAN fertilizer bomb attacks in Afghanistan. By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends. In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies. As terrorism scholar Thomas Ruttig observed: "Both in Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[223] Here, its "cooptation" of the Taliban was especially effective.

380.     Al-Qaeda's planning activities extended specifically to the two CAN fertilizer bomb attack types that account for every attack in this case: IEDs and suicide bombs.

---

[221] *Id.* at 293.

[222] *Resilient al-Qaeda* at 9.

[223] Thomas Ruttig, *The Other Side* at 22, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

381.  **IEDs.** Al-Qaeda planned the Taliban's campaign of IED attacks in Afghanistan in which the explosive was ammonium nitrate derived from Fatima Group CAN Fertilizer manufactured, sold, and distributed by Fatima and Pakarab.

382.  At all relevant times, al-Qaeda was the world leader amongst Sunni terrorist groups with respect to converting fertilizer into ammonium nitrate for use in CAN fertilizer bomb attacks against Western targets. As Senator Charles Schumer stated in 2004, "bombs using [CAN] [were] the weapon of choice of al-Qaida."

383.  From 2001 through 2016, al-Qaeda supported fertilizer-based bomb strategies in every theater in which al-Qaeda pursues terrorist attacks against America and its allies. As one journalist wrote in 2007, "[i]n the new age of Islamist terrorism, [CAN] fertiliser packed into a truck with plastic explosive as a detonator has also become an al Qaida trademark."[224]

384.  CAN fertilizer bombs were also a literal part of al-Qaeda's terrorism playbook, and al-Qaeda regularly instructed Taliban and Haqqani Network terrorists, in person and in writing, regarding CAN fertilizer bombs. For example, a 39-page al-Qaeda memo recovered from an al-Qaeda laptop in Pakistan in 2004 provided that military explosives were often impractical to acquire, and instructed instead that jihadists should use home-made explosives, including ammonium nitrate bombs derived from CAN fertilizer.

385.  Al-Qaeda and the Haqqani Network agents, operatives, and fronts in Afghanistan and Pakistan facilitated al-Qaeda's CAN fertilizer bomb infrastructure by purchasing every essential element of the Syndicate's bombmaking enterprise and managing the transportation and logistics of vast volumes of bombs and bomb precursors. These Syndicate front companies

---

[224] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, Press Association News (Apr. 30, 2007).

serviced the litany of joint al-Qaeda / Haqqani Network bombmaking factories and training camps in eastern Afghanistan and Syndicate-controlled territory in Afghanistan and Pakistan. It did so because the Haqqani Network have historically played a key role in obtaining and securing bomb components and precursors for use by al-Qaeda bombmakers operating in camps in Afghanistan and Pakistan jointly run by al-Qaeda and the Haqqani Network under the leadership of Syndicate polyterrorists like Sirajuddin Haqqani.

386.    While al-Qaeda and Haqqani Network fronts and agents were sourcing their key explosive ingredient exclusively from Fatima and Pakarab, al-Qaeda forward-deployed terrorist trainers in Afghanistan and Pakistan specifically instructed the Taliban to acquire Fatima Group CAN Fertilizer, convert it into an ammonium nitrate bomb, and use the resulting weapon to kill and maim Americans in Afghanistan.

387.    Al-Qaeda's plan for the nationwide deployment of CAN fertilizer bombs against Americans in Afghanistan also included aggressive support by al-Qaeda bombmakers and logisticians in Pakistan, aided by their Taliban and Haqqani Network allies, to maintain a series of joint al-Qaeda/Taliban (including through the Haqqani Network) bombmaking sites, where the purpose was specifically to construct large volumes of CAN fertilizer bombs detonated via a Syndicate IED or suicide bomber. In so doing, bin Laden and his Taliban allies, including its Haqqanis, were reprising one of their celebrated roles against the Soviets during the Afghan war, when they worked together to help arm the mujaheddin with key anti-armor weapons.

388.    By 2009, according to famed journalist Peter Bergen, al-Qaeda's strategy to teach the Taliban how to turn CAN fertilizer into CAN fertilizer bombs to kill Americans in Afghanistan was widely known:

> [I]n recent years, Taliban leaders have drawn especially close to Al Qaeda. . . .
> Today, at the leadership level, the Taliban and Al Qaeda function ***more or less as***

*a single entity*. The signs of this are everywhere. For instance, IED attacks in Afghanistan have increased dramatically since 2004. What happened? As a Taliban member told Sami Yousafzai and Ron Moreau of *Newsweek*, "***The Arabs taught us how to make an IED by mixing nitrate fertilizer and diesel fuel and how to pack plastic explosives and to connect them to detonators and remote-control devices like mobile phones***. We learned how to do this blindfolded so we could safely plant IEDs in the dark."[225]

389.    At all relevant times, dual al-Qaeda/Haqqani Network operative Sirajjudin Haqqani planned the Syndicate's CAN fertilizer bombing campaign, and focused above all else on producing a regular, reliable, and deadly supply of CAN fertilizer bombs for use in Syndicate IED and suicide bomb attacks targeting Americans in Afghanistan.

390.    Like his al-Qaeda brothers, Sirajuddin Haqqani viewed the Syndicate's CAN fertilizer bomb campaign infrastructure as a key source of al-Qaeda and Haqqani Network power in Afghanistan and Pakistan, and leverage over other members of the Syndicate. Consequently, al-Qaeda and Haqqani Network operatives, including Sirajuddin Haqqani and other Haqqani family members, closely oversaw the core commercial and financial relationships that enabled Syndicate's regular and reliable flow of Fatima Group CAN Fertilizer for conversion into CAN fertilizer bombs. This close involvement by senior al-Qaeda and Haqqani Network leadership ensured a tight nexus between Defendants' reckless financial services to al-Qaeda and Haqqani Network agents, operatives, and fronts and the Syndicate's CAN fertilizer bomb infrastructure.

391.    In this relationship, the Haqqani Network provided the location, support, and funding for the CAN fertilizer bombmaking sites, while al-Qaeda bombmakers presided over an assembly line of explosives creation in which bombmakers would convert Fatima Group CAN Fertilizer into CAN fertilizer bombs.

---

[225] *The Front* (emphases added).

392.    Once al-Qaeda's bombmakers had cooked down Fatima Group CAN Fertilizer into ammonium nitrate, al-Qaeda would then prepare the ammonium nitrate to be used in one or more CAN fertilizer bombs derived from al-Qaeda schematics, including: (1) large CAN fertilizer-based IEDs specifically designed to destroy an American armored vehicle; (2) small CAN fertilizer-based IEDs specifically designed to kill or maim Americans on foot; and (3) CAN fertilizer-based suicide vests and suicide VBIEDs specifically designed to take out the largest possible American armor, or to be deployed as part of a complex attack targeting an American installation. Different bomb types require different component parts, and therefore al-Qaeda's bombmakers would coordinate the correct parts with the correct designs to ensure maximal effect. Once al-Qaeda's designed- and manufactured-CAN fertilizer bombs were completed, al-Qaeda and the Haqqani Network would distribute the CAN fertilizer bombs to the relevant Syndicate terrorist cells throughout Afghanistan to blow up Americans.

393.    More broadly, al-Qaeda members regularly trained Taliban and Haqqani Network commanders in sophisticated CAN fertilizer bomb-making techniques that were material to the terrorists' ability to assemble and deploy explosives against Coalition forces. According to the terrorist scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated [IEDs], including remote controlled detonators. For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas. They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology. Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[226]

---

[226] *Graveyard Of Empires* at 292.

394.    Al-Qaeda's support of Taliban and Haqqani Network IED attacks also included the use of forward deployed al-Qaeda terrorist trainers throughout Afghanistan. For example, by 2010, "[i]n southern Afghanistan, there [were] pockets of al Qa'ida . . . in Helmand and several neighboring provinces, such as Kandahar and Zabol," which helped the Taliban "conduct suicide attacks and other [IED]" attacks.[227] Al-Qaeda also forward deployed IED terrorist trainers in P2K and N2KL. At all relevant times, al-Qaeda's forward deployed trainers directed the CAN fertilizer bomb campaign in keeping with its status as a "signature" al-Qaeda attack type.

395.    Al-Qaeda's planning efforts were significant and amplified the lethality of Taliban and Haqqani Network attacks. Indeed, al-Qaeda's ability to export its terrorism expertise to local groups is what "renders al-Qaeda effective in the first place."[228] In the case of the Taliban and the Haqqani Network, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[ ]ing of what some observer[s] call 'strategic-level funding.'"[229] Those activities were material to the Taliban's and Haqqani Network's ability to execute the type of attacks that killed and injured Plaintiffs. As Mr. Ruttig concluded, al-Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[230]

396.    As Mr. Bergen put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do

---

[227] *Id.* at 330.

[228] Thomas Ruttig, *The Other Side* at 22, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

[229] *Id.*

[230] *Id.*

– as trainers and force multipliers."[231] Al-Qaeda's sophistication and support was important to the Taliban's (including its Haqqani Network's) terrorist enterprise. And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks. For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[232]

397.    **Suicide Attacks.** Al-Qaeda's planning activities extended to suicide bombings. The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy. Al-Qaeda exported its suicide-bombing expertise to the Taliban through their joint syndicate, and in so doing played a pivotal leadership and operational role in every Taliban (including Haqqani Network) suicide bombing in Afghanistan during the relevant time period. For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

398.    Al-Qaeda planned suicide bombings in Afghanistan by mounting a coordinated communications campaign to persuade Taliban (including Haqqani) terrorists to embrace suicide attacks against Americans. This campaign included messages touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of Taliban and Haqqani leadership.

399.    Al-Qaeda used this message – and the moral authority conveyed by bin Laden's 2003 *fatwa* authorizing martyrdom operations – to change the Taliban's (including its Haqqani

---

[231] *The Front*.

[232] *Al Qaeda Growing Stronger*.

Network's) organizational posture toward suicide bombing. As Dr. Jones summarized the evidence, "Al Qa'ida's involvement was particularly important in this regard."[233]

400. To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps that converted disaffected recruits into suicide bombers at an industrial scale. In collaboration with other syndicate members, Al-Qaeda created and designed a process for identifying candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal the explosives in a Suicide VBIED, navigate a checkpoint, and detonate for maximum impact. Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

401. To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban relied upon a series of dual-hatted al-Qaeda/Taliban (including Haqqani Network) terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons. Such dual-hatted al-Qaeda/Taliban (including Haqqani Network) terrorists include, but are not limited to:

(i)     **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network, who has stated that al-Qaeda "enlighten[s] the road for [the Taliban] and they resist against the cross worshippers [*i.e.*, the Americans] by cooperating with us and us with them in one trench," pursuant to cooperation "at the highest limits"[234];

(ii)    **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces; and

(iii)   **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari)**, a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban.

---

[233] *Graveyard of Empires* at 293.

[234] *Taliban Cooperation*.

402.     Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers, and the suicide bombs they detonated, in support of the Taliban's jihad against Americans in Afghanistan. The Syndicate's suicide attack infrastructure included: (1) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the Syndicate; (2) joint al-Qaeda/Taliban safe houses and ratlines to support the deployment of suicide bombers inside Afghanistan; (3) joint al-Qaeda/Taliban explosives factories, in which the Syndicate converted Fatima Group CAN Fertilizer into ammonium nitrate for use in suicide vests and suicide VBIEDs; (4) joint al-Qaeda/Taliban suicide VBIED development sites, in which al-Qaeda and Taliban (including Haqqani Network) bombmakers married the CAN fertilizer bomb with a vehicle to create a suicide VBIED; and (5) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for increasing the likelihood that a particular attacker would carry out his or her attack, as well as incentivizing the next generation of suicide bombers.

403.     As a reflection of the joint nature of al-Qaeda-Taliban martyrdom operations, al-Qaeda suicide bombers were often referred to as "Mullah Omar's Missiles." By following a strategy in which the weapons (*i.e.*, the suicide bomber) was created by al-Qaeda and then deployed by the Taliban, both organizations played to their respective operational competencies to maximize the impact of their shared jihad against Americans in Afghanistan. Indeed, when a suicide bomber detonated a CAN fertilizer bomb, as happened in every suicide bomb attack in this case, al-Qaeda created both the suicide bomber and the explosive device itself.

**G.     Al-Qaeda Committed Terrorist Attacks That Killed And Injured Plaintiffs, Often In Joint Cells With The Taliban, The Haqqani Network, And Lashkar-E-Taiba**

404.     Working together, the Syndicate terrorist groups committed every IED and suicide bomb attack in this case. Consistent with bin Laden's playbook, al-Qaeda provided the

technical expertise, training, ratlines, forward deployed support in Afghanistan, and fundraising support, while the Taliban, Haqqani Network, Lashkar-e-Taiba, and Jaish-e-Mohammed provided training camps, safe houses, front companies to purchase components, and terrorists to be trained.

405.    Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. In fact, many terrorist operatives were "dual-hatted," meaning that they were both al-Qaeda and Taliban (including Haqqani Network) members. Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs. Examples are set forth below.

406.    **Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) Nangarhar, Nuristan, Kunar and Laghman Provinces (known as "N2KL"), which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the Taliban, and Lashkar-e-Taiba maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The polyterrorists who ran these joint cells included:

(i)      **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[235]

(ii)     **Sakhr al-Taifi**, al-Qaeda's number two in Afghanistan, who embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against" "coalition troops throughout eastern Afghanistan," and "supplie[d] weapons and equipment to insurgents."[236]

(iii)    **Mufti Assad**, an al-Qaeda network and "insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout

---

[235] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan* (Nov. 4, 2016).

[236] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who" "train[ed] [] insurgents on how to construct and use [IEDs]."[237]

(iv)   **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces.

(v)    **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks.

(vi)   **Abu Ikhlas al-Masri**, an al-Qaeda commander who helped coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture in December 2010.

(vii)  **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who "coordinated attacks against coalition forces," throughout Kunar Province, "conducted training" and helped terrorists with "weapons procurement".[238]

(viii) **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who directed al-Qaeda operations in Kunar Province, with specific responsibility  for "planning attacks against" "coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" that were facilitated by his "network" of Taliban terrorists.[239]

(ix)   **Fatah Gul**, an al-Qaeda facilitator who "ran terrorist training camps where insurgents learned how to conduct [IED] attacks" in the N2KL area.[240]

407.   **Paktia, Paktika, and Khost ("P2K") Provinces.** Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also operated as a "traditional al-Qaeda safe haven[]."[241] In this area, al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The dual-hatted terrorists who ran the cells included:

---

[237] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

[238] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Apr. 16, 2011).

[239] U.S. Dep't of Def., *Strike Kills No. 2 Insurgent in Afghanistan* (Apr. 26, 2011).

[240] ISAF Joint Command, *Morning Operational Update* (Aug. 5, 2012).

[241] *Resilient al-Qaeda* at 11-12.

(i)     **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network;

(ii)     **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's military council; and

(iii)     **Khalil al-Rahman Haqqani**, Jalaluddin Haqqani's brother and a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and operational commander" for the Haqqani Network,[242] as well as an agent who "acted on behalf of al-Qa'ida"[243] and had "been linked to al-Qa'ida terrorist operations."[244]

408.     **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city. This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including its Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing terrorist attacks, each of which executed the Syndicate's CAN fertilizer bomb campaign in Kabul Attack Network-related provinces. *See supra* Part V.A.3. The dual-hatted al-Qaeda/Taliban terrorists who ran the cells included:

(i)     **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network.

(ii)     **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban.

---

[242] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War J. (Feb. 9, 2011).

[243] Press Release, U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[244] Press Release, U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani Network Leaders* (Aug. 20, 2014).

## II.  DEFENDANTS ASSISTED THE SYNDICATE

### A.  The Syndicate Relies on an International Criminal Network to Access Funds

409.  The Syndicate relied on an international criminal network to access funds. The entities in this network include, but are not limited to, the Khanani Money Laundering Organization ("Khanani MLO"); Value Added Tax ("VAT") fraud cells in Europe operated by Samir Azizi and Imran Yakub Ahmed; the Russian Mafia; contributions from narco-warlords like Hikmatullah Shadman; and others. These Syndicate agents are described herein.

#### 1.  The Khanani MLO

247.  Altaf Khanani and his laundering empire, the Khanani MLO, were vital to the Syndicate's efforts to raise hundreds of millions of dollars annually through illicit overseas income generated by al-Qaeda and its affiliates, like the Haqqani Network.

248.  Altaf Khanani established the Khanani MLO in the 1990s for the primary purpose of laundering the transnational organized crime profits, mostly but not entirely from opium, realized by al-Qaeda, the Taliban (including its Haqqani Network), and D-Company, which three designated terrorist groups were the Syndicate's original terrorist "visionaries' behind turning Afghanistan's opium economy into the potent, worldwide, and vast funds and logistical benefits that al-Qaeda and the Haqqani Network gained from their alliance with the Khanani MLO.

249.  Among the reasons for the Khanani MLO's notoriety was Altaf Khanani's long-standing practice of using his relatives to manage and operate the Khanani MLO's network of notorious terrorist fronts.  Since it was created, the Khanani MLO has always employed the Khanani family members and Khanani-associated entities, each of whom usually carried their own indelible stench of terrorist finance given their direct paper connections to other Khanani family members or entities.

250.     With respect to the Khanani MLO's entities, the Khanani MLO relied upon notorious Khanani-related fronts, which included, but were not limited to: (1) Khanani & Kalia International; (2) Al-Zarooni Exchange; (3) Mazaka General Trading L.L.C.; (4) Jetlink Textiles Trading; (5) Seven Sea Golden General Trading LLC; (6) Aydah Trading LLC; (7) Wadi Al Afrah Trading LLC; (8) Kay Zone General Trading LLC; (9) Landtek Developers; (10) Kay Zone Builders & Developers; and (11) Unico Textiles.

251.     With respect to the Khanani MLO's leadership, Altaf Khanani borrowed a page from the Haqqani family playbook and stacked the Khanani MLO's leadership with members of Khanani's family including, but not limited to: **(1) Obaid Khanani**, Altaf's son and senior manager at Al Zarooni Exchange, who held a leadership role in the Khanani MLO; **(2) Hozaifa Khanani**, Altaf's nephew and manager of Khanani MLO real estate investments; and **(3) Javed Khanani**, Altaf's brother and key launderer, who cleansed the FTOs' criminal proceeds through money service businesses in the U.A.E., including but not limited to Al Zarooni Exchange, for or on behalf of the Khanani MLO, and also managed the Khanani MLO's operations in Pakistan.

252.     The Khanani MLO has provided a full spectrum of illicit financial services to Khanani's original core customer base in from the early 1990s through the late 2000s: al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, all of whom Khanani had long served in his role as the world's leading opium-related money launderer. Khanani also served as the personal financier and agent to Sirajuddin Haqqani and Dawood Ibrahim, both leaders of Syndicate entities.

253.     By no later than 2008, and continuously ever since, Altaf Khanani, Khanani's family, and the Khanani MLO (collectively, "the Khanani Cell") were notorious in the U.S., Pakistan, the U.A.E., Europe, and amongst the banking and remitter communities, for Khanani's

status as one of the world's worst polyterrorist financiers and the Khanani MLO's reputation as the worst terrorist finance enterprise in the world. Among other things, Khanani, Khanani's family, and the Khanani MLO were notorious for funding: (i) al-Qaeda, an FTO since 1999; (ii) the Taliban, an SDGT since 2002, including its Haqqani Network, an FTO since 2012; (iii) D-Company, an SDGT since 2002; (iv) Hezbollah, an FTO since 1997; and (v) the Qods Force, an SDGT since 2007 and an FTO since 2019. For each such FTO and SDGT, Khanani, the Khanani family, and the Khanani MLO were internationally infamous as:

(i)  **Syndicate intelligence agents**, who served, among others, al-Qaeda, the Haqqani Network, and D-Company, to whom the Khanani Cell provided financial services, management consulting, and commercial intelligence to aid the terrorist enterprise;

(ii)  **Syndicate terrorist financiers**, who served, among others, al-Qaeda, the Taliban (including its Haqqani Network), D-Company, and Hezbollah, to whom the Khanani Cell provided a comprehensive suite of U.S. Dollar-related financial services worldwide; and

(iii)  **Syndicate terrorist taxpayers**, who paid "taxes" to, among others, D-Company and the Haqqani Network for decades through the relationships between Altaf Khanani and Dawood Ibrahim (with respect to D-Company) and between Altaf Khanani and most senior leaders of the Haqqani family, which have existed since the 1990s.

254.  Khanani's relationship with the Haqqani Network was especially close. Ever since the 1990s, Khanani, the Khanani family, and the Khanani MLO have served as agent, financier, and ally to the Haqqani Network, including, but not limited to, through Khanani's services for senior Haqqani family members. On information and belief, from the 1990s through the present, Khanani, the Khanani family, and the Khanani MLO served the Haqqani Network through their service to, among others, senior members of the Haqqani family as follows:

(i)  Altaf Khanani, the Khanani family, and the Khanani MLO served the Haqqani family since at least the 1990s, when they helped Jalaludin Haqqani fund, arm, and lead the Taliban's first successful conquest of Kabul.

(ii)  Altaf Khanani, the Khanani family, and the Khanani MLO continued serving the Haqqani family in the Syndicate's post-9/11 rebuilding years from 2002 through

2006, when they helped Jalaluddin enable al-Qaeda's logistical renaissance in Afghanistan, Pakistan, and the U.A.E.

(iii)    Altaf Khanani, the Khanani family, and the Khanani MLO grew their relationship with the Haqqani family in the mid-2000s, when they served Sirajuddin Haqqani (responsible for overall transnational operations) and his uncle Khalil Haqqani (responsible for transnational terrorist finance and logistics), and helped each manage aspects Haqqani Network finances.

(iv)    Beginning around this time, Khanani, the Khanani family, and the Khanani MLO coordinated directly with, and paid "taxes" to, the Haqqani Network's transnational leaders responsible for collecting "taxes" or "donations" from transnational criminal organizations led by Pakistanis, most of all, helping al-Qaeda manage the Taliban's global opium pipeline in the mid-2000s, by serving Sirajuddin Haqqani (responsible for overall transnational operations) and his uncle Khalil Haqqani (responsible for transnational terrorist finance and logistics), and helped each manage aspects Haqqani Network finances.

(v)    From 2008 through at least 2016, Sirajuddin Haqqani and Khalil Haqqani were responsible for receiving and redistributing the Haqqani Network's transnational "tax," "donation," and narcotics income from the U.A.E., Pakistan, and other vital Khanani MLO laundering hubs for the Syndicate.

(vi)    On or about 2008, Altaf Khanani, the Khanani family, and the Khanani MLO intensified their relationship with the Haqqani Network after Khanani and the Khanani MLO relocated from Pakistan to the U.A.E. Their decision to collaborate was mutually beneficial because Khanani operated the largest global Pakistani criminal organization in world history (*i.e.*, the Khanani MLO) and the Haqqani Network specialized in providing operational, logistical, and terrorist muscle to transnational criminal organizations (*e.g.*, to help drug smugglers move product across a border).

(vii)    By 2010, Khanani, the Khanani MLO's, and the Haqqani Network's growing transnational alliance benefited all involved: Khanani gained a powerful protector in Pakistan and the U.A.E., while the Haqqani Network was aided by Khanani's and the Khanani MLO's terrorist intelligence, finance, and management consulting activities, in addition to the separate, multi-million dollar annual "tax" payments, which Khanani and the Khanani MLO made to the Haqqani Network each year from the 1990s through the present.

(viii)    When Altaf Khanani was arrested in 2015, the Khanani family and the Khanani MLO remained faithful servants to the Haqqani Network through their services to the Haqqani family even after Khanani was extradited to the U.S.

(ix)    Today, the Khanani MLO continues to serve as a financier for the Haqqani Network. As a result, the Khanani MLO likely financed Sirajuddin Haqqani's terrorist conquest

of Kabul in 2021, which would be the **second** time the Khanani family helped finance the Haqqani family's conquest of Kabul on behalf of the Taliban.

255.    Aside from his pivotal decades-long relationship with the Haqqani Network, Khanani was also *himself* both a Syndicate agent and operative through his membership in one or more constituent members of the Syndicate, including, but not limited to al-Qaeda affiliate D-Company. Specifically, Khanani was the equivalent of the Chief Financial Officer for D-Company, and a personal financier to D-Company leader Dawood Ibrahim.

256.    By 2008, the Syndicate was earning money from criminal operations worldwide, including but not limited to narco-trafficking, fraud, and other rackets, and Khanani enabled al-Qaeda and the Haqqani Network to effectively manage their global finances, launder their illicit income, and then repatriate it back to al-Qaeda or Haqqani Network-controlled accounts to be shared with the other members of the Syndicate for use in their joint terrorist campaign against the U.S. in Afghanistan.

257.    The Khanani MLO played a key role operationalizing much of the transnational terrorist finance architecture used by Al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company to transfer the U.S. Dollars they all earned (often working together as allies) through USD-dependent transnational criminal operations.  The Khanani MLO was essential to this shared terrorist finance enterprise because it relied heavily on the movement of U.S. Dollars between countries and banks that financed Syndicate activities in Afghanistan through criminal schemes inside of Afghanistan (such as the Haqqani Network's protection money rackets) and worldwide (such as al-Qaeda's VAT fraud rackets in Europe).  The Khanani MLO helped each Syndicate member manage much of its global criminal income, including but not limited to, the U.S. Dollars each group earned through terrorist finance schemes such as protection payments, narco-trafficking, large-scale VAT fraud,

and other core criminal rackets upon which al-Qaeda and the Haqqani Network notoriously relied after 9/11 to finance attacks against Americans in Afghanistan.

258.    Khanani and the Khanani MLO enabled each of the above al-Qaeda affiliates and Syndicate members to seamlessly transfer their worldwide criminal income streams to terrorist operatives – also around the world – who directly supported attacks against Americans in Afghanistan.  For example, through the terrorist finance that each Defendant routed to al-Qaeda, the Haqqani Network, and other Syndicate members through the Khanani MLO, al-Qaeda could use the Khanani MLO to convert the Russian Rubles and European Euros into U.S. Dollars (which greatly improved al-Qaeda's killing power).  Thereafter, the Khanani MLO discretely transferred al-Qaeda's and the Haqqani Network's U.S. Dollars to another country in Europe or the Middle East, where al-Qaeda and Haqqani Network finance and logistics cells supported the terrorist campaign against Americans, such as an al-Qaeda finance cell in Europe that sent regular payments to senior Haqqani Network commanders, or a Haqqani Network logistics cell in the U.A.E. that purchased Fatima Group CAN Fertilizer or other key bomb parts needed to maximize the lethality of the Syndicate's terrorist campaign against Americans in Afghanistan.

259.    The Khanani MLO operated from 2001 until 2008 in Pakistan, when the Pakistani government charged Khanani and many of his family members with illegally siphoning USD$10 billion out of Pakistan. The charges made international news at the time because even then, Khanani's business was massive, turning over more than USD$10 billion annually. Khanani avoided conviction in Pakistan, where rumors had it "that the bribe paid" by Khanani to achieve

that outcome "was in the nine figures."[245] Khanani then moved his operation to Dubai, where it operated from 2008 until 2016.

260.    From 2008 until 2016, the Khanani MLO used entities, including Al Zarooni Exchange and Mazaka General Trading, to carry out terrorist financing for Syndicate clients. During that period, the Khanani MLO laundered between $13 billion and $16 billion per year. During this period, Khanani and the Khanani MLO exclusively served a narco-terrorist clientele, and Syndicate members, collectively, comprised Khanani's largest group of clients. On information and belief, Syndicate members also collectively accounted for most of the Khanani MLO's transactions relating to the U.A.E., Afghanistan, Pakistan, the U.A.E., Russia, Estonia, and other geographies in which al-Qaeda and the Haqqani Network managed the Syndicate's transnational terrorist finance and logistics architecture from 2008 through 2016.

261.    While the Khanani MLO also serviced narco-terrorists operating in Mexico, Colombia, and China, their transaction activity for such customers generally took place in their own spheres of influence – not Europe, Russia, the Middle East, or South Asia.

262.    Khanani and the Khanani MLO ordinarily used branches within the relevant region to launder narcotics money for a particular narco-terrorist group as a strategy to better conceal their terrorist finance activities. This meant that when Defendants' employees understood that Khanani or the Khanani MLO was engaged in finance activity, the likely identity of the Khanani MLO's narco-terrorist client (or clients, in the case of the Syndicate) was obvious from the geographies of the banks upon which the Khanani MLO relied to conduct the transaction.

---

[245] Linton Besser, *Catching the Money Man*, ABC News (Australia) (Feb. 5, 2018), https://www.abc.net.au/news/2018-02-05/the-billion-dollar-bust/9383890?nw=0&r=HtmlFragment

263.   From 2001 through 2016, al-Qaeda, the Haqqani Network (representing the Taliban), Lashkar-e-Taiba, and D-Company, in combination with their Russian Mafia Opium JV partners, collectively controlled the narcotics markets in Europe, the Middle East, Central Asia, Afghanistan, and Pakistan:  Syndicate members controlled both opium supply and the key smuggling route chokepoints from Afghanistan and Pakistan necessary to travel on to Central Asia, the Middle East, and Europe, while their Russian Mafia JV partners managed transnational aspects throughout Central Asia and Europe, in coordination with overseas al-Qaeda and Haqqani Network cells operating in those same European and Central Asian geographies. Mexican, Colombian, and Chinese narco-terrorists largely focused on their own spheres of influence (the Americas for the first two, East Asia for the third).

264.   As a result, any time that Khanani or the Khanani MLO conducted transactions through banks or remitters in Europe, Russia, Central Asia, the Middle East, Afghanistan, or Pakistan, al-Qaeda and the Haqqani Network were more likely than not the beneficiary because the Khanani MLO's other (non-Syndicate) narco-terrorists clients ordinarily laundered their money in the Americas (for the Mexican and Colombian cartels) or East Asia (for the Chinese cartels), and it would have been contrary to the operational security of such non-Syndicate narco-terrorists' laundering efforts for the non-Syndicate terrorists to use European, Middle Eastern, Russian, or Pakistani banks in connection with drug transactions in geographies like Mexico City, Medellin, or Hong Kong.

265.   Khanani himself was arrested by the United States in September 2015.  A few months later, on November 12, 2015, the U.S. Department of the Treasury designated the Khanani MLO a transnational criminal organization. The press release accompanying the designation explained, among other things, that:

(i)     "The Khanani Money Laundering Organization exploit[ed] its relationships with financial institutions to funnel billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations."

(ii)    "The Khanani MLO facilitate[d] illicit money movement between Pakistan, the United Arab Emirates (UAE), United States, United Kingdom, Canada, Australia, and other countries, and … launder[ed] billions of dollars in … crime proceeds annually."

(iii)   "Altaf Khanani, the head of the Khanani MLO, and Al Zarooni Exchange [were] involved in the movement of funds for the Taliban, and Altaf Khanani [was] known to have had relationships with Lashkar-e-Tayyiba, Dawood Ibrahim, al-Qa'ida, and Jaish-e-Mohammed."

(iv)    "The Khanani MLO offer[ed] money laundering services to … individuals associated with Hizballah."

(v)     "DEA['s] Miami Field Division Special Agent in Charge" stated that "'[t]he DEA's arrest of Khanani, who [was] a major international money launderer for multiple transnational criminal organizations as well as designated terrorist groups across the globe, and the Treasury's designation of [the Khanani MLO], reiterate[d] the U.S. government's commitment to targeting the world's top criminals, including those who blur[red] the line between drug trafficking, terrorism, and organized crime."[246]

266.    Khanani was convicted of money laundering in 2016 and sentenced to prison in 2017.  On information and belief, the Khanani MLO continued operating after Khanani's arrest and remains in operation to this day.

267.    Further confirming the allegations herein, the Financial Action Task Force in 2018 issued a report on money laundering and the Khanani MLO that "examined potential links between [professional money launderers] and terrorist financing," and concluded that "[t]he Khanani [MLO] provide[d] the clearest example of a professional money laundering

---

[246] U.S. Department of the Treasury, Press Center, *Treasury Sanctions The Khanani Money Laundering Organization* (Nov. 12, 2015), tinyurl.com/qkhn42es.

organisation, providing services to a UN designated terrorist organisation" because "terrorists use[d] the services of" the Khanani MLO "to move funds."[247]

268.    The Khanani MLO supported the Syndicate in seven different ways.  *First*, Khanani and the entities he controlled, including but not limited to, Mazaka General Trading and Al-Zarooni Exchange served as agents and fronts for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, all of which used Khanani to repatriate overseas income back to Afghanistan and Pakistan to support Syndicate attacks against Americans.  As one of al-Qaeda's and the Haqqani Network's most valuable financial minds, Khanani and the Khanani MLO he directed, did not just move the Syndicate's money:  they also served as a global economic intelligence arm for the Syndicate, providing vital nonpublic information concerning nearly every data point relevant to al-Qaeda's and the Haqqani Network's ability to manage the Syndicate's financial affairs including, but not limited to:  (i) identifying corrupt banks, remitters, corporations, service providers, and politicians who are willing to transact business with terrorists; and (ii) discerning, and helping terrorist clients, take advantage of new trends in global finance and money laundering, *e.g.*, "mirror trades."

269.    *Second,* the Khanani MLO was originally purpose-built to serve, and always served as, an agent for al-Qaeda, the Haqqani Network (and though them, the Taliban), and

---

[247] Financial Action Task Force, *FATF Report: Professional Money Laundering*, at 7 (July 2018), https://www.fatf-gafi.org/media/fatf/documents/Professional-Money-Laundering.pdf. The FATF also documented, *id.* at 29-30, how "[i]n one case, funds were channelled to accounts of companies registered in the Middle East, with subsequent cash withdrawals via exchange houses. Cash was then transported back to the country of origin and declared on the border as profits from legitimate business activities in the Middle East, which were intended to be used for the purchase of real estate."  On information and belief, the FATF's quote described the Khanani MLO's movement of cash on behalf of al-Qaeda and/or the Haqqani Network cells in the U.A.E. to Pakistan (the "country of origin") because, among other reasons, the Khanani MLO was the only group consistent with the described organization, which was referenced in the FATF report as having a substantial nexus to the Middle East.

D-Company, to manage every financial aspect of their coordinated transnational opium enterprise. Every aspect of the Khanani MLO's structure and operation was designed to enable the Syndicate's terrorist finance. While the Khanani MLO also grew in the mid-2000s to service other narco-terrorists, it was created to service al-Qaeda and its affiliates, and from 2008 onward, the Khanani MLO served an exclusively narco-terrorist clientele.

270.    *Third*, the Khanani MLO provided a comprehensive suite of financial services to al-Qaeda, the Haqqani Network (and through them, the Taliban), LT, and D-Company, including, but not limited to: (1) laundering their money obtained from opium sales, fraud, and other unlawful schemes; (2) converting their money from an array of local currencies, such as Russian Rubles, into USD, which al-Qaeda and the Haqqani Network insisted upon as the currency of choice to maximize the lethality of their terrorist campaign in Afghanistan; (3) moving their money through the global financial system, including extracting it from countries like Russia; (4) investing their money in commercial ventures in order to launder it; (5) protecting their money by serving, in effect, as a transnational bank for it; and (6) transferring cleansed profits back to Syndicate agents and operatives. Each of these functions independently aided al-Qaeda and the Haqqani Network (and the Taliban through it), as well as Lashkar-e-Taiba and D-Company.

271.    *Fourth*, Khanani himself paid kickbacks (also called "taxes") to both D-Company and the Haqqani Network. Specifically, Khanani was known to take a 3% commission on funds laundered from all his clients. He was also a senior member of D-Company, and it was normal

practice for such senior members to pay ten percent (10%) or more of one's money to Dawood Ibrahim, D-Company's head, as a form of tribute.[248]

272.    Khanani also managed finances for Sirajuddin Haqqani, a terrorist leader for the Haqqani Network and al-Qaeda, and other members of the Haqqani family, and it was common practice for Sirajuddin and the other Haqqani family members to require anybody with close access to Haqqani affairs to pay approximately 2.5% of their income, also as a form of tribute or "tax."[249] Through this mechanism, each transaction that benefited the Khanani MLO also indirectly lent financial support to the Syndicate through the income that flowed from Khanani to D-Company and the Haqqani Network.

273.    On information and belief, Khanani and the Khanani MLO transferred at least two-point-five percent (2.5%) of the total income of the Khanani MLO each year to the Haqqani Network, and at such rate, each Defendant directly or indirectly facilitated at least $100,000, each year from 2008 through 2016, which U.S. Dollars flowed through Defendants' New York branches, including SCB New York, DBTCA, and Danske New York, to help the Khanani MLO earn income by servicing its clients while knowing that the Khanani MLO would necessarily, and inevitably, pay the Haqqani Network's 2.5% terrorist "tax" as a direct and foreseeable result of Defendants' deliberate facilitation of Khanani MLO transaction activities.

---

[248] Plaintiffs' belief that Khanani's kickback percentage to Dawood Ibrahim was most likely 10 percent is based upon prevailing practices of every Syndicate member from 2008 through 2016, each of whom followed a similar mafia-like playbook, under which 10-20 percent of a terrorist cell leader's net income was transferred to the person on top of them in the organization. Here, Ibrahim was the only person who outranked Khanani in D-Company and therefore the person Khanani had to pay.

[249] To avoid confusion, such "donations," "respect payments," or *Zakat* from terrorist financers like Khanani to the Haqqani Network were different from the "protection payments" that the Haqqani Network charged western contractors and the like. On information and belief, the Haqqani Network's rate assessed to people like Khanani was 2.5%, while the Haqqani Network's "protection payments" rates ranged from 10%-20% and were often more.

274.     On information and belief, each Defendant's facilitation of the Khanani MLO's illicit services collectively caused more than $500,000 in value of Khanani MLO "tax payments" or "donations" to flow into the terrorist budgets of the Haqqani Network from 2008 through 2016, and the Khanani MLO directly transferred at least several million U.S. Dollars to the Haqqani Network each year during this period, which "tax payments" and donations" were ***in addition to*** the vast sums of terrorist finance that the Khanani MLO managed, moved, and concealed on the Haqqani Network's (and other Syndicate FTOs') behalf.

275.     *Fifth*, one key feature of the Khanani MLO's strategy was that it did not segregate terrorist customers' money but, instead, co-mingled the funds into one pot of money, for the benefit of all Khanani MLO's customers. Because money is fungible, and the Khanani MLO regularly made payments to each Syndicate member, every time any Defendant aided Khanani or the Khanani MLO it was, by definition, aiding the Syndicate because it was helping their agent manage their money.

276.     *Sixth*, because the Khanani MLO comingled the money of al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and its other terrorist customers, and then reinvested such commingled funds through commercial and real estate ventures to "clean," protect, and grow the money, the Khanani MLO effectively functioned as a terrorist finance investment vehicle, through which each terrorist customer was paid shares of Khanani MLO "clean" money in proportion to the money they put into the Khanani MLO. As a result, ***every*** Khanani MLO-related transaction aided the flow of terrorist finance to al-Qaeda and the Haqqani Network (and the Taliban through it), as well as Lashkar-e-Taiba and D-Company, based on their respective "shares" of the Khanani MLO's commingled, reinvested funds.

277.    *Seventh*, the Khanani MLO helped al-Qaeda, the Haqqani Network (and through it, the Taliban), Lashkar-e-Taiba, and D-Company manage and diversify their vast narco-terrorist-related financial operations and income streams through a number of means including, but not limited to, facilitating each group's ability to: (1) diversify the geographies in which they operated, which provided operational and law enforcement risk diversity; (2) diversify the strategies they deployed to conceal their terrorist finance amongst a range of vehicles, including real estate and commercial services; and (3) diversify their financial partners, by maintaining a mix of global financial institutions (the SCB, Deutsche Bank, and Danske Bank Defendants) and money remitters (Placid Express and Wall Street Exchange). This diversification aided each group's and the Syndicate's ability to raise and protect its money.

278.    Thus, even for Khanani-related transactions that did not directly or indirectly touch on Afghanistan, Pakistan, or the U.A.E., Defendants' provision of financial services to Khanani still aided al-Qaeda's and the Haqqani Network's terrorist campaign against Americans in Afghanistan by aiding both groups' broader management of their (and the Taliban's) finances, which allowed the Syndicate, like any other transnational organization, to spend more money on what it prized most: attacking Americans in Afghanistan. At the scale at which Khanani operated, even marginal improvements in the Syndicate's financial portfolio promised enormous resources to attack Americans in Afghanistan. For example, even if the Syndicate's financial diversification through Khanani only improved its overall portfolio performance by one-tenth-of-one percent (0.1%) – which is a fraction of what is ordinarily accomplished by diversification and was likely much less than the results Khanani produced – such an outcome helped the Syndicate repatriate at least several hundred thousand additional U.S. Dollars per year.

279.    Simply put, any time a bank or money transmitter helped Khanani engage in any transaction anywhere in the world it was directly or indirectly aiding-and-abetting terrorist attacks against Americans in Afghanistan because al-Qaeda, the Haqqani Network (and through them, the Taliban), Lashkar-e-Taiba, and D-Company all were effectively "shareholders" of the Khanani MLO and, as a result, owned a direct percentage of every Khanani MLO dollar.

### 2.    VAT Fraud Cells

280.    Since the 2000s, al-Qaeda and the Taliban have raised funds to finance terrorist attacks through tax fraud schemes, usually seeking to fraudulently obtain refunds of VAT. Such trends have continued through the present.

281.    VAT is similar to U.S. sales taxes in the sense that it is calculated as a percentage of the purchase price of a good. The difference between VAT and sales tax is that sales taxes ordinarily are charged only to end consumers, while VAT is paid at each step along a chain of distribution, with each purchaser paying the increment of VAT that corresponds to the value it adds to a sale. Taxing authorities manage this by requiring every seller in the chain to collect VAT based on the price it charges its buyers, and permitting that seller to deduct any VAT it paid to acquire the product. For example, imagine a distributor that buys a cell phone from a manufacturer, and then sells the cell phone to a retailer. The distributor pays VAT to the manufacturer at the time it purchases the phone (which the manufacturer remits to the taxing authority), and the distributor then charges VAT to the retailer when it sells the phone (which the distributor then remits to the taxing authority). Because the distributor is only supposed to pay VAT on the amount of value it adds to the transaction, the distributor can then seek a refund of any VAT it paid to the manufacturer.

282.    Because the European Union consists of many taxing authorities with different VAT rates, it is possible to engage in fraud by moving goods across borders through a chain of

sham businesses issuing fake invoices that give the appearance that VAT was paid when it was not. The sham businesses can then seek a refund of the VAT that they falsely claimed to have paid in another country, causing governments to issue refunds that they should not. By the time the government figures out what has happened (which often involves an investigation across multiple borders), the sham business will usually be dissolved and the fraudsters will have moved on to a new scheme.

283. By 2006, the Syndicate had developed a sophisticated infrastructure to train VAT fraudsters to create a new stream of terrorist finance. Al-Qaeda and the Taliban maintained "research departments" to identify the best strategies and organized "VAT fraud boot camps" to train a younger generation of terrorists in Afghanistan and Pakistan, who subsequently set up fundraising cells in Europe for the express purpose of sending money back to the Syndicate to attack and kill Americans in Afghanistan.

284. Syndicate VAT fraud cells based their fraud on various commodities, including mobile phones. As they grew more sophisticated, they traded carbon emissions credits.[250]

285. These trends continue through the present day. In 2019, for example, Spanish police arrested ten members of a transnational al-Qaeda fundraising cell that committed "tax fraud," which sums it then "laundered" and used for the "financing of terrorism" committed by "Al Qaeda," through the transfer of the fraudulently obtained tax funds "to [al-Qaeda to] provide

---

[250] Michael Day & Tom Bawden, *Briton 'Used Carbon Trading to Fund Terror'*, The Independent (UK) (Sept. 24, 2014), https://www.independent.co.uk/news/uk/crime/briton-used-carbon-trading-to-fund-terror-9754108.html.

sustenance and economic support to [its] terrorist militias" as part of the tax fraud cell's "support" of "Al-Qaeda" and "related" "jihadist terrorist organizations."[251]

286.     The perpetrators of Syndicate-sponsored VAT fraud schemes remitted *at least* 10% of the proceeds to the Syndicate. Some, however, remitted 100% based on the theological logic that VAT was un-Islamic and therefore a pious al-Qaeda terrorist must divert essentially all the resulting money to the jihad.

287.     Samir Azizi and Imran Yakub Ahmed  were both dual-hatted polyterrorist operatives or agents for al-Qaeda and the Haqqani Network. These men received training from al-Qaeda and the Haqqani Network concerning how to: (1) operate a VAT fraud scheme; (2) use global financial institutions to convert the Euros obtained through the VAT fraud into USD, which the Syndicate greatly preferred; and (3) transfer the resulting USD back to the Syndicate in Afghanistan, Pakistan, and the U.A.E. to support attacks against Americans in Afghanistan.

### i.     Samir Azizi and the Azizi Cell

288.     Samir Azizi was a dual-hatted, Afghan-born German operative of Al-Qaeda and the Haqqani Network.  By the time he was sixteen, Azizi led a Syndicate finance cell operating out of Europe and the U.A.E. whose purpose was to generate cash flow for al-Qaeda and the Taliban through financial crime schemes involving global financial institutions. The cell operated from the mid-2000s through 2015. Plaintiffs refer to Azizi and the European and U.A.E. associates who directly participated in his frauds collectively as the "Azizi Cell."

289.     Azizi operated the Azizi Cell consistent with its status as an al-Qaeda and Haqqani Network terrorist finance scheme that relied upon transactions with unethical western

---

[251] Euclid Infotech: Banks and Financial Institution News, *Spain: Disarticulated a Criminal Organization Dedicated Allegedly to the Financing of Terrorism and Money Laundering* (June 19, 2019).

banks to convert such funds to U.S. Dollars to then be repatriated back to accounts controlled by Syndicate agents or operatives to finance attacks against Americans in Afghanistan.

290.    While Azizi had a talent for terrorist finance, he sometimes displayed indiscretion that—when combined with the millions of U.S. Dollars and Euros that Azizi was raising and moving through his schemes, as a young man with no advanced education and no obvious (or even plausible) explanation for the millions sloshing around in his accounts—revealed that his activities were unlawful. For example, Azizi openly discussed fraudulent activities, regularly used aliases that indicated criminal action was afoot, like when Azizi called himself "Al Capone"—the iconic murderous gangster known to criminals around the world as the patron saint of money launderers based on his reputation for having invented the crime.

291.    The German government concluded that Azizi was a Syndicate operative who raised money to support terrorist attacks in Afghanistan. When Germany requested Azizi's extradition, German prosecutors represented to the U.S. government, in support of Azizi's extradition, that "[t]here [were] numerous indications here that the cash flows" generated by the Azizi Cell "[were] used to finance terrorism."[252]

292.    On March 20, 2015, United States Magistrate Judge Howard R. Lloyd granted the U.S. government's motion for a certificate of extraditability concerning Azizi, to extradite him from California to Germany to stand trial for criminal charges arising out of his participation in the Syndicate's VAT Finance Scheme.[253] In his Order, Judge Lloyd found that the German government had represented to the United States that "there were also indicators that [Azizi and

---

[252] *In re Extradition of Samir Azizi*, Formal Request for Extradition, No. 5:14-xr-90282 PSG, at 11 (N.D. Cal. Mar. 20, 2015).

[253] *In re Extradition of Samir Azizi*, Dkt. 60, No. 5:14-xr-90282 PSG (N.D. Cal. Mar. 20, 2015) (Order granting U.S. government's motion for certificate of extraditability concerning Azizi).

the Azizi Cell] were using the VAT [money] procured through such fraud, not only for personal enrichment, but also to finance terrorism."[254]

293.    The linkage between the Azizi and Ahmed VAT fraud schemes in Europe and anti-American terrorist violence in Afghanistan is in fact irrefutable. Coalition special forces recovered direct evidence establishing that both cells had been funding al-Qaeda and the Haqqani Network when they raided what was the cave hideout of a joint al-Qaeda/Haqqani Network cell operating near the Afghan/Pakistan border in 2010 and discovered there documents relating to both VAT fraud cells.

294.    Even before that date, though, U.S. and European counter-terrorist-finance-facing regulators regularly emphasized the direct link between sophisticated tax fraud schemes and terrorist finance, including VAT frauds, and terrorist violence. These statements included, but were not limited to: (1) a statement in 2006 by United kingdom Home Secretary John Reid, reported in the Guardian newspaper as well as other English-language outlets, that drew "an explicit link . . . between fundraising by terrorist groups and the European-wide so-called 'carousel' VAT fraud"[255]; (2) a 2007 report by the Financial Action Task Force noting the need for "an increasing global awareness of the use of carousel style frauds as a vehicle for raising funds for other crimes and terrorism"[256]; (3) the FBI's statement that "criminal organizations engaged in tax fraud schemes that may be tied to" "terrorism"[257]; (4) Pierre Moscovici, the EU's

---

[254] *Id.* at 22.

[255] Alan Travis & Ashley Seager, *Reid Wants Europe to Fight VAT Fraud Linked to Terror Funds*, The Guardian (Oct. 26, 2006), https://www.theguardian.com/politics/2006/oct/26/eu.terrorism.

[256] FATF, *Laundering the Proceeds of VAT Carousel Fraud* 19 (2007), https://www.fatf-gafi.org/media/fatf/documents/reports/Laundering%20the%20Proceeds%20of%20VAT%20Caroussel%20Fraud.pdf.

[257] FBI, *Investigating Tax Refund Fraud*, Press Release, States News Service (Mar. 18, 2014).

Economic and Financial Affairs Commissioner, statement that "cross-border [VAT] fraud 'carousel[s]' … serve[d] to finance criminal activities, including, no doubt, terrorist activities"[258]; (5) the European Commission's statement that "VAT fraud schemes can be used to finance … terrorists"[259]; and (6) the European Parliament's findings that "Europol estimate[d] that around EUR 60 billion of VAT fraud [was] linked to organised crime and terrorism financing" and that "money laundering … assume[d] various forms, and that the money laundered [could] have its origin in various illicit activities, such … tax evasion and fraud," which could foreseeably "be used to finance terrorism."[260] Tom Kirchmaier, a professor and researcher of financial crime at the Copenhagen Business School and the London School of Economics, confirmed the recognized fact that "VAT Money for Jihadists" aided al-Qaeda attacks: "If you are to stop [al-Qaeda] jihadists, you have to stop their financing and this starts with stopping the [VAT fraud] scams."[261]

### ii. Imran Yakub Ahmed and the Ahmed Cell

295.    Imran Yakub Ahmed ("Ahmed"), a British-Pakistani citizen, was the ringleader of another such Syndicate VAT fraud fundraising and finance cell.

---

[258] MENA Report, *Belgium: Opening Remarks by Commissioner Moscovici on the Commission's Proposal on the Import and Trafficking of Cultural Goods* (Aug. 17, 2017), 2017 WLNR 21814135.

[259] European Commission, Press Release, *Fair Taxation*, States News Service (Nov. 30, 2017).

[260] European Parliament Special Committee on Financial Crimes, Tax Evasion and Tax Avoidance, *Report on Financial Crimes, Tax Evasion and Tax Avoidance (2018/2121(INI))*, Co-Rapporteurs Jeppe Kofod and Luděk Niedermayer (Mar. 8, 2019), https://www.europarl.europa.eu/doceo/document/A-8-2019-0170_EN.html ("European Parliament Report").

[261] Yerepouni Daily News (Lebanon), *Danish VAT Money for Jihadists in Syria* (Sept. 12, 2019), 2019 WLNR 27689949.

296.     Imran Yakub Ahmed was a dual-hatted operative of Al-Qaeda and the Haqqani

Network.   He led the Ahmed Cell, which functioned as an al-Qaeda and Haqqani Network front

that was created to raise funds through financial crimes, convert such funds to U.S. Dollars, and

repatriate such freshly laundered dollars back to accounts controlled by al-Qaeda and Haqqani

Network agents and operatives to finance attacks against Americans in Afghanistan.

297.     From the mid-2000s through 2010, the Ahmed Cell raised more than a 1.15

*billion* Euros through VAT fraud schemes aided by complicit financial institutions. In 2017,

Ahmed was convicted by a court in Italy for conspiracy to steal VAT. Plaintiffs refer to Ahmed

and the European and U.A.E. associates who directly participated in his frauds, collectively as

the "Ahmed Cell."

### 3.     The Russian Mafia

298.     Beginning no later than the early 1990s, under bin Laden's personal leadership,

al-Qaeda and the Taliban pursued a close working relationship with the Russian Mafia. The close

partnership between al-Qaeda, the Taliban, and the Russian Mafia was the direct result of bin

Laden's Syndicate vision: he personally oversaw the development of al-Qaeda's relationship

with the Russian Mafia on behalf of the Taliban because he reasoned that the Taliban (and by

extension, al-Qaeda) could convert their control over Afghanistan's opium market into a reliable

source of terrorist finance for al-Qaeda and its affiliates, through close partnership with the

Russian Mafia.

299.     Foremost among Russian Mafia groups was the Solntsevskaya Group, which was

Russia's largest transnational narco-terrorist cartel, and routinely committed acts of international

terrorism itself. The Group was led by notorious narco-terrorist and Russian Mafia "boss of

bosses" Semion Mogilevich, who was publicly described by media outlets as "one of the world's

most dangerous terrorists,"[262] notoriously nicknamed "the face of Russian organised crime," and the "Brainy Don" because of his reputation for ruthlessness, business prowess, and possession of an economics degree. Plaintiffs refer to Solntsevskaya Group and Mogilevich collectively as the "Russian Mafia" because they *were* (and remain) the Russian Mafia.

300.     At all relevant times, the Russian Mafia was expressly hostile to the United States. For example, according to journalist Craig Unger, "Mogilevich made no secret of the contempt he had for the United States" and his view that America was "the enemy."[263] Mogilevich was known as a powerful gangster to the FBI since the 1990s (the agency issued a report about him in 1998 saying as much), and on October 21, 2009 was placed on the Ten Most Wanted Fugitives list. At the time, FBI agents commented that Mogilevich "has access to so much, including funding, including other criminal organizations, that he can, with a telephone call and order, affect the global economy."[264]

301.     From the late 1990s through 2016, al-Qaeda and the Taliban employed the Russian Mafia as one of their agents that, alongside Khanani and the Khanani MLO, managed a substantial portion of the Syndicate's terrorist finance operations each year, including those relating to opium.

302.     Yossef Bodansky served as the director of the Congressional Task Force on Terrorism and Unconventional Warfare. In his pre-9/11 book, *bin Laden*, Mr. Bodansky presciently warned about the dire looming threat from al-Qaeda, which he attributed, in part, to

---

[262] Lyndsey Telford, *Tape Reveals Slain Journalist Probing Putin Link to Terrorist*, Irish Independent (Jan. 24, 2015), 2015 WLNR 2357960.

[263] Craig Unger, *House of Trump, House of Putin* 108 (Dutton 2d. ed. 2019) ("Unger").

[264] CNN, *FBI: Mobster More Powerful Than Gotti* (Oct. 24, 2009), https://www.cnn.com/2009/CRIME/10/24/mogilevich.fbi/.

its agent/principal relationship with the Russian Mafia, which allowed al-Qaeda to leverage the

Russian Mafia's existing geographies, relationships, competencies, resources, smuggling routes,

corrupt relationships, and safe houses to kickstart the Syndicate's growth as a terrorist enterprise:

> bin Laden and the Russian Mafia have ***established yet another complex money laundering operation*** described by an insider as "an extended and octopus-like network***"*** … These funds are ***used to finance the Taliban [] and a host of Islamist terrorist operations***. Bin Laden makes a commission on these transactions, ***which is laundered by the Russian mafia*** … Bin Laden administers and manages [the Taliban's opium profits]—***laundering them through the Russian Mafia***—in return for a commission of between 10 and 15 percent…[265]

303.    The agency relationship described by Mr. Bodansky continued through 2016,

tended by Sirajuddin Haqqani and a host of other Syndicate terrorists. Indeed, according to Mr.

Zarate, "As [Transnational Criminal Organizations] grow more interconnected in ways that

transcend national boundaries," "the ability of such [Transnational Criminal Organizations] to

provide their infrastructure and expertise to" "terrorists" "raises the specter of alliances of

convenience and profit aligned dangerous against the United States. The reach of the Russia-

based organized crime network of Semion Mogilevich is a stark example of this point."[266]

304.    The Russian Mafia's services as al-Qaeda's and the Haqqani Network's money

laundering agent was notorious for decades. For example, in 2002, Mark Galeotti explained that,

because al-Qaeda's "underground banking system" was "under serious threat [after 9/11] and

brokers [were] being deterred from handling their money," "[t]he Russians [could] and [did]

***offer the services of their own huge and well-established money laundering operations***, which

---

[265] Yossef Bodansky, *Bin Laden: The Man Who Declared War on America* 315 (Forum 1999) (emphasis added) ("Bodansky, *Bin Laden*").

[266] Zarate, *Treasury's War*, at 379.

already deal[t] *securely and efficiently* with *much larger sums* than the [Syndicate] terrorists need to move."[267]

305.     From the late 1990s through 2016, public statements from U.S. and Russian government officials, and regular media reports, documented allegations that the Russian Mafia, including but not limited to Mogilevich, served as an agent of al-Qaeda and the Taliban for financial crime purposes, while also being partners in the Syndicate-Russian Mafia opium joint venture. These reports alerted Defendants to the Russian Mafia's agency relationship with al-Qaeda and the foreseeable risk that Russian Mafia-related laundering transactions were laundering al-Qaeda money.

306.     Beginning in the late 1990s, al-Qaeda, the Taliban, and the Russian Mafia intensified their close working relationship into, effectively, a terrorist joint venture through which a two-way "Afghanistan-to-Russia Opium Pipeline" flows. From Afghanistan-to-Russia, Afghan opium flowed from the Taliban in Afghanistan and Pakistan to the Russian Mafia in Russia and other parts of Central Asia and once received, through the Russian Mafia, to Europe, Africa, and the Middle East; from Russia-to-Afghanistan, Russian weapons, explosives, and freshly laundered money (usually converted from other currencies into U.S. Dollars) flowed back to al-Qaeda and the Taliban.

307.     From 9/11 through the present, the Syndicate has maintained an exclusive or nearly exclusive opium supply relationship with the Russian Mafia, who trust one another after decades of close partnership. Moreover, the Taliban and Russian Mafia are bonded by the practical reality that, of the world's major opium-growing regions, Afghanistan offers – by far – the closest and most secure smuggling route to Russia and, through Russia, to the rest of Central

---

[267] Mark Galeotti, *Crime Pays*, World Today (Aug./Sept. 2002), 2002 WLNR 16294207.

Asia, Europe, and the Middle East. As a result, al-Qaeda, the Taliban, and the Russian Mafia have found it in their own mutual interest to pursue a decades-long joint venture to manage and regulate the world's opium trade, playing much the same role as OPEC does with oil.

308.     From 9/11 through the present, approximately ninety-five percent (95%) of all opium sold in Russia, Central Asia, the Middle East, and Europe flowed through the same pipeline: from the Taliban (who grew it), then to al-Qaeda and the Haqqani Network (who worked with Syndicate members and al-Qaeda affiliates like D-Company to export it), then to the Syndicate's long-standing joint venture partners in the Russian Mafia (who took it to the world market and helped launder the resulting proceeds).

309.     In March 2009, Russian Federal Drug Control Service Director Viktor Ivanov publicly stated that: (1) "Afghanistan [] produce[d] 95% of the opium in the world"; and (2) "[d]rug trafficking from Afghanistan seriously affect[ed] Russia" because approximately "90% of Russian drug addicts use[d] heroin compared to just 10% in European countries."[268]

310.     The Russian Mafia, al-Qaeda and the Taliban pursued their joint venture under the leadership of Mogilevich, bin Laden, and Jalaluddin Haqqani (and later Sirajuddin Haqqani).

311.     From the late 1990s through 2016, media reports regularly documented allegations that the Russian Mafia, including but not limited to Mogilevich, served as an agent of al-Qaeda and the Taliban for financial crime purposes, while also being partners in the Syndicate-Russian Mafia Opium Joint Venture.

---

[268] Interfax Russia & CIS Military Newswire, *Afghan Drugs Problem Has No Military Solution – FSKN Chief* (Mar. 24, 2009).

### 4.     Tribute from Warlords like Hikmatullah Shadman

312.     From the 2000s through at least 2013, Hikmatullah Shadman was a notorious Taliban-adjacent warlord in Afghanistan who was known to provide, and did in fact provide, financial and logistical support to the Taliban, including its Haqqani Network. As such, Shadman fit the classic high-threat terrorist finance profile of someone who, while not a member of the Syndicate himself, had direct and notorious connections to the Taliban.

313.     Shadman's criminal enterprise relied on USD transactions. Shadman was paid in USD, Shadman relied upon USD-denominated financial services, and Shadman regularly made bulk USD cash payments to Syndicate organizations in amounts of at least $30,000, usually denominated in $100 bills.

314.     Shadman's criminal enterprise depended upon regular bulk cash payments to the Taliban and Haqqani Network, including direct cash "tax" payments to the Taliban and the Haqqani Network, which were enforced as part of the Syndicate's monopoly on the criminal activity, including protection rackets and money laundering enterprises, upon which Shadman's business depended.

315.     Shadman's ability to access and distribute money from his accounts with financial institutions like Defendants was critical to Shadman's ability to fund Taliban and Haqqani Network operations. As a former forensic accountant from Task Force 2010 explained:

> The greater impact was civil forfeiture – taking the money away. Attack the money of aiders and abettors, not just beneficiaries, along the lines of the chain. Petraeus' "money as a weapons system" was right; it's also a weapon if you take it away. … An example was Hikmatullah Shadman, who was criminally indicted in 2015. … We attacked 2 accounts that added up to $70 million.… That's using money as a weapon. Follow and attack the money.[269]

---

[269] Office of the Special Inspector General for Afghanistan Reconstruction, LL-03 – U.S. Perception and Responses to Corruption in Afghanistan, Lessons Learned Record of Interview,

316.     U.S. government investigators found that Shadman transferred money to a notorious Taliban money launderer who had been linked to one or more suicide bombings committed by the Syndicate.

317.     The U.S. government also determined that Shadman made regular "tax" payments of his Afghanistan-related income to the Taliban, including its Haqqani Network, as part of the Taliban's extortion rackets in Afghanistan and Pakistan.

### 5. Iran's Terrorist Sponsors:  The National Iranian Oil Company (NIOC) and National Iranian Tanker Company (NITC)

318.     In this Complaint, Plaintiffs allege that Defendants Standard Chartered Bank and Deutsche Bank knowingly routed hundreds of millions of U.S. Dollars to the IRGC, including its Hezbollah Division and Qods Force, through USD-denominated transactions involving Standard Chartered Bank, SCB Dubai, and SCB New York (for the SCB Defendants), and similar USD-denominated transactions conducted by Deutsche Bank, DB Dubai, and DBTCA that directly or indirectly facilitated illicit transactions by two long-term fronts for Hezbollah and Qods Force funding and supply operations in support of Iranian proxies.

319.     To lay the foundation for those allegations, Plaintiffs first outline the relevant Hezbollah and Qods Force fronts, agents, operatives, and cut-outs whom al-Qaeda and the Taliban relied upon, through their alliance with Hezbollah and the Qods Force, to serve as an additional stream of terrorist finance that was nearly equal to the value of every Defendant's – even Deutsche Bank's – aid to the Syndicate.

---

*Interview with Thomas Creal, Former Forensic Accountant on Task Force 2010*, at 1 (Mar. 23, 2016).

320.    To support their shared terrorist campaign against Americans in Afghanistan, al-Qaeda, the Taliban, and the IRGC, including its Hezbollah Division and Qods Force, followed similar strategies to satisfy the transnational financial, operational, and logistical needs required by their campaign against the United States in Afghanistan.

321.    For the IRGC, including its Hezbollah Division and the Qods Force, resourcing Iran's alliance with al-Qaeda and the Taliban did not call for anything unusual, merely that Hezbollah, the Qods Force, and the Regular IRGC do what they have done since Iran created each: rely heavily upon *criminal* financial institutions and *criminal* corporate partners, which Hezbollah and the Qods Force relied upon to provide "cover" to facilitate, among other things:

(i)     illicit financial transactions to acquire and distribute U.S. Dollars, e.g., laundering and recycle U.S. Dollar-denominated drug profits to finance Hezbollah operations;

(ii)    illicit purchases of embargoed American technology, e.g., bulk purchasing thousands of black market secure American mobile phones;

(iii)   illicit movement of terrorist operatives, e.g., a Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company;

(iv)    illicit safe havens, e.g., a fictitious company used as cover for an al-Qaeda safehouse in Afghanistan; and

(v)     illicit cache sites, e.g.,  Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company.

322.    From 2006 through 2021, the Regular IRGC funded Hezbollah and the Qods Force through several primary means, including, but not limited to, the Regular IRGC's overall budget, and the Regular IRGCs "off-books" slush funds, which the IRGC financed through its mafia-like system for extracting value out of every conceivable transaction in order to finance the IRGC's terrorist campaign against Americans in Afghanistan and Iraq.

323.    From 2006 through 2021, Hezbollah and the Qods Force also funded their own – and one another's – operations, logistics, and personnel through their shared fundraising and

logistics networks and cells.  Most commonly, joint cells operating in Dubai, and comprised Hezbollah and Qods Force operatives, coordinated a vast effort to source the precious U.S. Dollars, state-of-the-art American technologies, and irreplaceable services it needed from the United States by leveraging the IRGC's relationships with the corporate criminal community – in which Defendants Standard Chartered Bank and Deutsch Bank had especially notorious reputations for criminality.

324.    To provide al-Qaeda and the Taliban with every manner of material support one can offer, the IRGC relied on its Hezbollah Division and Qods Force to deploy both FTOs' global terror networks, which, by 2006, were already heavily integrated around the world as a result of, among other things, both groups applying the lessons they had learned from their attempted terrorist attacks against Americans and Israelis from 2001 through 2006 in Iraq, Afghanistan, Lebanon, and Israel (one relevant lesson here: joint cells produce more reliable supply and logistical chains, while also giving the IRGC more visibility and control (through Hezbollah) of its local proxies without harming the IRGC's core "plausible deniability" mantra.

325.    As a result, from 2006 through 2021, Hezbollah and the Qods Force ordinarily applied the same joint cell approach that worked for its operatives in like Iraq and Syria thinking, correctly, that the organizational efficiencies generated by the joint cell model are even greater in the financial and logistical setting. As set forth below, Hezbollah and the Qods Force jointly raised money and supported the logistical needs of the IRGC's proxies, including al-Qaeda and the Taliban, by arranging industrial-sized channels of financial and logistical support through a litany of notorious fronts and cut-outs, all of which served only one purpose:  to source the huge amounts of U.S. Dollars and American technologies upon which Hezbollah, the Qods Force, al-

Qaeda, and the Taliban all relied to sustain their shared terrorist campaign against Americans in Afghanistan.

326.    As a notorious front for Hezbollah and the Qods Force, funds and weapons (including weapons components) provided to NIOC and NITC through its financial and/or commercial transactions inevitably flowed through NIOC and NITC to both Hezbollah and the Qods Force, regardless of which IRGC component had the "first taste" of the value in question because both FTOs' master – the Grand Ayatollah – has always demanded that his IRGC terrorists share with one another and treat each other equitably.

327.    From 2006 through 2021, Hezbollah and Qods Force operatives ordinarily followed the Ayatollah's "share with one another" approach to support their key financial and logistical needs.  As a result, Hezbollah and the Qods Force ordinarily received a significant percentage of any financial support (including U.S. Dollars) or logistical support (including embargoed American technologies) that flowed to the other, and in roughly equal percentages.

328.    Under longstanding IRGC doctrine, which Hezbollah and the Qods Force always followed from 2001 through 20201, Hezbollah, the Qods Force, and the Regular IRGC were constitutionally required, in effect, to regularly allocate a percentage of all their assets, including their funds, to support the "resistance" (i.e., proxy terrorist) movements that sought to "challenge" (i.e., attack through terror) the "oppressors" (i.e., the U.S. and Israel) that Hezbollah and the Qods Force sponsored pursuant to both FTOs' obligations under Iran's constitution to export the revolution by targeting Americans for terrorist violence.

329.    Accordingly, a broad consensus of counter-terrorism professionals would usually reach two basic conclusions – and recommend U.S. government actions based upon such conclusions – when confronted with information suggesting that Hezbollah or the Qods Force

obtained money, weapons, or technology through an illicit commercial transaction pursued by a cell in an overseas financing or logistical hub like the U.A.E., South Africa, U.K., or Germany.

330.    *First*, because of the institutional sharing of funds, arms, and supplies between Hezbollah and the Qods Force, both FTOs would almost certainly be expected to receive a material share of any windfall that the other engineers through an illicit commercial deal because it would be an affront to the Ayatollah himself for one IRGC component not to share with the other in such circumstances.

331.    *Second*, considering Hezbollah's and the Qods Force's legal mission under Iran's constitution to support "resistance movements" who "challenge" the "oppressors" – i.e., IRGC terrorist proxies, like al-Qaeda and the Taliban, who attack Americans or Jews in the Middle East – Hezbollah and the Qods force would almost certainly eb expected to share a material portion of any financial or technical "scores" that either IRGC component obtained through illicit commercial deals with key IRGC proxies who were killing the most Americans at the time, which from 2006 through 2021 meant only two places in the world:  Afghanistan and Iraq.

332.    As a result, from 2001 through 2021, the IRGC, including its Hezbollah Division and Qods Force, ordinarily shared – by redistributing – a portion of every increment of value that Hezbollah and the Qods Force derived from any illicit transaction designed to route money to the IRGC with the IRGC's proxies in Afghanistan and Iraq.

333.    From 2001 through 2011, the IRGC, including its Hezbollah Division, prioritized Afghanistan and Iraq roughly equally, but recognized that the different cultural, religious, ethnic, tribal, political, and historical contexts called for different approaches.  Most of all, Hezbollah and the Qods Force regularly participated directly in attacks against Americans in Iraq.  In Afghanistan, in contrast, Hezbollah and the Qods Force mostly accomplished their terrorist

agenda through proxies (al-Qaeda and the Taliban), but even then, Hezbollah and the Qods Force occasionally jointly committed attacks alongside al-Qaeda and the Taliban.[270] Regardless of how often Hezbollah and Qods Force terrorists jointly participated in attacks in Iraq as compared to Afghanistan, the river of supplies that the IRGC poured into both countries was roughly equal.[271]

334.  After the United States substantially departed from Iraq in 2011, Afghanistan was the only place on earth where the IRGC, including its Hezbollah Division and Qods Force, could still pursue a large-scale terror campaign against the United States in the Middle East in which the IRGC knew it could kill a lot of Americans if it tried.  As a result, from 2011 through 2021, whenever the IRGC, including its Hezbollah Division and Qods Force, obtained any major infusion of funds, technologies, weapons, communications devices, or other items that could aid their terrorist enterprise, the most reasonable "default" assumption was that the IRGC would redeploy most of these resources to support its campaign against Americans in Afghanistan.

335.  With respect to the monetary fruit of their terrorist finance schemes, Hezbollah and the Qods Force ordinarily shared any U.S. Dollars or other currency that either obtained through their shared transnational finance and logistics schemes worldwide, including, but not limited to, the money they earned through their procurement and laundering activities in the United States, U.A.E., South Africa, Lebanon, Germany, and United Kingdom.  For example, if

---

[270] For example, the Qods Force and the Haqqani jointly committed a sophisticated IED attack in Kabul in 2020 in order to retaliate for an earlier American air strike in Iraq that killed Brigadier General Qassem Soleimani, who led the Qods Force for decades until his death in 2020.  Similarly, al-Qaeda, the Taliban, Hezbollah, and the Qods Force jointly committed numerous attacks in the sparsely populated provinces of western Afghanistan, which Hezbollah and the Qods Force used, in effect, as a "live fire" training grounds for al-Qaeda and Taliban (including Haqqani Network) terrorist, meaning, that Hezbollah and the Qods Force helped "train" the al-Qaeda and Taliban terrorists with whom the Hezbollah and Qods Force operatives were co-located by joining with them, and participating in, their attacks against American targets in Afghanistan.

[271] The IRGC's distribution of Hezbollah's signature roadside bomb, the explosively formed penetrator (or "EFP") was the primary exception to the IRGC's (including its Hezbollah Division and Qods Force's)

Hezbollah or the Qods Force obtains a major terrorist finance "win" in a key overseas hub, e.g., a $100 million transfer in Dubai, most counter-terrorist finance practitioners would ordinarily expect Hezbollah and the Qods Force toe each receive a significant share of the windfall.

336.    With respect to the technological fruit of their terrorist diversion schemes, Hezbollah and the Qods Force applied the same "share with each other" approach to meet each FTOs' vast logistical needs:  front and center of which was ensuring the river of IRGC financial, technical, and operational support for its al-Qaeda and Taliban proxies in Afghanistan remained flowing at all times.

337.    Iran created the National Iranian Oil Company and National Iranian Tanker Company to fund the export of the Iran's Islamist Revolution around the world, meaning, to support anti-American terror operations in the Middle East in order to drive the United States out of the region.

338.    The National Iranian Oil Company ("NIOC") has been sanctioned by the U.S Department of the Treasury's Office of Foreign Assets Control ("OFAC") under four Treasury Department programs: Iranian Transactions and Sanctions Regulations, 31 CFR part 560 ("IRAN"); Iran Freedom and Counter-Proliferation Act of 2012 ("IFCA"); Iranian Financial Sanctions Regulations ("IFSR"); and Global Terrorism Sanctions Regulations ("SDGT").  Its OFAC listing specifies that it is linked to Iran's Islamic Revolutionary Guard Corps Qods Force ("IRGC-QF").[272]

---

[272] 272 U.S. Department of the Treasury Office of Foreign Assets Control, Sanctions List (Updated 2/10/2022) https://sanctionssearch.ofac.treas.gov/details.aspx?id=11317.

339.    The National Iranian Tanker Company ("NITC") is a subsidiary of NIOC.[273] It too is sanctioned by the Department of the Treasury's Office of Foreign Assets Control ("OFAC"). It is sanctioned under the same four programs as NIOC (IRAN, IFCA, IFSR, and SDGT). Its OFAC listing specifies that it is linked to IRGC-QF.[274]

340.    NIOC's and NITC's purpose were to raise funds and obtain weapons (including weapons components) for IRGC terrorist proxies that the IRGC supplied through its Hezbollah Division and Qods Force.

341.    At all times, NIOC and NITC have been led by an agent or cut-out for the IRGC, including its Hezbollah Division and Qods Force, and has served as a central hub of Hezbollah and Qods Force fundraising and logistics, which value has flowed through to al-Qaeda and the Taliban, including its Haqqani Network, to facilitate attacks against Americans in Iraq.

342.    On September 24, 2012, Treasury Department identified NIOC as an agent or affiliate of the IRGC,[275] and described the IRGC's use of NIOC as follows:

> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil … NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.
>
> Under the current Iranian regime, the IRGC's influence has grown within NIOC. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds

---

[273] U.S. Department of the Treasury, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force* (October 26, 2020) https://home.treasury.gov/news/press-releases/sm1165.

[274] U.S. Department of the Treasury Office of Foreign Assets Control, Sanctions List (Updated 2/10/2022) https://sanctionssearch.ofac.treas.gov/details.aspx?id=15117.

[275] U.S. Department of the Treasury, Frequently Asked Questions (February 6, 2013) https://home.treasury.gov/policy-issues/financial-sanctions/faqs/266.

operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC. As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.[276]

343. On November 8, 2012, OFAC added NIOC to its Specially Designated Nationals ("SDN") List in implementation of Sections 214 through 216 of the Iran Threat Reduction and Syria Human Rights Act of 2012.[277]

344. On September 4, 2019 the Treasury Department acted against "a large shipping network that is directed by and financially supports the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy Hizballah" using oil originating with NIOC and NITC. The Treasury Department described the scheme benefiting IRGC-QF and Hezbollah as follows in its press release:

> Over the past year, the IRGC-QF has moved oil worth hundreds of millions of dollars or more through this network for the benefit of … Hizballah, and other illicit actors. Senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi oversees this sprawling network, which features dozens of ship managers, vessels, and facilitators. … The IRGC-QF … relies heavily on Hizballah officials and front companies to broker associated contracts. …
>
> ["]Treasury's action against this sprawling petroleum network makes it explicitly clear that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, the IRGC-Qods Force," said Treasury Secretary Steven Mnuchin. "Our actions over the last two weeks should serve as a strong warning to anyone considering facilitating the Qods Force's oil sales that there will be swift consequences."

---

[276] U.S. Department of the Treasury, Press Release, *Treasury Submits Report To Congress On NIOC And NITC* (September 24, 2012) https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

[277] U.S. Department of the Treasury, Press Release, *Update to the Iranian Financial Sanctions Regulations; Iran Sanctions Designations; Non-proliferation Sanctions Designations; Anti-terrorism Designations; Non-proliferation Sanctions Designations Updates; Anti-terrorism Sanctions Designations Updates* (November 8, 2012) https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20121108.

"The Iranian regime is leveraging a terrorist organization as its chief conduit for obfuscating and selling hundreds of millions of dollars of illicit oil to fuel its nefarious agenda. Iran's exportation of oil directly funds acts of terrorism by Iranian proxies …," said Sigal Mandelker, Under Secretary for Terrorism and Financial Intelligence. "This vast oil-for-terror shipping network demonstrates how economically reliant Tehran is on the IRGC-QF and Hizballah as financial lifelines. The international community must vehemently reject Iranian oil and related products in the same way that it rejects the violent acts of terrorism these networks fund." …

Today, OFAC is announcing the designation of some 16 entities and 10 individuals pursuant to E.O. 13224, and is also identifying 11 vessels as property in which blocked persons have an interest. The IRGC and Hizballah, both identified as Foreign Terrorist Organizations by the U.S. Department of State under Section 219 of the Immigration and Nationality Act, are also designated pursuant to E.O. 13224.

OFAC SHIPPING ADVISORY

Today OFAC also issued a new advisory to the maritime community to warn of the risks involved with participating in illicit schemes such as the IRGC-QF's oil-for-terror shipping network. This advisory is in addition to the Maritime Petroleum Shipping Community issued by OFAC on March 25, 2019, which warns of sanctions risks related to oil shipments to Syria, including those from Iran.

IRGC-QF NETWORK OVERSIGHT

The IRGC-QF's highest-ranking officials have long overseen exports of Iranian oil, often masking its origins and sending it to the Syrian regime or IRGC-QF proxies across the region.

IRGC-QF Commander Qasem Soleimani (Soleimani) supervises fellow IRGC-QF official Rostam Qasemi, who has continued taking advantage of his domestic and international connections in the energy industry since his tenure as Iran's Minister of Petroleum from 2011 to 2013.

IRGC-QF official Rostam Qasemi, who is also the head of the Iranian-Syrian Economic Relations Development Committee, manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil. Qasemi relies on trusted IRGC-QF officials and associates to run the network, including his son, Morteza Qasemi. Morteza Qasemi has helped finalize the network's oil contracts.

Ali Qasir, a Lebanese national and IRGC-QF associate, also serves as a lynchpin for this IRGC-QF-orchestrated network. His responsibilities for the network's

financial affairs include negotiating sales prices for the goods and settling vessel-related payments. Additionally, Ali Qasir assigns vessels to conduct shipments for the network based on the IRGC-QF's guidance. …

CONNECTIONS WITH THE IRANIAN ENERGY, SHIPPING, AND INSURANCE SECTORS

The crude oil and condensate sold by this IRGC-QF network originates with the National Iranian Oil Company (NIOC), and ultimately is delivered to Syria. The IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things.

National Iranian Tanker Company (NITC) vessels have been used in the IRGC-QF-run operation. These vessels include the DESTINY, the HAPPINESS I, and the SINOPA, which were identified on November 5, 2018, as blocked property in which NITC has an interest. The DEVREZ and the DELICE also were identified on that day as blocked property in which the Islamic Republic of Iran Shipping Lines (IRISL) has an interest. …

TIES TO HIZBALLAH AND ASSOCIATED FRONT COMPANIES

The IRGC-QF also uses several front companies to mask its role in selling the crude oil, condensate, and gas oil. The companies are overseen by Hizballah officials Muhammad Qasir and Muhammad Qasim al-Bazzal (al-Bazzal), both of whom were designated pursuant to E.O. 13224 in 2018 in connection with another oil-for-terror scheme.

345. NIOC and NITC funds IRGC terrorist proxies in Afghanistan, through the fundraising and logistical support that flows through Hezbollah and the Qods Force.

### 6. Other Syndicate Operatives and Financiers

346. In addition to the foregoing examples, the Syndicate also relied on others who did business with Defendants. These included:

347. Mustafa Ahmed al-Hisawi, al-Qaeda's paymaster, and a key lieutenant of 9/11 mastermind Khalid Shaikh Mohammed.

348. Mamoun Darkazanli and Mamdouh Mahmud Salim were al-Qaeda supporters, operatives, and fundraisers who were members of al-Qaeda's notorious cell in Hamburg,

Germany that raised funds, helped source technology, and acted as close confederates of Osama bin Laden.

349.    "Viktor Bout, the 'Merchant of Death'" "reigned as the world's most notorious arms merchant for nearly two decades,"[278] who was from the 1990s through his detention in 2008 a known agent and facilitator for al-Qaeda and the Taliban, whom he served as a client from the 1990s through 2008. Bout sourced weapons, explosives, and other key items for al-Qaeda and the Taliban's terrorist enterprise, using shell companies in the United States to operate a worldwide arms smuggling empire, and to transport Syndicate gold and opium. On November 2, 2011, Bout was convicted for providing material support to terrorists. Commenting on the conviction, Congressman Ed Royce stated that Bout had "done irreparable damage across the world - arming insurgents, militias and terrorists," and that his "'Merchant of Death' moniker was well-earned" on account of, among other things, the fact that Bout "armed the Taliban."[279] Bout is currently serving his 25-year sentence in federal prison.

350.    Abdul Baqi Bari, a member of al-Qaeda, the Taliban, and the Haqqani Network who also worked directly for Jalaluddin Haqqani as a "right hand" man, and as a money launderer and financial manager who used Pakistani banks to secure and manage millions of USD for the Taliban, and to distribute the Taliban's money to al-Qaeda and Taliban terrorists to attack Americans in Afghanistan. After 9/11, Bari played a key role as al-Qaeda guided the Taliban in its post-9/11 transformation from failed illegitimate regime to key cog in al-Qaeda's terrorist Syndicate. Bari was directly tasked by Mullah Omar and the Haqqanis with managing a

---

[278] Zarate, *Treasury's War*, at 119.

[279] States News Service, Press Release from Congressman Ed Royce, *Royce Commends Guilty Verdict in Trial of International Arms Dealer Viktor Bout "Justice Served," Says Terrorism Chair* (Nov. 2, 2011).

network of businesses in Afghanistan, Pakistan, the U.A.E., and Europe that existed for the sole purpose of financing, funding, and logistically supporting terrorist attacks against Americans in Afghanistan. On May 17, 2012, the Treasury Department sanctioned Bari based on findings that substantially track Plaintiffs' allegations.[280]

## B. Deutsche Bank Enabled Syndicate Terrorist Finance

351.     From 2009 through 2016, Deutsche Bank Defendants knowingly and directly transmitted at least $59,326,477 to Syndicate agents and operatives. During this time, Deutsche Bank transferred at least $49,787,832 to Khanani and the Khanani MLO, at least $8,568,060 to Samir Azizi and the Azizi Cell, likely at least $10,000,000 to Imran Yakub Ahmed and the Ahmed Cell, and at least $970,585 to Mamoun Darkazanli and Mamdouh Mahmud Salim (the Hamburg Cell).

352.     The table below summarizes Plaintiffs' allegations concerning Deutsche Bank's direct financial aid to the Syndicate through a litany of long-term relationships with notorious Syndicate fronts, shell companies, operatives, agents, or business partners.

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | DB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Altaf Khanani and the Khanani Money Laundering Organization | 2009-2016 | $49,787,832 minimum (likely at least $100,000,000) | Deutsche Bank<br>DB Moscow<br>DB New York (DBTCA)<br>DB London |
| Samir Azizi and the Azizi Cell | 2007-2012 | $8,568,060 minimum (likely at least $10,000,000) | Deutsche Bank<br>DB New York (incl. DBTCA)<br>DB Frankfurt<br>DB London |

---

[280] U.S. Department of the Treasury, Press Release, *Treasury Imposes Sanctions on Individuals Linked to the Taliban and Haqqani Network* (May 17, 2012).

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | DB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Imran Yakub Ahmed and the Ahmed Cell | 2005-2010 | Likely at least $10,000,000 | Deutsche Bank<br>DB New York (incl. DBTCA)<br>DB Frankfurt<br>DB London |
| Mamoun Darkazanli and Mamdouh Mahmud Salim (The Hamburg Cell) | 1995-2003 | $970,585 minimum (likely least $2,000,000) | Deutsche Bank<br>DB New York (DBTCA)<br>DB Frankfurt<br>DB London |
| TOTAL | | **$59,326,477 minimum** (likely more than $120,000,000) | |

353. Even this, however, is just the tip of the iceberg, as discovery is likely to reveal Deutsche Bank transferred hundreds of millions of USD to the Syndicate during this time. For decades, Deutsche Bank deliberately served as a terrorist financier for al-Qaeda. While Plaintiffs allege that Deutsche Bank aided a litany of terrorist financiers, that is a separate point. ***Deutsche Bank itself was a financier for al-Qaeda and the Taliban.*** Even against the depraved conduct exhibited by the other Defendants in this case, Deutsche Bank's stands out for one reason: Deutsche Bank affirmatively executed every key component of the Syndicate's end-to-end finance needs for two of its most important income streams.

354. *First*, from 2000 through 2016, Deutsche Bank brazenly operated its own **"Russian Laundromat"** alongside a series of other Deutsche Bank-managed or aided Laundromats in Russia and eastern Europe, including, but not limited to, the **"Moldovan Laundromat"** and the **"Azeri Laundromat."**

355.     Deutsche Bank's "Russian Laundromat" used illicit transactions like "mirror trades"[281] while providing purpose-built, bespoke, end-to-end terrorist finance and fundraising service to the Syndicate, through al-Qaeda and the Taliban via their agents Khanani and the Russian Mafia.[282]

356.     Deutsche Bank's personnel ***directly conspired with known Russian Mafia money launderers*** to custom build a Laundromat that Khanani and the Russian Mafia used to convert al-Qaeda's and the Taliban's sea of Rubles from their Russian opium sales, which were nearly worthless as an instrument of terrorist finance in Afghanistan, into USD, which directly resulted in more Syndicate terrorist attacks and more dead and injured Americans in Afghanistan by leveraging the purchasing power and stability afforded by USD, the "gold standard" of Syndicate terrorist finance.[283]

357.     "[T]he Deutsche Bank 'mirror trading' scheme … used Western banks" to move illicit income "out of Russia."[284] According to award-winning *New York Times* Business

---

[281] Mirror trades are money laundering transactions that can only be enabled by multinational banks. The essence of the transaction is that a company in Russia contacts the trading desk of a multinational bank (*e.g.*, DB Moscow) and buys, with Rubles, shares of a blue chip Russian stock. Around the same time, another company somewhere else calls a foreign trading desk at the same bank (*e.g.*, DB London) and sells the same number of shares of the same Russian stock in USD. The two companies (the buyer and the seller) are in fact owned by the same person. The net effect of the transactions is that Russian Rubles become USD—without scrutiny from currency regulators, tax regulators, or others who could spot cross-border currency flows.

[282] On information and belief, the lead DB Moscow architect of the Russian Laundromat, Mr. Wiswell, is currently evading his widely anticipated arrest and extradition to the United States.

[283] Plaintiffs believe discovery is likely to reveal that Khanani directly or indirectly aided the creation, operation, or refinement, of one or more of Deutsche Bank's Laundromats, including, but not limited to, the Bank's "Russian Laundromat." Thus, for the avoidance of all doubt, Plaintiffs do not mean to imply that Khanani was uninvolved in the creation of the Russian Laundromat.

[284] Anne Applebaum, *A KGB Man to the End*, The Atlantic (July 27, 2020), 2020 WLNR 22507368.

Investigations editor David Enrich's summary of the scheme, the "customer [] participat[ed] in mirror trades with Deutsche to extract rubles from Russia and convert them into dollars, ***using Deutsche's U.S. Operations—DBTCA—as a Laundromat***," after which Deutsche Bank wired the Syndicate's freshly converted and cleansed U.S. Dollars to another high-risk jurisdiction where the "beneficiary" did "with the money as he pleased."[285]

358.     Deutsche Bank's services were essential to the Russian Laundromat. The Syndicate, through Khanani and the Russian Mafia, needed to clean an avalanche of opium Dollars, which grew larger as the Syndicate's terrorist campaign intensified. Given the sheer volume of its opium cash flow, the Syndicate (through Khanani and the Russian Mafia) desired a custom-built Laundromat designed to conceal the Syndicate's torrent of cash during the key Russian and eastern European legs of its journey to market before profits (and weapons) could flow back to the Syndicate in Afghanistan and Pakistan.

359.     *Second,* from the mid-2000s through at least 2015, Deutsche Bank assumed a second direct role as a Syndicate financier and fundraiser through the activities of Deutsche Bank's German Laundromat, which the Bank operated through DB Frankfurt, and supported through DB London and DB New York (including DBTCA).

360.     Deutsche Bank's German Laundromat provided end-to-end terrorist finance services to the Syndicate like its Russian Laundromat counterpart. While the Russian Laundromat was all about al-Qaeda and Taliban opium, the German Laundromat was about specially trained al-Qaeda and Haqqani Network fundraising cells who raised tens of millions of U.S. Dollars for the Syndicate through a VAT fraud-based terrorist fundraising and finance

---

[285] David Enrich, *Dark Towers: Deutsche Bank, Donald Trump, and an Epic Trail of Destruction* 232 (Custom House 2020) ("Enrich, *Dark Towers*").

scheme. This scheme involved al-Qaeda and Haqqani Network operatives working hand-in-hand with Deutsche Bank personnel to defraud European governments.

361. Like the Russian Laundromat, Deutsche Bank's financial services were essential to both sides of the terrorist finance equation: (1) Deutsche Bank helped the Syndicate illicitly fundraise through the scheme when it cloaked the Syndicate's fraudulent transactions with the legitimacy of a global financial institution; and (2) thereafter, Deutsche Bank helped the Syndicate illicitly convert the fruit of their theft (denominated in Euros) into the precious U.S. Dollars that the Syndicate required in Afghanistan, Pakistan, and the U.A.E. to support attacks against Americans in Afghanistan.

362. When Deutsche Bank helped its Syndicate customers raise, wash, and transfer tens of millions of U.S. Dollars through its Russian Laundromat and German Laundromat, Deutsche Bank assumed an active operational role in al-Qaeda and its Syndicate affiliates. It was *Deutsche Bank* – not the Syndicate – that took two key affirmative steps that enabled the Syndicate to raise and then move their USD back to the Syndicate to be used in Afghanistan, Pakistan, and the U.A.E. to attack Americans in Afghanistan.

363. With respect to the Syndicate's illicit USD fundraising, it was Deutsche Bank that conducted the coordinated "mirror trades" through the Russian Laundromat that moved the Syndicate's money (through Khanani) out of Russia so that the Syndicate (through Khanani) could convert its largely worthless (for their purposes) Russian rubles into precious USD to fund attacks against Americans. And it was Deutsche Bank, not Azizi or Ahmed, who prepared key documentation that enabled the Syndicate to execute its VAT fraud to raise their desired terrorist funds.

364. With respect to the Syndicate's illicit USD transfers, it was Deutsche Bank, not Khanani, who provided the key non-public information concerning the ***Bank's own controls against terrorist finance***, which the Bank deliberately did to make even more money from its Russian Laundromat by making it easier for the terrorist financiers using it to cover their tracks – and thereby win a larger share of the global "dirty money" business. And it was Deutsche Bank, not Azizi or Ahmed, who approved a host of transactions, as well as overrode the concerns of whistleblowers, to maintain the secrecy of the Syndicate's VAT fraud schemes for years.

365. In two separate multi-year, 9-figure Syndicate terrorist finance schemes, Deutsche Bank twice chose to directly partner with the terrorists by helping them (through their agents and operatives) design and execute both the Syndicate's illicit ***fundraising*** schemes ***and*** their associated illicit ***transfer*** schemes as well – the two sides of the terrorist finance coin.

366. As Mr. Enrich explained, "Deutsche's embrace of a profits-at-any-price approach, its extreme tolerance for risks that were unbearable for most banks, had real-world consequences."[286] Because local currencies were notoriously unstable, violent actors needed "an international currency" to reliably source weapons, and "[t]he U.S. dollar [was] the closest thing to a globally accepted form of money—and Deutsche started helping" terrorist facilitators "get access to gobs of American currency."[287]

367. A broad consensus of independent observers is that Deutsche Bank operated as a Laundromat and was notorious for such conduct amongst the financial services marketplace, media, and its former employees: (1) David Enrich (*New York Times*): "Deutsche Bank" "got in" "trouble for being essentially a laundromat for Russian money"; (2) *Philadelphia Inquirer*:

---

[286] *Id.* at 103.

[287] *Id.*

"Deutsche Bank" "developed a reputation as a laundromat"; (3) *New Yorker*: "Deutsche Bank" helped" "[t]he Moscow Laundromat"; (4) *Evening Standard*: "Deutsche Bank" "process[ed] the cash in" "the UK end of the so-called Laundromat[,]" "[its] Russian money-laundering scam"; (5) *Associated Press*: "Between 2011 and 2014," "21 shell companies[']" "funds were transferred worldwide via 112 bank accounts" "including" "Deutsche Bank" via "a scheme, dubbed Laundromat"; (6) *Newsweek*: "[T]he Global Laundromat" "scheme" "cleaned at least $20 billion," and "[m]ost U.S. banks" "refused to offer banking services[,]" but "Deutsche Bank" "agreed" so "[o]nce again, Deutsche was the entry point for criminal Russian money into the global financial system"; (7) *Bloomberg*: "More than $889 million" was "transferred from Deutsche Bank accounts" "in the" "Troika Laundromat between 2003 and 2017"; and (8) Luke Harding (*Guardian*): "A group of Moscow bankers" "sen[t] cash out of [Russia] via a different route, nicknamed the Global Laundromat[,]" which was "another Russian money-laundering scheme" that "also involve[ed] Deutsche Bank."[288]

368. "For over a decade, Deutsche has been part of almost every high-profile banking scandal."[289] Properly understood, Deutsche Bank's "rampant misconduct was not an accident but the inevitable consequence of the culture, incentives, and neglect emanating from the top of

---

[288] David Enrich, quoted in *Hardball with Chris Matthews for March 15, 2019, MSNBC*, MSNBC: Hardball with Chris Matthews (Mar. 19, 2019), 2019 WLNR 8784955; Philadelphia Inquirer, *Risky Debtedness* (Sept. 30, 2020), 2020 WLNR 27621985; Caesar, *Moscow Laundromat*; Simon English, *Banking Controls Over 'Dirty Money' Laundering Slammed*, Evening Standard Online (Mar. 21, 2017), 2017 WLNR 8783127; Matti Huuhtanen, *Report Reveals $21b Money-Laundering Plan; Scheme Allegedly Linked 21 Firms To 96 Countries*, Associated Press, *republished by* Boston Globe (Mar. 22, 2017), 2017 WLNR 8845066; Luke Harding, *Is Donald Trump's Dark Russian Secret Hiding in Deutsche Bank's Vaults?*, Newsweek (Dec. 29, 2017), 2017 WLNR 39561107; Bloomberg, *The Banks That Are Involved In The Russian Money Laundering Scandal*, Republished by NoticiasFinancieras - English (Mar. 6, 2019), 2019 WLNR 7192074; Luke Harding, *Collusion* 316 (Vintage Books 2017) ("Harding").

[289] New Europe, *Germany Probes Deutsche Bank's Role in Danske-Laundromat Scandal* (October 16, 2019), 2019 WLNR 31204583.

Deutsche."[290] Deutsche Bank followed a "typical plan" whenever one of its criminal schemes was discovered: "Keep quiet, downplay the severity of the problem, and hope everyone gets distracted and moves on."[291]

369.     According to Ulrich Thielemann, a German business ethicist who studied Deutsche Bank's conduct, it was reasonable to conclude that Deutsche Bank was "close to a criminal organization" because "[t]here [were] employees who [said] that the bank [was] designed in a way to make sure employees cheat[ed] and carr[ied] out fraudulent acts" with the understanding that "when this bec[ame] public," the Bank could "always" (falsely) "say [that] these [were] isolated cases" of misconduct committed by "rogue employees," rather than what was, in fact, Deutsche Bank's systematic Bank-wide operation as a Laundromat for Syndicate terrorist financiers through 2016.[292]

370.     Wall Street analysts also branded "Serial Offender Status" upon Deutsche Bank. For example, in 2018, *TheStreet.com* reported that "Deutsche Bank's Serial Offender Status" had "[d]raw[n] [c]riticism of" the Bank's "Executives" and that "Deutsche Bank's inability to learn from its checkered past has many market watchers questioning [] [Deutsche Bank] bigwigs" in light of the Bank's "Laundromat" scandals, which had "drag[ed] Deutsche further into disrepute as well as the still churning Russian laundry."[293] Moreover, *TheStreet.com* reported that a prominent American CEO who was familiar with the allegations against Deutsche Bank

---

[290] Enrich, *Dark Towers*, at 263.

[291] *Id.* at 318.

[292] Deutschlandfunk Kultur, *Enthüllungen um die Deutsche Bank: In der Nähe einer kriminellen Vereinigung, Ulrich Thielemann im Gespräch mit Ute Welty* (Sept. 22, 2020) (translated by Plaintiffs).

[293] Kevin Curran, *Deutsche Bank's Serial Offender Status Draws Criticism of Executives, Regulators; The Hot Seat Atop Deutsche Bank Got a Bit Hotter After Thursday Morning's Raid on the Company's Frankfurt Headquarters*, TheStreet.com (Nov.29, 2018) (Westlaw).

concluded that the transactions in question "raise[d] red flags" of "criminal" activity, and,

referencing Deutsche Bank, assessed that "[o]ver the next five to ten years we are going to

discover that a number of prestigious banks," including Deutsche Bank, "have been essentially

laundering money for the Russian mafia."[294]

371. *Newsweek*'s deep-dive investigation also concluded that Deutsche Bank's

Laundromat behavior was the product of broader criminality running throughout the Bank,

including DB New York (including DBTCA), DB London, and DB Frankfurt:

> Between 2010 and 2014, Moscow bankers were sending cash out of the country
> through something called the Global Laundromat—a scheme that cleaned at least
> $20 billion, according to investigators in Moldova and the Balkans, though the
> true figure may be much greater. … According to one senior ex-employee, who
> worked in equities in Asia and New York, the ***bank's problems went way beyond
> these [Laundromat] scams.*** The 2008 crash hit Deutsche Bank hard, the
> employee said. In order to cover up holes in the balance sheet, a few members of
> staff took part in risky, complex and possibly illegitimate forms of finance. These
> practices were extensive, the person alleged. They might have involved
> innovative and opaque ways of getting outside parties to underwrite risky loans,
> the banker added, using structures to disguise who ultimately are the lenders and
> the beneficiaries.[295]

372. Members of Congress have also recognized that Deutsche Bank has operated as a

rogue institution and direct threat to the safety of Americans. For example, Senator Chris Van

Hollen and Senator Elizabeth Warren excoriated Deutsche Bank for its systemic provision of

financial services to terrorists: "[t]he compliance history of [Deutsche Bank] raises ***serious***

***questions about the national security and criminal risks posed by its U.S. operations***. This is

particularly so, given its history of inadequate risk management and compliance policies and

---

[294] *Id*.

[295] Luke Harding, *Is Donald Trump's Dark Russian Secret Hiding in Deutsche Bank's Vaults?*,
Newsweek (Dec. 29, 2017) (emphasis added), 2017 WLNR 39561107.

controls [and] poor corporate culture."[296] After Representative Maxine Waters, Chairwoman of the House Committee on Financial Services, investigated Deutsche Bank, she concluded it was "the biggest money laundering bank in the world."

### 1.     The Khanani MLO and the Russian Mafia

373.     Deutsche Bank served as a key financial partner for Khanani and, through its transactions with the Khanani MLO, enabled vast amounts of terrorist finance to flow through to the Syndicate's members to support attacks against Americans in Afghanistan.

#### i.     DB's Agent/Principal Relationships Relevant To Khanani

374.     As context for Plaintiffs' Khanani allegations, Plaintiffs first briefly outline the history of Deutsche Bank's "Russian Laundromat" and mirror trades scheme, which was one of (but not the only) Deutsche Bank Laundromats that serviced al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and D-Company through the Khanani MLO.  The scheme was complex, and involved an array of Deutsche Bank entities who served in an agent/principal manner somewhat like B's more general agent/principal relationships previously described.

375.     In 2011, DB Moscow's head equities trader, Tim Wiswell, met with two known launderers who were notoriously associated with the Russian Mafia.

376.     During the meeting, DB Moscow (through Mr. Wiswell) and Mr. Wiswell each acted as an agent for Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London.

377.     DB Moscow and Mr. Wiswell **acted for the benefit of** Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London.

---

[296] Senator Chris Van Hollen and Senator Elizabeth Warren, *Letter to the Honorable Mike Crapo* (Dec. 13, 2018).

378. Moscow and Mr. Wiswell followed Deutsche Bank's, Deutsche Bank Securities, Inc.'s, DBTCA's, and DB London's standard "Laundromat" strategy.

379. DB Moscow and Mr. Wiswell designed DB's Russia Laundromat to flow billions of illicit USD-related deals through Deutsche Bank's, Deutsche Bank Securities, Inc.'s, DBTCA's, and DB London's accounts, and intentionally structured the deal to maximize the revenue of each DB Defendant.

380. Indeed, such DB Defendants were included in these trades for the purpose of growing Deutsche Bank's, Deutsche Bank Securities, Inc.'s, DBTCA's, and DB London's own income: the DB Defendants' income from these trades was not incidental to DB Moscow's and Mr. Wiswell's scheme, but rather, the entire point of it.

381. DB Moscow and Mr. Wiswell **acted with the knowledge and consent** of Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London, whose knowledge and consent was repeatedly ratified by such DB Defendants in emails, phone calls, bonus decisions, fee discussions, watercooler talk, order discussions, revenue discussions, and on.

382. From 2001 through 2017, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, DB London, and DB Moscow, including their branches and affiliates, pursued an integrated global "Laundromat" strategy under DB's "One Bank" approach that laundered transnational criminal organizations' illicit profits at a scale that only a few other banks in world history have matched.

383. Through their pursuit of DB's Laundromat strategy, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit deals involving the applicable DB Defendant in furtherance of the scheme, and

Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

384.     Until its Russian Laundromat was exposed, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London actively encouraged DB Moscow and Mr. Wiswell to continue to source mirror trade-related income for the DB Defendants by, among other things, encouraging DB Moscow and Mr. Wiswell to charge premium rates that exceeded the normal fees that the DB Defendants charged for similar services.  When they did so, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit transactions involving the applicable DB Defendant in furtherance of DB's Laundromat scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

385.     On information and belief, one or more officers, directors, attorneys, employees, and/or agents of Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London each provided pre-authorizations, or otherwise knew such pre-authorizations had been provided, to DB Moscow and Mr. Wiswell in furtherance of the mirror trading scheme.  DB Moscow's and Mr. Wiswell's ability to act through pre-authorized ordering channels confirms that, through their pre-authorization, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit transactions involving the applicable DB Defendant in furtherance of DB's Laundromat scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

386.     DB Moscow and Mr. Wiswell **acted under some degree of control of** Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London, each of whom regularly

exercised a certain amount of control over DB Moscow and Mr. Wiswell, doing so through formal and informal channels that included, but were not limited to, written instructions transmitted by email and text message, official contracts and authorizations, telephonic instructions, and communications that took place during in-person meetings in Russia, Germany, the U.S., and the U.K., all of which confirmed executed between the DB agent and principal entities described above.

387.    One or more officers, directors, employees, and/or agents of Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and/or DB London provided pre-authorization to DB Moscow and Mr. Wiswell to confer the legal authority, and database access, necessary so that DB Moscow and Mr. Wiswell could execute certain trades that were essential to the operation of the mirror trading scheme (by promoting its concealment) and profitability of the scheme (by facilizing heavier trading volume), both of which were the primary reason the scheme benefited al-Qaeda and the Taliban in the first place:  discreetly convert their opium exports into a reliable and robust pipeline for sourcing precious U.S. Dollars and repatriating their transnational criminal profits in order to fund attacks against Americans in Afghanistan.

388.    By doing so, these DB Defendants confirmed their control in the principal/agent relationship with DB Moscow and Mr. Wiswell because Deutsche Bank, Deutsche Bank Securities, Inc., and DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit transactions involving the applicable DB Defendant in furtherance of DB's Laundromat scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

389.    Mr. Wiswell and agreed to an expansive scheme during the meeting to launder "dirty money" through the use of illicit trades, such as "mirror trades," whose only purpose was

to facilitate financial crime, including terrorist finance. After this meeting with the Russian

Mafia, Deutsche Bank helped the Russian Mafia establish and operate the terrorist finance

facility that Deutsche Bank itself internally described as its "Russian Laundromat" or

"Laundromat."

390. When it created, operated, and serviced its criminal clients through the Russian

Laundromat, Deutsche Bank, and each DB Defendant, understood that the Russian Laundromat

was serving Syndicate terrorist financiers as well. Among other reasons, Deutsche Bank knew

that: (1) each such Syndicate member had a long-standing money-laundering relationship with

the same Russian Mafia organization that Deutsche Bank partnered with to operate its Russian

Laundromat; (2) the Russian Laundromat was, by design, meant to service not just the Russian

Mafia, but also the Russian Mafia's transnational criminal joint venture partners, most of all, the

Syndicate members who supplied the opium that served as one of the Russian Mafia's top

income streams; and therefore (3) any Laundromat in such circumstances would – and did –

inevitably be used by agents, operatives, or fronts for the Syndicate.

### ii. DB's Khanani MLO and Russian Mafia Transactions

391. Once Deutsche Bank's Russian Laundromat was fully operational, the Russian

Mafia quickly put the word out to the terrorist financier community – chief among them, Altaf

Khanani. This was exactly what Deutsche Bank intended when it created its Laundromat in the

first instance. Soon thereafter, according to *Guardian* investigative journalist and best-selling

author Luke Harding, "[DB Moscow] began notching up profits of $500 million to $1 billion a

year."[297]

---

[297] Harding at 310.

392.    From 2011 through 2016,[298] and likely since after 9/11,[299] Deutsche Bank provided financial services to Khanani and the Khanani MLO. During this period, Deutsche Bank transferred at least **$50,507,832** U.S. Dollars from DBTCA accounts in New York to accounts operated on the Syndicate's behalf by Khanani as the Syndicate's agent. On information and belief, these numbers are the "tip of the iceberg." Deutsche Bank's true amount of Syndicate terrorist finance routed through Khanani from 2011 through 2016 likely exceeded $100 million. Most of those funds were then passed on to Khanani's Syndicate clients, al-Qaeda and the Haqqani Network.

393.    From 2008 through 2016, and most likely since 2001, Khanani, acting as al-Qaeda's, the Taliban's, and the Haqqani Network's agent, regularly laundered the Syndicate's overseas income, including opium-related profits, through Deutsche Bank, DB Frankfurt, DB New York, DB Dubai, and DB Moscow accounts. The Khanani MLO used such Deutsche Bank accounts to repatriate more than $100,000 per month, each year from 2008 through 2016, in laundered al-Qaeda and Taliban (including Haqqani Network) funds back to accounts controlled by agents or operatives for al-Qaeda, the Haqqani Network, or another Syndicate group to finance attacks against Americans in Afghanistan. These USD-denominated transactions originated in locations that included, but were not limited to, Europe, the former Soviet Union, and the Middle East, Hong Kong, Australia, and the United States, but were ordinarily routed

---

[298] On information and belief, Deutsche Bank, DB London, DB Moscow, and DB New York (including DBTCA) continued providing financial services to Khanani and his front companies until on or about 2016, when regulators in the U.A.E. moved against him.

[299] On information and belief, Khanani used Deutsche Bank, including DB London, DB New York (including DBTCA), and/or DB Moscow, collectively, for most of the "30 years" in the terrorist finance "market" that Khanani described during a secretly recorded Skype call.

through DB New York accounts held in the name of Al Zarooni Exchange, Mazaka General Trading, or other Khanani-related accounts.

394.    Given the volume of business that Khanani did through Deutsche Bank, on information and belief, Khanani's collective U.S. Dollar profit-transfers to Dawood Ibrahim and the Haqqani Network, which were directly attributable to commissions the Khanani MLO earned on its transactions through Deutsche Bank, exceeded at least $100,000 per year to the Haqqani Network and at least $500,000 per year to Dawood Ibrahim. These are the numbers one may reasonably infer on the mere assumption that Deutsche Bank only did $100 million in transactions per year with the Khanani MLO. This, however, is not plausible given the scale of Deutsche Bank's Laundromats, which collectively moved tens of billions, and the Khanani MLO's operations, which moved billions annually.

395.    Deutsche Bank financed the Syndicate through the transactions it executed on behalf of Khanani though the Russian Laundromat. Through Mazaka General Trading and Al Zarooni Exchange, Khanani helped repatriate enormous sums for each member of the Syndicate.

396.    For example, over a little more than a year between 2013 and 2014, the Khanani MLO, acting through Mazaka General Trading, partnered with Deutsche Bank, through DB Moscow, DB London, and DB New York (including DBTCA), to repatriate at least $49,787,832 from overseas accounts to its Syndicate clients through Deutsche Bank-designed and-executed mirror trades and/or one-legged trades. These transactions facilitated the Syndicate repatriating tens of millions in precious USD – its gold standard currency – from narcotics sales back to al-Qaeda and the Haqqani Network for use by Syndicate terrorists to attack Americans in Afghanistan.

397. On information and belief, the Syndicate repatriated at least tens of millions of illicit U.S. Dollars each year from 2011 through 2016 via Deutsche Bank's mirror trades and one-legged trades on behalf of Mazaka General Trading, including but not limited to, trades executed for Khanani by DB Moscow, DB New York (including DBTCA), and DB London.

398. Deutsche Bank knew of the terrorist finance flowing to the Syndicate through DBTCA's Laundromat-related transactions based upon the data it possessed. NYDFS, for example, caught Deutsche Bank by using simple data analysis techniques. The data and analytical tools available to each DB Defendant was far greater than the comparable data available to NYDFS, and therefore each DB Defendant knew of the terrorist finance risks of Deutsche Bank's Syndicate-related transactions.

399. From 2011 through 2015, Deutsche Bank's mirror trading scheme directly enabled Khanani's repatriation of at least several million dollars per year from illicit al-Qaeda and Taliban (including Haqqani Network) profits in Russia and the Former Soviet Union, through other Khanani-controlled accounts, and ultimately landing back at accounts controlled by Syndicate agents or operatives, where the U.S. Dollars illicitly provided by Deutsche Bank to al-Qaeda and its allies through its mirror trading scheme could be used – and were used – to support terrorist attacks against Americans in Afghanistan.

400. Like many terrorist financiers, Khanani generally divided his activities among more than one front. To service the Syndicate's USD cash flow needs, Khanani relied relatively equally upon Al Zarooni Exchange and Mazaka General Trading. As a result, if one entity engaged in a transaction, the other likely engaged in a similar transaction, near in time, and in a similar amount.

401.    On information and belief, al-Qaeda, the Haqqani Network, and other Syndicate members repatriated at least tens of millions of illicit USD income each year from 2011 through 2016 via Deutsche Bank's mirror trades and one-legged trades on behalf of Al Zarooni Exchange, including but not limited to, such trades executed for the Khanani MLO by DB Moscow, DB New York (including DBTCA), and DB London.

402.    On information and belief, Khanani and his related entities constituted one or more of the specific entities described by NYDFS as having used Deutsche Bank's mirror trading scheme to be "paid … in U.S. dollars" through "trades" that did not "demonstrate[] any legitimate economic rationale."

403.    Deutsche Bank's assistance to al-Qaeda and its franchises through the Russian Laundromat aided al-Qaeda and its allies by helping conceal the terrorist finance enterprise itself. This extended the value of the enterprise and the Khanani MLO's ability to extract more money from it. Indeed, this is a well-recognized – and critical – value-add from terrorist finance separate and apart from the money itself.

404.    Deutsche Bank also aided and abetted Syndicate fundraising and finance through the financial services it provided to Khanani via the Bank's "Moldovan Laundromat," which continued to operate until 2016, running even after the Bank began shutting down its "Russian Laundromat."

405.    For example, in just one four-month period alone in 2014, Deutsche Bank processed $720,000 in U.S. Dollar-denominated transactions on behalf of al-Qaeda and the Haqqani Network through their agent, the Khanani MLO, via Mazaka General Trading.

406.     On information and belief, Khanani used Deutsche Bank to conduct the trades necessary for the Khanani MLO to collectively repatriate at least $100,000 per month to the Syndicate throughout the duration of the Moldovan Laundromat from 2008 through 2016.

407.     On information and belief, DB Moscow and DB Dubai only stopped providing financial services to Al Zarooni Exchange after the UAE's Central Bank revoked its license in 2016, which rendered Deutsche Bank's earlier posture no longer tenable.

408.     On or about 2017, after every Plaintiff was injured, Deutsche Bank fully ended every Russian Mafia- and Khanani-related Laundromat. As Ms. Belton reported, "[t]hough all of the [Deutsche Bank Laundromat] schemes were eventually shut down after they attracted too much scrutiny, each time it was too little too late. By the time Russian regulators moved in on them, tens of billions of dollars had already moved illegally into the West."[300]

### 2.     VAT Fraud Cells

409.     Deutsche Bank intentionally aided the Azizi and Ahmed Cells' terrorist financing VAT fraud schemes. At least seven Deutsche Bank employees directly assisted the Syndicate's VAT finance scheme by, among other things, facilitating transactions they knew to pose an extreme risk for Syndicate terrorist fundraising and finance.[301]

### i.     Samir Azizi and the Azizi Cell

410.     Deutsche Bank deliberately aided the flow of hundreds of millions of dollars of VAT fraud funds to the Azizi Cell, likely supplying al-Qaeda and the Taliban with tens of millions of U.S. dollars from 2009 through 2015.

---

[300] Belton at 411.

[301] Alexander Hübner & Jonathan Gould, *Seven Deutsche Bank Staff Charged Over Carbon Trading Scandal*, Reuters (Aug. 13, 2015), https://www.reuters.com/article/uk-deutsche-bank-carbon-idUKKCN0QI0M220150813.

411.    "Early on," according to Mr. Enrich, a financial crimes investigator "warned Deutsche in writing that its traders appeared to be partaking in tax fraud. But the Deutsche traders … kept doing it."[302] "In November 2009," Mr. Enrich reported, the same investigator "marched into [DB London's] offices and told its lawyers that Deutsche had already been put on written notice that it was likely engaged in fraud and that the consequences for the continued misbehavior could be severe."[303] "[T]he following month," according to Mr. Enrich, the same investigator "paid another visit … and read [Deutsche Bank's] lawyer the riot act. … When a Deutsche employee asked a colleague why [Deutsche Bank] was willing to take such a large legal risk, the response came back: 'Because we're that greedy.'"[304]

412.    In December 2012, German authorities raided multiple Deutsche Bank offices in connection with these schemes, and criminal charges were later brought against some of the people involved.

413.    For about a decade from the mid-2000s through 2015, Azizi used Deutsche Bank accounts at DB Frankfurt, DB London, and DB New York (including DBTCA) to enable the Syndicate's VAT Finance Scheme.

414.    In a post-arrest interview, Azizi directly admitted to using Deutsche Bank as his willing financial partner in the Syndicate's VAT Finance Scheme.

415.    Through its support for Syndicate VAT fraud, Deutsche Bank was the but-for cause of al-Qaeda's and the Haqqani Network's ability to realize terrorist finance. For example, according to the German media outlet *Handelsblatt* (as translated by Plaintiffs), al-Qaeda's

---

[302] Enrich, *Dark Towers*, at 150.

[303] *Id.* at 150-151.

[304] *Id.* at 151.

"illegal sales tax carousel" "*would not have worked without the involvement of a bank*."[305]

According to the German magazine *Der Spiegel*, Deutsche Bank's involvement afforded key operational benefits to the terrorists' VAT fraud schemes:

> Several witnesses testified that [the fraudster's] *relations with Deutsche Bank had proven to be particularly helpful*. [Deutsche Bank's] role … was to buy up the certificates from various front companies, export them, and put them back into the system. Deutsche Bank *made the accounts available to the fraudulent companies* and *made sure that there were no indications of suspected money laundering*. Deutsche Bank *gave the dealings a serious demeanor* … [and] used a *special Deutsche Bank program* that enabled super-fast transfers. In just a few minutes, the transactions were run across multiple accounts. This allowed the carousel to turn faster and generate even more profit.[306]

416.     On information and belief, from 2007 through 2012, the Azizi Cell transferred more than $8.6 million to al-Qaeda and the Haqqani Network and regularly repatriated illicit income to al-Qaeda and Haqqani Network-controlled accounts in Afghanistan, Pakistan, the U.A.E., Germany, and elsewhere to directly finance operations by joint cells operated by al-Qaeda, the Haqqani Network, and their allies in Afghanistan and Pakistan.

417.     Plaintiffs set forth the Azizi Cell's total estimated transfers to al-Qaeda and the Haqqani Network, which Plaintiffs identify by VAT scheme, approximate amounts, and dates:[307]

---

[305] Yasmin Osman and René Bender, *Staatsanwaltschaft Erhebt Anklage Gegen Hochrangigen Ex-Deutschbanker*, Handelsblatt (Aug. 8, 2019) (translated by Plaintiffs), https://www.handelsblatt.com/finanzen/banken-versicherungen/banken/umsatzsteuerkarussell-staatsanwaltschaft-erhebt-anklage-gegen-hochrangigen-ex-deutschbanker/24883420.html?ticket=ST-1320507-gU7JbkSULqmb0ejP7krR-ap4.

[306] Martin Hesse and Andreas Ulrich, *Batman vor Gericht*, Spiegel (Mar. 30, 2017) (translated by Plaintiffs), https://www.spiegel.de/wirtschaft/unternehmen/co2-betrug-urteil-gegen-peter-virdee-singh-erwartet-a-1140945.html.

[307] Deutsche Bank enabled a broad array of the Azizi Cell's VAT Frauds; Plaintiffs identify the various schemes by the company used by the Azizi Cell in furtherance of the scheme. With respect to the amounts, plaintiffs have rounded to the nearest thousand dollars for all estimated sums above $500 and to the nearest $10 for all estimated sums below $500.

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|---|---|---|---|
| 1 | On or about December 2007 | $21,000 | WOG GmbH |
| 2 | On or about March 2008 | $6,000 | WOG GmbH |
| 3 | On or about April 2008 | $8,000 | WOG GmbH |
| 4 | On or about May 2008 | $11,000 | WOG GmbH |
| 5 | On or about June 2008 | $7,000 | WOG GmbH |
| 6 | On or about July 2008 | $21,000 | WOG GmbH |
| 7 | On or about August 2008 | $43,000 | WOG GmbH |
| 8 | On or about September 2008 | $56,000 | WOG GmbH |
| 9 | On or about January 2009 | $12,000 | Wega Mobile GmbH |
| 10 | On or about February 2009 | $37,000 | Wega Mobile GmbH |
| 11 | On or about March 2009 | $41,000 | Wega Mobile GmbH |
| 12 | On or about April 2009 | $38,000 | Wega Mobile GmbH |
| 13 | On or about May 2009 | $46,000 | Wega Mobile GmbH |
| 14 | On or about June 2009 | $80,000 | Wega Mobile GmbH |
| 15 | On or about July 2009 | $51,000 | Wega Mobile GmbH |
| 16 | On or about August 2009 | $1,000 | Ferrograph GmbH |
| 17 | On or about August 2009 | $81,000 | Wega Mobile GmbH |
| 18 | On or about September 2009 | $27,000 | Ferrograph GmbH |
| 19 | On or about September 2009 | $21,000 | Wega Mobile GmbH |
| 20 | On or about October 2009 | $6,000 | Wega Mobile GmbH |
| 21 | On or about October 2009 | $31,000 | Hamster Mobile GmbH |
| 22 | On or about November 2009 | $16,000 | iTrading GmbH |
| 23 | On or about November 2009 | $60 | iCell GmbH |
| 24 | On or about November 2009 | $19,000 | Hamster Mobile GmbH |

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|-----|-----|-----|-----|
| 25 | On or about December 2009 | $19,000 | iTrading GmbH |
| 26 | On or about December 2009 | $8,000 | iCell GmbH |
| 27 | On or about December 2009 | $22,000 | Hamster Mobile GmbH |
| 28 | On or about January 2010 | $2,000 | iTrading GmbH |
| 29 | On or about January 2010 | $31,000 | iCell GmbH |
| 30 | On or about January 2010 | $33,000 | Hamster Mobile GmbH |
| 31 | On or about February 2010 | $945,000 | iTrading GmbH |
| 32 | On or about February 2010 | $231,000 | iCell GmbH |
| 33 | On or about February 2010 | $197,000 | Nexo Chafka GmbH |
| 34 | On or about February 2010 | $19,000 | Hamster Mobile GmbH |
| 35 | On or about March 2010 | $234,000 | iTrading GmbH |
| 36 | On or about March 2010 | $358,000 | iCell GmbH |
| 37 | On or about March 2010 | $51,000 | Nexo Chafka GmbH |
| 38 | On or about March 2010 | $40,000 | Hamster Mobile GmbH |
| 39 | On or about April 2010 | $314,000 | iCell GmbH |
| 40 | On or about April 2010 | $96,000 | Nexo Chafka GmbH |
| 41 | On or about April 2010 | $7,000 | Hamster Mobile GmbH |
| 42 | On or about May 2010 | $323,000 | iTrading GmbH |
| 43 | On or about May 2010 | $130,000 | iCell GmbH |
| 44 | On or about May 2010 | $467,000 | AS Handel GmbH |
| 45 | On or about May 2010 | $93,000 | Nexo Chafka GmbH |
| 46 | On or about May 2010 | $91,000 | Amaan Enterprise GmbH |
| 47 | On or about June 2010 | $323,000 | iCell GmbH |
| 48 | On or about June 2010 | $49,000 | Amaan Enterprise GmbH |

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|---|---|---|---|
| 49 | On or about July 2010 | $25,000 | iCell GmbH |
| 50 | On or about July 2010 | $5,000 | Nexo Chafka GmbH |
| 51 | On or about July 2010 | $127,000 | Amaan Enterprise GmbH |
| 52 | On or about August 2010 | $38,000 | iCell GmbH |
| 53 | On or about August 2010 | $77,000 | Nexo Chafka GmbH |
| 54 | On or about August 2010 | $81,000 | Amaan Enterprise GmbH |
| 55 | On or about September 2010 | $46,000 | iCell GmbH |
| 56 | On or about September 2010 | $284,000 | AS Handel GmbH |
| 57 | On or about September 2010 | $46,000 | Nexo Chafka GmbH |
| 58 | On or about September 2010 | $100,000 | Hamster Mobile GmbH |
| 59 | On or about September 2010 | $186,000 | Amaan Enterprise GmbH |
| 60 | On or about October 2010 | $104,000 | iCell GmbH |
| 61 | On or about October 2010 | $75,000 | Nexo Chafka GmbH |
| 62 | On or about October 2010 | $500,000 | Hamster Mobile GmbH |
| 63 | On or about October 2010 | $231,000 | Amaan Enterprise GmbH |
| 64 | On or about November 2010 | $41,000 | iCell GmbH |
| 65 | On or about November 2010 | $210,000 | AS Handel GmbH |
| 66 | On or about November 2010 | $9,000 | Nexo Chafka GmbH |
| 67 | On or about November 2010 | $110,000 | Hamster Mobile GmbH |
| 68 | On or about November 2010 | $118,000 | Amaan Enterprise GmbH |
| 69 | On or about December 2010 | $62,000 | iCell GmbH |
| 70 | On or about December 2010 | $55,000 | Nexo Chafka GmbH |
| 71 | On or about December 2010 | $110,000 | Amaan Enterprise GmbH |
| 72 | On or about January 2011 | $48,000 | iCell GmbH |

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|---|---|---|---|
| 73 | On or about January 2011 | $32,000 | Nexo Chafka GmbH |
| 74 | On or about January 2011 | $138,000 | Amaan Enterprise GmbH |
| 75 | On or about February 2011 | $68,000 | Amaan Enterprise GmbH |
| 76 | On or about March 2011 | $57,000 | AS Handel GmbH |
| 77 | On or about March 2011 | $63,000 | Amaan Enterprise GmbH |
| 78 | On or about April 2011 | $21,000 | Amaan Enterprise GmbH |
| 79 | On or about May 2011 | $10,000 | Amaan Enterprise GmbH |
| 80 | On or about June 2011 | $53,000 | Amaan Enterprise GmbH |
| 81 | On or about July 2011 | $82,000 | Amaan Enterprise GmbH |
| 82 | On or about July 2011 | $5,000 | My iCell GmbH |
| 83 | On or about August 2011 | $22,000 | Amaan Enterprise GmbH |
| 84 | On or about August 2011 | $32,000 | My iCell GmbH |
| 85 | On or about September 2011 | $32,000 | My iCell GmbH |
| 86 | On or about October 2011 | $3,000 | My iCell GmbH |
| 87 | On or about November 2011 | $4,000 | BAK Enterprise GmbH |
| 88 | On or about February 2012 | $303,000 | BAK Enterprise GmbH |
| 89 | On or about May 2012 | $192,000 | BAK Enterprise GmbH |

418.    Deutsche Bank's illicit transactions directly aided Syndicate cells operating in the Afghanistan and Pakistan border regions, including on information and belief, joint cells comprising al-Qaeda and Taliban fighters.

419.    The nexus between Deutsche Bank's conduct and terrorist attacks committed by joint Syndicate cells against Americans in Afghanistan was tight. For example, evidence of Azizi's financial support for the Syndicate includes "documents found by British special forces

in a cave on the Afghan-Pakistan border," from which the *Independent* "traced the proceeds" from Deutsche Bank's trades "to Middle Eastern terror groups" operating "in a cave on the Afghan-Pakistan border"—*i.e.*, al-Qaeda and the Taliban, including its Haqqani Network.[308]

420.     The Final Azizi Memo confirms the direct, operational, and devastating value chain that through which Deutsche Bank and Standard Chartered Bank facilitated the flow of enormous volumes of untraceable mobile phones sourced by the Azizi Cell because the Azizi Cell operationalized its VAT fraud scheme by regularly purchasing mobile phones in the United States and then reexporting them to Afghanistan – and cell phone exports to Afghanistan were the definitive red flag of all red flags for suspected VAT fraud-related transactions because cell phones purchased in the United States – like the thousands of phones Azizi supplied to al-Qaeda, provide enormous operational advantages for terrorists because they are functionally untraceable by U.S. counter-terrorism professionals.

421.     Deutsche Bank also, through the same VAT fraud scheme, facilitated the regular deliverer of thousands, if not tens of thousands, of untraceable American and Chinese cell phones that that the Azizi Cell purchased, on information and belief, in the United States, including in Oakland, California.   Al-Qaeda terrorists could – and did – use these American-purchased cell phones that DB (and SCB) helped Azizi finance, and effectively smuggle, from Oakland, through Europe and Dubai, finally landing in Afghanistan for the Syndicate's use.

422.     The Syndicate's cell phone pipeline through the Azizi Cell – which DB and SCB built – benefited every facet of al-Qaeda's terrorist campaign against Americans:

(i)     **Communications and Concealment.**  Al-Qaeda terrorists could communicate with one another securely, knowing that the illicit nature of their phone acquisition , most of all, how their illicit export from the United States (because Azizi did not follow

---

[308] Jim Armitage, *Life Is A Carousel Of Fraud And The People Involved Can Be Clever And Very Dangerous*, Independent (Aug. 14, 2015), 2015 WLNR 24079306.

laws designed to prevent cell phones from being illicitly reexported to FTOs like al-Qaeda), concealed the al-Qaeda and Haqqani Network terrorists whom Azizi supplied from many of the most potent American counter-terror tools and strategies. Which was the entire point of al-Qaeda's emphasis on its VAT fraud cells' bulk purchase of cell phones in the first instance.

(ii) **Cash Flow.** Al-Qaeda and Haqqani Network operatives regularly re-sold the black market cell phones they obtained through operatives like Azizi on black markets around the world, where the universal rate for untraceable phones like the ones Azizi Supplied was a 10X markup, resulting in a net profit of about $2,000 per phone. And Azizi exported at least thousands, if not tens of thousands, of such phones each year from 2009 until 2015. At that rate, the "free goods" value of Azizi's cell phones alone supplied al-Qaeda and Haqqani Network operatives in Afghanistan with at least several hundred thousand U.S. Dollars' worth of untraceable cell phones each year from 2008 through 2015.

(iii) **Attacks.** Al-Qaeda and the Haqqani Network also used the illicitly supplied cell phones provided to directly facilitate attacks both by enabling communications between operatives in the field as well as by serving as part of the IED itself.

423. Since 9/11, every other major FTO has prioritized the acquisition of the industrial volumes of mobile phones from the U.S. for the same reasons identified above – - most of all, al-Qaeda's ally, the IRGC. Because the typical terrorist operative often required five (5) or more cell phones for tradecraft reasons, and cell phones were one of the best ways to detonate IEDs, transnational cell phone exports conducted by small start-ups that had some nexus to Afghanistan were, more or less, the single brightest counter-terrorism red flag possible by 2012, when Defendants' scheme was in full bloom.

424. Indeed, Azizi left nothing to the imagination and foreclosed any ability of his banking partners to pretend there was not a nexus between his VAT fraud and Afghan terror, because the key instrumentality of his fraud (cell phones sales) were directly connected through and unbroken chain of carousel transactions that began in Oakland, California, and ended in Afghanistan with, as Azizi disclosed to his terrorist finance allies at Deutsche Bank and Standard Chartered Bank: *"Sale of Chinese cheap cell phones to Afghanistan."*

425.     Deutsche Bank's senior management, including, but not limited to, Mr. Ackermann and Mr. Jain, knew that Deutsche Bank's deliberate facilitation of VAT fraud enabled Syndicate fundraising by no later than April 2010, when German law enforcement searched Deutsche Bank's offices in Frankfurt based upon German law enforcement's belief that Deutsche Bank had been "aiding and abetting VAT fraud" relating to, among other things, Deutsche Bank's carbon-related trades on behalf of the Azizi Cell and the Ahmed Cell.

426.     After the German raid in late December 2012, Jürgen Fitschen, Deutsche Bank's co-CEO at the time, manifested his (and the Bank's) consciousness of guilt over the Bank's Syndicate terrorist finance through the VAT fraud schemes the Bank enabled when he called a senior German official to complain about the audacity German prosecutors had displayed by even suggesting that Deutsche Bank could have deliberately enabled the VAT fraud schemes that Deutsche Bank had, in fact, enabled on behalf of its VAT fraudster customer base. This customer base included the Syndicate's Ahmed Cell and Azizi Cell (the "December 2012 Fitschen Call"). According to Mr. Laabs:

> The many hunters, prosecutors, and banking authorities were closing in, especially the EU investigators were making progress … The managers of Deutsche Bank could decide how to deal with the situation: Either act as if they were above the law or they take the questions and deep suspicions to heart. Jürgen Fitschen, the bank's Co-CEO, had already made a decision. He seemed to believe that his employer was above the law. In December 2012, when the public prosecutor went with various police officers to secure evidence in the bank that could prove that traders had participated in the CO2 emissions trading fraud, Fitschen picked up the phone to complain to the Hessian Prime Minister. Apparently, [Fitschen] had forgotten that the [German] judiciary should and must be independent.[309]

---

[309] Laabs, *Bad Bank*, at 476 (translated by Plaintiffs) (emphasis added).

427.     The December 2012 Fitschen Call reflected Mr. Fitschen's, and Deutsche Bank's, consciousness of guilt relating to the Bank's substantial assistance to the VAT fraudsters whom Deutsche Bank serviced, including the Ahmed Cell and the Azizi Cell.

428.     Indeed, the Final Azizi Memo explicitly confirms Plaintiffs' core thesis – that Deutsche Bank and Standard Chartered Bank, through their combined services to Azizi and the al-Qaeda fundraising cell he led likely routed tens of millions, at least, in value to al-Qaeda, and Azizi and the Azizi Cell appear to have been one of its most prolific fundraisers in recent history.

429.     Western law enforcement has no doubt that Samir Azizi and the Azizi Cell did exactly what Plaintiffs allege – VAT fraud on an industrial scale, which flowed back to al-Qaeda and the Haqqani Network and funded Syndicate attacks against Americans in Afghanistan.  The Final Azizi Memo confirms that one or more members of the Azizi Cell "generally confessed" and "cooperat[ed] with the investigation."

430.     On information and belief, from 2009 through 2015, Deutsche Bank, DBTCA, DB London, and DB Dubai directly facilitated Azizi Cell VAT fraud trades that caused the transfer of at least $10 million in USD value from the United States to al-Qaeda and Haqqani Network terrorists in Afghanistan.  These DB Defendants enabled this value transfer, among other ways, though their facilitation of the Azizi Cell's transactions supporting the VAT fraud, and transferring the funds and cell phones to Afghanistan, which directly funded and supplied joint cells of al-Qaeda and Haqqani Network terrorists throughout Afghanistan, including, but not limited to, the Joint Cells that committed attacks in the P2K and N2KL regions, and while acting as the Kabul Attack Network.

### ii. Imran Yakub Ahmed and the Ahmed Cell

431.    On information and belief, the U.S. government also concluded that Deutsche Bank knowingly aided the transactions with Ahmed and the Ahmed Cell that enabled the Syndicate's VAT Finance Scheme.

### 3. Iran's Terrorist Sponsors

432.    On information and belief, Deutsche Bank, DB Dubai, DB London, and DBTCA, regularly facilitated NIOC and NITC transactions in the same manner as the SCB Defendants, including through supporting illicit transactions that facilitated NIOC and NITC activities, from 2001 through at least 2012.

433.    Deutsche Bank, DB Dubai, DB London, and DBTCA knew that NIOC and NITC served as a front for Iranian terrorism through the IRGC's Hezbollah Division and Qods Force. Among other reasons, Deutsche Bank, DB Dubai, DB London, and DBTCA knew they were helping Iran-backed terrorists and simply did not care

434.    On information and belief, from 2001 through 2012, Deutsche Bank, DB Dubai, DB London, and DBTCA caused tens of millions in U.S. Dollars each year to flow through illicit transactions with NIOC and NITC, into Hezbollah and Qods Force accounts, which funded al-Qaeda's and the Taliban's terrorist campaign against Americans in Afghanistan from 2006 through 2016.

### 4. Mamoun Darkazanli and the Hamburg Cell

435.    Mamoun Darkazanli and Mamdouh Mahmud Salim were al-Qaeda supporters, operatives, and fundraisers who were each a member of al-Qaeda's notorious cell in Hamburg, Germany.

436.    On March 6, 1995, Darkazanli and Salim jointly traveled to a Hamburg branch of Deutsche Bank and opened an account in a manner that raised substantial red flags for terrorist

finance even under pre-9/11 practices. This included, but were not limited to, indicia that Darkazanli and Salim: (1) were involved in transnational financial crime; (2) engaged in a pattern of transactions and travel that lacked a legitimate business purpose; (3) expressed hostility towards modernity (*e.g.*., refusing to shake the hands of a woman); and (4) had substantial connections to, and financial interests in, ultra-high-risk geographies for terrorist finance. Deutsche Bank, DB New York, and DB Frankfurt ignored these red flags because they did not care about such risks.

437. From 1995 through at least 2001, Deutsche Bank, including DB Frankfurt and DB New York (including DBTCA), provided financial services to al-Qaeda's Hamburg Cell through its services to Darkazanli and Salim. On information and belief, Deutsche Bank, through these branches, facilitated more than $100,000 in U.S. Dollar-related financing activities for al-Qaeda each year from June 1995 through at least September 2003, and such Deutsche Bank-enabled transactions permitted the Hamburg Cell to repatriate hundreds of thousands of U.S. Dollars even while raising clear red flags for terrorist finance even under pre-9/11 standards.

438. For example, between 1994 and 1998, Deutsche Bank, DB Frankfurt, and DB London processed more than $600,000 into Darkazanli-controlled accounts through transactions that, on their face, raised obvious terrorist finance red flags, including, but not limited to, the red flags raised by: (1) transactions with a radical Islamist preacher who called for attacks against America; (2) transactions with a bank known to be owned by Middle Eastern nationals suspected of being directly linked to terrorist groups; and (3) transactions with a company that had already been publicly linked to al-Qaeda operations in Europe before 9/11.

439. On information and belief, Deutsche Bank facilitated at least $370,585 in other U.S. Dollar-denominated transactions, which benefited the Hamburg Cell, including, but not

limited to, Syndicate-related transactions enabled by Deutsche Bank that included transactions in the exact amounts of $171,085, $100,000, $57,000, $30,000, $10,000, $1,700, and $800.

440.    In September 1998, global media outlets reported that German authorities in Bavaria had arrested Salim to extradite him to the U.S. on terrorism charges.[310]

441.    Thereafter, Deutsche Bank continued providing financial services to al-Qaeda's Hamburg Cell even after one of its members, Salim, was publicly reported to have been arrested by German authorities in order to be extradited to the United States on terrorism charges – one of the reddest possible red flags imaginable for Deutsche Bank when it came to the Bank's continued services to Darkazanli. Deutsche Bank knew that Salim and Darkazanli were, in effect, partners, and Deutsche Bank knew that Darkazanli was likely an al-Qaeda operative after his co-account holder (Salim) was arrested.

442.    After Deutsche Bank closed the Bankers Trust acquisition in June 1999, the Bank's financial services to al-Qaeda's Hamburg cell, through Darkazanli and Salim, began involving DBTCA. On information and belief, DB Frankfurt and DB London served as an agent for DB New York (including DBTCA), under the Bank's "hub-and-spokes model," and drove substantial U.S. Dollar-denominated transaction business relating to the Hamburg Cell after June 1999 through at least September 2003.

443.    On information and belief, from 1995 through at least September 2003, al-Qaeda routed more than one million U.S. Dollars (inclusive of transactions in other currencies) to the

---

[310] See, e.g., Reuters, *Press Digest – Germany – September 21, 1998* (Sept. 21, 1998) ("main stories from [previous day's] German newspapers" included *Sueddutsche Zeitung*'s story that "Bavarian authorities [said] they aim[ed] to get suspected Bin Laden associate Mamdouh Mahmud Salim deported to the United States as quickly as possible following his arrest by German police.").

Hamburg cell through financial transactions with Darkazanli and/or Salim, routing more than $100,000 to the Hamburg Cell each year from 1995 through 2002.

   **B.     Standard Chartered Bank Enabled Syndicate Terrorist Finance**

   444.     While "Deutsche might have been the industry's worst offender," according to Mr. Enrich, "it was hardly the only criminal entity. Just about every scandal that engulfed [Deutsche Bank] during the past two decades *also* swept over *at least one or two other rivals*."[311] Such is the case here: Standard Chartered Bank (alongside Danske Bank, *infra*) joined Deutsche Bank as global financial institutions that consciously chose to operate Laundromats for Syndicate agents, operatives, fronts, and partners from 2001 through 2016.

   445.     From 2001 through 2016, Standard Chartered Bank knowingly and directly transmitted at least $13,066,300 to Syndicate agents and operatives. During this timeframe, the Standard Chartered Bank Defendants knowingly transmitted at least $5,350,000 to Khanani and the Khanani MLO, $116,300 to Mustafa Ahmed al-Hisawi, at least $2,600,000 to Abdul Baqi Bari, and at least $5,000,000 to Fatima and Pakarab. Even this, however, is just the tip of the iceberg, as discovery is likely to reveal Standard Chartered Bank facilitated more than $100 million of Syndicate-related terrorist finance, which funded attacks by those groups and their Syndicate allies, including the Taliban.

   446.     The table below summarizes Plaintiffs' allegations concerning Standard Chartered Bank's direct financial aid to the Syndicate through a litany of long-term relationships with notorious Syndicate fronts, shell companies, operatives, agents, or business partners.

---

[311] Enrich, *Dark Towers*, at 360.

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | SCB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Altaf Khanani and the Khanani Money Laundering Organization | 2009-2016 | $5,350,000 minimum (likely at least $100,000,000) | Standard Chartered Bank<br>SCB New York<br>SCB London<br>SCB Dubai<br>SCB Pakistan |
| Mustafa Ahmed al-Hisawi | 2000-2001 | $116,300 | Standard Chartered Bank<br>SCB Dubai<br>SCB London<br>SCB New York |
| Victor Bout | 1999-2008 | Likely at least $18,000,000 | Standard Chartered Bank<br>SCB Dubai<br>SCB New York |
| Abdul Baqi Bari | 2000-2006 | $2,600,000 minimum (likely at least $3,000,000) | Standard Chartered Bank<br>SCB Dubai<br>SCB London<br>SCB Pakistan<br>SCB New York |
| Hikmatullah Shadman | 2008-2013 | Likely at least $1,200,000 | Standard Chartered Bank<br>SCB Dubai<br>SCB Afghanistan<br>SCB New York |
| Fatima Fertilizer Co. & Pakarab Fertilizers Ltd. | 2008-2014 | $5,000,000 minimum (likely at least $10,000,000) | Standard Chartered Bank<br>SCB London<br>SCB Dubai<br>SCB Pakistan<br>SCB New York |
| TOTAL | | $13,066,300 minimum (likely more than $130,000,000) | |

447.    The Standard Chartered Bank Defendants maintained a general policy of knowingly or recklessly providing USD financial services to suspected fronts for terrorist groups, money laundering enterprises, and criminal syndicates, while refusing to cooperate with

most U.S. government terrorism-related requests if doing so would reduce Standard Chartered Bank's profits from a customer relationship. That policy applied to each of the transactions between the U.S., Pakistan, and the U.A.E. pursued by Defendants. Standard Chartered Bank's practice was to commit egregious violations of U.S. counter-terrorist finance laws, regulations, and norms if it thought it could avoid detection. Plaintiffs refer to this practice as Standard Chartered Bank's "Laundromat Strategy" or "Laundromat."

448.    Standard Chartered Bank operated its Laundromat for terrorist financiers to maximize the Bank's profits, including those of SCB New York, by winning as much business as possible in high-volume USD-denominated "dirty money" markets. Each Standard Chartered Bank Defendant knew these markets necessarily included vast amounts of terrorist finance flowing to al-Qaeda, the Haqqani Network, and their allies. Standard Chartered Bank thus knowingly or recklessly enabled terrorist finance activity. As one Standard Chartered Bank executive has explained, Standard Chartered Bank's philosophy in conflict zones can be summed up as: "We make money *because of* the risk."[312]

449.    In 2012, NYDFS confirmed Standard Chartered Bank's Laundromat status when it publicly concluded that "Standard Chartered Bank operated as a rogue institution" that "*left the U.S. financial system vulnerable to terrorists*" through its "programmatic[]" "misconduct" that lasted "nearly a decade" and "move[d] at least $250 billion through [SCB New York]."[313]

450.    Although they used different verbiage, NYDFS and DOJ both concluded, in effect, that Standard Chartered Bank operated as a Laundromat that willingly serviced terrorist

---

[312] Chris Cockerill, *Big Risk, Big Profit*, Euromoney (Sept. 1, 2000) (emphasis added), 2000 WLNR 10574765.

[313] 2012 Consent Order at 1, 2, 4 (emphasis added).

financiers. NYDFS concluded that Standard Chartered Bank was a "rogue institution" and U.S. Attorney Liu concluded that the SCB Defendants were "repeat corporate offenders."

451.     Regardless of the nomenclature – "rogue institution," "repeat corporate offender[]," or Laundromat – a broad consensus of independent observers is that Standard Chartered Bank's conduct was deliberate: (1) _Daily Mail_: "[SCB] showed an astonishing lack of scruples about who it did business with"; (2) Professor of Law and Economics Scholar: "Standard Chartered was a massive money launderer," and "[l]ike fish, Standard Chartered rotted from the head"; (3) Global Financial Integrity (watchdog group): the "Standard Chartered allegations" were "emblematic of systemic money laundering" and "demonstrate[d] a systemic, widespread pattern of disregard for anti-money laundering policies at one of the world's biggest banks"; (4) _Finanser_: "Standard Chartered's Money Laundering [was] Standard Bank Business"; (5) _DealBreaker_: "StanChart's time honored money-laundering tradition"; (6) _Sense on Cents_: "the Standard Chartered laundromat" "launder[ed] money for entities" "engaged in international terrorist activities," "the laundromat operated by Standard Chartered" "[constituted] years of racketeering" and made SCB an "institution that pretended to be a bank but was really running a laundromat" that aided terrorism as "a cost of doing business," and "the ongoing 'wash, rinse, repeat' cycle of money laundering activities at the laundromat heretofore known as Standard Chartered Bank" "indicate[d] that the Standard Chartered Laundromat has been open 24/7/365"; (7) _Reuters_: "a Moldovan 'Laundromat' probe into an alleged Russian-led money laundering scheme" began "after newspaper reports said that UK banks including" "Standard Chartered were named as being among those that did not turn away suspicious money transfers"[314]

---

[314] James Salmon, _Greed Was Not Good For UK banks; Britain's Masters of Disaster Have Been Forced to Hand Over Billions in Retribution_, Daily Mail (UK), (Jan. 8, 2013), 2013 WLNR

452.     Indeed, as the *Daily Mail* observed in 2012, allegations that U.K. banks engaged in flagrant financial misconduct were plausible even at the time:

> A detailed review in the summer of 2011 by the Financial Services Authority found that around a ***third of banks appeared willing to accept very high levels of money laundering risk if the price was right***. … So it is not as though the idea London banks ***double up as laundromats is entirely without foundation***. … Peter Sands, Standard Chartered's chief executive, … argues his bank's dealings were an ***innocent matter of enabling Tehran cashew nut salesmen to sell their wares*** to overseas clients … It all sounds very plausible, until you reflect that the banks have hair-splitting, side-tracking and ***bamboozling down to a fine art***.[315]

453.     Third party observers also concluded that Standard Chartered Bank's operation as a "rogue institution" continued through at least 2016. Examples include when a former federal prosecutor explained that Standard Chartered Bank was "[a]t the top of the heap" of "[g]lobal banks" that "[were] the poster children" for "the importance of [] compliance"[316]; an analyst noted that "[i]t wasn't just the reputational hit of having broken rules; it was the garishness of the

517581; Yves Smith, *Bill Black: How Dare DOJ Insult HSBC's Crooks as Less "Professional" than Liberty Reserve's Crooks?*, Naked Capitalism (Oct. 6, 2014), 2013 WLNR 13316090; Global Financial Integrity, Press Release, *Standard Chartered Allegations Emblematic of Systemic Money Laundering Orchestrated by International Banking Community* (Aug. 7, 2012); Chris Skinner, *Standard Chartered's Money Laundering is Standard Bank Business*, Finanser by Chris Skinner (Blog) (Aug. 7, 2012), 2012 WLNR 16599095; Bess Levin, *Standard Chartered CEO's Crack Down On Badly Behaving Bankers Has Reached Hashtag-Level Serious*, DealBreaker (June 13, 2016) (emphasis added), 2016 WLNR 18187600; Larry Doyle, *Standard Chartered Scandal: "Asian Regulators Had Lost Faith in American Regulators"*, Sense on Cents (Aug. 13, 2012), 2012 WLNR 17161569 (emphasis added); Larry Doyle, *LIBOR Scandal: NY AG Takes Center Stage*, Sense on Cents (Aug. 16, 2012), 2012 WLNR 17353304 (emphasis added); Larry Doyle, *HSBC Money Laundering Scandal: More Racketeering*, Sense on Cents (Dec. 11, 2012), 2012 WLNR 26330270 (emphasis added); Larry Doyle, *Standard Chartered Money Laundering: Wash, Rinse, Repeat*, Sense on Cents (Oct. 6, 2014), 2014 WLNR 22786177 (emphasis added); Reuters News, *UPDATE 2-UK To Investigate Any UK Banking Involvement In "Laundromat" Case* (Mar. 21, 2017) (emphasis added).

[315] Ruth Sunderland, *Spin Cycle*, Daily Mail (Aug. 11, 2012), 2012 WLNR 17042212 (emphasis added).

[316] Michael Volkov, *Standard Chartered Pays Over $1 Billion for Continuing Sanctions Violations (Part I of III)*, JD Supra (Blog) (Apr. 16, 2019), 2019 WLNR 11911799.

details" which shocked even those who "[felt] the US over-reach[d] in its penalties…, []
[SCB]'s conduct frequently appeared brazen"[317]; and a third headline proclaimed that "[SCB] let
a customer open a bank account using a suitcase stuffed with … cash in a shocking money
laundering breach."[318]

454.    From 2001 through 2016, Standard Chartered Bank regularly, and knowingly or
recklessly, facilitated Syndicate terrorist finance and fundraising activities, indeed millions in
USD activity through SCB accounts each year, that were operated by agents or operatives for
al-Qaeda, the Haqqani Network, and LT, among other Syndicate members.

455.    Keeping with its practice, Standard Chartered Bank also knowingly, or recklessly,
facilitated terrorist finance activities by the Syndicate's known agents, operatives, and fronts.
SCB New York, SCB Dubai, and SCB Pakistan regularly processed transactions on behalf of
fronts, operatives or agents of the Syndicate, including the Taliban and the Haqqani Network,
which were ordinarily routed through SCB New York because the transactions were either USD-
denominated or USD-backstopped under a currency pairing.

456.    The Standard Chartered Bank Defendants thus collectively enabled, from 2001
through 2016, more than $100 million in al-Qaeda, Haqqani Network, and other Syndicate allies'
illicit transactions that directly or indirectly facilitated the logistics or financial efforts of its
fronts, operatives, and/or agents. On information and belief, each Standard Chartered Bank
Defendant individually directly facilitated millions of U.S. Dollars of Syndicate finance.

---

[317] Chris Wright, *Standard Chartered's $1 Billion Fine Draws Line Under Iran Breaches*,
Euromoney (Apr. 10, 2019), 2019 WLNR 13256728.

[318] James Burton, *Standard Chartered Fined for Breaking Iran Sanctions After Letting a
Customer Open an Account with Suitcase of Cash*, Daily Mail Online (UK) (Apr. 9, 2019).

457.     Plaintiffs' allegations concerning Standard Chartered Bank's facilitation of al-Qaeda, Haqqani Network, and Lashkar-e-Taiba terrorist finance and logistics directly supporting Syndicate attacks in Afghanistan are most likely the "tip of the iceberg," and discovery would identify additional relationships between Standard Chartered Bank and other al-Qaeda, Haqqani Network, and Lashkar-e-Taiba terrorist agents, operatives, fronts, or partners from 2001 through 2016 in addition to those set forth herein.

### 1.     The Khanani MLO

458.     From 2008 through 2016, and probably since 2001, Standard Chartered Bank provided financial services to Khanani's companies, including Al Zarooni Exchange and Mazaka General Trading, to launder at least hundreds of millions annually for al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and their Syndicate allies to pay for the Syndicate's terrorist campaign against Americans in Afghanistan.

459.     On information and belief, Khanani banked with Standard Chartered Bank, including SCB London, SCB New York, SCB Dubai, and SCB Pakistan, collectively, for most of the "30 years" in the terrorist finance "market" that Khanani described during a secretly recorded call.

460.     Khanani used accounts at SCB New York and SCB Dubai on behalf of Al Zarooni Exchange, a notorious Khanani-affiliated money changer based in Dubai, to conduct transactions on behalf of al-Qaeda, the Haqqani Network, and their allies repatriating money back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

461.     On information and belief, Khanani also maintained one or more accounts at SCB London and SCB Pakistan, including but not limited to, one or more accounts on behalf of, or

used to facilitate USD-denominated transactions by, Al Zarooni Exchange, enabling it to access U.S. Dollars through SCB New York via SCB London or SCB Pakistan.

462. Khanani also maintained accounts at SCB New York and SCB Dubai on behalf of Mazaka General Trading, which was another notorious Khanani-affiliated laundering front in Dubai, to conduct transactions on behalf of al-Qaeda, the Haqqani Network, and their allies repatriating money back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan. On information and belief, SCB London and SCB Pakistan also maintained one or more accounts for Mazaka General Trading, and/or facilitated one or more USD-denominated transactions between Mazaka General Trading and SCB New York or SCB Dubai.

463. Each Standard Chartered Bank Defendant's officers, employees, and agents understood that Standard Chartered Bank was helping Khanani regularly launder money between 2008 and 2016, and most likely going back to 2001. Data available to SCB London, SCB New York, SCB Dubai, and SCB Pakistan regularly revealed suspicious USD-denominated transactions involving Pakistan, Afghanistan, and/or the U.A.E. Due to the number, frequency, and volume of Khanani's transactions, his laundering activities, and the associated profits, Khanani would have been widely known throughout Standard Chartered Bank. Khanani's use of Standard Chartered Bank would also have been widely known throughout Standard Chartered Bank due to its "One Bank" policy.

464. By 2008, the Standard Chartered Bank Defendants understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al-Qaeda and the Taliban. This was based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world,

and regular reporting by major media outlets. *Infra* Part V.F. At all relevant times, the Standard

Chartered Bank Defendants knew that because Khanani was an agent of al-Qaeda and the

Haqqani Network, and was laundering their money, transactions associated with the Al Zarooni

Exchange or Mazaka General Trading were likely related to Syndicate terrorist logistics or

finance.

465.    Khanani was subject to one or more arrest warrants, "red notices," and/or similar

indicia of law enforcement interest from the U.S., Pakistan, the U.A.E., Afghanistan, and/or

Australia, between 2008 and 2015. This was known to the Standard Chartered Bank Defendants,

so they knew or were generally aware that Khanani was a terrorist financier.

466.    For example, in 2012, a senior compliance employee at SCB Dubai ("SCB Dubai

Employee 1") learned that SCB Dubai had been using SCB New York to carry out USD money-

laundering transactions for the Khanani MLO. SCB Dubai Employee 1 further understood that

Khanani was a suspected agent of terrorist organizations, such as al-Qaeda and the Haqqani

Network because he/she uncovered Standard Chartered Bank's provision of financial services to

Khanani during the course of a terrorism-related audit concerning suspected terrorist finance

activity facilitated by SCB Dubai. By the spring 2013, SCB Dubai Employee 1 had determined

that:

- SCB New York and SCB Dubai had been facilitating significant transactions with one or
  more known Khanani fronts;

- Khanani was a suspected terrorist money launderer who laundered overseas funds on
  behalf of anti-American terrorist groups;

- Revenues derived from SCB New York's and SCB Dubai's scheme contributed to funds
  used to support terrorist activities that killed and wounded American service members;

- SCB New York played an important role in the terrorist finance scheme, because some
  transactions were USD-denominated and/or used U.S. Dollars in currency-pairing, and
  that the transactions likely violated American law; and

- SCB Dubai's activity was part of a much broader practice of SCB New York and SCB Dubai facilitating high-terrorist-finance-risk USD-denominated transactions.

467. SCB Dubai Employee 1 rightfully concluded that Standard Chartered Bank's relationship with Khanani risked terrorism because the SCB Defendants' provision of financial services to Khanani did, in fact, fund Syndicate terrorists in Afghanistan and Pakistan through 2016, and likely had been doing so since 2001.

468. Even though each Standard Chartered Bank Defendant knew of SCB's role in facilitating Syndicate terrorist finance by providing financial services to Syndicate agents, operatives, and fronts such as Khanani by no later than 2008, and SCB Dubai had actual knowledge of the same when SCB Dubai Employee 1 uncovered SCB Dubai's role in fall 2012, SCB allowed Khanani to continue using SCB accounts, including those at SCB New York, to launder at least tens of millions of USD annually on behalf of al-Qaeda and the Haqqani Network until Khanani was arrested in 2015 At that time, SCB had facilitated Khanani's terror finance for approximately a decade.

469. Rather than stop Khanani's money laundering, Standard Chartered Bank attempted to punish people who raised concerns about Standard Chartered Bank's reckless practices. SCB Dubai, for example, retaliated against one or more persons who questioned the foreseeable terrorism risks raised by SCB Dubai's and SCB New York's practices.

470. On information and belief, Khanani did not have any "legitimate" Standard Chartered Bank customers and/or accounts.

471. From 2008, and most likely since 2001, and through 2016, Khanani and the Khanani MLO, acted as al-Qaeda's and the Haqqani Network's agent, regularly laundering the Syndicate's overseas income. To do this, Khanani used Standard Chartered Bank, SCB Dubai,

SCB Pakistan, and SCB New York accounts to repatriate more than $1 million per month in laundered Syndicate U.S. Dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan, through USD-denominated transactions that originated in Europe, Russia, the Middle East, Hong Kong, Australia, and the U.S., but were ordinarily routed through SCB New York accounts held in the name of Al Zarooni Exchange, Mazaka General Trading, or other Khanani-related accounts.

472.    On information and belief, by 2013, each SCB Defendant knew that one or more current or former Standard Chartered Bank managers, employees, or agents had become a whistleblower and had raised concerns that, in sum and substance, SCB London, SCB New York, SCB Dubai, and/or SCB Pakistan had facilitated terrorist finance activity by Khanani, whom each SCB Defendant knew to be a notorious terrorist financier for al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and other anti-American terrorists. Among other things, each SCB Defendant knew, in sum and substance, that: (1) a whistleblower determined that Standard Chartered Bank "ha[d] blood on its hands" and that "based on SCB's own records[,] … there were many SCB transactions post-2008 on behalf of … Al Zarooni Exchange," which was a Khanani front used to repatriate overseas al-Qaeda and Taliban income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan; and (2) another whistleblower concluded that Standard Chartered Bank's reckless banking practices "contributed to funds … ultimately used to support terrorist activities that killed and wounded [American] soldiers."

### 2.    VAT Fraud Cells

473.    Standard Chartered Bank intentionally aided the Azizi Cell's terrorist financing VAT fraud schemes.   Indeed, Plaintiffs' allegations against Deutsche Bank, *infra* § II.B.2, on

their own, show Standard Chartered Bank's key aid al-Qaeda and the Haqqani Network through SCB's facilitation of the Syndicate's VAT fraud terrorist finance pipeline.

474.     On information and belief, from 2008 through 2015, Standard Chartered Bank, through SCB New York, SCB Dubai, and SCB London, facilitated more than $10 million per year in value transfers from the Azizi Cell to al-Qaeda and the Haqqani Network, including senior leadership elements in both organizations.

475.     Like Deutsche Bank, Standard Chartered Bank's personnel worked closely with Azizi and members of the Azizi Cell to facilitate every aspect of the VAT fraud carousel and performed the same functions in the VAT fraud scheme as did their similarly-situated Deutsche Bank colleagues, and relied upon the same fraud tactic as did Deutsche Bank.

476.     Indeed, as memorialized by the Final Azizi Memo, Samir Azizi directly implicated Standard Chartered Bank his VAT fraud scheme when interviewed by law enforcement when he stated (as memorialized by law enforcement) that "Standard Chartered Bank 'made available' the company Fairfax Partners Ltd.," which was one of the vital cogs that facilitated the entire value chain at issue.

477.     Standard Chartered Bank's illicit transactions with the Azizi Cell depended upon SCB New York to regularly supply the millions of U.S. Dollars necessary to, among other things, pay for the thousands of untraceable cell phones, which Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai all directly facilitated by virtue of the manner in which each participated in, enabled, and concealed, the Azizi Cell's VAT fraud.

478.     Through their involvement in the Azizi Cell's VAT fraud trades, Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai directly facilitated the transfer of millions of U.S. Dollars' worth of value in U.S. Dollars and illicit cell phones each year and

directly funded and supplied joint cells of al-Qaeda and Haqqani Network terrorists that operated throughout Afghanistan from 2009 through 2015, including, but not limited to, the Joint Cells that committed attacks in the P2K and N2KL regions, as well as those that supported attacks committed by the Kabul Attack Network.

479.     On information and belief, from 2009 through 2015, Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai directly facilitated Azizi Cell VAT fraud trades that caused the transfer of at least $10 million in USD value from the United States to al-Qaeda and Haqqani Network terrorists in Afghanistan.  These SCB Defendants enabled this value transfer, among other ways, though their facilitation of the Azizi Cell's transactions supporting the VAT fraud, and transferring the funds and cell phones to Afghanistan, which directly funded and supplied joint cells of al-Qaeda and Haqqani Network terrorists throughout Afghanistan, including, but not limited to, the Joint Cells that committed attacks in the P2K and N2KL regions, and while acting as the Kabul Attack Network.

### 2.     Hikmatullah Shadman

480.     From the 2000s through at least 2013, Hikmatullah Shadman was a notorious Haqqani Network-aligned warlord in Afghanistan who had a specific reputation, known to the SCB Defendants, of providing financial and logistical support to the Haqqani Network. While Shadman funded the Taliban (including Haqqani Network), whose attacks he was known for supporting, Standard Chartered Bank provided him the bundles of USD he passed along to the terrorists.

481.     From 2008 through November 2012, Shadman used SCB New York, SCB Afghanistan, and SCB Pakistan accounts in furtherance of his criminal enterprise in Afghanistan and related Syndicate finance activities.