# No. 22-132

## United States Court of Appeals for the Second Circuit

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY,
TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER,
PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FEDERICK C. BENSON,
BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER,

*(caption continued on inside cover)*

Appeal from the United States District Court
Eastern District of New York (No. 1:19-cv-11876-AKH)

## JOINT APPENDIX VOL. 3 (JA601-843)

Brian T. Frawley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for the Danske Bank Defendants*

Sharon L. Nelles
Andrew J. Finn
Bradley P. Smith
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for the Standard Chartered Bank
Defendants*

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
202-629-3530

*Attorneys for Plaintiffs-Appellants*

David G. Januszewski
Sheila C. Ramesh
Sesi V. Garimella
Isabella Abelite
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000

*Attorneys for the Deutsche Bank
Defendants*

MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL,, RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER, TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD, PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE, PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS, LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ, FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE, KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE, PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS, JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS, CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM, DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH HIS NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS NEXT FRIEND, STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, MICHAEL FESTUS FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH HIS NEXT FRIEND, KARA GIBSON, KARA GIBSON, JESSICA ANNE BENSON, JOANNA GILBERT, EMMITT DWAYNE BURNS, JANICE CARUSO, PAUL EDWARD GOINS, III, PATRICIA GOINS, DANA RAINEY, L. C. D., BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW

GOLLNITZ, TYLER GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK GORDON, ADRIAN KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY ANDERSON, GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN, DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY HARDISON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA HARDISON, SHEILA RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER, BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM SAMUEL HARTSWICK, ALEX HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY LOUISE HORNS, BENJAMIN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M. HUNTER, KENNA HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT, SHELBY IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT, CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND, CHARLOTTE LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE, PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT FRIEND, KENT ALAN SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS, TRENT LORNE SKEENS, Z. R. S., BY AND THROUGH HER NEXT FRIEND, KENT ALAN SKEENS, BRIAN CHRISTOPHER JERGENS, TERENCE LONNIE JONES, JOHN C. MCCARTHY, ALISON R. POHN, KEVIN KING, STEPHANIE ANN MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY AND THROUGH HER NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN LAMBKA, JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR, MEREDITH LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT FRIEND MIRANDA LANDRUM, JAMES R. LANDRUM, JANET LANDRUM, MIRANDA LANDRUM, HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR., ALEXANDER LAU, DAVID WILLIAM HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G. MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L. MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK CHARLES MCEVOY, JANICE H. PROCTOR, LUANN VARNEY, SHANNON K. MCNULTY, JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J. METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA

KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS, NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L. OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS, TRACY ANNE HERRING, ADAN PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ, B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ, S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY, KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS W. PETERS, G.R.P., BY AND THROUGH HIS NEXT FRIEND, ASHLEY PETERS, CHRISTINE H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS, BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ, SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J. SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN

SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY, LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS, GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS, LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE, GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY, FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN, NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE, CHRISTOPHER MICHAEL VAN ETTEN, CATHERINE KIMBERLY VAUGHN KRYZDA, C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L. WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN, KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART LAMAR PERRY, AARON WILLIAM PRESCOTT,

Plaintiffs - Appellants,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND

ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST, KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R., BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY STRANGE, KEVIN WILLIAMS,

       Plaintiffs,

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

       Defendants - Appellees,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN BRANCH, DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH, PLACID NK CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE LLC,

       Defendants.

_____

# TABLE OF CONTENTS

## Volume 1

Docket Entries ................................................................................................1

Stipulation and Notice of Voluntary Dismissal Without Prejudice as to Certain of the Named Defendants (Doc. 10) ..........................................62

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) .............66

## Volume 2

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) (cont'd) ................................................................................................301

## Volume 3

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) (cont'd) ................................................................................................601

Exhibit A to Corrected Amended Complaint (Doc. 38-1) ..........................674

Declaration of Brian T. Frawley in Support of Danske Bank Defendants' Motion to Dismiss (Doc. 45) ....................................................698

Exhibit 1: Chart of Attacks (Doc. 45-1) ....................................................700

Exhibit 3: Article in *Corriere Della Sera* (Doc. 45-3) ...............................710

Exhibit 4: Article in *Süddeutsche Zeitung* (Doc. 45-4) ..............................714

Exhibit 5: Article in *Business Recorder* (Doc. 45-5)..................................721

Declaration of Sheila C. Ramesh in Support of Deutsche Bank Defendants' Motion to Dismiss (Doc. 49) ............................................727

Exhibit 1: Transcript from December 7, 2021 pre-motion conference (Doc. 49-1) ..............................................................................729

Declaration of Andrew J. Finn in support of Standard Chartered Bank Defendants' Motion to Dismiss (Doc. 55) ............................................751

Exhibit 1: U.S. Department of State list of Foreign Terrorist Organizations (Doc. 55-1) ..........................................................................753

Exhibit 2: Written Agreement by and Among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004) (Doc. 55-2) ..............................769

Exhibit 3: Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah, *United States* v. *Sum of $70,990,605*, No. 1:12-cv-01905 (D.D.C. Feb. 22, 2019) (Doc. 55-3)....................................................................................783

Exhibit 4: Verified Complaint for Forfeiture in Rem, *United States* v. *Sum of $70,990,605*, No. 12-cv-1905 (D.D.C. Nov. 20, 2012) (Doc. 55-4)....................................................................................789

Exhibit 5: Adam Luck, *Whistleblower Says Bank Has Blood on Its Hands: RAF Veteran Claims Standard Chartered Helped Iran Terrorists, Ahead of Court Battle*, THIS IS MONEY (Sept. 7, 2019) (Doc. 55-5) ........................................................807

Exhibit 6: Richard Holmes, et al., *Standard Chartered's Iran Problems Didn't Go Away*, BUZZFEED NEWS (Sept. 21, 2020) (Doc. 55-6)....................................................................................816

Excerpts of Exhibit 8: Amended Complaint, *Zobay* v. *MTN Grp Ltd.*, No. 21-cv-03503 (E.D.N.Y. Feb. 9, 2022) (Doc. 55-8) ......................834

Stipulation and Order of Voluntary Dismissal as to Danske Markets Inc. (Doc. 69) ............................................................................841

Plaintiffs' Notice of Appeal (Doc. 92) ...................................................843

**The Brandon Mullins Family**

1627.   Specialist Brandon Mullins served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SPC Mullins was injured in an IED attack in Kandahar Province, Afghanistan. SPC Mullins died on August 25, 2011 as a result of injuries sustained during the attack.

1628.   The attack was committed by the Taliban.

1629.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1630.   SPC Mullins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1631.   SPC Mullins was a national of the United States at the time of the attack and his death.

1632.   As a result of the August 25, 2011 attack, SPC Mullins was injured in his person and/or property. The Plaintiff members of the Mullins Family are the survivors and/or heirs of SPC Mullins and are entitled to recover for the damages SPC Mullins sustained.

**The Thomas Murach Family**

1633.    Specialist Thomas Murach served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Murach was injured in an IED attack in Kandahar Province, Afghanistan. SPC Murach died on May 4, 2013 as a result of injuries sustained during the attack.

1634.    The attack was committed by the Taliban.

1635.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1636.    SPC Murach's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1637.    SPC Murach was a national of the United States at the time of the attack and his death.

1638.    As a result of the May 4, 2013 attack, SPC Murach was injured in his person and/or property. The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

**The Liam Nevins Family**

1639.    Sergeant First Class Liam Nevins served in Afghanistan as a member of the U.S. Army. On September 21, 2013, SFC Nevins was injured in an insider attack in Paktia Province,

Afghanistan. SFC Nevins died on September 21, 2013 as a result of injuries sustained during the attack.

1640.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1641.   SFC Nevins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was lawfully wearing the uniform of his enemy.

1642.   SFC Nevins was a national of the United States at the time of the attack and his death.

1643.   As a result of the September 21, 2013 attack, SFC Nevins was injured in his person and/or property. The Plaintiff members of the Nevins Family are the survivors and/or heirs of SFC Nevins and are entitled to recover for the damages SFC Nevins sustained.

**The Christopher Newman Family**

1644.   Staff Sergeant Christopher Newman served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SSG Newman was injured in a suicide bombing attack in Kabul Province, Afghanistan. SSG Newman died on October 29, 2011 as a result of injuries sustained during the attack.

1645.   The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1646. The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1647. On information and belief, the suicide bomber who detonated the bomb during the attack was: (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1648. On information and belief, the device that the suicide bomber detonated during the attack was: (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1649. SSG Newman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1650.   SSG Newman was a national of the United States at the time of the attack and his death.

1651.   As a result of the October 29, 2011 attack, SSG Newman was injured in his person and/or property. The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

**The Bryan Nichols Family**

1652.   Chief Warrant Officer 2 Bryan Nichols served in Afghanistan as a member of the U.S. Army Reserve. On August 6, 2011, CW2 Nichols was injured in an attack on a helicopter in Wardak Province, Afghanistan. CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack.

1653.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1654.   CW2 Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1655.   CW2 Nichols was a national of the United States at the time of the attack and his death.

1656.   As a result of the August 6, 2011 attack, CW2 Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of CW2 Nichols and are entitled to recover for the damages CW2 Nichols sustained.

**The Rob Nichols Family**

1657.   Specialist Rob Nichols served in Afghanistan as a member of the U.S. Army. On July 23, 2013, SPC Nichols was injured in an IED attack in Wardak Province, Afghanistan. SPC Nichols died on July 23, 2013 as a result of injuries sustained during the attack.

1658.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1659.   On information and belief, the bomb that the Haqqani Network detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1660.   SPC Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk

1661.   SPC Nichols was a national of the United States at the time of the attack and his death.

1662.   As a result of the July 23, 2013 attack, SPC Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

### The Nicholas Olivas Family

1663.   Corporal Nicholas Olivas served in Afghanistan as a member of the U.S. Army. On May 30, 2012, CPL Olivas was injured in an IED attack in Kandahar Province, Afghanistan. CPL Olivas died on May 30, 2012 as a result of injuries sustained during the attack.

1664.   The attack was committed by the Taliban.

1665.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1666.   CPL Olivas's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1667.   CPL Olivas was a national of the United States at the time of the attack and his death.

1668.   As a result of the May 30, 2012 attack, CPL Olivas was injured in his person and/or property. The Plaintiff members of the Olivas Family are the survivors and/or heirs of CPL Olivas and are entitled to recover for the damages CPL Olivas sustained.

### The Kyle Osborn Family

1669.   Sergeant Kyle Osborn served in Afghanistan as a member of the U.S. Army. On September 13, 2012, SGT Osborn was injured in a rocket propelled grenade attack in Ghazni

Province, Afghanistan. SGT Osborn died on September 13, 2012 as a result of injuries sustained during the attack.

1670.   The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1671.   SGT Osborn's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1672.   SGT Osborn was a national of the United States at the time of the attack and his death.

1673.   As a result of the September 13, 2012 attack, SGT Osborn was injured in his person and/or property. The Plaintiff members of the Osborn Family are the survivors and/or heirs of SGT Osborn and are entitled to recover for the damages SGT Osborn sustained.

**The Nicholas Ott Family**

1674.   Corporal Nicholas Ott served in Afghanistan as a member of the U.S. Marine Corps. On August 10, 2011, Cpl Ott was injured in an IED attack in Helmand Province, Afghanistan. Cpl Ott died on August 10, 2011 as a result of injuries sustained during the attack.

1675.   The attack was committed by the Taliban.

1676.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1677.    Cpl Ott's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1678.    Cpl Ott was a national of the United States at the time of the attack and his death.

1679.    As a result of the August 10, 2011 attack, Cpl Ott was injured in his person and/or property. The Plaintiff members of the Ott Family are the survivors and/or heirs of Cpl Ott and are entitled to recover for the damages Cpl Ott sustained.

### The Cody Patterson Family

1680.    Specialist Cody Patterson served in Afghanistan as a member of the U.S. Army. On October 6, 2013, SPC Patterson was injured in an IED attack in Kandahar Province, Afghanistan. SPC Patterson died on October 6, 2013 as a result of injuries sustained during the attack.

1681.    The attack was committed by the Taliban.

1682.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1683.   SPC Patterson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1684.   SPC Patterson was a national of the United States at the time of the attack and his death.

1685.   As a result of the October 6, 2013 attack, SPC Patterson was injured in his person and/or property. The Plaintiff members of the Patterson Family are the survivors and/or heirs of SPC Patterson and are entitled to recover for the damages SPC Patterson sustained.

**The Joseph Perez Family**

1686.   Mr. Joseph Perez served in Afghanistan as a civilian government contractor working for FedSys. On July 22, 2012, Mr. Perez was injured in an insider attack in Herat Province, Afghanistan. Mr. Perez died on July 22, 2012 as a result of injuries sustained during the attack.

1687.   The attack was committed by the Taliban.

1688.   Mr. Perez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1689.   Mr. Perez was a national of the United States at the time of the attack and his death.

1690.   As a result of the July 22, 2012 attack, Mr. Perez was injured in his person and/or property. The Plaintiff members of the Perez Family are the survivors and/or heirs of Mr. Perez and are entitled to recover for the damages Mr. Perez sustained.

**The Ricardo PerezRamos Family**

1691.   Plaintiff Sergeant Ricardo PerezRamos served in Afghanistan as a member of the U.S. Army. On November 20, 2011, SGT PerezRamos was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT PerezRamos, who suffered the immediate loss of his left leg in the blast, a spinal cord injury, severe burn, embedded shrapnel, and a broken pelvis. As a result of the November 20, 2011 attack and his injuries, SGT PerezRamos has experienced severe physical and emotional pain and suffering.

1692.   The attack was committed by the Taliban.

1693.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1694.   The attack that injured SGT PerezRamos would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1695.   SGT PerezRamos was a national of the United States at the time of the attack, and remains one to this day.

1696.  As a result of the November 20, 2011 attack and SGT PerezRamos's injuries, each member of the PerezRamos Family has experienced severe mental anguish, emotional pain and suffering.

**The John Perry Family**

1697.  Staff Sergeant John Perry served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SSG Perry was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSG Perry died on November 12, 2016 as a result of injuries sustained during the attack.

1698.  The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1699.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1700.  On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1701.   SSG Perry's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1702.   SSG Perry was a national of the United States at the time of the attack and his death.

1703.   As a result of the November 12, 2016 attack, SSG Perry was injured in his person and/or property. The Plaintiff members of the Perry Family are the survivors and/or heirs of SSG Perry and are entitled to recover for the damages SSG Perry sustained.

### **The Joseph Peters Family**

1704.   Sergeant Joseph Peters served in Afghanistan as a member of the U.S. Army. On October 6, 2013, SGT Peters was injured in an IED attack in Kandahar Province, Afghanistan. SGT Peters died on October 6, 2013 as a result of injuries sustained during the attack.

1705.   The attack was committed by the Taliban.

1706.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1707.   SGT Peters's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive
detonation system indiscriminately placed civilians at risk.

1708.   SGT Peters was a national of the United States at the time of the attack and his
death.

1709.   As a result of the October 6, 2013 attack, SGT Peters was injured in his person
and/or property. The Plaintiff members of the Peters Family are the survivors and/or heirs of
SGT Peters and are entitled to recover for the damages SGT Peters sustained.

### The Francis Phillips IV Family

1710.   Staff Sergeant Francis Phillips IV served in Afghanistan as a member of the U.S.
Army. On May 4, 2013, SSG Phillips was injured in an IED attack in Kandahar Province,
Afghanistan. SSG Phillips died on May 4, 2013 as a result of injuries sustained during the attack.

1711.   The attack was committed by the Taliban.

1712.   On information and belief, the bomb that the Taliban detonated during the attack
was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda
bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-
Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that
were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in
order to facilitate the Taliban's attack.

1713.   SSG Phillips's murder would have violated the laws of war if these terrorist
groups were subject to them because, among other reasons, the terrorist(s) who planted the IED
neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive
detonation system indiscriminately placed civilians at risk.

1714.   SSG Phillips was a national of the United States at the time of the attack and his death.

1715.   As a result of the May 4, 2013 attack, SSG Phillips was injured in his person and/or property. The Plaintiff members of the Phillips Family are the survivors and/or heirs of SSG Phillips and are entitled to recover for the damages SSG Phillips sustained.

**The Trevor Pinnick Family**

1716.   Specialist Trevor Pinnick served in Afghanistan as a member of the U.S. Army. On June 12, 2012, SPC Pinnick was injured in an IED attack in Kandahar Province, Afghanistan. SPC Pinnick died on June 12, 2012 as a result of injuries sustained during the attack.

1717.   The attack was committed by the Taliban.

1718.   SPC Pinnick's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1719.   SPC Pinnick was a national of the United States at the time of the attack and his death.

1720.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1721.   As a result of the June 12, 2012 attack, SPC Pinnick was injured in his person and/or property. The Plaintiff members of the Pinnick Family are the survivors and/or heirs of SPC Pinnick and are entitled to recover for the damages SPC Pinnick sustained.

**The Jesse Pittman Family**

1722.   Petty Officer 1st Class Jesse Pittman served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Pittman was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Pittman died on August 6, 2011 as a result of injuries sustained during the attack.

1723.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1724.   PO1 Pittman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1725.   PO1 Pittman was a national of the United States at the time of the attack and his death.

1726.   As a result of the August 6, 2011 attack, PO1 Pittman was injured in his person and/or property. The Plaintiff members of the Pittman Family are the survivors and/or heirs of PO1 Pittman and are entitled to recover for the damages PO1 Pittman sustained.

**The Brandon Prescott Family**

1727.   Specialist Brandon Prescott served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Prescott was injured in an IED attack in Kandahar Province, Afghanistan. SPC Prescott died on May 4, 2013 as a result of injuries sustained during the attack.

1728.   The attack was committed by the Taliban.

1729.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1730.   SPC Prescott's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1731.   SPC Prescott was a national of the United States at the time of the attack and his death.

1732.   As a result of the May 4, 2013 attack, SPC Prescott was injured in his person and/or property. The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

**The Peter Provost Family**

1733.   Mr. Peter Provost served in Afghanistan as a civilian contractor working for Fluor Corporation. On November 12, 2016, Mr. Provost was injured in a suicide bombing attack in Parwan Province, Afghanistan. Mr. Provost died on November 12, 2016 as a result of injuries sustained during the attack.

1734. The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1735. On information and belief, the suicide bomber who detonated the bomb during the attack was: (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1736. On information and belief, the device that the suicide bomber detonated during the attack was: (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1737. Mr. Provost's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1738. Mr. Provost was a national of the United States at the time of the attack and his death.

1739.   As a result of the November 12, 2016 attack, Mr. Provost was injured in his person and/or property. The Plaintiff members of the Provost Family are the survivors and/or heirs of Mr. Provost and are entitled to recover for the damages Mr. Provost sustained.

**The Christopher Raible Family**

1740.   Lieutenant Colonel Christopher Raible served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2012, LtCol Raible was injured in a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan. LtCol Raible died on September 15, 2012 as a result of injuries sustained during the attack.

1741.   The attack was committed by the Taliban.

1742.   LtCol Raible's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1743.   LtCol Raible was a national of the United States at the time of the attack and his death.

1744.   As a result of the September 15, 2012 attack, LtCol Raible was injured in his person and/or property. The Plaintiff members of the Raible Family are the survivors and/or heirs of LtCol Raible and are entitled to recover for the damages LtCol Raible sustained.

**The Thomas Ratzlaff Family**

1745.   Senior Chief Petty Officer (SEAL) Thomas Ratzlaff served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO (SEAL) Ratzlaff was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO (SEAL) Ratzlaff died on August 6, 2011 as a result of injuries sustained during the attack.

1746.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1747.    SCPO (SEAL) Ratzlaff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1748.    SCPO (SEAL) Ratzlaff was a national of the United States at the time of the attack and his death.

1749.    As a result of the August 6, 2011 attack, SCPO (SEAL) Ratzlaff was injured in his person and/or property. The Plaintiff members of the Ratzlaff Family are the survivors and/or heirs of SCPO (SEAL) Ratzlaff and are entitled to recover for the damages SCPO (SEAL) Ratzlaff sustained.

**The Jarrold Reeves Jr. Family**

1750.    Colonel (Ret.) Jarrold Reeves Jr. served in Afghanistan as a civilian contractor working for Fluor Corporation. On November 12, 2016, COL (R) Reeves was injured in a suicide bombing attack in Parwan Province, Afghanistan. COL (R) Reeves died on November 12, 2016 as a result of injuries sustained during the attack.

1751.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1752.    On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that

permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1753. On information and belief, the device that the suicide bomber detonated during the attack was: (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1754. COL (R) Reeves's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1755. COL (R) Reeves was a national of the United States at the time of the attack and his death.

1756. As a result of the November 12, 2016 attack, COL (R) Reeves was injured in his person and/or property. The Plaintiff members of the Reeves Family are the survivors and/or heirs of COL (R) Reeves and are entitled to recover for the damages COL (R) Reeves sustained.

**The Chad Regelin Family**

1757. Petty Officer First Class Chad Regelin served in Afghanistan as a member of the U.S. Navy. On January 2, 2012, PO1 Regelin was injured in an IED attack in Helmand Province,

Afghanistan. PO1 Regelin died on January 2, 2012 as a result of injuries sustained during the attack.

1758.    The attack was committed by the Taliban.

1759.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1760.    PO1 Regelin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1761.    PO1 Regelin was a national of the United States at the time of the attack and his death.

1762.    As a result of the January 2, 2012 attack, PO1 Regelin was injured in his person and/or property. The Plaintiff members of the Regelin Family are the survivors and/or heirs of PO1 Regelin and are entitled to recover for the damages PO1 Regelin sustained.

**The Joseph Richardson Family**

1763.    Sergeant Joseph Richardson served in Afghanistan as a member of the U.S. Army. On November 16, 2012, SGT Richardson was injured in a complex attack involving an IED and small arms fire in Paktika Province, Afghanistan. SGT Richardson died on November 16, 2012 as a result of injuries sustained during the attack.

1764.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1765.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1766.   SGT Richardson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1767.   SGT Richardson was a national of the United States at the time of the attack and his death.

1768.   As a result of the November 16, 2012 attack, SGT Richardson was injured in his person and/or property. The Plaintiff members of the Richardson Family are the survivors and/or heirs of SGT Richardson and are entitled to recover for the damages SGT Richardson sustained.

**The Colby Richmond Family**

1769.   Sergeant Colby Richmond served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SGT Richmond was injured in an IED attack in Helmand Province, Afghanistan. SGT Richmond died on August 25, 2011 as a result of injuries sustained during the attack.

1770.   The attack was committed by the Taliban.

1771.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1772.   SGT Richmond's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1773.   SGT Richmond was a national of the United States at the time of the attack and his death.

1774.   As a result of the August 25, 2011 attack, SGT Richmond was injured in his person and/or property. The Plaintiff members of the Richmond Family are the survivors and/or heirs of SGT Richmond and are entitled to recover for the damages SGT Richmond sustained.

**The Joseph Riley Family**

1775.   Specialist Joseph Riley served in Afghanistan as a member of the U.S. Army. On November 24, 2014, SPC Riley was injured in a vehicle-born IED attack in Kabul Province, Afghanistan. SPC Riley died on November 24, 2014 as a result of injuries sustained during the attack.

1776.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack),

and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1777.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1778.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1779.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1780.   SPC Riley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the detonation of a vehicle indiscriminately placed civilians at risk.

1781.   SPC Riley was a national of the United States at the time of the attack and his death.

1782.   As a result of the November 24, 2014 attack, SPC Riley was injured in his person and/or property. The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

**The Nathan Rimpf Family**

1783.   Plaintiff First Lieutenant Nathan Rimpf served in Afghanistan as a member of the U.S. Army. On July 8, 2012, 1LT Rimpf was injured in an IED attack in Ghazni Province, Afghanistan. The attack severely wounded 1LT Rimpf, who suffered the loss of his left leg below the knee, the loss of his right leg above the knee, and partial paralysis of his right scapula. As a result of the July 8, 2012 attack and his injuries, 1LT Rimpf has experienced severe physical and emotional pain and suffering.

1784.   The attack was committed by the Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1785.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1786.   The attack that injured 1LT Rimpf would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1787.  1LT Rimpf was a national of the United States at the time of the attack, and remains one to this day.

1788.  As a result of the July 8, 2012 attack and 1LT Rimpf's injuries, each member of the Rimpf Family has experienced severe mental anguish, emotional pain and suffering.

### **The Michael Ristau Family**

1789.  Sergeant Michael Ristau served in Afghanistan as a member of the U.S. Army. On July 13, 2012, SGT Ristau was injured in an IED attack in Zabul Province, Afghanistan. SGT Ristau died on July 13, 2012 as a result of injuries sustained during the attack.

1790.  The attack was committed by the Haqqani Network, a part of the Taliban.

1791.  On information and belief, the bomb that the Haqqani Network detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1792.  SGT Ristau's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1793.  SGT Ristau was a national of the United States at the time of the attack and his death.

1794.   As a result of the July 13, 2012 attack, SGT Ristau was injured in his person and/or property. The Plaintiff members of the Ristau Family are the survivors and/or heirs of SGT Ristau and are entitled to recover for the damages SGT Ristau sustained.

**The Heath Robinson Family**

1795.   Senior Chief Petty Officer Heath Robinson served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Robinson was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Robinson died on August 6, 2011 as a result of injuries sustained during the attack.

1796.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1797.   SCPO Robinson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1798.   SCPO Robinson was a national of the United States at the time of the attack and his death.

1799.   As a result of the August 6, 2011 attack, SCPO Robinson was injured in his person and/or property. The Plaintiff members of the Robinson Family are the survivors and/or heirs of SCPO Robinson and are entitled to recover for the damages SCPO Robinson sustained.

**The Rodolfo Rodriguez Family**

1800.   Sergeant Rodolfo Rodriguez Jr. served in Afghanistan as a member of the U.S. Army. On September 14, 2011, SGT Rodriguez was injured in an IED attack in Kandahar

Province, Afghanistan. SGT Rodriguez died on September 14, 2011 as a result of injuries sustained during the attack.

1801.   The attack was committed by the Taliban.

1802.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1803.   SGT Rodriguez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1804.   SGT Rodriguez was a national of the United States at the time of the attack and his death.

1805.   As a result of the September 14, 2011 attack, SGT Rodriguez was injured in his person and/or property. The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SGT Rodriguez and are entitled to recover for the damages SGT Rodriguez sustained.

**The Matthew Roland Family**

1806.   Captain Matthew Roland served in Afghanistan as a member of the U.S. Air Force. On August 26, 2015, Capt Roland was injured in an insider attack in Helmand Province, Afghanistan. Capt Roland died on August 26, 2015 as a result of injuries sustained during the attack.

1807.   The attack was committed by the Taliban.

1808.   Capt Roland's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1809.   Capt Roland was a national of the United States at the time of the attack and his death.

1810.   As a result of the August 26, 2015 attack, Capt Roland was injured in his person and/or property. The Plaintiff members of the Roland Family are the survivors and/or heirs of Capt Roland and are entitled to recover for the damages Capt Roland sustained.

### The Angel Roldan Jr. Family

1811.   Mr. Angel Roldan Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On May 16, 2013, Mr. Roldan was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the attack.

1812.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1813.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1814.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1815.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1816.   Mr. Roldan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road during rush hour.

1817.   Mr. Roldan was a national of the United States at the time of the attack and his death.

1818.   As a result of the May 16, 2013 attack, Mr. Roldan was injured in his person and/or property. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

**The Christopher Rosebrock Family**

1819.   Plaintiff Captain Christopher Rosebrock served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rosebrock was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded CPT Rosebrock, who suffers from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums. As a result of the April 4, 2012 attack and his injuries, CPT Rosebrock has experienced severe physical and emotional pain and suffering.

1820.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the suicide bomber.

1821.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1822.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1823.   The attack that injured CPT Rosebrock would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

1824.   CPT Rosebrock was a national of the United States at the time of the attack, and remains one to this day.

1825.   As a result of the April 4, 2012 attack and CPT Rosebrock's injuries, each member of the Rosebrock Family has experienced severe mental anguish, emotional pain and suffering.

### The Nicholas Rozanski Family

1826.   Captain Nicholas Rozanski served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack in Faryab Province, Afghanistan. CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack.

1827.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the suicide bomber.

1828.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack

Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1829.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1830.   CPT Rozanski's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

1831.   CPT Rozanski was a national of the United States at the time of the attack and his death.

1832.   As a result of the April 4, 201 attack, CPT Rozanski was injured in his person and/or property. The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

**The Joshua Sams Family**

1833.   Plaintiff Corporal Joshua Sams served in Afghanistan as a member of the U.S. Marine Corps. On January 12, 2012, Cpl Sams was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Sams, who suffered the loss of both legs above the knee, the loss of two fingers on his right hand, and the loss of his right testicle, his

anus, his colon, and three feet of intestine, which results in erectile dysfunction, urinary incontinence, and a permanent colostomy. As a result of the January 12, 2012 attack and his injuries, Cpl Sams has experienced severe physical and emotional pain and suffering.

1834.   The attack was committed by the Taliban.

1835.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1836.   The attack that injured Cpl Sams would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1837.   Cpl Sams was a national of the United States at the time of the attack, and remains one to this day.

1838.   As a result of the January 12, 2012 attack and Cpl Sams's injuries, each member of the Sams Family has experienced severe mental anguish, emotional pain and suffering.

**The Rex Schad Family**

1839.   Staff Sergeant Rex Schad served in Afghanistan as a member of the U.S. Army. On March 11, 2013, SSG Schad was injured in an insider attack in Wardak Province, Afghanistan. SSG Schad died on March 11, 2013 as a result of injuries sustained during the attack.

1840.   The attack was committed by the Haqqani Network, a part of the Taliban.

1841.   SSG Schad's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1842.   SSG Schad was a national of the United States at the time of the attack and his death.

1843.   As a result of the March 11, 2013 attack, SSG Schad was injured in his person and/or property. The Plaintiff members of the Schad Family are the survivors and/or heirs of SSG Schad and are entitled to recover for the damages SSG Schad sustained.

**The Jonathan Schmidt Family**

1844.   Staff Sergeant Jonathan Schmidt served in Afghanistan as a member of the U.S. Army. On September 1, 2012, SSG Schmidt was injured in a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan. SSG Schmidt died on September 1, 2012 as a result of injuries sustained during the attack.

1845.   The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1846.   SSG Schmidt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1847.   SSG Schmidt was a national of the United States at the time of the attack and his death.

1848.   As a result of the September 1, 2012 attack, SSG Schmidt was injured in his person and/or property. The Plaintiff members of the Schmidt Family are the survivors and/or heirs of SSG Schmidt and are entitled to recover for the damages SSG Schmidt sustained.

**The Mark Schoonhoven Family**

1849.   Staff Sergeant Mark Schoonhoven served in Afghanistan as a member of the U.S. Army. On December 15, 2012, SSG Schoonhoven was injured in an IED attack in Kabul Province, Afghanistan. SSG Schoonhoven died on January 20, 2013 as a result of injuries sustained during the attack.

1850.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1851.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1852.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1853.   SSG Schoonhoven's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1854.   SSG Schoonhoven was a national of the United States at the time of the attack and his death.

1855.   As a result of the December 15, 2012 attack, SSG Schoonhoven was injured in his person and/or property. The Plaintiff members of the Schoonhoven Family are the survivors and/or heirs of SSG Schoonhoven and are entitled to recover for the damages SSG Schoonhoven sustained.

**The Jacob Schwallie Family**

1856.   Sergeant Jacob Schwallie served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SGT Schwallie was injured in an IED attack in Ghazni Province, Afghanistan. SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the attack.

1857.   The attack was committed by the Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1858.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1859.   SGT Schwallie's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1860.   SGT Schwallie was a national of the United States at the time of the attack and his death.

1861.   As a result of the May 7, 2012 attack, SGT Schwallie was injured in his person and/or property. The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

**The Samuel Shockley Family**

1862.   Plaintiff Staff Sergeant Samuel Shockley served in Afghanistan as a member of the U.S. Army. On March 17, 2013, SSG Shockley was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Shockley, who suffered the loss of both legs above the knee, the loss of his middle finger and index finger on his right hand, a skin graph on his right arm from his elbow to his wrist, and missing a testicle. As a result of the March 17, 2013 attack and his injuries, SSG Shockley has experienced severe physical and emotional pain and suffering.

1863.   The attack was committed by the Taliban.

1864.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1865.   The attack that injured SSG Shockley would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1866.   SSG Shockley was a national of the United States at the time of the attack, and remains one to this day.

1867.   As a result of the March 17, 2013 attack and SSG Shockley's injuries, each member of the Shockley Family has experienced severe mental anguish, emotional pain and suffering.

**The Forrest Sibley Family**

1868.   Staff Sergeant Forrest Sibley served in Afghanistan as a member of the U.S. Air Force. On August 26, 2015, SSgt Sibley was injured in an insider attack in Helmand Province, Afghanistan. SSgt Sibley died on August 26, 2015 as a result of injuries sustained during the attack.

1869.   The attack was committed by the Taliban.

1870.   SSgt Sibley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1871.   SSgt Sibley was a national of the United States at the time of the attack and his death.

1872.   As a result of the August 26, 2015 attack, SSgt Sibley was injured in his person and/or property. The Plaintiff members of the Sibley Family are the survivors and/or heirs of SSgt Sibley and are entitled to recover for the damages SSgt Sibley sustained.

**The Billy Siercks Family**

1873.   First Sergeant Billy Siercks served in Afghanistan as a member of the U.S. Army. On September 27, 2011, 1SG Siercks was injured in an indirect fire attack in Logar Province, Afghanistan. 1SG Siercks died on September 28, 2011 as a result of injuries sustained during the attack.

1874.   The attack was committed by the Haqqani Network, a part of the Taliban.

1875.   1SG Siercks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1876.   1SG Siercks was a national of the United States at the time of the attack and his death.

1877.   As a result of the September 27, 201 attack, 1SG Siercks was injured in his person and/or property. The Plaintiff members of the Siercks Family are the survivors and/or heirs of 1SG Siercks and are entitled to recover for the damages 1SG Siercks sustained.

**The Anne Smedinghoff Family**

1878.   Ms. Anne Smedinghoff served in Afghanistan as a U.S. Foreign Service Officer working for the U.S. Department of State. On April 6, 2013, Ms. Smedinghoff was injured in a suicide bombing attack in Zabul Province, Afghanistan. Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the attack.

1879.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell in the Kabul Attack Network.

1880.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1881.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1882.   Ms. Smedinghoff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, she was a civilian State Department Employee not taking part in hostilities and escorting Afghan journalists covering American officials donating books to a school.

1883.   Ms. Smedinghoff was a national of the United States at the time of the attack and her death.

1884.   As a result of the April 6, 2013 attack, Ms. Smedinghoff was injured in her person and/or property. The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

**The Orion Sparks Family**

1885.   Staff Sergeant Orion Sparks served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SSG Sparks was injured in a suicide bombing attack in Logar Province, Afghanistan. SSG Sparks died on September 26, 2012 as a result of injuries sustained during the attack.

1886.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1887.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1888.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked"

by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1889.   SSG Sparks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1890.   SSG Sparks was a national of the United States at the time of the attack and his death.

1891.   As a result of the September 26, 2012 attack, SSG Sparks was injured in his person and/or property. The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

**The Nicholas Spehar Family**

1892.   Petty Officer 2nd Class Nicholas Spehar served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO2 Spehar was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO2 Spehar died on August 6, 2011 as a result of injuries sustained during the attack.

1893.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1894.   PO2 Spehar's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1895.   PO2 Spehar was a national of the United States at the time of the attack and his death.

1896.   As a result of the August 6, 2011 attack, PO2 Spehar was injured in his person and/or property. The Plaintiff members of the Spehar Family are the survivors and/or heirs of PO2 Spehar and are entitled to recover for the damages PO2 Spehar sustained.

**The Cameron Stambaugh Family**

1897.   Specialist Cameron Stambaugh served in Afghanistan as a member of the U.S. Army. On July 8, 2012, SPC Stambaugh was injured in an IED attack in Wardak Province, Afghanistan. SPC Stambaugh died on July 8, 2012 as a result of injuries sustained during the attack.

1898.   The attack was committed by the Haqqani Network, a part of the Taliban.

1899.   On information and belief, the bomb that the Haqqani Network detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1900.   SPC Stambaugh's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1901.   SPC Stambaugh was a national of the United States at the time of the attack and his death.

1902.   As a result of the July 8, 2012 attack, SPC Stambaugh was injured in his person and/or property. The Plaintiff members of the Stambaugh Family are the survivors and/or heirs of SPC Stambaugh and are entitled to recover for the damages SPC Stambaugh sustained.

**Daniel Stamper Jr.**

1903.   Plaintiff Sergeant Daniel Stamper Jr. served in Afghanistan as a member of the U.S. Army. On April 26, 2012, SGT Stamper was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT Stamper, who suffers from a traumatic brain injury. As a result of the April 26, 2012 attack and his injuries, SGT Stamper has experienced severe physical and emotional pain and suffering.

1904.   The attack was committed by the Taliban.

1905.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1906.   The attack that injured SGT Stamper would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1907.   SGT Stamper was a national of the United States at the time of the attack, and remains one to this day.

**The Michael Strange Family**

1908.   Petty Officer 1st Class Michael Strange served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Strange was injured in an attack on a helicopter in Wardak

Province, Afghanistan. PO1 Strange died on August 6, 2011 as a result of injuries sustained during the attack.

1909.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1910.   PO1 Strange's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1911.   PO1 Strange was a national of the United States at the time of the attack and his death.

1912.   As a result of the August 6, 2011 attack, PO1 Strange was injured in his person and/or property. The Plaintiff members of the Strange Family are the survivors and/or heirs of PO1 Strange and are entitled to recover for the damages PO1 Strange sustained.

**The Joshua Strickland Family**

1913.   Sergeant Joshua Strickland served in Afghanistan as a member of the U.S. Army. On September 21, 2013, SGT Strickland was injured in an insider attack in Paktia Province, Afghanistan. SGT Strickland died on September 21, 2013 as a result of injuries sustained during the attack.

1914.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1915. SGT Strickland's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1916. SGT Strickland was a national of the United States at the time of the attack and his death.

1917. As a result of the September 21, 2013 attack, SGT Strickland was injured in his person and/or property. The Plaintiff members of the Strickland Family are the survivors and/or heirs of SGT Strickland and are entitled to recover for the damages SGT Strickland sustained.

**The Cameron Stuart Family**

1918. Plaintiff Sergeant Cameron Stuart served in Afghanistan as a member of the U.S. Army. On September 30, 2012, SGT Stuart was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT Stuart, who suffers from severe damage to his left leg, which required several reconstructive surgeries. As a result of the September 30, 2012 attack and his injuries, SGT Stuart has experienced severe physical and emotional pain and suffering.

1919. The attack was committed by the Taliban.

1920. On information and belief, the bomb that the Taliban detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1921.   The attack that injured SGT Stuart would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1922.   SGT Stuart was a national of the United States at the time of the attack, and remains one to this day.

1923.   As a result of the September 30, 2012 attack and SGT Stuart's injuries, each member of the Stuart Family has experienced severe mental anguish, emotional pain and suffering.

**Joshua Sust**

1924.   Plaintiff Corporal Joshua Sust served in Afghanistan as a member of the U.S. Marine Corps. On November 12, 2011, Cpl Sust was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Sust, who suffered the loss of his left leg below the knee, open fractures to his left arm, a traumatic brain injury, and post-traumatic stress disorder. As a result of the November 12, 2011 attack and his injuries, Cpl Sust has experienced severe physical and emotional pain and suffering.

1925.   The attack was committed by the Taliban.

1926.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1927.   The attack that injured Cpl Sust would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1928.   Cpl Sust was a national of the United States at the time of the attack, and remains one to this day.

### The Barry Sutton Family

1929.   Mr. Barry Sutton served in Afghanistan as a civilian government contractor working for DynCorp Free Zone. On August 22, 2015, Mr. Sutton was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the attack.

1930.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1931.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1932.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban

terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1933.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1934.  Mr. Sutton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1935.  Mr. Sutton was a national of the United States at the time of the attack and his death.

1936.  As a result of the August 22, 2015 attack, Mr. Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

**The Ryan Timoney Family**

1937.  Plaintiff Captain Ryan Timoney served in Afghanistan as a member of the U.S. Army. On May 20, 2012, CPT Timoney was injured in a suicide bombing attack in Uruzgan

Province, Afghanistan. The attack severely wounded CPT Timoney, who lost his left leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty. As a result of the May 20, 2012 attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

1938.  The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1939.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1940.  On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1941.  The attack that injured CPT Timoney would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1942.   CPT Timoney was a national of the United States at the time of the attack, and remains one to this day.

1943.   As a result of the May 20, 2012 attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**Frederick Tolon**

1944.   Plaintiff Sergeant Frederick Tolon served in Afghanistan as a member of the U.S. Army. On October 10, 2011, SGT Tolon was injured in a complex attack involving small arms fire and indirect fire in Kandahar Province, Afghanistan. The attack severely wounded SGT Tolon, who suffers from severely deforming scarring on his chest with shrapnel pieces remaining in his chest, nerve damage to, and very limited mobility of, the right arm, permanent partial vision loss, traumatic brain injury, tinnitus, post-traumatic stress disorder, and anxiety. As a result of the October 10, 2011 attack and his injuries, SGT Tolon has experienced severe physical and emotional pain and suffering.

1945.   The attack was committed by the Taliban.

1946.   The attack that injured SGT Tolon would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1947.   SGT Tolon was a national of the United States at the time of the attack, and remains one to this day.

## The Aaron Torian Family

1948.   Master Sergeant Aaron Torian served in Afghanistan as a member of the U.S. Marine Corps. On February 15, 2014, MSgt Torian was injured in an IED attack in Helmand Province, Afghanistan. MSgt Torian died on February 15, 2014 as a result of injuries sustained during the attack.

1949.   The attack was committed by the Taliban.

1950.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1951.   MSgt Torian's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1952.   MSgt Torian was a national of the United States at the time of the attack and his death.

1953.   As a result of the February 15, 2014 attack, MSgt Torian was injured in his person and/or property. The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

**The Jon Townsend Family**

1954.   Private First Class Jon Townsend served in Afghanistan as a member of the U.S. Army. On September 16, 2012, PFC Townsend was injured in an insider attack in Zabul Province, Afghanistan. PFC Townsend died on September 16, 2012 as a result of injuries sustained during the attack.

1955.   The attack was committed by the Haqqani Network, a part of the Taliban.

1956.   PFC Townsend's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1957.   PFC Townsend was a national of the United States at the time of the attack and his death.

1958.   As a result of the September 16, 2012 attack, PFC Townsend was injured in his person and/or property. The Plaintiff members of the Townsend Family are the survivors and/or heirs of PFC Townsend and are entitled to recover for the damages PFC Townsend sustained.

**Kevin Trimble**

1959.   Plaintiff Private First Class Kevin Trimble served in Afghanistan as a member of the U.S. Army. On September 17, 2012, PFC Trimble was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded PFC Trimble, who lost both legs above the knee, lost his left arm above the elbow, and also suffers from post-traumatic stress disorder and partial hearing loss. As a result of the September 17, 2012 attack and his injuries, PFC Trimble has experienced severe physical and emotional pain and suffering.

1960.   The attack was committed by the Taliban.

1961.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1962.   The attack that injured PFC Trimble would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1963.   PFC Trimble was a national of the United States at the time of the attack, and remains one to this day.

**Christopher Van Etten**

1964.   Plaintiff Corporal Christopher Van Etten served in Afghanistan as a member of the U.S. Marine Corps. On June 13, 2012, Cpl Van Etten was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Van Etten, who suffered the loss of his right leg below the knee, the loss of his left leg above the knee, and a traumatic brain injury. As a result of the June 13, 2012 attack and his injuries, Cpl Van Etten has experienced severe physical and emotional pain and suffering.

1965.   The attack was committed by the Taliban.

1966.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1967.   The attack that injured Cpl Van Etten would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1968.   Cpl Van Etten was a national of the United States at the time of the attack, and remains one to this day.

**The Aaron Vaughn Family**

1969.   Chief Petty Officer Aaron Vaughn served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Vaughn was injured in an attack on a helicopter in Wardak Province, Afghanistan. CPO Vaughn died on August 6, 2011 as a result of injuries sustained during the attack.

1970.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1971.   CPO Vaughn's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1972.   CPO Vaughn was a national of the United States at the time of the attack and his death.

1973.   As a result of the August 6, 2011 attack, CPO Vaughn was injured in his person and/or property. The Plaintiff members of the Vaughn Family are the survivors and/or heirs of CPO Vaughn and are entitled to recover for the damages CPO Vaughn sustained.

**The Kraig Vickers Family**

1974.   Senior Chief Petty Officer Kraig Vickers served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Vickers was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Vickers died on August 6, 2011 as a result of injuries sustained during the attack.

1975.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1976.   SCPO Vickers's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1977.   SCPO Vickers was a national of the United States at the time of the attack and his death.

1978.   As a result of the August 6, 2011 attack, SCPO Vickers was injured in his person and/or property. The Plaintiff members of the Vickers Family are the survivors and/or heirs of SCPO Vickers and are entitled to recover for the damages SCPO Vickers sustained.

**The Seth Wakeling Family**

1979.   Plaintiff Specialist Seth Wakeling served in Afghanistan as a member of the U.S. Army. On September 26, 2013, SPC Wakeling was injured in an IED attack in Wardak Province, Afghanistan. The attack severely wounded SPC Wakeling, who lost his left leg below the knee

and sustained other severe injuries. As a result of the September 26, 2013 attack and his injuries, SPC Wakeling has experienced severe physical and emotional pain and suffering.

1980.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1981.   On information and belief, the bomb that the Haqqani Network detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1982.   The attack that injured SPC Wakeling would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1983.   SPC Wakeling was a national of the United States at the time of the attack, and remains one to this day.

1984.   As a result of the September 26, 2013 attack and SPC Wakeling's injuries, each member of the Wakeling Family has experienced severe mental anguish, emotional pain and suffering.

### The Nickolas Welch Family

1985.   Specialist Nickolas Welch served in Afghanistan as a member of the U.S. Army. On July 23, 2013, SPC Welch was injured in an IED attack in Wardak Province, Afghanistan. SPC Welch died on August 6, 2013 as a result of injuries sustained during the attack.

1986.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1987.   On information and belief, the bomb that the Haqqani Network detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1988.   SPC Welch's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1989.   SPC Welch was a national of the United States at the time of the attack and his death.

1990.   As a result of the July 23, 2013 attack, SPC Welch was injured in his person and/or property. The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

**The Jeffrey White Jr. Family**

1991.   Specialist Jeffrey White Jr. served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SPC White was injured in an IED attack in Khost Province, Afghanistan. SPC White died on April 3, 2012 as a result of injuries sustained during the attack.

1992.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1993.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1994.   SPC White's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1995.   SPC White was a national of the United States at the time of the attack and his death.

1996.   As a result of the April 3, 2012 attack, SPC White was injured in his person and/or property. The Plaintiff members of the White Family are the survivors and/or heirs of SPC White and are entitled to recover for the damages SPC White sustained.

**The James Wickliff Chacin Family**

1997.   Specialist James Wickliff Chacin served in Afghanistan as a member of the U.S. Army. On August 12, 2013, SPC Wickliff Chacin was injured in an IED attack in Logar Province, Afghanistan. SPC Wickliff Chacin died on September 20, 2013 as a result of injuries sustained during the attack.

1998.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1999.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2000.   SPC Wickliff-Chacin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2001.   SPC Wickliff Chacin was a national of the United States at the time of the attack and his death.

2002.   As a result of the August 12, 2013 attack, SPC Wickliff Chacin was injured in his person and/or property. The Plaintiff members of the Wickliff Chacin Family are the survivors and/or heirs of SPC Wickliff Chacin and are entitled to recover for the damages SPC Wickliff Chacin sustained.

**Brian Williams**

2003.   Plaintiff Staff Sergeant Brian Williams served in Afghanistan as a member of the U.S. Air Force. On April 25, 2012, SSgt Williams was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded SSgt Williams, who suffered the immediate loss of his left leg below the knee during the blast, which later had to be amputated higher, the

loss of his left testicle due to trauma, a compound fracture of the left arm, ruptured eardrums, missing teeth, soft tissue damage all over his body, and a traumatic brain injury. As a result of the April 25, 2012 attack and his injuries, SSgt Williams has experienced severe physical and emotional pain and suffering.

2004.   The attack was committed by the Taliban.

2005.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2006.   The attack that injured SSgt Williams would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the ID neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2007.   SSgt Williams was a national of the United States at the time of the attack, and remains one to this day.

**The Clarence Williams III Family**

2008.   Specialist Clarence Williams III served in Afghanistan as a member of the U.S. Army. On July 8, 2012, SPC Williams was injured in an IED attack in Wardak Province, Afghanistan. SPC Williams died on July 8, 2012 as a result of injuries sustained during the attack.

2009.   The attack was committed by the Haqqani Network, a part of the Taliban.

2010.   On information and belief, the bomb that the Haqqani Network detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

2011.   SPC Williams's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2012.   SPC Williams was a national of the United States at the time of the attack and his death.

2013.   As a result of the July 8, 2012 attack, SPC Williams was injured in his person and/or property. The Plaintiff members of the Williams Family are the survivors and/or heirs of SPC Williams and are entitled to recover for the damages SPC Williams sustained.

**The Mark Worley Family**

2014.   Plaintiff Sergeant Mark Worley served in Afghanistan as a member of the U.S. Army. On August 11, 2012, SGT Worley was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded SGT Worley, who lost his right leg below the knee, and sustained nerve damage in left leg with dropfoot and a deep laceration to his right forearm. As a result of the August 11, 2012 attack and his injuries, SGT Worley has experienced severe physical and emotional pain and suffering.

2015.   The attack was committed by the Taliban.

2016.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2017.   The attack that injured SGT Worley would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2018.   SGT Worley was a national of the United States at the time of the attack, and remains one to this day.

2019.   As a result of the August 11, 2012 attack and SGT Worley's injuries, each member of the Worley Family has experienced severe mental anguish, emotional pain and suffering.

**The Sonny Zimmerman Family**

2020.   Staff Sergeant Sonny Zimmerman served in Afghanistan as a member of the U.S. Army. On July 15, 2013, SSG Zimmerman was injured in an attack involving a recoilless rifle in Paktia Province, Afghanistan. SSG Zimmerman died on July 16, 2013 as a result of injuries sustained during the attack.

2021.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

2022. SSG Zimmerman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2023. SSG Zimmerman was a national of the United States at the time of the attack and his death.

2024. As a result of the July 15, 2013 attack, SSG Zimmerman was injured in his person and/or property. The Plaintiff members of the Zimmerman Family are the survivors and/or heirs of SSG Zimmerman and are entitled to recover for the damages SSG Zimmerman sustained.

**CLAIMS FOR RELIEF**

**COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**[All Defendants: Aiding-And-Abetting Liability, Attack Predicate]**

2025.    Plaintiffs incorporate their factual allegations above.

2026.    The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by al-Qaeda and the Taliban, including its Haqqani Network.

2027.    The terrorist attacks committed that killed or injured Plaintiffs and their family members, were acts of international terrorism because they were violent acts that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

2028.    The attacks that killed or injured Plaintiffs appear to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2029.  The attacks that injured Plaintiffs occurred primarily outside the territorial jurisdiction of the United States.

2030.  The attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

2031.  Defendants provided substantial assistance to the terrorist organizations behind the attacks, thus aiding and abetting the attacks by facilitating al-Qaeda's and the Taliban's, including the Haqqani Network's, unending supply of Fatima Group CAN Fertilizer for use in CAN fertilizer bombs targeting Americans in Afghanistan, and by providing essential U.S. Dollar-related financial services to al-Qaeda and Taliban, including Haqqani Network, agents, operatives, and fronts to facilitate the repatriation of millions in overseas al-Qaeda, Taliban (including Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and/or D-Company income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

2032.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks described herein. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2033.  As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants: Aiding-And-Abetting Liability, RICO Predicate]

2034.   Plaintiffs incorporate their factual allegations above.

2035.   From at least 2007 through 2016, terrorists from al-Qaeda conspired with Mullah Omar and others to conduct and maintain the Taliban, including the Haqqani Network, as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan. Throughout that time, the Taliban, including the Haqqani Network, was a group of associated individuals that functioned as a continuing unit, whose express purpose included violence against, and the expulsion of, Americans in Afghanistan. The Taliban, including the Haqqani Network, engaged in, and its activities affected, foreign commerce.

2036.   From at least 2007 through 2016, Mullah Omar and other terrorists employed by or associated with the Taliban, including the Haqqani Network, and al-Qaeda (including without limitation Sirajuddin Haqqani, Jalaluddin Haqqani, Mullah Baradar, Mawlawi Ahmad Bilal, and other terrorists described herein) have maintained interests in and conducted the affairs of the Taliban, including the Haqqani Network, as an enterprise by engaging in a campaign to expel Americans from Afghanistan through crime and anti-American violence (the "Taliban-al-Qaeda Campaign").

2037.   Specifically, Mullah Omar, Sirajuddin Haqqani, and other terrorists employed by or associated with the Taliban, including the Haqqani Network, and al-Qaeda conducted and participated in the conduct of the Taliban's, including the Haqqani Network's, affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking,

damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

2038.   The Taliban-al-Qaeda Campaign was an act of international terrorism. It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States. The Taliban-al-Qaeda Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2039.   The Taliban-al-Qaeda Campaign occurred primarily outside the territorial jurisdiction of the United States.

2040.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Taliban-al-Qaeda Campaign. Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Mullah Omar,

Sirajuddin Haqqani, and other terrorists associated with the Taliban, including the Haqqani Network, conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of the Taliban, including the Haqqani Network. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Taliban-al-Qaeda Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2041.   Defendants aided and abetted and knowingly provided substantial assistance to the Taliban (including the Haqqani Network), its members, and the Taliban-al-Qaeda Campaign. Defendants did so by laundering money for the al-Qaeda, the Taliban, including the Haqqani Network, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, that financed the Taliban's, including the Haqqani Network's, terrorist attacks, and, in the case of the Standard Chartered Bank Defendants, by also assuming a role in the Haqqani Network's bomb-making pipeline by enabling Fatima's and Pakarab's deliberate supply of Fatima Group CAN Fertilizer to Haqqani Network agents, operatives, and fronts to assist the Haqqani Network's CAN fertilizer bomb logistics and undermine U.S. counterinsurgency efforts in Afghanistan.

2042.   The Taliban-al-Qaeda Campaign was committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

2043.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

2044.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

2045.   Plaintiffs request that the Court:

(a)     Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)     Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)     Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)     Award Plaintiffs prejudgment interest; and

(e)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated: February 15, 2022

Respectfully submitted,

*/s/ Ryan R. Sparacino*

Ryan R. Sparacino (*pro hac vice*)
Eli J. Kay-Oliphant
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Jonathan L. Ashley III | U.S. | Joshua Ryan Ashley | Father |
| Jonathan Leigh Ashley IV | U.S. | Joshua Ryan Ashley | Brother |
| Jordan T. Ashley | U.S. | Joshua Ryan Ashley | Brother |
| Tammie Maria Ashley | U.S. | Joshua Ryan Ashley | Mother |
| Cheryl Atwell | U.S. | Bradley W. Atwell | Mother |
| Erin Riedel | U.S. | Bradley W. Atwell | Sister |
| Angela Kahler | U.S. | Thomas A. Baysore Jr. | Sister |
| Pamela E. Alexander Bell | U.S. | Vincent J. Bell | Mother |
| James Bell | U.S. | Vincent J. Bell | Father |
| London Jacinda Bell | U.S. | Vincent J. Bell | Sister |
| Andrea Roe | U.S. | Vincent J. Bell | Sister |
| Frederick C. Benson | U.S. | Darrik C. Benson | Father |
| Beverly Mills | U.S. | Darrik C. Benson | Mother |
| Maggie Mae Bilyeu | U.S. | Maggie Mae Bilyeu | Injured by a suicide bombing attack. |
| Katherine Abreu-Border | U.S. | Jeremie S. Border | Sister |
| Mary Border | U.S. | Jeremie S. Border | Mother |
| DeLaynie K. Peek | U.S. | Jeremie S. Border | Sister |
| Francisco Javier Briseño Gutierrez | U.S. | Francisco J. Briseño-Alvarez Jr. | Father |
| Luis Briseño | U.S. | Francisco J. Briseño-Alvarez Jr. | Brother |
| Marissa Brown | U.S. | Allan Eric Brown | Widow |
| Ariell S. Taylor, individually and on behalf of the Estate of Christopher L. Brown | U.S. | Christopher L. Brown | Widow, Estate PR |
| William A. Burley | U.S. | Nicholas B. Burley | Brother |
| William Michael Burley | U.S. | Nicholas B. Burley | Father |
| Michael Collins | U.S. | Nicholas B. Burley | Brother |

---

[1] As identified in Part VII of the Amended Complaint.

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Dan Olmstead | U.S. | Nicholas B. Burley | Step-father of SPC Nicholas B. Burley; lived in the same household as SPC Burley for a substantial period of time and considered SPC Burley the functional equivalent of a biological son |
| Tammy Olmstead | U.S. | Nicholas B. Burley | Mother |
| August Wildman | U.S. | David E. Cabrera | Widow |
| Corbin Cabrera | U.S. | David E. Cabrera | Son |
| Daniel Matias Cabrera | U.S. | David E. Cabrera | Foster-Brother of LTC David E. Cabrera; lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother |
| Gillian Leigh Cabrera | U.S. | David E. Cabrera | Daughter |
| M.G.C., by and through his next friend, August Wildman | U.S. | David E. Cabrera | Son |
| R.X.C., by and through his next friend, August Wildman | U.S. | David E. Cabrera | Son |
| Robert Cabrera | U.S. | David E. Cabrera | Foster-Father of LTC David E. Cabrera; lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological son |
| Ronald Paul Hopkins | U.S. | David E. Cabrera | Brother |
| Suzanne Renae Martinez | U.S. | David E. Cabrera | Sister |
| JD Prosser | U.S. | David E. Cabrera | Sister |
| Gloria Diane Trelfa | U.S. | David E. Cabrera | Foster-Sister of LTC David E. Cabrera; lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Cynthia Carol Campbell | U.S. | Christopher George Campbell | Sister |
| Ramiro Cardoza Jr. | U.S. | Kevin Cardoza | Brother |
| Ramiro Cardoza Sr. | U.S. | Kevin Cardoza | Father |
| Maria Cardoza | U.S. | Kevin Cardoza | Mother |
| Brittani Marie Carner | U.S. | Timothy Norman Carner | Wife |
| T.M.C., by and through his next friend, Timothy Norman Carner | U.S. | Timothy Norman Carner | Son |
| Timothy Norman Carner | U.S. | Timothy Norman Carner | Injured by an IED attack. |
| Cordaro Devone Clark | U.S. | Chazray C. Clark | Brother |
| Corteize Clark | U.S. | Chazray C. Clark | Brother |
| Keyko D. Clark | U.S. | Chazray C. Clark | Mother |
| Precious Clark | U.S. | Chazray C. Clark | Sister |
| Cleveland Davis | U.S. | Chazray C. Clark | Brother |
| April Cleary | U.S. | Jonathan Cleary | Mother |
| Jonathan Cleary | U.S. | Jonathan Cleary | Injured by an IED attack. |
| B.C., by and through his next friend, Holly Conrad | U.S. | Timothy J. Conrad Jr. | Son |
| Holly Conrad | U.S. | Timothy J. Conrad Jr. | Widow |
| Peyton Cooney | U.S. | Ross Cox | Daughter |
| A.C., by and through his next friend, Nicole Cox | U.S. | Ross Cox | Son |
| Brennan Cox | U.S. | Ross Cox | Son |
| H.C., by and through her next friend, Nicole Cox | U.S. | Ross Cox | Daughter |
| Nicole Cox | U.S. | Ross Cox | Wife |
| Ross Cox | U.S. | Ross Cox | Injured by an IED attack. |
| Anthony D'Augustine | U.S. | Joseph D'Augustine | Father |
| Jennifer D'Augustine | U.S. | Joseph D'Augustine | Sister |
| Nicole D'Augustine | U.S. | Joseph D'Augustine | Sister |
| Patricia D'Augustine | U.S. | Joseph D'Augustine | Mother |
| Michele Kulesa | U.S. | Joseph D'Augustine | Sister |
| | | | |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Brenda Daehling | U.S. | Mitchell K. Daehling | Mother |
| Kayla Marie Daehling | U.S. | Mitchell K. Daehling | Sister |
| Kirk W. Daehling | U.S. | Mitchell K. Daehling | Father |
| Samantha Jean McNamara | U.S. | Mitchell K. Daehling | Widow |
| Heather Frances Daniels | U.S. | Devin J. Daniels | Step-mother of SGT Devin J. Daniels; lived in the same household as SGT Daniels for a substantial period of time and considered SGT Daniels the functional equivalent of a biological son |
| James L. Daniels | U.S. | Devin J. Daniels | Father |
| Lucas Daniels | U.S. | Devin J. Daniels | Brother |
| Sophie Daniels | U.S. | Devin J. Daniels | Sister |
| Judith Sara Darrough | U.S. | James M. Darrough | Step-mother of SGT James M. Darrough; lived in the same household as SGT Darrough for a substantial period of time and considered SGT Darrough the functional equivalent of a biological son |
| Robert Charles Darrough | U.S. | James M. Darrough | Father |
| C.D., by and through his next friend, Helena Davis | U.S. | Jonathan D. Davis | Son |
| Helena Davis | U.S. | Jonathan D. Davis | Widow |
| Joseph Roger Deslauriers | U.S. | Joseph Roger Deslauriers | Injured by an IED attack. |
| Lisa Deslauriers | U.S. | Joseph Roger Deslauriers | Wife |
| Alberto D. Diaz | U.S. | Alberto D. Diaz | Injured by an IED attack. |
| Anthony M. Diaz | U.S. | Alberto D. Diaz | Brother |
| Frances P. Diaz | U.S. | Alberto D. Diaz | Mother |
| Kayla N. Diaz | U.S. | Alberto D. Diaz | Wife |
| Matthew J. Diaz | U.S. | Alberto D. Diaz | Brother |
| Maximo Diaz | U.S. | Alberto D. Diaz | Father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| N.J.A.D., by and through his next friend, Kayla N. Diaz | U.S. | Alberto D. Diaz | Son |
| N.J.D., by and through her next friend, Kayla N. Diaz | U.S. | Alberto D. Diaz | Daughter |
| B.C.D., by and through his next friend, Kelli Dodge | U.S. | Corey J. Dodge | Son |
| Kelli Dodge | U.S. | Corey J. Dodge | Widow |
| P.A.D., by and through her next friend, Kelli Dodge | U.S. | Corey J. Dodge | Daughter |
| Phouthasith Douangdara | U.S. | John Douangdara | Father |
| Robert Alexander Dove | U.S. | Robert Alexander Dove | Injured by an IED attack. |
| Sarah Peters-Duarte, individually and on behalf of the Estate of Curtis Joseph Duarte | U.S. | Curtis Joseph Duarte | Widow, Estate PR |
| Joseph Duarte | U.S. | Curtis Joseph Duarte | Father |
| Joy Coy | U.S. | Stephen J. Dunning | Sister |
| Robert L. Dunning, individually and on behalf of the Estate of Tomoe Dunning | U.S. | Stephen J. Dunning | Father, Estate PR |
| Carey Greggory DuVal | U.S. | Carey Greggory DuVal | Injured by a vehicle-born IED attack. |
| Erich Martin Ellis | U.S. | Erich Ellis | Injured by an IED attack. |
| James Russell Ellis | U.S. | Erich Ellis | Father |
| James Earl Ellis | U.S. | Robert W. Ellis | Brother |
| Joelle R. Ellis | U.S. | Robert W. Ellis | Mother |
| John F. Ellis | U.S. | Robert W. Ellis | Father |
| Vanessa Marie Anzures | U.S. | Vincent J. Ellis | Sister |
| Brian Edward Ellis | U.S. | Vincent J. Ellis | Father |
| Julie Ann Ellis | U.S. | Vincent J. Ellis | Mother |
| Victor Raymond Ellis | U.S. | Vincent J. Ellis | Brother |
| Catherine Elm Boatwright | U.S. | Michael D. Elm | Sister |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Margaret Elm Campbell | U.S. | Michael D. Elm | Sister |
| Dennis John Elm | U.S. | Michael D. Elm | Father |
| Donna Lee Elm | U.S. | Michael D. Elm | Mother |
| Matthew Elm | U.S. | Michael D. Elm | Brother |
| Christine Rangel | U.S. | Michael D. Elm | Sister |
| Charles Essex | U.S. | Richard A. Essex | Father |
| Marion Ruth Hopkins | U.S. | Richard A. Essex | Mother |
| John L. Fant | U.S. | Garrett A. Fant | Father |
| Stephanie Jane Fisher | U.S. | Thomas K. Fogarty | Mother |
| C.F., by and through his next friend, Stephanie Jane Fisher | U.S. | Thomas K. Fogarty | Son |
| K.F., by and through his next friend, Stephanie Jane Fisher | U.S. | Thomas K. Fogarty | Son |
| Thomas Anthony Fogarty | U.S. | Thomas K. Fogarty | Father |
| Erica Fox | U.S. | Michael Festus Fox | Wife |
| G.F., by and through his next friend, Michael Festus Fox | U.S. | Michael Festus Fox | Son |
| Michael Festus Fox | U.S. | Michael Festus Fox | Injured by an IED attack. |
| Jason Wayne Gibson | U.S. | Jason Wayne Gibson | Injured by an IED attack. |
| Q.G., by and through his next friend, Kara Gibson | U.S. | Jason Wayne Gibson | Son |
| Kara Gibson | U.S. | Jason Wayne Gibson | Wife |
| Jessica Anne Benson | U.S. | William Joseph Gilbert | Sister |
| Joanna Gilbert | U.S. | William Joseph Gilbert | Mother |
| Emmitt Dwayne Burns | U.S. | Paul Goins Jr. | Step-son of Mr. Paul Goins Jr.; lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Janice Caruso | U.S. | Paul Goins Jr. | Step-daughter of Mr. Paul Goins Jr.; lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father |
| Paul Edward Goins III | U.S. | Paul Goins Jr. | Son |
| Patricia Goins | U.S. | Paul Goins Jr. | Widow |
| Dana Rainey | U.S. | Paul Goins Jr. | Step-daughter of Mr. Paul Goins Jr.; lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father |
| L.C.D., by and through his next friend, Bridgett L. DeHoff | U.S. | Jonathan A. Gollnitz | Son |
| Kirk Andrew Gollnitz | U.S. | Jonathan A. Gollnitz | Brother |
| Tyler Gollnitz | U.S. | Jonathan A. Gollnitz | Brother |
| Conchetta Michell Diaz | U.S. | Brittany Bria Gordon | Sister |
| Cedric Donshae Gordon Sr. | U.S. | Brittany Bria Gordon | Brother |
| Cedric Frank Gordon | U.S. | Brittany Bria Gordon | Father |
| Adrian Kie-Alun Sherrod | U.S. | Brittany Bria Gordon | Brother |
| Kristin Caracciolo | U.S. | Douglas J. Green | Sister |
| Suni Chabrow | U.S. | Douglas J. Green | Mother |
| Paige Erlanger | U.S. | Douglas J. Green | Sister |
| Colby Anderson | U.S. | Travis Scott Green | Step-son of GySgt Travis Scott Green; lived in the same household as GySgt Green for a substantial period of time and considered GySgt Green the functional equivalent of a biological father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Hayley Anderson | U.S. | Travis Scott Green | Step-daughter of GySgt Travis Scott Green; lived in the same household as GySgt Green for a substantial period of time and considered GySgt Green the functional equivalent of a biological father |
| A.G., by and through her next friend, Travis Scott Green | U.S. | Travis Scott Green | Daughter |
| A.G., by and through her next friend, Travis Scott Green | U.S. | Travis Scott Green | Daughter |
| E.G., by and through her next friend, Travis Scott Green | U.S. | Travis Scott Green | Daughter |
| Glenda Green | U.S. | Travis Scott Green | Sister |
| Julie Green | U.S. | Travis Scott Green | Ex-Wife |
| T.G., by and through her next friend, Travis Scott Green | U.S. | Travis Scott Green | Daughter |
| Travis Scott Green | U.S. | Travis Scott Green | Injured by an IED attack. |
| Carol Griffin | U.S. | Kevin J. Griffin | Step-mother of CSM Kevin J. Griffin; lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological son |
| Daniel Griffin | U.S. | Kevin J. Griffin | Step-brother of CSM Kevin J. Griffin; lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological brother |
| Matt Griffin | U.S. | Kevin J. Griffin | Brother |
| Shawn Patrick Griffin | U.S. | Kevin J. Griffin | Brother |
| Sheila Ristaino | U.S. | Kevin J. Griffin | Sister |
| Jerry Hardison, individually and on behalf of the Estate of Teresa Hardison | U.S. | Jeremy F. Hardison | Father, Estate PR |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Justina Hardison | U.S. | Jeremy F. Hardison | Sister |
| Holly Marie Harpe | U.S. | Scott D. Harper | Step-sister of LCpl Scott D. Harper; lived in the same household as LCpl Harper for a substantial period of time and considered LCpl Harper the functional equivalent of a biological brother |
| Angela Marie Harper | U.S. | Scott D. Harper | Step-mother of LCpl Scott D. Harper; lived in the same household as LCpl Harper for a substantial period of time and considered LCpl Harper the functional equivalent of a biological son |
| Brian Harper | U.S. | Scott D. Harper | Father |
| Joseph Troy Hulsey Jr. | U.S. | Scott D. Harper | Step-brother of LCpl Scott D. Harper; lived in the same household as LCpl Harper for a substantial period of time and considered LCpl Harper the functional equivalent of a biological brother |
| Adam Samuel Hartswick | U.S. | Adam Samuel Hartswick | Injured by an IED attack. |
| Alex Henigan | U.S. | Jay Henigan | Son |
| Kevin Honaker | U.S. | Kevin Honaker | Injured by an IED attack. |
| Larry D. Horns | U.S. | Christopher Alexander Horns | Father |
| Tamara Elaine Horns | U.S. | Christopher Alexander Horns | Mother |
| Tiffany Louise Horns | U.S. | Christopher Alexander Horns | Sister |
| Benjamin Horsley | U.S. | Justin L. Horsley | Brother |
| John Horsley | U.S. | Justin L. Horsley | Brother |
| Songmi Kietzmann | U.S. | Justin L. Horsley | Mother |
| Kathleen Lynn Alexander | U.S. | Michael Anthony Hughes | Sister |
| Daniel Owen Hughes | U.S. | Michael Anthony Hughes | Brother |
| Patricia Shirley Hughes | U.S. | Michael Anthony Hughes | Sister |

9

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Kristine Anne Zitny | U.S. | Michael Anthony Hughes | Sister |
| Betty Darlene Black | U.S. | Eric M. Hunter | Mother |
| Joey J. Hunter II | U.S. | Eric M. Hunter | Brother |
| Joey J. Hunter Sr. | U.S. | Eric M. Hunter | Father |
| Eric M. Hunter | U.S. | Eric M. Hunter | Injured by an IED attack. |
| J.H., by and through his next friend, Kenna Hunter | U.S. | Eric M. Hunter | Son |
| Kenna Hunter | U.S. | Eric M. Hunter | Wife |
| K.H., by and through her next friend, Kenna Hunter | U.S. | Eric M. Hunter | Daughter |
| Nicholas Walter Robinson IV | U.S. | Eric M. Hunter | Brother |
| Michael Iubelt | U.S. | Tyler Ray Iubelt | Father |
| Shelby Iubelt | U.S. | Tyler Ray Iubelt | Widow |
| V.I., by and through her next friend, Shelby Iubelt | U.S. | Tyler Ray Iubelt | Daughter |
| Charlotte Loquasto | U.S. | Tyler Ray Iubelt | Mother |
| J.A.L., by and through his next friend, Charlotte Loquasto | U.S. | Tyler Ray Iubelt | Brother |
| Bradley Dylan Ivanchan | U.S. | Bradley Dylan Ivanchan | Injured by an IED attack. |
| Adam Matthew Jayne | U.S. | Ryan P. Jayne | Brother |
| Ayzia J. Jayne | U.S. | Ryan P. Jayne | Sister |
| Paul Elmer Jayne | U.S. | Ryan P. Jayne | Father |
| G.A.S., by and through his next friend, Kent Alan Skeens | U.S. | Ryan P. Jayne | Brother |
| Kent Alan Skeens | U.S. | Ryan P. Jayne | Step-father of SPC Ryan P. Jayne; lived in the same household as SPC Jayne for a substantial period of time and considered SPC Jayne the functional equivalent of a biological son |
| Sherry A. Skeens | U.S. | Ryan P. Jayne | Mother |
| Trent Lorne Skeens | U.S. | Ryan P. Jayne | Brother |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Z.R.S., by and through her next friend, Kent Alan Skeens | U.S. | Ryan P. Jayne | Sister |
| Brian Christopher Jergens | U.S. | Brian Christopher Jergens | Injured by an IED attack. |
| Terence Lonnie Jones | U.S. | Terence Lonnie Jones | Injured by an IED attack. |
| John C. McCarthy | U.S. | Alexis Leigh Kamerman | Step-father of Ms. Alexis Leigh Kamerman; lived in the same household as Ms. Kamerman for a substantial period of time and considered Ms. Kamerman the functional equivalent of a biological daughter |
| Alison R. Pohn | U.S. | Alexis Leigh Kamerman | Mother |
| Kevin King | U.S. | Kevin King | Kidnapped by Haqqani Network and subsequently injured. |
| Stephanie Ann Miller | U.S. | Kevin King | Sister |
| Edward Klein | U.S. | Edward Klein | Injured by an IED attack. |
| Abby Knapp-Morris | U.S. | Michael J. Knapp | Widow |
| K.K., by and through her next friend, Abby Knapp-Morris | U.S. | Michael J. Knapp | Daughter |
| Brandon Korona | U.S. | Brandon Korona | Injured by an IED attack. |
| Brian Lambka | U.S. | Todd W. Lambka | Father |
| Jordan Lambka | U.S. | Todd W. Lambka | Brother |
| | | | |
| | | | |
| | | | |
| Douglas A. Landphair | U.S. | Jason D. Landphair | Father |
| Jean S. Landphair | U.S. | Jason D. Landphair | Mother |
| Meredith Landphair | U.S. | Jason D. Landphair | Sister |
| B.R.L., by and through her next friend, Miranda Landrum | U.S. | Brandon J. Landrum | Daughter |

11

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| G.B.L., by and through his next friend, Miranda Landrum | U.S. | Brandon J. Landrum | Son |
| James R. Landrum | U.S. | Brandon J. Landrum | Father |
| Janet Landrum | U.S. | Brandon J. Landrum | Mother |
| Miranda Landrum | U.S. | Brandon J. Landrum | Widow |
| Holly Lau Abraham | U.S. | David William Haalilio Lau | Sister |
| Leroy Wingkit Lau Jr. | U.S. | David William Haalilio Lau | Brother |
| Alexander Lau | U.S. | David William Haalilio Lau | Son |
| David William Haalilio Lau | U.S. | David William Haalilio Lau | Injured by a suicide bombing attack. |
| Hamide Lau | U.S. | David William Haalilio Lau | Wife |
| K.L., by and through his next friend, David William Haalilio Lau | U.S. | David William Haalilio Lau | Son |
| M.L., by and through her next friend, David William Haalilio Lau | U.S. | David William Haalilio Lau | Daughter |
| Vivian Perry | U.S. | David William Haalilio Lau | Mother |
| Michelle Lee Rauschenberger | U.S. | David William Haalilio Lau | Sister |
| Jammie Joann Smith | U.S. | David William Haalilio Lau | Sister |
| Eric Daniel Lund | U.S. | Eric Daniel Lund | Injured in a complex attack involving IEDs, small arms fire, and rocket propelled grenades. |
| Karyn Sue Stone | U.S. | Chase S. Marta | Mother |
| Lawrence Marta | U.S. | Chase S. Marta | Father |
| Taylor Marta | U.S. | Chase S. Marta | Sister |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Bob Surprenant | U.S. | Ethan J. Martin | Step-father of CPL Ethan J. Martin; lived in the same household as CPL Martin for a substantial period of time and considered CPL Martin the functional equivalent of a biological son |
| Kristie Surprenant | U.S. | Ethan J. Martin | Mother |
| Brian M. Martin | U.S. | Wyatt J. Martin | Father |
| Catherine G. Martin | U.S. | Wyatt J. Martin | Sister |
| Elizabeth A. Martin | U.S. | Wyatt J. Martin | Sister |
| Julie K. Martin | U.S. | Wyatt J. Martin | Mother |
| Jose Luis Martinez Hernandez | U.S. | Jose Luis Martinez Hernandez | Injured by an IED attack. |
| Liseth Martinez-Arellano | U.S. | Jose Luis Martinez Hernandez | Wife |
| Chester R. McBride Sr. | U.S. | Chester J. McBride III | Father |
| Annie L. McBride | U.S. | Chester J. McBride III | Mother |
| Alexandra Dorian McClintock | U.S. | Matthew Q. McClintock | Widow |
| D.C.M., by and through his next friend, Alexandra Dorian McClintock | U.S. | Matthew Q. McClintock | Son |
| George B. McClintock | U.S. | Matthew Q. McClintock | Father |
| Joyce Patricia Paulsen | U.S. | Matthew Q. McClintock | Mother |
|  |  |  |  |
| Kathleen McEvoy | U.S. | Richard P. McEvoy | Widow |
| Michelle Rose McEvoy | U.S. | Richard P. McEvoy | Daughter |
| Patrick Charles McEvoy | U.S. | Richard P. McEvoy | Son |
| Janice H. Proctor | U.S. | Richard P. McEvoy | Mother |
| Luann Varney | U.S. | Richard P. McEvoy | Sister |
| Shannon K. McNulty | U.S. | Richard L. McNulty III | Sister |
| John Means | U.S. | Dale W. Means | Father |
| Clarence Joseph Metcalf | U.S. | Michael J. Metcalf | Father |

13
**JA686**

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Kimberly Metcalf | U.S. | Michael J. Metcalf | Mother |
| Jeremy J. Metzger | U.S. | Jonathan M. Metzger | Brother |
| Theresa Karlson | U.S. | Eugene C. Mills III | Mother |
| Anna Maria Banzer | U.S. | Travis A. Morgado | Sister |
| Andrea Kessler | U.S. | Travis A. Morgado | Mother |
| Sofia Kessler | U.S. | Travis A. Morgado | Sister |
| Eric Morgado | U.S. | Travis A. Morgado | Brother |
| Jose Alberto Morgado | U.S. | Travis A. Morgado | Father |
| Connor Alexian Pladeck-Morgado | U.S. | Travis A. Morgado | Brother |
| Anna Morgan | U.S. | Jedidiah Daniel Morgan | Wife |
| Jedidiah Daniel Morgan | U.S. | Jedidiah Daniel Morgan | Injured by an IED attack. |
| Miriam A. Mullen | U.S. | Sean W. Mullen | Mother |
| Nancy Marie Mullen | U.S. | Sean W. Mullen | Widow |
| William J. Mullen | U.S. | Sean W. Mullen | Father |
| Catherine Mullins | U.S. | Brandon S. Mullins | Mother |
| Thomas Mullins | U.S. | Brandon S. Mullins | Father |
| Bethany Rose Mullins Randall | U.S. | Brandon S. Mullins | Sister |
| Chet Murach | U.S. | Thomas Paige Murach | Father |
| William Anthony Murach | U.S. | Thomas Paige Murach | Brother |
| William R. Nevins | U.S. | Liam Jules Nevins | Father |
| Derrick Anthony Davis | U.S. | Christopher R. Newman | Brother |
| Donald Edward Newman Sr. | U.S. | Christopher R. Newman | Grandfather of SSG Christopher R. Newman; lived in the same household as SSG Newman for a substantial period of time and considered SSG Newman the functional equivalent of a biological son |
| Amanda Newman | U.S. | Christopher R. Newman | Widow |
| Mary R. Hammerbacher-Nichols | U.S. | Bryan J. Nichols | Widow |
| Brandon Nichols | U.S. | Bryan J. Nichols | Brother |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Cynthia Nichols | U.S. | Bryan J. Nichols | Mother |
| Douglas Nichols | U.S. | Bryan J. Nichols | Father |
| Monte Douglas Nichols | U.S. | Bryan J. Nichols | Brother |
| Nicole Ann Robles | U.S. | Bryan J. Nichols | Sister |
| Bruce K. Nichols | U.S. | Rob Lee Nichols | Father |
| Jeanne M. Nichols | U.S. | Rob Lee Nichols | Step-mother of SPC Rob Lee Nichols; lived in the same household as SPC Nichols for a substantial period of time and considered SPC Nichols the functional equivalent of a biological son |
| M.G.N., by and through her next friend, Bruce K. Nichols | U.S. | Rob Lee Nichols | Sister |
| Adolf Olivas | U.S. | Nicholas Henry Olivas | Father |
| Christa L. Osborn | U.S. | Kyle B. Osborn | Step-mother of SGT Kyle B. Osborn; lived in the same household as SGT Osborn for a substantial period of time and considered SGT Osborn the functional equivalent of a biological son |
| Creighton David Osborn | U.S. | Kyle B. Osborn | Father |
| Kade M. Osborn | U.S. | Kyle B. Osborn | Brother |
| Katlyn M. Osborn | U.S. | Kyle B. Osborn | Sister |
| Julia Ott | U.S. | Nicholas S. Ott | Sister |
| Nancy R. Wilson | U.S. | Cody J. Patterson | Mother |
| Robin Elizabeth Akers | U.S. | Joseph R. Perez | Daughter |
| Tracy Anne Herring | U.S. | Joseph R. Perez | Daughter |
| Adan Perez | U.S. | Joseph R. Perez | Son |
| Anthony Perez | U.S. | Joseph R. Perez | Son |
| Debra Ann Perez | U.S. | Joseph R. Perez | Widow |
| Nicholas Joseph Francis Perez | U.S. | Joseph R. Perez | Son |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| B.M., by and through his next friend, Darilyn Perez Ramos | U.S. | Ricardo J. PerezRamos | Step-son of SGT Ricardo J. PerezRamos; lived in the same household as SGT PerezRamos for a substantial period of time and considered SGT PerezRamos the functional equivalent of a biological father |
| Ricardo J. PerezRamos | U.S. | Ricardo J. PerezRamos | Injured by an IED attack. |
| Darilyn Perez Ramos | U.S. | Ricardo J. PerezRamos | Wife |
| A.P., by and through her next friend, Ricardo J. PerezRamos | U.S. | Ricardo J. PerezRamos | Daughter |
| S.P., by and through her next friend, Ricardo J. PerezRamos | U.S. | Ricardo J. PerezRamos | Daughter |
| A.T.P., by and through her next friend, Stewart Lamar Perry | U.S. | John William Perry | Sister |
| G.W.P., by and through his next friend, Julianne Good Perry | U.S. | John William Perry | Son |
| Julianne Good Perry | U.S. | John William Perry | Widow |
| Kathleen Perry | U.S. | John William Perry | Mother |
| L.R.P., by and through her next friend, Julianne Good Perry | U.S. | John William Perry | Daughter |
| Stewart Lamar Perry | U.S. | John William Perry | Father |
| Ashley Peters | U.S. | Joseph Michael Peters | Widow |
| Deborah Jean Peters | U.S. | Joseph Michael Peters | Mother |
| Dennis W. Peters | U.S. | Joseph Michael Peters | Father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| G.R.P., by and through his next friend, Ashley Peters | U.S. | Joseph Michael Peters | Son |
| Christine H. Phillips | U.S. | Francis G. Phillips IV | Widow |
| S.N.P., by and through her next friend, Christine H. Phillips | U.S. | Francis G. Phillips IV | Daughter |
| Bethany Rose Wesley | U.S. | Trevor Adam Pinnick | Sister |
| John Terry Pittman Sr. | U.S. | Jesse Daryl Pittman | Father |
| Ida Belle Pittman | U.S. | Jesse Daryl Pittman | Mother |
| Aaron William Prescott | U.S. | Brandon Joseph Prescott | Brother |
| Jacob Richard Prescott | U.S. | Brandon Joseph Prescott | Brother |
| Joshua Michael Prescott | U.S. | Brandon Joseph Prescott | Brother |
| Tracey Marie Prescott | U.S. | Brandon Joseph Prescott | Mother |
| Judith L. Ashley | U.S. | Peter Louis Provost | Sister |
| Louise P. Conlon | U.S. | Peter Louis Provost | Sister |
| Meghan Janet Hollingsworth | U.S. | Peter Louis Provost | Daughter |
| MaryJane G. Medeiros | U.S. | Peter Louis Provost | Sister |
| Sarah Tiffany Peterson | U.S. | Peter Louis Provost | Daughter |
| Brian Provost | U.S. | Peter Louis Provost | Son |
| Gail Provost | U.S. | Peter Louis Provost | Widow |
| Gertrude Provost | U.S. | Peter Louis Provost | Mother |
| John A. Provost | U.S. | Peter Louis Provost | Brother |
| Louis Provost | U.S. | Peter Louis Provost | Father |
| Paul Provost | U.S. | Peter Louis Provost | Brother |
| Scott Peter Provost | U.S. | Peter Louis Provost | Brother |
| | | | |
| Lona L. Bosley | U.S. | Christopher K. Raible | Sister |
| Andrea N. Ratzlaff | U.S. | Thomas A. Ratzlaff | Widow |
| Hannah Mason | U.S. | Jarrold M. Reeves Jr. | Daughter |

17

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Summer Reeves Dunn | U.S. | Jarrold M. Reeves Jr. | Daughter |
| Charlotte Ann Reeves | U.S. | Jarrold M. Reeves Jr. | Mother |
| Jennifer Katherine Reeves | U.S. | Jarrold M. Reeves Jr. | Daughter |
| | | | |
| Victoria Jane Reeves | U.S. | Jarrold M. Reeves Jr. | Sister |
| Joyce Ann Tulloch | U.S. | Jarrold M. Reeves Jr. | Sister |
| Mallory Taylor Williams | U.S. | Jarrold M. Reeves Jr. | Daughter |
| Scott Regelin | U.S. | Chad R. Regelin | Father |
| Shirene Regelin | U.S. | Chad R. Regelin | Mother |
| Cassie Marie Richardson | U.S. | Joseph A. Richardson | Sister |
| Cynthia Jeffries Richmond | U.S. | Colby Lee Richmond | Mother |
| Michelle Riley | U.S. | Joseph William Riley | Mother |
| Rodney Riley | U.S. | Joseph William Riley | Father |
| Nathan Jeremy Rimpf | U.S. | Nathan Jeremy Rimpf | Injured by an IED attack. |
| Christopher Powers | U.S. | Michael E. Ristau | Step-brother of SGT Michael E. Ristau; lived in the same household as SGT Ristau for a substantial period of time and considered SGT Ristau the functional equivalent of a biological brother |
| Halie Ristau | U.S. | Michael E. Ristau | Sister |
| Randy Ristau | U.S. | Michael E. Ristau | Father |
| Suzanne Ristau | U.S. | Michael E. Ristau | Step-mother of SGT Michael E. Ristau; lived in the same household as SGT Ristau for a substantial period of time and considered SGT Ristau the functional equivalent of a biological son |
| Daniel Mark Robinson | U.S. | Heath M. Robinson | Father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Rodolfo Rodriguez Sr. | U.S. | Rodolfo Rodriguez Jr. | Father |
| Derek Rodriguez | U.S. | Rodolfo Rodriguez Jr. | Son |
| K.R., by and through her next friend, Melissa Rodriguez | U.S. | Rodolfo Rodriguez Jr. | Daughter |
| Melissa Rodriguez | U.S. | Rodolfo Rodriguez Jr. | Widow |
| | | | |
| Barbara A. Roland | U.S. | Matthew D. Roland | Mother |
| Erica M. Roland | U.S. | Matthew D. Roland | Sister |
| Mark K. Roland | U.S. | Matthew D. Roland | Father |
| Angel R. Roldan | U.S. | Angel Roldan Jr. | Son |
| Lieselotte R. Roldan | U.S. | Angel Roldan Jr. | Widow |
| Matthias P. Roldan | U.S. | Angel Roldan Jr. | Son |
| Samantha G. Roldan | U.S. | Angel Roldan Jr. | Daughter |
| Christopher J. Rosebrock | U.S. | Christopher J. Rosebrock | Injured by a suicide bombing attack. |
| Alex Jason Rozanski | U.S. | Nicholas J. Rozanski | Brother |
| Joshua Anthony Sams | U.S. | Joshua Anthony Sams | Injured by an IED attack. |
| Colleen Whipple | U.S. | Rex L. Schad | Mother |
| A.L.S., by and through his next friend, Natalie Schmidt | U.S. | Jonathan P. Schmidt | Son |
| Brandon Tyler Schmidt | U.S. | Jonathan P. Schmidt | Brother |
| LeeAnn Schmidt | U.S. | Jonathan P. Schmidt | Mother |
| Natalie Schmidt | U.S. | Jonathan P. Schmidt | Widow |
| Phillip J. Schmidt | U.S. | Jonathan P. Schmidt | Father |
| Sheeshta Marie Perry | U.S. | Mark Henry Schoonhoven | Step-daughter of SSG Mark Henry Schoonhoven; lived in the same household as SSG Schoonhoven for a substantial period of time and considered SSG Schoonhoven the functional equivalent of a biological father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| A.M.S., by and through her next friend, Tammie Sue Schoonhoven | U.S. | Mark Henry Schoonhoven | Daughter |
| A.R.S., by and through her next friend, Tammie Sue Schoonhoven | U.S. | Mark Henry Schoonhoven | Daughter |
| Christopher Scott Schoonhoven | U.S. | Mark Henry Schoonhoven | Brother |
| Deborah Fern Schoonhoven | U.S. | Mark Henry Schoonhoven | Mother |
| Tammie Sue Schoonhoven | U.S. | Mark Henry Schoonhoven | Widow |
| Sarah Melinda Schwallie | U.S. | Jacob M. Schwallie | Mother |
| Samuel Robert Shockley | U.S. | Samuel Robert Shockley | Injured by an IED attack. |
| Spenser J. Fernandez | U.S. | Forrest B. Sibley | Brother |
| Suzi L. Fernandez | U.S. | Forrest B. Sibley | Mother |
| Jordan L. Sibley | U.S. | Forrest B. Sibley | Sister |
| Lowell Brent Sibley, individually and on behalf of the Estate of Forrest B. Sibley | U.S. | Forrest B. Sibley | Father, Estate PR |
| G.S., by and through his next friend, Georganne M. Siercks | U.S. | Billy J. Siercks | Son |
| G.S., by and through his next friend, Georganne M. Siercks | U.S. | Billy J. Siercks | Son |
| Georganne M. Siercks | U.S. | Billy J. Siercks | Widow |
| Joan M. Smedinghoff | U.S. | Anne T. Smedinghoff | Sister |
| Mark T. Smedinghoff | U.S. | Anne T. Smedinghoff | Brother |
| Mary Beth Smedinghoff | U.S. | Anne T. Smedinghoff | Mother |
| Regina C. Smedinghoff | U.S. | Anne T. Smedinghoff | Sister |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Thomas Smedinghoff | U.S. | Anne T. Smedinghoff | Father |
| Jan Marie Hurnblad Sparks | U.S. | Orion N. Sparks | Mother |
| Erik Sparks | U.S. | Orion N. Sparks | Brother |
| Garry Lee Sparks | U.S. | Orion N. Sparks | Brother |
| Jane Sparks | U.S. | Orion N. Sparks | Step-mother of SSG Orion N. Sparks; lived in the same household as SSG Sparks for a substantial period of time and considered SSG Sparks the functional equivalent of a biological son |
| Zachary Douglas Sparks | U.S. | Orion N. Sparks | Brother |
| Lisa Martinusen | U.S. | Nicholas P. Spehar | Sister |
| Marie Sentina Mielke | U.S. | Nicholas P. Spehar | Sister |
| Annette Spehar | U.S. | Nicholas P. Spehar | Mother |
| Jacob Louis Spehar | U.S. | Nicholas P. Spehar | Brother |
| Luke Spehar | U.S. | Nicholas P. Spehar | Brother |
| Patrick Spehar | U.S. | Nicholas P. Spehar | Father |
| Mitchell L. Stambaugh | U.S. | Cameron J. Stambaugh | Father |
| Charles Wesley Strange III | U.S. | Michael J. Strange | Brother |
| Carly Elizabeth Strange | U.S. | Michael J. Strange | Sister |
| Charles Wesley Strange | U.S. | Michael J. Strange | Father |
| Katelyn Marie Strange | U.S. | Michael J. Strange | Sister |
| Garrett Layne Funk | U.S. | Joshua J. Strickland | Brother |
| Joshua Nicholas Sust | U.S. | Joshua Nicholas Sust | Injured by an IED attack. |
| Erin Nicole Goss | U.S. | Barry Sutton | Daughter |
| Trecia Brock Hood | U.S. | Barry Sutton | Sister |
| Wendy Shedd | U.S. | Barry Sutton | Sister |
| Freddie Dewey Sutton | U.S. | Barry Sutton | Brother |
| Harriet Sutton | U.S. | Barry Sutton | Mother |
| Summer Breanne Sutton | U.S. | Barry Sutton | Daughter |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|------|-------------|-----------|-------------|
| Diane Timoney | U.S. | Ryan Gregory Timoney | Mother |
| Gregory Timoney | U.S. | Ryan Gregory Timoney | Father |
| Ryan Gregory Timoney | U.S. | Ryan Gregory Timoney | Injured by a suicide bombing attack. |
| Frederick Allen Tolon | U.S. | Frederick Allen Tolon | Injured by a complex attack involving small arms fire and indirect fire. |
| Esta Smith | U.S. | Aaron C. Torian | Mother |
| Jimmy Smith | U.S. | Aaron C. Torian | Step-father of MSgt Aaron C. Torian; lived in the same household as MSgt Torian for a substantial period of time and considered MSgt Torian the functional equivalent of a biological son |
| Emily Torian | U.S. | Aaron C. Torian | Sister |
| Joe Torian | U.S. | Aaron C. Torian | Father |
| Nathan Ewell Torian | U.S. | Aaron C. Torian | Brother |
| Brittany Taylor Townsend | U.S. | Jon R. Townsend | Widow |
| Kevin Trimble | U.S. | Kevin Trimble | Injured by an IED attack. |
| Christopher Michael Van Etten | U.S. | Christopher Michael Van Etten | Injured by an IED attack. |
| Catherine Kimberly Vaughn Kryzda | U.S. | Aaron C. Vaughn | Widow |
| C.C.V., by and through her next friend, Catherine Kimberly Vaughn Kryzda | U.S. | Aaron C. Vaughn | Daughter |
| R.C.V., by and through his next friend, Catherine Kimberly Vaughn Kryzda | U.S. | Aaron C. Vaughn | Son |
| Robert Martin Kahokulani Vickers Jr. | U.S. | Kraig Michael Kaleolani Vickers | Brother |
| Robert Martin Kahokulani Vickers Sr. | U.S. | Kraig Michael Kaleolani Vickers | Father |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Hortense Kainoa Wainani Vickers | U.S. | Kraig Michael Kaleolani Vickers | Widow |
| K.N.V., by and through his next friend, Hortense Kainoa Wainani Vickers | U.S. | Kraig Michael Kaleolani Vickers | Son |
| K.E.F.V., by and through her next friend, Hortense Kainoa Wainani Vickers | U.S. | Kraig Michael Kaleolani Vickers | Daughter |
| K.M.G.V., by and through her next friend, Hortense Kainoa Wainani Vickers | U.S. | Kraig Michael Kaleolani Vickers | Daughter |
| Mark Matthew Kaleinani Vickers | U.S. | Kraig Michael Kaleolani Vickers | Brother |
| Mary Jane Vickers | U.S. | Kraig Michael Kaleolani Vickers | Mother |
| Vance Marshall Keliiolani Vickers | U.S. | Kraig Michael Kaleolani Vickers | Brother |
| Makahea Xhelili | U.S. | Kraig Michael Kaleolani Vickers | Adopted daughter of SCPO Kraig Michael Kaleolani Vickers; lived in the same household as SCPO Vickers for a substantial period of time and considered SCPO Vickers the functional equivalent of a biological father |
| Michelle Joy Kapunaheleokalani Yarborough | U.S. | Kraig Michael Kaleolani Vickers | Sister |
| Barry Welch | U.S. | Nickolas S. Welch | Father |
| Lorria Welch | U.S. | Nickolas S. Welch | Mother |
| Zackary Welch | U.S. | Nickolas S. Welch | Brother |
| Jeffrey L. White Sr. | U.S. | Jeffrey Lee White Jr. | Father |
| Kyle White | U.S. | Jeffrey Lee White Jr. | Brother |
| Michael White | U.S. | Jeffrey Lee White Jr. | Brother |

**Exhibit A to Complaint**
**Under the Anti-Terrorism Act (18 U.S.C. § 2333)**
*Wildman v. Deutsche Bank AG, et al.* (E.D.N.Y. Am. Compl. Filed Feb. 15, 2022)

| Name | Nationality | Family[1] | Description |
|---|---|---|---|
| Paula K. White | U.S. | Jeffrey Lee White Jr. | Mother |
| Michelle Carolina Rotelli | U.S. | James T. Wickliff Chacin | Sister |
| Martha Carolina Smith | U.S. | James T. Wickliff Chacin | Mother |
| Thomas Elmer Wickliff | U.S. | James T. Wickliff Chacin | Father |
| Brian Anthony Williams | U.S. | Brian Anthony Williams | Injured by an IED attack. |
| Clarence Williams Jr. | U.S. | Clarence Williams III | Father |
| Abrill Renee Williams | U.S. | Clarence Williams III | Sister |
| Samantha Shervon Williams | U.S. | Clarence Williams III | Sister |
| Talisa Shervon Williams | U.S. | Clarence Williams III | Mother |
| Mona G. Betzen | U.S. | Mark G. Worley | Mother |
| Cody Worley | U.S. | Mark G. Worley | Brother |
| Gregory W. Worley | U.S. | Mark G. Worley | Father |
| James Wayne Worley | U.S. | Mark G. Worley | Brother |
| Mark G. Worley | U.S. | Mark G. Worley | Injured by an IED attack. |
| Baily Zimmerman | U.S. | Sonny C. Zimmerman | Sister |
| Chris Lee Zimmerman | U.S. | Sonny C. Zimmerman | Father |
| Michelle Zimmerman | U.S. | Sonny C. Zimmerman | Mother |
| Daniel Lee Brown | U.S. | Daniel Lee Brown | Injured by an IED attack. |
| Kristina Brown | U.S. | Daniel Lee Brown | Wife |
| Daniel Edward Stamper Jr. | U.S. | Daniel Edward Stamper, Jr. | Injured by an IED attack. |
| Cameron Jay Stuart | U.S. | Cameron Jay Stuart | Injured by an IED attack. |
| Katy Stuart | U.S. | Cameron Jay Stuart | Wife |
| Adriana Wakeling | U.S. | Seth Tanner Wakeling | Wife |
| Seth Wakeling | U.S. | Seth Tanner Wakeling | Injured by an IED attack. |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUGUST WILDMAN, *et al.*, | |
| Plaintiffs, | |
| v. | |
| DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S, DANSKE MARKETS INC., PLACID NK CORPORATION d/b/a PLACID EXPRESS, and WALL STREET EXCHANGE LLC, | **21 Civ. 4400 (KAM) (RML)** |
| Defendants. | |

## DECLARATION OF BRIAN T. FRAWLEY

BRIAN T. FRAWLEY hereby declares under penalty of perjury as follows:

1.      I am a member of the law firm of Sullivan & Cromwell LLP, counsel for Defendants Danske Bank A/S and Danske Markets Inc. (the "Danske Defendants") in this action, and a member of the Bar of this Court.  I make this Declaration in support of the Danske Defendants' Motion to Dismiss the Amended Complaint.

2.      Attached hereto as Exhibit 1 is a chart, prepared at my direction, that lists, in ascending chronological order, each of the alleged terrorist attacks identified in paragraphs 1101 through 2024 of the Amended Complaint, including the date and description of the alleged attacks, as well as the organization alleged to be responsible for the alleged terrorist attacks.

3.      Attached hereto as Exhibit 2 is the transcript from the December 7, 2021 pre-motion conference held in this matter before the Honorable Kiyo A. Matsumoto.

**JA698**

4.     Attached hereto as Exhibit 3 is a true and correct copy of the article printed by Italian news *Corriere Della Sera*, which plaintiffs cite in paragraph 553 of the Amended Complaint.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the article printed by German news *Süddeutsche Zeitung*, which plaintiffs cite in paragraph 540, note 351 of the Amended Complaint.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the article printed by *Business Recorder*, which plaintiffs cite in paragraph 541, note 352 of the Amended Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        March 18, 2022

                                              */s/ Brian T. Frawley*
                                              Brian T. Frawley

**JA699**

# Exhibit 1

**_Wildman_ v. _Deutsche Bank_, 21 Civ. 4400 (KAM) (E.D.N.Y.)**
List of Alleged Terrorists Attacks Identified in the Amended Complaint
(Am. Compl. ¶¶ 1101-2024)

| No. | Date | Description | Organization |
|---|---|---|---|
| | | **2011** | |
| 1. | 08/06/2011 | Attack on a helicopter in Wardak Province | Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell |
| 2. | 08/07/2011 | IED attack in Uruzgan Province | Taliban |
| 3. | 08/10/2011 | IED attack in Helmand Province | Taliban |
| 4. | 08/25/2011 | IED attack in Helmand Province | Taliban |
| 5. | 08/25/2011 | IED attack in Kandahar Province | Taliban |
| 6. | 08/28/2011 | IED attack in Kandahar Province | Taliban |
| 7. | 09/13/2011 | IED attack in Helmand Province | Taliban |
| 8. | 09/14/2011 | IED attack in Kandahar Province | Taliban |
| 9. | 09/15/2011 | IED attack in Helmand Province | Taliban |
| 10. | 09/18/2011 | IED attack in Kandahar Province | Taliban |
| 11. | 09/23/2011 | IED attack in Helmand Province | Taliban |
| 12. | 09/25/2011 | Insider attack in Kabul Province | Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| 13. | 09/25/2011 | IED attack in Laghman Province | Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| 14. | 09/26/2011 | IED attack in Helmand Province | Taliban |
| 15. | 09/27/2011 | Indirect fire attack in Logar Province | Haqqani Network (a part of the Taliban) |
| 16. | 10/10/2011 | Complex attack involving small arms fire and indirect fire in Kandahar Province | Taliban |
| 17. | 10/13/2011 | IED attack in Helmand Province | Taliban |

**JA701**

| No. | Date | Description | Organization |
|-----|------|-------------|--------------|
| **18.** | 10/14/2011 | IED attack in Khost Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **19.** | 10/22/2011 | IED attack in Kandahar Province | Taliban |
| **20.** | 10/27/2011 | IED attack in Helmand Province | Taliban |
| **21.** | 10/29/2011 | Suicide bombing attack in Kabul Province | Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **22.** | 11/12/2011 | IED attack in Helmand Province | Taliban |
| **23.** | 11/15/2011 | IED attack in Kandahar Province | Taliban |
| **24.** | 11/15/2011 | IED attack in Helmand Province | Taliban |
| **25.** | 11/20/2011 | IED attack in Kandahar Province | Taliban |
| **26.** | 11/30/2011 | IED attack in Helmand Province | Taliban |
| **27.** | 12/13/2011 | IED attack in Kandahar Province | Taliban |
| | | **2012** | |
| **28.** | 01/02/2012 | IED attack in Helmand Province | Taliban |
| **29.** | 01/06/2012 | IED attack in Kandahar Province | Taliban |
| **30.** | 01/12/2012 | IED attack in Helmand Province | Taliban |
| **31.** | 02/07/2012 | IED attack in Kandahar Province | Taliban |
| **32.** | 02/23/2012 | Insider attack in Nangarhar Province | Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **33.** | 03/03/2012 | IED attack in Kandahar Province | Taliban |
| **34.** | 03/09/2012 | Grenade launcher attack in Helmand Province | Taliban |
| **35.** | 03/27/2012 | IED attack in Helmand Province | Taliban |

**JA702**

| No. | Date | Description | Organization |
|-----|------|-------------|--------------|
| **36.** | 04/03/2012 | IED attack in Khost Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **37.** | 04/03/2012 | IED attack in Kunar Province | Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **38.** | 04/04/2012 | Suicide bombing attack in Faryab Province | al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the suicide bomber |
| **39.** | 04/22/2012 | IED attack in Ghazni Province | Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **40.** | 04/25/2012 | IED attack in Helmand Province | Taliban |
| **41.** | 04/26/2012 | IED attack in Kandahar Province | Taliban |
| **42.** | 05/06/2012 | IED attack in Paktia Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **43.** | 05/07/2012 | IED attack in Ghazni Province | Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **44.** | 05/13/2012 | IED attack in Khost Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **45.** | 05/18/2012 | Indirect fire attack in Kunar Province | Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **46.** | 05/20/2012 | Complex attack involving two IEDs followed by small arms fire and rocket propelled grenades in Kandahar Province | Taliban |

| No. | Date | Description | Organization |
|-----|------|-------------|--------------|
| **47.** | 05/20/2012 | Suicide bombing attack in Uruzgan Province | Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber |
| **48.** | 05/23/2012 | IED attack in Kandahar Province | Taliban |
| **49.** | 05/30/2012 | IED attack in Kandahar Province | Taliban |
| **50.** | 05/31/2012 | IED attack in Helmand Province | Taliban |
| **51.** | 06/01/2012 | Complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **52.** | 06/09/2012 | IED attack in Kandahar Province | Taliban |
| **53.** | 06/12/2012 | IED attack in Helmand Province | Taliban |
| **54.** | 06/12/2012 | IED attack in Kandahar Province | Taliban |
| **55.** | 06/13/2012 | IED attack in Helmand Province | Taliban |
| **56.** | 06/20/2012 | IED attack in Helmand Province | Taliban |
| **57.** | 06/22/2012 | Sniper attack in Helmand Province | Taliban |
| **58.** | 07/08/2012 | IED attack in Wardak Province | Haqqani Network (a part of the Taliban) |
| **59.** | 07/08/2012 | IED attack in Ghazni Province | Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **60.** | 07/13/2012 | IED attack in Zabul Province | Haqqani Network (a part of the Taliban) |
| **61.** | 07/19/2012 | IED attack in Helmand Province | Taliban |
| **62.** | 07/22/2012 | IED attack in Logar Province | Haqqani Network (a part of the Taliban) |
| **63.** | 07/22/2012 | Insider attack in Herat Province | Taliban |
| **64.** | 08/01/2012 | IED attack in Paktika Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **65.** | 08/01/2012 | IED attack in Helmand Province | Taliban |

**JA704**

| No. | Date | Description | Organization |
|-----|------|-------------|--------------|
| 66. | 08/07/2012 | Insider attack in Paktia Province | Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| 67. | 08/08/2012 | Suicide bombing attack in Kunar Province | Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| 68. | 08/11/2012 | IED attack in Helmand Province | Taliban |
| 69. | 08/16/2012 | Attack on a helicopter in Kandahar Province | Taliban |
| 70. | 09/01/2012 | Complex attack involving small arms fire and grenades in Ghazni Province | Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| 71. | 09/13/2012 | Rocket propelled grenade attack in Ghazni Province | Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| 72. | 09/15/2012 | Complex attack involving small arms fire and rocket propelled grenades in Helmand Province | Taliban |
| 73. | 09/16/2012 | Insider attack in Zabul Province | Haqqani Network (a part of the Taliban) |
| 74. | 09/17/2012 | IED attack in Kandahar Province | Taliban |
| 75. | 09/26/2012 | Suicide bombing attack in Logar Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| 76. | 09/30/2012 | IED attack in Kandahar Province | Taliban |
| 77. | 10/01/2012 | Suicide bombing attack by an individual wearing an Afghan police uniform in Khost Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |

| No. | Date | Description | Organization |
|-----|------|-------------|--------------|
| 78. | 10/13/2012 | IED attack in Zabul Province | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| 79. | 10/22/2012 | IED attack in Kandahar Province | Taliban |
| 80. | 11/03/2012 | IED attack in Paktia Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| 81. | 11/16/2012 | Complex attack involving an IED and small arms fire in Paktika Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| 82. | 11/18/2012 | IED attack in Helmand Province | Taliban |
| 83. | 12/15/2012 | IED attack in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **2013** | | | |
| 84. | 02/22/2013 | IED attack in Helmand Province | Taliban |
| 85. | 03/11/2013 | Insider attack in Wardak Province | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| 86. | 03/17/2013 | IED attack in Kandahar Province | Taliban |
| 87. | 04/06/2013 | Suicide bombing attack in Zabul Province | Taliban (including the Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell in the Kabul Attack Network |
| 88. | 05/04/2013 | IED attack in Kandahar Province | Taliban |
| 89. | 05/14/2013 | IED attack in Kandahar Province | Taliban |

| No. | Date | Description | Organization |
|-----|------|-------------|--------------|
| **90.** | 05/16/2013 | Suicide bombing attack in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **91.** | 06/02/2013 | IED attack in Helmand Province | Taliban |
| **92.** | 06/18/2013 | Rocket attack in Parwan Province | Taliban |
| **93.** | 06/23/2013 | IED attack in Paktika Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **94.** | 07/15/2013 | Attack involving a recoilless rifle in Paktia Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **95.** | 07/23/2013 | IED attack in Wardak Province | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| **96.** | 07/30/2013 | Indirect fire attack in Logar Province | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| **97.** | 08/12/2013 | IED attack in Logar Province | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| **98.** | 09/21/2013 | Insider attack in Paktia Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **99.** | 09/26/2013 | Insider attack in Paktia Province | Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **100.** | 09/26/2013 | IED attack in Wardak Province | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| **101.** | 10/06/2013 | IED attack in Kandahar Province | Taliban |

| No. | Date | Description | Organization |
|---|---|---|---|
| **2014** | | | |
| **102.** | 01/17/2014 | Complex attack involving a suicide bomber and gunmen in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **103.** | 02/10/2014 | IED attack in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **104.** | 02/15/2014 | IED attack in Helmand Province | Taliban |
| **105.** | 08/12/2014 | IED attack in Kandahar Province | Taliban |
| **106.** | 08/24/2014 | Suicide bombing IED attack in Nangarhar Province | Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell |
| **107.** | 11/24/2014 | Vehicle-borne IED attack in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **108.** | 12/12/2014 | IED attack in Parwan Province | Taliban |
| **2015** | | | |
| **109.** | 01/29/2015 | Insider attack in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |

| No. | Date | Description | Organization |
|---|---|---|---|
| **110.** | 08/22/2015 | Suicide bombing attack in Kabul Province | Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network |
| **111.** | 08/26/2015 | Insider attack in Helmand Province | Taliban |
| **112.** | 12/21/2015 | Suicide bombing attack in Parwan Province | Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber |
| | | **2016** | |
| **113.** | 01/05/2016 | Complex attack involving small arms fire in Helmand Province | Taliban |
| **114.** | 08/07/2016 | Kidnapped at gunpoint outside the front gates of American University of Afghanistan | Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) |
| **115.** | 11/12/2016 | Suicide bombing attack in Parwan Province | Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber |

**JA709**

# Exhibit 3

Stampa | Stampa senza immagine | Chiudi

L'INCHIESTA

# La grande truffa dell'Iva in Italia per finanziare i gruppi islamici

La Procura di Milano: 1.150 milioni di Iva rubati al Fisco. Gli 007: sono finiti ai fondamentalisti islamici per la jihad

Luigi Ferrarella e Giuseppe Guastella



Cercavano Osama Bin Laden, trovarono solo un pugno di fatture. Ma per le forze alleate il blitz in un covo dei talebani al confine tra Afghanistan e Pakistan nel 2010 si è rivelata una miniera di informazioni che attraverso Europa, Medioriente e Hong Kong hanno portato sulle tracce di una colossale frode fiscale sui certificati ambientali servita a finanziare anche il terrorismo islamico. Le stesse orme seguite dalla Procura di Milano in un'indagine che, innescata dalla denuncia di una commercialista terrorizzata, con l'incriminazione di 38 indagati e il sequestro di 80 milioni di euro colpisce ora un'associazione criminale anglo-pakistana e una franco-israeliana che dal 2009 al 2012 hanno rubato all'Italia più di un miliardo di euro di Iva.

**I documenti scoperti nel rifugio,** non lontano dall'area dove il 2 maggio 2011 i Navy Seals americani hanno ucciso Bin Laden, conducevano ad Imran Yakub Ahmed, un pachistano di 40 anni con passaporto inglese residente a Preston (Gran Bretagna), amministratore della milanese "Sf Energy Trading spa", sulla quale stavano indagando i pm Carlo Nocerino e Adriano Scudieri nel pool guidato dall'aggiunto Francesco Greco. I pm e la Guardia di Finanza si erano mossi dopo che a presentarsi in Procura era stata una commercialista di Milano spaventata dalla

JA711

facilità con la quale guadagnava soldi a palate lavorando per alcune società intestate a prestanome cinesi e italiani, cartiere che facevano girare milioni di euro vendendo e acquistando migliaia di carbon credit .

**Con l'accordo di Kyoto sulla riduzione delle emissioni** di anidride carbonica, infatti, ad ogni Stato è assegnata una quota massima di produzione di CO2. Le aziende che producono meno gas-serra del tetto assegnato possono vendere il rimanente della quota alle imprese meno virtuose emettendo appunto carbon credit , certificati ambientali che possono essere negoziati bilateralmente o in un mercato telematico, scambi sotto la supervisione di autorità pubbliche nazionali quali in Italia il «Gestore dei Mercati Energetici», una spa che fa capo al Ministero dell'Economia.

**Le due organizzazioni criminali operavano** sia singolarmente che insieme. Acquistavano i certificati in Gran Bretagna, Francia, Olanda e Germania attraverso società fittizie con sede in Italia, vere e proprie «cartiere» che producevano solo fatture e che erano intestate a prestanome quasi sempre cinesi o a persone estranee ma vittime di furti d'identità. Dopo aver acquistato senza pagare l'Iva, esclusa in questo tipo di transazioni intracomunitarie, le «cartiere» aggiungevano l'Iva al 20 per cento e vendevano i certificati ad altre società, anche queste fittizie, che facevano da intermediari con gli ignari acquirenti finali. Una volta incassata l'Iva, invece di versarla allo Stato italiano la «cartiera» chiudeva i battenti e spariva nel nulla, mentre i soldi, milioni e milioni di euro, venivano dirottati su conti correnti a Cipro e Hong Kong per finire a Dubai, negli Emirati Arabi Uniti. Lì le rogatorie avviate dai pm milanesi a caccia di Imran Yakum Ahmed sono cadute nel nulla, mentre i soldi sottratti all'Erario italiano sono stati riciclati in diamanti ed investimenti immobiliari. C'è stato anche qualcuno che non ha resistito e ha comprato due orologi da 50mila euro ciascuno in una prestigiosa gioielleria di Roma.

**Ma l'aspetto più inquietante che emerge** dalle carte dell'indagine milanese è che dietro le «imponenti operazioni di riciclaggio» legate alla frode fiscale potrebbe celarsi un canale di «finanziamento al terrorismo internazionale» di matrice islamica. A lanciare l'allarme sono stati i servizi segreti americani e inglesi che hanno esaminato la documentazione trovata tra le montagne tra Pakistan e Afghanistan e hanno segnalato tutto alla «Hm Revenue & Custom di Londra», una sorta di GdF inglese, il cui ufficio stampa, contattato dal Corriere della Sera , non ha fornito ulteriori dettagli perché non può «discutere di singoli casi per ragioni legali». Peraltro i pm milanesi non hanno prove dirette su questo profilo, né possono utilizzare le carte dell'intelligence . Questo meccanismo criminale è stato replicato per anni in

**JA712**

centinaia di transazioni facendo impazzire le polizie di tutta Europa, fino a quando le due organizzazioni hanno trasferito gli affari in Italia dopo che altri Paesi dell'Ue erano corsi ai ripari con norme che avevano di fatto rotto il giocattolo. Un ginepraio in cui si sono mossi anche gli investigatori della «Bundeskriminalamt» tedesca, della «Service National de Douane Judiciare» francese, ma anche di Belgio e Liechtenstein, tutti coordinati da Europol e Eurojust. La conclusione è che i mercati energetici europei sono «fortemente manipolati e comunque viziati da un numero impressionate di transazioni commerciali effettuate al precipuo scopo di realizzare rilevanti frodi agli Erari». La preoccupazione è alta, tanto che le indagini sono state estese a livello internazionale acquisendo i dati in possesso del «Citl», l'ente di Bruxelles che monitora a livello europeo gli scambi dei permessi di emissione di CO2.

**Le indagini della Procura milanese**, chiuse in questi giorni in vista della richiesta di processo, solo per il primo filone hanno scoperto una frode da 660 milioni, di cui 80 sequestrati. Trentotto gli indagati di cui 11 ricercati, e un centinaio le perquisizioni eseguite in società e abitazioni. Un'inchiesta parallela, ancora in corso, sta già disvelando un'altra frode del tutto analoga che ha sottratto ai contribuenti italiani altri 450 milioni.

24 settembre 2014 | 07:06
© RIPRODUZIONE RISERVATA

JA713

# Exhibit 4

SüddeutscheZeitung

**Finanzskandal**

# Dänische Waschmaschine

23. September 2020, 18:59 Uhr  |  Lesezeit: 6 min

**Der Fall Danske gilt als größter Geldwäscheskandal der europäischen Geschichte. Auch die Deutsche Bank ist darin verstrickt.**

*Von Frederik Obermaier, Mauritius Much, Hannes Munzinger und Meike Schreiber*

Howard Wilkinsons Einsatz war klein, sogar sehr klein. Exakt ein Pfund Sterling investierte er in einen Stapel Dokumente, die ihm zeigten, dass etwas faul war in Dänemarks wichtigster Bank, der Danske Bank. Die Papiere sollten den größten Bankenskandal der jüngeren Geschichte auslösen.

Passiert ist das vor acht Jahren, der zurückhaltende Brite ist damals 41 Jahre alt, Banker und angekommen im mittleren Management der mittelgroßen Danske Bank. Wilkinson verantwortet die Finanzmarkttransaktionen in den baltischen Staaten und arbeitet in Tallinn, Estland. Er trägt eine eckige Brille, die angegrauten Haare sind bereits auf dem Rückzug - auf den ersten Blick ist da nichts Heldenhaftes an dem Mann, der den Stein ins Rollen bringt. Aber sein Tun wird am Ende nicht nur dazu führen, dass er seinen Job aufgeben wird. Der Chef seiner Bank wird zurücktreten, ein ganzer Geschäftszweig aufgelöst werden und ein Manager tot im Garten liegen.

Allerdings kommt der Skandal der Danske Bank erst 2018 an die Öffentlichkeit: Umgerechnet etwa 200 Milliarden Euro sollen in der estnischen Filiale der Bank gewaschen worden sein. Aus den FinCEN-Files, einem Datensatz aus dem US-Finanzministerium, geht nun hervor, dass ein berüchtigter, für Terroristen tätiger Geldwäscher von den Machenschaften in der Bank profitierte. Seit einiger Zeit ermittelt auch die Staatsanwaltschaft Frankfurt gegen mindestens einen Mitarbeiter der Deutschen Bank im Zusammenhang mit dem Danske-Skandal. Der Deutschen Bank droht nach SZ-Informationen eine Strafzahlung.

Was Wilkinson damals, 2012, für ein Pfund Sterling kauft, sind die Geschäftsberichte der britischen Firma Lantana Trade. Ihm war aufgefallen, dass über ihr Danske-Konto viele Millionen Dollar flie-

**JA715**

ßen. Laut der Bilanzen aber, die er online abruft, müsste die Firma zu diesem Zeitpunkt inaktiv sein, ihr letzter Jahresabschluss weist eine Bilanzsumme von null Pfund aus. Wilkinson meldet seine Erkenntnisse pflichtbewusst mehreren Kollegen und einem Vorgesetzten. Zu hören bekommt er, dass der Kunde einen Fehler gemacht habe und die Bilanz korrigieren würde. Das sei kein ungewöhnlicher Vorgang.

Doch als Wilkinson ein Jahr später von einem Kollegen erfährt, wem die Firma Lantana Trade angeblich gehören soll, kehren seine Zweifel zurück: mehreren Beamten des russischen Inlandsgeheimdienstes FSB und Igor Putin, ein Cousin des russischen Präsidenten Wladimir Putin. Howard Wilkinson besorgt sich neuere Dokumente aus dem Firmenregister, findet weitere Ungereimtheiten. Eine falsche Bilanz kann ein Fehler sein, aber mehrere? Obwohl er das Problem doch intern bereits gemeldet hatte? Der Banker wittert kriminelle Energie, nicht nur auf Seite der Kunden, sondern auch in seiner eigenen Bank - und schreibt eine Mail an führende Danske-Manager.

Gleichzeitig forscht Wilkinson weiter und erkennt ein System: Bei den Konten der Auslandskunden, welche die größten Umsätze machen, findet er weitere britische Firmen, bei denen die Bilanzen nicht zu den wahren Geschäften passen. Sie sind alle an derselben Adresse gemeldet. Wilkinson macht wieder Meldung nach oben: Danske habe Kunden behalten, obwohl sie Bilanzen gefälscht, also gegen Gesetze verstoßen hatten. Wenn sich das wiederholte, habe man weggesehen. Es sei davon auszugehen, dass die Bank sogar einem Unternehmen geholfen habe, das in Geldwäsche verwickelt sein könnte; zumindest bestehe der Verdacht.

Wie richtig Wilkinson lag, lässt sich heute mit Dokumenten aus den FinCEN-Files belegen. Sie nennen zum Beispiel die Firma Mazaka General Trading aus Dubai. Auf ihr Konto bei der Danske Bank flossen zwischen April und August 2014 - Monate nachdem Wilkinson erstmals vor dubiosen Geschäften von Auslandskunden gewarnt hatte - insgesamt 720 000 Dollar. Mazaka war eine Firma, die einer der damals meistgesuchten Geldwäscher, der Pakistaner Altaf Khanani, nutzte. Jahrzehntelang hatte er nach Erkenntnissen des US-Finanzministeriums für Drogenkartelle aus Mexiko oder Kolumbien Geld gewaschen. Auch Terrororganisationen wie al-Qaida, Hisbollah, die Taliban in Afghanistan gehörten zu seinen Kunden. Auf SZ-Anfrage wollte sich Khanani nicht äußern.

Auch im Fall von Igor Putin, dem Präsidenten-Cousin, bestätigen die geleakten Daten Wilkinsons Verdacht. Putins angebliche Firma Lantana erhielt Geld von der russischen Promsberbank, die später zusammenbrach, weil umgerechnet fast 50 Millionen Dollar verschwunden waren. Ein Teil davon floss offenbar an Lantana. Die FinCEN-Files enthüllen noch weitere Transaktionen von und an

Lantana, insgesamt geht es um mehr als fünf Millionen Dollar. Auf eine SZ-Anfrage nahm Igor Putin dazu keine Stellung.

Das ist das Wissen von heute. Damals, im April 2014, nehmen die Verantwortlichen der Danske Bank ihren Mitarbeiter Howard Wilkinson immer noch nicht ernst - er kündigt. Erst zwei Jahre später wird die Danske Bank in Estland das Geschäft mit Auslandskunden beenden, und ein weiteres Jahr vergeht, bis die schmutzigen Geschäfte durch die dänische Zeitung *Berlingske* öffentlich werden. 2018 tritt Danske-Chef Thomas Borgen zurück. 2019 wird Aivar Rehe, Vorstand der estnischen Niederlassung zur Zeit der Geldwäsche-Operationen, tot in seinem Garten gefunden. Die Polizei geht von einem Suizid aus.

Die Bank erklärt heute, zu speziellen Fragen des Skandals nichts sagen zu können. Sie gibt aber zu, dass sie niemals einen solch großen Bestand an ausländischen Kunden hätte aufnehmen sollen.

Was bei der Danske Bank in Estland passiert war, wird zum Gegenstand von Debatten und Anhörungen im dänischen und Europäischen Parlament. Im November 2018 erklärt Howard Wilkinson vor Abgeordneten in Brüssel das Versagen aller Kontrollen seiner ehemaligen Bank. Er wirkt bei seiner Anhörung nervös, an seiner Seite sitzt US-Anwalt Stephen Kohn, der immer wieder Whistleblower vertritt. Wilkinson ist jetzt auch einer, und er packt aus. Er erklärt, welche Länder in den Skandal verwickelt sind, dazu hat er eine Präsentation vorbereitet. An einer Stelle heißt es: "Europäisches Land B (US-Niederlassung einer europäischen Bank)". Gemeint ist die USNiederlassung der Deutschen Bank.

**Die Litauen-Spur**

Im Oktober 2015 gab die Deutsche Bank ihre Rolle als Korrespondenzbank für das Geldhaus Danske in Estland auf. Kurze Zeit später erkannte der Konzern aber, dass er auch in mutmaßliche Geldwäsche mit der litauischen Niederlassung der Danske Bank verwickelt war. Das zeigt ein geheimer Bericht der Deutschen Bank von November 2015, der sich in den FinCEN-Files findet. Hintergrund waren die sogenannten Spiegelgeschäfte - Mirror Trades - eine spezielle Art von Aktienhandel, bei denen über mehrere Jahre mehrere Milliarden Dollar aus Russland abgeflossen sein sollen. Eine der maßgeblichen Mirror-Trade-Firmen bekam demnach über die Deutsche Bank Anfang September 2012 gut drei Millionen Dollar auf ihr Konto bei der Danske Litauen überwiesen. Auf eine detaillierte Anfrage zum Thema Danske erklärte die Deutsche Bank allgemein: "Mitarbeiter der Bank haben nicht vorsätzlich ungesetzliche Aktivitäten ermöglicht." SZ

Ohne die Deutsche Bank wäre ein Großteil der Geschäfte der Danske Bank in Estland gar nicht möglich gewesen. Das deutsche Geldhaus agierte viele Jahre lang als Korrespondenzbank für Danske. In dieser Rolle leitete sie für die estnische Bank, die keine Niederlassung in den USA hat, Dollar-Zahlungen auf Bankkonten in Übersee, wo sich dann die Spur des Geldes laut Wilkinson verlor. Zwischen 2007 und 2015 flossen nach Angaben von US-Behörden auf diesem Weg 267 Milliarden Dollar von Estland aus in alle Welt. Mindestens 150 Milliarden davon stammten aus Russland oder ehemaligen Staaten der Sowjetunion.

Auch aus Deutschland nahmen Ermittler Kontakt mit Howard Wilkinson auf. Mit seinem Anwalt reiste er nach SZ-Informationen 2019 nach Wiesbaden. Das Bundeskriminalamt soll ihm eine geheime Unterkunft und Personenschutz organisiert haben. Und so saß der frühere Banker mehrere Tage lang in einem schmucklosen Konferenzraum mit Beamten des BKA zusammen und erzählte: über Danske, die dubiosen Kunden - und die Bezüge nach Deutschland. Er überreichte den Ermittlern auch Dokumente, wie zu hören ist. Kurz darauf leitete die Staatsanwaltschaft Frankfurt mehrere Ermittlungsverfahren ein - unter anderem gegen den früheren CSU-Bundestagsabgeordneten Eduard Lintner. Und gegen Karin Strenz, sie sitzt bis heute für die CDU im Bundestag. Gegen beide wird wegen des Verdachts der Bestechung und Bestechlichkeit von Mandatsträgern ermittelt, es gab mehrere Durchsuchungen. Die beiden sollen sich vom autokratischen aserbaidschanischen Regime haben bestechen lassen - das Geld dafür soll über die Danske Bank transferiert worden sein. Auf Nachfrage bestätigte die Staatsanwaltschaft Frankfurt, dass gegen eine Abgeordnete im Bundestag und einen Ex-Abgeordneten ermittelt werde. Ein Abschluss des Verfahrens sei noch nicht absehbar. Lintner und Strenz ließen Anfragen unbeantwortet.

Im September 2019 tauchten die Strafermittler dann auch bei der Deutschen Bank auf - wegen des Verdachts der Beihilfe zur Geldwäsche. Das Frankfurter Geldhaus habe Verdachtsmeldungen zu spät abgegeben, so vermuten die Ermittler. Zu einer Durchsuchung kam es nicht, weil die Deutsche Bank die geforderten Unterlagen auf freiwilliger Basis den Ermittlern übergab. Auf Anfrage äußerte sich die Deutsche Bank nicht dazu. Im Fokus der Untersuchung steht mindestens ein ehemaliger Mitarbeiter, gegen den die Ermittlungen vor dem Abschluss stehen sollen, wie es aus Behörden-kreisen heißt. Wahrscheinlich läuft es auf eine empfindliche Geldbuße gegen die Bank hinaus, we-gen Verstößen gegen das Geldwäschegesetz. Auf Anfrage erklärte die Deutsche Bank, laufende Un-tersuchungen nicht zu kommentieren.

In den USA musste die Deutsche Bank wegen des Falls schon eine Strafe in Höhe von umgerechnet 150 Millionen Euro zahlen. Die US-Regulierungsbehörde wirft der Bank vor, sie habe Geschäfte "auf eine unsichere und unzuverlässige Weise" getätigt. Während sich Konkurrenten aus den baltischen Staaten zurückgezogen hatten, weil das Geldwäscherisiko dort als hoch eingeschätzt wird, blieb die Deutsche Bank - auch dann, als bei der Partnerbank Danske immer wieder vor Geld und Kunden mit Verbindungen nach Russland gewarnt wurde. Erst im Oktober 2015 beendete sie ihr Geschäft als Korrespondenzbank für Danske in Estland. Dazu räumte die Deutsche Bank auf Anfrage Mängel in der Kontrolle und Überwachung anderer Banken ein, für die man Transaktionen in Dollar tätigte. Nun habe man jedoch fast eine Milliarde Dollar in die Verbesserung von Kontrollen investiert und die Abteilung zur Bekämpfung von Finanzkriminalität auf mehr als 1500 Personen aufgestockt.

Dass Danske und die Deutsche Bank genutzt wurden, um riesige Mengen Geld aus Russland zu schaffen, war offenbar kein Zufall. Das behauptet zumindest Boris Fomin, Ex-Verwaltungsratschef der zusammengebrochenen Promsberbank, in einem Brief an die Zeitung Berlingske: Die russi-schen Geldwäscher hätten Insiderinformationen über die Kontrollsysteme beider Banken gehabt. Fomin sitzt wegen Veruntreuung der Promsberbank-Gelder in einem russischen Gefängnis. Sein Anwalt reagierte nicht auf eine Anfrage.

Mittlerweile kooperieren nach SZ-Informationen Ermittler mehrerer Länder in Sachen Danske: 2019 trafen sich demnach Beamte aus Estland, Dänemark, Spanien, den USA und Deutschland. Sie vereinbarten, Informationen auszutauschen. Der Whistleblower Wilkinson hat Estland inzwischen verlassen, seinen Wohnort im Vereinigten Königreich hält er geheim. In einem Interview mit dem amerikanischen TV-Sender CBS sagte er auf die Frage, ob er sich um seine Sicherheit sorge: "Das Wesen der Leute, die Geld waschen wollen, bedeutet wahrscheinlich, dass sie nicht die Art von Leu-ten sind, mit denen man in die Kneipe gehen und ein Bier trinken will."

**JA719**

Bestens informiert mit SZ Plus – 4 Wochen kostenlos zur Probe lesen. Jetzt bestellen unter: www.sz.de/szplus-testen

URL:        www.sz.de/1.5042107

Copyright:  Süddeutsche Zeitung Digitale Medien GmbH / Süddeutsche Zeitung GmbH

Quelle:     SZ vom 24.09.2020

Jegliche Veröffentlichung und nicht-private Nutzung exklusiv über Süddeutsche Zeitung Content. Bitte senden Sie Ihre Nutzungsanfrage an syndication@sueddeutsche.de.

# Exhibit 5

GGL 15.02 ▼ -0.48 (-3.1%)      GTECH 7.74 ▼ -0.03 (-0.39%)      HUMNL 6.60 ▼ -0.10 (-1.49%)

BR100 4,353 -35.3 (-0.8%)      BR30 15,423 -226.4 (-1.45%)      KSE100 43,807 -168.5 (-0.38%)      KSE30 16,825 -193.1 (-1.13%)

Coronavirus
LOW
Source: covid.gov.pk

Pakistan Deaths
30,319 ▲ 2 *24hr*

Pakistan Cases
1,520,634 ▲ 514 *24hr*

Sindh       Punjab      Balochistan     Islamabad      KPK
572,868     504,142     35,453          134,887        218,433

# BUSINESS RECORDER
Founded by M.A. Zuberi

Mar 18, 2022
PRINT EDITION ►
BR MARKETS ►
Dollar to PKR ►

Home          Latest          BR Research          Markets ≡

MARKETS

# FinCEN Files: Pakistan's Altaf Khanani got huge sums from account in Danske Bank

- As per the documents, Altaf Khanani, who was arrested by the US Authorities back in 2015 exchanged large and suspicious sums for accounts in Denmark's bank namely Danske Bank's branch in Estonia through one of his central companies.

Ali Ahmed Updated 21 Sep, 2020

| Facebook | Twitter |
|---|---|
| Whatsapp | Comments |





**After Panama Leaks the world of global finance is yet again rocked by the latest leaks called the FinCEN Files, which shows how the world's leading banks were involved in money laundering for suspicious individuals.**

The FinCEN Files, which is a list of thousands of documents containing over 2,100 leaked Suspicious Activity Reports (SARs) filed by banks and other financial firms with the U.S. Department of Treasury's Financial Crimes Enforcement Network (FinCen) have shed light on one such case involving the infamous money-launderer from Pakistan Altaf Khanani.

As per the documents, Altaf Khanani, who was arrested by the US Authorities back in 2015 exchanged large and suspicious sums for accounts in Denmark's bank namely Danske Bank's branch in Estonia through one of his central companies, the Danish newspaper *Berlingske Tidende* reported.

**JA723**

According to the report, the leaked documents show, that a customer of Danske Bank's branch, which according to the newspaper has hidden owners, exchanged millions with the Dubai -registered company Mazaka General Trading, which US authorities have linked to Khanani.

"There can only be one reason why money has been moved out of Danske Bank and into his trading companies - and that is money laundering. Because that was the only thing that happened in those companies," says Richard Grant, the former head of the Australian intelligence service told *DR*, a Danish news platform.

Back in September 2015, the US authorities arrested Altaf Khanani for involvement in laundering funds for designated terrorist organizations.

The US Office of Foreign Assets Control (OFAC) said in a statement, "The Khanani Money Laundering Organisation (MLO) is a TCO composed of individuals and entities operating under the supervision of Pakistani national Altaf Khanani, who the US Drug Enforcement Administration (DEA) arrested this September."

"The Khanani MLO facilitates illicit money movement between Pakistan, the United Arab Emirates (UAE), United States, United Kingdom, Canada, Australia, and other countries, and is responsible for laundering billions of dollars in organized crime proceeds annually," the statement added.

Further, the statement accused Khanani Money Laundering Organisation (MLO) of laundering illicit funds for organized crime groups, drug trafficking organizations, and designated terrorist groups throughout the world.

"Altaf Khanani, the head of the Khanani MLO, and Al Zarooni Exchange have been involved in the movement of funds for the Taliban, and Altaf Khanani is known to have had relationships with Lashkar-e-Tayyiba, Dawood Ibrahim, al Qaeda, and Jaish-e-Mohammed," the statement further said.

PAKISTAN     US     MONEY LAUNDERING     FINCEN FILES

PAKISTAN



# Have asked PM Imran to impose Governor's rule in Sindh: Sheikh Rashid

FinCEN Files: Pakistan's Altaf Khanani got huge sums from account in Danske Bank

As tensions rise, PTI's MNA asks Sindh govt to provide security

Surge in power sector capacity payments 'haemorrhaging' government finances: Tarin

Russia bogged down, blasting Ukrainian cities as war enters fourth week

Rupee crosses 180 for first time against USD

Bourse fails to sustain gains, KSE-100 Index down 0.4%

UN votes to secure formal presence in Taliban-ruled Afghanistan

PPP, PDM to protect MNAs being threatened with violence: Bilawal

IFC enhances trade facility for private Pakistani bank

JA725

Little known Asif Afridi in Pakistan's limited-overs squad for Australia series

Biden to speak with Xi about Ukraine war: White House

READ MORE STORIES

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUGUST WILDMAN, et al., | |
| Plaintiffs, | |
| v. | |
| DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK LIMITED, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S, DANSKE MARKETS INC., PLACID NK CORPORATION d/b/a PLACID EXPRESS, and WALL STREET EXCHANGE LLC, | **21 Civ. 4400 (KAM) (RML)** |
| Defendants. | |

**DECLARATION OF SHEILA C. RAMESH IN SUPPORT OF DEUTSCHE BANK AG AND DEUTSCHE BANK TRUST COMPANY AMERICAS' MOTION TO DISMISS PLAINTIFFS' CORRECTED AMENDED COMPLAINT**

I, Sheila C. Ramesh, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.       I am a member of the bar of this Court and of the firm Cahill Gordon & Reindel LLP, attorneys for Defendants Deutsche Bank AG and Deutsche Bank Trust Company Americas (together, the "Deutsche Bank Defendants")

2.       I make this Declaration in support of the Deutsche Bank Defendants' Motion to Dismiss the Corrected Amended Complaint and to put certain materials relevant to the Motion before the Court.

**JA727**

3.      Attached hereto as Exhibit 1 is a true and correct copy of the transcript from the

December 7, 2021 pre-motion conference before this Court.


Dated:  March 18, 2022
New York, New York

_____
                        Sheila C. Ramesh

2

**JA728**

# Exhibit 1

1

```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
2     - - - - - - - - - - - - - - - X
                                    :
3       AUGUST WILDMAN, et al.,     :   21-CV-04400(KAM)
                                    :
4            Plaintiffs,            :
                                    :
5                                   :   United States Courthouse
        -against-                   :   Brooklyn, New York
6                                   :
                                    :
7                                   :   December 7, 2021
        DEUTSCHE BANK               :   1:00 p.m.
8       AKTIENGESELLSCHAFT, et      :
        al.,                        :
9                                   :
             Defendants.            :
10    - - - - - - - - - - - - - - - X

11        TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE VIA
12                          TELECONFERENCE
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
13                 UNITED STATES DISTRICT JUDGE

14

15                    A P P E A R A N C E S:

16
For the Plaintiffs:        SPARACINO PLLC
17                         1920 L Street, NW
                           Suite 535
18                         Washington, DC 20036

19                         BY:  RYAN SPARACINO, ESQ.
                                ELI JOHNSON KAY-OLIPHANT, ESQ.
20

21   For Defendant
     Deutsche Bank AG
22   and Deutsche Bank
     Trust Company Americas:  CAHILL GORDON & REINDEL LLP
23                            32 Old Slip
                              New York, NY 10005
24
                              BY:  DAVID G. JANUSZEWSKI, ESQ.
25
```

*Proceedings*                                                                    2

1            A P P E A R A N C E S:  (Continued.)

2    For Defendant
     Standard Chartered
3    Bank:                      SULLIVAN & CROMWELL LLP
                                125 Broad St
4                               New York, NY 10004

5                               BY:  ANDREW FINN, ESQ.

6    For Defendant
     Danske Bank A/S
7    and Danske Markets,
     Inc:                       SULLIVAN & CROMWELL LLP
8                               125 Broad Street
                                New York, NY 10004-2948
9
                                BY:  BRIAN THOMAS FRAWLEY, ESQ.
10
     For Defendant
11   Placid NK Corp.:           WHITE & CASE LLP
                                701 13th St, NW
12                              Washington, DC 20005

13                              BY:  CLAIRE DELELLE, ESQ.
                                     MICHAEL MAHAFFEY, ESQ.
14

15   Court Reporter:            DENISE PARISI, RPR, CRR
                                Official Court Reporter
16                              Telephone: (718) 613-2605
                                E-mail:  DeniseParisi72@gmail.com
17
     Proceedings recorded by computerized stenography.  Transcript
18   produced by Computer-aided Transcription.

19                  *    *    *    *    *

20

21           (All parties present via teleconference.)

22           THE COURT:  Hello.  Good afternoon.

23           This is Judge Matsumoto.

24           This is a pre-motion conference in the case Jonathan

25   L. Ashley, III, et al., versus Deutsche Bank, et al.

Case 1:21-cv-04400-HG-RML Document 149-11 Filed 06/04/22 Page 140 of 225 PageID #: 4224

 1          I'm going to take the appearances starting with the
 2   plaintiff, and I will just ask each counsel to remember to
 3   identify himself or herself before you speak.
 4          First let's get the appearance for the plaintiff,
 5   please.
 6          MR. SPARACINO:  This is Ryan Sparacino, counsel for
 7   the plaintiffs.
 8          THE COURT:  All right.  Thank you.
 9          Will you be the one speaking on their behalf today,
10   sir?
11          (Pause.)
12          THE COURTROOM DEPUTY:  Sir?
13          THE COURT:  Hello?  Will you be speaking on their
14   behalf today, or will your co-counsel also be speaking?
15          MR. SPARACINO:  I apologize, Your Honor.  I didn't
16   know if Your Honor could hear me.  I said yes, Your Honor.
17          THE COURT:  All right.  We didn't hear you.
18          Who is here for Deutsche Bank?
19          MR. JANUSZEWSKI:  Good afternoon, Your Honor.
20          I'm David Januszewski from Cahill Gordon for
21   Deutsche Bank AG and Deutsche Bank Trust Company Americas.
22          THE COURT:  Thank you.
23          All right.  Next we have, Standard Chartered Bank.
24   Who's appearing for Standard Chartered, please?
25          MR. FINN:  Good afternoon, Your Honor.

*Proceedings*                                                    4

1          Andrew Finn from Sullivan & Cromwell on behalf of

2    Standard Chartered.

3          THE COURT:  Okay.  Thank you.

4          Next we have Danske Bank.

5          MR. FRAWLEY:  Good afternoon, Your Honor.

6          It's Brian Frawley from Sullivan & Cromwell for

7    Danske Bank and Danske Markets.

8          THE COURT:  Is there any conflict with your firm's

9    representation of two of the defendants by any chance?  I'm

10   assuming you checked.

11         MR. FRAWLEY:  Your Honor, it's Brian Frawley.

12         We do not believe there is any conflict, and our

13   clients are aware of the representation.

14         THE COURT:  All right.  Thank you.

15         And who do we have for Placid NK, please?

16         MS. DELELLE:  Good afternoon, Your Honor.

17         This is Claire Delelle on behalf of Placid, and with

18   me is an associate on my team, Michael Mahaffey, who will

19   present on Placid's behalf pursuant to Section 3, paragraph E

20   of Your Honor's chamber's practices.

21         THE COURT:  All right.  Thank you.  I appreciate

22   your making that accommodation for an associate.

23         What I would like to do, again, is remind everybody

24   to identify yourself by name before you speak.

25         So I have a general question of the plaintiffs'

Case 1:21-cv-04400-HG-RML Document 49-11 Filed 06/04/22 Page 162 of 225 PageID #: 4226

1   counsel.

2          It seems to me -- I mean, I think this complaint is

3   a monster.  I think, on its face almost, it violates Rule 8.

4   I'm wondering why you couldn't bring separate lawsuits against

5   each of the defendant's banks.  You know, I understand your

6   theory about a syndicate becoming part of a money

7   laundering -- you know, having associations with many money

8   launderers and, you know, doing business with the various

9   defendants, but you are not alleging that every defendant is

10  allegedly responsible for aiding and abetting each of the

11  alleged acts that injured your clients, are you,

12  Mr. Sparacino?

13          MR. SPARACINO:  Plaintiffs are alleging that each

14  defendant aided and abetted both the terrorist campaign --

15  (Teleconference interruption.) -- they're the group -- the

16  persons that committed the acts -- (Teleconference

17  interruption.) -- under JASTA, under the secondary liability

18  for aiding and abetting, plaintiffs must allege and prove that

19  the defendant aided the person who committed the attack, and

20  we believe we've done that here.

21          THE COURT:  Well, that's not the point what you

22  believe.  My point is whether -- you're alleging that each of

23  the four bank defendants aided and abetted each of the

24  injuries against each of your clients; is that what you're

25  telling me?

Case 1:21-cv-04400-HG-RML Document 49-11 Filed 05/04/22 Page 143 of 225 PageID #: 4227

1          MR. SPARACINO:  In the complaint, each defendant,

2    among other things -- (Teleconference interruption.) -- money

3    laundering organization while it was the world's --

4    (Teleconference interruption.) -- laundering --

5          THE COURT:  You are breaking up.  You are breaking

6    up.

7          Do you have a better phone line to speak on?

8          MR. SPARACINO:  I apologize.  Your Honor, I

9    apologize.  Is that better?  I don't have an explanation for

10   my phone service.  Am I coming through better now for Your

11   Honor?

12         THE COURT:  Yes, you are.  I was losing every half

13   word.

14         All right.  So I just wanted to understand because,

15   honestly, I think that it becomes very difficult to --

16   especially in terms of contemplating the various defenses that

17   the defendants had raised, including personal jurisdiction,

18   failure to state a claim, imposition pleading on various

19   points like general awareness, substantial assistance,

20   et cetera.  I'm just wondering if there's a neat and cleaner

21   way for you to have presented your claims; and if you tell me

22   no, I accept that.  But let me just say this:  There are a lot

23   of entities and names floating around in this complaint that

24   really don't seem to have direct connection to any of the

25   defendants or their claims or any of the alleged acts for

Case 1:21-cv-04400-HG-RML Document 45-11 Filed 06/04/22 Page 144 of 225 PageID #: 4228

1  which you seek compensation, and I'm just wondering if your

2  obligation to comply with Rule 8 was taken into consideration

3  when you drafted this complaint.

4  　　　　　MR. SPARACINO:  I hear you; I hear Your Honor loud

5  and clear.  We were very conscious of our ruling obligations

6  when we drafted the complaint.  We -- (Teleconference

7  interruption.) -- in a landscape in which it seems like no

8  matter how detailed anti-terror -- (Teleconference

9  interruption.) -- complaint is, the defense attorney hasn't

10  alleged with precision enough --

11  　　　　　THE COURT:  The Circuit has given us some guidance

12  on that -- I'm well aware -- but let me ask you this:  I'm not

13  interested in your proposal to have them spend the time and

14  effort and their client's funds to draft a motion to dismiss

15  only to have you then come and amend your complaint.  I would

16  rather you do that now before any briefing occurs so that I

17  can get your best iteration of the facts that you believe

18  support each of your client's claims, and then I can assess

19  whether those allegations are sufficient to state a claim

20  against each of the defendants; so I would like for you to do

21  that first, and I would like to find out how much time you

22  need to do that.

23  　　　　　MR. SPARACINO:  (Teleconference interruption.) --

24  contemplated, and I believe we proposed this to Your Honor,

25  that the defendant's original motion would be filed in January

1   and --

2          THE COURT:  No.  Sir, sir, sir, you are missing the

3   point.  I'm saying amend your complaint before they spend the

4   time and money drafting a motion to dismiss.

5          MR. SPARACINO:  I was explaining the calendar.  I

6   was trying to explain my -- the context in my answer, which is

7   to say that I believe that we can do so along the same general

8   calendar that we've already -- (Teleconference interruption.)

9   -- is what I was trying to say.

10         THE COURT:  What, you could amend your complaint

11  along the same general calendar, which is?  You propose that

12  the defense briefs would come in January 21, 2022; your

13  opposition would be filed March 18th -- and, by the way,

14  nobody files anything until the motion is fully briefed, and

15  then the replies would be -- and the fully briefed motion

16  would be filed April 15th.  But then you state that you want

17  to amend your complaint upon review of the motion, and I'm

18  saying that that's not really fair to the defendants who will

19  have spent time and effort briefing a motion where I'm giving

20  you an opportunity now to amend your complaint without motion

21  practice, assuming the defendants agree.  And then we can

22  schedule motion practice against the complaint if defendants

23  still believe that you are pleading a deficient --

24  (Teleconference interruption.) -- as far as the allegations

25  against your clients.

*Proceedings*                                                          9

1         MR. SPARACINO:  What I was proposing was that we be

2    permitted to file our amended complaint on the date that we

3    had currently reserved for when our opposition was due.  That

4    was what I was trying to articulate.

5         THE COURT:  So in March rather than January?  Why do

6    you need that much time?

7         MR. SPARACINO:  I apologize.  I had understood that

8    that would be in February.  I don't believe we need until

9    March.  I believe that we would need until early February

10   partly because we expect we will have additional clients who

11   will join the case, and there are separate processes we have

12   for that, and partly because we take Your Honor's statement --

13   (Teleconference interruption.) -- during today's hearing to

14   heart, and we would anticipate spending a lot of time to

15   comport the complaint to what Your Honor had described.

16        THE COURT:  I'm happy to hear from any of the

17   defense counsel.  I would just ask that you identify yourself.

18   Actually, maybe we should do this in order hearing first from

19   Deutsche Bank.

20        MR. JANUSZEWSKI:  Yes, Your Honor, David Januszewski

21   from Cahill.

22        We are just supportive of the course that Your Honor

23   has suggested and would have made some of the points that you

24   eluded to in terms of the burden and expense on our clients to

25   respond to this only to have an amendment where they clearly

Case 1:21-cv-04400-HG-RML   Document 45-11   Filed 06/01/23   Page 147 of 225 PageID #: 4231

1  know what the issues are and the deficiencies we assert, so we

2  support the idea of having them amend first.

3          THE COURT:  All right.

4          What about counsel for Standard Chartered Bank?

5  Mr. Finn?

6          MR. FINN:  Yes, Your Honor, it's Andrew Finn for

7  Standard Chartered.

8          Standard Chartered as well would have no objection

9  to allowing the plaintiffs to amend and thereafter trying to

10 agree on a briefing schedule for motions to dismiss.

11 Obviously, some of our clients have personal jurisdiction

12 objections that we wouldn't be waiving by agreeing to allow an

13 amendment at this point, but we have no objection to

14 proceeding in this way.

15         THE COURT:  All right.

16         And we also have Mr. Frawley from Danske Bank.

17         MR. FRAWLEY:  Yes, Your Honor.  Brian Frawley.

18         Thank you.

19         Danske Bank has no objection to proceeding this way,

20 but to be clear, if the plaintiffs amend now, it will be our

21 position that they don't get to amend again following the

22 motion to dismiss.

23         THE COURT:  Well, we will talk about that in a

24 second.  I actually agree with you because this is their

25 opportunity to state the best iteration of the factual

Case 1:21-cv-04402-BCM Document 61-11 Filed 05/01/23 Page 148 of 225 PageID #: 4232

1   allegations that support their claims, and I want to give them

2   a full opportunity.  I'm reluctant to give the plaintiff until

3   February, frankly, but if it will give me their best iteration

4   of all the facts that support their claims, I'm happy to give

5   them that time, but they will not be given leave to replead.

6            Let me ask Placid's counsel.

7            Mr. Mahaffey, are you going to speak on behalf of

8   Placid NK?

9            MR. MAHAFFEY:  Yes, Your Honor.  This is Michael

10  Mahaffey.

11           Thank you.

12           And we fully support Your Honor's proposal, and we

13  also agree with Your Honor that February is a pretty extended

14  time frame.  Our client's preference is to move this forward

15  as quickly as possible.  This complaint was filed in August.

16  We filed our letter in October pointing out the deficiencies

17  in the complaint, so of course we want to help the Court make

18  this a smooth process, and we are happy to be on a uniform

19  briefing schedule, but we would be remiss if we didn't note

20  that our client would, as Your Honor said, like to move this

21  forward a little more quickly than a February amendment.

22           THE COURT:  Well, I will ask plaintiffs' counsel.

23           Mr. Sparacino, can you file an amended complaint any

24  earlier than February, because this case will have been filed

25  for -- you know, this complaint was filed in August of 2021.

Case 1:21-cv-04402-BMC-RML Document 64-11 Filed 06/01/27 Page 149 of 225 PageID #: 4233

1   It just seems odd to me that you need six months to file an

2   amended complaint from the date of the first filing to

3   February.  Can you do it any sooner is my bottom line

4   question.

5            MR. SPARACINO:  I think potentially if we -- I think

6   we could probably do it as late as maybe the last week in

7   January, but to make us do it sooner than that, candidly,

8   would -- we, kind of, assumed, I guess, that we would, you

9   know, not, in any scenario, have to have this on file before,

10  you know -- (Teleconference interruption.) --

11           THE COURT:  Before what?  I'm sorry, sir.  Before

12  what?  You cut out.

13           MR. SPARACINO:  Just before the end of January.  You

14  know, we have -- we are in the process of, among other things,

15  negotiating with co-counsel who expect to come on board and

16  serve as lead counsel, to likely include additional clients in

17  the complaint, and a substantial amount over the holidays.  We

18  will work as fast as we possibly can.  I'm confident that we

19  could make an end-of-January deadline.

20           One alternative, I suppose, is we could probably

21  make a -- we could easily make an end-of-January deadline,

22  assuming the parties are amenable to us including additional

23  plaintiffs just as a related case, which we designate related,

24  and agree by stipulation that whatever Your Honor's rulings in

25  this case bind that case as well.  That should be an efficient

*Proceedings*                                                                 13

1   way to ensure that we have no problem meeting that

2   end-of-January deadline without any -- to address Placid's

3   concerns.

4            THE COURT:  I can't speak for them.

5            Does somebody on the defense side want to be heard?

6            MR. FRAWLEY:  Your Honor, it's Brian Frawley from

7   Sullivan & Cromwell for Danske Bank.

8            I can't really agree in the abstract that some

9   lawsuit I haven't seen yet is going to be duplicative and

10  overlapping with the current lawsuit, but, you know, the rules

11  provide methods for the plaintiffs to add parties to this case

12  through amendments or otherwise, and we will be accommodating

13  to any request to do so.  This is the first we're hearing that

14  there's going to be a different lawsuit filed that I haven't

15  seen yet, so we'll cooperate.  We agree with Placid's counsel

16  that, you know, this lawsuit is, in some ways, defamatory

17  towards our client accusing them of being terrorists, and we

18  want to move this forward.

19           THE COURT:  All right.

20           So am I hearing you say that you would prefer to

21  have the plaintiffs amend, joining all other parties that they

22  plan to join, and give them a little bit more time until

23  February instead of late January?  Does anybody object to that

24  plan?  If we're going to move forward through motion practice

25  with four different defendant groups, I would rather have a

Case 1:21-cv-04400-HG-RML Document 60-11 Filed 06/01/23 Page 151 of 225 PageID #: 4235

1   complaint that really represents the -- (Teleconference

2   interruption.) -- statement of facts and assess the deficiency

3   of the claims on that.

4         Does anyone object, on the defense side, to giving

5   plaintiffs' counsel until early February, as he proposed

6   initially?

7         For Deutsche Bank.

8         MR. JANUSZEWSKI:  David Januszewski from Cahill.

9         We would support that.  We would support the idea of

10  taking him at his word as to what he needs to produce his true

11  final product, and if that's the first week of February, we

12  would support that.

13        THE COURT:  All right.  If any other defendant wants

14  to be heard, I will hear you, but if I don't hear anything, I

15  will assume that the February date is satisfactory to

16  everybody.

17        (Pause.)

18        THE COURT:  All right.

19        So, Mr. Sparacino, let's set a date in February when

20  you are going to file your amended complaint, please, and this

21  will include those additional plaintiffs that you are talking

22  about.  Hopefully you'll straighten out any co-counsel issues

23  that you are currently engrossed in and we can get this

24  rolling.  So when in February, sir?

25        MR. SPARACINO:  I propose, perhaps, Wednesday,

*Proceedings*                                                              15

1   February -- Tuesday, February 8th.  That would give us

2   essentially just the first week.

3              THE COURT:  All right.

4              MR. KAY-OLIPHANT:  Your Honor, this is Eli

5   Kay-Oliphant.

6              THE COURT:  I'm sorry, who's speaking?

7              MR. KAY-OLIPHANT:  This is Eli Kay-Oliphant from

8   Sparacino PLLC.

9              I think my partner, Ryan Sparacino, may have

10  overlooked a deadline that we have literally three days before

11  that in another case, so I would suggest that perhaps a week

12  further from what he just described.

13             MR. SPARACINO:  He's right about that.  The 15th

14  would be much better, that's correct.

15             THE COURT:  All right.  Now we're not in early

16  February, we're in mid-February, but that's it.  All right?

17  February 15th.

18             What I would like to do -- I'm assuming it's going

19  to be as bad, or maybe worse than what we've got now, in terms

20  of length and number of paragraphs.  I would really, really

21  hope, Mr. Sparacino and Mr. Kay-Oliphant, that you would try

22  very hard to shorten the allegations, focus on the factual

23  deficiencies that are identified for you, add those facts,

24  take out everything that is not absolutely relevant and

25  material to your claim, and do your best to state your claims

1    for all your clients, and I would like to give the defendants

2    some time to read your amended pleading and decide how they

3    want to proceed.  I mean, maybe some of your claims can be

4    dropped if you think about whether there's a lack of personal

5    jurisdiction, or you have some issues with not being able to

6    state facts against certain of the defendants that are

7    necessary to state a claim.  I hope you would give that

8    careful thought.

9           But let me ask defense counsel -- you may all have

10   different views about this, but when would you like to advise

11   the Court as to how you intend to proceed?  I don't think we

12   need another pre-motion conference, but if you do decide to

13   proceed with your motions, I would like to have some mutually

14   agreeable briefing schedule, which, by the way, I think was a

15   little bit lengthy.  I have never seen a briefing schedule

16   with that generous of a time frame, but how much time would

17   you need to make a decision as to how you are going to

18   proceed, assuming that plaintiff's amended complaint is

19   hopefully slightly shorter than what we've got now.

20          MR. FRAWLEY:  Your Honor, it's Brian Frawley from

21   Sullivan & Cromwell on behalf of the Danske Bank defendants.

22          I think this is true for some of the other defendant

23   groups as well, but the allegations against Danske Bank all

24   derive from a publicly-issued report about issues that the

25   bank experienced ending in 2016, so I frankly don't expect the

Case 1:21-cv-04400-HG-RML Document 62-45/11/2023, 06701/327, Page 154 of 225 PageID #: 4238

1   Danske Bank specific allegations to change very much in any

2   complaint.  They are all public records.  I would suggest that

3   we could advise the Court within a week of receiving that

4   complaint of our intentions with respect to motions and

5   propose a schedule that we will certainly agree would be --

6   (Teleconference interruption.) -- which was extended due to

7   some holiday and competing scheduling issues, but I would

8   anticipate moving against that complaint within 30 days.

9               THE COURT:  All right.  Is that true for all the

10  defendants as well?

11              MR. JANUSZEWSKI:  That would be fine for Deutshce

12  Bank, Your Honor.

13              David Januszewski for Deutsche Bank.

14              MR. MAHAFFEY:  This is Michael Mahaffey for Placid

15  Express, and that works for us as well.

16              MR. FINN:  And Andrew Finn for Standard Chartered.

17              Also fine for Standard Chartered.

18              THE COURT:  All right.  So you will be moving within

19  30 days against -- in all likelihood -- against the amended

20  complaint.

21              All right.  And that would bring us to mid-March --

22  let's say March 18th.  By March 18th; is that all right?

23              MR. FRAWLEY:  Brian Frawley.

24              It's fine for Danske Bank.

25              THE COURT:  All right.  If any defense lawyer thinks

*Proceedings*                                                                18

1    March 18th is too soon, let me know now, please.

2              (Pause.)

3              THE COURT:  All right.  So now that plaintiffs'

4    counsel is in the position of having to defend against four

5    motions, so I'm happy to give him a little more latitude to

6    respond.

7              How's May 13th, Mr. Sparacino?

8              MR. SPARACINO:  Your Honor, it is also my birthday,

9    full disclosure.  That's a wonderful date.

10             THE COURT:  All right.  You are fine with that?  All

11   right.  I would hate to have you --

12             MR. SPARACINO:  No problem.  No problem.

13             THE COURT:  Okay.  All right.  So you will serve

14   your oppositions by May 13th.

15             And defendants' reply, what would you need for that?

16   Does somebody want to speak about that?

17             MR. FRAWLEY:  It's Brian Frawley from Sullivan &

18   Cromwell.

19             I would think that three weeks would be sufficient

20   at least from Danske Bank's perspective.

21             THE COURT:  Does anyone have an issue with three

22   weeks on the defense side?

23             MR. MAHAFFEY:  Your Honor, this is Mike Mahaffey

24   with Placid Express.

25             We could do sooner, we could do two weeks, but three

Case 1:21-cv-04402-BCM Document 61-11/2306,07/0143/7, Page 206 of 225 PageID #: 4240

1   weeks is fine to stay on a uniform schedule.

2           THE COURT:  Counsel, once again -- I'm assuming no

3   other defendant has an issue with the three-week reply after

4   plaintiff's opposition; is that correct?

5           MR. JANUSZEWSKI:  That's fine for Deutsche Bank,

6   Your Honor.

7           THE COURT:  Okay.  Thank you.

8           Counsel, please consult my motion practices.  I

9   would like you to file the fully briefed motion on June 3rd,

10  not before.  You may provide me with two courtesy copies in

11  advance when you serve your papers on your adversary.

12          And, Mr. Sparacino, when you file your amended

13  complaint, please provide two copies of that to chambers.  All

14  right?  I'm just, kind of, in shock about the amount of paper

15  that this case -- even to print the docket sheet was 114

16  pages.  It was kind of mind-boggling.  We are not interested

17  in wasting a lot of paper, but I would like you to deliver the

18  courtesy copies of your complaint to our chambers once it's

19  filed on February 15th, if you would, please.

20          (Pause.)

21          THE COURT:  Hello?

22          MR. SPARACINO:  I apologize.  I am going to get a

23  better phone service.  I said yes, Your Honor.

24          THE COURT:  Okay.  Am I the only one not hearing

25  Mr. Sparacino?

*Proceedings* 20

1    MR. JANUSZEWSKI:  No.  We all have the same problem.

2    THE COURT:  All right.  Very good.

3    MR. SPARACINO:  I apologize for my -- I apologize.

4    THE COURT:  Okay.

5    MR. FRAWLEY:  Your Honor, it's Brian Frawley.

6    If it's of any benefit to the Court, I think the

7    parties would all be happy to amend the caption of this so

8    there aren't 800 parties in it and alleviate any issues with

9    the pages that that creates.

10    THE COURT:  I think we are just going to, in the

11    future, be selective about what we print.  I think obviously

12    in the amended complaint, all the plaintiffs have to be named

13    and identified, but yet we can -- if it's all right with

14    Mr. Sparacino -- agree that Jonathan L. Ashley, III, will be

15    the lead plaintiff, and it will be "et al."

16    Is that all right with you, sir?

17    MR. SPARACINO:  Yes.  The lead plaintiff, as we

18    filed it, was Ms. August Wildman, but there was something on

19    ECF that switched that around.  We are happy to restyle it how

20    Your Honor prefers.

21    THE COURT:  Well, any plaintiff you want to name as

22    the lead or the first named plaintiff with "et al.," that's

23    fine.  Probably our ECF system got a little spooked by this

24    complaint and how to process it, so whatever plaintiff you

25    want to name in the shortened caption, it's fine with me, and

Case 1:21-cv-04402-BMC-RML Document 64-11 Filed 06/01/22 Page 228 of 225 PageID #: 4242

1   you will name all the other defendants; and the amended

2   complaint will identify each of the plaintiffs so that we can

3   understand which plaintiffs are affiliated with one another

4   and are seeking relief that arises from a particular injury or

5   death.

6          Is there anything else I need to address right now?

7          (Pause.)

8          THE COURT:  No?

9          All right.  Thank you, Counsel.  I hope everybody

10  stays safe, and enjoy your holidays.

11         (Matter concluded.)

12

13                  *     *     *     *     *

14

15  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

16

17     /s/ Denise Parisi                December 16, 2021

18  _____      _____
       DENISE PARISI                      DATE

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

AUGUST WILDMAN, *et al*.,

          Plaintiffs,

         -v.-

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al*.,

         Defendants.

---

No. 1:21-CV-04400 (KAM) (RML)

## <u>DECLARATION OF ANDREW J. FINN</u>

ANDREW J. FINN makes the following declaration under penalty of perjury:

1.      I am a member in good standing of the Bar of this Court and am a partner of Sullivan & Cromwell LLP, attorneys for defendants Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Bank (Pakistan) Limited in the above-captioned action. I respectfully submit this Declaration in support of the Standard Chartered Defendants' Motion To Dismiss the Amended Complaint and to place certain documents before this Court.

2.      Attached hereto are true and correct copies of the following:

| | |
|---|---|
| *Foreign Terrorist Organizations*, U.S. DEP'T STATE, https://www.state.gov/foreign-terrorist-organizations | Exhibit 1 |
| Written Agreement by and Among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004) | Exhibit 2 |
| Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah, *United States* v. *Sum of $70,990,605*, No. 1:12-cv-01905 (D.D.C. Feb. 22, 2019), ECF No. 345-1 | Exhibit 3 |

**JA751**

| | |
|---|---|
| Verified Complaint for Forfeiture in Rem, *United States* v. *Sum of $70,990,605*, No. 12-cv-1905 (D.D.C. Nov. 20, 2012), ECF No. 3 | Exhibit 4 |
| Adam Luck, *Whistleblower Says Bank Has Blood on Its Hands: RAF Veteran Claims Standard Chartered Helped Iran Terrorists, Ahead of Court Battle*, THIS IS MONEY (Sept. 7, 2019) | Exhibit 5 |
| Richard Holmes, et al., *Standard Chartered's Iran Problems Didn't Go Away*, BUZZFEED NEWS (Sept. 21, 2020) | Exhibit 6 |
| Pre-Motion Conference Transcript, *Wildman* v. *Deutsche Bank AG*, No. 1:21-cv-04400 (E.D.N.Y. Dec. 7, 2021) | Exhibit 7 |
| Amended Complaint, *Zobay* v. *MTN Grp Ltd.*, No. 21-cv-03503 (E.D.N.Y. Feb. 9, 2022), ECF No. 52 | Exhibit 8 |

Executed on March 18, 2022, in New York, New York.

*/s/ Andrew J. Finn*
Andrew J. Finn

**JA752**

# Exhibit 1

Case 1:21-cv-04402-HG-RML Document 59-65 Filed 06/04/22 Page 162 of 165 PageID #: 4305

Employees

Job Seekers

Students

Travelers

Visas

An official website of the United States Government   Here's how you know

**UKRAINE**

U.S. citizens in Ukraine: follow **Embassy Kyiv** and **TravelGov** on Twitter, and **complete this form so we can communicate with you**. U.S. citizens seeking to depart Ukraine can call **1-833-741-2777** (in the U.S.) or **1-606-260-4379** (from overseas).

**MORE INFORMATION FOR AMERICANS IN UKRAINE** →

Home  >  ...  > Foreign Terrorist Organizations

# Foreign Terrorist Organizations

**BUREAU OF COUNTERTERRORISM**

Share

Foreign Terrorist Organizations (FTOs) are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

**Designated Foreign Terrorist Organizations**

| Date Designated | Name |
|---|---|

**JA754**

Case 1:21-cv-04402-HG-RML   Document 69-11 Filed 05/04/22   Page 132 of 165 PageID #: 4306

| 10/8/1997 | Abu Sayyaf Group (ASG) |
| 10/8/1997 | Aum Shinrikyo (AUM) |
| 10/8/1997 | Basque Fatherland and Liberty (ETA) |
| 10/8/1997 | Gama'a al-Islamiyya (Islamic Group – IG) |
| 10/8/1997 | HAMAS |
| 10/8/1997 | Harakat ul-Mujahidin (HUM) |
| 10/8/1997 | Hizballah |
| 10/8/1997 | Kahane Chai (Kach) |
| 10/8/1997 | Kurdistan Workers Party (PKK, aka Kongra-Gel) |
| 10/8/1997 | Liberation Tigers of Tamil Eelam (LTTE) |

**JA755**

| 10/8/1997 | National Liberation Army (ELN) |
|---|---|
| 10/8/1997 | Palestine Liberation Front (PLF) |
| 10/8/1997 | Palestine Islamic Jihad (PIJ) |
| 10/8/1997 | Popular Front for the Liberation of Palestine (PFLP) |
| 10/8/1997 | PFLP-General Command (PFLP-GC) |
| 10/8/1997 | Revolutionary People's Liberation Party/Front (DHKP/C) |
| 10/8/1997 | Shining Path (SL) |
| 10/8/1999 | al-Qa'ida (AQ) |
| 9/25/2000 | Islamic Movement of Uzbekistan (IMU) |
| 5/16/2001 | Real Irish Republican Army (RIRA) |

**JA756**

| 12/26/2001 | Jaish-e-Mohammed (JEM) |
| 12/26/2001 | Lashkar-e Tayyiba (LeT) |
| 3/27/2002 | Al-Aqsa Martyrs Brigade (AAMB) |
| 3/27/2002 | Asbat al-Ansar (AAA) |
| 3/27/2002 | al-Qaida in the Islamic Maghreb (AQIM) |
| 8/9/2002 | Communist Party of the Philippines/New People's Army (CPP/NPA) |
| 10/23/2002 | Jemaah Islamiya (JI) |
| 1/30/2003 | Lashkar i Jhangvi (LJ) |
| 3/22/2004 | Ansar al-Islam (AAI) |
| 7/13/2004 | Continuity Irish Republican Army (CIRA) |

**JA757**

| | |
|---|---|
| 12/17/2004 | Islamic State of Iraq and the Levant (formerly al-Qa'ida in Iraq) |
| 6/17/2005 | Islamic Jihad Union (IJU) |
| 3/5/2008 | Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) |
| 3/18/2008 | al-Shabaab |
| 5/18/2009 | Revolutionary Struggle (RS) |
| 7/2/2009 | Kata'ib Hizballah (KH) |
| 1/19/2010 | al-Qa'ida in the Arabian Peninsula (AQAP) |
| 8/6/2010 | Harakat ul-Jihad-i-Islami (HUJI) |
| 9/1/2010 | Tehrik-e Taliban Pakistan (TTP) |
| 11/4/2010 | Jaysh al-Adl (formerly Jundallah) |

Jaysh al-Adl (formerly Jundallah)

5/23/2011          Army of Islam (AOI)

9/19/2011          Indian Mujahedeen (IM)

3/13/2012          Jemaah Anshorut Tauhid (JAT)

5/30/2012          Abdallah Azzam Brigades (AAB)

9/19/2012          Haqqani Network (HQN)

3/22/2013          Ansar al-Dine (AAD)

11/14/2013         Boko Haram

11/14/2013         Ansaru

12/19/2013         al-Mulathamun Battalion (AMB)

Case 1:21-cv-04402-HG3RML Document 69-11 Filed 06/04/22 Page 168 of 251 PageID #: 4311

| | |
|---|---|
| 1/13/2014 | Ansar al-Shari'a in Benghazi |
| 1/13/2014 | Ansar al-Shari'a in Darnah |
| 1/13/2014 | Ansar al-Shari'a in Tunisia |
| 4/10/2014 | ISIL Sinai Province (formerly Ansar Bayt al-Maqdis) |
| 5/15/2014 | al-Nusrah Front |
| 8/20/2014 | Mujahidin Shura Council in the Environs of Jerusalem (MSC) |
| 9/30/2015 | Jaysh Rijal al-Tariq al Naqshabandi (JRTN) |
| 1/14/2016 | ISIL-Khorasan (ISIL-K) |
| 5/20/2016 | Islamic State of Iraq and the Levant's Branch in Libya (ISIL-Libya) |
| 7/1/2016 | Al-Qa'ida in the Indian Subcontinent |

**JA760**

Case 1:21-cv-04400-HG-RML Document 62-45 Filed 06/04/22 Page 169 of 251 PageID #: 4312
3/18/22, 1:47 PM

| | |
|---|---|
| 8/17/2017 | Hizbul Mujahideen (HM) |
| 2/28/2018 | ISIS-Bangladesh |
| 2/28/2018 | ISIS-Philippines |
| 2/28/2018 | ISIS-West Africa |
| 5/23/2018 | ISIS-Greater Sahara |
| 7/11/2018 | al-Ashtar Brigades (AAB) |
| 9/6/2018 | Jama'at Nusrat al-Islam wal-Muslimin (JNIM) |
| 4/15/2019 | Islamic Revolutionary Guard Corps (IRGC) |
| 1/10/2020 | Asa'ib Ahl al-Haq (AAH) |
| 1/14/2021 | Harakat Sawa'd Misr (HASM) |

**JA761**

| 3/11/2021 | ISIS-DRC |
| 3/11/2021 | ISIS-Mozambique |
| 12/1/2021 | Segunda Marquetalia |
| 12/1/2021 | Revolutionary Armed Forces of Colombia – People's Army (FARC-EP) |

**Delisted Foreign Terrorist Organizations**

| Date Removed | Name | Date Originally Designated |
|---|---|---|
| 10/8/1999 | Democratic Front for the Liberation of Palestine - Hawatmeh Faction | 10/8/1997 |
| 10/8/1999 | Khmer Rouge | 10/8/1997 |
| 10/8/1999 | Manuel Rodriguez Patriotic Front Dissidents | 10/8/1997 |

**JA762**

| 10/8/2001 | Japanese Red Army | 10/8/1997 |
| 10/8/2001 | Tupac Amaru Revolution Movement | 10/8/1997 |
| 5/18/2009 | Revolutionary Nuclei | 10/8/1997 |
| 10/15/2010 | Armed Islamic Group (GIA) | 10/8/1997 |
| 9/28/2012 | Mujahedin-e Khalq Organization (MEK) | 10/8/1997 |
| 5/28/2013 | Moroccan Islamic Combatant Group (GICM) | 10/11/2005 |
| 7/15/2014 | United Self Defense Forces of Colombia | 9/10/2001 |
| 9/3/2015 | Revolutionary Organization 17 November (17N) | 10/8/1997 |
| 12/9/2015 | Libyan Islamic Fighting Group (LIFG) | 12/17/2004 |
| 6/1/2017 | Abu Nidal Organization (ANO) | 10/8/1997 |

**JA763**

| 2/16/2021 | Ansarallah | 1/19/2021 |
| 12/1/2021 | Revolutionary Armed Forces of Colombia (FARC) | 10/8/1997 |

## Identification

The Bureau of Counterterrorism in the State Department (CT) continually monitors the activities of terrorist groups active around the world to identify potential targets for designation. When reviewing potential targets, CT looks not only at the actual terrorist attacks that a group has carried out, but also at whether the group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

## Designation

Once a target is identified, CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. Upon the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the Federal Register, at which point the designation takes effect. By law an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit not later than 30 days after the designation is published in the Federal Register.

Until recently the INA provided that FTOs must be redesignated every 2 years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the redesignation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its

**JA764**

Case 1:21-cv-04402-HG-RML Document 62-56 Filed 11/08/24 Page 173 of 175 PageID #: 4316

designation date (or in the case of redesignated FTOs, its most recent redesignation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a 5 year period with respect to a designation, then the Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

## Legal Criteria for Designation under Section 219 of the INA as amended

1. It must be a foreign organization.

2. The organization must engage in terrorist activity, as defined in **section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B))**, or terrorism, as defined in **section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2))**, or retain the capability and intent to engage in terrorist activity or terrorism.

3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

## Legal Ramifications of Designation

1. It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a

JA765

specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."

2. Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).

3. Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

**Other Effects of Designation**

1. Supports our efforts to curb terrorism financing and to encourage other nations to do the same.

2. Stigmatizes and isolates designated terrorist organizations internationally.

3. Deters donations or contributions to and economic transactions with named organizations.

4. Heightens public awareness and knowledge of terrorist organizations.

5. Signals to other governments our concern about named organizations.

**Revocations of Foreign Terrorist Organizations**

The Immigration and Nationality Act sets out three possible basis for revoking a Foreign Terrorist Organization designation:

1. The Secretary of State must revoke a designation if the Secretary finds that the circumstances that were the basis of the designation have changed in such a manner as to warrant a revocation;

2. The Secretary of State must revoke a designation if the Secretary finds that the national security of the United States warrants a revocation;

3. The Secretary of State may revoke a designation at any time.

Any revocation shall take effect on the date specified in the revocation or upon publication in the

**JA766**

Federal Register if no effective date is specified. The revocation of a designation shall not affect

any action or proceeding based on conduct committed prior to the effective date of such

revocation.

---

TAGS

Bureau of Counterterrorism     Countering Violent Extremism     Counterterrorism     Terrorism

---

# Related Articles

—— MARCH 7, 2022

## Terrorist Designation of Katibat al Tawhid wal Jihad

**READ MORE**

---

—— MARCH 4, 2022

## Sanctioning Hizballah Financiers in Guinea

**READ MORE**

---

—— MARCH 1, 2022

**JA767**

Designation of ISIS Organizers and Financial Facilitators based in South Africa

**READ MORE**

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

**JA768**

# Exhibit 2

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

NEW YORK STATE BANKING DEPARTMENT
NEW YORK, NEW YORK

| | |
|---|---|
| ——————————————————————— ) | |
| Written Agreement by and among ) | |
| ) | |
| STANDARD CHARTERED plc ) | Docket Nos. 04-024-WA/RB-FB |
| London, United Kingdom ) | 04-024-WA/RB-FBR |
| ) | |
| STANDARD CHARTERED BANK ) | |
| London, United Kingdom ) | |
| ) | |
| STANDARD CHARTERED ) | |
|  NEW YORK BRANCH ) | |
| New York, New York ) | |
| ) | |
| FEDERAL RESERVE BANK OF NEW YORK ) | |
| New York, New York ) | |
| ) | |
| and ) | |
| ) | |
| NEW YORK STATE BANKING DEPARTMENT ) | |
| New York, New York ) | |
| ——————————————————————— ) | |

WHEREAS, Standard Chartered plc, London, United Kingdom, the holding company of

Standard Chartered Bank, London, United Kingdom (the "Bank"), a foreign bank as defined in

section 1(b)(7) of the International Banking Act (12 U.S.C. 3101(7)), and the New York, New

York branch of the Bank (the "New York Branch") are taking steps to address deficiencies

relating to compliance with applicable federal and state laws, rules, and regulations relating to

anti-money laundering ("AML") policies and procedures, including the Currency and Foreign

Transactions Reporting Act, 31 U.S.C. 5311 et seq. (the Bank Secrecy Act or "BSA"), as

amended by the USA PATRIOT Act; the rules and regulations issued thereunder by the U.S.

**JA770**

Department of the Treasury (31 C.F.R. Part 103); the suspicious activity reporting requirements of Regulation K of the Board of Governors of the Federal Reserve System (the "Board of Governors") (12 C.F.R. 211.24(f)) and those of the New York State Banking Department (the "Department") (3 N.Y.C.R.R. Part 300);

WHEREAS, the New York Branch provides significant services to its correspondent banks, including non-U.S. banks, and also conducts a high volume of U.S. dollar funds transfer clearing business, and examiners have identified compliance and risk management deficiencies at the New York Branch in these operational areas;

WHEREAS, the Bank and the New York Branch are taking steps to enhance due diligence policies and procedures relating to the New York Branch's funds transfer clearing operations and correspondent accounts for non-U.S. banks and are addressing risks associated with these lines of business, including legal and reputational risks, by implementing industry sound practices designed to identify and effectively manage such risks;

WHEREAS, it is the common goal of Standard Chartered plc, the Bank, the New York Branch, the Federal Reserve Bank of New York (the "Reserve Bank"), and the Department to ensure that the Bank and the New York Branch fully address all deficiencies in the New York Branch's AML policies and procedures, customer due diligence practices, risk management processes, and internal control environment; and

WHEREAS, on September 14, 2004, the board of directors of Standard Chartered plc, at a duly constituted meeting, adopted a resolution authorizing and directing Evan Mervyn Davies, Group Chief Executive of Standard Chartered plc and Group Chief Executive of the Bank to enter into this Written Agreement (the "Agreement") on behalf of Standard Chartered plc and the Bank, and James F. McCabe, Chief Executive Officer of The Americas to enter into this

2

**JA771**

Agreement on behalf of the New York Branch, and consenting to compliance by Standard Chartered plc, the Bank, the New York Branch, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(4) of the Federal Deposit Insurance Act, as amended (12 U.S.C. 1813(u) and 1818(b)(4)), with each and every provision of this Agreement.

NOW, THEREFORE, Standard Chartered plc, the Bank, the New York Branch, the Reserve Bank, and the Department hereby agree as follows:

**Anti-Money Laundering Compliance**

1.      Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written AML program designed to improve the New York Branch's system of internal controls and to ensure compliance with all applicable provisions of the BSA and the rules and regulations issued thereunder.  The program shall include provisions for updates on an ongoing basis as necessary to incorporate amendments to the BSA and the rules and regulations issued thereunder.  The program shall, at a minimum:

(a)      Improve the New York Branch's system of internal controls, particularly in the area of funds transfer clearing operations, to ensure compliance with all recordkeeping and reporting requirements;

(b)      include controls designed to ensure compliance with all requirements relating to correspondent accounts for non-U.S. persons, including but not limited to the prohibition on correspondent accounts for foreign shell banks (31 C.F.R. 103.177) and due diligence requirements for certain correspondent accounts (31 C.F.R. 103.181);

(c)      provide for the ability to retrieve transaction records to ensure prompt and accurate responses to law enforcement subpoena requests;

3

**JA772**

(d)     provide for thorough assessment of legal and reputational risks associated with correspondent accounts and funds transfer clearing operations, and for regular review of risk tolerance by appropriate members of senior management;

(e)     provide for the retention of outside consultant assistance as necessary and appropriate to assess risks associated with particular lines of business and to design and implement controls to manage such risks; and

(f)     be designed to ensure identification and verification of the identity of account holders and transactors in accordance with applicable regulations.

**Independent Testing and Audit**

2.     Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written plan for enhancing independent testing of the New York Branch's AML compliance.  The plan shall include, at a minimum:

(a)     Procedures to evaluate the New York Branch's compliance with the BSA, the rules and regulations issued thereunder, and all other applicable AML and suspicious activity reporting requirements;

(b)     procedures to evaluate the New York Branch's adherence to industry sound practices relating to AML compliance, customer and correspondent account due diligence, and the reporting of suspicious activities;

(c)     procedures for ongoing compliance monitoring covering operations and customer due diligence in the funds transfer and correspondent banking lines of business, including a schedule of compliance reviews to be performed in those areas;

(d)     regular evaluation of training to ensure that appropriate personnel at the New York Branch possess the requisite knowledge necessary to comply with the BSA;

(e)     provisions for independent testing to be performed by qualified parties (which may include internal audit) who are independent of the Bank's and the New York Branch's business lines and compliance function;

(f)     procedures for review of independent testing results by senior Bank and New York Branch management and escalation to the board of directors in appropriate circumstances;

(g)     procedures to ensure that senior Bank and New York Branch management institute appropriate actions in response to the independent testing results; and

(h)     procedures to ensure that independent testing results are communicated to the Reserve Bank and the Department on a regular basis and retained for subsequent supervisory review.

**Training**

3.     Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written plan to provide effective training to all appropriate personnel at the New York Branch (including, but not limited to, correspondent account relationship personnel, employees involved in funds transfer clearing operations, and customer contact personnel) in all aspects of regulatory and internal policies and procedures related to the BSA and the identification and reporting of suspicious transactions, and to update the training on a regular basis to reasonably ensure that all personnel are trained in the most current legal requirements and in the organization's risk management processes.

**Suspicious Activity Reporting and Customer Due Diligence**

      4.      Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written customer due diligence program designed to reasonably ensure the identification and timely, accurate, and complete reporting of all known or suspected violations of law against or involving the New York Branch and suspicious transactions at the New York Branch to law enforcement and supervisory authorities as required by the suspicious activity reporting provisions of Regulation K of the Board of Governors (12 C.F.R. 211.24(f)) and 3 N.Y.C.R.R. 300.1.  At a minimum, the program shall include:

      (a)      A methodology for assigning risk levels to the New York Branch's customer base, including correspondent accountholders;

      (b)      a risk focused assessment of the New York Branch's customer base to:

      (i)      identify the categories of customers whose transactions and banking activities are routine and usual; and

      (ii)      determine the appropriate level of enhanced due diligence necessary for those categories of customers that pose a heightened risk of conducting potentially illicit activities at or through the New York Branch;

      (c)      for each customer whose transactions require enhanced due diligence, procedures to:

      (i)      determine the appropriate documentation necessary to verify the identity and business activities of the customer; and

      (ii)      understand the normal and expected transactions of the customer;

(d)     for correspondent accounts established, maintained, administered, or managed in the United States for a foreign financial institution, procedures that comport with the industry sound practices that are set forth in available public guidance (e.g., the New York Clearing House Association LLC's "Guidelines for Counter Money Laundering Policies and Procedures in Correspondent Banking" (March 2002) and the Basel Committee on Banking Supervision's "Customer Due Diligence for Banks" (October 2001)), and that include, but are not limited to:

(i)     obtaining appropriate information about the correspondent, its business operations, its customers, and its AML procedures, particularly with regard to its customer relationships that may present a heightened risk of money laundering; and

(ii)     procedures to ensure that correspondent banking services provided by the New York Branch are reviewed and approved by appropriate levels of management, and are subject to appropriate ongoing review; and

(e)     procedures designed to ensure proper identification and reporting of all known or suspected violations of law and suspicious transactions, including but not limited to:

(i)     effective monitoring of customer accounts and transactions, including funds transfers conducted through the New York Branch, consistent with industry sound practices;

(ii)     appropriate participation by New York Branch senior management in the process of identifying, reviewing, and reporting potentially suspicious activity; and

(iii)     adequate referral of information about potentially suspicious activity through appropriate levels of management, including a policy for determining action to

be taken in the event of multiple filings of Suspicious Activity Reports on the same customer or where a correspondent fails to provide due diligence information.

**Transaction Review**

5.    (a)    Within 20 days of this Agreement, the Bank and the New York Branch shall jointly engage a qualified independent firm (the "Consultant") acceptable to the Reserve Bank and the Department to conduct a review of account and transaction activity for the time period beginning no later than July 23, 2002 through the present to determine whether suspicious activity involving accounts or transactions at, by, or through the New York Branch was properly identified and reported in accordance with applicable suspicious activity reporting regulations (the "Review").

(b)    Within 10 days of the engagement of the Consultant, but prior to the commencement of the Review, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department for approval an engagement letter that sets forth:

(i)    the scope of the Review, including the types of accounts and transactions to be reviewed;

(ii)    the methodology for conducting the Review, including any sampling procedures to be followed;

(iii)    the expertise and resources to be dedicated to the Review; and

(iv)    the anticipated date of completion of the Review.

(c)    Upon completion of the Review, the Bank and the New York Branch shall jointly provide to the Reserve Bank and the Department a copy of the Consultant's report detailing the findings of the Review at the same time the report is provided to the Bank and the New York Branch.

(d)     Upon completion of the Review, the Bank and the New York Branch shall ensure that all matters or transactions required to be reported that have not previously been reported are reported in accordance with applicable rules and regulations.

**Approval and Progress Reports**

6.     The programs, plans, engagement letter, and the identification of the independent consultant required by paragraphs 1, 2, 3, 4, and 5(b) of this Agreement shall be submitted to the Reserve Bank and the Department for review and approval.  Acceptable programs, plans, and an acceptable engagement letter shall be submitted to the Reserve Bank and the Department within the time periods set forth in this Agreement and an acceptable independent consultant shall be retained within the time period set forth in paragraph 5(a) of this Agreement.  The Bank and the New York Branch shall adopt the approved programs, plans, and engagement letter within 10 days of approval by the Reserve Bank and the Department and then shall fully comply with them.  During the term of this Agreement, the approved programs, plans, and engagement letter shall not be amended or rescinded without the prior written approval of the Reserve Bank and the Department.

7.     Within 10 days after the end of each month following the date of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department, written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Agreement, and the results thereof.  Management's responses to any audit reports covering AML matters prepared by internal and external auditors shall be included with the progress report.  The Reserve Bank and the Department may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

**Notices**

8.      All communications regarding this Agreement shall be sent to:

          (a)     Mr. Robert A. O'Sullivan
                      Senior Vice President
                      Federal Reserve Bank of New York
                      33 Liberty Street
                      New York, NY  10045

          (b)     Mr. Michael J. Lesser
                      Deputy Superintendent
                      New York State Banking Department
                      One State Street
                      New York, NY  10004

          (c)     Mr. Evan Mervyn Davies, CBE
                      Group Chief Executive
                      Standard Chartered plc
                      Group Chief Executive
                      Standard Chartered Bank
                      1 Aldermanbury Square
                      London EC2V7SB
                      United Kingdom

          (d)     Mr. James F. McCabe
                      Chief Executive Officer - The Americas
                      Standard Chartered Bank
                      1 Madison Ave.
                      New York, N.Y.  10010

**Miscellaneous**

9.      The provisions of this Agreement shall be binding on Standard Chartered plc, the Bank, the New York Branch, and each of their institution-affiliated parties in their capacities as such, and their successors and assigns.

10.     Each provision of this Agreement shall remain effective and enforceable until stayed, modified, terminated or suspended in writing by the Reserve Bank and the Department.

11.     Notwithstanding any provision of this Agreement, the Reserve Bank and the Department may, in their sole discretion, grant written extensions of time to the Bank and the New York Branch to comply with any provision of this Agreement.

12.     The provisions of this Agreement shall not bar, estop or otherwise prevent the Board of Governors, the Reserve Bank, the Department, or any federal or state agency from taking any further or other action affecting Standard Chartered plc, the Bank, the New York Branch, or any of their current or former institution-affiliated parties or their successors or assigns.

13.    This Agreement is a "written agreement" for the purposes of, and is enforceable by the Board of Governors as an order issued under, section 8 of the Federal Deposit Insurance Act and by the Department pursuant to Section 39 of the New York State Banking Law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of this 7th day of October, 2004.

STANDARD CHARTERED plc

By:_____
       Evan Mervyn Davies, CBE
       Group Chief Executive

FEDERAL RESERVE BANK OF
  NEW YORK

By:_____
       Robert A. O'Sullivan
       Senior Vice President

STANDARD CHARTERED BANK

By:_____
       Evan Mervyn Davies, CBE
       Group Chief Executive

NEW YORK STATE BANKING
  DEPARTMENT

By:_____
       Michael J. Lesser
       Deputy Superintendent

STANDARD CHARTERED BANK
  New York Branch

By:_____
       James F. McCabe
       Chief Executive Officer, The Americas

12

**JA781**

13.  This Agreement is a "written agreement" for the purposes of, and is enforceable by the Board of Governors as an order issued under, section 8 of the Federal Deposit Insurance Act and by the Department pursuant to Section 39 of the New York State Banking Law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of this 7th day of October, 2004.

STANDARD CHARTERED PLC

By:_____
Evan Mervyn Davies, CBE
Group Chief Executive

FEDERAL RESERVE BANK OF
NEW YORK

By:_____
Robert A. O'Sullivan
Senior Vice President

STANDARD CHARTERED BANK

By:_____
Evan Mervyn Davies, CBE
Chairman Group Chief Executive

NEW YORK STATE BANKING
DEPARTMENT

By:_____
Michael J. Lesser
Deputy Superintendent

STANDARD CHARTERED BANK
New York Branch

By:_____
James F. McCabe
Chief Executive Officer, The Americas

12

JA782

# Exhibit 3

## STIPULATION AND SETTLEMENT AGREEMENT

BETWEEN:

THE UNITED STATES OF AMERICA, Plaintiff

And

HIKMATULLAH SHADMAN, ROHULLAH FAIZY AND NAJIBULLAH SADULLAH, Claimants

WHEREAS:

1. Whereas, the United States filed a Verified Complaint for Forfeiture *in Rem* on November 20, 2012, in the United States District Court for the District of Columbia, captioned at *United States of America v. Sum of $70,990,605 et al.*, 12-1905, and a Third Amended Verified Complaint for Forfeiture *in Rem* (the "Complaint"), in this case (the "Pending Action") on August 6, 2015, seeking the forfeiture of approximately $57.3 million in defendant assets (the "Defendant Assets"), as more fully described in the Complaint;

2. On August 27, 2013, Hikmatullah Shadman and his brothers, Rohullah Faizy and Najibullah Sadullah, filed verified claims to the Defendant Assets (collectively, the "Shadman Claimants"), both individually and on behalf of their specific interests in Hikmat Shadman Logistics Services Company ("HSLSC"), Hekmat Shadman General Trading, LLC ("Hekmat"), Faizy Elham Brothers, Ltd., and Everest Faizy Logistics Services ("Everest");

3. The United States and the Shadman Claimants desire to enter into this Stipulation and Settlement Agreement ("Settlement Agreement"), which involves forty-nine million dollars ($49,000,000) of the Defendant Assets, and which encompasses all assets to which the Shadman Claimants have pending claims, that were restrained by Order of the United States District Court upon probable cause provided by the United States in May 2013 at Deutsche Bank Americas, which served as the U.S. interbank account for Emirates National Bank;

4. On January 3, 2019, HSLSC pleaded guilty in the Eastern District of North Carolina to a Criminal Information, No. 5:18-cr-492-1, charging the corporation with two counts of paying gratuities to two U.S. service members in Afghanistan, and one count of conspiracy to do the same, in order to ensure the award of contracts to HSLSC, and was sentenced the same day to pay a $810,000 fine and forfeit $190,000 ("Criminal Fine and Forfeiture");

5. On August 11, 2014, a Relator filed an action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA") in the United States District Court for the District of Columbia, which remains under seal (the "FCA Action"). The FCA Action names as defendants, among others, certain companies owned and/or operated by

**JA784**

the Shadman Claimants, specifically HSLSC, Hekmat, Hikmat Supply and Construction Company, and Everest (collectively, the "Shadman Companies");

6. Notice of the Pending Action was provided to claimants as required under the applicable Federal Rules of Civil Procedure; notice was also published on the government website www.forfeiture.gov for 30 consecutive days, and the deadline for third party claims to be filed in this matter has also expired; and

7. The United States and the Shadman Claimants have negotiated this Settlement Agreement and wish to resolve all claims which may arise out of the Pending Action through this Settlement Agreement, except any claims arising out of the FCA Action.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BY THE UNDERSIGNED PARTIES AS FOLLOWS:

1. The United States and the Shadman Claimants consent to the terms of this Settlement Agreement, and agree to take all reasonable steps necessary to execute its terms.

2. The Shadman Claimants represent that they own the $49,000,000 of the Defendant Assets described in paragraph 3 above, which is the subject of this Settlement Agreement.

3. Pursuant to this Settlement Agreement, the Shadman Claimants agree to pay the Relator fifty-five thousand dollars ($55,000) to satisfy the Relator's expenses, attorney's fees and attorney costs in the FCA Action ("Relator's Attorneys' Fees"), and agree to pay the Relator's Attorneys' Fees and the Criminal Fine and Forfeiture prior to any release of funds to the Shadman Claimants.

4. Upon proof of payment of the Relator's Attorneys' Fees and the Criminal Fine and Forfeiture, the Shadman Claimants shall receive twenty-three million four hundred and forty-five thousand dollars ($23,445,000), which represents twenty-four and one half million dollars ($24,500,000) of the Defendant Assets restrained at Deutsche Bank Americas, less the payment of the Relator's Attorneys' Fees and the Criminal Fine and Forfeiture. Such release of funds shall be made pursuant to written instructions to be provided by the Shadman Claimants' counsel and in full satisfaction of the Shadman Claimants' claims in the Pending Action.

5. Coincident with this Settlement Agreement, the Shadman Companies will enter into a separate settlement agreement with the United States to resolve their liability to the United States under the FCA (the "FCA Settlement Agreement") for the Covered Conduct, as that term is defined in the FCA Settlement Agreement. As set forth in the FCA Settlement Agreement, it is also agreed that one and one-half million dollars ($1,500,000) of the Defendant Assets will be allocated and distributed to the United States as payment to resolve the United States' FCA claims against the Shadman Companies for the Covered Conduct, and shall be released by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the Department of Justice prior to entry of any final forfeiture Order against the Defendant Assets. The FCA Settlement Agreement provides that, following the receipt of this payment, the FCA

2

**JA785**

Action against the Shadman Companies will be dismissed in accordance with the terms of the FCA Settlement Agreement. Nothing in this Settlement Agreement, resolving the claims in the Pending Action, releases the Shadman Companies from any civil claim under the FCA; any release of claims arising under the FCA shall be governed solely by the terms and conditions of the FCA Settlement Agreement.

6. Pursuant to this Settlement Agreement, the remaining balance of the Defendant Assets restrained at Deutsche Bank Americas, and all interest earned on the entirety of the Defendant Assets since seizure, less any expenses or fees incurred and owed to Deutsche Bank Americas as of the date the Consent Judgment of Forfeiture is served on Deutsche Bank Americas, shall be forfeited by the United States, and all right, title, and interest in the remaining funds shall be vested in the United States and no one else.

7. Pursuant to this Settlement Agreement, the Shadman Claimants agree not to file any future claims with respect to the Defendant Assets or any facts related to the Complaint.

8. The United States and the Shadman Claimants agree that the settlement of this matter upon the terms and conditions set forth in this Settlement Agreement shall be the final and complete satisfaction of all claims asserted by the United States and the Shadman Claimants in the Pending Action.

9. Except as otherwise provided for in this Settlement Agreement, the United States and the Shadman Claimants specifically waive any rights to further litigate against each other their respective interests in the Defendant *Res* or to petition for remission or mitigation of the settlement, releases, or forfeiture.

10. The Shadman Claimants hereby agree to forever discharge and hold harmless the United States and any and all of its agencies, agents, officers, employees and contractors (including, but not limited to, the Department of Justice, the Special Inspector General for Afghanistan Reconstruction, and their agents officers, employees and contractors) from any and all claims, forfeitures, liabilities, obligations, appeals, or demands arising out of or related to the Pending Action, or the seizure of any Defendant *In Rem*, including, but not limited to, any claim for attorneys' fees, costs or interests which may be asserted on behalf of the Shadman Claimants, whether pursuant to 28 U.S.C. § 2465 or otherwise.

11. Except as to any claims arising under the FCA, the United States, on its own behalf and on behalf of its representatives, agents, assignees, and attorneys, hereby agrees to forever discharge and hold harmless the Shadman Claimants and any and all companies, officers, agents, representatives, heirs, assigns, and employees of same, from any and all claims, forfeitures, liabilities, obligations, appeals, or demands arising out of or related to the Pending Action, or the seizure of any Defendant *In Rem*, including, but not limited to, any claim for attorney's fees, costs or interests which may be asserted on behalf of the United States.

**JA786**

12. For the purpose of effectuating this Settlement Agreement, the Shadman Claimants, without admitting any liability, agree not to oppose the entry of a Judgment of Forfeiture consistent with the terms of this Settlement Agreement.

13. Each party shall bear its own costs, attorney's fees, and expenses.

14. As it pertains to this Settlement Agreement, all rights of appeal are hereby waived. Notwithstanding the foregoing, the United States and the Shadman Claimants do not waive their rights to enforce the terms of this Settlement Agreement, which rights are expressly retained.

15. The Shadman Claimants and the United States agree that this Settlement Agreement is contingent upon and will become immediately null and void should the Court fail to enter a Judgment of Forfeiture consistent with this Settlement Agreement.

16. The Shadman Claimants and the United States agree that this Settlement Agreement is contingent upon and will become immediately null and void if the United States' claims against the Shadman Companies in the FCA Action and the Relator's claims for attorneys' fees are not resolved successfully through completed execution of the FCA Settlement Agreement and payment as set forth above.

17. The Shadman Claimants acknowledge that they are represented by competent counsel in connection with the negotiation, preparation, and execution of this Settlement Agreement, and the legal effects thereof have been explained to them, and they are entering into this Settlement Agreement freely and voluntarily, without coercion, duress or undue influence.

18. Except as set forth in the FCA Settlement Agreement, this Settlement Agreement constitutes the entire final, complete and exclusive agreement and understanding between and among the United States and the Shadman Claimants, and supersedes all prior or contemporaneous written or oral agreements. The United States and the Shadman Claimants expressly acknowledge that they have not relied on any representations, warranties, agreements, or understandings not expressly contained in this Settlement Agreement.

19. Each party to this Settlement Agreement acknowledges that it has participated in the negotiation, drafting, and preparation of this Settlement Agreement. If there is a dispute, controversy, or disagreement over the meaning of this Settlement Agreement, or any term herein, the parties acknowledge that no provision of this Settlement Agreement will be interpreted in favor of, or against, either of the parties hereto because any such party or its counsel participated in the drafting thereof, or because any such provision is inconsistent with any prior draft hereof or thereof.

20. There shall be no modification of this Settlement Agreement unless in writing and signed by all the undersigned parties or their authorized representatives.

**JA787**

21. This Settlement Agreement, and any dispute arising thereof, shall be governed by the laws of the United States and the laws of the District of Columbia. The United States and the Shadman Claimants agree that the exclusive jurisdiction and venue for any dispute arising under this Settlement Agreement is the United States District Court for the District of Columbia. This Court shall retain jurisdiction to enforce this Settlement Agreement.

22. The signatories to this agreement represent that they have authority to execute this Settlement Agreement on behalf of their clients.

23. The Parties stipulate that the allegations set forth in the Complaint are sufficient to establish a statutory and factual basis for forfeiture.


DEBORAH L. CONNOR, CHIEF
MONEY LAUNDERING AND ASSET
RECOVERY SECTION

Dated: 2/22/19          By:

Daniel H. Claman
Principal Deputy Chief, International Unit
Patricia M. Sulzbach
Steven C. Parker
Trial Attorneys, International Unit
U.S. Department of Justice, Criminal Division
1400 New York Avenue, NW, Ste 10100
Washington, D.C. 20005
Tel: (202) 616-5313
Fax: (202) 514-5522

*Attorneys for Plaintiff United States of America*


Dated: 2-22-19          By:

FH+H, PLLC

Thomas M. Craig
Milton C. Johns
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
Phone: (703) 590-1234
Fax: (703) 590-0366

*Attorneys for the Shadman Claimants*

5

**JA788**

# Exhibit 4

FILED

NOV 2 6 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     )
*Department of Justice, Asset Forfeiture &*
          Plaintiff, *Money Laundering* )
                    *Section*)
v.      *1400 New York Ave,N.W.*)
       *Washington, D.C. 20530*)

THE SUM OF $70,990,605 HELD IN  )
ACCOUNT NUMBER 050210000527810,  )
IN THE NAME OF HIKMAT SHADMAN  )
LOGISTICS SERVICES COMPANY,  )
LOCATED AT AFGHANISTAN  )
INTERNATIONAL BANK,  `
SHAHR-E-NAW, HAJI YAQOOB
SQUARE, SHAHABUDIN WATT,
P.O. BOX 2074, KABUL, AFGHANISTAN, AND
ALL INTEREST, BENEFITS OR ASSETS
TRACEABLE THERETO;

                     )
and                   )
                     )
THE SUM OF $6,930,000 HELD IN  )
ACCOUNT NUMBER 050210001288613,  )
IN THE NAME OF FAIZY ELHAM  )
BROTHERS, LTD., LOCATED AT  )
AFGHANISTAN INTERNATIONAL BANK,  )
SHAHR-E-NAW, HAJI YAQOOB  )
SQUARE, SHAHABUDIN WATT,  )
P.O. BOX 2074, KABUL, AFGHANISTAN, AND )
ALL INTEREST, BENEFITS OR ASSETS  )
TRACEABLE THERETO;  )
                     )
          Defendants.  )

Case No. _____

Case: 1:12-cv-01905
Assigned To : Roberts, Richard W.
Assign. Date : 11/26/2012
Description: General Civil

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Comes now the Plaintiff, United States of America, through its undersigned attorneys,

and respectfully states as follows:

**JA790**

## I. NATURE OF THE ACTION

1. This is an action *in rem* for the forfeiture of the named defendant properties pursuant to 18 U.S.C. §§ 981(a)(1)(C), and 984.

2. The defendant properties, approximately $77,920,605 located in Afghanistan, were illegally acquired through a conspiracy orchestrated by Hikmatullah Shadman, an Afghan national, together with other individuals, both known and unknown, to obtain payments from the United States for the transportation of military supplies in Afghanistan through the illegal and fraudulent use of the wires in violation of 18 U.S.C. § 1343, beginning as early as November 2010 and continuing until at least March 2012. Through this wire fraud conspiracy, Hikmatullah and his co-conspirators made bribe payments, fraudulently inflated prices, and caused the United States to be invoiced for and to make payments of $77,920,605 to the defendant accounts in Afghanistan.

3. The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(C) as property which constitutes or is derived from proceeds traceable to a violation of any offense constituting a "specified unlawful activity," or a conspiracy to commit such an offense. Pursuant to 18 U.S.C. § 1956(c)(7)(A) and 18 U.S.C. § 1961(a), violations of 18 U.S.C. § 1343 are specified unlawful activities. For any civil forfeiture action in which the defendant property is cash or funds deposited into a financial institution, 18 U.S.C. § 984 provides that the government does not have to identify the specific property involved in the offense that is the basis for the forfeiture. Identical property found in the same account as the property involved in the forfeiture offense is subject to forfeiture; it is no defense that said property has been removed and replaced by identical property. Section 984 applies to civil forfeiture actions commenced within one year from the date of the offense.

## II.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a), and 18 U.S.C. §§ 981(a)(1)(C) and 984.

5.     This Court has *in rem* jurisdiction over the named defendant properties pursuant to 28 U.S.C. §§ 1345 and 1355(a).

6.     This Court has venue over this action pursuant to 28 U.S.C. §§1355(b)(2) on the basis that the named defendant properties are presently located in a foreign country.

## III.     DEFENDANT PROPERTIES

7.     The defendant properties alleged to be subject to forfeiture are as follows:

(a) **The sum of $70,990,605 held in bank account number 050210000527810**, in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan, and all interest, benefits or assets traceable thereto; and

(b) **The sum of $6,930,000 held in bank account number 050210001288613**, in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan, and all interest, benefits or assets traceable thereto.

8.     On November 7, 2012, United States Magistrate Judge Alan Kay of the United States District Court for the District of Columbia issued a seizure warrant, under seal, for each of the defendant properties, finding probable cause that the defendant properties are subject to forfeiture.  The seizure warrants were transmitted to Afghanistan for enforcement pursuant to a United Nations Convention Against Corruption mutual legal assistance request.  The defendant bank accounts have not yet been restrained.

3

**JA792**

## IV.    STATEMENT OF FACTS

### Background on NATO Contracting Process in Afghanistan

9.    As part of its mission in Afghanistan, the United States Government pays contractors and subcontractors through the North Atlantic Treaty Organization (NATO) to resupply military forces operating in the country. The United States Government utilizes local Afghan-owned businesses to transport fuel and bulk quantities of dry cargo (such as food, water, and other supplies) by truck to various locations throughout the country.

10.    The United States Government provides funding in U.S. dollars for all transportation missions conducted to resupply U.S. military units, as alleged herein. This resupply program is administered by NATO in Afghanistan through NATO's own Maintenance and Supply Agency (NAMSA). Each individual transportation mission (which may involve numerous trucks) is awarded by means of a document formally referred to as a Transportation Movement Request or "TMR." Under this arrangement, NAMSA engages prime contractors who, in turn, award individual TMRs to local Afghan subcontractors for each specific transportation job.

11.    TOIFOR Global Life Support Services (TOIFOR), a Hungarian firm located at Kandahar Airfield, Afghanistan, has served as the sole prime contractor to NAMSA under NATO Contract No. 4600001510 (known as the "Jingle Truck" contract) since October 2007.[1]

12.    Under the Jingle Truck contract, and at all times relevant to this complaint, TOIFOR awarded TMRs to subcontractors for truck shipment to various locations within areas designated by the U.S. military command.

---

[1] In 2011 TOIFOR changed its name to "Xeless." To avoid confusion, this Complaint refers to the company as TOIFOR, whether operating under the name TOIFOR or Xeless.

4

**JA793**

13.     Each quarter, subcontractors seeking TMRs from TOIFOR would send TOIFOR a price list reflecting the price the subcontractor would charge to deliver shipments along specific routes.  TOIFOR, in turn, would submit the price lists to NAMSA.

14.     For each transportation movement request TOIFOR received from U.S. military command, TOIFOR would identify all of the subcontractors proposing to make deliveries to the requesting military unit's location and then select four (4) vendors from that group whose offered price was below the maximum price allowed.  TOIFOR's operations manager then awarded the TMR to a subcontractor based on several pertinent factors, including price.

15.     After selecting the subcontractor, TOIFOR submitted the TMR to U.S. military officials for review and approval.  Once the transportation mission was approved, the TMR documents were forwarded to NAMSA by the U.S. military so that TOIFOR could execute the mission.  At that point, the subcontractor was authorized by TOIFOR to make the delivery by truck.

16.     Following each delivery of supplies, the subcontractor returned the completed TMR form and an invoice to TOIFOR for payment.  TOIFOR, in turn, electronically transmitted all TMRs and invoices for each month to NAMSA for payment.

17.     NAMSA aggregated the individual invoices and electronically transmitted quarterly invoices to U.S. Forces-Afghanistan for payment under the Jingle Truck contract.  This information was then electronically transmitted by the U.S. military to the Defense Finance and Accounting Service (DFAS) office in Rome, New York, with a request that funds be transmitted to NAMSA for payment.

18.     DFAS processed each request and authorization for payment and disbursed payment by electronic funds transfer (EFT) from the U.S. Army's account at the U.S. Treasury,

**JA794**

designated as DSSN (Disbursing Station Symbol Number) 5570, to NAMSA's European bank account, number LU120019000050008000, located at Banque et Caisse d'Espargne de l'Etat in Luxembourg.

19.     After receiving funds from the United States Treasury account, NAMSA processed the payment to TOIFOR and wired funds by EFT from its bank account in Luxembourg to TOIFOR's bank account at Afghanistan International Bank in Kabul, Afghanistan in U.S. dollars.

20.     TOIFOR then disbursed payment for TMRs by EFT in U.S. dollars to the subcontractors' bank accounts.

### Scheme to Defraud the United States

21.     Hikmatullah Shadman ("Hikmatullah"), an Afghan national and owner of Hikmat Shadman Logistics Services Company ("HSLSC") (a/k/a "Hikmat Shadman Supply and Construction Company", "Hikmat Shadman Commerce, Construction & Supply Company", or "Hikmat Shadman Commerce Construction Supplies"), operated as one of TOIFOR's subcontractors for TMRS awarded under the Jingle Truck contract at all times alleged herein.

22.     Beginning as early as November 2010, and continuing at least until March 2012, Hikmatullah and other individuals, both known and unknown, engaged in a conspiracy to commit wire fraud which resulted in Hikmatullah and HSLSC being fraudulently awarded at least 5,421 TMRs valued at $77,920,605 to HSLSC under the Jingle Truck contract.

23.     The payments for the fraudulently obtained TMRs were made with money transferred from the United States Treasury at the direction of the DFAS, located in Rome, New York, through NAMSA to TOIFOR, which, in turn, made payments to Hikmatullah, as described in further detail below.

### JA795

24.    Between November 2010 and March 2012, $77,920,605 in TMR payments was transferred by TOIFOR in fifteen installments (approximately one per month) by electronic funds transfer into **defendant bank account number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

## Bribery and Kickbacks

25.    As part of the wire fraud conspiracy discussed herein, and in order to obtain the award of lucrative TMRs, Hikmatullah bribed and paid "kickbacks" to Henry Omonobi-Newton ("Newton"), the TOIFOR operations manager at Kandahar Airfield, and his successor in that position, Paul Hele ("Hele"), including through, but not limited to, the specific examples set forth herein.  Hikmatullah engaged in discussions and negotiations to further his fraud scheme without several confidential sources, as detailed below.

        a.    In July 2011, Hikmatullah approached a confidential source believed to be reliable ("CS-1"), an HSLSC employee, with a sealed envelope and directed CS-1 to deliver the envelope to Henry Newton.

        b.    CS-1 saw Hikmatullah take cash from a vault in his office and put hundred dollar bills in the envelope.  Hikmatullah specifically told CS-1 to show the envelope to no one but Newton.  CS-X delivered the envelope to Newton, who opened it in CS-1's presence.  The envelope contained a large number of hundred dollar bills, and Newton gave two of them to CS-1 to keep for himself.

        c.    Another confidential source believed to be reliable ("CS-2") had a conversation with CS-1, during which time  CS-1 acknowledged he was about to deliver that same envelope containing a stack of U.S. hundred dollars bills to Newton at Hikmatullah's direction.  CS-2,

7

**JA796**

who observed the envelope in CS-1's hands, further stated that the stack of bills appeared to be one and one-half to two inches thick and that all of the bills that were visible were one-hundred dollar bills.

      d. After CS-1 returned from his meeting with Newton, he acknowledged to CS-2 that Newton had given CS-1 money from the stack of bills he delivered to Newton after CS-1 complained about not getting anything back from Newton after all the money he had given Newton.

      e. Another confidential source believed to be reliable, ("CS-3"), has informed law enforcement that Newton received kickbacks from HSLSC for the award of TMRs to that company.

      f. Also in July 2011, Allan Samonte, a TOIFOR employee, told CS-1 that Newton had given Samonte and other TOIFOR employees approximately $500 in cash. Newton told the employees that the money was from Hikmatullah.

      g. On or about October 17, 2011, Paul Hele replaced Newton as TOIFOR operations manager. Hikmatullah continued the conspiracy by paying kickbacks to Paul Hele in return for the award of TMRs.

      h. Neil Patrick James Tendido is employed by HSLSC. Periodically throughout his employment, Tendido was responsible for processing TMR invoices for HSLSC. CS-1 stated to Tendido on multiple occasions that he was delivering cash to Newton and Hele on behalf of HSLSC.

      i. CS-3 also stated to Tendido that money was transferred from an HSLSC bank account to a bank account belonging to Hele in South Africa.

8

**JA797**

j.    In or about November 2011, CS-2 saw a bank transfer receipt for the transfer of $10,000 from an HSLSC bank account at Afghanistan International Bank ("AIB") to Hele's personal bank account at AIB.  An administrative employee of TOIFOR later admitted that the bank slip was "probably destroyed." CS-2 maintains that it was destroyed because he was not supposed to have seen it, and it could "get them into trouble."

### Fraudulent Subcontract Awards

26.    Also as part of this conspiracy, Hele, in cooperation with Hikmatullah, inflated and manipulated bids submitted by subcontractors, including Hikmatullah and HSLSC, for TMR awards under the Jingle Truck Contract.

a.    A fourth confidential source believed to be reliable ("CS-4"), a competitor of HSLSC, approached Hele because his company was not receiving any TMRs from TOIFOR.

b.    On or about January 11, 2012, Hele sent an email to all subcontractors, including CS-4 and Hikmatullah, reminding them that price lists were due by January 12, 2012. In response, CS-4 lowered his prices 60 to 70 percent for all routes before submitting his price list to Hele. Hele, who was required to acknowledge receipt of this price list, failed or refused to do so.  CS-4 did in fact lower his prices on the price list he submitted to Hele by January 24, 2012.

c.    On or about January 20, 2012, Hele telephoned CS-4 and requested a meeting with him.  They subsequently scheduled a meeting for January 24, 2012.

d.    On January 24, 2012, Hele asked CS-4 why the prices on his list were so low. Hele told CS-3 that because the "Americans have a lot of money," he should keep his prices high.  Hele also said that when he submitted CS-4's price list to NAMSA, he intended to remove the prices that CS-4 and other subcontractors listed for high-risk areas so that when

**JA798**

NAMSA received the price list there would be no quotes for those locations. Hele told CS-4 that, if asked, he planned to tell NAMSA that these routes were dangerous and required quotes on a case-per-case basis. The price lists that Hele submitted to NAMSA did in fact have CS-4's prices deleted.

      e.  Hele also solicited CS-4 to participate in a fraud scheme in which Hele said he would rotate the award of TMRs for high-risk areas among CS-4's company, companies affiliated with Hikmatullah, and other companies at prices determined by Hele.

      f.  When TMRs for these high-risk areas later became available, Hele told CS-4 to submit bids in amounts more than three times higher than CS-4 had proposed on the price list that Hele failed to submit to NAMSA. CS-4 did as Hele instructed, but did not receive a single TMR. Over ninety percent of the low-risk routes, and a majority of the high-risk routes, continued to be awarded to Hikmatullah.

      g.  In this way, Hele solicited CS-4 to participate in a price-fixing scheme so that Hele could continue to award TMRs to Hikmatullah at an inflated rate. In doing so, Hele was able to ensure that at least one other bidder in the pool from which he picked HSLSC was sufficiently high as to make Hikmatullah and HSLSC's bid appear reasonable. This scheme continued until March 2012 when, as a result of the investigation into Hikmatullah's conduct, HSLSC stopped receiving TMRs.

      h.  This price-fixing scheme is corroborated by an email that Newton drafted on or about October 18, 2011, to TOIFOR's CEO complaining that Hele, "reversed every price list that contractors submitted, and added his own cut on top of it and forced the contractors to accept the change and he was paid by the contactor every $ that was topped on their price…"

        i.   CS-4 also acknowledged hearing Ahmad Baseer, a vice president of TOIFOR, state that Paul Hele received a percentage of the proceeds from TMRs he awarded to companies owned by Hikmatullah.

27.     A review of bank records shows that on November 17, 2011, $19,000 in hundred dollar bills was deposited into Paul Hele's wife's bank account and another $40,000 in hundred dollar bills was deposited into Paul Hele's brother's bank account, both in South Africa. During one of the two deposits, the individual who deposited the money told the bank teller that the cash consisted of salary payments from Afghanistan. However, TOIFOR paid the salaries of its employees, including Hele, by electronic funds transfer, not through cash payments. The cash payments deposited in South Africa are believed to be bribe payments paid by Hikmatullah to Hele, his co-conspirator.

## TMRs Awarded to HSLSC

28.     A certified forensic examiner providing a detailed analysis of the TMRs awarded to HSLSC pursuant to the Jingle Truck contract on behalf of the Special Inspector General for Afghanistan Reconstruction found that between November 2010 and October 2011 *at least* 3,999 TMRs worth over $36 million had significant indicia of fraud during one year of the approximately 17 month conspiracy period:

        a.   HSLSC was awarded 2,329 TMRS worth $21,866,357 when it was the *highest* bidder, without sufficient justification.

        b.   HSLSC was awarded 10 TMRS worth $208,000 in instances when it *did not even submit a bid*.

**JA800**

c.    HSLSC was awarded 158 TMRs worth $2,151,000 when it was the *only* bidder, despite other subcontractors available to do the transportation mission under the Jingle Truck contract;

d.    HSLSC was awarded 1,355 TMRs worth $11,277,260 in circumstances without explanation where it *did not submit a bid, and no bids were submitted by any other contractor.*

29.    U.S. Forces-Afghanistan experts commissioned to address contracting corruption and its negative impact on military strategy conducted a study which corroborated the study done by the certified forensic examiner, referenced above. It showed, based upon a calculation of average pricing (*i.e.*, price per subcontractor by vehicle type for each delivery location), that Hikmatullah illegally overcharged NAMSA (in reality, the United States Government) by at least $31.1 million during the period from October 2010 to September 2011.

30.    5421 TMRs were submitted and resulted in $77,920,605 in payments to Hikmatullah under the Jingle Truck contract.

**Tracing Proceeds to Accounts to be Seized**

31.    The $77,920,605 paid to Hikmatullah by TOIFOR under the Jingle Truck contract was deposited into the defendant bank accounts as detailed below.

32.    TOIFOR invoiced NAMSA for payment on each transportation mission awarded to HSLSC. NAMSA aggregated the individual invoices and electronically transmitted quarterly invoices to U.S. Forces-Afghanistan for payment under the Jingle Truck contract. This information was then electronically transmitted by the U.S. military to the DFAS office in Rome, New York, with a request that funds be transmitted to NAMSA for payment.

33.     DFAS processed each request and disbursed payment by EFT from the U.S. Army's account at the U.S. Treasury, designated as DSSN (Disbursing Station Symbol Number) 5570, to NAMSA's European bank account, number LU120019000050008000, located at Banque et Caisse d'Espargne de l'Etat in Luxembourg.

34.     After receiving funds from the United States Treasury account, NAMSA processed the payment to TOIFOR and wired funds by EFT from its bank account in Luxembourg to TOIFOR's bank account at Afghanistan International Bank in Kabul, Afghanistan in U.S. dollars.

35.     TOIFOR  then disbursed payment for the TMRs on an approximately monthly basis by EFT in U.S. dollars to **defendant bank account number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

36.     On or about June 19, 2011, Hikmatullah directed Tendido to transfer $4,000,000 of the $77,920,605 to another bank account Hikmatullah controlled, **defendant bank account number 050210001288613**, held in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

37.     On or about July 30, 2011, Hikmatullah directed Tendido to transfer $2,930,000 of the $77,920,605 he received from TOIFOR into **defendant bank account number 050210001288613**, held in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

## V.   BASIS FOR FORFEITURE

38.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 36, above.

39.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" or a conspiracy to commit such offense is subject to forfeiture to the United States.

40.     Pursuant to 18 U.S.C. §§1956(c)(7) and 1961(1), the transmission, or causing the transmission, of any writings in interstate or foreign commerce by wire communication for the purpose of executing any scheme or artifice to defraud, or to obtain money by means of false or fraudulent pretenses, representations, or promises (commonly referred to as "wire fraud"), in violation of 18 U.S.C. § 1343, constitutes "specified unlawful activity" for purposes of 18 U.S.C. § 981(a)(1)(C).

41.     As alleged herein, beginning in November 2010 and continuing until at least March 2012, Hikmatullah and his co-conspirators, having devised or intending to devise a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, used or caused someone to use the wire or radio in interstate or foreign commerce in violation of 18 U.S.C. § 1343.

42.     As further alleged herein, Hikmatullah and his co-conspirators caused the United States Government electronically to transfer at least $77,920,605 to NAMSA as payment to TOIFOR for the fraudulently obtained TMRs and invoices submitted by Hikmatullah, which funds TOIFOR transferred to Hikmatullah's company, HSLSC, by electronic funds transfer into

14

**JA803**

**defendant bank account number 050210000527810**, held in the name of Hikmat Shadman

Logistics Services Company, located at Afghanistan International Bank, Kabul, Afghanistan.

43.     As further alleged herein, between November 2010 and March 2012, Hikmatullah

Shadman and/or his co-conspirators transferred $6,930,000 from **defendant bank account**

**number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company,

located at Afghanistan International Bank to **defendant bank account number**

**050210001288613,** held in the name of Faizy Elham Brothers, Ltd., located at Afghanistan

International Bank in Kabul, Afghanistan.

44.     Pursuant to Title 18 U.S.C. § 984, in any forfeiture action in which the defendant

property is cash or funds deposited into a financial institution, it is "not necessary for the

Government to identify specific property involved in the offense that is the basis for the

forfeiture" if the forfeiture action is brought within one year "from the date of the offense."  18

U.S.C. §§ 984(a)(1)(A),(b).

45.     Afghanistan International Bank (AIB) is a "financial institution," as defined under

the International Banking Act of 1978, 12 U.S.C. § 3101(b)(7), for purposes of 18 U.S.C. § 984.

46.     Therefore, the defendant properties constitute or are derived from proceeds

traceable to a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 and are subject

to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.

**VI.     PRAYER FOR RELIEF**

WHEREFORE plaintiff, the United States of America, requests that judgment be entered

in its favor and against the defendant properties; that, pursuant to law, notice be provided to all

interested parties to appear and show cause why the forfeiture should not be decreed; that the

defendant properties be condemned and forfeited to the United States of America and delivered

**JA804**

into its custody for disposition according to law; that the plaintiff be awarded its costs and

disbursements in this action; and for such other and further relief as this Court may deem just

and proper.

Respectfully submitted,

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND
    MONEY LAUNDERING SECTION

LINDA M. SAMUEL
Deputy Chief
DANIEL H. CLAMAN
Assistant Deputy Chief
ELIZABETH A. ALOI
Trial Attorney
Asset Forfeiture and Money
    Laundering Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., Suite 10100
Washington, D.C. 20530
Telephone: (202) 514-1263

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Robert D. Doherty, am a Special Agent in the Office of the Special Inspector General for Afghanistan Reconstruction (SIGAR), and the special agent assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint for Forfeiture *In Rem*, and the statements contained therein are true to the best of my knowledge and belief, and I base my knowledge for this verification of the Complaint for Forfeiture *In Rem* on the following:

    (a)    Information I have learned, or been given by special agents working with the International Contract Corruption Task Force (ICCTF), and other law enforcement officials who have participated in the joint investigation of Hikmatullah Shadman, and other individuals engaged in an illegal fraud scheme involving the award of transportation contracts funded by the United States Government in the Islamic Republic of Afghanistan;

    (b)    My participation in the interviews of various cooperating witnesses or my knowledge of other such interviews, relating to the investigation of Hikmatullah Shadman, and other individuals engaged in an illegal fraud scheme involving the award of transportation contracts funded by the United States Government in the Islamic Republic of Afghanistan; and

    (c)    My experience in foreign corruption, fraud and embezzlement investigations, and the experience of other law enforcement officers related to foreign corruption, fraud, and embezzlement investigations.

I declare under penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 20th day of November, 2012.

*Robert D. Doherty*
ROBERT D. DOHERTY
Special Agent
Office of Special Inspector General for the
Afghanistan Reconstruction

**JA806**

# Exhibit 5

3/18/22, 1:54 PM

Case 1:21-cv-04400-HG Standard Chartered faces allegations it helped facilitate deadly attacks on US troops | This is Money Page 216 of 251 PageID #: 4359

How we can help | Contact us | **f** Follow 14K

Thursday, Mar 17th 2022 1PM **50°F**    4PM **49°F**    **5-Day Forecast**

# This is MONEY.co.uk
### FINANCIAL WEBSITE OF THE YEAR

Money Home | Business | Saving & banking | Investing | Bills | Cars | Holidays | Cards & loans | Pensions | Mortgages | Experts | Buy-to-let     Login

ADVERTISEMENT

# Whistleblower says bank has blood on its hands: RAF veteran claims Standard Chartered helped Iran terrorists, ahead of court battle

- **RAF veteran claims Standard Chartered helped Iran terrorists**
- **He goes public ahead of court battle with UK giant**

By ADAM LUCK, FINANCIAL MAIL ON SUNDAY
**PUBLISHED:** 16:51 EST, 7 September 2019 | **UPDATED:** 05:19 EST, 8 September 2019

**18**
shares

**1**
View comments

Embattled financial giant Standard Chartered faces a high-profile court battle that will lay bare allegations it helped facilitate deadly attacks on British and US troops.

The 166-year-old bank is accused of helping companies connected to Iran's Revolutionary Guard and enabling the pariah state to sidestep sanctions.

The Mail on Sunday revealed the impending legal battle earlier this year and a court hearing over a potentially embarrassing whistleblowing claim for compensation under US law is expected in the coming months.






JA808






UK'S CHEAPEST LIFE INSURANCE
Compare insurers and the best deals
Save money now
Powered by Cavendish Online

This is MONEY
NEW SERVICE

**+2**
View gallery

**Claims: Ex-banker Julian Knight wears his veteran's badge, inset**

Briton Julian Knight, a former senior figure at Standard Chartered, has agreed to go public for the first time after years of legal battles in the US hit the bank with fines of nearly $2 billion (£1.6 billion).

The former RAF pilot told of his reaction when he first realised the bank was breaking sanctions: 'I was angry.

'I served in the military for eight years and I was taught that terrorists were bad people yet here was a British bank allowing Iran to circumnavigate sanctions.'

Knight, referring to evidence in court papers he and his partner in the legal suit have filed in the US with details of the allegations, said: 'The bank has blood on its hands.'

The 49-year-old – who has remained anonymous until now and says he suffers ill health from stress after alerting US regulators – stands at the centre of a claim that could win hundreds of millions of dollars under the US False Claims Act, which encourages whistleblowers and was introduced by Abraham Lincoln.

In April, Standard Chartered was fined $1.1 billion (£900 million) for breaching Washington's sanctions against Iran after a US criminal investigation found the bank had been dealing with Iranian, Sudanese and Cuban individuals and entities.

At the time, chief executive Bill Winters pointed the blame at two junior employees. The bank said the pair 'were aware of certain customers' Iranian conn[...] and conspired with them to break the law'.

DON'T MISS

▶ **Fund star Nick Train backs his steady growth stocks to return to form**
'You can be well-rewarded for holding what others regard as boring'

▶ **Buy-to-let lenders hike rates on cheapest fixed mortgages**
Landlords will now pay almost £500 more

▶ **Best share ideas for your Isa:**
We ask investing experts to pick the shares that can hold up in volatile markets

▶ **Former Chelsea townhouse of a decorated nurse who looked after First World War casualties**
For sale for £7million

▶ **Last hurrah for the V12 Vantage**
Aston Martin's gutsy tourer reaches end of the road in spectacular style

▶ **Could landlords get a tax cut?**
Calls for 3% buy-to-let stamp duty surcharge to be abolished

▶ **Woodford scandal drags on**
Investors are told they

**SHARE THIS ARTICLE**

**18** shares

**RELATED ARTICLES**


Whistleblower: I told Standard Chartered it had dirty money...

HSBC hits out at democracy protests: Bank is accused of...


New £1[...] threat [...] Charte[...]

Lloyds [...] whistle[...] claim:

**JA809**

It added that it had since made significant changes including 'substantial investments in its financial crime compliance' and had 'significantly expanded its sanctions compliance teams'.

Yesterday, a Standard Chartered spokeswoman told The Mail on Sunday the US government has filed a motion with the courts to dismiss the claim.

She added: 'We are pleased that the government has decided to move to dismiss the qui tam [whistleblower] lawsuit against us. As we said when it was filed, this suit is baseless and contains many of the same inaccuracies and false allegations as the relator's previous suit.'

But a lawyer for Knight and his partner said the case has 'a long way to go' and that 'ultimately the court makes the decision'.

US court papers in support of the claim state: 'From early 2001 to at least 2014, SCB [Standard Chartered Bank] illegally moved hundreds of billions of dollars... through the US financial system on behalf of individuals, businesses and financial institutions that were subject to US economic sanctions because of their links to Iran. SCB knowingly falsified the electronic records and documentation by which these transactions were effected.

'In addition, the SCB knowingly made deceptive and misleading responses to inquiries by Federal financial regulators.

'[The] unavoidable fact is that SCB used its resources to help terrorists kill and wound American, British and other coalition military personnel and thousands of innocent civilians.'

The court papers claim Standard Chartered's own records show the bank dealt with, among other Iranian entities, Bank Sadarat, which has been named as 'providing funding' for proscribed terror groups.

## CITY HIGH-FLIER WAS LINKED TO PRINCES

Julian Knight first caught the public eye in 2007 when he was pictured with Princes Harry and William as the head of climate change charity Global Cool.

The ambitious son of a Boots director, Knight had been seconded to Global Cool from the Man Group, which is one of the largest hedge fund in the world.

After leaving school, Knight had joined the RAF and qualified as a pilot but baled out in 1996 after eight years' service when cutbacks hit his ambition to become a Top Gun fighter pilot. Instead Knight opted for a high-flying career in the City, joining Rothschild where he specialised in foreign exch...

▶ AD FEATURE

▶ I drive 15,000 miles a year for work but am worried the 45p per mile allowance will no longer cover my petrol costs
What can I do?

▶ Fiat to reward electric car owners who drive efficiently with crypto t
It can be used to pay for Netflix, Amazon and Spotify

▶ Where experts are investing THEIR Isa money this year
From the safe haven of gold to backing property in the West End

▶ The best cash Isa deals on offer now for new savings and transfers
Would you lock your money away for five years at 1.9%?

▶ Want to save for a child's future AND help make their world a better place?
Go green or ethical with a Junior Isa

▶ Shoppers fear online checkout chaos and declined payments as new ID checks now apply to purchases
How to help yours get through

▶ Could you become an Isa millionaire - and would it get you financial independence?
This is Money podcast

JA810



ADVERTISEMENT

+2
View gallery

**Ambitious: Knight with Harry and William at the Global Cool event**

In 2008, he moved on to Standard Chartered where – after initially burnishing their environmental credentials following his time at Global Cool – he moved back into foreign exchange.

Knight left Standard for Societe Generale in New York in 2013, but his position became increasingly difficult as he was required to disclose his whistleblowing to employers and regulators alike.

He returned to London and joined a friend's hedge fund. He subsequently suffered a major heart scare which doctors told him was stress-related, prompting him to leave the world of high finance, moving north with his family.

Last year, Knight's estranged wife Nasreen was jailed after attacking him and threatening to kill his future wife Erika.

He now lists his chosen profession as 'house husband'.

In a separate case designed to establish the right of US military famil[...] for effectively funding terror attacks, Bank Sadarat was accused of 'tr[...] funds to (terror group) Hezbollah and the Iranian Revolutionary Guard[...] claim brought by Knight and his associate also says Standard clients [...] National Iranian Oil Company (NIOC)', adding 'in 2008 (the US gover[...] identified NIOC as an affiliate of the Iranian Revolutionary Guard Cor[...]

Knight, who was based in Dubai as global head of transaction banking [...] exchange, said he alerted Standard Chartered about the vulnerability [...]



JA811

trading system to money laundering and its failure to properly monitor and account for clients in 2011.

Later that year, after leaving the bank – he says under pressure – Knight was approached by an American currency trader who asked him if he knew anything about Standard Chartered breaching US sanctions against Iran.

Knight said: 'I began to reflect on the fact that my brother, who is an RAF helicopter pilot, was ferrying around military personnel in Iraq. It is no secret that British and coalition troops and Iraqi civilians were killed by Iranian-funded IEDs. Where did the money that funded these IEDs come from?'

In 2012, Knight and the American trader – who has spoken to The Mail on Sunday but does not want to be named – met with US Federal and State financial regulators. Standard Chartered had only just paid a £415 million fine to the US over allegations it had broken sanctions on Iran and left the American financial system 'vulnerable to terrorists'.

Now Knight suffers from a serious heart condition related to stress and no longer works in the City. A father of six, he remarried during the summer and now lives in the East Midlands.

He is likely to be called to give evidence in US courts when his fellow whistleblower presses his claim for a payout next year.

But the Briton said: 'I will not be claiming any of the money. I just want to see justice served.'

Share or comment on this article: Standard Chartered faces allegations it helped facilitate deadly attacks on British and US troops

**18** shares

Some links in this article may be affiliate links. If you click on them we may earn a small commission. That helps us fund This Is Money, and keep it free to use. We do not write articles to promote products. We do not allow any commercial relationship to affect our editorial independence.



**Has the shift from growth to value kicked in already and what shares could profit?**
BP and Shell shares have bounced 45% in a year and pay big dividends, but will they be held back for not being green?

**Gresham House's Ken Wotton on why he gets stuck in to back small companies that can win big**
The hunt for exceptional companies that bring disruption and big returns: Baillie Gifford US Growth's Kirsty Gibson

**Where investors can profit in the dividend recovery- the firms bringing back payouts for shareholders**
Investing in the best of British smaller companies can pay off in the Covid recovery: Georgina Brittain

**'Crypto is the poster child of empty calorie speculation': Barry Norrison how inflation could affect growth stars, value shares and bitcoin**
Are Lloyds, NatWest, Barclays and HSBC primed for recovery profits - and will investors ever fall back in love with bank shares?

**Tom Becket: Will investors profit from a Roaring Twenties stock market or face a return to low growth with even more debt?**
How we invest in companies helping the planet: Jupiter Green manager Jon Wallace

**A simple mix of shares, bonds and cash doubled investors' money in five years: Baillie Gifford Managed Fund's Iain McCombie**
Nick Train: 'As long as you're not taking an apocalyptic view, there's plenty to be optimistic about'

You May Like — Sponsored Links by Taboola

New iPhone 13 Deals
iPhone 13 | Deals

New 2022 VW Tiguan Incentives
2022 Tiguan Incentives | Search Ads

New Luxury Cars on Sale
Luxury Cars | Search Ads



JA812

**50 Menu Items Fast Food Workers Say Never To Order**
Our Health Depot

**Moisturizers for Mature Skin Most Seniors Might Not Know About**
Moisturizer | Search Ads

**When you eat eggs every day, this is what happens to your body.**
OMGIFacts

**Hawaii All-Inclusive Beach Front Hotel Deals**
Hawaii Vacations | Search Ads

**All New Lexus RX350 Deals**
Lexus RX350 | Search Ads

**New Senior Living Residences Near New York (Take a Look at the Prices)**
Senior Living | Search Ads

ADVERTISEMENT

**MOST WATCHED MONEY VIDEOS**                    Embed this </>

Alfa Romeo reveals the ten best tunnels in the

'Fun to drive': New Ferrari 296 GTB is an

F1 designer Gordon Murray unveils new

DeLorean tease the launch of an electric

How Hyundai's Ioniq 5 can charge home

Morgan Motor Company unveil the

New car sales boom and these are the 5

Grenadier 4X4s to be built in new French

**FROM THE WEB**                    Sponsored Links by Taboola

**The Best Cruises For Senior Travers, Top Senior Discounts**
Cruise Deals                    Learn More

**Great Deals On Carhartt Clothing & Apparel Going On Now**
Carhartt Deals & Discounts

**2022 Cruises Are Now On Sale, Explore The Top Trips & Destinations**
2022 Cruise Deals

**Cheap Flights to Hawaii**

JA813

Hawaii Flights | Search Ads

## MOST READ MONEY

   

What the Bank of England base rate

How high will the base rate go? Bank

Nickel trading finally resumes at

UK regulator puts brakes on £6bn



## Comments 1
Share what you think

Add your comment

| Newest | Oldest | Best rated | Worst rated |

The comments below have been moderated in advance.


Loading...

The views expressed in the contents above are those of our users and do not necessarily reflect the views of MailOnline.

We are no longer accepting comments on this article.

## MORE TOP STORIES

▶ Currys launches 'Cash for Trash' scheme rewarding shoppers who bring in old or broken tech - but how do you make sure you wipe personal data first?
▶ As firms are fined by the watchdog, beware the white goods cold-callers pushing unneeded insurance policies on the elderly and vulnerable
▶ No smartphone, no shopping: New security checks mean one in four online payments will require a code
▶ Curious about crypto? PayPal criticised for bombarding customers with adverts encouraging them to invest in risky cryptocurrencies
▶ Could giving up your own vehicle and signing up to a car club put the brakes on your motoring costs?
▶ Cashback sites accused of rewarding gambling: Three big firms promoting more than 60 bingo and betting sites
▶ Is a degree still a good investment? New student loan rules will see graduates paying them off into their 60s - and mean nurses pay more than bankers
▶ Claims management firms to have their fees capped at 30%, under new City watchdog rules
▶ Do you have an old N64 and games that could be worth hundreds of pounds? From GoldenEye to Mario, here's what late 90s Nintendo gear can now fetch
▶ British Gas Homecare wins the Wooden Spoon Award! Firm had 191k complaints in 6 months as customers waited 8 weeks for boiler repairs
▶ Insulation was supposed to save us money... but it ruined our homes: Millions face crippling repair costs after botched green upgrades
▶ Cost of a basic funeral fell for the first time on record last year, but growing number of families opted for budget cremations during the pandemic
▶ Top 10 companies for customer service: First Direct and John Lewis slip down as Pets at Home takes the crown and Skoda and Timpson blast up the ranks
▶ Greensill goes back to his roots: Disgraced financier heads back to the family farm (and his £2.3m holiday home) in rural Australia

▶ MORE HEADLINES

ADVERTISEMENT



JA814

Case 1:21-cv-04400-HG-RML Document 60-15 Filed 06/08/22 Page 223 of 251 PageID #: 4366




Get in touch if you have...

● Something we need to know about
● Been wronged by a bank or company
● Just a great story to tell

Contact the team
in confidence ›

Money Home    Business    Saving & banking    Investing    Bills    Cars    Holidays    Cards & loans    Pensions    Mortgages    Experts    Buy-to-let

Sitemap | Archive | Video Archive | Topics Index | Mobile Apps | Screensaver | RSS | Text-based site | Reader Prints | Our Papers | Top of page
Daily Mail | Mail on Sunday | This is Money
Metro | Jobsite | Mail Travel | Zoopla.co.uk | Prime Location



This is Money is part of the Daily Mail, Mail on Sunday & Metro media group

dmg media

Contact us    How to complain    Advertise with us    Contributors    Terms    Do not sell my info    Privacy policy & cookies ▷



JA815

# Exhibit 6

# THE GOVERNMENT AND THE WHISTLEBLOWERS

**Confidential records from the FinCEN Files show that the bank was reporting its own suspicions about customers with links to Iran until at least 2017.**

By Richard Holmes, Tom Warren, Jason Leopold, Anthony Cormier, John Templon, Jeremy Singer-Vine, Scott Pham, Tanya Kozyreva, and Emma Loop

*BuzzFeed News; Ishan Tankha, Betty Zapata, and Alex Fradkin for BuzzFeed News; Getty Images*

Posted on September 21, 2020, at 1:18 p.m. ET

*This is part of the FinCEN Files investigation. To read more, click* <u>here</u>. *Want to help us expose corruption and hold the highest levels of power to account? Become a BuzzFeed News Member* <u>here</u>.

On a summer morning in 2012, Anshuman Chandra read a news article about a Saudi Arabian financial institution suspected of

**BuzzFeed News**    Standard Chartered's Problems With Suspicious Clients Di...

JA817

Case 1:21-cv-...HG-RML Document 55-8 Filed 06/01/22 Page 226 of 251 PageID #: 4369

facilitating the funding of al-Qaeda attacks, including 9/11. The bank was called Al Rajhi, and a US Senate committee cited allegations it had handled payments to suicide bombers in Somalia, Sri Lanka, India, and the Philippines.

Chandra was deeply troubled, he said, and not just because he knew people who had died in terrorist attacks. He was disturbed because Chandra worked for Standard Chartered bank, and he realized that his employer was doing business with Al Rajhi.

So Chandra warned a supervisor about what he had learned, he said, but he never heard back.

From Standard Chartered's Dubai office, where Chandra was a client services manager, he dug deep into bank records. He later learned, examining a yearly profit report, that in 2009 alone, Standard Chartered earned $2 million from its relationship with Al Rajhi. (Al Rajhi did not respond to a request for comment.)



JA818

Anshuman Chandra
Ishan Tankha for BuzzFeed News

But that wasn't all. Poring over Standard Chartered's accounts, he found a number of customers in Iran, a country under US sanctions, and Chandra feared that they too had been indirectly supporting terrorist activities.

"I actually got goosebumps," Chandra said.

This time, he decided to bypass his bosses. He turned to the US government.

By the fall of 2013, Chandra and another whistleblower, Julian Knight, had handed US authorities thousands of internal bank records that they claimed show Standard Chartered was giving safe harbor to a number of customers moving money to Iran.

The documents came at a significant time. A year earlier, the bank had acknowledged its role in concealing tens of thousands of transactions with businesses in Iran. Under threat of criminal prosecution, the bank had agreed to clean up its act.

Ultimately, the government walked away from the whistleblowers. But the two men had flagged real problems. The bank itself, confidential records show, later reported to the US Treasury that it had suspicions about at least 31 companies contained in the data the whistleblowers had handed over.

Prosecutors eventually determined in 2019 that the bank had allowed more illegal transactions for Iranian clients — including one who had been in Knight and Chandra's documents from 2013.

Taken together, the whistleblowers' accounts and the banks' Treasury reports offer a fresh glimpse of Standard Chartered's problem with suspicious clients di

Chartered and the extent to which the US government gives big banks a pass when they break the rules.



Banks are required to file suspicious activity reports, or SARs, when they spot transactions that bear the hallmarks of money laundering or other financial misconduct. These confidential reports, which go to the Treasury Department's Financial Crimes Enforcement Network, or FinCEN, are not by themselves evidence of a crime, but they can support investigations and intelligence gathering. The FinCEN Files investigation is based on more than 2,100 of these documents that BuzzFeed News shared with the International Consortium of Investigative Journalists and more than 100 newsrooms around the world.

After the whistleblowers passed along their records, including transaction spreadsheets and client lists, the FBI pursued an investigation. But it was short-lived. An agent who was looking into the bank said their documents did not show evidence of new illegal transactions. A judge recently issued a ruling blocking Knight from an opportunity for whistleblower compensation.

BuzzFeed News    Standard Chartered's Problems With Suspicious Clients Di

# "If they analyzed the data, they could have stopped this much earlier."

In response to detailed questions from BuzzFeed News, <u>Standard Chartered said in a statement</u>, "We take our responsibility to fight financial crime extremely seriously and have invested substantially in our compliance programmes." A spokesperson added that the bank files SARs "when circumstances warrant and that means our screening and monitoring systems are working as intended."

The bank said it employs 2,000 people worldwide to detect and report suspicious transactions, and that "U.S. and U.K. authorities have publicly acknowledged" that the bank "has undergone a comprehensive and positive transformation over the last several years." Standard Chartered, which like all banks is prohibited from disclosing the contents or even the existence of SARs, did not address many of the specific allegations in this story.

Knight is appealing the decision on his whistleblower case. Both he and Chandra are pursuing a separate suit alleging that the bank retaliated against them for their disclosures.

They say the decision to come forward wreaked havoc on their lives — and they don't know why the government didn't dig deeper into their materials. "I feel betrayed," Chandra said. "If they analyzed the data," he added, "they could have stopped this much earlier."

"These false allegations have been thoroughly discredited by the U.S. authorities who undertook a comprehensive investigation into the claims," the Standard Chartered spokesperson said.

The FBI did not respond to multiple requests for comment. "The Department of Justice stands by its work, and remains committed to aggressively investigating and prosecuting financial crime—including

Lloyd said in a statement responding to detailed questions about the
FinCEN Files investigation.

# A Startling Discovery

Standard Chartered's headquarters in London.

*Alex Fradkin / Redux for BuzzFeed News*

**The global headquarters of Standard Chartered** bank stands stolidly
on Basinghall Avenue in the heart of the City of London, an imposing
modern fortress of glass and steel.

The bank's history dates back 150 years and tracks the rise of the
British Empire. Standard, at the time a separate institution, banked
Cecil Rhodes, the diamond baron who supported policies of racial
inequality in southern Africa; Chartered financed the opium trade,
ensuring that Britain profited from the drug addictions of millions in
China, Hong Kong, and India. The combined companies now rake in

more than $15 billion in revenue and employ 85,000 people in 60 different markets.

Case 1:21-cv-02702-AKH Document 55-6 Filed 06/01/22 Page 3 of 23 PageID #: 4374

Standard Chartered was one of the few heavyweight banks to emerge unscathed from the 2008 financial crisis. It avoided much of the criticism its competitors received for their risky and deceptive mortgage-trading practices, and even managed to earn a profit throughout the crash. In 2012, its CEO said it succeeded because unlike its competitors, it <u>saw</u> "virtue in being boring."

But in August of that year, the world learned of another side to Standard Chartered. New York state prosecutors announced that the bank had helped its clients hide at least 59,000 financial transactions, worth a quarter of a trillion dollars, that potentially violated American sanctions against Iran. The bank had made "hundreds of millions of dollars in fees" off those clients, the prosecutors said.

The bank admitted to having broken the law, but only up until 2007. The New York regulators had threatened to revoke the bank's business charter. The punishment would effectively halt its access to the US dollar market, a death blow for a global financial institution.

But, with a promise from Standard Chartered to stay on the straight and narrow, and an outside monitor keeping a close eye on the bank, prosecutors held off bringing any criminal charges. New York state issued a fine of $340 million — a mere 1.3% of Standard Chartered's revenue that year. The bank was allowed to continue winding down its business with a number of Iranian clients.

Meanwhile, the bank was also being investigated by US federal authorities. But Standard Chartered had a well-placed advocate.

## Endanger one bank, he seemed to suggest, and the whole economy could suffer.

BuzzFeed News    Standard Chartered's Problems With Suspicious Clients Di...

George Osborne, the UK's chancellor of the exchequer at the time, wrote a letter to the Federal Reserve copying in Timothy Geithner, then the US secretary of the Treasury, to discuss his "concerns."

The US was coming down awfully hard on the bank, Osborne said, hard enough to endanger its health. "For a systemically important financial institution," he wrote, "this could lead to contagion." Endanger one bank, he seemed to suggest, and the whole economy could suffer.

Geithner and Osborne were both heading to Tokyo for the annual World Bank meeting. Geithner's briefing notes for that planned meeting, later dug up in a congressional probe, make clear that the world's superpower believed Standard Chartered had crossed a line: "Treasury considers SCB's conduct surrounding sanctions violations to be reckless and egregious but not the worst we have encountered."

The Department of Justice and Standard Chartered ultimately negotiated a deferred prosecution agreement, the US government's preferred tool for getting wayward banks back on track. Standard Chartered would pay a second fine — $227 million — but so long as the bank kept its nose clean, there would be no criminal prosecution on the federal level, either, and the bank would not lose its license.

A spokesperson for Geithner told BuzzFeed News the Treasury secretaries have "no authority over criminal prosecutions" and that "such matters are handled independently by the Department of Justice and the bank regulators respectively." The spokesperson added that Geithner "did not push for lenient treatment for Standard Chartered from the US government."

# The Handoff

lients Di

Julian Knight at his home in Grantham, England.

*Betty Zapata for BuzzFeed News*



Standard Chartered's Problems With Suspicious Clients Di

Case 1:21-cv-04400-HG-RML Document 55-7 Filed 08/01/22 Page 140 of 180 PageID #: 4377

Chandra was working in the bank's Dubai office when, he said, he heard two of his colleagues talking about a former colleague named Julian Knight. They were saying he had blown the whistle on the bank.

Knight, a former flight lieutenant in Britain's Royal Air Force, had risen to become one of the global heads of transaction banking at Standard Chartered before getting fired in 2011.

He was living in Germany when he first heard the bank was in trouble with prosecutors. Knight did not believe that Standard Chartered had stopped banking Iranian clients.

He dug out a compact disc that had all the company emails, profit reports, and transaction spreadsheets he had downloaded before leaving the bank. Through a friend, he passed it to the Treasury Department.

Those records, which have since been reviewed by BuzzFeed News, showed that Standard Chartered was working with Iranian clients after 2007. What Knight didn't know was that the government had allowed the bank to fulfill its obligations with some Iranian clients after 2007. Those clients had permission to repay their outstanding loans to the bank in currencies other than US dollars, or to withdraw their existing balances from bank accounts that were otherwise blocked by the US government.

Chandra didn't know all those details, either. He just knew he needed to speak with Knight. Chandra said that in April 2013 he sent Knight an email and soon after that passed on the information he had gathered, with the request that it be handed to the US authorities.

He was visiting Standard Chartered's Zambia branch when he received his first email from Matthew Komar.

Case 1:21-cv-04400-HG-RML   Document 95-67   Filed 08/01/23   Page 12 of 18 PageID #: 4378

"I am a Special Agent with the FBI who is the case agent on the investigation into Standard Chartered," Komar wrote in an email obtained by BuzzFeed News. "I would like to speak with you."

Chandra was nervous about speaking with Komar, who asked many questions, but the two stayed in touch.

## "Need your help urgently for my and family's safety."

On October 2, 2013, a week after his first contact with the FBI, Komar gave him some unwelcome news. The FBI had let slip that it was talking to Chandra. His name was "inadvertently sent by a member of the investigative team to the Bank's counsel," Komar wrote. He said the bank's lawyers had promised not to share the information with their client.

Chandra had already emailed Komar, telling him about an unexpected scan of Chandra's computer, the first of what he said were a number of strange developments at work. "I'm very worried at the moment," he wrote.

Over the next few months, according to his emails to the FBI, he lost access to certain shared files, he had more random checks on his laptop, and his managers grew hostile toward him.

In October 2014, Chandra reported getting his first death threat. In an email to Komar, he quoted the caller saying, "We know you helped Americans, its not good and we will take care of you."

Chandra wrote to Komar: "Need your help urgently for my and family's safety."

Chandra said Komar suggested he call the local police. It was the last,

Case 1:21-cv-02443-CBA-MMH Document 55-67 Filed 08/01/22 Page 236 of 251 PageID #: 4379

**Chandra and Knight**, angered by how they had been treated by both the bank and the FBI, turned to American courts.

In 2018, Knight filed what is known as a qui tam lawsuit under the False Claims Act. He sought compensation for assisting the US government in its prosecution of the bank for sanctions violations. But Komar testified that his information wasn't useful, because the investigators were not able to "corroborate or validate" the whistleblower's allegations. This past June, a judge dismissed the case.

A year after filing that lawsuit, Knight joined with Chandra to file another, this time accusing Standard Chartered of retaliating against them, "discrediting them and destroying their careers in the industry." Knight claimed that the stress of the harassment had taken a serious toll on his health.

Standard Chartered countered that with the retaliation claim, Knight and Chandra were just looking for "another bite at the apple" after the first lawsuit went south. The bank said the two former employees were not entitled to the protections granted to whistleblowers, because the information they gave the government had no value — and even if Chandra were a whistleblower, that's not what caused his termination. As for Knight, the bank said he had waived his right to sue when he signed his termination agreement.

The retaliation lawsuit, and any last chance of vindication from the courts for Chandra and Knight, is still pending.

But another kind of vindication had long been happening — much of it in secret.

# The Bank's Own Suspicions

Standard Chartered headquarters in London.

*Alex Fradkin / Redux for BuzzFeed News*

**Chandra and Knight had expressed concerns** about some of the bank's customers. It turns out similar suspicions were being documented by the bank itself.

The FinCEN Files show the bank filed at least 35 SARs on 31 customers that appeared in the documents Chandra and Knight sent to the FBI in 2013. These SARs, filed after the whistleblowers had handed their information to the FBI, show the bank itself alerting the government to questions about the legitimacy of some of its business.

One of the clients included in both the whistleblowers' documents and the bank's reports was Al Zarooni Exchange. The US government alleges that Al Zarooni tested the US financial system in 2015 for supporting

the Altaf Khanani money laundering organization, which is alleged to have funneled "billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations."

The Dubai-based company was accused by the Treasury of laundering cash for the Taliban. Two years after the sanctions were issued, Standard Chartered's compliance staff filed a suspicious activity report showing that the bank had facilitated "multiple transactions" for Al Zarooni Exchange in 2009 and 2010. During that time, Taliban militants staged violent attacks that killed civilians and soldiers. Al Zarooni could not be reached for comment.

Another such client was a large diamond trader accused by prosecutors of black market diamond sales, tax evasion, and bribery. In a SAR from January 2017, the bank indicated it had reported the company's transactions in multiple prior filings. Between 2014 and 2016, the SAR said, Standard Chartered had moved more than $4 billion for the company.

Some of the 35 SARs mentioning customers in the whistleblowers' documents discussed possible links to Iran. One was suspected by the bank to have used "fraudulent documents" to hide its trade with Iran until at least 2014, according to the SAR. Another "may have sought to obfuscate" payments to Iran for the leasing of containers at Iranian airports, according to a 2017 SAR.

The SARs were being written and reviewed behind a wall of secrecy. But eventually a very public repudiation of Standard Chartered's practices involving Iran would take place.

In April 2019, seven years after Standard Chartered entered into its deferred prosecution agreement, US Attorney Jessie Liu announced that the bank's transactions for Iranian clients had "undermined the integrity of our financial system and harmed our national security."

**BuzzFeed News**     Standard Chartered's Problems With Suspicious Clients Di

## The Department of Justice stuck with the same form of punishment it had been using for Standard Chartered since 2012.

Liu's statements came as Standard Chartered settled investigations with the Department of Justice, the New York Department of Financial Services, and the UK's FCA.

The investigations found that senior managers in the bank's Dubai office hadn't blocked transactions from Iran after staff discovered dozens of clients used the bank's internet platform known as "Straight-to-Bank" to access US dollar accounts. The bank's compliance staff, according to the New York prosecutors, had "utterly failed."

The Dubai office is where Chandra once worked and where he had first grown uneasy about Standard Chartered's systems for thwarting financial crime. And the Straight-to-Bank system had been identified by Knight when he tried to call attention to problems at Standard Chartered. His documents show Knight mentioned the system in a presentation he prepared for law enforcement.

The Department of Justice stuck with the same form of punishment it had been using for Standard Chartered since 2012. It levied an array of new fines and penalties totaling $1.1 billion (less than a third of the bank's profits that year), and extended Standard Chartered's deferred prosecution agreement. It was the sixth time it had to be extended in the space of seven years.

In the press release announcing the new fines, Liu named Mahmoud Reza Elyassi, an Iranian who used accounts in Standard Chartered's Dubai branch. Former Standard Chartered employees knew that Elyassi "conducted U.S. dollar transactions for the benefit of Iranian interests," the government said, "and helped Elyassi disguise his Iranian connections to avoid suspicion."

Case 1:21-cv-02587-AS-SLC Document 184-17 Filed 06/01/23 Page 240 of 251 PageID #: 4383

Six and a half years earlier, Elyassi's name had appeared somewhere else: Chandra's disclosures to the FBI — the ones that the FBI had discarded as worthless. ●



Richard Holmes is an investigations reporter for BuzzFeed News and is based in London.

Contact Richard Holmes at richard.holmes@buzzfeed.com.

Got a confidential tip? Submit it here.



Tom Warren is an investigations correspondent for BuzzFeed News and is based in London.

Contact Tom Warren at tom.warren@buzzfeed.com.



Jason Leopold is a senior investigative reporter for BuzzFeed News and is based in Los Angeles. He is a 2018 Pulitzer finalist for international reporting, recipient of the IRE 2016 FOI award and a 2016 Newseum Institute National Freedom of Information Hall of Fame inductee.

Contact Jason Leopold at jason.leopold@buzzfeed.com.



Anthony Cormier is an investigative reporter for BuzzFeed News and is based in New York. While working for the Tampa Bay Times, Cormier won the 2016 Pulitzer Prize for Investigative Reporting.

Contact Anthony Cormier at anthony.cormier@buzzfeed.com.



John Templon is a data reporter for BuzzFeed News and is based in New York. His secure PGP fingerprint is 2FF6 89D6 9606 812D 5663 C7CE 2DFF BE75 55E5 DF99

Contact John Templon at john.templon@buzzfeed.com.



Contact Jeremy Singer-Vine at jeremy.singer-vine@buzzfeed.com.



Scott Pham is a data reporter for BuzzFeed News and is based in New York.

Contact Scott Pham at scott.pham@buzzfeed.com.



Tanya Kozyreva was an investigative correspondent for BuzzFeed News based in Kiev, Ukraine.

Contact Tanya Kozyreva at tanya.kozyreva@buzzfeed.com.

JA822



Standard Chartered's Problems With Suspicious Clients Di...

Emma Loop was a political reporter for BuzzFeed News and is based in Washington, DC.



# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE ZOBAY, individually, and for the estate of STEPHEN S. EVERHART, LINDSAY M. EVERHART, ABDUL GHAFFAR MUGHAL, SITORAI KHASANZOD, KHALID MUGHAL, HAMID MUGHAL, ANGELA MUGHAL, N.M., by and through her next friend Abdul Ghaffar Mughal, M.M., by and through his next friend Abdul Ghaffar Mughal, WAYNE NEWBY, THERESA HART, NATHAN NEWBY, JASON RZEPA, CASSANDRA RZEPA, C.R., by and through his next friend Cassandra Rzepa, K.R., by and through his next friend Adrian Davis, TYLER N. OGDEN, WILLIAM M. CHINN, SEAN M. NIQUETTE, LAUREN NIQUETTE, THOMAS NIQUETTE, MARY NIQUETTE, ED ELLIOTT, BRIAN C. ALLDRIDGE, JOANN ALLDRIDGE, RONALD ALLDRIDGE, DIANNA ALLDRIDGE, TODD JEFFREY ALLDRIDGE, ANDREW MAJOR, ASHLEY MAJOR, ALYSSA MAJOR, MARCUS JAMIL SULLEN, DAVID EUGENE HICKMAN, VERONICA HICKMAN, DEVON F. HICKMAN, TAMMIE FROST, individually, and for the estate of RUSSELL FROST, MADISON FROST, CRYSTAL FROST, AMANDA FROST, WAIEL EL-MAADAWY, BILQIS AIDARA ADJEI, ALEXIS GRANT, MALIK ELMAADAWY, G.E., by and through his next friend Latasha Elmaadawy, GABRIEL ELMAADAWY, ZEINAB EL-MAADAWY, IHAB EL-MAADAWY, TAMER EL-MAADAWY, MOHAMMED EL-MAADAWY, MUSTAFA EL-MAADAWY, AMR MOHAMED, BRENDA MOHAMED, NICOLE KAMALESON, BARCLAY KAMALESON, CADE KAMALESON, CEDRIC PAUL KAMALESON, SUNDERRAJ MARK KAMALESON,GRACE A. KREISCHER, C.L.K., by and through his next friend Grace Kreischer, BRIANNE BARLOW, JASON BARLOW, SHUSHAWNDRA GREGOIRE, J.D.G., by and through his next friend ShuShawndra Gregoire, JOHN GREGOIRE SR., L.R.G., by and through her next friend John Gregoire Sr., ALDENE LEE,<br><br>Plaintiffs, | JURY TRIAL DEMANDED<br><br><br>Case No.: 21-cv-3503 |

**JA835**

v.

MTN GROUP LIMITED, MTN IRANCELL, MTN
DUBAI LIMITED, ZTE CORPORATION, ZTE (USA)
INC., ZTE (TX) INC., HUAWEI TECHNOLOGIES
CO., LTD., HUAWEI TECHNOLOGIES USA INC.,
HUAWEI DEVICE USA INC., FUTUREWEI
TECHNOLOGIES, INC., and SKYCOM TECH CO.,
LTD.,

          Defendants.

**AMENDED COMPLAINT FOR VIOLATION
OF THE ANTI-TERRORISM ACT**

Ryan R. Sparacino (*pro hac vice*)
Eli J. Kay-Oliphant
 (EDNY Bar No. EK8030)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

**JA836**

that way. ***That is [expletive]***. Here, on the ground, these guys all work together as long as they are Muslims. There is no other division that matters."[301]

621. Al-Qaeda's alliance with Iran's lead terrorist proxy, Lebanese Hezbollah, continued at all relevant times and proved the intelligence operatives on the ground had been right all along. For example, in 2012, the Council on Foreign Relations reported that "al-Qaeda ha[d] stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[302]

622. On or about August 7, 2020, on the anniversary of the Iran/al-Qaeda bomb attack against U.S. embassies in Africa, Israeli commandos acting at the request of the United States killed al-Qaeda's number 2 leader, Abu Muhammad al-Masri, in a covert mission in Tehran.[303] Masri was in Iran as a guest of the Iranian government and was permitted to freely plan attacks against the United States from an Iranian-provided safe-haven in Tehran. The timing of the attack was not a coincidence, but a rather a professional slap in the terrorists' face extended by the U.S. and Israeli governments to Iran and al-Qaeda, as the latter allies suffered an embarrassing and catastrophic loss on the anniversary of one of their greatest terrorist triumphs.

623. The mafia-style "syndicate" of which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam formed a part, made attacks by each group more lethal. Iran's mutually reinforcing support for al-Qaeda, AQI, and AI therefore made each group more effective.

624. By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families. Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members.

---

[301] *Id.*

[302] *al-Qaeda (a.k.a. al-Qaida, al-Qaʿida)*, Council on Foreign Relations (June 6, 2012).

[303] Goldman at al., *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*.

191

**JA837**

Moreover, al-Qaeda was closely intertwined with al-Qaeda-in-Iraq and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda planned and authorized the Sunni attacks in which it did not directly participate. Material support and resources provided to al-Qaeda thus also flowed to al-Qaeda-in-Iraq and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

### iii. The IRGC, Including Its Hezbollah Division And Qods Force, Established Al-Qaeda-In-Iraq As An Iranian Sunni Terrorist Proxy In Iraq

625. Iran used the IRGC to provide Zarqawi with the Iranian patronage necessary to establish al-Qaeda-in-Iraq and turn it into the terrorist killing machine it would become.

626. "When the Taliban government collapsed, a strange opportunity presented itself. Many members of al-Qaida fled Afghanistan and crossed the border into Iran."[304]

627. All told, Zarqawi was based in Iran for at least a year after his escape from Afghanistan after 9/11. After bin Laden family members and Zarqawi joined Iran as "guests" following 9/11, Soleimani devised a successful plan to turn them into Iranian terrorist assets to carry out attacks against America. As Mr. Sadjadpour explained:

> After the U.S. military campaign to topple the Taliban began, Iran detained hundreds of al Qaeda fighters fleeing Afghanistan, including some members of Osama bin Laden's family and Abu Musab al-Zarqawi, the future leader of al Qaeda in Iraq. Many Iranians saw these jihadists as a threat—Sunni zealots who hated overwhelmingly Shiite Iran. Yet Soleimani, the architect of the Islamic Republic's plans for regional dominance, realized that they could also be an asset. … many al Qaeda members [] spent months and even years as "guests" of Iran. Soleimani broke bread with bin Laden's sons, who affectionately called him Hajji Qassem … He appointed two senior Quds Force officers to "provide the guests with whatever they needed," including refrigerators, widescreen TVs and an "unlimited budget" to furnish a religious library. Saif al-Adel, a notorious al Qaeda explosives expert, had access to a sports complex in a posh Tehran neighborhood, where he swam laps alongside Western diplomats.[305]

---

[304] NPR, *Throughline*.

[305] Sadjadpour, *Sinister Genius*.

192

sanctions on Iran's oil and finance sectors in 2012 started to bite, the [IRGC] responded by setting up complex operations involving the likes of Dubai ….
"*The IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies,*" said a trader involved in … the oil industry. *"These companies partnered with some foreign companies to bypass sanctions. Most of the time cash was delivered to a foreign account in a neighbouring country.*"[435]

900.    At all relevant times, Defendants understood that the U.S. government believed that IRGC, including Qods Force, activities in the U.A.E. supported anti-American terrorism in Iraq and Afghanistan.  For example, in 2008, President George W. Bush gave a widely-reported speech to U.A.E. government and business leaders in which he called Iran "the world's leading sponsor of terrorism" and stressed that illicit transactions in the U.A.E. were important to the IRGC's, including the Qods Force's, ability to provide "support for Islamist groups and militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[436]  Press reports concerning President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."[437]

901.    From 2005 through 2016, accounts from prominent Western media sources also reported on the direct link between the Iranian telecom, communications, and information technology sectors and the IRGC, including its Hezbollah Division and Qods Force.

902.    On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC, including its Hezbollah Division and Qods Force.  Each Defendant generally maintained a corporate security group responsible

---

[435] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016) (emphasis added).

[436] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.

[437] *Id.*

280

for supervising their global supply chains, doing counterparty diligence, and preventing the theft

or diversion of the devices or services they sold, including in the Middle East.  As part of such

efforts, Defendants' standard practice would have been to conduct basic open-source research on

the Iranian telecom market and the mechanics of making telecom deals in Iran – even a modicum

of which would have uncovered the reports discussing the Iranian front entities' terrorist ties set

forth above.[438]

903.    After 2005, Defendants could not have conducted credible due diligence that

would have "cleared" their transactions with their counterparties controlled by the IRGC,

including its Hezbollah Division and Qods Force.  Defendants also knew or recklessly

disregarded the IRGC's, including the Qods Force's, control of their business partners based

upon the statements set forth in prominent due diligence materials concerning Iran.

904.    MTN's collusion against Turkcell with the conservatives who controlled the

IRGC, including its Hezbollah Division and Qods Force, fronts responsible for the Irancell

contract itself became a notable "red flag" about the highly risky Iranian business environment

that Defendants knew of, and ignored.  For example, as the *Economist*'s flagship due diligence

report, the *Economist Intelligence Unit*, explained in June 2005:

> There is considerable doubt that [] Turkish investment projects … will proceed
> after facing opposition from the new conservative-dominated [Iranian parliament,
> the] Majlis. The Majlis in late 2004 passed a law giving it a veto over foreign
> investment and in early 2005 ruled that Turkcell … should reduce its stake in []
> Irancell … to 49% from 70% [and] … that a majority of Iranian shareholders
> would have to support any management decisions and that security issues be

---

[438] This allegation applies to all Defendants except MTN Irancell.  Plaintiffs allege that MTN
Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the
counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods
Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have
approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods
Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC,
including the Qods Force.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

AUGUST WILDMAN, *et al.*,

              Plaintiffs,

        v.

DEUTSCHE BANK AKTIENGESELLSCHAFT,
DEUTSCHE BANK TRUST COMPANY
AMERICAS, STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC, STANDARD
CHARTERED BANK (PAKISTAN) LIMITED,
DANSKE BANK A/S, DANSKE MARKETS INC.,
PLACID NK CORPORATION d/b/a PLACID
EXPRESS, and WALL STREET EXCHANGE LLC,

              Defendants.

**21 Civ. 4400 (HG) (RML)**

## STIPULATION AND ORDER OF VOLUNTARY DISMISSAL
## AS TO DANSKE MARKETS INC.

WHEREAS, on August 5, 2021, plaintiffs August Wildman, *et al.* ("Plaintiffs") filed a Complaint in this action, naming as a defendant, *inter alia*, Danske Markets Inc.;

WHEREAS, on February 26, 2022, Plaintiffs filed an Amended Corrected Complaint, also naming as a defendant, *inter alia*, Danske Markets Inc.;

WHEREAS, on March 18, 2022, Danske Markets Inc., together with Danske Bank A/S, served a Motion to Dismiss the Amended Corrected Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(2), and 12(b)(6);

WHEREAS, Plaintiffs do not oppose the motion to dismiss as to defendant Danske Markets Inc. only, and Plaintiffs and Danske Markets Inc. hereby agree to dismiss Danske Markets Inc. from this action on the terms and conditions set forth herein.

WHEREFORE, IT IS HEREBY STIPULATED, AGREED AND ORDERED, that, pursuant Federal Rule of Civil Procedure 41(a)(2), Danske Markets Inc. is voluntarily

**JA841**

dismissed, without prejudice, as a defendant in this action, with each party to bear its own attorneys' fees and costs.

Dated:          July 6, 2022



SPARACINO PLLC                              SULLIVAN & CROMWELL LLP

By:*/s/ Ryan R. Sparacino*                  By:*/s/ Brian T. Frawley*
Ryan R. Sparacino (*pro hac vice forthcoming*)   Brian T. Frawley
Eli J. Kay-Oliphant                         Amanda Shami
1920 L Street, NW, Suite 835                125 Broad Street
Washington, D.C.  20036                     New York, New York  10004
Tel: (202) 629-3530                         Tel:  (212) 558-4000
ryan.sparacino@sparacinopllc.com            frawleyb@sullcrom.com
eli.kay-oliphant@sparacinopllc.com          shamia@sullcrom.com

*Attorneys for Plaintiffs*                  *Attorneys for Danske Markets Inc.*



SO ORDERED:


_____
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

AUGUST WILDMAN, *et al.*,

                Plaintiffs,

      v.

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al.*,

                Defendants.

No. 1:21-CV-4400-HG-RML

**PLAINTIFFS' NOTICE OF APPEAL**

Notice is hereby given that all plaintiffs named in the Amended Complaint (Doc. 38) hereby appeal to the United States Court of Appeals for the Second Circuit from the final judgment entered January 3, 2023 (Doc. 91) dismissing plaintiffs' claims against defendants Deutsche Bank Aktiengesellschaft, Deutsche Bank Trust Company Americas, Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Bank (Pakistan) Limited, and Danske Bank A/S, as well as any adverse interlocutory orders.

Dated: January 27, 2023

                        Respectfully submitted,

                        s/Tejinder Singh

                        Tejinder Singh
                        Ryan R. Sparacino
                        Eli J. Kay-Oliphant
                        SPARACINO PLLC
                        1920 L Street, NW, Suite 835
                        Washington, D.C. 20036
                        Tel: (202) 629-3530
                        tejinder.singh@sparacinopllc.com
                        ryan.sparacino@sparacinopllc.com
                        eli.kay-oliphant@sparacinopllc.com

                        *Counsel for Plaintiffs*

**JA843**