# No. 23-132

## United States Court of Appeals for the Second Circuit

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY, TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER, PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FEDERICK C. BENSON, BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER, MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA,

*(caption continued on inside cover)*

Appeal from the United States District Court
Eastern District of New York (No. 1:19-cv-11876-AKH)

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

Tejinder Singh
Geoffrey P. Eaton
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
202-629-3530
tejinder@sparacinopllc.com
geoff.eaton@sparacinopllc.com

*Attorneys for Plaintiffs-Appellants*

DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS
NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND,
AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE
MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL,,
RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE
CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER,
TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO
D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN
CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD,
PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN
COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS
COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE,
PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE
DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS,
LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES
DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA
DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ,
FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY
AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT
FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE,
KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE,
PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE,
INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH
DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS,
JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA
MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS,
CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM,
DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION
RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH HIS
NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS NEXT FRIEND,
STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, MICHAEL FESTUS
FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH HIS NEXT FRIEND, KARA
GIBSON, KARA GIBSON, JESSICA ANNE BENSON, JOANNA GILBERT, EMMITT DWAYNE
BURNS, JANICE CARUSO, PAUL EDWARD GOINS, III, PATRICIA GOINS, DANA RAINEY,
L. C. D., BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW
GOLLNITZ, TYLER GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK
GORDON, ADRIAN KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN
CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY
ANDERSON, GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN,

DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY HARDISON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA HARDISON, SHEILA RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER, BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM SAMUEL HARTSWICK, ALEX HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY LOUISE HORNS, BENJAMIN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M. HUNTER, KENNA HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT, SHELBY IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT, CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND, CHARLOTTE LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE, PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT FRIEND, KENT ALAN SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS, TRENT LORNE SKEENS, Z. R. S., BY AND THROUGH HER NEXT FRIEND, KENT ALAN SKEENS, BRIAN CHRISTOPHER JERGENS, TERENCE LONNIE JONES, JOHN C. MCCARTHY, ALISON R. POHN, KEVIN KING, STEPHANIE ANN MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY AND THROUGH HER NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN LAMBKA, JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR, MEREDITH LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT FRIEND MIRANDA LANDRUM, JAMES R. LANDRUM, JANET LANDRUM, MIRANDA LANDRUM, HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR., ALEXANDER LAU, DAVID WILLIAM HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G. MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L. MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK CHARLES MCEVOY, JANICE H. PROCTOR, LUANN VARNEY, SHANNON K. MCNULTY, JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J. METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY

MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS, NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L. OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS, TRACY ANNE HERRING, ADAN PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ, B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ, S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY, KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS W. PETERS, G.R.P., BY AND THROUGH HIS NEXT FRIEND, ASHLEY PETERS, CHRISTINE H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS, BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ, SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J. SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY, LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS,

GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY
BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE
HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS,
LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS
SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES
WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE,
GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK
HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER
BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY,
FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN,
NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE,
CHRISTOPHER MICHAEL VAN ETTEN, CATHERINE KIMBERLY VAUGHN KRYZDA,
C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN
KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN
KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN
KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND
THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND
THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY
AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK
MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL
KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI
YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L.
WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA
ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY
WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA
SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY
WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY
ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN,
KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY
STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL
BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART
LAMAR PERRY, AARON WILLIAM PRESCOTT,

Plaintiffs - Appellants,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND
ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND
THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND
JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY
AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER

NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND
THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST,
KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R.,
BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN
RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY
STRANGE, KEVIN WILLIAMS,

    Plaintiffs,

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY
AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD
CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

    Defendants - Appellees,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD
CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN BRANCH,
DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH, PLACID NK
CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE LLC,

    Defendants.

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 4

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE ............................................................. 5

   I.   Rule 28.1(b) Statement ............................................................. 5

   II.   JASTA Aiding and Abetting Liability ...................................... 6

   III.   Plaintiffs' Allegations .............................................................. 7

       A.   Standard Chartered ......................................................... 9

       B.   Deutsche Bank ............................................................... 18

       C.   Danske Bank .................................................................. 24

   IV.  Procedural History ................................................................. 27

SUMMARY OF ARGUMENT .......................................................... 29

STANDARD OF REVIEW ................................................................ 31

ARGUMENT .................................................................................... 32

   I.   The Complaint States a Claim Against Standard Chartered Bank ............ 37

       A.   Standard Chartered's Financing of the Terrorists' Explosive Suppliers Aided and Abetted Terrorist Violence ................................ 37

       B.   Standard Chartered's Facilitation of VAT Fraud by Terrorist Operatives Aided and Abetted Terrorist Violence ............................ 48

       C.   Standard Chartered's Money Laundering for Terrorist Operatives Aided and Abetted Terrorist Violence ............................ 53

   II.   The Complaint States a Claim Against Deutsche Bank ............................ 62

       A.   Deutsche Bank's Facilitation of VAT Fraud by Terrorist Operatives Aided and Abetted Terrorist Violence ............................ 63

i

B.  Deutsche Bank's Money Laundering for the Russian Mafia and
Terrorist Operatives Aided and Abetted Terrorist Violence .............. 67

III.  The Complaint States a Claim Against Danske Bank ................................ 70

IV.  The District Court Improperly Rejected Plaintiffs' Claim for Aiding
and Abetting the Taliban-al-Qaeda Campaign .......................................... 73

CONCLUSION ...................................................................................................... 75

ii

# TABLE OF AUTHORITIES

## Cases

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ...................................................... 34, 35, 36, 43, 47

*Boim v Holy Land Found. for Relief and Dev.*,
  549 F.3d 685 (7th Cir. 2008)...................................................................................74

*Bonacasa v. Standard Chartered PLC*,
  2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) ..................................... 2, 38, 40, 45

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .................................... 6, 33, 35, 36, 41, 47, 51, 74

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021)................................................. 4, 32, 34, 35, 36, 38, 39

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009).....................................................................................33

*Jazini v. Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998)....................................................................................55

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)...... 1, 4, 31, 32, 33, 36, 38, 39, 41, 42, 51, 53, 55, 62

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018).................................................................... 36, 41, 74

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)..................................................................... 35, 44

*United States v. Kozeny*,
  667 F.3d 122 (2d Cir. 2011)....................................................................................57

*United States v. Pregler*,
  925 F.2d 268 (8th Cir. 1991)...................................................................................74

iii

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014)................................................................33

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) .........................................................40

## Statutes

1 U.S.C. § 1 ......................................................................................74

18 U.S.C. § 2333 ...............................................................................1

18 U.S.C. § 2333(d)(2)....................................................................4, 6

18 U.S.C. § 2338 .............................................................................4

28 U.S.C. § 1291 .............................................................................4

28 U.S.C. § 1331 .............................................................................4

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
  130 Stat. 852 (2016)...................... 1, 4, 5, 6, 7, 27, 31, 32, 37, 42, 53, 74

  § 2(a)(5)...................................................................................6

  § 2(b) ...................................................................................6, 31

## Other Authorities

Bo Elkjær et al., *1,2 mia. kroner fra formodet momssvindel ført igennem
  Danske Bank i Hørsholm*, Dagbladet Information (May 27, 2019),
  tinyurl.com/57anmzj3 ....................................................................26

PakArab Fertilizers Ltd., Company Overview (Dec. 24, 2019),
  https://fatima-group.com/pafl/page.php/company-overview-pafl-a...................10

U.S. Dep't of Justice, *Danske Bank Pleads Guilty to Fraud on U.S. Banks in
  Multi-Billion Dollar Scheme to Access the U.S. Financial System* (Dec.
  13, 2022), https://www.justice.gov/opa/pr/danske-bank-pleads-guilty-
  fraud-us-banks-multi-billion-dollar-scheme-access-us-financial ......................25

iv

## PRELIMINARY STATEMENT

In this case under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, amended by the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016) , Gold Star families whose loved ones were killed or injured in terrorist attacks in Afghanistan seek relief from three multinational banks—Standard Chartered Bank (SCB), Deutsche Bank (DB), and Danske Bank—that assisted the terrorists through systematic criminal conduct.

After September 11, 2001, financial institutions worldwide took robust steps to curb terrorists' ability to finance attacks. Where most banks saw risk and acted to mitigate it, appellees saw an opportunity to augment their profits by catering to criminals. These banks courted high-risk customers, including agents for al-Qaeda and its allies. In the process, they: (1) knowingly enabled the terrorists' pipeline for bombs by financing fertilizer companies that supplied explosive materials to terrorist fronts and operatives for use in Afghanistan; (2) facilitated criminal value-added tax (VAT) fraud schemes that raised millions of dollars for terrorist cells; and (3) illegally laundered billions of dollars for terrorists and their partners. The banks' assistance enabled the terrorists to kill and injure Americans in Afghanistan, including plaintiffs and their loved ones.

Plaintiffs' allegations state a claim under this Court's decision in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), which held that a bank

1

that aided customers affiliated with a terrorist organization could be liable for aiding and abetting that organization's terrorist acts. The Court explained that against the backdrop of ongoing terrorist violence, a bank's provision "of banking services that permitted the laundering of money . . . in violation of regulatory restrictions meant to hinder the ability of [foreign terrorist organizations] to carry out terrorist attacks" plausibly constitutes aiding and abetting. *Id.* at 865.

Plaintiffs' allegations against each bank surpass the ones that sufficed in *Kaplan*. SCB served suppliers of terrorist explosives despite warnings from the U.S. government that the bank was supporting terrorist attacks. Another court in this circuit considering nearly identical allegations against SCB—with the benefit of the decision below—held that such allegations state a claim under this Court's precedents. *See Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718, at *10-15 (S.D.N.Y. Mar. 7, 2023). This case is even stronger because plaintiffs also allege that SCB knowingly facilitated the terrorists' VAT fraud and money laundering schemes for years—even after SCB's employees identified the risk. SCB's terrorism-related misconduct has resulted in over $1 billion in penalties.

DB bankers devised and executed schemes that terrorists and transnational criminals used to raise and move money from around the world to Afghanistan. This included facilitating VAT fraud perpetrated by terrorist agents to steal money from European governments and send it to Afghanistan, as well as conducting industrial-

scale money laundering to create large stashes of untraceable U.S. dollars for criminals. DB did this despite a clear consensus in the international financial community that these activities would foreseeably cause terrorist attacks. These schemes have prompted enforcement actions against DB resulting in prison sentences for DB employees and hundreds of millions of dollars in penalties.

Danske operated one of the largest money laundering operations the world has ever seen. Its customers included terrorist VAT fraud cells, terrorist money launderers, and Russian organized criminals. Its illicit activities persisted for years despite repeated warnings from regulators, whistleblowers, and experts that made it clear to Danske's highest management that it was engaged in criminal conduct that foreseeably facilitated terrorism. Danske's misconduct has resulted in a criminal guilty plea and more than $2 billion in penalties.

In sum, these banks knowingly assisted terrorists in accessing resources they needed to commit the attacks that injured plaintiffs. That is textbook aiding and abetting, and this Court should hold that plaintiffs' complaint states viable claims against each bank.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 2338. The court entered judgment for defendants on January 5, 2023. SA62. Plaintiffs appealed on January 27, 2023. JA843. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiffs assert liability under JASTA's aiding-and-abetting provision, 18 U.S.C. § 2333(d)(2). The elements are: (1) the plaintiff must be injured by an act of international terrorism that was committed, planned, or authorized by a designated foreign terrorist organization (FTO); (2) the defendant must have assisted—either directly or indirectly—the principal tortfeasor; (3) the defendant must have been generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was a foreseeable risk; and (4) the defendant must have substantially assisted that illegal activity. *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495-501 (2d Cir. 2021); *Kaplan*, 999 F.3d at 863.

The district court held that plaintiffs failed to plead the third and fourth elements (general awareness and substantial assistance) as to any defendant. The court also held that an "act of international terrorism" does not include a campaign involving multiple attacks. The issues on appeal are whether those determinations were correct as to the bank defendants. Plaintiffs have dropped other defendants and

4

focus on three core allegations: funding the supply chain for explosives (SCB only), VAT fraud (all banks), and money laundering (all banks).[1]

## STATEMENT OF THE CASE

### I.        Rule 28.1(b) Statement

Plaintiffs-appellants are 479 Americans who were injured, or family members of Americans injured or killed, in terrorist attacks in Afghanistan from 2011 through 2016. Plaintiffs allege that defendants-appellees knowingly provided substantial assistance to a syndicate of terrorist groups headed by al-Qaeda, which committed, planned, and/or authorized the attacks that injured plaintiffs and their loved ones. Plaintiffs asserted claims against defendant-appellees, among others, for aiding and abetting under JASTA. District Judge Hector Gonzalez dismissed plaintiffs' complaint with prejudice and without leave to amend. *See Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) (SA1-61). Plaintiffs timely appealed as to the bank defendants. JA843.

---

[1] Because plaintiffs did not appeal the judgment as to the money remitters, those entities are out of the case. With respect to the defendant-appellee banks, plaintiffs on appeal rely only on the three channels of support discussed in the text to establish that the complaint states viable claims. But plaintiffs do not waive other allegations against defendants-appellees—and intend to pursue those other allegations on remand to the extent relevant to any viable claims.

5

## II.    JASTA Aiding and Abetting Liability

JASTA codified a cause of action for aiding and abetting when the plaintiff was injured by an act of international terrorism "committed, planned, or authorized by" an FTO. 18 U.S.C. § 2333(d)(2). In such cases, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *Id.* As Congress explained, JASTA seeks:

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b).

To achieve Congress's intended breadth, JASTA adopts standards for secondary liability from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). JASTA § 2(a)(5). In that case, Linda Hamilton provided administrative support to a burglary enterprise run by Bernard Welch. Hamilton was held liable for aiding and abetting an unplanned murder Welch committed during a botched burglary—even though she did not intend, know about, or cause the killing, and may not even have known she was aiding burglaries. 705 F.2d at 474-75, 488-89. Thus, under *Halberstam*, a defendant can be liable for aiding and abetting an act of violence if

6

violence was "a foreseeable risk" of the enterprise the defendant assisted. *Id*. at 488. The defendant need not intend violence, nor contribute directly to the violent act; indeed, the defendant need not even know the precise nature of the illegal activity it is assisting. *See id.* All it must know is that it is assisting an overall illegal or tortious activity. *See id.* If "violence and killing is a foreseeable risk" from that activity, the defendant is liable. *Id.* Under this standard, even acts that are "neutral standing alone" can support liability based on the "context of the enterprise they aided." *Id.*

This Court's recent decisions in *Kaplan* and *Honickman* address the pleading requirements for JASTA aiding-and-abetting claims against banks. These cases are discussed *infra* pp.32-36.

### III.   Plaintiffs' Allegations

This case arises out of terrorist attacks committed by al-Qaeda and its allies— including the Taliban, its Haqqani Network, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company—which comprise what U.S. government officials have described as a "Syndicate" of terrorist organizations that carried out a coordinated campaign of attacks against Americans in Afghanistan. JA98, 101-02 (¶¶89, 96-97). These organizations are ideologically committed to killing Americans to drive the United States from the Middle East. Plaintiffs allege, with supporting detail, that each and every attack at issue in this case was committed, planned, or authorized by al-Qaeda or at least one other designated Syndicate FTO. *See* JA97-217, JA512-666.

To finance these attacks, these terrorists relied "on an international criminal network to generate money and then move that money back to Afghanistan and Pakistan, where it can be used to pay for terrorist personnel and infrastructure, and also to purchase weapons, explosives, and other matériel." JA79 (¶5). The terrorists' sources of illicit income include heroin trafficking, tax fraud, protection rackets, smuggling, extortion, and other criminal schemes that generate hundreds of millions of dollars annually. *E.g.*, JA81, 115, 121-22, 125 (¶¶13, 128, 143-44 , 156). Sources cited in the complaint thus explain that "there is a complete fusion of terrorist and criminal activity. There is not a 'nexus' between the two worlds; they are one and the same," such that "criminal activity is inseparable from every aspect of terrorist organizations and their behavior." JA43 (¶139).

The Syndicate's financing schemes required the complicity of international banks. The terrorists' need to launder tainted money and preference for U.S. dollars "makes access to the international financial system—and especially to the U.S. banking system—critically important to the Syndicate's operations." JA79 (¶5); *see also* JA332-36 (¶¶596-606) (authoritative sources explaining the importance of tight financial controls to prevent terrorism). Most banks refused to provide that access and adopted robust compliance regimes to prevent terrorists from using their systems. *E.g.*, JA110 (¶115). But a few rogue banks chose to become "laundromats," *i.e.*, hubs of illicit finance. JA337-38 (¶¶609-10). As documented in a slew of

8

sources, these banks knew they could attract tremendous volumes of profitable business from money launderers, transnational criminals, and terrorists looking to raise, clean, move, and spend dirty money—and the banks consciously designed their businesses to attract those customers. JA338-53 (¶¶611-52). A chorus of experts agree that any bank that chose to structure its business that way was most likely doing so intentionally—as opposed to being duped by terrorists into aiding them. JA380-84 (¶¶719-25). Indeed, experts have explained that participating in such financial crime was "tantamount to the sale of weapons." JA334 (¶602). That is because access to funds, and especially U.S. dollars, was critical to the Syndicate's ability to kill and injure Americans in Afghanistan. *See* JA467-72 (¶¶965-78).

The defendant banks operated the world's largest and most notorious laundromats. They assisted the Syndicate in multiple overlapping ways.

## A. Standard Chartered

SCB assisted the Syndicate in three ways: (1) funding its bombmaking enterprise; (2) facilitating VAT fraud; and (3) engaging in industrial-scale money laundering for Syndicate agents.

1. SCB played a role in terrorist bombings in Afghanistan through its financial support to Pakistani explosive suppliers Fatima Group and Pakarab Fertilizers.[2] The terrorists' deadliest weapons in their war on Americans were improvised explosive devices (IEDs) made from Calcium Ammonium Nitrate (CAN) fertilizer. By 2007, it was widely recognized that CAN was "one of the weapons of choice for Al Qaida." JA307 (¶506). By 2009, an onslaught of "crude but powerful roadside bombs" made of CAN caused American military fatalities in Afghanistan to double. JA307 (¶507).

Nearly all the terrorists' CAN came from Fatima, JA308 (¶508), which provided a "deliberate supply of CAN fertilizer to Syndicate agents, operatives, and fronts from 2009 through 2016," JA506 (¶1075); *see also* JA507-09, 668, 671 (¶¶1077, 1081-82, 2031, 2041). Although Fatima "had known for years that [its] products were being weaponized in bulk to create thousands of deadly bombs," it refused to take measures requested by the U.S. government to stem the tide. JA312-13 (¶¶516, 519). Indeed, Fatima had effectively been infiltrated by the ISI, a rogue Pakistani intelligence agency that supported the Haqqani Network and other Syndicate groups—and which, according to a retired senior American military

---

[2] As the complaint explains, these companies were "related." JA308 (¶508). Specifically, Pakarab is part of the Fatima Group. *See* PakArab Fertilizers Ltd., Company Overview (Dec. 24, 2019), https://fatima-group.com/pafl/page.php/company-overview-pafl-a. For ease of reference, this brief uses "Fatima" as shorthand for both companies.

official, built Fatima's fertilizer plants to ensure that terrorists could access explosives. JA312-16 (¶¶518-521, 523-24).

SCB played an active role in Fatima's operations: Fatima publicly identified SCB as one of its "major bankers," JA316 (¶526) (emphasis altered), and had eight-figure credit facilities with the bank, JA506 (¶1074). The services provided included U.S. dollar-denominated foreign exchange, correspondent account, and letter-of-credit services for sales of CAN fertilizer. JA316-17 (¶¶525, 527). Those services were particularly important to facilitate international sales (*e.g.*, to bulk buyers in the United Arab Emirates), which included purchases by terrorists or their proxies. JA506-07 (¶¶1073, 1075-76). Moreover, by providing access to U.S. dollar services, SCB ensured that the price of CAN fertilizer remained low and stable—making it the explosive of choice for terrorists. JA505, 507-08 (¶¶1072, 1077-82).

SCB knew that its work for Fatima was facilitating deadly attacks on Americans "no later than 2011." JA455 (¶913); *see also* JA309-11 (¶¶510, 514-15). Beginning that summer, multiple media outlets reported the use of fertilizer bombs on Americans. JA309 (¶510). On September 1, 2011, the *Associated Press* published a long report exposing Fatima's role. JA310-11 (¶514).

Then, in January 2013, Lieutenant General (LTG) Mike Barbero, then-head of the U.S. anti-IED effort, "met in person with senior executives at SCB New York's office." JA317 (¶529). LTG Barbero showed SCB that Fatima was

11

knowingly supplying explosive materials that were killing hundreds of American soldiers, and that the bank's financial services were crucial to the terrorists' campaign. JA317-18 (¶529). Although LTG Barbero pleaded with SCB to cease providing financial services to Fatima "to save American lives by preventing future CAN fertilizer bomb attacks against Americans in Afghanistan," SCB refused. JA318 (¶529(vii)); *see also* JA306-07, 317-18 (¶¶505, 529-31).

2. SCB also collaborated with al-Qaeda and Haqqani Network agents operating VAT fraud schemes. *E.g.*, JA299 (¶¶474-75). Starting no later than 2006, the Syndicate set up cells in Europe that were purpose-built by al-Qaeda and other terrorist organizations to finance terrorism. JA233 (¶283). The cells obtained fraudulent VAT refunds from European governments; laundered the proceeds through complicit international banks to convert them to U.S. dollars; and then routed those dollars to the Syndicate to finance attacks on Americans in Afghanistan. JA233-34 (¶¶283, 287).

Public sources linked VAT fraud to terrorist finance starting in 2006. These included widely reported statements by the United Kingdom Home Secretary drawing "an explicit link ... between fundraising by terrorist groups and the European-wide so-called 'carousel' VAT fraud"; a 2007 report by the Financial

Action Task Force (FATF)[3] connecting VAT fraud and terrorism; and similar statements in later years by the FBI, European authorities, and terrorism researchers. JA236-37 (¶294); *see also* JA368-72 (¶¶690-99). In 2010, Coalition forces discovered evidence in a cave hideout of al-Qaeda and Haqqani Network forces linking two European VAT fraud cells to those organizations. JA236 (¶293).

One of those cells was operated by Samir Azizi, a teenaged al-Qaeda and Haqqani Network operative responsible for funneling tens of millions of VAT-fraud dollars to the Syndicate from 2009 until his 2015 arrest. JA274 (¶410). Azizi appears "to have been one of the most prolific fundraisers for al-Qaeda in history." JA79 (¶4). The complaint details the identities of the Azizi Cell's sham companies and the amounts transferred to the Syndicate. JA276-80 (¶417).

"VAT fraud as practiced by al-Qaeda" required the willing assistance of complicit banks because it "was one of the simplest of all terrorist finance schemes for banks to detect." JA412 (¶795). The scheme "prioritized scale and simplicity," and so the "fraudsters usually copied-and-pasted (or close to it) the same schemes, entities, and everything." JA413 (¶798). Consequently, Syndicate VAT fraud only worked with "the willing involvement of corrupt western banks," because it required

---

[3] FATF is the leading international anti-money laundering organization, whose guidance banks monitored closely, JA333, 370-71 (¶¶598, 695, 697).

"a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to do)." JA412 (¶795).

SCB played that role. Following his arrest, "Azizi directly implicated [SCB] [in] his VAT fraud scheme when interviewed by law enforcement," indicating that SCB provided a company that Azizi used in his fraud. JA299 (¶476). Members of Azizi's cell also "generally confessed" to the scheme, confirming that SCB was complicit in a massive fraud that supported terrorism. JA284 (¶¶428-29). SCB thus helped the Azizi Cell raise at least $10 million for the Syndicate from 2008 through 2015. JA298-99 (¶¶473-75).

3. SCB also engaged in industrial-scale money laundering, principally through its Dubai branch, acting for years as a Syndicate laundromat. Regulators repeatedly sanctioned SCB for financial improprieties that benefited terrorists. JA428-30 (¶¶843-44, 847-48). Among others, SCB assisted Altaf Khanani and what the Treasury Department described as the Khanani Money Laundering Organization (Khanani MLO).

Altaf Khanani was a notorious international money launderer, described by law enforcement as "a James Bond villain" with "a worldwide network" that moved "billions of dollars." JA366-67 (¶685). Beginning in the 1990s, he ran the Khanani MLO, a web of companies that gathered, invested, moved, and repatriated billions

14

of dollars for the worst criminal and terrorist enterprises—including al-Qaeda, the Haqqani Network, and D-Company. JA218-20, 225-26 (¶¶248, 250, 252-53, 265).

A drumbeat of public reports including *USA Today* (2001), the *New York Times* (2003), and the Pakistani press (2008) linked Khanani to Syndicate terrorist groups. JA361-62 (¶¶672-73). In 2008, Pakistan charged him with money laundering offenses involving billions of dollars. JA223-24 (¶259). These charges made international news; Khanani avoided conviction by reportedly paying a nine-figure bribe. *Id.* He then fled to Dubai where he continued laundering money for terrorists and criminals. *Id.*

The FATF later described Khanani's organization as "the clearest example of a professional money laundering organisation, providing services to" designated terrorists. JA226-27 (¶267). Indeed, Khanani was the Syndicate's principal money launderer, and was internationally infamous for his connections with Syndicate terrorists. JA219-22 (¶¶253-55). He acted not only as the head of the Khanani MLO, but also as an advisor to (among others) Sirajuddin Haqqani, a key leader in al-Qaeda and the Haqqani Network. JA219-22 (¶¶252, 254-55). Khanani's connection to Syndicate terrorists was so close that "any time a bank or money transmitter helped Khanani engage in any transaction anywhere in the world it was directly or indirectly aiding-and-abetting terrorist attacks against Americans in Afghanistan" because the relevant terrorist organizations "all were effectively 'shareholders' of the Khanani

15

MLO and, as a result, owned a direct percentage of every Khanani MLO dollar." JA232 (¶279); *see also* JA230 (¶276).

Much of the Khanani MLO's work for the Syndicate ran through two Dubai-based front companies: Mazaka General Trading and Al Zarooni Exchange, which handled at least hundreds of millions of dollars in Syndicate-related transactions. JA224 (¶260). Although both fronts masqueraded as commercial trading firms, the veneer was thin: Both were "shell companies" with no legitimate operations and no "real corporate presence." JA365-66 (¶682). As an Australian investigator later explained, "[t]here can only be one reason" for money to move into Khanani's "trading companies—and that is money laundering. Because that was the only thing that happened in those companies." JA321 (¶541). Indeed, both companies' operations raised "a litany of obvious counter-terrorist finance red flags," including "trading histor[ies] [that] strongly indicated [they were] engaged in capital flight, laundering, or other financial crimes in high-risk-terrorist-finance jurisdictions." JA366 (¶682).

These red flags alerted any bank doing business with Khanani's companies that it was playing a role in unlawful activity. JA365-66, 368 (¶¶682, 688). Through normal diligence procedures, banks would learn of the true identity of their customers and determine whether their transactions were suspicious. JA354-56 (¶¶655-59). What is more, any bank seeking to move dirty money would take steps

16

to ascertain who it was dealing with—to protect the bankers' personal safety, if nothing else. JA364-66 (¶¶678, 681-82). When banks like SCB did so vis-à-vis the Khanani companies, they would have discovered that these companies were closely associated with Khanani; for example, by revealing that Khanani's son Obaid was a senior manager at Al Zarooni. JA219, 361, 364-65 (¶¶251, 671, 678).

Nevertheless, SCB assisted the Khanani MLO for nearly a decade by "provid[ing] financial services to Khanani's companies . . . to launder at least hundreds of millions annually for al-Qaeda, the Haqqani Network," and other Syndicate members. JA294 (¶458). And SCB knew who it was dealing with. In 2012, senior compliance officers at the Dubai branch conducting an audit of "suspected terrorist finance activity" "learned that SCB Dubai had been using SCB New York to carry out [U.S. dollar] money-laundering transactions for the Khanani MLO," and that "Khanani was a suspected agent of terrorist organizations," including al-Qaeda and the Haqqani Network. JA296 (¶466). In 2013, an SCB whistleblower "determined that Standard Chartered Bank 'had blood on its hands,'" and that "'based on SCB's own records . . . there were many SCB transactions post-2008 on behalf of . . . al-Zarooni Exchange.'" JA298 (¶472).

SCB's assistance to the Khanani MLO was part of a pattern. In 2012, the U.S. Department of Justice and the New York Department of Financial Services (NYDFS) determined that SCB had assisted Iranian terrorist groups raising and

17

moving money. JA427-28 (¶¶842-43). NYDFS's Consent Order labeled SCB a "rogue institution," and made clear that for "nearly a decade," SCB "programmatically engaged in deceptive and fraudulent misconduct [] to move at least $250 billion . . . then covered up its transgressions." JA428 (¶843). SCB did so unapologetically: When employees voiced concern about terrorist finance risk, SCB's senior leadership expressed naked contempt for U.S. counterterrorism policy, responding, "You fucking Americans. Who are you to tell us . . . that we're not going to deal with Iranians." JA428-29 (¶844). For these and other reasons, NYDFS concluded that SCB helped "finance terrorist groups" and "left the U.S. financial system vulnerable to terrorists." JA428 (¶843). Indeed, allegations showing SCB's continuous knowledge of its role in terrorist finance are legion. *See* JA428-59 (¶¶844-920).

## B. Deutsche Bank

Senior American officials have called DB "the biggest money laundering bank in the world," JA264-65 (¶372), and with good reason: For years, DB operated what the media, regulators, and its own bankers described as "laundromats" all over the world, JA257, 261-62, 264, 266 (¶¶354, 367, 371, 382). As relevant here, DB: (1) facilitated Syndicate VAT fraud; and (2) laundered money for transnational criminals in high-terrorism-risk geographies.

1. Like SCB, DB "deliberately aided the flow of hundreds of millions of VAT fraud funds to the Azizi Cell, likely supplying al-Qaeda and the Taliban with tens of millions of U.S. dollars from 2009 through 2015." JA274 (¶410). Samir Azizi "directly admitted to using Deutsche Bank as his *willing financial partner* in the Syndicate's VAT Finance Scheme." JA275 (¶414) (emphasis added).

DB also assisted a second VAT fraud cell operated by Imram Yakub Ahmed, a British-Pakistani citizen who committed VAT fraud in Europe and the U.A.E. for al-Qaeda and the Haqqani Network before he was arrested and imprisoned in Italy in 2017. JA234, 237-38, 256-57 (¶¶287, 295-97, 351-52). The Ahmed Cell "raised more than . . . 1.15 billion Euros through VAT fraud schemes aided by complicit financial institutions." JA238 (¶297). At least $10 million of that went to the Syndicate via DB. JA256-57 (¶¶351-52). The true total was likely much higher because the Syndicate also imposed "taxes" on criminal activity by the "Pakistani and Afghan diaspora in Europe," including VAT fraud. JA123, 234 (¶¶148, 286).

DB played an active role in these schemes. For example, it bought carbon-emissions certificates from the front companies, exported them, and "put them back into the system." JA274-76 (¶¶409 & n.301, 415). DB also "made the accounts available to the fraudulent companies . . . made sure that there were no indications of suspected money laundering . . . [and] used a special Deutsche Bank program that enabled super-fast transfers" of illicit funds to stay ahead of regulators. JA276 (¶415)

19

(emphasis omitted). Thus, "it was Deutsche Bank, not Azizi or Ahmed, who prepared key documentation that enabled the Syndicate to execute its VAT fraud to raise their desired terrorist funds." JA260 (¶363). DB's own compliance officers noted to each other that these transactions raised red flags for terrorist finance—and then decided not to stop them. JA393, 411, 415-16 (¶¶741, 791, 806-09).

DB's senior management knew of the bank's involvement in VAT fraud no later than 2009, when a financial crimes investigator warned the bank in writing, and then visited DB to complain to DB's counsel and management. JA275 (¶411). In 2010, German authorities searched DB's offices based on suspicion of VAT fraud. JA283 (¶425). And in 2012, authorities raided multiple DB offices and arrested seven employees on charges relating to carbon-trading VAT fraud that the employees "knew to pose an extreme risk for Syndicate terrorist fundraising and finance." JA274-75 (¶¶409, 411).

2. DB, in collaboration with Altaf Khanani and the Russian Mafia, established the bank's "Russian Laundromat" to assist criminals in converting rubles (many from sales of the Syndicate's opium) to U.S. dollars. JA258, 265 (¶¶356, 375); *see also* JA404-07 (¶¶766-75, 779), and JA269-74, 475-76 (¶¶390-408, 990-91). This scheme was hatched in 2011 by DB Moscow's head equities trader in collaboration "with two known launderers who were notoriously associated with the Russian Mafia." JA265 (¶375); *see also* JA404-06 (¶¶765-75) (describing the meeting and

the resulting collaboration between DB and the Russian Mafia). The operation used fraudulent "mirror trades" to convert currencies and move them across borders undetected. JA258, 406-07 (¶¶355 & n.281, 777). These trades had no legitimate economic purpose, but were designed (as a former DB banker explained) "to create stashes of black cash," which are "only needed by criminals." JA392 (¶739).

DB knew what it was doing. JA391-93 (¶¶736-40) (reporting multiple findings by investigators and former employees that DB acted knowingly). It devised the mirror trading scheme intentionally, and charged unusually high fees to participants precisely because it knew that these were not above-board transactions. JA392-93 (¶740). Its bankers openly described the service as a "laundromat." JA407 (¶779). DB thus became a compromised financial institution, sympathetic to organized crime. JA407-08 (¶780). Moreover, insiders at DB could see the illicit nature of the trades using simple data analysis. JA272 (¶398). And the sheer scale of the transactions—moving billions of dollars over just a few years—necessarily alerted senior executives to the trades and the identities of the customers. JA421-22 (¶829); *see also* JA274 (¶408) (reports that tens of billions of dollars illegally moved into the West through the mirror trades).

DB's mirror trading scheme assisted terrorist finance in at least two ways. First, DB's laundromat transferred over $50 million to the Khanani MLO. JA270 (¶392); *see also* JA276-80 (¶417). In 2013-2014 alone, the Khanani MLO, "acting

21

through Mazaka General Trading, partnered with Deutsche Bank . . . to repatriate at least $49,787,832 from overseas accounts to its Syndicate clients through Deutsche Bank-designed and-executed mirror trades." JA271 (¶396).

Second, the Russian Mafia used DB's mirror trading scheme to launder the proceeds of crime—including Syndicate opium proceeds that were critical to the Syndicate's campaign of violence against Americans in Afghanistan. JA148-49, 258-59, 264 (¶¶215-17, 356, 358, 370).

The relationship between the Russian Mafia and al-Qaeda is deep and longstanding: It was cultivated by Osama bin Laden himself in the 1990s as a means to launder opium profits. JA238 (¶298). In the 2000s, approximately 95% of all opium sold in Russia, Central Asia, the Middle East, and Europe flowed through the same pipeline: From the Taliban (who grew it), then to al-Qaeda and the Haqqani Network (who worked with Syndicate terrorists to export it), then to the Syndicate's joint-venture partners in the Russian Mafia (who sold it and helped launder the proceeds). JA242 (¶308). Russian organized crime entities thus purchased large amounts of Afghan opium from Syndicate terrorists, paying the Syndicate in guns and laundered money. JA148 (¶216). Multiple public sources in the 1990s and 2000s explained that the Russian Mafia had become an important money laundering agent for al-Qaeda and other Syndicate organizations. JA239-42, 375 (¶¶302-11, 707-08).

Authoritative sources thus explained—well before the attacks in this case—that there was a "direct causal link between insurgent funding and the opium trade," and that the Taliban was investing its revenues "in weapons and [using] those weapons against our forces." JA470 (¶974); *see also* JA470 (¶975). Later reports emphasized that "[d]rug trafficking in the [Central Asian] region is *inextricably tied to terrorism*, and *drug proceeds enable this activity*" because "the illicit trafficking of opiates . . . destined for the Russian Federation and Eastern Europe was the predominant funding mechanism for *Afghan-based terrorist activity*." U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 257 (2016) (emphasis added). The complaint includes additional allegations, citing public sources, explaining that Russian organized crime and terrorism in Afghanistan were closely linked. JA374-75, JA471 (¶¶705-08, 976-77).

Banks accordingly "understood that any financial institution or money remitter who served as a 'Laundromat' would inevitably route substantial sums of U.S. Dollars to terrorist financiers seeking to raise and move money to support anti-American terrorist attacks." JA337 (¶610). Indeed, this has been common knowledge among financial institutions since "the 1980s," JA338 (¶611), and the public sources drawing this connection ensured that "no reasonable financial institution could have believed that acting as Laundromat for organized crime groups had no foreseeable link to terrorism," JA338 (¶612).

23

That knowledge became more acute after September 11, when the U.S. government and the FATF explicitly drew connections between money laundering and terrorist financing. JA111-12, 332-33 (¶¶117-18, 597-99). Expert and media sources have also long recognized the close connection between laundromats and terrorism finance. *E.g.*, JA116-17, 139-40, 155-56, 226-27, 236-37, 239-41, 334, 337-53, 471-72 (¶¶131, 192-95, 234, 267, 294, 302, 304-05, 602, 609-52, 977-78). Indeed, the complaint provides over 50 pages of detail, drawn from public sources, explaining why "the connections between" the unlawful transactions here "and Syndicate violence have been well-established since well before the first attacks at issue in this case." JA330 (¶592); *see also* JA332-84 (¶¶596-725).

### C. Danske Bank

Danske operated one of the largest laundromats in history. Its "Global Laundromat" in Estonia "made over $233 billion . . . in suspicious transactions" from 2007 to 2016. JA319-20 (¶¶534-35). "Danske Bank knew in 2007 that the Estonia branch was a laundromat." JA459 (¶921). The complaint details multiple communications to Danske starting in 2007 from regulators, Danske's own compliance group and internal auditors, whistleblowers, and correspondent banks that had processed transactions for Danske—all warning that the Estonia branch was processing a high volume of illegitimate transactions. JA460 (¶926). Nevertheless, "Danske Bank chose to aggressively grow the laundromat," knowing that its banking

24

practices "were designed to facilitate financial crime and money laundering." JA459 (¶¶921, 923).

In December 2022 (after this case was filed but before it was dismissed), Danske pled guilty "and agreed to forfeit $2 billion to resolve the United States' investigation" in connection with its Estonian operations, including "the laundering of criminal and suspicious proceeds through the United States." U.S. Dep't of Justice, *Danske Bank Pleads Guilty to Fraud on U.S. Banks in Multi-Billion Dollar Scheme to Access the U.S. Financial System* (Dec. 13, 2022), https://www.justice.gov/opa/pr/danske-bank-pleads-guilty-fraud-us-banks-multi-billion-dollar-scheme-access-us-financial. The government explained that Danske "deliberately disregarded U.S. law of which it is well aware, facilitated the laundering of criminal and suspicious proceeds through the United States, and placed the U.S. financial network at risk, all in the name of its bottom line." *Id.* Danske admitted to a statement of facts and a criminal information showing persistent misconduct since it acquired its Estonian business in 2007.

The plea shows that Danske's laundromat catered to criminal elements in Russia, *i.e.*, the Russian Mafia. Public reports confirm that Danske also sent U.S. dollars to the Khanani MLO through its front, Mazaka; that "Mazaka's 'customers'" included "[t]errorist organizations such as al-Qaeda" "and the Taliban"; and that

25

"[b]etween April and August 2014" alone, "a total of $720,000 flowed into [Mazaka's] account at Danske Bank." JA321 (¶540).

Danske also facilitated Syndicate VAT fraud. In 2009, "Danske Bank . . . allowed accounts controlled by the Danish-owned company Swefin to conduct VAT fraud of over $100 million," JA323 (¶548), in multiple European countries, including Italy, JA322 (¶546). Italian authorities recognized the terrorism connection after Coalition troops found documents from the scam during an operation in the mountains between Afghanistan and Pakistan in 2010. JA324 (¶554). And the Italian press reported that the same fraud was used to finance al-Qaeda in Afghanistan. JA323 (¶553); *see also* JA325 (¶¶559-61) (additional reports linking Danish VAT fraud to terrorist finance).[4] And of course, Danske was privy—like every other bank—to the myriad authoritative public statements warning that VAT fraud was an important mode of terrorist finance. *See supra* pp.12-13. Danske Bank's complicity thus allowed the Syndicate to access criminal VAT fraud profits.

\* \* \*

---

[4] Plaintiffs can amend the complaint to cite a Danish newspaper report that the Italian VAT fraud was perpetrated by the Ahmed Cell, a fundraiser for al-Qaeda and the Haqqani Network. JA238 (¶¶296-97); *see* Bo Elkjær et al., *1,2 mia. kroner fra formodet momssvindel ført igennem Danske Bank i Hørsholm*, Dagbladet Information (May 27, 2019), tinyurl.com/57anmzj3.

26

Based on these and other unlawful acts of assistance, plaintiffs allege that the defendant banks aided and abetted the acts of international terrorism that injured plaintiffs and killed their loved ones. The complaint pleads two counts: Aiding and abetting the attacks, JA667-68; and aiding and abetting the Taliban-al-Qaeda campaign, a racketeering enterprise that included the attacks, JA669-71.

## IV. Procedural History

The original complaint was filed August 5, 2021. JA1. The operative corrected amended complaint was filed February 26, 2022. JA78. Defendants moved to dismiss for failure to state a claim; some SCB entities and Danske Bank also challenged personal jurisdiction. The district court dismissed the action with prejudice and without leave to amend, holding that plaintiffs failed to state an aiding-and-abetting claim.

*First*, the court held that plaintiffs failed to allege that any defendant had the requisite "general awareness" to be held liable under JASTA. As to SCB's provision of financial services to Fatima, the court acknowledged that "a senior U.S. military official informed Standard Chartered about how Fatima and Pakarab's [fertilizer] product was being used by FTOs" to kill Americans, but concluded that this allegation of *actual knowledge* was insufficient to plead "general awareness." SA44.

With respect to VAT fraud, the court found that the complaint did not allege "sufficient facts permitting the reasonable inference" that the defendant banks were

27

aware that Azizi or Ahmed were "connected to international terror at the time" the banks provided them with "routine banking services." SA32; *see also id.* at 38, 48.

The court held that allegations about defendants' widespread criminal money laundering also had an insufficient nexus to terrorism. Thus, the court concluded that plaintiffs failed to adequately allege that any defendant was sufficiently "aware of any connections between [Defendants' customers] Al-Zarooni or Mazaka and the Khanani MLO or the Syndicate" during the relevant period, because the complaint identified no "public sources" to "link Khanani to th[ose] two companies" prior to 2015 and 2016, respectively. SA27; *see also id.* at 38-39. It further held that even if plaintiffs had plausibly pled defendants' awareness of those connections, "the Court would still find that insufficient to establish that Defendants were 'generally aware' of their role in Syndicate attacks in Afghanistan," because the Khanani MLO also financially supported other enterprises in addition to the Syndicate. *Id.* at 25, 28.

*Second*, the court found that plaintiffs had not plausibly alleged that defendants provided "substantial assistance." SA34-36, 45-47, 50-52. The court discounted plaintiffs' allegations of financial assistance as vague, attenuated, or implausible, or—where allegations were concrete and direct—characterized the assistance as "routine banking services" that could not give rise to liability.

*Third*, the court rejected the second count of the complaint—aiding and abetting based on a racketeering predicate—by holding that the term "act of

international terrorism" means only individual terrorist attacks, and not the overall
Taliban-al-Qaeda campaign that defendants assisted. SA60-61.

*Fourth*, the court determined that amendment would have been futile, and so
denied leave to amend. SA61 n.38.

The court entered judgment on January 5, 2023. JA58. Plaintiffs timely
appealed as to the SCB, DB, and Danske defendants. JA843.

## SUMMARY OF ARGUMENT

Plaintiffs' complaint states claims for aiding and abetting against each
defendant bank because each bank knowingly provided substantial assistance to the
Syndicate terrorists who injured plaintiffs and their loved ones. As the complaint
explains, defendants were not honest banks that dangerous customers exploited; they
were crooked banks that sought those customers out and offered them services that
law-abiding banks would not. Then, defendants augmented the risk by deliberately
executing non-routine unlawful transactions (including VAT fraud and mirror
trades), in the riskiest geographies for terrorist finance (including Russia, Dubai,
Pakistan, and Estonia, among others), for customers that provided explosives and
money to Syndicate terrorists (including Fatima, VAT fraud cells, the Khanani
MLO, and the Russian Mafia). They did so at scale for years. And they knew what
they were doing—not only because they set out to break the law in the first instance,
but also because the U.S. government told them; their compliance personnel

29

discovered and reported it; and their customers raised a blizzard of red flags that only a culpable bank could have ignored. This misconduct caused at least tens of millions of dollars, as well as tens of millions of pounds of explosives, to reach Syndicate terrorists in Afghanistan while those same terrorists were attacking Americans. Taking those allegations as true, and drawing all permissible inferences in plaintiffs' favor, the complaint easily states a claim.

The district court reached a contrary conclusion by ignoring or mischaracterizing plaintiffs' allegations and by skewing this Court's precedents beyond recognition. The court repeatedly described defendants' transactions as "routine" or innocuous when the complaint alleges otherwise—and when this Court's precedents compel courts to credit that allegation. The court also ignored or denied the established connections between international financial crime and terrorist finance. Indeed, the district court treated defendants' alleged persistent criminality as *disfavoring* liability, holding that because defendants' unlawful schemes aided transnational criminals in addition to terrorists, it was implausible to allege that their conduct would foreseeably lead to terrorism—even though governments, experts, and the media have long explained that support for transnational organized crime in general, and VAT fraud and money laundering in particular, foreseeably leads to terrorist violence. Alarmingly, the court repeatedly

30

made arguments that even defendants eschewed, reaching to discredit plaintiffs' allegations and draw inferences against them.

This Court should reverse. At the pleading stage, the question is whether the complaint—read as a whole in the light most favorable to plaintiffs, with inferences drawn in their favor—plausibly alleges claims under what Congress described as the "broadest possible" cause of action against any person or entity that "provided material support, directly or indirectly," to terrorists. JASTA § 2(b). This complaint does. The district court's criticisms do not show otherwise; instead, they identify potential factual disputes that cannot be decided against plaintiffs at this stage—or (at most) issues that can be cured by amendment, which the court should have permitted.

The district court also erred in rejecting Count Two, which alleges that defendants aided the Taliban-al-Qaeda terror campaign. The court erroneously believed that an "act of international terrorism" can only be the specific attack that injures the plaintiff—but the text and context of the statute establish otherwise.

## STANDARD OF REVIEW

This Court reviews the district court's decision de novo, accepting as true plaintiffs' nonconclusory factual allegations and drawing inferences in plaintiffs' favor. *Kaplan*, 999 F.3d at 854. When drawing such inferences, the Court considers

the allegations holistically, and not in isolation. *Id.*

## ARGUMENT

This Court should reverse the decision below and hold that plaintiffs' complaint states a claim against all three banks. Here, the district court correctly determined that plaintiffs were injured by acts of international terrorism, and that the complaint pleads that designated FTOs committed, planned, or authorized every attack in this case, as JASTA requires. SA19-21. The court erred, however, in holding that the complaint fails to plead the "general awareness" and "substantial assistance" elements of a JASTA aiding-and-abetting claim.

The first contested element is whether defendants were "generally aware of [their] role as part of an overall illegal or tortious activity." *Kaplan*, 999 F.3d at 863 (quotation marks omitted). This connotes "something less than full, or fully focused, recognition," and is "less demanding than a requirement that [the plaintiffs] show awareness." *Id.* Thus, "[t]he defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman*, 6 F.4th at 496. This Court is "lenient in allowing scienter issues . . . to survive motions to dismiss"—even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d

Cir. 2009) (quotation marks omitted); *see also Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) (applying this rule in a terrorism case).

Applying that approach, this Court held in *Kaplan* that when the plaintiffs alleged that public sources identified a bank's customers (two investment companies, two individuals, and a charitable foundation) as being parts of Hizbollah, it was plausible to infer that the bank—which was subject to various legal requirements to know its customers—was aware of those connections, such that when the bank helped those customers launder money, it was generally aware that it was playing a role in Hizbollah's terrorist activities. *See* 999 F.3d at 865. The defendant argued that the complaint was too vague about the public statements (not mentioning who made them, where they were made, or providing dates)—and indeed did not even allege that the defendant "read or was aware of such sources." *Id.* at 864-65. But the Court held that at the pleading stage, the plaintiffs' allegations were enough, and that "[a]ny further needed specificity can be sought in discovery." *Id.* at 864.

With respect to the "substantial assistance" element, the Court applies a six-factor test to determine whether assistance is substantial. The first factor is the "nature of the act" assisted, which determines "what [kind of] aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. This factor also imposes "a proportionality test to particularly bad or opprobrious acts," such that "a defendant's

responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Id*. at 484 n.13. Thus, in relation to "vicious acts" like terrorist violence, "even 'relatively trivial' aid could count as substantial." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 222 (D.C. Cir. 2022) (quoting *Halberstam*, 705 F.2d at 484 n.13). Notably, this factor does *not* ask whether the defendant specifically encouraged terrorist violence; instead, it is only about assessing the fit between the injurious act and the support given. *See Honickman*, 6 F.4th at 500. Here, the "fit" between significant financial assistance and terrorist attacks is a snug one.

The second factor is the amount and kind of assistance. Assistance need not "be shown to have been indispensable to the injurious acts for this factor to weigh in support of liability"—and plaintiffs need not allege that the defendant was "the top funder of a terrorist action"; it is enough if the "alleged assistance was at least significant." *Atchley*, 22 F.4th at 222. Moreover, plaintiffs need not "allege the FTO actually received the funds," as long as they "plausibly allege[] the general awareness element." *Honickman*, 6 F.4th at 500.

The third factor is the defendant's presence or absence at the time of the tort. This factor is not at issue here—but its absence is not dispositive. As the D.C. Circuit explained in *Halberstam*, Hamilton was not present for the murder, but her back-

office assistance to a burglary enterprise was nevertheless substantial enough to hold her liable for it. 705 F.2d at 488; *see also Atchley*, 22 F.4th at 222-23.

The fourth factor is the relationship between the defendant and the primary tortfeasor. This factor "is useful for determining the defendant's capacity to assist." *Honickman*, 6 F.4th at 500. Plaintiffs need not show "a direct relationship between the defendant and the FTO," so long as the relationship is not so "attenuated" as the one in *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019). *Honickman*, 6 F.4th at 501. There, the defendant bank did business with Al Rajhi Bank (ARB), the largest bank in Saudi Arabia, which was believed to have terrorist customers. *See id*. When those terrorist connections were reported—ten months before the attacks at issue in *Siegel*—the defendant "ceased doing business with ARB altogether." *Siegel*, 933 F.3d at 224.

The fifth factor is the defendant's state of mind. This asks whether the defendant's state of mind "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise," rather than a "passing fancy or impetuous act." *Halberstam*, 705 F.2d at 488. The factor does "not limit secondary liability to those who are 'one in spirit' with terrorists"; it encompasses those "who may seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime." *Atchley*, 22 F.4th at 223-24. "Knowledge of one's own actions and general

35

awareness of their foreseeable results, not specific intent, are all that is required." *Id*. at 223.

The final factor is the duration of assistance. In *Halberstam*, the support lasted five years, which weighed *heavily* in favor of liability. 705 F.2d at 488. In *Kaplan*, three years was enough. *See* 999 F.3d at 865 (support began in 2003; attacks occurred in 2006). And *Atchley* held that four years was "a significant duration" for support to terrorists. 22 F.4th at 224.

Importantly, these six "factors are 'variables,' and the absence of some need not be dispositive." *Kaplan*, 999 F.3d at 856 (quotation marks omitted); *Honickman*, 6 F.4th at 500. Moreover, "[d]isputed facts pertinent to these factors and the weight to assign such facts are not matters that can be determined as a matter of law." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 (2d Cir. 2018). Accordingly, if some of the factors support liability, dismissal is inappropriate.

For the reasons explained below, the complaint states a claim against each defendant bank. Each bank rendered multifaceted criminal assistance to the Syndicate's operatives and allies, allowing the terrorists to access the money and explosives they needed to kill and maim hundreds of Americans in Afghanistan. The level of culpability alleged and the level of detail in plaintiffs' allegations dwarf what the Court held sufficient in *Kaplan*. The decision below must be reversed.

36

## I.    The Complaint States a Claim Against Standard Chartered Bank

As described in the statement of the case, SCB assisted Syndicate terrorists in three ways: (1) financing their explosive suppliers; (2) facilitating VAT fraud; and (3) helping the Khanani MLO launder the Syndicate's money. Each of these streams of assistance would suffice, on its own, to support a claim for aiding and abetting under JASTA. Collectively, they easily do so.

### A. Standard Chartered's Financing of the Terrorists' Explosive Suppliers Aided and Abetted Terrorist Violence

SCB's assistance to Pakistani fertilizer manufacturers Fatima and Pakarab was shocking. Senior American military officials took the highly unusual step of personally informing SCB that Fatima's CAN fertilizer was a "vital ingredient" in the terrorist IEDs causing 80% of American casualties in Afghanistan, *and* that SCB's financial services were critical to Fatima's ability "to supply terrorists in Afghanistan with Fatima Group CAN Fertilizer at the scale necessary to sustain the Syndicate's nationwide CAN fertilizer bomb campaign." JA317-18 (¶528(i), (vii)). Presented with that grim knowledge, SCB continued financing the fertilizer manufacturers. JA318 (¶¶530-31). Hundreds of Americans were killed and maimed as a result.

That is aiding and abetting. Indeed, the Southern District recently concluded as much when it denied SCB's motion to dismiss a case alleging the same assistance

to Fatima. *See generally Bonacasa*, 2023 WL 2390718. For substantially the same reasons, this Court should hold that plaintiffs have stated a claim.

### 1. SCB was "generally aware" of its role in the terrorists' IED attacks

SCB was at least "generally aware" of its role in financing Syndicate terrorism no later than 2011, when major Western media reported that Fatima was producing nearly all the CAN fertilizer used by the terrorists in their Afghanistan IED campaign. It had full awareness of its role no later than 2013, when the U.S. military took the extraordinary step of traveling to SCB's New York offices to personally inform the bank that it was funding the terrorist campaign and could "save American lives" by ending its support for the two companies. The district court ignored the media reports and dismissed the importance of the pivotal New York meeting only by refusing to credit plaintiffs' plausible allegations or draw reasonable inferences in their favor.

This Court's cases hold that when public sources connect a defendant's counterparty to terrorism prior to the plaintiffs' injuries, an inference of general awareness is plausible; it is not necessary at the pleading stage for the plaintiff also to show that the defendant actually knew about those sources. *E.g.*, *Kaplan*, 999 F.3d at 864-65; *Honickman*, 6 F.4th at 501. Here, public sources connecting Fatima to Syndicate terrorism abound. The first major-media reports about the role of CAN fertilizer in al-Qaeda terrorism arose in 2007. JA307 (¶506 & nn.325-26). Fatima's

role in the Syndicate's bombing campaign "was a matter of widespread public knowledge no later than September 1, 2011"—before all but a handful of the attacks at issue here—when the *Associated Press* published a long report revealing that "[t]he main ingredient in most of the homemade bombs that have killed hundreds of American troops . . . is fertilizer produced by a single company in Pakistan" and "smuggled by militants" into Afghanistan." JA310 (¶514). That same year, the American military publicly stated that 80% of IEDs, and 90% of American IED casualties, involved fertilizer from "two factories in Pakistan," *i.e.*, Fatima. JA311 (¶515). Congress held hearings on the matter in 2012, lamenting Fatima's continued provision of explosives to the terrorists. JA312-13 (¶519). And by early 2013, U.S. officials were publicly describing Fatima as a "pseudoterrorist organization" to the press, confirming that the company's deliberate practices relating to CAN fertilizer were indispensable to the Syndicate's bomb attacks against Americans in Afghanistan. JA315 (¶523); *see also* JA308-11 (¶¶508-15).

These public sources—none of which the district court's opinion acknowledges—more than adequately support the inference that, no later than 2011, SCB was generally aware of its role in enabling the terrorist IED campaign in Afghanistan. *Kaplan*, 999 F.3d at 865; *cf. Honickman*, 6 F.4th at 503.

That inference becomes ironclad in 2013, by which time SCB had *actual knowledge* of its role in the terrorist campaign. That knowledge was conveyed

directly by the U.S. military, which told SCB executives that SCB's work for Fatima was not only "directly facilitating CAN fertilizer bomb attacks against Americans in Afghanistan," but was necessary to sustain the terrorists' murderous campaign. JA317-18 (¶529). The military's presentation included "detailed data" and charts demonstrating Fatima's "key role" in "enabling anti-American terrorism in Afghanistan," maps indicating the physical relationship between Fatima's manufacturing facility and the terrorists' "logistics ratlines," and even "detailed American casualty figures" indicating deaths or injuries that the U.S. military "believed were attributable to the Fatima and Pakarab transactions relating to Fatima Group CAN Fertilizer that were facilitated by SCB New York's provision of financial services to Fatima and Pakarab." *Id.*

Presented with substantively identical allegations in *Bonacasa* (and after ordering supplemental briefing concerning the decision below), the Southern District held that similarly situated plaintiffs had adequately pled "general awareness." *Bonacasa*, 2023 WL 2390718, at *10-11. The only other court presented with similar allegations reached the same conclusion even under the stricter scienter standard for primary ATA liability. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 50 (D.D.C. 2010) (allegations that government specifically warned the defendant bank that its customer was a terrorist were sufficient to support ATA claim). That result

40

is straightforward: If a defendant's actual knowledge of its role in acts of terrorism isn't sufficient to constitute "general awareness" of that role, then nothing is.

Here, though, the district court insisted that plaintiffs failed to plausibly plead SCB's general awareness. Its various rationales do not withstand scrutiny. Indeed, their common thread is that they have nothing to do with "general awareness"—that is, with what SCB allegedly knew about the role it was playing in the terrorists' bombing campaign by funding Fatima. For example, the court's determination that the financial services SCB provided to Fatima were "routine" says nothing about SCB's *mens rea* in providing those services. Even "acts that are neutral standing alone" must be "evaluated in the context of the enterprise they aided." *Kaplan*, 999 F.3d at 865 (quoting *Halberstam*, 705 F.2d at 488). Here, that context makes all the difference: Financial services provided with actual knowledge that those services are "directly facilitating CAN fertilizer bomb attacks against Americans in Afghanistan," JA317 (¶529), are not "routine" in any sense of the word. At a minimum, as this Court has held, whether financial services are "routine" is a "question[ ] of fact for a jury to decide." *Linde*, 882 F.3d at 327. Plaintiffs allege that Fatima was not an ordinary fertilizer company, but had instead been captured by the ISI, which used the company deliberately to ensure an unending supply of CAN fertilizer for the Haqqani Network and its terrorist allies. JA312-16 (¶¶518-21, 524). Moreover, starting in 2011, Fatima rejected all overtures from the U.S. government

41

to modify their fertilizer to make it harder to use in bombs (which the United States even offered to pay for), and the media reported these companies' role in producing the explosives that caused 80 to 90% of American casualties. JA310-16 (¶¶514-26). Support for such a company can hardly be described as "routine" as a matter of law.

Similarly, the district court's determination that Fatima did not "directly suppl[y] FTOs with fertilizer" but provided it to "Pakistani farmers and fertilizer dealers" who smuggled it into Afghanistan is both wrong and irrelevant. Nowhere does the complaint allege that Fatima sold fertilizer exclusively to "Pakistani farmers and fertilizer dealers"; the district court appears to have invented that allegation from whole cloth.[5] Instead, plaintiffs allege that "militants" and "wealthy people with links to the insurgents"—not unwitting farmers—purchased CAN and then "trucked [it] across the border" into Afghanistan for use in IEDs. JA310-11 (¶514). Anyway, whether Fatima supplied the CAN to FTOs directly or indirectly is irrelevant to its scienter because it did so deliberately, in violation of repeated U.S. entreaties to stop.[6] *E.g.*, JA317-18, 506 (¶¶529, 1075); *see Kaplan*, 999 F.3d at 855 (JASTA applies to support provided indirectly).

_____

[5] The district court cites paragraphs 513-14 (JA310) for this proposition. Neither says anything about "farmers" or "fertilizer dealers."

[6] This also disposes of the district court's unfavorable comparison to *Atchley*, which it cites for the proposition that the intermediary in that case "did business directly

Nor is it relevant that, as the district court put it, only "a miniscule percentage of the otherwise legitimate product produced by Fatima and Pakarab was ultimately used by terrorists." SA43. Based on plaintiffs' allegations, even 1% of Fatima's output was approximately *17.6 million pounds* of CAN fertilizer—an "unending supply" for terrorists, enough for at least 140,000 bombs (and as many as 1.4 million). *See* JA308-11 (¶¶509-10, 514-15). And the U.S. government told SCB that Fatima's CAN fertilizer was responsible for "approximately 80% of all American bomb casualties in Afghanistan," and that if SCB would "cease its provision of financial services to Fatima and Pakarab" it would "save American lives." JA317-18 (¶529). Whether those American casualties were caused by 1% of Fatima's output or 90%, SCB was aware that by financing Fatima, it was funding those attacks. JA318 (¶530).

The district court also erroneously brushed aside the extraordinary meeting in which the U.S. military told SCB of its role in the Syndicate's terrorist acts. It concluded that "even if Standard Chartered was made aware of the fact that a small portion of Fatima and Pakarab's products was being misused . . . by other

_____

with an[ ] FTO." SA43. The court's account of *Atchley* is also incorrect: the intermediary there (the Iraqi Ministry of Health) was not "controlled by an FTO," but by Jaysh al-Mahdi, a terrorist group that was not an FTO. *Atchley*, 22 F.4th at 209. The FTO in *Atchley* was Hizbollah, which was only indirectly connected to the Ministry. *Id.*

individuals after it had been purchased," "that in and of itself is insufficient to establish that Standard Chartered was generally aware of the role it was playing in terrorist activities." SA44. That is a gross mischaracterization of what the U.S. government told SCB. The government did not merely give SCB an "FYI" that a small percentage of its customers' products were being misused downstream; it pleaded with SCB to stop providing financial assistance to companies that were supplying America's worst enemies with explosive materials responsible for hundreds of American deaths every year. JA317-18 (¶529). SCB blew off the government and continued supporting these companies. JA318 (¶¶530-31).

The cases cited by the district court are accordingly distinguishable. The court cited *Siegel*, where the defendant bank had "'little reason to suspect that it was assuming a role in [al- Qaeda's] terrorist activities,' because HSBC's customer was a legitimate business and was never publicly identified as a terrorist affiliate to al-Qaeda." SA44 (quoting *Siegel,* 933 F.3d at 224). Here, however, SCB had *every* reason to suspect that it was assuming a role in the Syndicate's terrorist activities, *because the U.S. Army told it so*. And unlike the defendant in *Siegel*, which "crucially . . . ceased doing business with ARB altogether" when potential terrorist connections came to light, 933 F.3d at 224, SCB continued financing Fatima transactions. Similarly, the district court relied on *Honickman* for the proposition that it is insufficient to allege that "a defendant *might have known* about a *possible*

nexus between its customer and the FTO that caused plaintiffs' injuries." SA44. This again mischaracterizes the complaint, which alleges that SCB *actually knew* about the *actual* nexus between Fatima and Syndicate terrorists.

The court in *Bonacasa* relied on the district court's mischaracterization of plaintiffs' allegations to distinguish that case from this one, explaining that "Plaintiffs [in *Bonacasa*] do not allege that Standard Chartered knew of a mere 'possible' and/or 'indirect' relationship between Fatima and al Qaeda." *Bonacasa*, 2023 WL 2390718, at *13. That is a false distinction because plaintiffs do not allege a mere "possible" or "indirect" relationship, but a certain and direct one. There is no substantive difference between the Fatima-related allegations in *Bonacasa* and here. Both complaints plausibly allege that SCB was aware of its role in the Syndicate's attacks before any plaintiffs were injured, yet knowingly provided assistance to Fatima and, by extension, the Syndicate. This Court should hold, consistent with *Bonacasa*, that plaintiffs have pleaded general awareness.

### 2. SCB's assistance to the Syndicate's terrorist attacks was substantial

SCB's assistance to the Syndicate's attacks was "substantial" by any measure. The *acts assisted* were terrorist bombings using Fatima's CAN fertilizer that killed and maimed hundreds of Americans. As one of Fatima's "major bankers," JA316 (¶526), SCB provided financial assistance to Fatima, and even the district court acknowledged that "financial support is 'indisputably important' to the operation of

a terrorist organization." SA45, 50, 54. The U.S. government likewise concluded that SCB provided critical trade finance to the Syndicate's pipeline for explosives, JA318 (¶529(vii)), and Fatima CAN fertilizer bombs caused 80 to 90% of all American casualties in Afghanistan. JA316-17 (¶¶526, 529(i)). There is accordingly a straight line from SCB's assistance to Fatima to nearly every IED attack in this case. JA472-73 (¶¶983-85).

The *amount and type* of assistance also supports liability. SCB's assistance allowed Fatima to maintain stable and low prices for its CAN fertilizer, which made it a favorite of smugglers and terrorists. JA505, 508-09 (¶¶1072, 1082). The dollar value of SCB's more direct assistance is estimated to be at least $5-10 million. JA288-89 (¶¶445-46). And the U.S. military told SCB that its financial services were crucial to the Syndicate's terrorist campaign. JA318 (¶529(vii)). Crucial assistance is necessarily "substantial."

The *relationship* between SCB and the Syndicate likewise favors liability because SCB was a major banker for Fatima, which was complicit with terrorists. Fatima's role in terrorist violence was reported in 2011. Then, reports swirled that the ISI had captured the company; by 2013, U.S. officials were describing Fatima as a "pseudoterrorist organization" in the press. JA311-15, 317 (¶¶515, 518-21, 523, 529(i)). That same year, U.S. military pleaded with SCB to stop assisting Fatima.

46

JA318 (¶529(vii)). But SCB continued. JA318 (¶¶530-31). SCB's connection to the terrorists was more than sufficient to support substantiality.

SCB's *state of mind* also supports liability. Any notion that SCB's assistance to Fatima and the terrorist enterprise was a mere "passing fancy or impetuous act," *Halberstam*, 705 F.2d at 488, died when LTG Barbero told the bank that it could "save American lives" by ceasing its support for Fatima, and SCB consciously chose to pursue profits instead. JA318 (¶529(vii)). That is enough to support liability. *See Atchley*, 22 F.4th at 223. Plaintiffs' other allegations about SCB's state of mind, which showed that SCB's senior leadership displayed open contempt toward U.S. regulators and counterterrorism policy, also show SCB's culpable state of mind. *E.g.*, JA427-59 (¶¶841-920).

The *duration* of support was at least six years. JA288-89 (¶446). This is longer than the amounts found substantial in *Atchley* and *Halberstam*. The duration of SCB's assistance in the face of mounting evidence that it was contributing to terrorist attacks in Afghanistan strongly favors substantiality.

The district court nonetheless found that plaintiffs failed to plausibly allege "substantial assistance." SA45-47. But it did not specifically address the Fatima-related allegations (except as to the duration-of-assistance factor, which it found *favored* substantiality). Had it done so, it could not have avoided finding that SCB's alleged assistance was "substantial."

47

**B. Standard Chartered's Facilitation of VAT Fraud by Terrorist Operatives Aided and Abetted Terrorist Violence**

SCB also facilitated VAT fraud by terrorist financier Samir Azizi and his Azizi Cell. "Samir Azizi directly implicated Standard Chartered Bank [in] his VAT fraud scheme when interviewed by law enforcement." JA299 (¶476). Azizi admitted that SCB gave him access to a company called Fairfax Partners, "which was one of the vital cogs that facilitated the entire value chain at issue." JA299 (¶476). By assisting Azizi, SCB "facilitated more than $10 million per year in value transfers from the Azizi Cell to al-Qaeda and the Haqqani Network, including senior leadership elements in both organizations." JA299 (¶474). This value flowed through to violent terrorist cells that committed the attacks that injured plaintiffs and their loved ones. JA299-300 (¶¶478-79). In rejecting plaintiffs' VAT fraud claims, the district court systematically ignored or refused to credit their plausible allegations.

*1. SCB was generally aware that it was playing a role in criminal VAT fraud that foreseeably risked terrorism*

SCB was a willing participant in Azizi's fraud. As explained *supra* pp.13-14, such schemes were easy for banks to detect because they required a high volume of irregular transactions, repeated over and again with full visibility to the participating bank. Azizi's scheme, which was being carried out by a teenager with no obvious legitimate assets, was perhaps the most obvious example. JA234-35 (¶¶288, 290).

48

The scheme could only work with the bank's complicity. JA412 (¶795). And SCB's "personnel worked closely with Azizi and members of the Azizi Cell to facilitate every aspect of the VAT fraud carousel." JA299 (¶475).

These allegations plausibly allege SCB's general awareness that it was playing a role in an overall illegal or tortious activity. But the district court found insufficient allegations connecting Azizi's VAT fraud to FTOs. It even went so far as to characterize the transactions as "routine." SA32. That is flatly inconsistent with the allegation that "VAT fraud . . . requires a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to do)." JA412 (¶795). For example, SCB allegedly made a company available to Azizi— which is not typical banking behavior. JA299 (¶476).

Syndicate terrorist attacks were a foreseeable consequence of assisting Azizi's scheme. SCB knew that it was facilitating VAT fraud, and VAT fraud schemes had been linked to Syndicate terrorists as early as 2006 by authorities as prominent as the U.K. Home Secretary, FATF, the FBI, and European authorities. JA236-37 (¶294); *see also* JA370-72 (¶¶694-99) (more public sources drawing the same link). This collection of public sources—many of which are addressed to banks specifically—put financial institutions on notice that if they knowingly assisted VAT fraud, terrorism was one foreseeable consequence.

The district court dismissed these allegations by noting that no public source connecting VAT fraud to terrorism discussed Azizi prior to his 2015 arrest. SA32. But banks have access to more than just public sources. Banks are subject to rigorous "know your customer" rules and can review those customers' transactions. JA356 (¶¶657-58). Here, Azizi was a young Afghan national with no demonstrable means of support who SCB was knowingly helping commit VAT fraud, whose pattern fit the mold of a Syndicate VAT fraudster—and who was, in fact, one of al-Qaeda's most prolific fundraisers. JA78-79, 234-36, 284 (¶¶4, 288-93, 428-30). Azizi's use of cell phones exported to Afghanistan as a vehicle for the VAT fraud scheme was an additional red flag (indeed, "the definitive red flag of all red flags") because export of cell phones to Afghanistan was itself an important form of support to the Syndicate. JA281-82 (¶¶420-24). In other words, even if it were *possible* for a bank to wrongly think that Azizi's VAT fraud was not a terrorist financing scheme, the opposite proposition (*i.e.*, the truth) was at least plausibly foreseeable based on what SCB knew about VAT fraud and Azizi.

The district court improperly disregarded or declined to credit these allegations. For example, the court rejected the significance of the role of cell phones in Azizi's fraud by asserting that "the Complaint does not allege that either Deutsche Bank or Standard Chartered was involved in, or aware of, these cell phone purchases." SA32. Again, not so: The complaint squarely alleges that a Western law

50

enforcement agency confirmed that both SCB and DB "facilitated the flow of enormous volumes of untraceable mobile phones sourced by the Azizi cell." JA281 (¶420). Moreover, the complaint alleges that SCB "worked closely with Azizi … to facilitate every aspect of the VAT fraud carousel." JA299 (¶475). VAT fraud involves obtaining fraudulent tax refunds on specific goods, JA232 (¶281)—*e.g.*, cell phones. Given SCB's close involvement in the scheme, it is not merely plausible but highly likely that SCB (and DB) knew what goods were at the center of the fraud they were helping to perpetrate. Nor does it matter that (as the district court put it) cell phones "have a wide variety of . . . non-nefarious uses." SA32. Plaintiffs allege that VAT frauds involving exports of cell phones are a hallmark of Syndicate finance. JA281 (¶420). Accepting as true the banks' willing participation in a VAT fraud scheme orchestrated by a teenage Afghani that involved shipping abnormally large quantities of cell phones to Afghanistan, "it defies credulity that [SCB and DB] did not know that something illegal was afoot," and that terrorism was a foreseeable result. *Kaplan*, 999 F.3d at 856 (quoting *Halberstam*, 705 F.2d at 486). The district court erred in holding otherwise.

### 2. SCB's VAT fraud assistance was substantial

SCB's assistance was also substantial. The act assisted was VAT fraud by an al-Qaeda and Haqqani Network operative—a crime that depends on the complicity of multinational banks to perpetrate and conceal, and is particularly opprobrious

because it remits money to violent terrorists. The amount of assistance was high: Years of complicity that allowed the Azizi cell to send at least $10 million per year from 2008 until 2015 to Syndicate leaders and terror cells in Afghanistan, JA299 (¶474), where even small amounts of money can fund horrific violence, JA472-73 (¶¶983-84). SCB's relationship with Azizi—and by extension al-Qaeda and the Haqqani Network—was direct. SCB's state of mind was culpable because VAT fraud is itself a crime, which was closely linked with terrorism by authoritative sources before and while SCB was perpetrating it. And the duration of support was seven years—which is easily enough to support liability.

In refusing to credit these allegations, the district court mischaracterized the complaint, opining that "Deutsche Bank and Standard Chartered were only involved tangentially in Azizi's VAT fraud." SA31. As explained *supra*, that is incorrect. Plaintiffs allege that Syndicate VAT fraud required banks to be actively complicit, including by engaging in non-routine behavior and facilitating transfers designed to deceive governments. SCB played that role, providing a company for Azizi to use and facilitating his illicit cross-border transactions, including those involving cell phones. JA299-300 (¶¶ 475-76, 479).

The court also erred in concluding that "the connection between the alleged support and the terrorist attacks at issue" was "too attenuated" to constitute substantial assistance. SA45. Accepting plaintiffs' allegations, SCB worked directly

52

with the Azizi Cell to commit VAT fraud, which Azizi used to fund Syndicate operations in Afghanistan. If by "attenuated" the court meant "indirect," it erred because JASTA permits liability "even when the defendant has given assistance only indirectly." *Kaplan*, 999 F.3d at 866. The connection alleged here is less "attenuated" than in *Kaplan*, where the defendant bank assisted Hizbollah affiliates that provided banking, investment, and social services for the organization. *Id*. at 849. The *Kaplan* plaintiffs did not allege that the defendant's customers directly funded terrorist attacks; by contrast, plaintiffs here point to "direct evidence" uncovered by Coalition forces that the Azizi Cell "directly funded the operations of joint al-Qaeda-Haqqani Network-Lashkar-e-Taiba cells in Afghanistan" of the kind that harmed the plaintiffs. JA156 (¶236). A connection only one step away from terrorist attacks is not "attenuated."

On balance, the "substantial assistance" factors plausibly support liability.

## C. Standard Chartered's Money Laundering for Terrorist Operatives Aided and Abetted Terrorist Violence

SCB knowingly helped the Khanani MLO launder tremendous sums. Just like VAT fraud, industrial-scale money laundering does not happen by accident. Instead, bankers and their banks must willingly participate—which makes them generally aware of their role in illegal activity. In addition to that common-sense proposition, SCB knew that it was laundering money for terrorist operatives and allies. That

assistance was also substantial, as it allowed the Syndicate to access massive amounts of cash.

      1.  *SCB was generally aware that it was playing a role in criminal money laundering that foreseeably risked terrorism*

Altaf Khanani was the Syndicate's top money launderer, and SCB's management knew that SCB was laundering money for the Khanani MLO by 2012, when a "senior compliance employee" carrying out "a terrorism-related audit" determined that SCB's Dubai branch had been using SCB New York to perform U.S. dollar money-laundering transactions for the Khanani MLO. JA296-97 (¶466). That employee "understood that Khanani was a suspected agent of terrorist organizations." *Id*. By Spring 2013 the employee determined that SCB New York and Dubai had been facilitating transactions for Khanani fronts, that Khanani was a suspected terrorist money launderer, that revenues from this money laundering scheme supported terrorist activities that killed Americans, that SCB's New York branch was playing an important role in the scheme by enabling U.S. dollar transactions, and that these practices were part of a broader strategy of facilitating high-terrorist-finance-risk U.S. dollar-denominated transactions. JA296-97 (¶466). That same year, two additional whistleblowers confirmed that SCB was aiding Khanani, and concluded that the bank had "blood on its hands." JA298 (¶472). SCB responded by retaliating against the whistleblowers and continuing its relationship

with Khanani—a fact that supports an inference of general awareness for the entire period, especially given SCB's practice of seeking out risky but lucrative customers. JA297 (¶469). Indeed, all of this occurred concurrently with SCB's admission that it had laundered over $250 *billion* for Iranian sponsors of terrorism and lied about it for a decade. JA428 (¶843).

The district court wrongly brushed these allegations aside as conclusory. SA38-39. A conclusory allegation "is but a restatement, with slight changes, of the legal standard." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998). Here, plaintiffs allege that a specific compliance employee conducting a terrorism-related audit made factual determinations at a specific time and place, and then followed up with further investigation—and that two whistleblowers made similar reports. The fact that the employees are not named does not make the allegations conclusory or implausible. Indeed, these allegations are stronger than the ones held sufficient in *Kaplan*. There, the plaintiffs alleged that unnamed speakers, on unidentified dates, asserted that the bank's customers were affiliated with Hizbollah. This Court held that those "allegations, although lacking some details, were not insufficient" because they identified a general time period (several years), the status of the speakers (senior Hizbollah officials), and the circumstances in which the statements were made (interviews); and that "[a]ny further needed specificity can be sought in discovery." 999 F.3d at 864. Here, unlike in *Kaplan*, SCB can easily

55

identify its employees based on information in its possession, and plaintiffs allege that SCB actually received the messages in question. JA296-98 (¶¶466-69, 472).

The district court's conclusion that knowledge in SCB's Dubai branch could not be imputed to SCB elsewhere (SA39) contradicts allegations that SCB operated as "One Bank," JA92 (¶58), and that SCB's foreign branches acted at the behest of SCB New York, which cleared the relevant U.S. dollar transactions, JA89-92 (¶¶49-60). The complaint thus alleges that "[d]ue to the number, frequency, and volume of Khanani's transactions, his laundering activities, and the associated profits, Khanani would have been widely known throughout" SCB, and that his use of the bank "would also have been widely known throughout Standard Chartered Bank due to its 'One Bank' policy." JA295 (¶463). It further alleges that SCB's deliberate, bank-wide participation in money laundering depended on coordination across its global branches, JA434-37 (¶¶862-69), and that SCB Dubai worked closely with SCB in London and New York to launder money, JA442-44 (¶¶884-89).

Based on these allegations, it is at least plausible that reports originating in Dubai about U.S. dollar denominated money laundering transactions for Khanani were communicated with SCB New York (which cleared the transactions) and SCB's home office—as those offices were also communicating with U.S. authorities in connection with SCB's settlements. Regardless, at the pleading stage, it is reasonable to infer that if an SCB Dubai employee could determine that SCB New

56

York was executing transactions for Khanani, SCB New York employees with access to the same information would also figure that out. *See* JA445-46 (¶892); *see also* JA354-58 (¶¶655-63) (cataloguing defendants' data capabilities); *cf. United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011) (evidence "that others with access to the same sources of information available to [the defendant] were able to figure out [an unlawful] scheme" can show the defendant's guilty knowledge).

In addition to those reports, private information alerted SCB to the nature of Khanani's transactions. Khanani's front companies were mere shells with no legitimate trading activity, and therefore had suspicious trading histories. JA365-66, 368 (¶¶682, 688-89). Indeed, subsequent news articles about Khanani were based on leaks of Suspicious Activity Reports filed contemporaneously with the various transactions by banks observing them—confirming that the transactions were suspicious to banks at the time. *E.g.*, JA321 (¶541 n.352). The complaint also alleges that SCB "knew about Khanani's identity, including the connections between Khanani, Khanani's family members, and Khanani MLO entities like Mazaka General Trading and Al-Zarooni Exchange" because, among other reasons, the bank had "know your customer" obligations that would have exposed those connections, and because bankers engaged in criminal money laundering "insist—for personal safety reasons—on knowing the identity of the true beneficiary" of the transactions. JA354, 364-65 (¶¶657, 678).

These allegations refute the district court's conclusion that "the Complaint fails to provide factual allegations from which the Court could even infer that Defendants were contemporaneously aware that either [Al Zarooni or Mazaka] was controlled by Khanani." SA27. Based on information in SCB's possession, it was at least plausibly able to discern that connection—and plaintiffs allege that SCB had actual knowledge. JA295-98 (¶¶463-72). That is more than enough to satisfy the Court's lenient standard for scienter allegations at the pleading stage.

By assisting Khanani, SCB foreseeably aided the Syndicate's terrorist violence. Public sources (including *USA Today*, the *New York Times*, and the Pakistani press) identified Khanani as a major money launderer for the Syndicate as early as 2001, JA361-63, 365-67 (¶¶672-76, 681, 683, 685-87), and explained that Khanani and his family had hands-on involvement with their front companies, JA360-61 (¶¶670-71). By 2008, Khanani had been charged with massive money laundering in Pakistan and was forced to flee the country—raising obvious red flags. JA79-80 (¶7). The complaint also explains that "Syndicate members, collectively, comprised Khanani's largest group of clients," JA224 (¶260). And of course, SCB's compliance employee in Dubai discovered Khanani's transactions during a terrorism-related audit—indicating that the bank itself connected the dots between Khanani and terrorism—and an employee whistleblower concluded that SCB had "blood on its hands." JA298 (¶472).

58

The district court's response to these allegations was striking. The court acknowledged that the Khanani MLO was a major money launderer for the Syndicate—such that "the services provided by Defendants could have supported al-Qaeda or the Haqqani Network." SA28. But, the court reasoned, the services "could just as easily have supported narco-terrorists operating in Mexico, Colombia, and China, or legitimate business ventures"—and for that reason, Khanani's companies were not "so closely intertwined with [al-Qaeda or the Haqqani Network's] violent terrorist activities" to support an inference of general awareness. *Id*. (cleaned up).

This reasoning is fatally flawed. First, the complaint *never* alleges that Khanani's companies engaged in "legitimate business ventures." On the contrary, "the only thing that happened in those companies" was "money laundering." JA321 (¶541). Plaintiffs allege that: "Khanani was an internationally notorious terrorist financier, not a legitimate businessman who sometimes dabbled in terrorist finance"; "Khanani and the entities he controlled had a singular purpose of laundering narcotics proceeds for terrorist groups"; "everything Khanani and his entities did was designed to enable terrorists to profit from drug sales"; and "Khanani and his entities did not engage in any 'legitimate' business." JA365 (¶681); *see also* JA365 (¶682) (alleging specifically that Al Zarooni, Mazaka, and the other Khanani MLO entities "did not conduct any legitimate business," including because "each such

entity was a shell company that did not have a real corporate presence anywhere and raised a litany of obvious counter-terrorist finance red flags"). For the district court to suggest that Khanani transactions could have been legitimate—an argument even SCB did not make—violates basic rules governing the pleading stage.

The complaint does note that Khanani assisted some *criminals* in addition to the Syndicate. But that is no defense! The fact that SCB assisted such a prolific criminal makes it even more clear that the bank was generally aware that it was playing a role in illegal activity—and it doesn't make terrorism any less foreseeable; it just makes other crimes foreseeable, too. In any event, the complaint explains why the Syndicate was the most likely beneficiary of the specific transactions here. First, even Khanani transactions that benefitted other criminals *also* benefitted the Syndicate. That is because Khanani himself was a Syndicate operative who provided critical intelligence and services to al-Qaeda and the Haqqani Network; paid kickbacks to Syndicate organizations based on global profits; and provided benefits to the Syndicate from diversification. JA227-31 (¶¶268-78). Thus, "any time a bank or money transmitter helped Khanani engage in any transaction anywhere in the world it was directly or indirectly aiding-and-abetting terrorist attacks against Americans in Afghanistan" because the Syndicate terrorist organizations "all were effectively 'shareholders' of the Khanani MLO and, as a result, owned a direct

60

percentage of every Khanani MLO dollar." JA232 (¶279). The district court ignored these allegations.

Plaintiffs further allege that laundering transactions for narco-terrorists in Mexico, Colombia, and China "generally took place in their own spheres of influence—not Europe, Russia, the Middle East, or South Asia." JA224 (¶261). Thus, "the likely identity of the Khanani MLO's narco-terrorist client (or clients, in the case of the Syndicate) was obvious from the geographies of the banks upon which the Khanani MLO relied to conduct the transaction." JA224 (¶262); *see also* JA363-64 (¶677) (explaining that defendants would have recognized that money-laundering cash flows into Pakistan were likely for the Syndicate). The district court dismissed this allegation as speculative, refusing to believe that such large swathes of the world were inherently suspicious. But the allegation is not that these regions are *generally* suspicious; it is that insofar as the Khanani MLO was active in these regions, the most likely beneficiary of its activity there was the Syndicate (as opposed to other criminals). That is supported by myriad factual allegations explaining that the Syndicate focused on these regions as sources for funds. JA137-60 (¶¶187-245).

### 2. SCB's money laundering assistance was substantial

SCB's assistance to the Syndicate through Khanani was also substantial. Here, the act assisted was terrorist money laundering that allowed Syndicate to access

funds in Afghanistan. Access to funds, and particularly U.S. dollars, was critical to the Syndicate's ability to attack Americans. The Syndicate depended on money launderers to convert the proceeds of its opium trafficking, protection rackets, and other criminal enterprises into U.S. dollars that it could spend on weapons, supplies, and personnel in Afghanistan—and it depended on Khanani in particular to make sure that its money was safe and growing. From 2009 to 2016, SCB moved at least $5.35 million, and likely many multiples of that, to the Syndicate through the Khanani MLO. JA288-89 (¶446). That is enough to pay for a litany of terrorist attacks. SCB did so as part of a global laundromat strategy in the face of internal whistleblower reports and intense regulatory scrutiny—evidencing a highly culpable mental state over seven years. That is substantial assistance. *E.g.*, *Kaplan*, 999 F.3d at 866 (processing "millions of dollars" for terrorist financiers constitutes substantial assistance).

* * *

Any one of these three channels of assistance would independently support a claim against SCB. Considering the complaint "as a whole," *Kaplan*, 999 F.3d at 865, the aggregated case against SCB at the pleading stage is overwhelming.

## II.    The Complaint States a Claim Against Deutsche Bank

Deutsche Bank enabled Syndicate VAT fraud by both the Azizi Cell and the Ahmed Cell. In addition, DB established a massive money laundering operation

designed to convert Russian rubles into U.S. dollars—catering to the Russian Mafia and the Khanani MLO, and thus allowing the Syndicate to convert its opium profits to U.S. dollars that were then repatriated to Afghanistan. These schemes both provided substantial assistance to the Syndicate. Collectively, these allegations easily state a claim for aiding and abetting.

## A. Deutsche Bank's Facilitation of VAT Fraud by Terrorist Operatives Aided and Abetted Terrorist Violence

Deutsche Bank played a key operational role in terrorist finance by assisting the Azizi and Ahmed Cells, both of which were established by al-Qaeda and the Haqqani Network to steal money from Europe and repatriate it to Afghanistan. Syndicate VAT fraud was extremely easy for banks to detect—and so only complicit banks would participate. JA412 (¶795). Here, DB played a hands-on role in the scheme to commit VAT fraud based on carbon credits (a scheme practiced by both Azizi and Ahmed). JA275-76, 283 (¶¶415, 425).

### 1. *DB was generally aware that it was playing a role in criminal VAT fraud that foreseeably risked terrorism*

DB's management knew what the bank was doing no later than 2009, when a financial crimes investigator repeatedly warned DB that it was engaging in tax fraud, JA275 (¶411), and then in 2010 when German law enforcement raided DB's Frankfurt offices because of VAT fraud suspicion, prompting DB's co-CEO to take notice. JA283-84 (¶¶425-27). Ultimately, multiple DB employees were prosecuted

63

for their role in VAT fraud. JA275 (¶412). And after Azizi was arrested, he identified DB "as his willing financial partner in the Syndicate's VAT Finance Scheme." JA275 (¶414).

Public sources—including FATF, as well as other government and media sources—also linked such fraud to terrorist financing in the 2000s. JA236-37, 368-72 (¶¶294, 690-99). Evidence about the specific cells DB financed was found in a Syndicate cave hideout in 2010. JA236 (¶293). And German authorities represented—and U.S. courts accepted—during Azizi's extradition that the proceeds of the crimes Azizi jointly committed with DB financed terrorism. JA235-36 (¶¶291-92).

That is enough to plausibly allege general awareness because VAT fraud is unambiguously illegal activity—and the robust links between such fraud and terrorism made the Syndicate's violence a foreseeable consequence.

Here, the district court again refused to credit plaintiffs' allegations. The court first stated that DB was "only involved tangentially in Azizi's VAT fraud." SA31. Not so. DB was hands-on in trading carbon certificates and utilizing special procedures to evade regulatory scrutiny. JA275-76 (¶415); *see also* JA260-61 (¶¶363-64) (explaining that it was DB, not Azizi or Ahmed, that "prepared key documentation that enabled the Syndicate to execute its VAT fraud to raise their desired terrorist funds" and that "approved a host of transactions, as well as overrode

64

the concerns of whistleblowers, to maintain the secrecy of the Syndicate's VAT fraud schemes for years").

The court described the trades DB made as "routine banking services." SA32. But participation in VAT fraud "requires a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to do)." JA412 (¶795). Here, DB repeatedly deviated from routine banking behavior. See JA274-76 (¶¶410-15) (cataloguing DB's irregular steps).

The court also disregarded the list of Azizi's transfers to the Syndicate in a footnote where the court, on its own initiative, hunted down what it believed to be the source of those figures and determined that the source did not believe that all the transfers were to al-Qaeda. SA31 n.23. That is manifestly inappropriate: The court was required to credit plaintiffs' allegations, not hunt down materials outside the complaint that might discredit them. It is also wrong: If this Court clicks the link the district court found and scours the resulting paper, it will not find the figures cited in the complaint—because they were not sourced from that paper. What the Court will find is confirmation that a "sworn statement of the German prosecutor" averred that Azizi's VAT fraud funded terrorism. SA31 n.23. The paper notes that this statement was based on 3000 pages of sealed materials, as opposed to publicly available evidence. But that doesn't make the prosecutor's *sworn statement* implausible.

The district court also determined, as it did with SCB, that there was insufficient public information linking Azizi to terrorism before his arrest. SA32. The widespread public information from authoritative sources recognizing VAT fraud as a form of terrorist finance, combined with the information DB had about Azizi (including his age, his Afghan nationality, the fact that he started his fraud using sales of mobile phones to generate the VAT refunds, and the fact that he was perpetrating a massive VAT fraud scheme at a time when the Syndicate was relying on such schemes for funds) made it at least plausibly foreseeable that Azizi's fraud was connected to the Syndicate.

The district court deemed plaintiffs' allegations about the Ahmed Cell conclusory with almost no analysis. SA29. But the complaint explains that DB processed carbon-related trades on behalf of the Ahmed Cell, JA283 (¶425), and that employees internally expressed concern about it, JA393 (¶741). Thus, from 2005 until 2010, DB transferred at least $10 million for the Ahmed Cell. JA256-57 (¶352). That is enough to allege that DB helped the Ahmed Cell commit VAT fraud—and other allegations about how banks *only* participate in Syndicate VAT fraud knowingly apply equally here. E.g., JA411-16 (¶¶794-809).

### 2. *DB's VAT fraud assistance was substantial*

DB's assistance to the Syndicate through VAT fraud was even more substantial than SCB's. All the arguments applicable to SCB's VAT fraud apply

66

here—and then some. *See supra* pp.51-53. Thus, plaintiffs allege that DB's participation in VAT fraud routed more than $18 million to the Syndicate between 2005 and 2012. JA256-57, 276-80 (¶¶352, 417). DB also facilitated access to cell phones, providing key operational support to the terrorists. JA281 (¶¶420-21). It did so through direct relationships with Syndicate operatives Azizi and Ahmed. As an active and willing participant in the fraud, DB's mental state was culpable (indeed, multiple DB bankers were arrested for their prominent roles in the scheme), and DB's support lasted "for more than a decade," JA486 (¶1020). These allegations easily render DB's assistance "substantial" under *Halberstam*.

### B. Deutsche Bank's Money Laundering for the Russian Mafia and Terrorist Operatives Aided and Abetted Terrorist Violence

Deutsche Bank's Russian Laundromat was a truly audacious criminal scheme that exploited the bank's multinational structure to surreptitiously convert rubles in Russia to U.S. dollars abroad without regulatory scrutiny. DB deliberately established this scheme in collaboration with the Russian Mafia, and even internally described it as a "Laundromat." JA475 (¶990). Criminality pervaded the scheme, the essence of which was to conduct transactions with no economic value that served no purpose other than moving large amounts of money undetected. *E.g.*, JA392 (¶739). Participants discussed the scheme openly, JA475-76 (¶¶990-91), and management at DB's highest levels knew about and blessed it even while the bank was on clear

notice of serious and widespread compliance issues, JA476-77 (¶¶992-93, 995-96); *see also* JA267 (¶¶384-85).

DB was also aware that industrial-scale money laundering from Russia would invariably assist the Syndicate, which was the Russian Mafia's opium joint-venture partner—because public sources made this clear. JA119-20, 148-49, 239-42, 269 (¶¶137-39, 215-17, 301-05, 311, 390). The Khanani MLO also used DB's Russian laundromat to move money—providing an independent connection to the Syndicate. JA228, 258-59, 270-74 (¶¶270, 355-58, 392-407). Indeed, DB invited these organizations to use its operation to move their dirty money, thus assuming "an active operational role in al-Qaeda and its Syndicate affiliates." JA260-61, 269 (¶¶362-64, 391).

### 1. DB was generally aware that it was playing a role in criminal money laundering that foreseeably risked terrorism

DB thus knew that it was engaged in illegal activity, and the Syndicate's terrorist violence was a foreseeable consequence because of the nature of DB's money-laundering customers and their transactions.

The district court held that this was not enough "to establish Deutsche Bank's general awareness of its role in Syndicate terrorist attacks in Afghanistan" because the complaint lacks facts connecting money laundering in Russia to terrorism in Afghanistan. SA23-24. But the Court ignored all of the allegations drawing precisely

that connection—for example a book published before September 11, 2001 explaining that "bin Laden and the Russian Mafia [had] established yet another complex money laundering operation" that was "used to finance the Taliban [] and a host of Islamist terror operations," and which revolved around laundering opium profits. JA239-40 (¶302). Many other public statements made before and during the relevant time drew similar connections, explaining that the Russian Mafia and Syndicate terrorists were collaborating to launder the proceeds of Syndicate opium sales so that the Syndicate could use those funds for terrorism. JA238-42 (¶¶298-311). Public sources similarly revealed connections between Khanani and the Syndicate. *See supra* pp.14-17.

The district court also erred in holding that DB was off the hook because, in an ecosystem awash with money laundering, DB would not "be able to differentiate services which, for example, supported organized crime in Latin America as opposed to supporting al-Qaeda carrying out terrorist acts." SA24. This reasoning is refuted *supra* pp.60-61. Whether DB knew the purpose of any particular money laundering transaction is irrelevant because it knew that it was playing a role in an overall illegal activity—and the Syndicate's terrorist violence was *one foreseeable risk* of that activity. The law does not require terrorist violence to be *the only* risk of the activity the defendant assisted, any more than murder was the only risk of the burglary enterprise in *Halberstam*.

69

*2. DB's money laundering assistance was substantial*

DB's money laundering assistance was substantial for the same reasons as SCB's. *See supra* pp.61-62. DB allowed the Syndicate to repatriate at least $50 million over a seven-year period. JA256-57 (¶¶351-52). DB's assistance also provided secrecy, which further contributed to violence. JA473-74 (¶¶986-87). And it solved one of the Syndicate's biggest financial problems: Transforming opium proceeds into untraceable U.S. dollars. DB did all of this pursuant to criminal schemes that its own bankers planned and executed, evidencing a highly culpable mental state—for over seven years.

**III. The Complaint States a Claim Against Danske Bank**

From 2007 until 2016, Danske deliberately operated a major laundromat in Estonia, JA319 (¶534), processing over $233 billion in suspicious transfers, JA484-85 (¶1012), including funds for black-listed Russian customers, known Khanani fronts like Mazaka General Trading, JA320-21 (¶¶538, 540), and Syndicate VAT fraudsters (the Ahmed Cell) using the platform Swefin, JA322-23 (¶¶546-50). As Danske Bank's criminal guilty plea shows, its scheme was criminal through-and-through. It also foreseeably contributed to Syndicate violence in Afghanistan.

*1. Danske was generally aware that its massive money-laundering operation was an illegal activity that foreseeably risked terrorism*

Danske knew that its laundromat risked funding terrorism for several reasons.

70

First, the sheer scale of it. This was the largest criminal money laundering operation in the world, principally moving money for suspicious Russian customers—of the type who had long been linked to terrorist finance. Second, the laundromat's location. As far back as 2001, "Estonia served as a key finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide," and was particularly important "with respect to one of the Syndicate's most important funding streams: Afghan opium," which frequently passed through Estonia. JA158 (¶¶239-41). The Syndicate's presence meant that "Defendants knew that transactions raising a risk of financial crimes like money laundering also foreseeably risked aiding al-Qaeda and the Haqqani Network. For example, due diligence publications regularly alerted Defendants to the significant presence of Islamist terrorist cells and operations in Estonia." JA158 (¶242).

The district court ignored or downplayed the allegations against Danske Bank. With respect to the Khanani MLO, the court improperly refused to credit the allegation that Mazaka had accounts at Danske Bank, SA48, implying that the account might have been held by somebody else when the complaint plainly alleges otherwise, JA321 (¶540). The court then reasoned that even if Danske did business with Mazaka, that would not support an inference of awareness. But if a Dubai-based shell company choosing to bank with Danske's backwater Estonian branch that Danske knew was principally engaged in money laundering is not suspicious, then

71

nothing is. The links between Mazaka and the Syndicate's terrorism are discussed *supra*.

The district court also attempted to minimize Danske Bank's guilty plea, describing it as occurring "in a completely separate fraud case." SA48. But the guilty plea was to defrauding U.S. banks by processing dishonest transactions for the Estonian laundromat's customers—*i.e.*, the exact conduct at issue here. It has long been public knowledge that access to U.S. dollars is a key goal of terrorist financiers, JA336-37 (¶608)—and so Danske plausibly knew that by enabling that access, it was providing a vital service to the terrorists.

The district court also disregarded the complaint's allegations regarding Swefin's accounts at Danske, which VAT fraudsters used to launder the proceeds of their schemes. The district court held that there was no allegation of "any specific connection between Swefin's Danske Bank accounts and terrorist financing." SA50. That is wrong—and as plaintiffs explained below (in a part of their opposition the district court never addressed), the issue can be addressed by an amendment to the complaint, if necessary. As the complaint explains, the Italian press reported that the VAT fraud run through Swefin was used to finance al-Qaeda in Afghanistan. JA323 (¶553). The complaint connects this Italian fraud explicitly to both Danske and to terrorism in Afghanistan. *See* JA322-23 (¶¶546, 553). To the extent more is required, plaintiffs can amend the complaint to cite the article discussed *supra* n.4, which

explains that the Italian fraud was the Ahmed Cell—a fundraiser for al-Qaeda and the Haqqani Network.

### 2. *Danske's money laundering assistance was substantial*

Danske provided "tens of millions of U.S. Dollars to the Syndicate." JA472 (¶981). This assistance was the result of a longstanding criminal scheme involving Syndicate agents and partners. It lasted "for nearly a decade" from 2007 until 2016. JA486 (¶1022). That, combined with the allegations of scienter discussed *supra*, is plausibly substantial under this Court's holding in *Kaplan*.

## IV. The District Court Improperly Rejected Plaintiffs' Claim for Aiding and Abetting the Taliban-al-Qaeda Campaign

Count two of the complaint alleges that in addition to aiding the attacks that injured plaintiffs, defendants aided and abetted the Taliban-al-Qaeda Campaign, comprising a pattern of racketeering acts that included, but were not limited to, the attacks that injured plaintiffs. JA669-71 (¶¶2036-37, 2040). This district court held that this campaign does not meet the statutory definition of an "act of international terrorism," which in the district court's view refers only to the specific attacks that injured plaintiffs. SA60-61. In support, the district court relied on a district court decision that had been reversed, as well as a magistrate judge's decision relying on the reversed decision.

The district court was wrong. "Acts of international terrorism" have always been understood to be broader than specific attacks. Before JASTA was enacted, for example, plaintiffs routinely brought claims alleging that the "act of international terrorism" was the defendant's provision of ongoing support to terrorist organizations—and no court ever suggested that such support was not an "act," as the statute uses the term. *See, e.g.*, *Linde*, 882 F.3d at 326 (holding that a jury must decide whether the provision of material support meets the definition of "international terrorism"); *Boim v Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) (holding that the provision of material support to terrorist organizations can qualify as an act of international terrorism).

Indeed, courts often use the word "act" to describe a multifaceted enterprise. *See*, *e.g.*, *United States v. Pregler*, 925 F.2d 268, 269 (8th Cir. 1991) ("A [three-year] conspiracy is an ongoing act"). Under the Dictionary Act, the singular word "act" includes the plural. *See* 1 U.S.C. § 1. And in *Halberstam* itself, the "act assisted" was not the individual murder but the long-running "burglary enterprise." 705 F.2d at 488. Just as the D.C. Circuit held Hamilton liable for assisting the "act" of a "five-year-long burglary campaign," so have plaintiffs pleaded defendants' liability for assisting the "act" of a multiyear terrorist campaign when the attacks that injured the plaintiffs were carried out in furtherance of that campaign. *Id*. Indeed, that is the only sensible conclusion in the JASTA context, as there is no

reason to think that Congress was interested in insulating defendants who assist terrorist campaigns from liability.

## CONCLUSION

This Court should reverse the decision below. If the Court determines that any of the district court's criticisms of the complaint were valid, it should hold that the court erred in denying leave to amend to cure those concerns.

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Geoffrey P. Eaton
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
Tel: 202-629-3530
tejinder.singh@sparacinopllc.com
geoff.eaton@sparacinopllc.com

May 11, 2023

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit established by this Court's order dated April 11, 2023 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 16,789 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


/s/ Tejinder Singh
Tejinder Singh

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2023, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.

/s/ Tejinder Singh
Tejinder Singh