# No. 23-132

## United States Court of Appeals for the Second Circuit

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY,
TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER,
PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FEDERICK C. BENSON,
BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER,

*(caption continued on inside cover)*

Appeal from the United States District Court
Eastern District of New York (No. 1:19-cv-11876-AKH)

## JOINT APPENDIX VOL. 2 (JA301-600)

Brian T. Frawley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for the Danske Bank Defendants*

Sharon L. Nelles
Andrew J. Finn
Bradley P. Smith
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for the Standard Chartered Bank Defendants*

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
202-629-3530

*Attorneys for Plaintiffs-Appellants*

David G. Januszewski
Sheila C. Ramesh
Sesi V. Garimella
Isabella Abelite
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000

*Attorneys for the Deutsche Bank Defendants*

MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL,, RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER, TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD, PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE, PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS, LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ, FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE, KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE, PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS, JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS, CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM, DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH HIS NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS NEXT FRIEND, STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, MICHAEL FESTUS FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH HIS NEXT FRIEND, KARA GIBSON, KARA GIBSON, JESSICA ANNE BENSON, JOANNA GILBERT, EMMITT DWAYNE BURNS, JANICE CARUSO, PAUL EDWARD GOINS, III, PATRICIA GOINS, DANA RAINEY, L. C. D., BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW

GOLLNITZ, TYLER GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK
GORDON, ADRIAN KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN
CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY
ANDERSON, GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN,
DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY HARDISON,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA HARDISON, SHEILA
RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER,
BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM SAMUEL HARTSWICK, ALEX
HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY
LOUISE HORNS, BENJAMIN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN
ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE
ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M.
HUNTER, KENNA HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT,
SHELBY IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT,
CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND, CHARLOTTE
LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE,
PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT FRIEND, KENT ALAN
SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS, TRENT LORNE SKEENS, Z. R. S.,
BY AND THROUGH HER NEXT FRIEND, KENT ALAN SKEENS, BRIAN CHRISTOPHER
JERGENS, TERENCE LONNIE JONES, JOHN C. MCCARTHY, ALISON R. POHN, KEVIN
KING, STEPHANIE ANN MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY
AND THROUGH HER NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN
LAMBKA, JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR,
MEREDITH LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA
LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT FRIEND
MIRANDA LANDRUM, JAMES R. LANDRUM, JANET LANDRUM, MIRANDA LANDRUM,
HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR., ALEXANDER LAU, DAVID WILLIAM
HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID
WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM
HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN
SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR
MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G.
MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ
HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L.
MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT
FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE
PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK
CHARLES MCEVOY, JANICE H. PROCTOR, LUANN VARNEY, SHANNON K. MCNULTY,
JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J.
METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA

KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS, NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L. OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS, TRACY ANNE HERRING, ADAN PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ, B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ, S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY, KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS W. PETERS, G.R.P., BY AND THROUGH HIS NEXT FRIEND, ASHLEY PETERS, CHRISTINE H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS, BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ, SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J. SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN

SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY, LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS, GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS, LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE, GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY, FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN, NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE, CHRISTOPHER MICHAEL VAN ETTEN, CATHERINE KIMBERLY VAUGHN KRYZDA, C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L. WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN, KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART LAMAR PERRY, AARON WILLIAM PRESCOTT,

Plaintiffs - Appellants,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND

ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST, KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R., BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY STRANGE, KEVIN WILLIAMS,

    Plaintiffs,

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

    Defendants - Appellees,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN BRANCH, DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH, PLACID NK CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE LLC,

    Defendants.

_____

# TABLE OF CONTENTS

## Volume 1

Docket Entries ................................................................................................1

Stipulation and Notice of Voluntary Dismissal Without Prejudice as to Certain of the Named Defendants (Doc. 10) ...........................................62

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) ..............66

## Volume 2

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) (cont'd) ................................................................................................301

## Volume 3

Corrected Amended Complaint Under the Anti-Terrorism Act (Doc. 38) (cont'd) ................................................................................................601

    Exhibit A to Corrected Amended Complaint (Doc. 38-1) ..........................674

Declaration of Brian T. Frawley in Support of Danske Bank Defendants' Motion to Dismiss (Doc. 45) ...................................................698

    Exhibit 1: Chart of Attacks (Doc. 45-1) ...................................................700

    Exhibit 3: Article in *Corriere Della Sera* (Doc. 45-3) ...............................710

    Exhibit 4: Article in *Süddeutsche Zeitung* (Doc. 45-4) .............................714

    Exhibit 5: Article in *Business Recorder* (Doc. 45-5)..................................721

Declaration of Sheila C. Ramesh in Support of Deutsche Bank Defendants' Motion to Dismiss (Doc. 49) ............................................727

    Exhibit 1: Transcript from December 7, 2021 pre-motion conference (Doc. 49-1) ............................................................................729

Declaration of Andrew J. Finn in support of Standard Chartered Bank Defendants' Motion to Dismiss (Doc. 55) ...........................................751

    Exhibit 1: U.S. Department of State list of Foreign Terrorist Organizations (Doc. 55-1) ...........................................................................753

Exhibit 2: Written Agreement by and Among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004) (Doc. 55-2) ..............................769

Exhibit 3: Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah, *United States* v. *Sum of $70,990,605*, No. 1:12-cv-01905 (D.D.C. Feb. 22, 2019) (Doc. 55-3) ...................................................................................783

Exhibit 4: Verified Complaint for Forfeiture in Rem, *United States* v. *Sum of $70,990,605*, No. 12-cv-1905 (D.D.C. Nov. 20, 2012) (Doc. 55-4) ...................................................................................789

Exhibit 5: Adam Luck, *Whistleblower Says Bank Has Blood on Its Hands: RAF Veteran Claims Standard Chartered Helped Iran Terrorists, Ahead of Court Battle*, THIS IS MONEY (Sept. 7, 2019) (Doc. 55-5) ......................................................................807

Exhibit 6: Richard Holmes, et al., *Standard Chartered's Iran Problems Didn't Go Away*, BUZZFEED NEWS (Sept. 21, 2020) (Doc. 55-6) ...................................................................................816

Excerpts of Exhibit 8: Amended Complaint, *Zobay* v. *MTN Grp Ltd.*, No. 21-cv-03503 (E.D.N.Y. Feb. 9, 2022) (Doc. 55-8) ......................834

Stipulation and Order of Voluntary Dismissal as to Danske Markets Inc. (Doc. 69) ...................................................................................841

Plaintiffs' Notice of Appeal (Doc. 92) ...................................................843

482.     Shadman used SCB New York accounts to facilitate at least several hundred thousand USD, annually, in cash payments to the Taliban, including its Haqqani Network.

483.     After the U.S. government determined that Shadman had aided the Syndicate, it instituted proceedings against Shadman's account on November 20, 2012. One of the motivations that compelled the U.S. government to seize Shadman's correspondent bank accounts at SCB New York, through AIB (which acquired SCB Afghanistan earlier in 2012), was its finding that Shadman aided Haqqani Network attacks.

484.     The U.S. government initiated the asset seizure against Shadman for more than $10,100,000 at a correspondent USD account at SCB New York maintained in connection with a Shadman-related USD account at AIB. Shadman's account had been at SCB Afghanistan from 2009 through September 2012, when AIB acquired SCB Afghanistan and its Shadman customer relationship. Shadman's SCB New York's accounts included, but were not limited to, account numbers 050210000527810, 050210001288613, and 05021020014251115.

485.     Seven years later, the matter settled with the U.S. government imposing a fine and retaining a substantial amount of the money.[319]

486.     From 2009 through at least 2012, Shadman used SCB New York accounts to facilitate regular bulk cash USD payments, denominated in $100 bills, as "taxes" paid to the Taliban and Haqqani Network, with each such regular payment totaling tens thousands of dollars per payment. On information and belief, Shadman used SCB New York accounts to facilitate the transfer hundreds of thousands of U.S. Dollars per year to the Taliban, and, collectively, at least several million U.S. Dollars to the Taliban and Haqqani Network from 2008 through 2012.

---

[319] *See* Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah (Feb. 22, 2019).

487.     From 2008 through at least 2012, Shadman used Standard Chartered Bank accounts, including accounts at SCB New York, to facilitate USD-denominated laundering activities in support of Syndicate suicide bombings. Among other things, Shadman used Standard Chartered Bank accounts to process at least several hundred thousand dollars of funding for the Syndicate's suicide bombing network targeting Americans in Afghanistan.

### 3.     Iran's Terrorist Sponsors – NIOC and NITC

488.     The SCB Defendants knew that NIOC and NITC served as a front for Iranian terrorism through the IRGC's Hezbollah Division and Qods Force.  Among other reasons, SCB Dubai personnel have admitted it, SCB Dubai whistleblowers have confirmed it, and the Department of Justice has prosecuted SCB because of it.

489.     On information and belief, from 2006 through 2016, Standard Chartered Bank, SCB Dubai, and SCB New York caused tens of millions in U.S. Dollars each year to flow through illicit transactions with NIOC and NITC, into Hezbollah and Qods Force accounts, which funded al-Qaeda's and the Taliban's terrorist campaign against Americans in Afghanistan from 2006 through 2016.

490.     The Department of Justice confirmed the plausibility of Plaintiffs' allegations against Standard Chartered Bank when it prosecuted SCB, yet again, for the same SCB Dubai-related transactions identified by Plaintiffs.

### 4.     Mustafa Ahmed al-Hisawi

491.     Hisawi served as al-Qaeda's paymaster and key financial planner. Hisawi chose Standard Chartered Bank as his banking partner and relied upon his SCB Dubai account to

distribute funds for 9/11 through SCB New York. As the *Independent* put it, "Standard Chartered [was] used to finance [the] 11 September attacks."[320]

492.     Hisawi's choice of Standard Chartered Bank is a telling indicator of the potency of the bank's Laundromat. As "[a]l Qaeda's Money Man," "[f]ew people kn[e]w more about the cash end of the business than al-Hawsawi."[321] The fact that Hisawi surveyed the financial universe in Dubai – with its dozens of banking options – and choose Standard Chartered Bank demonstrates al-Qaeda financiers' perception of the value offered by SCB's Laundromat.

493.     SCB Dubai knew of the terrorist finance-related "red flags" associated with Hisawi's transactions. While nothing the 9/11 hijackers did in their interactions with American banks inside the United States would have led the banks to suspect criminal behavior, the same cannot be said for Hisawi's interactions with SCB Dubai. As Hisawi helped plot 9/11, SCB Dubai recklessly provided banking services to him while disregarding multiple obvious "red flags" even under pre-9/11 standards. *First*, SCB Dubai recklessly permitted Hisawi to open an account in the first instance while knowing that Hisawi had supplied a fictitious employer in his SCB Dubai account application, using a fake, non-existent company called Al Khata Alumi. *Second*, SCB Dubai permitted Hisawi to use a pseudonym, Hashim Abdulrahman, instead of his real name. *Third*, in the context of these red flags, SCB Dubai ignored the terrorist finance risk associated with round-figure USD transfers from the U.A.E. to the United States, when Hisawi initiated one or more transfers of totaling $16,500 to Ramzi Binalshibh before 9/11.

---

[320] Chris Hughes, *Standard Chartered 'Used to Finance 11 September Attacks'*, Independent (Dec. 14, 2001), 2001 WLNR 7397401.

[321] Newsweek, *Al Qaeda's Money Man* (Mar. 24, 2003), 2003 WLNR 10694399.

494.    Hisawi used his account at SCB Dubai to facilitate more than $100,000 in USD transfers from Hisawi to 9/11 hijackers, including Marwan al-Shehhi and Mohammad Atta, which transactions were routed through SCB New York.

495.    After 9/11, al-Qaeda desperately needed to move its money and, once more, it relied on Hisawi's SCB Dubai account, which Hisawi used to receive about $16,300 of unused funds from the 9/11 hijackers, returned to him through SCB New York, to be shared with al-Qaeda leadership to help the group survive after 9/11.

496.    On information and belief, Hisawi used his Standard Chartered Bank accounts to repatriate at least $100,000 back to al-Qaeda leadership from after 9/11 through his detention in 2003.

497.    Hisawi's use of Standard Chartered Bank accounts to support Syndicate operations was a foreseeable consequence of SCB New York's and SCB Dubai's embrace of Standard Chartered Bank's Laundromat Strategy, and Hisawi would not have been able to use Standard Chartered Bank accounts to support Syndicate operations if SCB London and SCB New York had not facilitated SCB Dubai's practice of the Strategy.

**5.    Viktor Bout**

498.    "Standard Chartered … had [a] relationship[] with a company controlled by notorious Russian arms dealer Victor Bout."[322]

499.    From the late 1990s through his capture in 2008, Bout was aided by the SCB Defendants' reckless commercial practices, including but not limited to, SCB Dubai's and SCB New York's provision of financial services to Bout and/or fronts that SCB Dubai and SCB New

---

[322] Jason Nisse, *UK Banks Admit to Links with Russian Gun Runner*, Independent on Sunday (UK) (Oct. 5, 2003), 2003 WLNR 13909331.

York knew were linked to Bout, including but not limited to SAGT.[323] These services aided Bout's ability to run guns, bombs, gold, cash, and drugs for al-Qaeda and the Taliban, which directly aided the terrorists' ability to regroup from 9/11 through 2008.

### 6. Abdul Baqi Bari

500.    Abdul Baqi Bari was a dual-hatted al-Qaeda/Haqqani Network terrorist who, among other roles, served as the "right hand" of Jalaluddin Haqqani. He was also a Standard Chartered Bank customer for years.

501.    Bari maintained accounts at Standard Chartered Bank for the specific purpose of funding Haqqani Network operations, including Jalaluddin's leadership activities. Jalaluddin was also the beneficiary of accounts maintained by Bari at SCB Pakistan after 9/11 through at least 2006.

502.    On February 27, 2006, Pakistan's FIA froze one or more SCB Pakistan USD-related accounts controlled by Bari (or an entity he controlled) as part of an attempt to interdict Haqqani Network efforts to use Pakistani banks to transfer overseas funds from accounts in Dubai and elsewhere into terrorist accounts in Pakistan to use against Americans.

503.    Bari's frozen Standard Chartered Bank accounts included, but were not limited to, accounts at SCB Pakistan's branch in Peshawar, a notorious Syndicate stronghold. The accounts were in Bari's name and/or companies traced to Bari's name and contained at least several hundred thousand USD that Bari used to fund Jalaluddin Haqqani's terrorist enterprise. The FIA account freezes related to several million dollars in total account activity including more than $2

---

[323] In November 2002, the U.A.E. government kicked Bout and his operation out of the Emirates. On information and belief, Bout and/or one or more front companies associated with Bout continued using one or more SCB accounts to support Bout's operations on behalf of al-Qaeda and/or the Taliban after Bout's exit from the U.A.E. until Bout was arrested in 2008.

million in USD-related transfers to Syndicate operatives enabled by SCB Pakistan and SCB New York.

504.    When the Treasury Department imposed sanctions on Bari on May 17, 2012, Bari-controlled accounts at Standard Chartered Bank, including on information and belief SCB Pakistan, SCB London, SCB Dubai, and SCB New York, were among the "bank accounts" referenced by the Treasury Department.

**C.    Standard Chartered Bank Enabled Syndicate CAN Fertilizer Bomb Logistics**

505.    In addition to its role in terrorist finance, Standard Chartered Bank also knowingly assumed an operational role in the al-Qaeda's CAN fertilizer bomb campaign. Some background about that campaign is in order. But to avoid burying the lede, Standard Chartered Bank knowingly provided foreign exchange and export finance services to two Pakistani fertilizer companies that produced the overwhelming majority of CAN fertilizer used in Syndicate bombs. It did so despite years of press coverage and government statements linking that fertilizer to bombs and noting that the companies were not taking action to stop it. Indeed, Standard Chartered did so even after Lieutenant General Mike Barbero, the head of the Department of Defense's Joint IED Defeat Unit ("JIEDDO"), personally visited Standard Chartered's New York office in January 2013 and told the bank that its clients were facilitating the killing and maiming of American troops. LTG Barbero subsequently declared that Standard Chartered was "utterly useless" in taking action to disrupt the supply chain.[324] Instead, the bank

---

[324] Adam Luck, *US General Claims He Told Standard Chartered Its Client Helped the Taliban— But the Bank Did Nothing*, Daily Mail.com (Dec. 7, 2019), https://www.dailymail.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html.

continued to reap profits from these Syndicate-aligned fertilizer companies, and in the process supported the Syndicate's bombmaking enterprise.

506. In 2008, the Syndicate began dramatically increasing its emphasis on the use of ammonium nitrate bombs derived from CAN fertilizer, often called "CAN fertilizer bombs," which is a long-standing signature al-Qaeda bomb design.[325] Indeed, by 2007, it was widely recognized around the world that CAN was regularly "used to kill, to mass murder" and was "one of the weapons of choice for Al Qaida."[326] While associated with suicide truck bombs, al-Qaeda also used CAN fertilizer to make large anti-armor IEDs, small anti-personnel IEDs, suicide vests, and all other manners of suicide VBIEDs.

507. This shift to the use of fertilizer bombs transformed the conflict. When "American military fatalities in Afghanistan doubled in 2009" "perhaps the strongest force driving the Taliban's ability to inflict mounting casualties" "[was] its use of crude but powerful roadside bombs" "made of [CAN] -- fertilizer bombs, in essence, but of a size unseen before 2009, and now commonly ranging up to 1,000 pounds, big enough to flip a heavy armored vehicle like a toy."[327] "[T]hese" CAN fertilizer bombs "proved to be 'the surface-to-air missile of this war,' as a senior intelligence official" explained, "a rueful reference to the weapon that helped" the "mujahedin" "drive the Soviet military out of Afghanistan in 1989."[328]

---

[325] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, PA News (Apr. 30, 2007).

[326] Rep. Bennie Thompson, *quoted in* CQ-RollCall Political Transcriptions, *Rep. Bennie Thompson Holds a Markup of H.R. 1680, the Secure Handling of Ammonium Nitrate Act of 2007* (Apr. 18, 2007), 2007 WLNR 30462827.

[327] Laura King, *War Toll Likely to Get Even Worse; U.S. Troop Fatalities in Afghanistan Doubled to 318 Last Year. The Taliban's Bomb Tactics were a Big Factor*, L.A. Times (Jan. 1, 2010), 2010 WLNR 32019. CAN is sometimes referred to simply as "ammonium nitrate" and Plaintiffs refer to ammonium nitrate as "CAN" for efficiency's sake.

[328] *Id.*

508.  It would have been apparent to anybody looking that the CAN fertilizer bombs being deployed by Syndicate terrorists in Afghanistan were made of fertilizer being obtained from Pakistan, and specifically from two related companies: Fatima Fertilizer Company Limited, and Pakarab Fertilizers Limited. This was so for two reasons. First, these companies had a monopoly or near-monopoly on the production of CAN fertilizer in Pakistan—and much of the CAN fertilizer flowing into Afghanistan was coming from Pakistan. Second, Coalition forces were frequently seizing large stashes of CAN fertilizer, often in the original packaging bearing Fatima or Pakarab's name, from terrorists.[329]

509.  CAN fertilizer bombs derived from Fatima and Pakarab CAN fertilizer were the Syndicate's single most effective weapon for killing and maiming Americans in Afghanistan and countering the most advanced American armored vehicles. JIEDDO concluded that "[a] 110-pound bag of [CAN], a common fertilizer produced in Pakistan," exclusively made and sold by Fatima and Pakarab, "can produce 82 pounds of explosives, enough to destroy an armored truck or 10 smaller bombs targeting troops on foot."[330] As one analyst observed:

> None of the existing technology, to the chagrin of U.S. commanders, has been able to crack the toughest nut of the war on IEDs: bombs made of [CAN] fertilizer. Lacking enough metal content to make them detectable by traditional sensors, these explosives have been the bane of U.S. forces. Soldiers have dubbed these large bombs 'Buffalo killers' because they can destroy a heavily armored Buffalo mine-protected truck [also known as an "MRAP"].[331]

---

[329] Associated Press, *NATO: Huge Cache of Bomb Material Seized* (Nov. 10, 2009), https://www.nbcnews.com/id/wbna33820786; Asian News International, *US Look to Crackdown Source of Pakistani Fertilizer CAN Explosive* (Jan. 11, 2012), 2012 WLNR 665399.

[330] Tom Vanden Brook, *Drones Fight IEDs in Afghanistan*, USA Today (July 15, 2012).

[331] Sandra I. Erwin, *Buried Bombs Can Be Destroyed, But Not Defeated*, National Defense, Volume 96; Issue 698 (Jan. 2012), 2012 WLNR 30107637.

510.    That explosive capability meant that by 2009, "*[a]mmonium nitrate fertilizer bombs* [had] become the deadliest weapons used by" Syndicate terrorists to attack Americans.[332] By 2011, "[t]he use of roadside bombs in Afghanistan" ha[d] reached record highs, with US forces struggling to cut off the flow of Pakistani fertilizer used to build them."[333] As JIEDDO explained, "[d]uring the last 12 months, an unending supply of [CAN], originating almost exclusively from Pakistan, has been used to produce IEDs in Afghanistan despite a countrywide ban" on importing CAN fertilizer.[334] As *UPI* reported the views of JIEDDO, "*Afghan insurgents rel[ied] on fertilizer bombs*," with Fatima and Pakarab CAN fertilizer being "*the low-cost choice for [IED] makers in Afghanistan*."[335]

511.    The problem grew so bad that in November 2009, the Afghan Government, along with Coalition forces, adopted a new policy towards CAN fertilizer. Under this policy, American service members, Afghan police and military, and other Coalition members, were entitled to presume that all CAN fertilizer was potentially aiding and abetting al-Qaeda's CAN fertilizer bomb campaign in Afghanistan, and to seize *all* CAN fertilizer – regardless of the owner's identity or explanation for possessing the product. Simply put, the U.S. military concluded that CAN fertilizer in the region posed an inherent risk to American lives given the probability of its use by al-Qaeda, the Haqqani Network, and their allies. After the announcement, the U.S. government publicly and privately communicated its new "zero tolerance" CAN fertilizer policy to participants in the Afghanistan and Pakistan marketplace. Among other techniques, U.S.

---

[332] UPI NewsTrack, *Huge Bomb-Making Operation Found* (Nov. 11, 2009).

[333] Mathieu Rabechault, *In Afghanistan, More and More Roadside Bombs*, Agence France Presse English Wire (Aug. 7, 2011).

[334] *Id.*

[335] UPI NewsTrack, *Afghan Insurgents Rely on Fertilizer Bombs* (Nov. 26, 2011) (emphasis added).

government officials helped raise awareness of the new policy through a series of interviews in international news outlets, like the *New York Times*. For example, on November 12, 2009, the *Times*' award-winning war correspondent, Dexter Filkins, reported that the new policy was "aimed at taking the fertilizer out of the hands of Taliban insurgents," and permitted NATO forces to seize fertilizer "regardless" of the specific on-paper connection between the owner and insurgents.[336]

512.    In January 2010, Afghan President Hamid Karzai banned possession, production, and importation of CAN fertilizer in Afghanistan because of its demonstrated, and critical, role in the production of IEDs and suicide bombs used to perpetrate attacks in Afghanistan by al-Qaeda and its Taliban ally.

513.    Notwithstanding these actions, CAN fertilizer was continuously purchased in Pakistan and smuggled across the border into Afghanistan, where it was used to make homemade bombs.

514.    Fatima and Pakarab's role in the Syndicate's bombmaking knowledge was a matter of widespread public knowledge no later than September 1, 2011, when the *Associated Press* published a long report regarding Fatima's and Pakarab's key role in the Syndicate's fertilizer bomb campaign ("*AP* Report"):

> The **main ingredient in most of the homemade bombs** that have killed hundreds of American troops … is fertilizer produced by a **single company in Pakistan** … Enough [CAN] fertilizer for at least **140,000 bombs** was legally produced **last year by Pakarab Fertilizers Ltd.**, then smuggled by militants and their suppliers across the porous border into … Afghanistan, according to U.S. officials. The U.S. military says around **80 percent of Afghan bombs are made with the fertilizer** … The [U.S.] began talks a year and a half ago with Pakistani officials and Pakarab … But there is still no regulation of distribution and sale of [CAN]

---

[336] Dexter Filkins, *Afghan Bomb Cache Found; Huge Stash of Fertilizer had Potential to Create Thousands of Explosives*, N.Y. Times (Nov. 12, 2009), 2009 WLNR 22615622.

fertilizer. … Around Multan, dealers … say they are aware [CAN] can be used as an explosive, but *none has been told to report suspicious purchases*.

Pakistani fertilizer producers are not permitted to export to Afghanistan … But the *low price of fertilizer in Pakistan … has meant that smuggling has long been rife*. The chemical, known as CAN, is often trucked into southern Afghanistan … One dealer … told [the *AP*] *wealthy people with links to the insurgents placed orders for all three fertilizers produced by Pakarab*. They sold the two safer varieties domestically, then trucked the [CAN] across the border. …

Explosives can be made from a range of fertilizers, *but it is easy to turn CAN into a bomb*. … The fertilizer is sold in 110-pound [] sacks, which can be used to make between two and four bombs depending on whether they are targeting vehicles or foot patrols, said … an expert at [JIEDDO], who visited the Multan factory… Such bombs …have killed more than 719 Americans … since the conflict began … Last year's U.S. death toll – 252 – was as high as the two previous years combined, and 2011 is shaping up to be just as bloody.[337]

515.     Senior government officials also made clear statements about the risks of CAN fertilizer bombs. The head of JIEDDO, LTG Barbero, gave a 2011 speech to the Institute of Land Warfare, amplifying the U.S. government's concerns and stated, among other things, that JIEDDO had concluded that: (1) about "80 percent of IEDs in Afghanistan [were] made from [CAN] coming from fertilizer plants in Pakistan, specifically, two factories in Pakistan" (alluding to Fatima and Pakarab), where "[e]ach factory produce[d] as much as 400,000 metric tons of the material each year"; (2) under Fatima's and Pakarab's practices, "about one percent" of their CAN fertilizer was transferred "to insurgents," who "easily turned" the CAN fertilizer "into inexpensive explosives"; and (3) about "*90 percent* of [U.S.] casualties in Afghanistan" came "from ammonium nitrate explosive" derived from Fatima and Pakarab CAN fertilizer.[338]

---

[337] Chris Brummitt, AP Asia, *AP Impact: Pakistani Fertilizer Fuels Afghan Bombs* (Sept. 1, 2011) (emphasis added).

[338] C. Todd Lopez, *JIEDDO Working to Reverse Trend for Larger IEDs in Afghanistan*, Army News Service (Nov. 10, 2011) (emphasis added). The casualty percentage (90%) is higher than the IED percentage (80%) because fertilizer bombs derived from CAN fertilizer were the most devastating weapon in the Syndicate's arsenal, and uniquely capable of countering American protective measures, even the most heavily armored U.S. vehicles.

516.     The U.S. government attempted to stop the illicit flow of CAN fertilizer at the source, approaching Fatima and Pakarab about ways to prevent terrorists from obtaining CAN fertilizer, and to prevent it from being smuggled unlawfully over the border into Afghanistan. But the companies refused to provide any assistance whatsoever. After an international incident between the United States and Pakistan toward the end of 2011, the companies essentially broke off contact with the U.S. government, even though they had known for years that their products were being weaponized in bulk to create thousands of deadly bombs.

517.     U.S. officials also determined that "stop[ping] U.S. companies from trading with IED-connected entities" was an essential part of the American strategy of "going after these nefarious actors and effectively countering the networks that use IEDs."[339]

518.     Around the same time, it became apparent that rogue elements within the Pakistani ISI (an intelligence agency) were likely involved in efforts to keep the supply of CAN fertilizer flowing to terrorists. The ISI favors certain terrorist groups that threaten to destabilize what it perceives as Pakistan's geopolitical rivals, including India, Afghanistan, and the United States. Thus, the ISI has frequently been accused of conspiring with terrorist groups, providing support to such groups, and protecting them from reprisals by governments.

519.     For example, a September 21, 2012 exchange between LTG Barbero and a Member of Congress reflected the widespread U.S. government view at the time that Fatima and Pakarab had joined rogue ISI's conspiracy with the Haqqani Network to support CAN fertilizer bomb attacks against Americans in Afghanistan, including the specific view that Fatima's and Pakarab's refusal to dye their Fatima Group CAN Fertilizer was the give-away that Fatima and

---

[339] Rowan Scarborough, *Army's Vehicles Not Enough; Taliban Just Build Bigger Bombs*, Washington Times (Aug. 6, 2012), 2012 WLNR 16538203.

Pakarab intended to support rogue ISI's conspiracy to aid Haqqani Network CAN fertilizer bomb

attacks:

> MEMBER: … [W]e're all extremely frustrated … this has been going on for years… we [] keep going back to Pakistan, our supposed ally …what kind of ally would allow for this type of activity to continue? … [I]f we had two major fertilizer plants in Mexico and people were smuggling across … a small amount of fertilizer and killing five U.S. citizens a week, … we'd do something about it pretty quickly. And here we are today losing approximately five U.S. servicemen a week or having horrific injuries, and it seems that we're unable to do anything with our supposed ally in Pakistan. … *The Haqqani Network continues to operate with impunity* … especially in some of the border regions … Without any assistance with the Pakistanis at all, how are we going to deal with this?

> BARBERO: *Congressman, I can't argue with anything you said.* …

> MEMBER: … [A]ny aid and assistance that we have to Pakistan should be directly tied to their assistance to us to help us deal with these fertilizer plants in Pakistan and *especially something as simple as adding a color or an odor to the production of this fertilizer*. And I know those offers have been made. Those offers have been made to cover the cost of it and *they're not interested in doing it because I'm sure the ISI finds it convenient to continue to be able to work with the Haqqani Network to smuggle this* across the border. *Let's just call it the way it is.* They *like to destabilize* the Afghan government, destabilize the NATO allies. *They're fighting in Afghanistan and the Pakistanis continue to deal with these people […] to kill American soldier[s] every day.*[340]

520.    Terrorism experts also noted the nexus between rogue ISI hostility towards the

United States and Fatima's and Pakarab's refusal to change their intentional practices relating to

Fatima Group CAN Fertilizer. For example, in September 2012, Daniel Goure of the Lexington

Institute, explained that the "green on blue problem" – *i.e.*, a terrorist threat from an ally –

involves not just individuals or small groups but also rogue actors of national governments,

which was a "problem that has confronted the U.S. vis-à-vis Pakistan for most of the last

decade," and had been demonstrated by the fact, among other things, that "[m]ost of the [CAN]

---

[340] *Rep. C.W. Bill Young Holds a Hearing on Joint IED Defeat Organization*, CQ-RollCall Political Transcriptions (Sept. 21, 2012) (emphasis added), 2012 WLNR 30213606.

that goes into Taliban IEDs that kill Americans in Afghanistan comes from two Pakistani [*i.e.*, Fatima- and Pakarab-owned] factories."[341]

521.    Prominent retired American general officers have reached the same conclusion about Fatima's and Pakarab's willingness to conspire with rogue ISI to provide direct operational support for the Taliban, including the Haqqani Network. For example, in 2020, former Vice Chief of Staff of the U.S. Army General Jack Keane publicly stated, in sum and substance, that rogue ISI supported the Taliban and had "built two chemical fertilizer factories for them," referencing the Fatima and Pakarab factories that supplied Fatima Group CAN Fertilizer to the Syndicate. In the same statement, GEN Keane identified rogue ISI's relationship with Fatima and Pakarab, and the resulting supply of Fatima Group CAN Fertilizer to Syndicate terrorists targeting Americans in Afghanistan, as an example of "support" for the Taliban.

522.    Similarly, on January 27, 2013, the *Washington Times* reported that Fatima was seeking to "expand in [the] U.S., but balk[ing] on controlling bomb materials":

> ***Fatima's fertilizer components are used by terrorists in Pakistan and Afghanistan to build homemade bombs*** -- the No. 1 killer of American service members in Afghanistan. ***Fatima's corporate leaders know this is happening***, based on communications with [] administration officials and military leaders, ***but they have refused pleas to control the flow***, according to [Barbero].[342]

In the same article, the *Washington Times* reported that, "[a]s Fatima stiff-arm[ed] the U.S. military, it [was] eyeing a chunk of the American fertilizer market," and simultaneously planned

---

[341] Daniel Goure, Ph.D., Lexington Institute, *What are the Rules of Engagement in a World of Green on Blue Violence?*, States News Service (Sept. 24, 2012).

[342] Rowan Scarborough, *Pakistani Fertilizer Firm to Expand in U.S., But Balks on Controlling Bomb Materials*, Washington Times (Jan. 27, 2013) (emphasis added), 2013 WLNR 2165350.

a new investment in an American fertilizer plant in Indiana through a new Fatima Group subsidiary called Midwest Fertilizer Corporation.[343]

523.   On January 29, 2013, the *Washington Times* reported that American officials who focused on the IED threat had concluded that: (1) Fatima's and Pakarab's deliberate practices relating to Fatima Group CAN Fertilizer were indispensable to the Haqqani Network's ability to commit CAN fertilizer bomb attacks at scale against Americans in Afghanistan; and (2) Fatima and Pakarab were intentionally aiding the Haqqani Network by obstructing U.S. efforts to reduce the CAN fertilizer bomb threat in order to side with rogue ISI, who opposed any changes to Fatima's and Pakarab's CAN fertilizer practices:

> [Former Congressman Duncan Hunter] served as Marine officer in Iraq and Afghanistan says ***"it's crazy"*** that [Fatima] is being allowed to build a plant in the U.S. while it rejects Pentagon pleas to control its products that end up in homemade bombs that kill American troops, adding that ***Fatima was a "pseudo-terrorist organization that won't comply with any of our requests."***
> "We're not asking them to curtail production," said Mr. Hunter, who has been a leading voice in Congress in urging the Pentagon to come up with ways to defeat homemade bombs. "At the very least, they should have to comply with our requests for them to manage their [CAN] better. Fatima controls it all," Mr. Hunter said, adding that Fatima's assistance could drastically reduce the number of homemade bombs in Afghanistan. … Mr. Hunter also said that ***Fatima is influenced by "bad actors in Pakistan who want to create havoc and chaos in Afghanistan and thwart the U.S. efforts there***…"[344]

524.   The *Washington Times* corroborated Congressman Hunter's Fatima allegations and reported that "a government source who was informed of the congressman's comments said there is evidence that Pakistan's [ISI] is influencing Fatima," "[e]lements of ISI helped establish the Taliban in Afghanistan as an ally on its western front, and U.S. intelligence sources say ISI

---

[343] *Id.*

[344] Rowen Scarborough, *Subsidy for Fertilizer Company 'Crazy'; Marine Vet Can't Fathom a Deal with Pakistanis Tied to Roadside Bombs*, Washington Times (Jan. 29, 2013) (emphasis added), 2013 WLNR 2278333.

continues to help the insurgents to this day in their war with the elected government in Kabul," and that American efforts to get Fatima to reduce the Syndicate's CAN fertilizer bomb supply had been "cut off by the Pakistan government."[345]

525.    Each Standard Chartered Bank Defendant facilitated Fatima's and Pakarab's USD-denominated commercial sales, operations, and financing, and thereby enabled Fatima's and Pakarab's unlimited supply of Fatima Group CAN Fertilizer to the Haqqani Network.

526.    Fatima has publicly identified "Standard Chartered Bank" as one of the "**MAJOR BANKERS OF THE COMPANY**,"[346] and Fatima and Pakarab ordinarily follow the same practices. Each SCB Defendant, by providing financial services to Fatima and Pakarab while knowing that Fatima and Pakarab were supplying the Haqqani Network Fatima Group CAN Fertilizer – which was used to cause ninety percent (90%) of all American casualties in Afghanistan – assumed a role in al-Qaeda's CAN fertilizer bomb campaign and the Haqqani Network's CAN fertilizer bomb pipeline.

527.    Standard Chartered Bank's financial services to Fatima and Pakarab directly supported Fatima's and/or Pakarab's use of SCB New York's USD-denominated foreign exchange, correspondent account, and letter-of-credit services in connection with the sale of Fatima Group CAN Fertilizer. This is because: (1) Fatima and Pakarab regularly engaged in cross-border transactions in which the use of USD accounts at SCB New York was involved, directly or indirectly, in enabling the transaction to occur; and (2) Fatima and Pakarab ordinarily priced their goods in USD, and, as a consequence, needed a robust USD facility with SCB New

---

[345] *Id.*

[346] Fatima Fertilizer Company Ltd., *Prospectus* at 67 (Jan. 18, 2010) (emphasis in original).

York to hedge their credit risk and enable the smooth operation – and regular supply to the Syndicate – of Fatima Group CAN Fertilizer manufacturing and sales.

528.    In fall of 2012, JIEDDO leadership, including LTG Barbero, began an effort to complement their attempts to persuade Fatima and Pakarab to cease supplying the Syndicate with easy-to-divert fertilizer by identifying corporations and banks that, directly or indirectly, facilitated the Syndicate's CAN fertilizer bomb pipeline through Fatima and Pakarab. Once identified, senior JIEDDO personnel, including but not limited to LTG Barbero, contacted the identified complicit entity to encourage them to change their practices in order to interdict the flow of Fatima and Pakarab fertilizer to Syndicate terrorists to save American lives.

529.    In January 2013, JIEDDO leadership, led by LTG Barbero, met in person with senior executives at SCB New York's office ("New York Meeting"). The purpose of the New York Meeting was for LTG Barbero to communicate to Standard Chartered Bank through the assembled SCB New York executives, how the SCB Defendants were directly facilitating CAN fertilizer bomb attacks against Americans in Afghanistan.  During the New York Meeting:

(i)     LTG Barbero told SCB executives that Fatima and Pakarab were the exclusive source of the CAN fertilizer which was a vital ingredient in the CAN fertilizer bombs that accounted for approximately 80% of all American bomb casualties in Afghanistan.

(ii)    LTG Barbero presented SCB executives detailed data showing the key role that Fatima and Pakarab supply of Fatima Group CAN Fertilizer played in enabling anti-American terrorism in Afghanistan, including, but not limited to, charts and quotes concerning the same.

(iii)   LTG Barbero explained to SCB executives that Fatima and Pakarab had repeatedly refused to cooperate with American efforts to stop, or even reduce, the unfettered flow of Fatima Group CAN Fertilizer into Afghanistan for use by al-Qaeda affiliated terrorists by doing things such as applying a colorful dye to the fertilizer so that it would be harder for Haqqani Network operatives to smuggle.

(iv)    LTG Barbero showed SCB executives detailed American casualty figures from Afghanistan – including specific categories of injuries, such as death or loss of limb – that LTG Barbero believed were attributable to the Fatima and Pakarab transactions

relating to Fatima Group CAN Fertilizer that were facilitated by SCB New York's provision of financial services to Fatima and Pakarab.

(v)   LTG Barbero showed SCB executives a map of the state-of-the-art facilities that Fatima and Pakarab used to manufacture Fatima Group CAN Fertilizer as they relate to the Haqqani Network's logistics ratlines, to further show the key, and unique, geographic role that Fatima and Pakarab supply of Fatima Group CAN Fertilizer played in the Haqqani Network's CAN fertilizer bomb logistics infrastructure.

(vi)  LTG Barbero showed SCB executives photos of evidence derived from terrorist detentions in Afghanistan, which showed bags of Fatima Group CAN Fertilizer that had been seized from Taliban (including Haqqani Network) terrorists.

(vii) LTG Barbero told SCB executives that SCB New York provided irreplaceable foreign exchange and export finance services to Fatima and Pakarab, that Fatima and Pakarab would not be able to supply terrorists in Afghanistan with Fatima Group CAN Fertilizer at the scale necessary to sustain the Syndicate's nationwide CAN fertilizer bomb campaign without SCB New York's provision of financial services to Fatima and Pakarab, and that JIEDDO was urging SCB New York to cease its provision of financial services to Fatima and Pakarab to save American lives by preventing future CAN fertilizer bomb attacks against Americans in Afghanistan.

(viii) Alluding to Standard Chartered Bank's notorious reputation for deliberately facilitating Iranian proxy-related terrorist finance (which had been in the news only about a month prior), LTG Barbero told Standard Chartered Bank executives that SCB's track record was cause for additional concern, and LTG Barbero implored SCB New York to change its practices and end relationships, like those with Fatima and Pakarab, that played a role in aiding terrorist attacks against Americans.

(ix)  SCB New York communicated to LTG Barbero, in sum and substance, that Standard Chartered Bank would consider the points made by LTG Barbero during the meeting, falsely implying that SCB took JIEDDO's terrorism-related concerns seriously.

530.   Standard Chartered Bank never followed up with LTG Barbero or did anything positive – they blew JIEDDO off. Standard Chartered Bank's deliberate silence reflected its consciousness of guilt and awareness, by each SCB Defendant, that Standard Chartered Bank had enabled terrorist violence against Americans in Afghanistan.

531.   Rather than ending their role in the Syndicate's CAN fertilizer bomb campaign in Afghanistan and exiting the terrorist enterprise, each Standard Chartered Bank Defendant continued providing financial services to Fatima and Pakarab until at least 2015.

532.     It was widely understood that Afghanistan's and Pakistan's well-known permissive environment for the Syndicate's CAN fertilizer bomb infrastructure was essential to the Syndicate's access to this prized bombmaking ingredient. This ensured that market participants, including Defendants, understood that they were playing a role in carrying out the Syndicate's bomb attacks. As one complicit Pakistani admitted in an interview, ***"I know that it's used to kill American soldiers*** … [b]ut people in the tribal areas [in Pakistan] don't have any choice" other than deliberately sell CAN fertilizer to terrorists.[347]

## D.     Danske Bank Enabled Syndicate Terrorist Finance

533.     Danske Bank directly routed millions of USD to al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company. Among its other terrorist finance schemes, Danske Bank: (1) operated its own Laundromat that was also purpose-built, like the Russian Laundromat, to enable narcotics-related terrorist finance, including al-Qaeda and Haqqani Network finance; and (2) facilitated large-scale VAT fraud by al-Qaeda operatives in Europe. Both schemes routed millions of USD to terrorist agents, operatives, and fronts acting for the Syndicate. Plaintiffs outline each below.

### 1.     Danske Bank Enabled Syndicate Terrorist Finance Through Its Laundromat

534.     From 2007 through 2016, Danske Bank operated a laundromat out of its Estonia branch, and laundered substantial sums for Khanani, the Russian Mafia, the leadership of Azerbaijan, the Syndicate, and others.[348]

---

[347] Alex Rodriguez, *Bribes Keep Taliban Flush with Explosives*, L.A. Times (May 8, 2010) (emphasis added), 2010 WLNR 9039604.

[348] SNL European Financials Daily, *Danske Bank expands Estonia branch probe over potential money laundering* (September 25, 2017), 2017 WLNR 29604102.

535. Reportedly, Danske Bank's Estonian laundromat made over $233 billion dollars in suspicious transactions during that time period. Danske Bank's laundromat has been called the "Global Laundromat" due to its magnitude and geographic reach.

536. A large proportion of the money that transferred via these transactions was denominated in USD.

537. It was reported in 2017 that Danske Bank's violation of money-laundering rules, failure to monitor transactions, and failure to adequately identify clients had been "extensive and systematic and took place over a long time." Larse Krull of the Danish Aalborg University was quoted as saying: "It concerns transactions to such a degree that all the alarm bells should go off in the banks."[349]

538. Khanani was able to "exchange large and suspicious amounts for accounts in [Danske Bank's] name."[350] A customer of Danske Bank's Estonia branch, which purportedly had "hidden owners," exchanged millions with the Dubai-registered company Mazaka General Trading, an entity notoriously linked to Khanani.

539. On information and belief, the Khanani MLO used Danske Bank's Laundromat to source millions of USD for al-Qaeda and the Haqqani Network. For example, during a single four-month period on 2014, the Khanani MLO obtained more than $700,000 through Danske's Global Laundromat. Since Danske did not have a U.S. branch, Deutsche Bank's branch in New York (DBTCA) worked with Danske to complete the transaction.

---

[349] Arutz Sheva (Israel), *Danish Anti-Israel Moralizers in Huge Corruption Scandal* (Sept. 8, 2017), 2017 WLNR 27750168.

[350] Pak Revenue, *Pakistan's Altaf Khanani Got Huge Sums from Account in Danske Bank* (Sept. 22, 2020), http://pakrevenue.com/pakistans-altaf-khanani-got-huge-sums-from-account-in-danske-bank/.

540.     Investigative reports by respected media outlets confirmed that Danske Bank financed al-Qaeda and its allies through the Khanani MLO. For example, the German newspaper *Süddeutsche Zeitung* reported that Danske enabled USD cash flow to the Khanani MLO through its front, Mazaka General Trading, and reported: (1) "Mazaka was a company used by one of the most wanted money launderers at the time, Pakistani Altaf Khanani," (2) Mazaka's "customers" included "[t]errorist organizations such as al-Qaeda" "and the Taliban"; and (3) "[b]etween April and August 2014" "a total of $720,000 flowed into [Mazaka's] account at Danske Bank."[351]

541.     Richard Grant, the former head of the Australian intelligence service was quoted as saying "[t]here can only be one reason why money has been moved out of Danske Bank and into [Khanani's] trading companies - and that is money laundering. Because that was the only thing that happened in those companies."[352]

542.     As the Economist pointed out, "Danske missed chance after chance to stop the sluice."[353] It was not until 2015 that Danske Bank began addressing the issue, and not until 2016 that the subject accounts at the Estonia branch were all finally closed.

543.     After its Global Laundromat was exposed, Danske Bank conducted its own internal investigation which found "major deficiencies in controls and governance that made it possible to use Danske Bank's branch in Estonia for criminal activities such as money

---

[351] Frederik Obermaier, Mauritius Much, Hannes Munzinger, Meike Schreiber, *Dänische Waschmaschine*, Süddeutsche Zeitung (Sept. 23, 2020), https://www.sueddeutsche.de/wirtschaft/finanzskandal-daenische-waschmaschine-1.5042107.

[352] Business Recorder, *FinCEN Files: Pakistan's Altaf Khanani got huge sums from account in Danske Bank* (September 21, 2020), https://www.brecorder.com/news/40020006.

[353] The Economist, *Money-laundering: Questionable shape* (September 22, 2018), 2018 WLNR 29196326.

laundering." The CEO of Danske Bank then resigned, reportedly due to the scandal related to uncovering the Danske Bank laundromat.

544.    Danske Bank publicly stated that it has "taken a number of measures against current and former employees" "in the form … of warnings, dismissals, loss of bonus payments and reporting to the authorities," in response to its own investigation of its Laundromat.

545.    The Organized Crime and Corruption Reporting Project concluded that Danske Bank had violated at least 47 different anti-money laundering regulations. Danske Bank was subject to a control action in 2015 concerning compliance with measures of anti-money laundering and terrorist financing prevention, due to these money-laundering financial transactions. Danske Bank recently announced that "Danske Bank has been preliminarily charged by the Danish State Prosecutor for Serious Economic and International Crime with violating the Danish Anti-Money Laundering Act on four counts all relating to Danske Bank's Estonian branch in the period from 1 February 2007 to the end of January 2016."[354] U.S. financial crime authorities continue to investigate.

**2.     Danske Bank Enabled Syndicate Terrorist Finance Through Its VAT Fraud Schemes**

546.    It has been reported that in 2009 and 2010, the treasuries of Germany, Italy, and Spain were victims of VAT fraud, which was perpetrated using a Danske Bank account in the name of a company called Swefin.

547.    Finans and the daily newspaper *Information* gained access to documents via the German research organization Correctiv showing that Danske Bank set up an account for other

---

[354] Professional Wealth Management (PWM), *Danske Scandal Should Lead to Renewed Scrutiny of New Clients* (Feb. 27, 2019), 2019 WLNR 6352499.

later convicted VAT fraudsters at a time when several major European banks had dropped trading in $CO_2$ quotas—the scheme here—due to revelations of extensive fraud in the area.[355]

548.     In 2009, Danske Bank, via one of its branches in Denmark, allowed accounts controlled by the Danish-owned company Swefin to conduct VAT fraud of over $100 million.

549.     Over the course of five months in 2009, a fraudster named Mohammad Safdar Gohir, along with others, sent DKK 830 million through the Danske Bank account in Hørsholm, via an account which belonged to Swefin.

550.     Swefin was a payment platform, but it operated as a way to avoid regulation for criminal enterprises, and allowed VAT fraudsters to hide their cash flows from the authorities.

551.     Danske Bank thereby became a tool to hide the cash flows from the perpetrators' crime.

552.     Richard Ainsworth, adjunct professor at Boston University and a lawyer, explained that "[g]etting the money transferred to Swefin is like going through the gateway to the legitimate banking world. Then Swefin moved the money through several banks before they eventually ended up in a personally owned account or were simply reinvested in a new trip around a VAT carousel in the EU.

553.     In 2010 the same account in Danske Bank was used in another case of VAT fraud. This time, Spain was defrauded of approximately $40 million. Here, again, the Swefin account was used. It was reported by the Italian daily *Corriere Della Sera* that this VAT fraud had been used, among other things, to finance al-Qaeda in Afghanistan.

---

[355] Jette Aagaard, Niels Sandøe, and Matias Seidelin, *1 Mia. Kr Fra Svindelsager i Flere Europæiske Lande Kørte Gennem Danske Bank*, Finans.dk (May 26, 2019) (translated by Plaintiffs), https://finans.dk/finans2/ECE11392127/1-mia-kr-fra-svindelsager-i-flere-europaeiske-lande-koerte-gennem-danske-bank/?ctxref=ext.

554.    According to the newspaper, the Italian authorities were warned by the United States after U.S. and British troops found documents from the scam during an operation in the mountains between Afghanistan and Pakistan in 2010.

555.    Again, in 2016, while Danske Bank was dealing with the fallout from the Estonia branch money laundering fraud, millions of kroner flowed from suspected VAT fraud through a director's company account at Danske Bank in Denmark.

556.    Danske Bank, who allowed a 23-year-old Lithuanian man set up the account without ever showing up at the bank, has been criticized for its lack of control, particularly where management of the bank resides at its main branches in Denmark.

557.    Finanswatch reported on the fraud scheme in 2019:

> After its money laundering scandal in Estonia, Danske Bank is now criticised for connections to a suspected VAT fraud after DKK 51mn (EUR 6.83mn USD 7.88mn) was moved through a Lithuanian director's Danish Danske Bank account. The account had been created without the account's owner ever having appeared at the bank. The money went from the account to an exchange agency and disappeared thereafter. The company, to which the Lithuanian director is connected, has become part of Operation Greed, which has so far led to appeals against 17 people for extensive VAT fraud. Independent consultant Graham Barrow said that Danske Bank should have noticed the suspicious transactions, while he added that it nonsense to claim that money laundering was an issue only in Estonia when suspicious transactions have taken place in the company's homeland Denmark.[356]

558.    These types of VAT fraud schemes have been linked to terrorist finance. For example it has been reported that Abdessamad Fateh, also known as Abu Hamzah, a Specially Designated Global Terrorist, pursued these VAT-fraud enterprises in Denmark. Fateh is known to have ties to al-Qaeda.

---

[356] Finanswatch (via M-Brain Industry Insight (Denmark)), *Denmark: Danske Bank Criticised for Connections to Suspected VAT Fraud* (May 27, 2019).

559. The proceeds from VAT fraud are diverted, typically through a series of shell companies, to fund terrorism, including by al-Qaeda.

560. Published reports indicate that VAT fraud in Denmark accounted for approximately $12 million in terrorist finance.

561. In 2019, it was reported that fourteen businessmen had defrauded the Danish Treasury for years, raking in some $120 million through VAT fraud. Two of the businessmen were reported to be suspected of direct ties with the Islamic State and al-Qaeda. At the time, money laundering expert and senior adviser at Aalborg University, Lars Krull, reportedly commented that he feared that part of the money was used to finance terrorism.

**E.      Placid Express Enabled Syndicate Terrorist Finance**

562. Defendant Placid Express is an international money remitter.

563. Placid Express knowingly assumed a role in the Syndicate's terrorist fundraising and finance activities by directly aiding al-Qaeda's and the Haqqani Network's terrorist finance activities supporting attacks against Americans in Afghanistan.

564. Al Zarooni Exchange, which is one of Altaf Khanani's principal money laundering vehicles for the Syndicate, claimed a relationship with Placid Express.[357]

565. A currency remitter called Prime Currency Exchange Ltd.—owned and operated by Javed Khanani and then by another Khanani associate—remitted over $100 million to Pakistan using Placid Express and other unnamed money changers between 2009 and 2013. Prime Currency reported that it had "an agency agreement with Placid Express" to remit those funds to Pakistan. The relationship appeared active through at least 2016.[358]

---

[357] C4ADS, *Sandcastles: Tracing Sanctions Evasion Through Dubai's Luxury Real Estate Market* 28 (2018).

[358] All statements in this paragraph appeared *id*. at 28.

566.    Placid Express also has a partner company, Placid Express Middle East LLC, which shares multiple phone numbers with a U.S.-sanctioned company directly owned by multiple Khanani family members.[359]

567.    Based on these facts, Plaintiffs allege that Placid Express knowingly remitted millions of dollars for the Khanani MLO during the relevant time period.

568.    On information and belief, Placid Express at all relevant times facilitated transactions involving known or suspected Syndicate fronts, operatives, and/or agents in Afghanistan, Pakistan, or the U.A.E., which in turn facilitated Syndicate terrorist logistics, terrorist finance, or terrorist fundraising.

569.    When Placid Express helped Khanani wash and transfer hundreds of thousands of U.S. Dollars to the Syndicate, Placid Express assumed a role in al-Qaeda and its Syndicate affiliates' operations.

570.    Placid Express knowingly provided substantial assistance to the Syndicate, by allowing the Khanani MLO to transfer and wash USD for the Syndicate's benefit. Placid Express knew it was facilitating criminal activity by allowing the Khanani MLO to use Placid Express to transfer USD worldwide, and Placid Express knew that the Syndicate and the Syndicate's terrorist acts would benefit thereby.

571.    Discovery will likely reveal significant additional relationships between Placid Express and Khanani, the Khanani MLO, and the Syndicate.

**F.    Wall Street Exchange Enabled Syndicate Terrorist Finance**

572.    Defendant Wall Street Exchange knowingly assumed a role in the Syndicate's terrorist fundraising and finance activities by directly aiding the Syndicate's efforts to repatriate

---

[359] *Id.*

illicit USD back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

573.    Wall Street Exchange is one of the largest remitters in the Middle East and wholly owned by the UAE government and headquartered in Dubai. A money remitter is a payment service provider that accepts funds from a payer for the purpose of making them available to a payee, without necessarily maintaining an account relationship with the payer or payee.

574.    Wall Street Exchange provided essential financial services that directly benefited the Syndicate from at least 1995 through 2016. Wall Street Exchange substantially assisted the Syndicate's terrorist enterprise by facilitating a massive number and total amount of USD fund transfers. This is why Wall Street Exchange has been identified by law enforcement agencies as a conduit for money laundering and financial transactions related to illicit, illegal, and terrorist acts.

575.    Wall Street Exchange allowed Altaf Khanani, the Syndicate's leading money launderer and financier, who was at all relevant times the world's most notorious terrorist controller, to transfer funds using Wall Street Exchange's facilities.

576.    Wall Street Exchange laundered money for Khanani through his Khanani money laundering organization. Khanani's organization used Wall Street Exchange to transfer funds as part of its money laundering operations. Wall Street Exchange has been reported to be a "key conduit" for the billion-dollar money laundering operation run by Khanani.

577.    At all relevant times, and on information and belief from 1995 through 2015, the Khanani network laundered between $14 billion and $16 billion per year for organized crime syndicates across the world. At all relevant times, Khanani laundered money for the Syndicate.

On information and belief, Khanani laundered hundreds of millions if not billions of dollars for the Syndicate each year, including the years preceding the attacks at issue in this Complaint.

578.     On information and belief, Wall Street Exchange at all relevant times facilitated transactions involving known or suspected Syndicate fronts, operatives, and/or agents in Afghanistan, Pakistan, or the U.A.E., which in turn facilitated Syndicate terrorist logistics, terrorist finance, or terrorist fundraising.

579.     An Assistant Commissioner of the Australian Federal Police told an Australian investigative journalism television program that Khanani's money laundering operation was run through currency exchanges, and Wall Street Exchange was one that Khanani used for that purpose.

580.     That same government official told reporters that Wall Street Exchange knew it was evading anti-money laundering rules and supporting illicit groups, stating that the Khanani network was laundering between $14 billion and $16 billion a year for organized crime syndicates across the world.

581.     When Wall Street Exchange helped Khanani wash and transfer millions if not billions of U.S. Dollars to the Syndicate, Wall Street Exchange assumed a role in al-Qaeda and its Syndicate affiliates' operations.

582.     Wall Street Exchange knowingly provided substantial assistance to the Syndicate, by allowing the Khanani MLO to transfer and wash U.S. Dollars for the Syndicate's benefit. Wall Street Exchange knew it was facilitating criminal activity by allowing the Khanani MLO to use Wall Street Exchange to transfer U.S. Dollars worldwide, and Wall Street Exchange knew that the Syndicate and the Syndicate's terrorist acts would benefit thereby.

583.     The Syndicate went on to commit wrongful acts, including the attacks outlined in this Complaint, in part facilitated and aided by Wall Street Exchange allowing the Khanani MLO to transfer U.S. Dollars.

584.     By 2008, Wall Street Exchange understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al-Qaeda and the Taliban based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world, and regularly reported on by major media outlets.

585.     The amount and longevity of Wall Street Exchange's assistance to the Syndicate cannot be overstated. Over the course of years, Wall Street Exchange allowed the Khanani MLO to transfer funds hundreds if not thousands of times, in amounts that total hundreds of millions if not billions of U.S. Dollars.

586.     The funds that Wall Street Exchange transferred for the Khanani MLO went to the Syndicate and were used to perpetrate terrorist acts.

587.     Wall Street Exchange knew that the money transferred via its facilities would be received by the Syndicate and used to perpetrate terrorist acts.

588.     Wall Street Exchange thereby accepted fees and facilitated vast sums of terrorist finance through transfers to Syndicate agents, operatives, and fronts.

589.     Wall Street Exchange's unlawful acts were not "one-off" instances of Khanani and Syndicate operatives slipping through the cracks of Wall Street Exchange's otherwise rigorous counter-terrorist finance practices. Rather, the nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to execute demonstrate that Wall Street Exchange pursued this business because it was lucrative.

590.     Discovery will likely reveal significant additional relationships between Wall Street Exchange, on the one hand, and Khanani, the Khanani money laundering organization, and the Syndicate, on the other.

## III.   DEFENDANTS WERE GENERALLY AWARE THAT THEY WERE PLAYING A ROLE IN ILLEGAL ACTIVITY FROM WHICH TERRORIST VIOLENCE WAS A FORESEEABLE RISK

591.     None of the transactions or business relationships described in the preceding Part was above-board. All were instead marked by bright red flags of criminality that made Defendants aware that by participating, they were playing a role in illegal activity.

592.     Terrorism was also a foreseeable consequence of those transactions. By doing business with Syndicate affiliates like the Khanani MLO, Russian Mafia, Syndicate VAT fraud cells, Hikmatullah Shadman, Fatima and Pakarab, and the other Syndicate agents and operatives, Defendants took part in activities that carry a high risk of sending money to terrorist organizations—and terrorist organizations spend their money to perpetrate acts of terror. As explained above and in greater detail below, the connections between these sorts of criminal transactions and Syndicate violence have been well-established since well before the first attacks at issue in this case. Thus, at all relevant times, Defendants could foresee that their unlawful activity would facilitate terrorist attacks against American in Afghanistan.

593.     The Syndicate, including the Taliban and its affiliates, institutionalized control of its laundered revenue to ensure that such monies were recycled into the terrorist campaign against Americans. The laundering of money occurred via a highly regulated process designed to ensure that such efforts would benefit the broader insurgency. The Taliban's 2009 Code of Conduct, for example, contained extensive regulations governing the distribution of illicit funds. As Ms. Peters explained, those regulations "literally institutionaliz[ed] how profits earned from

organized crime are to be distributed within the command chain."[360] The money flowed both ways – from local commanders up to the Financial Commission for use by the Taliban's central leadership, and conversely from the leadership back down to local commanders for use in the field. In all cases, the Quetta Shura maintained the last word on all matters concerning the disposition of criminal earnings and laundered Taliban funds. That discipline allowed overseas terrorist finance to be effectively recycled back to the Taliban's leadership to finance the Taliban's terrorist machine around the country.

594.    The terrorist finance and logistical support that Defendants routed to the Haqqani Network also funded Taliban attacks, and vice versa. The Haqqani Network was part of the Taliban and operationally intertwined with Taliban leadership. For that reason, according to a declassified 2009 DIA cable, "a large majority of the Haqqani Network (HQN) funding comes from the Quetta . . . , Pakistan-based Taliban leadership."[361] As Ms. Peters concluded, the Haqqani Network relied on the Taliban organization to "cover operational costs," with the amount of financing depending on "the funding capacity of the Taliban leadership."[362] The financial and logistical flow went both ways: funding for the Taliban supported Haqqani attacks, and funding for the Haqqani Network supported Taliban attacks; similarly, explosives obtained by the Haqqanis supported Taliban attacks, and explosives obtained by the Taliban supported Haqqani Network attacks.[363]

---

[360] Gretchen Peters, *Crime & Insurgency In The Tribal Areas Of Afghanistan & Pakistan* at 16, Combatting Terrorism Ctr. (Oct. 15, 2010) ("Peters, *Crime & Insurgency*").

[361] Def. Intelligence Agency, *Afghanistan – Haqqani Network Finances* (Sept. 24, 2009).

[362] Peters, *Haqqani Network Financing*, at 23.

[363] Peters, *Crime & Insurgency*, at 33 (Quetta Shura agreed with the Haqqani Network "to operate alongside each other and to divide the proceeds they earn in some zones where more than one faction operates.").

595.    On information and belief, Defendants knew of all the public information cited herein promptly upon publication of such information given, among other things, Defendants' approach to information sharing, media monitoring and strategic communications efforts, and collective knowledge imputed to it by the thousands of employees and agents who work for every Defendant (other than Placid Express).[364]

### A.    Defendants Knew That Their Provision Of U.S.-Linked Financial Services To Syndicate Fronts, Operatives, Agents, And Partners Had A Close Link To Syndicate Terrorism

596.    Defendants knew that their provision of financial or money remitter services to Syndicate operatives, agents, fronts, and partners had a foreseeably close link to enabling terrorist attacks.

597.    In "the post 9/11 world," "banks" universally understood that the U.S. strategy to protect Americans from al-Qaeda and Taliban terrorist attacks after 9/11 was premised upon "[r]eliance on the anti-money-laundering regime" and an "all-out campaign" to promote counter-terrorism "to ensure that funds intended for terrorist groups, such as Al Qaeda, were not coursing through the veins of the international financial system."[365] "This focus reshaped the international landscape forever," according to Mr. Zarate, and "governments implemented and expanded global anti-money-laundering regulations and practices based on principles of financial transparency, information sharing, and due diligence" which reduced the threat from al-Qaeda and Taliban terrorist finance "by focusing squarely on the behavior of financial institutions."[366]

---

[364] For purpose of efficiency, this allegation applies to every public document cited herein. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 862-63 (2d Cir. 2021) (plaintiffs are permitted to allege bank's awareness of public sources on information and belief).

[365] Zarate, *Treasury's War*, at 8.

[366] *Id.*

598.    After 9/11, the Financial Action Task Force promulgated terrorist finance best practices that served as the starting point for any bank's analysis of the potential red flags before it. According to Professor Gurulé, "The [FATF] Nine Special Recommendations on Terrorist Financing, combined with the Forty Recommendations on Money Laundering, represent the international standard for preventing and suppressing the financing of terrorism."[367] Moreover, "[i]mplementation of the Nine Special Recommendations is essential to establishing an effective counter-terrorist financing regime."[368] By 2011, according to Dr. Jodi Vittori, "international financial institutions" had "endorsed" "international regimes" like the "standards proposed by the Financial Action Task Force," and understood that the FATF's terrorist finance rules "play" "an important role": "[b]y setting common standards and best practices, they put 'sand in the wheels' of terrorist organizations."[369]

599.    Defendants knew that counter-terrorist finance strategies that were necessary to degrade al-Qaeda's economic infrastructure were an important preventative tool for keeping Americans safe, and therefore that their own conduct put American lives in danger. According to Professor Gurulé, "Attacking the financial infrastructure of al Qaeda is fundamentally a preventative strategy. That is, starving the terrorists of funding worldwide is critical to preventing terrorist acts. The ultimate goal is to save lives by preventing the use of funds to fuel terrorist attacks."[370]

600.    Defendants knew enough to pay lip service to the need for strong Anti-Money Laundering and Counter-Terrorist Finance policies. For example, Deutsche Bank submitted

---

[367] Gurulé, *Unfunding Terror*, at 155.

[368] *Id.*

[369] Vittori, *Terrorist Financing*, at 165.

[370] Gurulé, *Unfunding Terror*, at 21.

responses to a questionnaire from the Wolfsberg Group representing that DB maintained "documented policies and procedures consistent with applicable AML [anti-money laundering], CTF [counter-terrorist finance] & Sanctions regulations to reasonably prevent, detect, and report: Money laundering[;] Terrorist financing[;] [and] "Sanctions violations." (or "CTF"), and "policies and practices" were "being applied to all branches and subsidiaries of [Deutsche Bank] both in the home country and in locations outside of that jurisdiction."

601.    Defendants knew the key role they played in helping transnational criminal organizations – like the Syndicate and its joint venture partner, the Russian Mafia – effectively conduct the finance activities necessary to sustain and grow their organizations. As one analyst explained the landscape, "[f]or [] master[s] of money laundering," "banks were essential" because transnational criminal organizations that required large amounts of U.S. Dollars – like the Syndicate and JV partner, the Russian Mafia – could only avail themselves of regular and reliable access to American currency and U.S.-backed financial instruments and trades through "corporate world" "bankers" in the U.S. and Europe, "who made it possible to launder money on a multibillion-dollar level on an ongoing basis."[371]

602.    Defendants knew that the financial services they provided to terrorists were tantamount to arming them. For example, Professor Mark Pieth, who served in multiple international bodies dedicated to rooting out terrorist finance, explained (as quoted and paraphrased by Ms. Van Vuuren), that banks understood that "[f]or a bank to be one of the cornerstones of undermining the sanctions" designed to prevent a violent actor from acquiring funds or moving money, "such behavior [was] tantamount to the sale of weapons."[372]

---

[371] Unger at 87-87.

[372] Hennie Van Vuuren, *Apartheid Guns and Money: A Tale of Profit* 201-02 (Hurst & Co. 2018).

603.     Defendants also knew that from the 1990s through present, the U.S. Dollar has been the "gold standard" currency of choice for al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, D-Company, and the Russian Mafia, therefore that their regular provision of U.S. Dollar-related services to such groups improved their purchasing power and allowed them to kill more Americans.[373]

604.     As former assistant secretary of the Treasury for terrorist finance Zarate explained in 2013, "[t]he United States has remained the world's primary financial hub, with inherent value embedded in access to and the imprimatur from the American financial system."[374] According to Mr. Zarate, because "[t]he dollar serves as the global reserve currency and the currency of choice for international trade, and New York has remained a core financial capital and hub for dollar-clearing transactions," al-Qaeda and the Taliban's ability to "access American markets, American banks, and American dollars" operated "as *financial weapons*" in the struggle between the Syndicate and the United States.[375]

605.     Defendants knew that Brigadier General Phillip E. McGhee, Director of Resource Management for U.S. Army Forces, U.S. Central Command, stated that al-Qaeda and Taliban terrorists in Afghanistan and Pakistan "especially" "like[d] to work with … American currency"

---

[373] These terrorist groups' decades-long reliance on the U.S. Dollar as the currency of choice to finance their illicit transactions was the result of a number of factors including, but not limited to: (1) the primacy of the U.S. Dollar as the world's reserve currency, which affords the terrorists the same purchasing power as any other commercial enterprise; (2) the specific economic contexts of the geographies in which the groups operates, all of which had a long-standing history of prioritizing dollars as the currency of choice for criminal transactions; and (3) the nearly-universal reliance on the U.S. Dollar in countries in which the United States has deployed large numbers of personnel who are being attacked by a terrorist campaign, such as Afghanistan and Iraq.

[374] Zarate, *Treasury's War*, at 9.

[375] *Id.*

because "U.S. currency [was] the currency of choice for Al-Qaeda and [Syndicate] insurgents because [Syndicate terrorists could] use those U.S. Dollars anywhere in the world."[376] Thus, Defendants knew that the U.S. military prioritized reducing the flow of U.S. Dollars to Afghanistan as one strategy to weaken the Syndicate by "reducing that source of funds," *i.e.*, access to U.S. Dollars, "for Al-Qaeda."[377]

606.     Defendants knew that the Syndicate's leadership specifically believed (correctly) that al-Qaeda's ability to access U.S. currency itself foreseeably risked terrorist violence against Americans in Afghanistan. As the *Army News Service* reported in 2009, "U.S. currency floating around" Afghanistan risked "providing cash to **facilitate insurgent operations**" because "**U.S. currency is the currency of choice for Al-Qaeda and insurgents because you can use those U.S. dollars anywhere in the world.** We are reducing that source of funds for Al-Qaeda.'"[378]

607.     Defendants also knew that the U.S. Dollar was the currency of choice for narco-terrorists around the world, including but not limited to each member of the Syndicate as well as the Russian Mafia. "According to the Financial Crimes Enforcement Network, the U.S. dollar in cash is the preferred currency of transaction for drug traffickers and terrorists globally" and "[m]ore than $100 billion a year in drug trafficking cash moves through the U.S. financial system alone."[379]

608.     Defendants knew that from 2000 through present, the media regularly reported on the broad preference for U.S. Dollars shared by nearly all actors in Afghanistan, Pakistan,

---

[376] C. Todd Lopez, *Army Aims to Stop Flow of Paper Money to Iraq, Afghanistan*, Army News Service, Defense Department Documents (Aug. 25, 2009), 2009 WLNR 16658037.

[377] *Id.*

[378] *Id.* (emphasis added).

[379] Alon Goren, *Brad Sherman Is Wrong About Bitcoin*, San Fernando Valley Business Journal (Aug. 6, 2018), 2018 WLNR 25445188.

Russia, and the U.A.E. – the Syndicate's four most important points of entry to the U.S. financial system since 9/11.

Defendants knew of statements by Members of Congress from both political parties that further alerted Defendants to the key role that access to the U.S. financial system and U.S. shell companies ordinarily played in complex trans-national Laundromats. For example, Senator Sheldon Whitehouse explained that "[t]he Azerbaijani Laundromat [was] *not a unique scheme*" and merely "exposed what many" "*already knew*: that … *terrorists*" "*routinely use[d] shell companies to hide assets and obscure illegal activities*" and that "the United States" was "a favorite destination for money laundering."[380] He concluded: "*Make no mistake, we [were] a facilitator, as well as a target, in this racket*."[381]

### B. Defendants Knew That Operating Laundromats For Customers In High-Risk Terrorist Finance Jurisdictions Foreseeably Aided Terrorism

609.    Each Defendant chose to serve as a "Laundromat" for Syndicate terrorist financiers and money launderers. When doing so, Defendants were not acting as responsible global financial institutions or money remitters, but rather, willing participants in unlawful schemes designed and intended to fund terrorist activity.

610.    The divide between legitimate banks, on the one hand, and "Laundromats," on the other, has been well-recognized for decades, and industry participants, including Defendants, understood that any financial institution or money remitter who served as a "Laundromat" would inevitably route substantial sums of U.S. Dollars to terrorist financiers seeking to raise and move money to support anti-American terrorist attacks. This "Laundromat" concept – criminal

---

[380] Sen. Sheldon Whitehouse, *Whitehouse Leads Helsinki Commission Hearing On Shell Corporations And Authoritarian Regimes*, States News Service (Oct. 3, 2017) (emphasis added).
[381] *Id.*

terrorists using commercial activities to cleanse their money and fund their violent operations –
first began with Al Capone.

611.    Beginning in the 1980s, and continuing ever since, financial industry and money
remitter professionals, law enforcement officials, and media around the world have documented
the regular pattern whereby some large financial institutions and money remitters evolve into
Laundromats purpose-built to serve terrorist financiers, fundraisers, and logisticians, including,
but not limited to, those associated with notorious designated international terrorist groups,
recognized terrorist/crime "fusion" groups, and narco-terrorist groups, and such terrorists, in
turn, use their financial partner's services to enable terrorist attacks. U.S. and European officials
have also publicly echoed the same warnings.

612.    Given all the public sources drawing connections between organized crime,
money laundering, and terrorism, no reasonable financial institution could have believed that
acting as Laundromat for organized crime groups had no foreseeable link to terrorism.

613.    As a result, Defendants were doing the exact opposite of what they needed to do
after 9/11 – instead of serving as the "first line of defense" in a "quasi-law enforcement role,"
Defendants helped the terrorists defeat law enforcement.[382]

---

[382] According to Professor Gurulé, "the FATF Special Recommendations recognize that financial
institutions represent the first line of defense to prevent funds being used by terrorist money
transfers. Domestic laws and regulations have been adopted by States to comply with the legal
obligations imposed by the Terrorist Financing Convention and international anti-terrorist
financing standards. These new measures have forced financial institutions to assume quasi-law
enforcement responsibilities to prevent terrorist financing … Almost seven years after the
September 11, 2001 terrorist attacks, al Qaeda, the Taliban, and their terrorist affiliates continue
to pose a serious threat to international peace and security. … As long as the threat of terrorism
persists, the quasi-law enforcement role financial institutions have been forced to play since 9/11
is likely to continue." Gurulé, *Unfunding Terror*, at 181.

614.    Defendants knew that al-Qaeda and the Taliban managed a sophisticated international network of terrorist financiers, who were constantly on the hunt for the next potential Laundromat in which to wash their "dirty" opium rubles and convert them into "clean" U.S. Dollars that could be used – and were used – to fund Syndicate attacks against Americans in Afghanistan. Thus, Defendants knew that when a bank or money remitter with access to the U.S. financial system operated as a Laundromat in any high-terrorist-finance risk jurisdiction, that choice was tantamount to doing business with the terrorist organizations themselves. Defendants knew that any bank or money remitter that understood it was acting as a Laundromat also necessarily understood – and *accepted as the cost of doing business* – that a vast sum of USD-denominated terrorist finance would inevitably flow through U.S.-based accounts to overseas accounts foreseeably controlled by al-Qaeda and the Haqqani Network.

615.    Defendants' motivation to grow and sustain their Laundromat was rooted, in substantial part, in their specific desire to directly or indirectly profit from hundreds of millions of dirty money – mostly U.S. Dollars – that they knew was flowing out of Afghanistan, Pakistan, the U.A.E., and Russia after 9/11 through 2016 as a result of the Syndicate's booming transnational criminal activities, including but not limited to, its need to wash the enormous cash flows resulting from its protection money rackets, profits from the Afghanistan-to-Russia Opium Pipeline, and other income sources. According to a *Credit Control* report in May 2006:

> It [was] plain from studying the statistics of significant fraud and corruption that the geographic scale and limitations [] changed dramatically [in the years following 9/11]. This [was] the 'flip-side' … of globalisation, instantaneous communication, uninterrupted market activity and … ever quicker travel. Off-shore havens and Special Purpose Entities (SPEs), urgent calls for dirty money (and for laundering it) for *Islam extremists*, poppy farmers in *Afghanistan* … have *added to the motives for corruption and provided a monster Laundromat for circulating and bleaching it.* Not only that: … conflicts over extradition and money-laundering rules, regulatory arbitrage and political indignation *kick up*

> **thick dust-clouds** behind which it has proved **increasingly easy to hide money,**
> **identities, Semtex** [*i.e.*, explosives], cadavers, tracks and trails.[383]

616.    Defendants knew that a bank's or money remitter's operation as a Laundromat in

a high-risk terrorist finance jurisdiction will inevitably cause terrorist violence because

transnational terrorist networks are smart, communicate with one another, and have historically

flocked to Laundromats when they learn of them, as Defendants knew they inevitably would. For

example, on February 5, 2013, E.C. Commissioner Cecilia Malmström stated that "banks should

never function as laundromats" because deliberately helping move "[d]irty money" in the

markets in which large European banks ordinarily competed foreseeably helped "organised

crime or [al-Qaeda or Taliban] terrorists to slip through" the post-9/11 counter-terrorist-finance

safeguards that were specifically designed to prevent efforts to "launder" money or "enable the

funding of [al-Qaeda and Taliban] terrorism."

617.    Defendants knew that their deliberate decision to disregard core counter-terrorist-

finance norms in high-risk terrorist finance jurisdictions would inevitably result in Defendants

becoming Laundromats for terrorist financiers. As Giles Edwards, a credit analyst at S&P,

explained, "when it comes to financial crime risk" (meaning risk that a bank's or money

remitter's financial services will enable terrorism finance, money laundering, and organized

crime activity), "a business model based on servicing clients that other banks will not touch" –

like that practiced by all Defendants under their New York Laundromat Strategies – "is not a

business model," and is contrary to the core rule of counter-terrorist finance that "places the onus

on credit and financial institutions to have anti-money laundering and countering financing of

---

[383] Jamie Stewart, *White Collar Crime: Fraud, Bribery And Corruption - All Alive And Well?*,
Credit Control, Volume 27; Issue 4/5 (May 20, 2006), 2006 WLNR 27626635 (emphasis added).

terrorism preventive measures in place, including policies, procedures and processes."[384] Alluding to, among others, Deutsche Bank, Mr. Edwards further noted that "[m]any of the companies involved in the various identified Laundromat cases are domiciled far from the original locations of the funds: in offshore centres, but also in key European financial centres, such as the UK, particularly when they allow opaque beneficial ownership structures."[385]

618.    Defendants knew that Defendants' terrorist finance services were provided to the Syndicate on a bespoke basis, routed through purpose-built Laundromats each Defendant operated for the express purpose of profiting from terrorist finance and money laundering.

619.    Defendants knew that financial institutions and money remitters around the world, including in the U.S., were often willing to deliberately service suspected terrorist agents, operatives, and fronts. For example, terrorist finance expert Raymond Baker conducted a broad study of the attitude of global financial institutions towards terrorist finance and money laundering.[386] Thereafter, he publicly explained the basic knowledge and approach taken by unethical financial institutions with branches in the U.S., like Defendants, to profit from providing banking services that enabled terrorist finance and violent crime:

> Whether the individual behind these ill-gotten gains is a murderous "godfather," a corrupt government official, or a tax-evading but respectable executive, it's

---

[384] David Chance, *Banks Face Rising Threat Over Links To Financial Crime*, Irish Independent (Apr. 22, 2019), 2019 WLNR 12537413.

[385] *Id.*

[386] Harvard Business School, *Q&A – Dirty Money: Raymond Baker Explores the Free Market's Demimonde* (Feb. 1, 2001) ([Q:] What evidence do you have for your observations? [A:] In the course of investigating the mispricing of trade as a means of moving tax-evading money across borders, I conducted a highly structured research project involving 550 business owners and managers in 12 countries. Later, when I came to the Brookings Institution, I traveled to 23 countries and talked with bankers, economists, lawyers, sociologists, and law-enforcement personnel about criminal, corrupt, and commercially tax-evading flows. U.S. and international agencies, such as the World Bank and the United Nations, are also important sources of information on these matters, as are a number of private and nonprofit organizations.").

important to understand that ***they all use the same process to launder their money***. … When it comes to large deposits from overseas, ***far too often American banks assume a "don't ask, don't tell" philosophy***. In fact, the Treasury Department estimates that 99.9 percent of the criminal money presented for deposit in the United States is accepted into secure accounts. It's a sad fact, but American banks … ***will accept money from overseas even if they suspect that it has been illegally obtained***. Outside the financial institutions, recent cases involving a range of products — such as appliances, helicopters, and gems — demonstrate that a variety of companies aren't vigilant enough when dirty money is used to purchase legitimate merchandise, ***even though suspicious buying-patterns should set off alarms***.[387]

While most American-headquartered financial institutions greatly improved their conduct after 9/11, Mr. Baker's above-description accurately described the attitude of each Defendant as it executed its Laundromat from 2001 through 2016.

620.    Defendants knew that the Syndicate-related funds (including those managed by the Russian Mafia) that moved through Defendants' Laundromats directly funded terrorist attacks. At all times, it has been widely recognized that "money laundering linked to UK companies … [was] used by … terrorists to move funds and pay for assets … [through] services paid for with 'laundromat' money."[388]

621.    Defendants knew that the "open door approach" followed by the British branches of global financial institutions and money remitters were the ideal vehicle for Laundromat activities. On July 21, 2020, for example, the Intelligence and Security Committee of the U.K. Parliament published the *Russia Report*, which detailed Russian activities in the United Kingdom and concluded, among other things, that the "open door approach," followed by certain

---

[387] Harvard Business School, *Q&A – Dirty Money: Raymond Baker Explores the Free Market's Demimonde* (Feb. 1, 2001).

[388] Michael Goodier, *Laundromat Britain; The Billions of Pounds of Dirty Money that has Made Its Way Into the UK Economy*, Huddersfield Daily Examiner (Nov. 7, 2019), 2019 WLNR 33610453.

Defendants and others like them, "provided ***ideal mechanisms by which illicit finance could be recycled through the London 'laundromat.*'"[389]

622.    Plaintiffs' allegations focusing on the combination of red flags raised by Defendants' processes, transaction types, transaction geographies, and other "red flags" separate from customer identity comports with core post-9/11 counter-terrorist finance principles, which always emphasized the need to carefully consider whether the transaction raises financial crime concerns while overlayed against a high-terrorist-finance risk geography, rather than a pre-9/11-style "check-the-box" exercise that focuses primarily on the identity of the customer, whereby the bank or money remitter simply confirmed the customer's purported identity was not on a watch list and, if not, rubber-stamped the transaction without anything more. For example, Heather A. Conley, formerly the Deputy Assistant Secretary of State for Eurasian Affairs, emphasized that FinCEN's post-9/11 counter-terrorist-finance doctrine treating "terrorism financing as illicit financing" – *i.e.*, the post-9/11 approach described in this paragraph – was key to reducing the terrorist threat posed by "the Russian laundromat and its affiliated enabling services that operate[d] within and outside the U.S. financial system."[390]

623.    Overall, Plaintiffs' Laundromat allegations accord with the mine run of recent scandals involving European banks, nearly all of which involved Deutsche Bank and Standard

---

[389] U.K. Parliament, Intelligence and Security Committee of Parliament, *Russia Report* at 3 (July 21, 2020) (emphasis added), https://isc.independent.gov.uk/wp-content/uploads/2021/01/20200721_Russia_Press_Notice.pdf.

[390] Testimony of Heather A. Conley, Former Deputy Assistant Secretary of State for Eurasian Affairs and Senior Vice President for Europe and Eurasia in the Center for Strategic and International Studies, *Senate Banking, Housing and Urban Affairs Committee Hearing on Russia Sanctions*, Financial Markets Regulation Wire (Sept. 6, 2018).

Chartered Bank. As *Euromoney* ruefully noted in 2020, the most recent scandal at the time was "just the latest in a long and sorry list of mirror trades and laundromats."[391]

624.     Defendants knew that post-9/11 banking and money remitter industry participants have universally understood that the deliberate failure to operate an effective counter-terrorist-finance policy is, ***itself***, an ***affirmative choice*** to aid terrorists because such groups are dynamic, seek out weaknesses in the financial system, and can be expected to take advantage, and do take advantage, of any financial institutions that lack effective AML/CTF policies and procedures. For example, according to Timur Mussin, the Chief Compliance Officer of a bank, the prevalence of terrorist finance risk after 9/11 meant that any bank or money remitter that chose to "[b]ecom[e] a 'Laundromat'" assumed a role in the terrorist enterprise at great peril to the public:

> [9/11] marked the beginning of global efforts to counter and prevent … money laundering and the financing of terrorism. International organizations and lawmakers … have been tightening their policies on AML/CFT issues. … The ***absence*** of effective processes can ***introduce criminals to the organization's client base*** – and with that, ***all the ensuing negative consequences, including the organization becoming part of "the laundromat."*** The same applies to counterparties of the organization.[392]

625.     Defendants also knew that their failure to rigorously follow universally practiced post-9/11 counter-terrorist-finance norms itself directly aided the Syndicate's efforts to infiltrate the U.S. financial system after 9/11. As former assistant secretary of the Treasury for terrorist financing Mr. Zarate explained, stakeholders like Defendants "knew the effectiveness of Treasury tools depended first and foremost on the ability of the private sector—most

---

[391] Peter Lee, *Santander Uses ThetaRay's Artificial Intuition to Bolster its AML Defences*, Euromoney (June 16, 2020), 2020 WLNR 18728434.

[392] Timur Mussin, *The Trouble with Weak AML & CFT Compliance Programs*, Corporate Compliance Insights (Dec. 1, 2020), 2020 WLNR 34238484.

importantly, the banks—to serve as the gatekeepers of the financial system."[393] "It was **not** enough," according to Mr. Zarate, "for American or Western European banks to have compliance systems and enhanced due diligence procedures" – such banks needed to practice "good corporate citizenship" and be "willing to protect the system."[394]

626.     Defendants knew that transnational criminal organizations, including the Syndicate and its JV partner, the Russian Mafia, actively sought to partner with corrupt financial institutions, rather than merely "trick" them. According to Jeffrey Robinson, an author who specializes in financial crime, a customer like Semyon Mogilevich – the Russian Mafia leader whose organization served as an agent for al-Qaeda and the Taliban and was known, for decades, to help conduct al-Qaeda's and its affiliates' transnational narcotics laundering activities (*supra* Part II.B.2.i), – "typifie[d] the new global criminal" who relied upon Defendants: "These men [did not] rob banks. They [bought] them."[395]

627.     Syndicate agents, operatives, and fronts did so by leveraging corrupt relationships with criminal financial institutions – like Defendants – to "tak[e] full advantage of ill-equipped law enforcement and lax money laundering laws" and the resulting stream of dirty money that flowed through the financial institutions like Defendants was so severe that, by the early 2000s, it "ha[d] become, the FBI [said], a strategic level threat on the geopolitical playing field."[396]

628.     Defendants also knew that "[f]or cartels," including the Syndicate and the Russian Mafia, "countries with weak institutions make ideal places to set up shop" and, in this context, Defendants also understood that narco-terrorists proactively assess the corporate landscape in the

---

[393] Zarate, *Treasury's War*, at 165.

[394] *Id.*

[395] Unger at 56.

[396] *Id.*

countries in which they do business seeking to determine whom in "the business community" will be willing to "launder their cash."[397]

629.     Defendants knew that the Russian Mafia always "maintained" the ability to "move money through Russian banks" with ease.[398]

630.     Defendants knew that the U.K. had a long-standing problem with terrorist finance associated with a range of transnational criminal groups, including but not limited to, the Russian Mafia. Surveying the wreckage in 2020, Anupreet Amole analyzed the prevalence of Laundromat activity in the U.K. and explained that the U.K. "parliamentary report on Russian influence note[d] the gradual development of 'the London laundromat,'" which only confirmed what "many legal and compliance professionals knew already," including the managers, employees, and agents of Defendants, that "the UK has a long-standing problem with illicit finance, whether or not connected to Russia."[399]

631.     Defendants knew of the terrorist finance scandal surrounding the 1991 collapse of the Bank of Credit & Commerce International ("BCCI"), which informed Defendants' own history, as well as Defendants' understanding of the inherent risks of operating a Laundromat in connection with high-terrorist-finance-risk jurisdictions. "'BCCI did **dirty work for every major terrorist service in the world**,' said Jack Blum," "who" "investigated the case."[400]

632.     Defendants knew that their decision to serve as Laundromats in the same markets in which BCCI had previously done so would inevitably result in vast flows of terrorist finance

---

[397] Tom Wainwright, *Narco-Nomics: How to Run a Drug Cartel* 118-19 (Public Affairs Press 2016).

[398] Zarate, *Treasury's War*, at 161.

[399] Anupreet Amole, *Trying to End the Illicit Laundromat Cycle*, FTAdviser.com (August 6, 2020), 2020 WLNR 22850806.

[400] *Id*. (emphasis added).

flowing from the United States to al-Qaeda and the Taliban in Afghanistan, Pakistan, the U.A.E., and Russia, given that BCCI's prior Laundromat focusing on the Middle East and Central Asia was also specifically, and widely, known to have been used by both terrorist groups.

633.    Defendants knew that the core lesson that observers, including banks and money remitters, learned from BCCI's own Laundromat for terrorists was that Islamist terrorists specifically, and most of all those focusing on Afghanistan, were keenly aware of the nuances of the global financial and money remitting system, understood the reputations of the industry participants, paid attention to trends, and acted like any other rational actor in their shoes would be expected to once they learned BCCI was open for business as a Laundromat—they flocked to BCCI and used it to finance their terrorist operations. Defendants intended to achieve the same profit through their own Laundromats that BCCI obtained, albeit in a more careful manner designed to avoid a repeat of BCCI's fate.

634.    Defendants knew that their conduct, including that relating to Khanani, modeled the key themes of the BCCI scandal. As the Pakistani media noted, "[w]hat reflect[ed] poorly on Pakistan [was] that Khanani's entire organisation had been shut down and its key players had been arrested in 2008," and yet the scheme continued.[401] In sum, "[t]he entire [Khanani] affair [was] a reminder of the 1991 BCCI scandal," and "[i]t seem[ed] we [had not] learn[ed] much since that time."[402]

635.    Defendants knew that robust anti-money-laundering compliance by financial institutions serving high-terrorist-finance-risk customers was essential to protecting Americans specifically from al-Qaeda and Taliban attacks after 9/11. Mr. Zarate, the first assistant secretary

---

[401] The News Int'l (Pakistan), *The Khanani Affair* (April 9, 2017), 2017 WLNR 11090249.
[402] *Id.*

of the Treasury dedicated to terrorist finance, recalled that "the classic financial weaponry of anti-money-laundering strategies" formed the core "set of tools that could disrupt Al Qaeda's operations" and keyed Treasury's "campaign to combat terrorist financing" after 9/11.[403]

636.     Defendants knew that any distinction between "money laundering" risk and "terrorist finance" risk was obliterated after 9/11 when analyzing terrorist finance risk attendant to the provision of financial or money remitter services to persons, entities, or accounts related to a high-risk terrorist finance jurisdiction.

637.     Defendants knew that after 9/11, there was broad international consensus that terrorist financing shared the identical methods as money laundering and therefore that AML violations relating to transactions connected to high-risk terrorist finance jurisdictions – without more – demonstrated significant terrorist finance risk.

638.     Defendants knew that U.S. and European financial institutions, including each Defendant, consistently pursued a unified anti-money-laundering/counter-terrorist-finance agenda – often abbreviated "AML/CTF" – after 9/11.

639.     Defendants knew that the post-9/11 counter-terrorist-finance regime rejected attempts by banks and money remitters to categorize suspected financial crimes in high-terrorist-finance-risk jurisdictions as merely presenting "money laundering" concern generally rather than "terrorist finance" risk specifically. Instead, the universally recognized counter-terrorist-finance best practice after 9/11 recognized that, with respect to transactions relating to a high-terrorist-finance-risk jurisdiction, terrorist financiers often laundered money and therefore, *ex ante* from the view of a responsible bank or money remitter, when customer activity raised money

---

[403] Zarate, *Treasury's War*, at 21.

laundering "red flags" in a high-risk jurisdiction for terrorist-finance, that same conduct also necessarily raised "red flags" for terrorist finance risk.

640.    Defendants knew that at all relevant times, banks and money remitters in the U.S. and Europe followed the same unified approach to anti-money-laundering and counter-terrorist-finance. Thus, Defendants knew that a bank's or money remitter's deliberate financial crime activities in high-risk terrorist finance jurisdictions definitionally enabled terrorist finance and inevitably caused terrorist finance to flow through the bank or money remitter, because illicit actors use the same mechanisms to accomplish both money laundering and terrorist finance.

641.    Defendants knew that the European Union officially extended the ordinary scope of anti-money-laundering (or "AML") to include counter-terrorist-finance (or "CTF") in 2005, and in so doing, adopted a risk-based approach that assumed the worst if a transaction, customer, or counterparty raised financial-crime-related red flags in a geographic, industry, or customer context that also carried elevated terrorist finance risk, *e.g.*., a transaction involving a company in Pakistan that included indicators of money laundering. According to Dr. Thomas Voller, Esq. and Matthew Wales, Esq., "[w]ithin the European Union, the fight against money laundering and terrorist financing is more or less unified."[404]

642.    Defendants knew that their Laundromats – by design – fostered a complete overlap between AML and CTF violations, and that such intentional opacity only magnified their malign intent given the Laundromat setting. According to Michelle Thorp, CEO of a financial services association, "reports that three key European banks" (including Deutsche Bank) "fac[ed] allegations over handling suspicious money" which came "after the 2010-2014 Global

---

[404] Dr. Thomas Voller, Esq. and Matthew Wales, Esq., *Prevention of Money Laundering: European Approach*, Business Credit, Volume 120; Issue 5 (May 1, 2018), 2018 WLNR 14325050.

Laundromat scheme" reinforced the importance of banks following the universal understanding in the financial services that "AML compliance extend[ed] to terrorist financing, which [was] facilitated through money laundering."[405]

643.　Defendants' awareness of the extreme terrorist finance risks attendant to the operation of their Laundromats was heightened by their related knowledge concerning the elevated terrorist finance risks of their customers' geographies. Defendants were sophisticated financial institutions and/or money remitters. As such, Defendants knew: (a) that geography-related "red flags" were critical to the effectiveness of counter-terrorist-finance practices at banks and money remitters like them; and (b) that Afghanistan, Pakistan, the U.A.E., and Russia were "high risk" terrorist finance jurisdictions for al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, which Defendants all knew relied upon all four geographies as the main arteries of their terrorist fundraising, finance, and logistics activities in support of Syndicate terrorist attacks against Americans in Afghanistan.

644.　Defendants knew that al-Qaeda had a significant presence throughout Europe, and that, according to Professor Gurulé, "Al Qaeda has been extremely active in Italy and Germany."[406] Moreover, "Al Qaeda considers Europe a central arena for the promotion of global jihad and the realization of its vision of an Islamic caliphate."[407]

645.　Defendants knew of regular, and substantial, U.S. Dollar-related cash flows between and among the U.S., U.K. and/or European countries, on the one hand, and Afghanistan, Pakistan, the U.A.E., and/or Russia, on the other, were often, on their own, powerful indicia of

---

[405] Michelle Thorp, *Dirty Laundry*, Credit Management (Nov. 1, 2019), 2019 WLNR 34501789.

[406] Gurulé, *Unfunding Terror*, at 79.

[407] *Id.* at 77.

terrorist finance given Defendants' knowledge of the Syndicate's widely reported financial strategies (*e.g..*, the Joint Venture). According to Dr. Rollie Lal, banks and money remitters understood that "[i]llicit activities of both the criminal and terrorist type require access to financial support"; as a result, Defendants knew how to track "the flow of money through both legal and illegal means into terrorist-held territory [such as Afghanistan and Pakistan], and out of countries that have a historical or political connection with [Syndicate terrorist] groups [such as Russia and the U.A.E.],"[408] which Defendants knew raised red flags for Syndicate activity.

646.    By no later than 2002, Defendants knew that responsible global financial institutions and money remitters terminated customer relationships, or even withdrew entirely from geographies, if the bank or money remitter could not regularly and reliably review and assess the terrorist finance risk posed by their customers. As Mr. Zarate recalled, Citibank famously changed the scope of its customer relationship to eliminate the identified terrorist finance risk.[409]

647.    Defendants knew that the Financial Action Task Force deemed Pakistan to pose the highest possible risk of terrorist finance when it deemed Pakistan both "high-risk and noncooperative" in February 2012, and that Pakistan was specifically identified for its extreme "terrorist finance" risk.

648.    Defendants knew that there was a widespread negative "perception" of the Pakistani financial services industry in the international business community that was "rooted in the international reputation that Pakistan … ha[d] as a country with … widespread money

---

[408] Lal, *Terrorist Criminal Enterprises*, at 191-92.

[409] Zarate, *Treasury's War*, at 87-89.

laundering practices."[410] Moreover, "[t]his [was] not just an anecdotal perspective," because "[t]he global money laundering and terrorist financing watchdog," the FATF, "publicised the shortcomings of the Pakistan anti-money laundering regime."[411]

649.    Based upon their branches and employees' connections to Afghan- and Pakistani-diaspora communities across Europe and Asia, Defendants knew that al-Qaeda and the Haqqani Network used transnational criminal activities in Europe, the Middle East, and Asia to directly support attacks against Americans in Afghanistan. For example, according to Dr. Rollie Lal, "in diaspora communities across Europe and Asia" – precisely the communities in which each Defendant focused much of its U.S. Dollar-related business and from which Defendants drew much of their employee pools – "it [was] clear that terrorist criminal enterprise [was] a venture for" "extensive" transnational activities by al-Qaeda and the Taliban, including its Haqqani Network, to sustain the terrorists' own surge in Afghanistan by using the opportunities afforded by "globalization" to create and sustain a network of cells in Europe, Asia, and the Middle East to fund, finance, and arm terrorists to attack Americans in Afghanistan.[412]

650.    Defendants knew that otherwise suspicious financial transactions involving members of the Pakistani diaspora in Europe, the Middle East, Russia, and Asia after 9/11 bore an extreme risk of terrorist fundraising, finance, and logistics activity. When Defendants processed suspicious transactions that already raised financial crime red-flags, Defendants' additional knowledge that their customers were Pakistani nationals living or conducting

---

[410] Business Recorder, *Why is Pakistan's Money Laundering Problem so Persistent?*, (Jan. 2, 2021), 2021 WLNR 89674.

[411] Business Recorder, *Why is Pakistan's Money Laundering Problem so Persistent?*, (Jan. 2, 2021), 2021 WLNR 89674.

[412] Dr. Thachuk and Dr. Lal, *Terrorist Criminal Enterprises* at 193.

suspicious transactions outside of Pakistan was an additional red flag that Defendants knew indicated the suspicious transaction in question foreseeably aided Syndicate terrorist finance, fundraising, and logistics, and Defendants.

651.    As sophisticated, long-time participants in the Afghanistan and Pakistan economies, Defendant knew that Afghanistan- and Pakistan-related transactions from 2001 through 2016 that raised suspicion of, or appeared related to, front company activity, money laundering, narcotics trafficking, terrorist logistics, or other indicia of criminal activity was likely to aid, and did in fact regularly aid, Syndicate attacks against Americans in Afghanistan by financing al-Qaeda, Taliban, and/or Haqqani Network activities.

652.    From 2001 through 2016, Defendants knew that regular public reports alerted banks and money remitters to the fact that companies, banks, and money remitters linked to Afghanistan, Pakistan, the U.A.E., and Russia were regularly funneling funding and bombmaking supply to the Syndicate through terrorist finance activities and illicit transactions related to criminal activity in Afghanistan, Pakistan, the U.A.E., Russia, and Europe and that the Syndicate was using such activities to support Syndicate attacks against Americans in Afghanistan.

C.    **Defendants Knew The U.S. and U.K. Governments Opposed Conduct Like Their Own**

653.    Defendants knew of the potential terrorist finance risk created by their reckless practices based upon direct communications from the U.S. government. From 2007 through 2010, the Treasury Department's Undersecretary for Terrorism and Financial Intelligence, Stuart Levey, visited with financial institutions, money remitters, and corporations around the world to inform them about the terrorist finance risks associated with permissive financial and commercial practices, including, but not limited to, the risks that al-Qaeda, Taliban, Haqqani

Network, and IRGC fronts were using, or could use, the financial, money remitter, or commercial system to support anti-American terrorist attacks. On information and belief, in 2007 and/or 2008, and again in 2009 and/or 2010, Undersecretary Levey specifically provided such warnings concerning al-Qaeda, Taliban, and Haqqani Network fronts' use of banks to one or more executives, managers, employees, or agents representing each Defendant.

654. Defendants knew of the potential terrorist finance risk created by their reckless practices based upon direct communications from the U.K. government. In 2006, the U.K. government prepared a list of thousands of suspected terrorist operatives, agents, fronts, and partners, which it then widely shared with financial institutions operating in the United Kingdom including, on information and belief, with one or more representatives of each Defendant's U.K. branch (the "2006 U.K. Government Terrorist Suspects List"). On information and belief: (1) a substantial number of the terrorists named in this Complaint were also identified in the 2006 U.K. Government Terrorist Suspects List shared with Defendants and reviewed by Defendants, including, but not limited to: (a) Khanani; (b) Darkazanli; (c) Bari; (d) Bout; and (e) Mogilevich; and (2) on or after 2006, the U.K. government provided the 2006 U.K. Government Terrorist Suspects List, and issued a warning concerning al-Qaeda, Taliban, and Haqqani Network fronts' use of banks, money remitters, and corporations, to one or more executives, managers, employees, or agents representing each Defendant.

### D. Defendants Possessed Sufficient Data To Prevent The Syndicate From Using Their Services For Terrorist Fundraising, Finance, and Logistics Operations

655. Defendants' customer diligence was both like and unlike the diligence conducted by responsible banks and remitters. Defendants' own diligence was similar in that Defendants ordinarily acquired the information necessary to know the identity of their counterparties and to know the terrorist finance risk. As a result, Defendants knew of enough merely from their

"window-dressing" diligence to know that their transactions foreseeably aided terrorists—Defendants just did not care. As one economic analyst reported, for example, "[t]he level of due diligence by [Standard Chartered Bank and Deutsche Bank] is already high in … Pakistan."[413] "Since 9/11," according to Professor Gurulé, "a significant shift has taken place in banks and other financial institutions with respect to monitoring financial transactions. Banks are now scrutinizing accounts and transactions for possible links to terrorists and terrorist organizations, making it more difficult for terrorists to move money through the financial sector.'"[414]

656.    At all relevant times, Defendants' sophisticated software proactively identified the sorts of financial crimes executed by the Syndicate's agents. By 2005, Mr. Kochan documented at the time, global financial institutions and money remitters, like Defendants, operated the equivalent of "Computerized Sherlock Holmes" platforms that identified ongoing financial crimes at their branches "each business day":

> Banks have used artificial intelligence as fraud detectives since the mid-1980's when credit card fraud losses started to escalate. Computerized fraud detection systems take in huge volumes of transaction data and look for tell-tale patterns to identify possible cases of fraud.
>
> The latest advance involves developing high tech "transaction sniffing systems" that make use of a body of rules that define the way that money launderers typically carry out their activities. These rules are founded on the three "Vs" of profiling – the volume, value, and velocity (timing) of transactions. If the rules are triggered, then the activity can be deemed "suspicious" and worthy of further investigation.
>
> David Porter, director for risk at the Detica consultancy, says: "They work in the same way that we pick out constellations in a starry sky. These technologies sift through a huge amount of data to work out for themselves what is suspicious without having to refer to a checklist of rules."[415]

---

[413] Dipanjan Roy Chaudhury, *FATF Grey Listing to Take its Toll on Pak Economy*, Economic Times (Feb. 26, 2018), 2018 WLNR 5894450.

[414] Gurulé, *Unfunding Terror*, at 376.

[415] Kochan, *The Washing Machine*, at 280-81.

657. Each Defendant was keenly aware of the foreseeable risk that their facilitation of USD-denominated transactions for terrorist operatives, agents, fronts, or partners foreseeably risked terrorist violence against Americans because each Defendant was a member of an integrated global bank or money remitter subject to common rules relating to anti-money-laundering/counter-terrorist finance (or "AML-CTF"), including know-your-customer ("KYC") and customer due diligence ("CDD") requirements, and each Defendant operated under policies and procedures that alerted them to the extreme terrorist finance risks posed by their transactions and customer relationships.

658. Each Defendant used sophisticated compliance, AML, and CTF software designed to monitor, in real-time, sanctions lists, watch lists, transaction data, media reports, enforcement actions, and more, for the understood purpose of identifying and preventing suspicious transactions that foreseeably could aid terrorists. Plaintiffs do not allege that Defendants did not ***know*** about Syndicate terrorist finance risks; Plaintiffs allege that Defendants did not ***care*** about Syndicate terrorist finance risks.

659. From here, however, Defendants' diligence practices sharply diverged from those of law-abiding banks and remitters: when Defendants conducted their diligence, the point of the exercise was to ***conceal*** their terrorist clients' and potential terrorist clients' terrorist finance through the "window dressing" afforded by their diligence—the exact opposite purpose of diligence when conducted by ethical banks and remitters, which is to ***reveal*** potential financial crimes as part of the banks' and remitters' widely-recognized post-9/11 role as America's first, and most important, line of defense against terror by al-Qaeda and its affiliates.

660. As sophisticated banks and money remitters, each Defendant knew the purpose of the criminal law prohibitions on material support to terrorists. As the U.S. Supreme Court has

explained, "Congress has prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. 18 U.S.C. § 2339B(a)(1). That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.' Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)."[416] Accordingly, Defendants understood that "any contribution" it made to members of the Syndicate would illegally facilitate their terrorist activity, and Defendants further understood that this prohibition against such contributions extended to the agents, operatives, and fronts of al-Qaeda, the Taliban, and the Haqqani Network.

661.    Defendants knew that they regularly processed suspicious transactions knowing of "red flags" indicating a high risk of Syndicate terrorist finance operations, including, but not limited to, instances when the transaction: (1) was on behalf of a suspected terrorist financier; (2) related to violent actors or criminal behavior like money laundering that Defendants understood to be directly correlated with terrorist finance risk; (3) had the effect of moving a large amount of U.S. Dollars from the Europe and the former Soviet Union, including Russia, to the Middle East, which Defendants understood to be a significant terrorist finance red flag; and/or (4) involved the transfer of large amounts of money between one or more legs of the Syndicate's hubs in Pakistan and/or the U.A.E. (in any direction involving any combination of the three), involved a large volume of cash, or was otherwise suspicious based on amount, pattern, timing, or history.

662.    At all relevant times, each Defendant acted knowing of the risk that one, several, or all the Afghanistan-, Pakistan-, U.A.E.-, Russia-, or Cyprus-related parties to their

---

[416] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010).

transactions, as applicable, were Syndicate agents, operatives, and/or fronts, and that the deal was in fact part of the Syndicate's terrorist finance activities and repatriation of overseas profits. A rule of thumb in Afghanistan, Pakistan, the U.A.E., and Russia since 9/11 has been: if it was dirty money, it foreseeably benefited al-Qaeda, the Taliban, and the Haqqani Network's logistical or financial efforts, and a responsible bank, money remitter, or corporation exits the transaction. As long-standing, and sophisticated, participants in the Afghanistan, Pakistan, U.A.E., Russia, and Cyprus markets, each Defendant knew of this reality at all relevant times.

663. Defendants knew of the terrorist finance risks attendant to their transaction activity relating to Khanani, Darkazanli, Azizi, Ahmed, and the Russian Mafia because Defendants regularly participated in international conferences and symposia concerning anti-money-laundering/counter-terrorist-finance that routinely shared information that alerted Defendants to the Syndicate's terrorist finance schemes alleged herein.

**E.  Defendants Knew Transactions In High-Terrorist-Finance-Risk Jurisdictions That Used "Buffers," "Shell Companies," Or "Intermediaries" Foreseeably Aided Syndicate Terrorist Fundraising, Finance, And Logistics Operations**

664. Defendants knew that their reliance on "buffers," "shell companies," "intermediaries," and the opacity created by transactions that involve multiple links in chain intentionally made it harder for their own financial professionals, as well as those of U.S. and European regulators, to prevent transactions that could aid terrorists. Indeed, a core theme of nearly every Laundromat in the past has been that the accused bank or money remitter – once caught – proclaimed that their transactions were incredibly complicated, the opacity and insufficient paperwork, while regrettable, proves they could not have known, and the existence of the multiple links, buffers, intermediaries or other similar artifices – which the bank or money remitter itself often created or improved – absolved the accused of responsibility for the terrorist finance that flowed through their Laundromat.

665.     Moreover, Defendants also knew that a substantial percentage of their executives, officers, employees, and agents recklessly disregarded obvious terrorist finance risk because the money pouring in was too great, and therefore were more likely to potentially attempt to conceal their terrorist finance by relying on such buffers, intermediaries, and the like. After 2007, according to Ms. Belton, "Western bankers" had "been blinded by the flood of cash flowing into the City of London from the former Soviet Union, and increasingly they'd come to depend on it, especially as the Western banking system hurtled towards the 2008 financial crisis."[417] Each Defendant promoted the use of buffers, intermediaries, layers, and multi-link-transaction-chains precisely because doing so would afford them plausible deniability if their conduct was ever exposed. This strategy only magnified Defendants' culpability.

666.     Defendants' practices of knowingly facilitating al-Qaeda and Taliban (including Haqqani Network) transactions through their Laundromats, only heightens their culpability. Defendants intentionally used the opaque financing process with an actual understanding that the al-Qaeda and its allies relied on such opacity to enable their terrorist finance strategies. Defendants' terrorist finance may have been routed to al-Qaeda through an agent, like the Khanani MLO, and the SCB-supplied CAN fertilizer bomb components may have been refined after Standard Chartered Bank enabled the sale, but in every instance, Defendants knew they were occurring and purposefully orchestrated them. That is because Defendants made it a business to earn money from illicit enterprise.

667.     Defendants knew that suspicious transactions in high-risk jurisdictions that relied on front companies or shell companies and raised concerns about "Mafia"-like activity were a known red flag for al-Qaeda specifically because bin Laden consciously emulated many

---

[417] Belton at 363.

organized crime finance strategies. Thus, any bank or money remitter's transaction in a high-risk jurisdiction that "relied on front companies—much like the Mafia" raised specific red flags for "Al Qaeda" involvement."[418]

### F. Defendants Knew Altaf Khanani Was A Notorious Terrorist Financier Of, And Agent For, Al-Qaeda, The Taliban, The Haqqani Network, Lashkar-E-Taiba, Jaish-E-Mohammed, And D-Company

668. From 2001 through 2016, Defendants knew that Altaf Khanani – through the Khanani MLO and associated fronts like Al Zarooni Exchange and Mazaka General Trading – was notorious as "a key financier for terrorists" who "king pinned a flourishing money laundering network involving … terror organizations like al-Qaeda, Hezbollah, and even the Taliban."[419] Defendants knew that Khanani was always notorious specifically for helping the Syndicate to launder money in support of terrorist operations targeting Americans in Afghanistan and Pakistan.

669. Defendants knew that Khanani's decades-long practice – and al-Qaeda- and Taliban-specific reputation – centered upon his role helping terrorists move their drug money, especially terrorists moving opium-related money in and/or out of Afghanistan, Pakistan, the U.A.E., and Russia, to name four of Khanani's most important Syndicate-related markets.

670. Defendants knew that even before 9/11, Khanani and his family were long-standing, notorious money launderers in Karachi, Pakistan, where Khanani, his family, and the Khanani MLO were all based before 2008.

---

[418] Zarate, *Treasury's War*, at 36.

[419] The World is One News (Indian TV News Show), *Pak National Altaf Khanani's Financial Relationship with Terror Organisations* (Sept. 21, 2020), https://www.youtube.com/watch?v=BHqa05FUbT4.

671.  From 2008 through 2017, Defendants knew that Altaf Khanani, and nearly every other member of Khanani's family, served as financiers for al-Qaeda and its allies based upon, among other things, Defendants' knowledge of such persons': (i) decades-long specific reputation as al-Qaeda and Taliban financiers; and (ii) open and notorious association with the fronts used by the Khanani MLO, including but not limited to: Mazaka General Trading, Al-Zarooni Exchange, and other Khanani-owned and/or controlled entities.

672.  Unsurprisingly, within weeks of 9/11, major media reports directly connected Khanani to suspected al-Qaeda and Taliban terrorist finance. Ever since, consistent media coverage alerted Defendants to widespread global suspicions that Khanani, his family, and their associated entities, *i.e.*, the Khanani MLO, financed terrorist attacks by al-Qaeda and its allies against Americans, including, but not limited to, attacks against Americans committed or facilitated by Syndicate members al-Qaeda, the Taliban (including its Haqqani Network), Jaish-e-Mohammed, D-Company, Lashkar-e-Taiba, as well as Syndicate ally Hezbollah. Examples of such media coverage include, but are not limited to:

(i)  *USA Today*, September 2001: "The worldwide hunt for [al-Qaeda's] finances … could [] dead-end in a place like [the Khanani & Kalia currency exchange], one of [Pakistan's] ubiquitous currency exchanges. Most of Pakistan's 600 currency dealers [ran] illicit money-transfer operations that [were] linked informally to a vast network of similar operations around the globe … [In Pakistan,] the business [was] dominated by Pakistan's Pashtun minority, who [were] kinsmen of Afghanistan's largest ethnic group. Most members of the repressive Taliban regime in Afghanistan are Pashtun. … U.S. authorities [were] looking at the hundi network 'because [it was] a great way to move a lot of money around while preserving anonymity,' [said] Neil Livingstone, CEO of … an international investigative firm … [T]he hundi network [was] the subject of international scrutiny [and was] singled out by the 30-nation Organization For Economic Cooperation and Development and other international institutions as a prime tool for money launderers. The possibility that al-Qa'eda and other terrorist groups [] moved money through the hundi network [was] 'more than remote,' [said] *Money Laundering Alert*."[420]

---

[420] James Cox, *'Hundi' System May Foil Investigators*, USA Today (Sept. 30, 2001).

(ii) <u>_New York Times_, October 2003</u>:  "'_Hawalas_ are the 1,000-pound beasts in this whole terrorist financial system,' said a senior American counterterrorism official []. … Dubai, along with Pakistan and India, forms the backbone of a system that abets terrorism. … "It's convenient and cheap for [] bin Laden to transfer cash from accounts in Pakistan and southwest Asia through Dubai," said Moyara Ruehsen, an international policy professor … One of the largest exchange houses and _hawala_ dealers in the Muslim world, [Khanani & Kalia International (or "KKI"), _i.e._, the Khanani MLO ] … [was] now being investigated … on suspicion of having transferred money to militant groups, American and Pakistani officials said. The authorities in the [U.A.E.] also investigated [KKI] …[421]

(iii) <u>_The Nation (Pakistan)_, November 2008</u>: "[Pakistan's] Federal Investigation Agency (FIA) has intensified [its] crackdown against money-changers as its agents …arrested another top forex trader Altaf Khanani … [The] National Research Cyber Crime Cell of FIA raided the office of Khanani and Kalia International (KKI) situated at Sima Trade Centre … to probe the scam of money laundering. … [Khanani] was running a foreign exchange company in the name of KKI [and] was arrested … by FIA Crime Wing on charges of being involved in the illegal transaction of foreign currency … An employee of a dealer standing outside the closed market seeking anonymity said that these money changers had become rich overnight; FIA should have taken their record into custody to probe into their transactions to the various countries. 'Bomb blasts can be stopped if the illegal business of Hundi and Hawala is controlled or stopped' he claimed. 'Financial help is being extended to the militants through this business' he further commented. … … [A Pakistani] TV channel reported that Altaf Khanani [] escaped abroad after deceiving authorities at" "Allama Iqbal International Airport [in Lahore, Pakistan]."[422]

673.    The FIA's arrest, investigation of, and failure to successfully prosecute, Khanani in 2008 prompted another wave of media coverage documenting his suspected laundering for terrorists. For example, on November 10, 2008, the Pakistani news outlet _Ummat_ reported that "[t]he American officials are keeping an eye on the Pakistan's biggest foreign currency scandal. … Khanani … Sources to a private TV channel have disclosed that American officials suspected that foreign money changers companies may have provided money to extremist militant groups."

674.    Defendants knew that Khanani also had an (accurate) reputation for laundering funds for Sirajuddin Haqqani and other members of the Haqqani family to support Haqqani

---

[421] Timothy L. O'Brien, _U.S. Focusing on Dubai as a Terrorist Financial Center_, New York Times (Oct. 5, 2003).

[422] Mansoor Khan and Amraiz Khan, _FIA Intensifies Crackdown_, The Nation (Pakistan) (Nov. 10, 2008).

Network operations in Pakistan and Afghanistan. For example, as one analyst explained, "Sirajuddin Haqqani, who in 2016 was appointed as deputy leader of the Taliban, was designated as a terrorist by the U.S. for his role as leader of the Haqqani network. The network … **has been known** to work closely with transnational criminal organizations like … the Altaf Khanani [Money Laundering Organization]. Given that these groups have been known to funnel billions of dollars through the global financial system … the financial community will likely **exercise extreme caution** in order to manage exposure to activities with a nexus to illicit finance."[423]

675.     From 2008 until 2015, Defendants knew that Khanani was a wanted man who was notorious around the world for laundering massive amounts of U.S. Dollars for the world's worst terrorist groups, including al-Qaeda, the Taliban (including its Haqqani Network, Lashkar-e-Taiba, Jaish-e-Mohammed, D-Company, and Lebanese Hezbollah.

676.     Defendants knew that Khanani was a criminal terrorist – not a legitimate businessman – who had the reputation since 9/11 as a transnational criminal and terrorist who ran a "major international money-laundering organisation [*i.e.*, the Khanani MLO] that count[ed], al-Qa'ida, Hezbollah, [and] the Taliban" amongst "its customers" and "used major international banks to 'wash' illicit funds" for its Syndicate customers.[424]

677.     Defendants knew that Khanani's and the Khanani MLO's cross-border money laundering operations were most plausibly understood to ordinarily finance al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and D-Company, rather than routing value for some other non-Syndicate terror group.  As Pakistani banking analyst Farooq Tirmizi explained in 2018,

---

[423] Hamad Alhelal, Sigma Ratings, *Kabul via Khartoum* (Mar. 6, 2020) (emphasis added), https://www.sigmaratings.com/knowledge-center/insights/kabul-via-khartoum-11180.

[424] Mark Schliebs, *Launderer for Terror Cartels at Work Here*, Australian (Jan. 25, 2016), 2016 WLNR 231.7203.

banks and remitters doing business in Pakistan knew "that *the reason* Pakistan was placed on the grey list" was "due to [Pakistan's] failure to take sufficient steps to curb terrorist financing, *not* specifically anti-money laundering."[425]  Indeed, Mr. Mr. Tirmizi explained, anyone familiar with Pakistan's financial system – like Defendants – understood necessarily understood one simple universal rule: transnational criminal organizations are loathe to move any illicit income from the U.S., E.U., and U.A.E. – where it is safe and denominated in Dollars – into Pakistan – where it is unsafe, and denominated in an unstable currency; FTOs have the exact opposite reaction:

> *No international criminal gangs use Pakistani banks to launder their money*, certainly not the kind that the rest of the world would care about. *But funds for terrorism do flow through Pakistani banks.*[426]

678.    Defendants knew about Khanani's identity, including the connections between Khanani, Khanani's family members, and Khanani MLO entities like Mazaka General Trading and Al-Zarooni Exchange.  Among other reasons, when Defendants' implicated executives, managers, employees, and agents consciously serviced the "dirty money" needs of suspicious customers from the countries that they understood to be the most important markets for the river of dirty money flowing out of al-Qaeda, the Taliban, and their Russian Mafia Opium JV partner, they inverted the normal incentive structure that compels criminals to be willfully blind. The reason is simple: any banker who considered moving dirty money for the Russian Mafia at scale could ordinarily be expected to insist – for personal safety reasons – on knowing the identity of

---

[425] Farooq Tirmizi, *The FATF 'Grey List' Means More Trouble For Pakistan Than You Think*, Daily Pakistan Today (Mar. 5, 2018) (emphasis added), 2018 WLNR 6953120. (emphasis added).

[426] Farooq Tirmizi, *The FATF 'Grey List' Means More Trouble For Pakistan Than You Think*, Daily Pakistan Today (Mar. 5, 2018) (emphasis added), 2018 WLNR 6953120. (emphasis added).

the true beneficiary and such person's associated murderous group because it was widely known that the Russian Mafia controlled the money laundering business in, and relating to, Russia.

679. Defendants knew that an attack in London in March 2012 reinforced the importance to always know one's customers if there was any chance they could include members of the Russian Mafia and that gunmen shot German Gorbuntsov, a Russian banker who had been involved in the "Moldovan Laundromat" and gotten himself "caught in the crossfire" involving "organised-crime groups warring over cash."[427]

680. Defendants and their personnel knew that the attack on Mr. Gorbuntsov highlighted the extreme risks taken by bankers and money remitters who operated Laundromats that could potentially implicate the Russian Mafia's "dirty money," and Defendants and their personnel knew that the attack on Mr. Gorbuntsov highlighted the personal safety reasons necessitating that bankers and money remitters in their position know the precise identities of their customers in order to avoid Mr. Gorbuntsov's fate.

681. Defendants knew that Khanani did not "trick" any Laundromat that serviced the Syndicate through him. With respect to Khanani's business bona fides, Defendants knew that: (1) Khanani was an internationally notorious terrorist financier, not a legitimate businessman who sometimes dabbled in terrorist finance; (2) Khanani and the entities he controlled had a singular purpose of laundering narcotics proceeds for terrorist groups; (3) everything Khanani and his entities did was designed to enable terrorists to profit from drug sales; and (4) Khanani and his entities did not engage in any "legitimate" business.

682. With respect to Al Zarooni Exchange, Mazaka General Trading, and the other Khanani MLO entities, Defendants knew that: (1) each such entity was controlled by Khanani

---

[427] Belton at 402.

and used exclusively for terrorist finance; (2) each such entity did not conduct any legitimate business; (3) each such entity was a shell company that did not have a real corporate presence anywhere and raised a litany of obvious counter-terrorist finance red flags; and (4) the trading history of each such entity strongly indicated it was engaged in capital flight, laundering, or other financial crimes in high-risk-terrorist-finance jurisdictions, and thus that such transactions foreseeably risked aiding terrorists. Moreover, Defendants' knowledge of Khanani's affiliation with, and control of, the shell companies used by the Khanani MLO, was amply demonstrated by how quickly each Defendant was able to determine that it had committed serious crimes when it dealt with Khanani specifically once people began asking questions.

683.    After 9/11, and by no later than 2003 at the latest, Defendants knew that Khanani and the Khanani MLO were internationally notorious as a suspected financier and fundraiser for al-Qaeda and the Taliban. As the *Australian* explained in 2016, "Khanani was a partner in a Karachi-based foreign exchange company," which "had long been suspected of ties to terrorist groups, with investigations … as long ago as 2003."[428]

684.    Defendants knew that Khanani was a notorious Pakistani terrorist financier who had evaded capture for decades. From 2008 through 2015, Khanani was also subject to one or more arrest warrants, "red notices," and/or similar indicia of law enforcement interest from the U.S., Pakistan, the U.A.E., Afghanistan, and/or Australia that were known to the Defendants.

685.    Defendants knew that Khanani's reputation for laundering money for al-Qaeda and the Taliban never changed because he never stopped representing them. By 2009, Defendants knew that Khanani had achieved a "James Bond Villain" level of global infamy as

---

[428] Mark Schliebs, *Launderer for Terror Cartels at Work Here*, Australian (Jan. 25, 2016), 2016 WLNR 231.7203.

one of the world's most notorious terrorist financiers. According to Robert Cassita, a DEA agent who investigated Khanani:

> [J]ust by the sheer … amount of money he was able to move, the network that he built on six different continents, created an air … that he was an untouchable … I always [] likened him to a James Bond villain. He fit[] the mold. He ha[d] a worldwide network. Move[d] billions of dollars, … [led] a transnational organization, and [was] someone that the world look[ed] [at] as a target.

According to David Stewart, of the Australian Federal Police, who also investigated Khanani, with respect to "high volume, very serious, transnational organized crime networks. … Khanani was the number 1 international controller as far as … terrorist funding was in the world and … was causing a significant impact on multiple countries throughout the world."

686. Defendants' understanding was cemented in the seven years from 9/11 through 2008, when Khanani was the subject of regular international media coverage concerning his fusion with al-Qaeda, the Taliban, and other extremists in Pakistan, and locked in Khanani's reputation as a suspected money launderer and terrorist amongst banks and money remitters around the world, as well as in the media and in government circles.

687. Defendants knew that Khanani also served as a personal agent for Sirajuddin Haqqani (designated as an SDGT in 2008) and the Haqqani Network (designated as an FTO in 2012). For example, as one regional analyst explained, that "Sirajuddin Haqqani" and the "Haqqani [N]etwork" have "**been known** to work closely with" "the Altaf Khanani [MLO]" and, "[g]iven that these groups have been known to funnel billions of dollars through the global financial system," banks and money remitters needed to "**exercise extreme caution**" "to manage

exposure to activities with a nexus to illicit finance," *i.e.*, Syndicate terrorism funded by Laundromats like Defendants.[429]

688.    Defendants knew that Khanani's relationships with his shell companies were open and notorious to the banks and money remitters that services the Syndicate through Khanani. Defendants knew that Al Zarooni Exchange and Mazaka General Trading were controlled by Khanani and used by Khanani for the specific purpose of executing illicit transactions designed to support the terrorist attacks of his terrorist clients, al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, by helping them finance their networks, including by converting their illicit income into usable U.S. Dollars and repatriating such freshly laundered U.S. Dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

689.    Defendants knew that Khanani did not have any legitimate business and therefore that they had to end ***all*** their relationships with him, which, on information and belief, most Defendants did not do even once they started reviewing their Khanani-related transactions. According to Professor Gurulé, "[t]errorist organisations' diverse requirement for financing creates a strong logic for seeking to disrupt terrorism by choking off funding flows to all terrorist-linked activities."[430]

### G.    Defendants Knew Terrorists Regularly Used Tax Fraud, Including VAT Fraud, Schemes To Finance Attacks

690.    By no later than 2005, each Defendant knew that organized financial crime activities in Europe were red flags for terrorist finance. As Mr. Kochan documented at the time:

---

[429] Hamad Alhelal, Sigma Ratings, *Kabul via Khartoum* (Mar. 6, 2020) (emphasis added), https://www.sigmaratings.com/knowledge-center/insights/kabul-via-khartoum-11180.

[430] Gurulé, *Unfunding Terror*, at 21.

Western governments and multilateral bodies have understood these dangers and sought to introduce some standards into bank's relationships… [I]n recent years, the financial police have turned their attention to … Financial police – tax officials, police detectives, customs agents, bank money laundering reporting officers and the like – have been charged with examining suspicious money movements for terrorist links. This new dimension has dramatically raised the profile of economic crime and investigation… Money laundering rules are their constant concern. … The trail between a terrorist and his backer may be cracked by investigation of a company involved in commercial illegality, such as tax evasion…may reveal links to terrorists. When organized crime groups involved in the Colombian drugs trade…links to terrorist groups have been unearthed.[431]

691.    Defendants knew that because: (a) substantial numbers of al-Qaeda cells were present all throughout Europe, including Germany, Italy, Spain, the U.K., and elsewhere; and (b) terrorist cells in Europe had, for decades-long, relied upon large-scale tax fraud schemes, including VAT fraud schemes, as a powerful form of terrorist finance, then necessarily (c) any red flags suggesting large-scale VAT fraud aided by a bank foreseeably suggested the possibility of al-Qaeda activity.

692.    According to Dr. Jodi Vittori, Europe's thicket of tax laws has long made tax-related issues attractive to terrorist financiers operating there, who have long recognized that "[d]efrauding governments" on funds flowing from things like "tax exemption certificates" were examples of "lucrative" "schemes" operated by the cells of "terrorist organizations" in Europe.[432]

693.    Defendants knew that Syndicate fundraising, finance, and logistics cells regularly used tax fraud schemes, including VAT fraud schemes, to fund Syndicate operations, and that such techniques were a time-honored tool of terrorist finance. In 2003, Steven Emerson testified

---

[431] Kochan, *The Washing Machine*, at xvi, 66.

[432] Vittori, *Terrorist Financing*, at 33.

that "[a] familiar pattern among fundraisers for terrorism [was] their sophisticated use of tax laws to maximize funds for terrorist operations."[433]

694.    Defendants knew that large-scale VAT fraud, in particular, was a screaming red flag that specifically indicated foreseeable al-Qaeda and Taliban (including Haqqani Network) terrorist finance and fundraising activity because both groups were known for being early adopters of VAT fraud as a funding strategy, befitting their demonstrated business acumen and transnational terrorist finance orientation.

695.    Defendants knew that in 2005, the FATF, a leading global organization designed to prevent money laundering, publicly warned financial institutions that VAT-related frauds in the EU could foreseeably finance terrorists and published several "case examples" that documented how EU-based VAT fraud schemes had funded terror.

696.    By 2007, two additional public events alerted Defendants to the extreme risk that European tax frauds, most of all VAT frauds, were "red flags" specifically denoting foreseeable al-Qaeda and/or Taliban (including Haqqani Network) terrorist finance activity. *First*, on February 23, 2007, the Financial Action Task Force publicly issued its report, *Laundering the Proceeds of VAT Carousel Fraud*, which warned Defendants, among other things, that:

- "VAT carousel fraud involves organised [] groups attacking tax systems to generate substantial profit … as a vehicle to launder and raise funds … to fund terrorism";

- "[T]o prevent … this [VAT] fraud, it [was] imperative that financial institutions fulfil[led] their obligations under the FATF recommendations to know their customers, and operate[d] due diligence," which "idea [was] supported in the FATF's Money Laundering and Terrorist Financing Typologies 2004-2005 report, which note[d] … VAT carousel fraud that uses an Alternative Remittance System to move funds"; and

---

[433] *Quoted in* D'Souza, *Terrorist Financing*, at 44.

- "There need[ed] to be an increase[ed] global awareness of the use of carousel style frauds as a vehicle for raising funds for … terrorism," and was "a serious crime. [434]

697.    Defendants knew that the FATF was an unquestioned, universally recognized standard setter for the combined world of AML/CTF around the world. Defendants, including their executives, managers, and employee in the U.S., U.K., Germany, Russia, U.A.E., Pakistan, Afghanistan, and elsewhere, knew that FATF guidance was an authoritative source and that deliberately departing from FATF practices foreseeably aided terrorist finance. The FATF's 2005 and 2007 reports were circulated widely amongst each Defendant's executives, officers, employees, and agents, including, on information and belief, each Defendant's specific personnel responsible for managing Defendants' customer relationships, legal, compliance, marketing, sales, finance, and accounting.

698.    *Second*, beginning in the summer of 2007, Imran Hussain, a Scottish-Pakistani Syndicate operative who raised millions for al-Qaeda, was the subject of international media coverage for the carousel fraud that he masterminded to execute a massive VAT scam that generated hundreds of millions in profits.

699.    Defendants knew that tax frauds in Europe were a decades-long, notorious, red flag for terrorist finance based on a constant stream of reports since the 1980s, which alerted Defendants to the widespread strategy of terrorist groups around the world, including the Syndicate, to fund operations through tax fraud schemes, often European VAT fraud schemes specifically. Such reports included, but were not limited to:

(i)     *Associated Press*, February 1987: "[Irish] Judge James Nicholson" "said [] that terrorist groups  in Northern Ireland are financed by funds they obtain by … tax fraud … at the end of a trial that  convicted three men of funnelling tax fraud money to the outlawed Irish National Liberation  Army."[435]

---

[434] FATF, *Laundering the Proceeds of VAT Carousel Fraud*, at 2, 8, and 19 (Feb. 23, 2007).

[435] AP Online, *Judge Says Tax Fraud Finances Terrorism* (Feb. 11, 1987).

(ii)    *EurActiv*, October 2006: "Interior ministers from Germany, France, Spain, Italy and Poland … attended a two-day UK meeting … [and] were told by UK Home Secretary and MI5 chief John Reid that terrorism [was] the 'biggest threat to all European nations' [and that] … Reid want[ed] Europe to fight VAT fraud linked to terror funds."[436]

(iii)    Financial Action Task Force, February 2007: "VAT carousel fraud" "generate[d] substantial profit [for terrorist groups]" "as a vehicle to launder and raise funds … to fund terrorism" … "[T]o prevent … this[,] [it was] imperative that financial institutions fulfil[led] their obligations under the FATF recommendations to know their customers, and operate[d] due diligence" …"[T]he use of carousel style frauds [was] a vehicle for raising funds for … terrorism … [and was] a serious crime."[437]

(iv)    *El Pais*, January 2009: "Police in Barcelona … arrested six Pakistani citizens on tax fraud charges amid suspicions that the group may have been sending money abroad to finance Islamist terrorism. … According to investigators, the group ran legitimate telephone call shops and internet cafes, but had failed to pay the correct amounts of VAT. … investigators suspect that the six Pakistanis may have been using their businesses and their illicit gains from tax fraud to raise funds to finance terrorism in Pakistan and other countries."[438]

(v)    *Tampa Tribune*, September 2011: "[D]ollars investigators [said were] being stolen through tax fraud might [have been] funneled to terrorists who [used] taxpayer money to hurt American troops or allies. …. 'When you look[ed] at the dollars and how [they were] being money-laundered, … it [brought] up another concern, particularly when you hear[d] about the businesses that [were] doing the money laundering and the folks that [were] behind it. You ha[d] to wonder where [was] that money going besides to a criminal enterprise,' [Rep. Rich] Nugen [stated]. … 'Here [we were] fighting terrorism across the board, we ha[d] troops engaged, and here we ha[d] a very profitable crime [that was] going on,' he said."[439]

(vi)    Jayesh D'Souza, 2012: "Tax evasion is related to terrorist financing … The government and the courts have attempted to clamp down on" "Tax Evasion/Fraud" "schemes used to support terrorist networks. …In the United States, a number of branches of the [IRS] are assigned to counter tax evasion related to terrorist financing and money laundering."[440]

---

[436] EurActiv (English), *Security & Defence - Call For G6 To Unite Against Terror* (Oct. 26, 2006).

[437] FATF, *Laundering the Proceeds of VAT Carousel Fraud*, at 2, 8 and X (Feb. 23, 2007).

[438] EurActiv (English), *EU Targets Terror Financing with VAT Fraud Crackdown* (June 12, 2017).

[439] Elaine Silvestrini, *Tax Fraud Loot Funds Terrorism?*, Tampa Tribune (Sept. 20, 2011), 2011 WLNR 19580302.

[440] D'Souza, *Terrorist Financing*, at 41-43.

### H. Defendants Knew Terrorists Regularly Used Capital Flight Schemes To Finance Attacks

700.    Defendants also knew that they were aiding Syndicate terrorism when they facilitated unlawful capital flight from customers posing a high risk of terrorist finance, especially when connected to Afghanistan, Pakistan, the U.A.E., or Russia. Deutsche Bank's "mirror trades," for example, were a form of capital flight.

701.    According to Raymond Baker, whenever a "European" or "North American" "bank[]" or "corporation[]" "aggressively compet[ed] to service illegal capital flight," it confirmed the "widespread" "perception" that "the West [was] not serious about its anti-money laundering programs, preferring instead to" "profit from the combined flows" of dirty money cycling through it.[441] "Thus," according to Mr. Baker, "illegal capital flight" aided by European and American banks or money remitters "remove[d] anti-money-laundering efforts as an effective instrument in the fight against … terrorism" and "thereby weaken[ed] the ability to prevail" against the "perilous threat[]" posed by terrorism "to our societies."[442]

### I. Defendants Knew Of The Close Link Between Narcotics-Related Transactions And Syndicate Violence

702.    Based on all the media reports cited herein, Defendants knew of the close linkage between their narcotics-related transactions and Syndicate violence.

703.    Defendants knew that Congress statutorily codified its recognition of the close linkage between narco-trafficking and terrorism committed by al-Qaeda in 2006, when Congress

---

[441] Raymond W. Baker, *Illegal Flight Capital Dangers for Global Stability*, International Politik, no. 6 (2000), *translated and quoted in* D'Souza, *Terrorist Financing*, at 42.

[442] *Id.*

amended the USA PATRIOT Act to create a new felony offense for aiding the narcotics trafficking activities of an FTO.[443]

704.    Moreover, in February 2011, the U.S. government publicly announced that the terrorist organization Lebanese Hezbollah had masterminded a long-term money laundering scheme that leveraged a foreign bank (Lebanese Canadian Bank) that used its New York branch to help a terrorist group launder drug money to support terrorist operations in the Middle East. This garnered major international media coverage and further alerted each Defendant to the foreseeable link between their provision of U.S.-linked financial services to a narco-terrorist and anti-American violence.

705.    The Russian Mafia nexus further alerted Defendants to the violent nature for the crimes they were aiding. Defendants knew of the widespread understanding in the business, financial, diplomatic, media, and academic communities of the fusion between illicit activities in the Russian financial services marketplace and Syndicate terrorist attacks against Americans in Afghanistan. For example, as Ms. Belton recounted, "in the wake of the [9/11] attacks, the focus was on counter-terrorism[,] … especially now that Russia [began] to convince the West of the links between Chechen rebels and [al-Qaeda]," which highlighted the fusion between Russian-related "counter-terrorism" and the Syndicate terrorist threat to Americans "in Afghanistan."[444]

706.    From 2001 through 2016, Defendants knew that widely reported public statements by Pakistani and Russian officials confirmed the inseparable link between transnational crime, including the Afghanistan-to-Russia opium pipeline, and terrorist attacks.

---

[443] USA PATRIOT Improvement and Reauthorization Act of 2005 § 122, 21 U.S.C. § 960a (2006).

[444] Belton at 278.

707. From the late 1990s through 2016, Defendants knew that the Russian Mafia were notorious for their opium joint venture with, and weapons sales to, al-Qaeda and the Taliban. For example, Defendants knew that a member of the Russian Duma publicly accused Mogilevich of selling tanks, armored personnel carriers, and light aircraft to Taliban terrorists in Afghanistan and al-Qaeda terrorists in Chechnya, which generated a wave of media coverage a few months after 9/11. Similarly, Defendants knew that Mogilevich and the Russian Mafia organized and hosted a secret summit in 2004 with al-Qaeda in eastern Europe, which leaked to the media and produced another wave of stories documenting al-Qaeda's close partnership with the Russian Mafia.

708. When Defendants deliberately enabled transactions that they knew directly or indirectly aided the Syndicate-Russian Mafia Opium Joint Venture, Defendants assumed a role in an enterprise they understood to be laced with violence. As Tom Wainwright explained in his book analyzing narco-terrorist cartel theory and practice, because cartels like the Syndicate and Russian Mafia cannot take their breach of contract claims to court, "[t]he one way that criminal organizations can enforce contracts is with violence, which is why a capacity to intimidate and kill is at the heart of any drug cartel's success."[445] Defendants therefore knew that the narcotics-related transactions they directly or indirectly aided went "hand in hand" with "violence" "because the use of force, or at least the threat of it, is the only way that drug cartels have of enforcing contracts."[446]

---

[445] Tom Wainwright, *Narco-Nomics: How to Run a Drug Cartel* 55 (Public Affairs Press 2016).
[446] *Id.* at 70.

**J.     Defendants Knew Of Al-Qaeda's, The Haqqani Network's, Hezbollah's, And The Qods Force's Role**

709.     In addition to Defendants' general knowledge that al-Qaeda sponsored CAN fertilizer bomb attacks against Americans, Defendants also knew of al-Qaeda's, the Haqqani Network's, and the IRGC's (including the IRGC's Hezbollah Division's and Qods Force's) role in al-Qaeda and Taliban (including Haqqani Network) attacks in Afghanistan, given the topic's wide coverage in mainstream media outlets. For example:

- On September 26, 2005, *Newsweek* reported that al-Qaeda was bringing instructors from Iraq to train the Taliban how to commit terrorist attacks against Americans.[447]
- On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[448]
- On April 30, 2012, the *Guardian* reported: "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign."[449]

710.     Given Defendants' sophistication, they were aware of reports like these, and their substance, which documented that the Taliban (including Haqqani Network) attacks Defendants were funding was supported in substantial part by al-Qaeda.

**K.     Defendants Knew That Their Transactions Were Not Routine**

711.     Defendants also knew that al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force were FTOs subject to the harshest criminal and financial sanctions possible under U.S. law and, given these FTOs' status, that any Defendant transaction that directly or indirectly

---

[447] *Unholy Allies*.

[448] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[449] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).

aided al-Qaeda, the Haqqani Network, Hezbollah, and/or the Qods Force was, by definition, not a regular, routine, or ordinary financial transaction.

712.    It would be improper to suggest that Defendants believed that their transactions with the terrorists identified in this Complaint were "routine" or "ordinary" because Defendants knew that FTOs like al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force derived vital financial, logistical, and operational value from purportedly "regular" transactions. Defendants knew that it was impossible for them to engage in any "routine" transaction with a front, agent, cut-out, or partner of al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force for numerous reasons including, among other things:

(i)     Defendants knew that the **unique legal posture of FTOs** under the array of U.S. laws that criminalized nearly all transactions with FTOs meant that any transaction with a customer associated with such FTOs that Defendants facilitated while Defendants knew that value would flow, directly or indirectly, from the customer to an FTO was criminalized under U.S. law and therefore not a "routine" financial transaction;

(ii)    Defendants knew that FTO-focused **counter-terrorism professionals and organizations**, like Treasury officials and the Financial Action Task Force, regularly emphasized that any transactions with FTOs, regardless of their nature, that facilitated the flow of U.S. Dollars or other value to FTOs after 9/11 were inherently dangerous and therefore not routine; and

(iii)   Defendants knew that **al-Qaeda's and the Taliban's post-9/11 notoriety**, as the two terrorist groups known to be responsible for the attack, meant that Defendants knew that even ordinary transactions with such FTOs were dangerous and therefore Defendants knew that any transactions that Defendants facilitated that directly or indirectly aided such FTOs were, by definition, not "routine".

713.    Plaintiffs' allegations comports with the broad post-9/11 consensus amongst counter-terror finance scholars and law enforcement personnel, who ordinarily concluded, from 2001 through the present, that when a bank or money remitter regularly processed transactions for an al-Qaeda, Haqqani Network, Hezbollah, and/or Qods Force front, operative, agent, cut-

out, partner, financer, or logistician, after 9/11, the bank or money remitter was not engaged in any "normal," "regular," or "routine" financial transaction.

**L.** **Defendants Knew That Even If Their Transactions Were Ostensibly Routine, Such Transactions Still Aided Terrorist Attacks**

714. Defendants also knew that FTOs, including but not limited to, al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, derived enormous financial, logistical, and operational value from ordinary, routine, and regular transactions, with the FTOs attaching the greatest value to U.S. Dollars, technologies, and services sourced through U.S. markets. Indeed, according to Professor Gurulé, "[t]he major methods used to move terror money" after 9/11 usually depended upon ostensibly routine transactions that flowed through "the traditional banking system, alternative remittance systems, such as *hawala*, and bulk cash couriers."[450]

715. Defendants also knew that even routine transactions aided al-Qaeda, the Haqqani Network, Hezbollah, the Qods Force, and the other FTOs who participated in Syndicate attacks against Americans in Afghanistan, because every such FTO heavily prioritized obtaining and using U.S. Dollars, goods, technologies, and services, to enable attacks. Defendants therefore knew that even "routine" transactions that facilitated value transfer from inside of America to the FTO's operatives overseas aided attacks because of the outsized importance of the U.S. to such FTOs' financial and logistical chains:

(i)    Defendants knew that strengthening al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's U.S. Dollar strategies aided the terrorists' purchasing power;

---

[450] Gurulé, *Unfunding Terror*, at 151. "Contrary to popular belief, terrorists use banks and other financial institutions to transfer funds. Deposit-taking institutions are particularly attractive because they provide an extensive range of financial services. Also, banks provide wide geographic availability either through their foreign branch offices or through correspondent accounts with foreign banks. Finally, large sums of money can be transferred instantaneously from a bank located in the United States, through bank accounts in the Middle East, to an offshore account in some other foreign country with the push of a button." *Id.*

(ii)     Defendants knew that improving al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's selection of U.S. goods and services through even routine services bolstered each FTO's supply chain; and

(iii)     Defendants knew that enhancing each FTO's operatives' cover and concealment, through the credibility that each Defendant knew, and believed to be, would result from the Defendant's American branch's facilitation of the FTO's U.S.-related financial transactions that leveraged American markets, banks, remitters, corporations, personnel, and/or service providers, *e.g.*, DBTCA's facilitation of Azizi's VAT fraud transfers to al-Qaeda and the Haqqani Network, SCB New York's facilitation of Haqqani Network purchases of explosives through Fatima Fertilizer, and Danske New York's facilitation of Khanani's transfers to al-Qaeda and its allies.

716.     It would be improper to suggest that Defendants did not know that routine financial transactions foreseeably aided terrorist attacks against Americans in Afghanistan and Iraq by al-Qaeda and its allies because Defendants knew that FTOs like al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force derived vital financial, logistical, and operational value from purportedly "regular" transactions because, among other reasons:

(iv)     Defendants knew that the **history of FTO attacks** against Americans before and after 9/11 involving al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force were materially aided by, among other things, routine transactions;

(v)     Defendants knew that the **shared post-9/11 FTO terrorist tradecraft** practiced by al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, ordinarily emphasized, among other things, that each FTO's operatives facilitate financial and logistical transactions through ordinary commercial and financial transactions wherever possible; and

(vi)     Defendants knew that the **extreme financial isolation of FTOs** meant even "routine" transactions provided outsized aid to al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, because FTOs were subject to the harshest sanctions possible and therefore derived key financial, tactical, and operational value from even ordinary transactions.

## M.    Defendants Knew That They Served Terrorists Who Did Not "Trick" Them

717.     Defendants knew that, when Defendants provided financial services to the terrorist operatives, agents, fronts, cut-outs and/or partners identified in this Complaint, Defendants intended to provide aid to persons whom Defendants knew were acting on behalf of

al-Qaeda, the Haqqani Network, Hezbollah, the Qods Force (and each of these four FTOs'
Syndicate allies and partners), and Defendants knew that no such FTOs' customers identified in
this Complaint "tricked" Defendants when Defendants aided the FTOs through such customers.

718.    Defendants knew that FTOs' emphasis on cooperation, rather than conflict,
accorded with the leadership strategies emphasized by nearly every relevant terror head,
including Bin Laden, Sirajuddin Haqqani, Hassan Nasrallah, and Qassem Soleimani, and also
their agents and financiers like Altaf Khanani and the Russian Mafia, all of whom understood
that while most global financial institutions and money remitters with American ties were no
longer open for business to al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force,
there would always be outlier western banks and remitters that criminally deviated and tried to
profit by "breaking bad" and facilitating financial crime as a business model.

719.    Defendants knew that the transactions Defendants facilitated on behalf of the
customers affiliated with al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force set
forth in this Complaint confirmed each Defendant's long-standing tacit deal with such FTOs—
*not* that Defendants were "tricked" by persons acting on behalf of such FTOs.  This allegation
accords with the broad consensus of counter-terror finance scholars and law enforcement
personnel whom have concluded that when a bank or money remitter regularly processed
transactions for al-Qaeda,  Haqqani Network, Hezbollah, and Qods Force fronts, operatives,
agents, cut-outs, financers, or logisticians between 2002 and 2020, that bank or remitter was
unlikely to have been "tricked" by an FTO and more likely to simply have maintained a tacit
deal with the FTO that profited both the bank/remitter and the FTO.

720.    *First*, former **U.S. counter-terrorist finance leaders in Afghanistan** also
confirm that when a bank or remitter routinely flowed U.S. Dollars or other valuable American

goods or services through to terrorist fronts, operatives, and agents relating to al-Qaeda, the

Haqqani Network, Hezbollah, and the Qods Force, American counter-terror professionals

ordinarily determined that it was more plausible that the bank or remitter in question intended to

aid anti-American FTO terrorists targeting U.S. persons in Afghanistan than that the bank or

remitter was routinely tricked by FTOs. For example, while Thomas Creal "served in

Afghanistan" "as the lead forensic accountant" for Task Force 2010, he "saw up close the start of

dirty money and subsequently how it was moved around the world, using banks" and thus:

> The money movers [were] critical as Al Capone witnessed [and could] be banks,
> very large banks, as seen by recent billion dollar settlements by … ***Deutsche***
> ***Bank***, … and others. But the funds were dirty as they entered the bank[s] … I
> suggest a refocus on black money, the banks, hawalas and money movers. The
> amounts will be billions of dollars and as [] a tactic…, if you bankrupt the enemy
> you will win the war.[451]

721. *Second*, retired **federal undercover officers** confirm that each Defendant's

Laundromat services were most plausibly explained as being the product of tacit deals between

Defendants and al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, rather than

terrorist trickery. For example, as retired federal agent Robert Mazur, who conducted

undercover terrorist finance- and narcotics-related investigations, explained in 2013:

> [S]ince 2006 more than a dozen banks [settled] with [DOJ] regarding violations
> related to money laundering[,] … [including] Standard Chartered. All admitted to
> criminal offenses; all were handed … traffic tickets. This has been the U.S.
> government's playbook in fighting terrorism … For make no mistake: Without
> the ability to "wash" billions of dollars from illicit sources each year, these
> criminal enterprises would falter. … I have seen this firsthand. I was a federal
> agent for 27 years and worked undercover as a money launderer within this
> murky realm for five of them. … The largest and most sophisticated of these
> criminal enterprises ***don't trick banks*** into laundering their money; ***rather, they***
> ***partner with that small segment of the international banking*** … ***community that***
> ***recirculates drug profits and cash from other illicit trades, like black-market***
> ***arms dealing***. The only way to stop the flow of this dirty money is to get ***tough***

---

[451] Thomas Creal, *A Re-Focus on Black Money*, PR NewsChannel (Apr. 20, 2017) (emphasis
added), 2017 WLNR 12209363.

*on the bankers who help mask and transfer it around the world*. … The stakes are simply too high … [A]s long as terrorists can move their cash freely around the world, we'll have no chance to halt their deadly trades.[452]

722.  *Third*, former **Treasury counter-terrorism personnel** also concluded that one may ordinarily assume that a bank or remitter that routinely moves money for terrorist fronts, operatives, and agents intended to do so rather than being tricked.  "Unfortunately," Mr. Zarate explained in 2013, "when there [was] money to be made" and a "staggering" "magnitude" of "illicit transactions" from which a bank could profit if it operated a Laundromat, a subset of global financial institutions, money remitters and corporations determined – even after 9/11 – their "[c]rime" would "pay" because Treasury officials knew from their experience that "[w]here there [was] money to be made and moved, financial institutions [would] be implicated":

> Banks and financial intermediaries will continue to *weigh the balance between making significant amounts of money while doing business with suspect customers* and the need to apply the most stringent financial controls and standards on money flowing through their systems.  *We have seen this over and over with multinational banks*, including, most recently, *HSBC and Standard Chartered*.  There is little mercy for those … [i]nstitutions that attempt to evade sanctions and scrutiny in order to tap lucrative business lines or markets.[453]

723.  Treasury's long experience confirms that even in a well-functioning financial system, a small minority of "bad banks" must be expected to regularly, and consciously, embrace enormous criminal risks to profit from serving the terrorist financiers who could not do business with responsible banks, and therefore, Treasury's leaders have believed that "bad banks" should "be our target" as a key part of the post-9/11 U.S. strategy to protect Americans from terrorist attacks by FTOs like al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force:

> There [were] *always banks engaged in fraudulent and criminal activity someplace in the world* [and]  … serving … terrorist networks.  They not only

---

[452] Robert Mazur, *How To Halt The Terrorist Money Train*, International Herald Tribune (Jan. 4, 2013) (emphasis added), 2013 WLNR 184047.

[453] *Id.* at 370.

provide[d] criminals access to banking services, but also allow[ed] for illicit financial activity to be hidden from the view of regulators, law enforcement, and intelligence services. …[B]anks around the world … *serv[ed] as nodes of illicit financing* … [in which] the dirty money of suspect actors mixed to access the international financial system.  For any … terrorist enterprise to have global and sustained reach, it must have a financial infrastructure to raise, hide, and move money to its operatives and operations.  Banks [were] the most convenient and important of these nodes … and [were] *critical to nefarious networks*.  Where there [was] a *transnational network of concern, there [was] likely also a bank or family of banks serving as a facilitator of that activity*.[454]

724.  *Fourth*, **terrorism scholars** confirm that Defendants knew that their Laundromat services reflected tacit deals with al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, not terrorist trickery.  Nick Kochan, for example, studied how al-Qaeda and its allies used agents to fund attacks and arm their fighters through transactions with complicit banks and money remitters and explained, in his 2005 book, that "[t]here [were] four key groups" "in our society who close[d] their eyes to" terrorist finance: "They are global corporations engaged in fraud; corrupt governments; organized criminals who trade in drugs; and terrorists."[455] He concluded that "terrorists [] waged wars on the financial system to fund their outrages" after 9/11 "and companies [] made themselves available" to terrorists "in a Faustian laundering pact"[456]:

> Criminals [in developing countries] need [] services provided by global corporations … to move and clean their money … [and such] [c]riminals *… look to Western banks for a huge array of devices* that include offshore companies and tax structures, false names for their bank accounts, and lawyers and accountants for their complex financial structures.  *Some banks will provide them willingly, satisfying the authorities with the formalities of due diligence* that have increased in volume in recent years in response to the perceived terrorist threat … [H]owever it comes about, … [t]he maker of the corrupt or fraudulent money *and the financial institution who helps move it* are *equally complicit* in a process, where both are conspirators, in both parts of the activity.[457]

---

[454] Zarate, *Treasury's War*, at 8 (emphasis added).

[455] Nick Kochan, *The Washing Machine: How Money Laundering and Terrorist Financing Soils Us* ix (Thomson 2005) ("Kochan, *The Washing Machine*").

[456] *Id.*

[457] Kochan, *The Washing Machine*, at x.

725.     Similarly, Dr. Jodi Vittori concluded that terrorists like "Al Qaeda understood the limits due to the regulations of the banking business" and were "particularly adept at manipulating the international banking system" to conduct transactions through corrupt banks, remitters, corporations, and lawyers worldwide.[458]

### N.     Defendants Knew That Their Transactions With Fronts, Operatives, Cut-Outs, Agents, Or Orbits Of The IRGC, Including Hezbollah And The Qods Force, Foreseeably Aided The Syndicate's Terrorist Attacks Against Americans In Afghanistan

726.     Defendants knew or recklessly disregarded that their transactions with fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force, financed, armed, and operationally supported Iranian proxy terrorist attacks against Americans in Afghanistan.  As Treasury official Sigal Mandelker noted in 2018, companies, banks, and remitters doing business in the U.S., Europe, and the Middle East have long known that the IRGC, including Hezbollah and the Qods Force, relied upon "'deceptive' Iranian transactions that ultimately channel[ed] money to terrorists" because IRGC tradecraft "'use[d] shell and front companies to conceal [the IRGC's] tracks' as part of an elaborate scheme designed to procure cash for the Quds Force."[459]

---

[458] Vittori, *Terrorist Financing*, at 150-51 ("Bin Laden once remarked to a Pakistani journalist that his financial backers 'are as aware of the cracks inside the Western financial system as they are of the lines in their hands.'  It used the international banking system regularly, and millions of dollars in accounts suspected connected with al Qaeda have been frozen.  Al Qaeda understood the limits due to the regulations of the banking business, and it allegedly used the regional banking systems of the Middle East, including the United Arab Emirates, Kuwait, Bahrain, and Lebanon, as they had been notoriously underregulated.  While in Afghanistan, Pakistani banks were frequently used for the same reason.").

[459] Sigal Mandelker, *quoted in* Guy Taylor, *Obama Hid Efforts To Aid Iran's Windfall*, Washington Times (June 6, 2018).

727.    Defendants knew that the IRGC's terrorist tradecraft, including that of its Hezbollah Division and Qods Force, has long – and notoriously – emphasized the use of fronts, operatives, agents, cut-outs, and Orbits, to enable the IRGC's supply of funding, weapons, and operational support through illicit commercial schemes designed by the IRGC, and executed outside of Iran by Hezbollah and the Qods Force, to facilitate the IRGC's movement of hundreds of millions of U.S. Dollars, weapons, and key American communications technologies (*e.g.*, secure, untraceable smartphones), through the IRGC's global logistical network, in order to facilitate the IRGC's aid to the IRGC's Syndicate terrorist proxies in Afghanistan.

728.    Defendants knew that Hezbollah and the Qods Force purpose-built the IRGC's global terror infrastructure after 9/11 primarily to facilitate two terrorist attack campaigns designed to drive the United States out of the Middle East:  (i) a terror campaign in Afghanistan led by al-Qaeda and the Taliban, including its Haqqani Network; and (ii) a terror campaign in Iraq involving both al-Qaeda (including its local Iraqi allies) and Jaysh al-Mahdi (the IRGC's local Shiite terrorist proxy in Iraq).

729.    Defendants knew that the IRGC, including Hezbollah and the Qods Force, routinely used commercial transactions involving the U.S., Europe, and the U.A.E. that terminated in Dubai and were designed to facilitate the movement of funds, arms, equipment, and personnel to aid the IRGC's support for Iran's terrorist proxies in Afghanistan and Iraq through Hezbollah and the Qods Force.  For example, in 2008, President Bush gave a speech in the U.A.E. that was widely covered in the media in which the President emphasized that the U.S. government sought "to enforce US sanctions against" "the Quds Force" because "Dubai in

particular ha[d] become a financial centre handling substantial Iranian investments which the [Bush] [A]dministration want[ed] to restrict."[460]

730. Defendants know that the IRGC's reliance on Dubai as a central hub to support Hezbollah's and the Qods Force's facilitation of anti-American terror in Afghanistan continued without interruption from 9/11 through the present. For example, as a regional studies professor explained in 2020, "Dubai" "maintain[ed] crucial avenues for the IRGC" "to generate money" and was "the gate to the world for" Hezbollah and Qods Force front company activities.[461]

731. Defendants knew that as the U.S. intensified its IRGC terrorism-related sanctions campaign between 2009 and 2012, the IRGC, including Hezbollah Division and the Qods Force, responded by using Hezbollah and Qods Force front companies, agents, cut-outs, partners, and Orbits from an interconnected global cell network that stretched from the United States to Singapore, and included the U.A.E., Iraq, Germany, South Africa, and elsewhere, to raise money through criminal enterprise, facilitate terrorist finance through the banking system, and source key arms and state-of-the-art U.S.-manufactured technologies necessary to continue to prosecute a terrorist campaign against Americans in Afghanistan and elsewhere.

732. Defendants knew that, "[a]s the U.S. and EU sanctions on Iran's oil and finance sectors in 2012 started to bite," the IRGC "responded by setting up complex operations involving the likes of Dubai" in which "[t]he IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies," and the IRGC "partnered with some foreign companies to

---

[460] *Id.*

[461] TRT World (Turkey), *Amid Soleimani Crisis, Iran Threatens to Level Dubai and Israel. But Why?* (Jan. 8, 2020), 2020 WLNR 663153.

bypass sanctions" in which "[m]ost of the time cash" (*i.e.*, U.S. Dollars) "was delivered to a foreign account in a neighbouring country."[462]

733.    On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC, including Hezbollah and the Qods Force.  Each Defendant generally maintained a corporate security group responsible for supervising their financial transactions, doing counterparty diligence, and preventing terrorist finance and money laundering.  As part of such efforts, Defendants' standard practice would have been to conduct basic open-source research on the IRGC, including Hezbollah and Qods Force, front activities in Dubai and Europe – even a modicum of which would have uncovered the reports discussing the IRGC front entities' terrorist strategy and ties set forth above.[463]

734.    After 2005, Defendants could not have conducted credible due diligence that would have "cleared" their transactions with their counterparties controlled by the IRGC, including Hezbollah and the Qods Force.  Defendants also knew or recklessly disregarded the IRGC's, including Hezbollah's and the Qods Force's, control of their business partners based upon the statements set forth in prominent due diligence materials concerning Iran.

735.    From 9/11 through 2017, U.S. government statements regularly alerted Defendants to the fact that their illicit transactions with fronts, operatives, agents, and cut-outs

---

[462] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016).

[463] This allegation applies to all Defendants except MTN Irancell.  Plaintiffs allege that MTN Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC, including the Qods Force.

acting for the IRGC, including its Hezbollah Division and Qods Force, fronts foreseeably aided

Syndicate attacks against Americans, including in Afghanistan, including, but not limited to:

(i)     State Department, October 2007: "The U.S. Government is taking [] major actions today
        to counter Iran's … support for terrorism by exposing Iranian … companies and
        individuals that have been involved in these dangerous activities and by cutting them off
        from the U.S. financial system. … The Treasury Department [] designated the IRGC-
        Qods Force (IRGC-QF) under E.O. 13224 for providing material support to … terrorist
        organizations… Last week, the Treasury Department issued a warning to U.S. banks
        setting forth the risks posed by Iran. … [the Qods Force's SDGT designation is]
        consistent with this warning, and provide[s] additional information to help [] institutions
        protect themselves from deceptive [] practices by Iranian entities and individuals engaged
        in or supporting … terrorism [and] also notif[ies] the international private sector of the
        dangers of doing business with … the many IRGC-affiliated companies that pervade
        several basic Iranian industries."

(ii)    President George W. Bush, January 2008:  In a widely-reported speech to U.A.E.
        government and business leaders, President Bush called Iran "the world's leading sponsor
        of terrorism" and stressed that illicit transactions in the U.A.E. were important to the
        IRGC's, including the Qods Force's, ability to provide "support for Islamist groups and
        militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[464]

(iii)   Treasury Department, May 2009: "The U.S. Department of the Treasury [] designated …
        two Africa-based supporters of the Hizballah terrorist organization, under E.O. 13224.
        E.O. 13224 targets terrorists and those providing support to terrorists or acts of terrorism
        by … prohibiting U.S. persons from engaging in any transactions with them.  'We will
        continue to take steps to protect the financial system from the threat posed by Hizballah
        and those who support it,' said Under Secretary for Terrorism and Financial Intelligence
        Stuart Levey." "Iran" "provide[s] significant support to Hizballah, giving money,
        weapons and training to the terrorist organization.  In turn, Hizballah is closely allied
        with and has an allegiance to [Iran].  Iran is Hizballah's main source of weapons and uses
        its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran.
        Iran provides hundreds of millions of dollars per year to Hizballah." [465]

(iv)    Treasury Department, February 2010: "Treasury" "implement[ed] existing U.S. sanctions
        against Iran's [IRGC] by designating an individual and four companies affiliated with the
        IRGC … 'As the IRGC consolidates control over broad swaths of the Iranian economy,

---

[464] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security*
(Jan. 14, 2008), 2008 WLNR 25283869.  In its coverage, the media noted that President Bush's
speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds
Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling
substantial Iranian investments which the administration want[ed] to restrict."  *Id.*

[465] Press Release, U.S. Treasury Dep't, *Treasury Targets Hizballah Network in Africa* (May 27,
2009) (emphases added).

… it is hiding behind companies … to maintain vital ties to the outside world,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. 'Today's action … will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.' … The U.S. has previously acted against the … IRGC-Qods Force for [its] involvement in … terrorism support activities."[466]

(v)    <u>Treasury Department, August 2010</u>: "The U.S. Department of the Treasury announced [] a set of designations targeting the Government of Iran's support for terrorism and terrorist organizations, including Hizballah … Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism. Today's designations expose Iran's use of its state apparatus – including the Islamic Revolutionary Guard Corps-Qods Force – and state-run social service organizations to support terrorism under the guise of … economic development … The IRGC-QF is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia. It was designated by Treasury pursuant to E.O. 13224 in October 2007 for its support of terrorism. … The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC) and IRGC-QF to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups. These activities include economic investment … implemented by companies and institutions that act for or on behalf of, or are owned or controlled by the IRGC and the Iranian government."[467]

(vi)    <u>Treasury Department, December 2010</u>: "The U.S. Department of the Treasury announced [] a set of designations targeting the financial networks of the Islamic Revolutionary Guard Corps (IRGC) … Today's actions further expose the continued engagement of the IRGC … in illicit activities and deceptive behavior. … '[T]he IRGC … [is a] major institutional participant[] in Iran's illicit conduct and in its attempts to evade sanctions. We will therefore continue to target and expose [its] networks,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. … The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's … support for terrorism …. The U.S., UN, EU, Japan, South Korea and others have all targeted the IRGC for sanctions because of this illicit activity. With the IRGC's expanding influence and control over broader segments of the Iranian economy … increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct. … Treasury has designated 14 IRGC-affiliated

---

[466] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) (emphasis added).

[467] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) (emphasis added).

individuals and entities since June 2010 for facilitating Iran's nuclear and ballistic missile program or support for terrorism."[468]

(vii) <u>Treasury Department, June 2011</u>: "Treasury Targets Commercial Infrastructure of IRGC, Exposes Continued IRGC Support for Terrorism." "Today," "Treasury" "designate[d] … Iranian commercial entities" "owned by [IRGC, which]" "continue[d] to be a primary focus of U.S. and international sanctions against Iran because of the central role [the IRGC] play[ed] in all forms of" "Iran's" "support for terrorism." "As Iran's isolation [] increased, the IRGC [] expanded its reach into critical sectors of Iran's economic infrastructure – to the detriment of the Iranian private sector – to generate revenue and conduct business in support of Iran's illicit activities. Today's actions target[ed] core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its" "illicit conduct." "The IRGC ha[d] a growing presence in Iran's financial and commercial sectors" and "control[ed] billions of dollars in corporate business." "Given its increased involvement in commercial activity, imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct." [469]

---

[468] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010).

[469] U.S. Treasury Dep't, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011) (emphasis added).

## IV.   EACH DEFENDANT KNEW THEY WERE AIDING THE SYNDICATE'S CAMPAIGN OF TERROR IN AFGHANISTAN

### A.   Deutsche Bank Knew It Was Aiding Terrorists

#### 1.   Deutsche Bank Knew It Operated As A Criminal Enterprise And Laundromat Until 2016

736.   Deutsche Bank committed financial crime, facilitated terrorist finance, and

laundered money consistently from the late 1980s through 2017. As Dr. Louise Shelley, the

Director of the Terrorism, Transnational Crime and Corruption Center at George Mason

University, testified before Congress in 2016:

> We [] need to ***focus on legitimate banks*** that can help facilitate the storing and
> transport of money for terrorists. Recent investigations reveal that ***legitimate
> large banks such as Deutsche Bank***, in violation of international regulations,
> ***receive funds that are associated with terrorists*** and criminals ***as this helps
> increase profits***. Officials at Deutsche Bank, in a significant number of suspicious
> files examined by auditors, revealed that officials were ***told to avoid warning
> signs or not to commit due diligence on what should be suspicious clients***.[470]

737.   David Enrich concluded that Deutsche Bank operated as "[a] criminal enterprise,"

whose Laundromat that systematically facilitated terrorist finance was "not the work of an

isolated crew of rogue Deutsche employees;" indeed, "[m]anagers knew. Their bosses knew.

American regulators … [found] evidence that at least one member of the bank's *vorstand*—[]

one of Deutsche's most senior executives—knew about and approved of the scheme."[471]

Deutsche Bank spent "decades" always making "expedient, easy choices with the single-minded

purpose of maximizing immediate profits":[472]

---

[470] Statement of Dr. Louise Shelley Director, Terrorism, Transnational Crime and Corruption
Center George Mason University, *Current Terrorist Financing Trends, Hearing Before the U.S.
House of Representatives Committee on Homeland Security, Subcommittee on Counterterrorism
and Intelligence*, Congressional Testimony via FDCH (May 12, 2016), 2016 WLNR 14564170.

[471] Enrich, *Dark Towers*, at 7, 16, 105.

[472] *Id.* at 7.

[Deutsche Bank's] ascent [was] fueled by **greed, sloppiness, hubris, and criminality**, and when the reckoning came, it was brutal. Deutsche's risk-taking—the product of years of make-money-at-all-costs mismanagement—was **out of control**. … Managers were incentivized to shirk responsibilities. … Deutsche exhibited a **jarring lack of interest in its clients' reputations**. It would soon become enveloped in scandals relating to money laundering, tax evasion, manipulating interest rates, manipulating the prices of previous metals, manipulating the currencies markets, bribing foreign officials, accounting fraud, violating international sanctions, ripping off customers, and ripping off the German, British, and United States governments. (**The list went on.**)[473]

738. Deutsche Bank insiders concurred. For example, Eric Ben-Artzi, a former Deutsche Bank risk analyst, stated in an on-the-record interview with *The New Yorker*, "There was cultural criminality. Deutsche Bank was structurally designed by management to allow corrupt individuals to commit fraud."[474]

739. Former Deutsche Bank bankers have confirmed Deutsche Bank's deliberate, massive criminality at the heart of the Bank's "Russian Laundromat." For example, "former Deutsche banker Roman Borisovich" stated on-the-record that Deutsche Bank's Laundromat "was an industrial-scale operation."[475] The former Deutsche Bank banker said that Deutsche Bank's financial services were designed for criminal use:

To the former senior Deutsche banker, the mirror-trade scheme … did not look like an operation aimed at avoiding taxes or customs, but like a scheme to create stashes of black cash … By means of a process known as *obnalichivaniye*, cash from company books was converted into untraceable black cash. … [S]aid the [former Deutsche] banker, '*obnalichivaniye* … is only needed by criminals …[476]

740. Deutsche Bank further evidenced it knew about the terrorist finance by charging premium rates for it. As one journalist reported, colleagues at Deutsche Bank "understood that

---

[473] *Id.* at 8-9 (emphasis added).

[474] Ed Caesar, *The Moscow Laundromat: Deutsche Bank's $10-Billion Scandal*, The New Yorker (Aug. 29, 2016) ("Caesar, *The Moscow Laundromat*").

[475] Belton at 407.

[476] *Id.* at 407-08.

[DB Moscow Head Equities Trader Tim Wiswell] had the blessings of his superiors, who on occasion pushed him to charge higher fees for this unique offering."

741.    Deutsche Bank also acted with actual knowledge of the VAT frauds committed by the Azizi Cell and the Ahmed Cell. Early on, a Deutsche Bank employee emailed a Deutsche Bank compliance colleague and informed Deutsche Bank's compliance department that "[t]he CO2 market" that Deutsche Bank was orchestrating for Azizi and Ahmed "[was] *showing typical characteristics of a sales tax carousel*," referring to a universally recognized red flag for terrorist finance generally and especially for al-Qaeda and the Haqqani Network finance activities. Protecting Deutsche Bank's Laundromat, the compliance officer responded, in effect, that there was nothing to worry about with respect to the potential terrorist finance risk that had been identified because "[t]he measures taken [were] *sufficient to document our duty of care in the event of a claim*." Thereafter, millions of U.S. Dollars poured into al-Qaeda's and the Haqqani Networks' coffers in Afghanistan, financing their devastating terrorist campaign there.

742.    "Deutsche Bank is a symbol of corporate recidivism: It has paid more than $9 billion in fines since 2008 related to a litany of alleged and admitted financial crimes and other transgressions, including manipulating interest rates, failing to prevent money laundering, evading sanctions on Iran … and engaging in fraud in the run-up to the financial crisis."[477]

743.    Mr. Enrich concluded that "Deutsche's mile-long rap sheet" "reflect[ed]" "on the institution and" "its endless cutting of corners and hostility to the rule of law."[478] Since 2010:

---

[477] James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, International New York Times (July 20, 2020), 2020 WLNR 20112125.

[478] Enrich, *Dark Towers*, at 360.

| Date | Regulator | DB Payment | Quote from Regulator |
|------|-----------|------------|----------------------|
| 1/8/2021 | DOJ | $130M | "Deutsche Bank *engaged in a criminal scheme to conceal payments*[479] to so-called consultants worldwide who served as *conduits* for bribes to foreign officials … so that they could unfairly obtain and retain lucrative business projects[.]" |
| 1/8/2021 | SEC | $120M | "Deutsche Bank [made]" "approximately *$7 million in bribe payments* or payments for unknown, undocumented, or unauthorized services" "[that] involved invoices and *documentation falsified by Deutsche Bank employees*." |
| 9/9/2020 | OFAC | $583,100 | "DBTCA" "agreed to pay $157,500 for processing a large payment ... through the United States that involved a property interest of a designated oil company in Cyprus" and" "agreed to remit $425,600 for *processing payments destined for accounts at a designated financial institution*." |
| 7/7/2020 | NYDFS | $150M | "Deutsche Bank failed to adequately monitor the activity of customers *that the Bank itself deemed to be high risk*. In the case of Jeffrey Epstein in particular, *despite knowing* Mr. Epstein's terrible criminal history, the Bank *inexcusably failed to detect or prevent millions of dollars of suspicious transactions.*" |
| 8/22/2019 | SEC | $16M | "*Deutsche Bank employees created false books and records that concealed corrupt hiring practices* and failed to accurately document and record certain related expenses." |
| 6/20/2018 | NYDFS | $205M | "[I]n some instances, [Deutsche Bank] *supervisors* engag[ed] in improper activity, [and] certain traders and salespeople repeatedly abused the trust of their customers and *violated New York State law over the course of many years*[.]" |
| 5/26/2017 | Federal Reserve | $41M | "Deficiencies in [DBTCA's] transaction monitoring capabilities *prevented DBTCA from properly assessing BSA/AML risk for billions of dollars in potentially suspicious transactions* processed between 2011 and 2015 for certain DBTCA affiliates in Europe for which the affiliates failed to provide sufficiently accurate and complete information." |

---

[479] All emphases in this table are supplied.

| Date | Regulator | DB Payment | Quote from Regulator |
|------|-----------|------------|----------------------|
| 1/30/2017 | NYDFS | $425M | "The evidence is **clear** that DB-Moscow traders **knowingly** and **actively** facilitated both of these [*i.e.*, "mirror trade" and "one-legged trade"] trading schemes." |
| 1/17/2017 | DOJ | $7.2B | "Deutsche Bank did not merely mislead investors: it **contributed directly to an international financial crisis**." |
| 1/4/2017 | DOJ | $95M | "Using **a web of shell companies** and series of calculated transactions, Deutsche Bank sought to escape liability for tens of millions of dollars in taxes." |
| 10/12/2016 | SEC | $9.5M | "Deutsche Bank … **failed to properly preserve and provide certain electronic records** sought by the SEC during its investigation." |
| 11/24/2015 | DOJ | $31M | "Deutsche Bank Suisse offered a variety of services and permitted some practices that **it knew** could and did assist U.S. taxpayers in **concealing assets** and income from the IRS." |
| 11/4/2015 | Federal Reserve | $58M | "[Deutsche Bank AG] did not have sufficient policies and procedures to ensure that activities conducted at its offices outside of the United States **complied with U.S. sanctions laws**." |
| 11/4/2015 | NYDFS | $258M | "Deutsche Bank used **non-transparent methods and practices** to conduct more than 27,200 U.S. dollar clearing transactions valued at **over $10.86 billion** on behalf of Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other entities **subject to U.S. economic sanctions**, including entities on the [SDN List]." |
| 4/23/2015 | CFTC | $800M | "Deutsche Bank **routinely engaged** in acts of … attempted manipulation and, at times, succeeded in manipulating" "interest rate benchmarks critical to the U.S. and global financial markets." |
| 4/23/2015 | DOJ | $775M | "Deutsche Bank [...] admitted its role in **manipulating LIBOR and participating in a price-fixing conspiracy** … by rigging [] LIBOR contributions with other banks." |
| 12/21/2010 | DOJ | $550M | "Deutsche Bank AG" "**admitted criminal wrongdoing** [and] its participation in financial transactions which furthered fraudulent tax shelters that generated billions of dollars in U.S. tax losses." |

744.     Indeed, in 2017 NYDFS entered a Consent Order which noted Deutsche Bank's "substantial history of regulatory violations over the last decade - one that placed it squarely on notice of the need to address potential compliance issues" and stated that Deutsche Bank's then-relevant criminal acts from 2011 to 2015, "occurred after the Bank was **on clear notice of serious and widespread compliance issues dating back a decade**."[480]

745.     On or about February 2019, two FBI agents met with a witness in DOJ's ongoing criminal investigation of Deutsche Bank. As recounted by Mr. Enrich,

> [The FBI] … had started out investigating Deutsche's money laundering in Russia—the notorious mirror trades—but they had widened their scope to focus on an **array of potential criminality at the bank**. … The [FBI] agents didn't think the crimes that occurred throughout the bank were the work of lone low-level employees—**they suspected that this was a product of a culture of criminality that pervaded Deutsche**. Tim Wiswell—Wiz, the supposed mastermind of the mirror trades—appeared to be a "fall guy," a "scapegoat," they explained. … "What we've been up against is stonewalling," [an agent told the witness]. "Clearly things went on in Deutsche Bank which weren't kosher. What we're up against is all those bad acts are being pushed down on the little people on the bottom." … "And the larger bank in its entirety is claiming ignorance and that it's one bad player. But we know what we've seen, it's a culture. …"[481]

On information and belief, the FBI concluded that Deutsche Bank had engaged in pervasive criminality, enabled by a culture of willful blindness and criminality throughout all elements of the institution, including its leadership ranks.

746.     On information and belief, the Department of Justice's criminal investigation of Deutsche Bank remains ongoing and has expanded far beyond the Bank's "Russian Laundromat" to include a broader investigation of Deutsche Bank's programmatic terrorist finance and money laundering, among other crimes.

---

[480] NYDFS 2017 Consent Order ¶¶ 61, 65 (emphasis supplied)

[481] Enrich, *Dark Towers*, at 358-59 (emphasis added).

747.     Deutsche Bank knew, as it is commonly understood, that a financial institution could not serve as a Laundromat without inevitably enabling terrorist finance. As Deutsche Bank's former CEO, Josef Ackermann, previously admitted, the Bank understood at all relevant times that "[i]f we even begin to allow gray zones" – *e.g.*, by providing Laundromat services in high-terrorist-finance-risk jurisdictions – the consequences from the foreseeable crimes that would follow, *e.g.*, Syndicate terrorist finance, would "all become[] uncontrollable."

748.     Deutsche Bank and DB Moscow reportedly used corrupt means to win business after its revenues dropped in the aftermath of the 2008 financial crisis. Corrupt practices were at times "blessed by top executives in Moscow and London."[482]

749.     In a stark admission, as the term itself connotes criminality in the financial services industry, Deutsche Bank has described its practices as a "Laundromat" and a "Russian Laundromat." A broad array of independent observers agreed with Deutsche Bank's self-evaluation.

750.     Deutsche Bank and DB Moscow reportedly used corrupt means to win business after its revenues dropped in the aftermath of the 2008 financial crisis. Corrupt practices were at times "blessed by top executives in Moscow and London."[483]

751.     In a stark admission, as the term itself connotes criminality in the financial services industry, Deutsche Bank has described its practices as a "Laundromat" and a "Russian Laundromat." An array of independent observers agree with Deutsche Bank's self-evaluation.

---

[482] Enrich, *Dark Towers*, at 196.

[483] Enrich, *Dark Towers*, at 196.

752.     Deutsche Bank also regularly acted in a manner consistent with its illicit Laundromat scheme. Deutsche Bank therefore consciously chose to serve as a Laundromat for terrorist financiers and money launderers and knew that it played that role for terrorists.

753.     **Deutsche Bank's Strategy to Solicit "Damaged Clients."** Deutsche Bank historically solicited business from clients that it believed to pose an elevated risk of financial crime, including terrorist finance. It therefore consciously chose to serve a Laundromat to such customers. "To differentiate itself from a crowded field of competitors," Mr. Enrich reported, "Deutsche planned to do deals that were ***too risky … for rival banks to stomach. 'Deutsche needs damaged clients,'*** one [Bank employee] would explain."[484]

754.     On information and belief, Deutsche Bank rarely, if ever, proactively terminated any then-existing lucrative customer relationship – even for its "damaged clients" – based on terrorist finance and money laundering risk at any point in time without some external prompt from a government or the media prior to on or about 2016. Simply put, before 2016, Deutsche Bank would deliberately bank with anyone and everyone – including terrorists – and continue doing so until they got caught, after which time the Bank would cut ties, feign ignorance, and thereby sustain its Laundromat scheme.

755.     **Deutsche Bank's Correspondent Account Revenue Decline.** After every Plaintiff was injured, Deutsche Bank started taking counter-terrorist finance seriously, and its correspondent account business rapidly fell apart, plunging by approximately forty percent (40%) over only a few years. Prior to 2016, a substantial portion of Deutsche Bank's correspondent banking services was used by criminals and money launderers and facilitated terrorist finance. Once Deutsche Bank began ending customer relationships with suspected

---

[484] Enrich, *Dark Towers*, at 170 (emphasis added).

terrorist financiers and money launderers, it became substantially less profitable – which demonstrates what Deutsche Bank was profiting from previously. Deutsche Bank knows why the revenue declined once they acted responsibly and knew it would so decline. Like an inside trader whose portfolio plummeted once he decides to play by the rules, one may infer from the change that a large percentage of Deutsche Bank's customers were suspect. While that 40% figure would be shocking for a respectable global financial institution, for a Laundromat like Deutsche Bank, it merely reflected that it had washed money well for a very long time.

756. **Deutsche Bank's Coordination with VTB.** The "frequent consultations" between Deutsche Bank's CEO and the Russian financial institution VTB's CEO from the early 2000s through at least 2012 is another strong indicator that Deutsche Bank operated as a Laundromat rather than a responsible global financial institution. According to Ms. Belton, by 2011, "Mr. Ackermann, "the then Deutsche Bank chief," "frequently consulted" the CEO of VTB.[485] VTB was, and is, an infamous front for terrorist finance and money laundering, and "VTB's Cyprus subsidiary was notorious among bankers for being a funnel for kickbacks."[486] VTB's reputation," however, "did little to dampen" Deutsche Bank's "enthusiasm" for doing business with it because Deutsche Bank was "[e]nticed by the billions of dollars in deals that were sloshing around … [in] Moscow."[487] Deutsche Bank knew what it was doing: It was operating a Laundromat. And consultations with VTB were just part and parcel to that business.

757. **Deutsche Bank Routinely Retaliated Against Whistleblowers.** Deutsche Bank's pattern and practice of using intimidation and retaliation tactics to deter and defeat

---

[485] Belton, *Putin's People*, at 479.

[486] Belton, *Putin's People*, at 398.

[487] Belton, *Putin's People*, at 360.

whistleblowers is further indication of its status as a Laundromat, not a responsible global financial institution, and that Deutsche Bank understood its role in transnational crime. For example, on or about 2016, Deutsche Bank retaliated against a DBTCA employee who raised compliance concerns relating to a transaction involving Russians ("Deutsche Bank Whistleblower 1"). Deutsche Bank retaliated against Deutsche Bank Whistleblower 1 and ignored the (correct) compliance advice she/he had provided.

758. Deutsche Bank's pervasive retaliation against terrorist finance whistleblowers is a powerful indicator of its deliberate and knowing aid to terrorist financiers like Altaf Khanani. For example, in a 2019 report, the European Parliament stated that "[t]he European Parliament … [w]orrie[d] that whistle-blowers [were] often discouraged from reporting their [terrorist finance] concerns for fear of retaliation and that if retaliation [was] not discouraged and remain[ed] unpunished, potential whistle-blowers [could] be dissuaded from reporting their … suspicions of money laundering or terrorist financing internally within the company or to [relevant financial crime law enforcement regulator]."[488]

759. **Deutsche Bank's Efforts to Deter Frank Discussions in Writing**. The evidence that Deutsche Bank tried to intimidate employees into not memorializing certain of their business practices further evidences that Deutsche Bank knew it was operating a Laundromat rather than a legitimate global financial institution. For example, in May 2014, Deutsche Bank executive Colin Fan filmed a video,[489] that offered an "implicit admission that misconduct was rampant inside [Deutsche Bank]."[490] In the video, Mr. Fan stated:

---

[488] European Parliament Report.

[489] The video remains online at https://www.mirror.co.uk/news/world-news/video-watch-top-bank-boss-3551810.

[490] Enrich, *Dark Towers*, at 239-40.

This is an important message. You need to pay close attention. It's about how you communicate in this company. You may not realize it, but right now, because of regulatory scrutiny, all your communications may be reviewed. This includes your emails, your conversations and your conduct. All of this is open to scrutiny. [After the camera zoomed in for a tighter shot of Mr. Fan's face and shoulders] Some of you are falling waaaaaaay short of our established standards. Let's be clear: Our reputation is everything. Being boastful, indiscreet, and vulgar is not okay. It will have serious consequences for your career. And I have lost patience on this issue. Communications that run even a small risk of being seen as unprofessional must stop. Right now. I need you to exercise good sense and sound judgment. Think carefully about what you say and how you say it. If not, it will have serious consequences for you personally.[491]

760.     Mr. Fan's video was an attempt by Deutsche Bank to protect its Laundromat which, because it was used by criminals for money laundering and assisted those who wanted to commit financial crimes, Deutsche Bank knew and understood required secrecy. As Mr. Enrich reported, the most plausible interpretation of Mr. Fan's message is that he wanted his subordinates to stop memorializing Deutsche Bank's Laundromat activities in writing.[492]

761.     **Deutsche Bank's Built-to-Fail Compliance System.** Deutsche Bank's deliberately "built-to-fail" compliance system further corroborates its operation as a Laundromat rather than a legitimate global bank, and Deutsche Bank's knowledge that it was doing so. As Mr. Enrich noted, "[a] German judge would later find that" financial crimes at Deutsche Bank were "enabled by the 'risk-affirming climate' that dominated Deutsche. *Internal safeguards*, such as a tough compliance squad … *were strangely absent*."[493]

---

[491] Enrich, *Dark Towers*, at 239-40.

[492] Enrich, *Dark Towers*, at 239-40. Moreover, as Mr. Enrich recounted, Mr. Fan's "deadpan delivery" was notable, it appeared he was "barely managing to suppress a smirk," and his "focus on addressing communications about bad behavior, rather than the bad behavior itself," was also highly telling. *Id.* at 240.

[493] *Id.* at 151 (emphasis added).

762.    Indeed, Deutsche Bank regularly instructed its American compliance personnel in Jacksonville to stop highlighting obvious instances of potential terrorist finance and money laundering. As Mr. Enrich recounted, "[o]ne employee would recount how she was instructed to stop highlighting transactions involving companies exposed in the massive leak known as the Panama Papers. Another was told to pipe down when protesting a transaction in which money was wired to a prominent sanctioned Russian."[494] Because Deutsche Bank minimized if not avoided compliance, it knew it was operating an illicit Laundromat, and it knew that it was laundering money for criminals and terrorists.

763.    **Deutsche Bank's Practice of Obstruction.** To further conceal its Laundromat activities, Deutsche Bank and its personnel regularly followed the same obstruction playbook, even when Bank personnel were "considered incriminated," such as the notorious time that a senior Bank executive, when being interviewed by German regulators, "did not deviate an inch from the line that Anshu Jain and all the others had toed for years: if there was trouble with authorities, do not admit to anything, and if in doubt, do not remember anything."[495] Under this coached strategy of obstruction, according to Mr. Laabs, Deutsche Bank and its personnel could always claim that "[t]here would be a lot to do, a lot to read, a lot to write, one was too important to take care of every detail, and so on and so forth" as a means of creating the plausible deniability that facilitated the operation of the Laundromat in the first instance.[496]

---

[494] *Id.* at 341.

[495] Laabs, *Bad Bank*, at 506 (translated by Plaintiffs) (emphasis added).

[496] *Id.* (translated by Plaintiffs) (emphasis added).

2. **Deutsche Bank Knew Terrorists Could Foreseeably Benefit From Its Russian Laundromat Because It Knew The Laundromat Was Designed By The Same Russian Mafia Organization That Notoriously Laundered Opium Money For Al-Qaeda And Its Allies**

764. While it was "based in Germany, … Deutsche Bank" had substantial "ties to" "the Russian mob."[497] Deutsche Bank knew both that it serviced the Russian Mafia and that it was known for doing so. Deutsche Bank shared the Russian Mafia's view that their partnership was financially worthwhile and has knowingly, or with general awareness, served as the Russian Mafia's preferred global financial institution for decades, doing so until on or about 2018, when Deutsche Bank finally committed to abandoning its Laundromat model and willingness to serve suspected Russian Mafia-affiliated customers.

765. In February 2011, Russian police raided DB Moscow's offices based upon information that DB Moscow facilitated Russian-Mafia-related transactions. This didn't deter Deutsche Bank. By 2011, Deutsche Bank's criminal partnership with the Russian Mafia was in full bloom: within weeks of the Russian police raid on DB Moscow's office on suspicions it was serving the Russian Mafia, events proved them correct. At an in-person meeting, DB Moscow, through Mr. Wiswell, planned the Russian Laundromat with two or more persons whom DB Moscow knew, or was generally aware, attended in their capacities as operatives and/or agent for Semyon Mogilevich and the Russian Mafia;[498] DB Moscow also knew, or was generally aware, that Mogilevich and his Russian Mafia organization were responsible for executing an infamous

---

[497] Wade Sikorski, *Guest Post: Making Russia Great Again*, Montana Post (Feb. 12, 2017), 2017 WLNR 4537693.

[498] According to Ms. Belton, the Russian "shadow bankers" who "invented the Moldovan Laundromat and [Deutsche Bank's] mirror trade schemes" were "linked to the same [Russian] mob" network that was behind the Bank of New York Laundromat, *i.e.*, Semyon Mogilevich. Belton at 459. According to Juan C. Zarate, "[t]he business of money was a serious and dangerous game in Russia, and it needed to be handled by someone with access and credibility." Zarate, *Treasury's War*, at 160.

prior $10 billion U.S. Dollar Laundromat scheme that the Russian Mafia and the BNY jointly operated in the late 1990s. Plaintiffs refer to this as the "2011 Meeting."

766.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that a group of Russian businessmen – whom Deutsche Bank, through Mr. Wiswell, knew to be associated with the Russian Mafia – wanted to use Deutsche Bank to execute so-called "envelope" trades, sometimes called "*Konvert*" trades in Russian, which was a form of "mirror trade" and would become the root of Deutsche Bank's Russian Laundromat.

767.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that the purpose of the proposed scheme was criminal in nature, as the scheme was purpose-built to appeal to Russian customers – whom Deutsche Bank knew already posed an exceptional terrorist finance risk – who sought to evade the then-recent Russian government crackdown on money launderers by moving income earned inside of Russia out of the country, usually changing the currency to U.S. Dollars, through "mirror trades."

768.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that the Bank could seize an enormous new, and lucrative, market in Russia by servicing Russian money launderer customers who sought to illicitly move money outside of Russia through "mirror trades" in response to the new market for such services that was created by the Russian government's crackdown.

769.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank that its proposed scheme was based on a similar approach the Russian Mafia had used in the past with Bank of New York and other financial institutions and represented a "well established" financial crime strategy that had "proven itself over the years."

770.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that it would be preferable if DB Moscow could serve as an agent for DB New York (including DBTCA) and DB London, to execute U.S.-linked "mirror trades" pursuant to the scheme and ensure Deutsche Bank's full support through every necessary international branch, including in the United States.

771.     During the 2011 Meeting, Deutsche Bank (via Mr. Wiswell) advised the Russian Mafia that Deutsche Bank agreed to provide the services requested by the Russian Mafia, including the "mirror trade" outlined in the meeting, and including using DB Moscow as an agent to complete the trades and route them through DBTCA and DB London.

772.     After the 2011 Meeting, Deutsche Bank, led by DB Moscow and Mr. Wiswell, created and deployed the Russian Laundromat, per the directions of the Russian Mafia. When Deutsche Bank dealt with the Russian Mafia and built and deployed the Russian Laundromat, it knew that it was participating in a criminal enterprise. Deutsche Bank also knew it was aiding terrorists because it knew the Russian Mafia laundered money for al-Qaeda and its Syndicate, and because it knew laundering money on massive scale will inevitably finance terrorism.

773.     Deutsche Bank, DBTCA, and DB London, through DB Moscow as their agent, also provided the Russian Mafia information concerning Deutsche Bank's anti-money-laundering and counter-terrorist-finance controls. This was done to enable terrorists to better conceal the millions of U.S. Dollar-denominated terrorist funds Syndicate operatives and agents, including Khanani and the Russian Mafia, transferred via Deutsche Bank's Laundromat from New York to Syndicate-controlled accounts.

774.     During the 2011 Meeting, DB Moscow represented Deutsche Bank, DB London, and DB New York (including DBTCA) as their agent. As agent, DB Moscow's actions and

knowledge were imputed to Deutsche Bank, DB London, and DB New York (including DBTCA), which were at all times the principal in their relationship with DB Moscow.

775.    After the 2011 Meeting, DB Moscow continued representing Deutsche Bank, DB London, and DB New York (including DBTCA) as their agent and executed every Syndicate terrorist finance transaction through Deutsche Bank's "Russian Laundromat."

776.    DB Moscow served as an agent for each identified Deutsche Bank entity and had the authority to execute agreements and trades on behalf of each of them. Mr. Wiswell's conduct, though criminal and wrongful, was entirely consistent with what Deutsche Bank wanted and expected from Mr. Wiswell, and they encouraged him because Mr. Wiswell generated enormous profits for Deutsche Bank through the criminal scheme. Deutsche Bank only had a problem with Mr. Wiswell after the Bank's "Russian Laundromat" was exposed and it could no longer deny or downplay the potential transnational criminal investigation and liability for it and its executives and employees.

777.    NYDFS concluded that DB Moscow was Deutsche Bank's agent. NYDFS concluded that the Deutsche Bank traders who operated the Bank's Russian Laundromat had been authorized by DB London and DB New York (including DBTCA) to use a Deutsche Bank's "remote booking" function to execute the mirror trades on behalf of DB London and DB New York (including DBTCA) and "[t]he evidence is clear that DB-Moscow traders knowingly and actively facilitated both of these trading schemes:"[499]

> [M]ost of the subject trades were placed by a single trader representing both sides of the transaction. The DB-Moscow trader would execute the sell side of the trade, helping the suspicious Russian counterparty acquire Russian securities, settled in rubles. The same DB-Moscow trader then would buy the identical quantity of the same stock from DB-London's customer as an over-the-counter trade, settled in U.S. dollars. The DB-Moscow trader would directly book the

---

[499] 2017 Consent Order ¶ 20.

trade to the DB-London trading book via a remote booking function. This "remote-booking" feature was central to the scheme, permitting the Moscow traders to carry out the mirror trades without any effective supervision or compliance review in London. This way, the scheme stayed under the radar.[500]

778.     Deutsche Bank was the but-for and proximate cause of the Russian Laundromat and all the resulting terrorist finance that coursed through Deutsche Bank's Russian Laundromat to its Syndicate clients through their agents, including, but not limited to, Khanani and the Russian Mafia. As Mr. Enrich reported, Deutsche Bank, through DB Moscow, knew that "Deutsche was a crucial cog in the Laundromat."[501]

779.     While they were executing the trades that routed tens of millions of U.S. Dollars to al-Qaeda and the Taliban, through their agents (Khanani and the Russian Mafia), Deutsche Bank's personnel internally described their terrorist finance scheme with the Russian Mafia as the Bank's "Russian Laundromat" or its "Laundromat."

780.     While Deutsche Bank operated its Russian Laundromat, through DB Moscow, and permitted the Russian Mafia to capture a branch of a large global financial institution for years, "[O]rganized crime elements in Russia [] compromise[d] Deutsche Bank," even though the Bank was "one of the largest financial institutions in the world."[502] When that happened, Deutsche Bank and DB Moscow transformed into a "sympathetic financial institution" – a terrorist finance concept referring to when a "financial institution" "[was] owned and operated by the terrorist organization or its closest supporters," and was therefore "considered a form of

---

[500] *Id.* ¶¶ 20-24.

[501] Enrich, *Dark Towers*, at 197. Deutsche Bank pursued a Laundromat strategy, in which it willingly operated as a Laundromat for terrorist financiers. Deutsche Bank also purpose-built the Russian Laundromat, while serving as one of the key global financial institutions in every other Russian Mafia-related Laundromat, *e.g.*., the "Global Laundromat."

[502] Leon Wolf, quoted in *ALL IN for July 19, 2017, MSNBC*, MSNBC: All In with Chris Hayes (July 20, 2017), 2017 WLNR 22092010.

internal resourcing" for the terrorists and/or their closest supporters. [503] Deutsche Bank knew it was a "sympathetic financial institution," and knew that meant that its facilities were being used to launder money for terrorists and other criminals.

781.     After the 2011 Meeting, DB Moscow continued to work closely with notorious Russian organized crime figures as they collaborated to it operationalize their shared "Russian Laundromat." According to Ms. Belton, Ivan Myazin, a notorious Russian organized crime figure, "was the real mastermind of both the Moldovan Laundromat and the Deutsche Bank mirror-trading scheme. … Behind Myazin, however, there was another level that went" "to the top of … Russian organized crime," *i.e.*, Mogilevich and the Russian Mafia. [504]

782.     Witnesses who attempted to expose Deutsche Bank's "Russian Laundromat" were murdered. As Ms. Belton reported, "[t]he number of common denominators between all the schemes – [including] the Moldovan Laundromat and the mirror trades – were astonishing, and for one banker in the middle of it, they proved deadly. Alexander Perepelichny was [related to] a large placer of orders with Deutsche Bank Moscow in the mirror-trade scam. After he began sharing information with investigators about some of the transfers …, which he'd also participated in, he died of a heart attack in suspicious circumstances while jogging in a park near London." [505] On information and belief, Mr. Perepelichny was murdered to obstruct investigations seeking to expose Deutsche Bank's "Russian Laundromat."

783.     From the moment Deutsche Bank, through DB Moscow, first co-designed the Russian Laundromat alongside its Russian Mafia customers, Deutsche Bank knew that vast

---

[503] Vittori, *Terrorist Financing*, at 42.

[504] Belton at 408.

[505] *Id.* at 411.

Russian Mafia-related financial crime was afoot through Deutsche's Russian Laundromat, and necessarily, terrorist finance would flood through the Russian Mafia to its clients and decades-long Joint Venture partners: al-Qaeda and the Taliban.

784.    When it operated its Russian Laundromat from 2011 through 2016, Deutsche Bank replicated substantial aspects of the same terrorist finance and money laundering scheme that the same Russian Mafia actors executed through Bank of New York in the late 1990s, which, on information and belief, also helped launder al-Qaeda and/or Taliban money.

785.    As Mr. Laabs recounted, "[t]he two largest financial hubs in the West – New York and London – played an important role in the flow of [dirty] money [outside of Russia]."[506] "At the end of the 1990s, the Bank of New York … was one of the main channels" for flowing dirty money out of Russia.[507] "From 2011 onwards, its neighbors, Deutsche Bank" "and its subsidiary Deutsche Bank Trust Company Americas, took over this task and pumped laundered, Russian money into the international financial cycle."[508]

786.    Semyon Mogilevich and the Russian Mafia have served as notorious agents for al-Qaeda and the Taliban since the 1990s. During that time, Mogilevich and the Russian Mafia helped to manage the financial system for the Syndicate and helped to launder al-Qaeda's heroin revenue. Al-Qaeda and the Syndicate, in turn, used the much-needed U.S. Dollars laundered through Mogilevich and the Russian Mafia's to commit acts of terrorism. *Supra* Part II.B.2.

787.    Deutsche Bank and its personnel knew: (1) how money laundering schemes worked in general; (2) how the Russian Mafia's laundering schemes worked in particular; and

---

[506] Laabs, *Bad Bank*, at 462 (translated by Plaintiffs) (emphasis added).

[507] *Id.* (translated by Plaintiffs) (emphasis added).

[508] *Id.* (translated by Plaintiffs) (emphasis added).

(3) the Russian Mafia's general reputed relationships and sources of income—plainly, Deutsche

Bank knew that the Russian Mafia partnered with al-Qaeda and the Taliban. Indeed, according to

the *Independent* in 2008, "Taliban drug lords [were] using cash from Afghanistan's bumper

heroin crop to … to buy better anti-aircraft weapons" from "mafia networks in Russia" "to

undermine [NATO's] military advantage."[509]

788.    Deutsche Bank knew that the Russian Mafia would ordinarily integrate all the

"dirty money" into common pools to make the scheme easier to execute, and as a consequence,

Deutsche Bank knew that whenever it helped the Russian Mafia launder money, move money

outside of Russia, or convert currency from Rubles to Dollars, it was directly doing the same for

the Syndicate, because the Russian Mafia was acting as the Syndicate's agent and was

laundering the Syndicate's money.

789.    On information and belief, an internal Deutsche Bank report concluded, among

other things, that: (1) Deutsche Bank operated as a "Laundromat" while servicing Russian Mafia,

including Semyon Mogilevich, between 2011 and 2014; and (2) Deutsche Bank processed "at

least €175 million" of "dirty money" for customers specifically affiliated with Semyon

Mogilevich and/or the Russian Mafia between 2011 and 2014.

### 3.    Deutsche Bank Knew Its Clients Were Engaged In Money Laundering, VAT Fraud, And Capital Flight, Which Deutsche Bank Knew Were Red Flags For Terrorist Finance

790.    Deutsche Bank knew its clients were engaged conduct that raised terrorist finance

red flags because Deutsche Bank knew that its clients were engaged in in money laundering,

VAT fraud, and capital flight, while operating out of, or otherwise related to, one or more

---

[509] Jerome Starkey, *Warlords Using Heroin Cash To Buy Surface-To-Air Missiles*, Independent (April 4, 2008), 2008 WLNR 6353571.

jurisdictions that Deutsche Bank knew to be a high risk for al-Qaeda and/or Haqqani Network terrorist finance activity.

### i. Deutsche Bank Knew About The VAT Frauds

791.   Deutsche Bank knew that potential terrorist finance was afoot when it executed Azizi's and Ahmed's VAT fraud schemes. When a Deutsche Bank employee emailed a compliance officer to alert the Bank that its "[t]he CO2 market" "[was] ***showing typical characteristics of a sales tax carousel***," a bright red flag for al-Qaeda and Haqqani Network terrorist finance. When Deutsche Bank's compliance officer replied that "[t]he measures taken" to paper over the trades were "***sufficient to document our duty of care in the event of a claim***."

792.   Plaintiffs' Azizi Cell-related allegations against Deutsche Bank apply equally to Standard Chartered Bank and, conversely, Plaintiffs' Azizi Cell-related allegations against Standard Chartered Bank, *infra*, apply equally to Deutsche Bank.

793.   When Azizi executed al-Qaeda's VAT fraud scheme, Azizi and the other members of the Azizi Cell followed the core principles of al-Qaeda and Haqqani Network tradecraft when running a VAT fraud, namely, to use the same shell companies and cycle transactions through a handful of dirty banks.  This matters because al-Qaeda and Haqqani Network's VAT fraud tradecraft meant Standard Chartered Bank and Deutche Bank both alerted one another throughout their shared operation of the same VAT fraud scheme executed by the Azizi Cell on behalf of al-Qaeda and the Haqqani Network.

794.   Under al-Qaeda's and the Haqqani Network's tradecraft for operationalizing VAT to fund al-Qaeda and Taliban attacks against Americans in Afghanistan, al-Qaeda and the Haqqani Network regularly trained and deployed VAT fraud cells under a Syndicate terrorist finance doctrine that that emphasized scale (lots of cells) and leverage (easy to create cells).

Thus, the Syndicate knew that it could count on a continuing supply of new VAT fraud cells, and therefore they could go for massive scale (through a simplified fraud menu).

795.    This approach helped the Syndicate conceal its VAT fraud scheme by making it (mostly) harder to detect, but it came with a hitch: it required the willing involvement of corrupt western banks, since VAT fraud, unlike many other modes of terrorist finance that flows through banks, requires a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to do). Simply put, VAT fraud as practiced by al-Qaeda was one of the simplest of all terrorist finance schemes for banks to detect.

796.    For that reason, Osama bin Laden and, later, Sirajuddin Haqqani knew that al-Qaeda's VAT fraud scheme could not succeed without the willing participation of at least one, preferably two, notoriously criminal global financial institutions with access to key markets.

(i)     Access to banks with **branches in Germany and the U.K.** were two of the Syndicate's top VAT fraud targets based on al-Qaeda's perceptive observations that, until recently, the U.K. and German governments did not devote the prosecutorial resources commonly seen in the U.S.

(ii)    Access to banks with **branches in the United States or another reliable means to access U.S. Dollars** was essential to the al-Qaeda's ability to convert euros (not useful in Afghanistan or Pakistan) into every terrorists' gold standard: the U.S. Dollar.

(iii)   Access too banks with branches in **the U.A.E.** was vital as an (a) logistical hub from which al-Qaeda directly funded and armed the terrorists targeting Americans in Afghanistan through its VAT fraud, and (b) inducement for al-Qaeda's and the Haqqani Network's VAT fraudsters to work harder (in Europe and the U.S.), so they could play harder (in Dubai) while the terrorists used the funds their VAT scheme to fight harder (in Afghanistan).[510]

---

[510] Some (but not all) of whom enjoyed spending significant amounts of money on lavish goods and entertainment, which Sirajuddin Haqqani (like bin Laden before him) pragmatically tolerated as an acceptable price the Syndicae had to pay to expand its VAT fraud labor pool and achieve the fundraising scale necessary for its VAT fraud pipeline to serve its intended purpose: a low-cost, reliable, and sustainable method for the Syndicate to source at least tens of millions of U.S. dollars each year to fund its attacks against America s in Afghanistan.

(iv)     Access with banks in **Afghanistan and Pakistan** also aided al-Qaeda's ability to operationalize its European VAT fraud schemes into U.S. dollars to purchase weapons and fund fighters in the Middle East. Al-Qaeda and the Haqqani Network did not, however, require such access as long as they had a reliable banking partner in Dubai, because both organizations routinely engaged in large bulk cash smuggling operations from the UAE to Afghanistan (through Pakistan) – a skill set that nearly every terrorist group in the Middle East mastered, including, but not limited to, al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, Hezbollah, and the Qods Force. Indeed, such operations are a classic example showing how such groups improved the lethality of their terror campaign against Americna in Afghanistan by working with one another.

797.     When al-Qaeda settled on VAT fraud as one of its core strategies to source U.S. dollars through American banks, it found an ingenious technique that only posed one risk: everything that made the strategy so effective also made it so obvious to any bank that was not affirmatively "in" on the VAT fraud scheme.

798.     In particular, the "carousel" nature of VAT frauds as practiced by al-Qaeda would quickly be discovered if an al-Qaeda-trained VAT fraudster attempted the scheme at an ethical bank for the exact reason why Deutsche Bank's VAT fraud transactions alerted SCB, and vice versa: because al-Qaeda tradecraft prioritized scale and simplicity, which meant that its VAT fraudsters usually copied-and-pasted (or close to it) the same schemes, entities, and everything.

799.     To maximize the lethality of their VAT fraud scheme, al-Qaeda and the Haqqani Network needed ***at least two*** large global banks that could facilitate their access to all or nearly all of these markets because the Syndicate could achieve powerful and dynamic network effects for its terrorist finance scheme through the inclusion of two willing criminal bank partners. Simply put, under the terrorist math practiced by the Syndicate's VAT fraud operatives, one (SCB) plus one (DB) equaled a lot more than two.

800.     Al-Qaeda's leaders understood that a minority of "bad banks" would always be willing to work with terrorists for profit and coupled that insight with al-Qaeda's knowledge,

based on decades on the ground in every country in Europe, that European governments have historically struggled to root out VAT fraud schemes due to a lack of resources that fundamentally distinguishes the U.S. and European approaches.

801.    As a result of the foregoing, the key glue binding the entire scheme was Deutsche Bank's and Standard Chartered Bank's affirmative, willing participation.  Each Bank's involvement magnified the potency of the other, and vice versa.

802.    For example, when SCB and DB, respectively, affixed their legitimacy to the Azizi Cells' transactions, SCB and DB each aided the Azizi Cell's ability, in turn, to deploy the imprimatur of one bank to aid the other bank's fraud, producing a win/win/win for all al-Qaeda, Deutsche Bank, and Standard Chartered Bank:  better concealment for all, and therefore more money for all.  This alone provided impossible-to-overstate value for the Syndicate by maintaining an al-Qaeda VAT fraudster's operational imperative: concealment.

803.    Similarly, the Azizi Cell could leverage its fraud strategies, and associated deal terms, which it learned that it learned from DB and apply it to SCB, or vice versa, like how a prosecutor's skills at fraud detection can grow over time based on work investigating similar financial crime schemes.

804.    Because the Azizi Cell used the same scheme, entities, and personnel in its transactions with Standard Chartered Bank and Deutsche Bank alike, the SCB Defendants knew that SCB, including SCB New York, was fueling al-Qaeda and Taliban violence through SCB's services to the Azizi Cell the same way that the DB Defendants knew that DBTCA was fueling al-Qaeda through their shared execution of the same scheme.

805.    This matters because when the Azizi Cell operated al-Qaeda's VAT fraud scheme, Standard Chartered Bank was alerted by two independent – and equally potent –

channels of communication, which involved different transactions, personnel, and entities, which ensured that each SCB Defendant below knew what it was doing – and aided al-Qaeda anyways.

806.     *First*, the same sorts of **internal operations data** that alerted certain Deutsche Bank insiders to the VAT fraud also alerted Standard Chartered Bank, including each SCB Defendant identified below.  As a result, DB and SCB each knew, and disregarded, a litany of crimson red flags for al-Qaeda terrorist finance raised by the internal operations data generated by Azizi Cell-related transactions at both SCB and DB, including, but not limited to, the:  (1) types of deals being pursued by the Azizi Cell; (2) biographies of the key members of the Azizi Cell; (3) virtually non-existent public record of the Azizi Cell's companies; (4) obviously suspicious nature of the business records and papers furnished by members of the Azizi cell to Deutsche's Bank; and (5) each Bank's direct communication with Azizi Cell members.

807.     *Second*, the same sorts of **external transaction data** that alerted Deutsche Bank insiders to the VAT fraud also alerted SCB insiders, and vice versa.  Following al-Qaeda's VAT fraud playbook, the Azizi Cell deployed the same shell companies, strategies, tactics, modes of communication, payment, bank accounts, industry focuses, geographies—***nearly everything***—in its VAT fraud schemes with both SCB and DB.  As a result, the Azizi Cell applied common transaction patterns and terrorist tradecraft, which were detected by at least several people inside and outside of Deutsche Bank.

808.     On information and belief, SCB personnel knew of the bright red al-Qaeda finance red flags that attached to the obvious VAT fraud SCB was enabling:  SCB personnel received similar information as their DB counterparts, which SCB personnel assessed after similar VAT fraud and terror finance training as their DB counterparts,  which SCB personnel

then similarly disregarded like their DB counterparts while similarly knowing that they worked at a bank that embraced a Laundromat business model.

809.    Accordingly, SCB's and DB's own willful blindness regarding the easily detectable and tell-tale indicia of ***the other's*** "carousel" activity flowing from the "front-of-the-envelope" transaction data available to all therefore materially assisted al-Qaeda's trade, and improved the effectiveness of the  scheme, allowing more money to flow to Afghanistan to kill the Americans working there, because each DB's terrorist finance scheme amplified the potency of SCB's – and vice versa, not only DB and SCB, but, more importantly, for al-Qaeda.

### ii.    Deutsche Bank Knew About the Russian Laundromat

810.    Many Deutsche Bank executives and employees, including personnel at DB London and DB New York (including DBTCA) knew that Deutsche Bank's Russian Laundromat executed many transactions that made no economic sense, which is a terrorist finance red flag. As Mr. Laabs recounted, "[i]n principle," "the transactions were not illegal, provided they served an economic purpose and the customers had a sound reputation."[511]

> But the men who had approached Tim Wiswell made a small loss on every transaction, as they had to pay a fee to the bank for buying and selling shares. Consequently, the deal made no economic sense. In addition, the new customers did not correspond at all to what a bank generally imagines a solid business partner to be. At the Moscow branch, Wiswell was tasked with overseeing the stock deals of the unusual customers, keeping his superiors happy, and ***making sure that, on paper, it seemed like the new Russian customers had been thoroughly scrutinized.***[512]

811.    Chris Barter served as the CEO of Goldman Sachs Moscow when Deutsche Bank operated its Russian Laundromat and publicly confirmed Deutsche Bank's prior knowledge of

---

[511] Laabs, *Bad Bank*, at 464 (translated by Plaintiffs) (emphasis added).

[512] *Id.* (translated by Plaintiffs) (emphasis added).

likely criminal activity when Deutsche Bank partnered with the Russian Mafia to create the

Russian Laundromat. As investigative journalist Luke Harding summarized:

> Barter recalled how he was approached by "broker types, not very senior,"
> seeking to do large, unexplained volumes of trade with Goldman Sachs. These
> were on behalf of major Russian clients. The brokers declined to identify their
> counterparties. Their names were concealed beneath "shell company after shell
> company," Barter said, making a due diligence process impossible. He turned this
> business down "in five seconds." Seemingly, the same entities approached
> Wiswell. There they got better results.[513]

812.    Mr. Barter's experience as CEO of Goldman Sachs Moscow also confirmed that

Deutsche Bank, DB London, and DB New York (including DBTCA) knew, or were generally

aware, that crime was afoot at DB Moscow. As Mr. Barter recalled of DB Moscow, it was clear

at the time, even from Goldman's outsider view, that: (1) "[DB Moscow traders] were doing

some very curious things"; (2) "[n]obody could make sense of their business"; and (3) from this

information, Mr. Barter concluded that "'something nefarious' was going on at Deutsche Bank

during the Wiswell period" when Deutsche Bank operated its Russian Laundromat.[514]

813.    On or about January 2014, DB Moscow personnel confronted another threat to

Deutsche Bank's scheme: another Cypriot bank, Hellenic Bank, sent a Request for Assistance

("RFA") to DB London based on the Hellenic Bank's perception that a pattern of transactions

from Deutsche Bank suggested potential terrorist finance and money laundering activity by

Deutsche Bank. This was notable because, as Mr. Enrich recounted, Cyprus's financial system

was, "[b]y design, … a go-to destination for Russians and others searching for somewhere to

hide ill-gotten cash. … [T]he laxity of its financial system" was among "Cyprus's biggest selling

points." As a result, "[i]t took a lot to make a Cypriot banker queasy, but [the] nearly $700

---

[513] *Harding* at 312-13.

[514] *Id.* at 311.

million [that] had flooded into [Hellenic Bank accounts]" through DB Moscow's mirror trading scheme "did the trick."[515]

814.    Seeking more information, Hellenic Bank "specifically asked whether DB-London had '*any reason to believe that the transactions [with Counterparty B] are in any way of a suspicious nature.*'"[516]

815.    "Eventually," Mr. Wiswell, "responded by reassuring the European Bank that Counterparty B '*ha[s] passed through our KYC [know-your-customer] procedures*' and that Deutsche Bank '*see[s] no reason for concern here.*'"[517] DB Moscow's statement was a lie told to conceal and sustain Deutsche Bank's mirror trading scheme and the Russian Laundromat. "Not a single Deutsche Bank compliance staffer was ever involved in the response to this [Request For Assistance] provided by the corrupt supervisor," on information and belief, "The Wiz," Tim Wiswell.[518]

816.    Even this limited window into how the Russian Laundromat worked made clear the link and the use of the U.S. financial system. As Mr. Enrich reported:

> *Wiz knew all about these transactions.* The Russian customer was participating in mirror trades with Deutsche to extract rubles from Russia and *convert them into dollars, using Deutsche's U.S. Operations—DBTCA—as a Laundromat.* Then the dollars were being zapped over to Cyprus, where the Russian beneficiary could do with the money as he pleased.[519]

817.    When Hellenic Bank escalated its inquiry to a senior Anti-Financial Crime employee at DBTCA who supervised special investigations, in an attempt to reconcile these

---

[515] Enrich, *Dark Towers*, at 231.

[516] 2017 Consent Order ¶ 38 (emphasis in original).

[517] *Id.* ¶ 39 (emphasis in original).

[518] *Id.* ¶ 39.

[519] Enrich, *Dark Towers*, at 232 (emphasis added).

concerns, the "senior [DBTCA] compliance employee [in New York] never responded to [Hellenic Bank]. Nor did the employee take any steps to investigate the basis for [Hellenic Bank's] inquiry, later explaining this omission on the ground that *the employee had 'too many jobs' and 'had to deal with many things and had to prioritize.'*"[520]

818.     The senior DBTCA compliance employee's explanation was a false attempt to exculpate the senior employee and DBTCA. Rather, the DBTCA employee declined to review the financial crime red flags raised by Hellenic Bank because the employee understood that his/her role at DBTCA was to facilitate its activities as a Laundromat, which necessarily entailed ignoring information requests that could expose the pervasive laundering happening throughout Deutsche Bank branches.

819.     Deutsche Bank did not merely confine its Syndicate-related financial services to the helping launder the terrorists' money. Deutsche Bank personnel, consistent with their activities as a Laundromat, leaked terrorist finance-related inquiries on one or more occasions to criminal suspects whom Deutsche Bank knew were connected to violence. According to NYDFS, Deutsche Bank committed a "serious breach of anti-money laundering and corruption policies and practices," when Deutsche Bank told its likely criminal client that Hellenic Bank had sought information about the client. And, even more troubling, "when the leak came to the attention of senior DB-Moscow management, no action to investigate the leak was taken."[521]

820.     NYDFS noted that in another instance, "despite the emergence of an unmistakable pattern of suspicious trading at the securities desk at DB-Moscow," Deutsche Bank apparently

---

[520] *Id.* (emphasis in original).

[521] 2017 Consent Order ¶ 42.

did not investigate.[522] Deutsche Bank knew that its clients were engaging in financial crimes, and it helped facilitate those crimes and, when confronted with evidence that the crime was occurring, Deutsche Bank did not investigate.

821. According to NYDFS, Deutsche Bank's "onboarding staff experienced hostility and threats from the [DB Moscow] supervisor," on information and belief Mr. Wiswell, "on several occasions when it appeared they had not moved quickly enough to facilitate transactions."[523] Each time this happened, DB Moscow, through Mr. Wiswell, deliberately facilitated transactions that it knew could finance terrorists, including specifically with Khanani.

822. "Distressingly," according to NYDFS, "this was a fact about which senior management at DB-Moscow was aware, yet management's response was inadequate. Indeed, although deficiencies in KYC policies and procedures were well known for many years, Deutsche Bank did not take sufficient action to implement genuine reform until 2016." [524]

823. According to NYDFS, Deutsche Bank's approach recklessly deviated from how responsible global financial institutions dealt with Russia, which was universally viewed as "high risk" by essentially everyone else but Deutsche Bank.[525]

824. NYDFS determined that DB Moscow often refused to even near universal counter-terrorist-finance practices, such as when Deutsche Bank refused to treat Russian-related clients as "high-risk" even though all its peers did for obvious reasons. DB Moscow even refused to do this because DB Moscow knew that if it chose to do so, most of its clients would be reclassified as high risk (whom DB Moscow knew to be terrorists and mobsters) and DB

---

[522] *Id.* ¶ 43.

[523] *Id.*

[524] *Id.*

[525] *Id.* ¶ 50.

Moscow would have to end its enormously profitable mirror trade and one-legged trade scheme. Prior to 2016, DB Moscow refused to do anything that could stop terrorist financiers like Altaf Khanani executing terrorist finance transaction through DB Moscow and DB London, including obtaining U.S. Dollars through DBTCA via DB Moscow's criminal schemes.

825.    Rather than punish Mr. Wiswell, as NYDFS observed, Deutsche Bank praised him and –thereby created "the pernicious culture that gave rise to the improper trading scheme and permitted it to continue uninterrupted for a five-year stretch."[526]

826.    In 2015, the Russian authorities began investigating Deutsche Bank's Russian Laundromat.[527]

827.    Soon thereafter, Deutsche Bank placed Mr. Wiswell on leave while it "investigated" Deutsche Bank's "Russian Laundromat." On information and belief, Mr. Wiswell left Deutsche Bank on or about August 2015.

828.    Even after Mr. Wiswell left, however, Deutsche Bank continued laundering money through DB Moscow, DB London, and DB New York (including DBTCA) for the Russian Mafia and Khanani through, among others, the Moldovan Laundromat.

829.    Deutsche Bank's attempt, through its 2015 internal investigation, to pin the blame on Mr. Wiswell was factually wrong, and only proved the Bank remained committed to its Laundromat ways. As Ms. Beltron reported,

> Some of Wiswell's colleagues were aghast [at the Bank's attempt to blame him].
> Of course more senior executives had been aware of the trades. "You can't just
> move $10 billion offshore without someone knowing it was going on. And over
> four years," said one. "Tim had plenty of conversations about these guys [*i.e.*, the
> people benefiting from Deutsche Bank's Russian Laundromat] with London [*i.e.*,
> DB London]. Everyone knew these guys would call, and they would buy and sell
> every day for four years. It's pretty hard to keep that a secret. The guy in [DB

---

[526] *Id.* ¶ 60.

[527] Belton at 406-07.

London] – even if he claims to know nothing about it – had to know who the clients were when for four years they were a top-five client."[528]

830.     NYDFS squarely rejected Deutsche Bank's attempt to paint Mr. Wiswell as a rogue employee. "In short," NYDFS concluded, "Deutsche Bank's [anti-money-laundering and counter-terrorist finance] control failures were longstanding and *enterprise-wide*, enabling the mirror trade scheme to *flourish and persist*."[529]

831.     Moreover, on or about October 2015, Mr. Wiswell issued public statements, through Russian counsel, in which Mr. Wiswell declared that: (1) Mr. Wiswell believed that Deutsche Bank's "compliance department" "must have known" about the illegal mirror trades that he conducted – including, but not limited to, those for the Syndicate through Khanani and the Russian Mafia – when operating the Bank's "Russian Laundromat"; (2) Mr. Wiswell believed that he "simply followed" Deutsche Bank's "instructions" and the Bank knew of, and approved, all the trades he executed while operating its "Russian Laundromat"; and (3) Mr. Wiswell informed, and received approvals and ratification from, at least twenty Deutsche Bank colleagues, including two senior Deutsche Bank managers at DB London, and based upon such discussions, Mr. Wiswell believed that the foregoing Deutsche Bank managers and employees knew of, approved, and ratified, DB Moscow's operation of the Russian Laundromat on behalf of DB London and DB New York (including DBTCA).

832.     Mr. Wiswell's claim to have informed DB London management is plausible. Among other reasons, DB London, and DB New York (including DBTCA) were making enormous profits from the Russian Laundromat, which Deutsche Bank management known for

---

[528] Belton at 407. As Ms. Belton reported, "[w]hen Moscow regulators finally clamped down on [Deutsche Bank's "Russian Laundromat"] scheme, they too settled on lower-level players." *Id.*

[529] 2017 Consent Order ¶ 60 (emphasis added).

their obsession over profits noticed. Indeed, as investigative journalist Luke Harding reported, "Deutsche Bank's London and New York divisions were economic beneficiaries of this [Russian Laundromat] arrangement" that "captured Deutsche Bank's Moscow outpost."[530] Deutsche Bank knew they operated the Russian Laundromat, and it therefore knew that its clients were engaged in financial crime, including laundering money for criminals and terrorists.

### 4. Deutsche Bank Knew It Was A Preferred Bank For Terrorist Financiers Based On Its History Of Enabling "Dirty Money" Transactions

833. According to Mr. Laabs, "Deutsche Bank had everything to offer that facilitated a money launderer's work: lousy internal controls, *a company culture in which everything seemed to be allowed, ruthless employees, and sufficient opportunity*, despite numerous warnings, to do business in controversial places around the world."[531]

834. From 2001 through 2017, Deutsche Bank regularly facilitated transactions for anti-American terrorists around the world, supporting terrorists or other criminal syndicates that deployed violence at scale, doing so on multiple continents and often being fined by governments in response:

- **Palestinian Terrorists in Israel.** On information and belief, Deutsche Bank knowingly or recklessly operated bank accounts for years on behalf of U.S. government-designated Palestinian terrorist groups, and such conduct remains under investigation by NYDFS.

- **Russian Narco-Terrorists in Europe and the Former Soviet Union.** Deutsche Bank facilitated the terrorist finance and fundraising efforts of Russian terrorists operating in Ukraine by providing banking services to them.

- **Italian Mafia Narco-Terrorists in Europe.** Deutsche Bank has a long history of knowingly, or recklessly, providing financial services to violent Italian mafia families operating throughout Europe. For example, Deutsche Bank provided 900 million euros in loans to an Italian confectioner owned by the business partner of a reputed member of the

---

[530] Harding at 316.

[531] Laabs, *Bad Bank*, at 462 (translated by Plaintiffs) (emphasis added).

Italian mafia,[532] while knowing, and not caring, that its counterparty, as Mr. Laabs put it, "had a sketchy past, present, and possibly future" in connection with its potential connection to the Italian mafia's money laundering activities, and the consequences of the deal did not matter to Deutsche Bank's personnel "because they received their bonus when the deal was closed."[533]

- **Jeffrey Epstein Sex Trafficking Organization Rapists in the U.S.** Deutsche Bank directly enabled Jeffrey Epstein's sex trafficking.[534] "Compliance officers reportedly flagged the transactions of Epstein's company at one point, but bank managers are said to have dismissed their concerns because nothing illegal happened and he was a 'lucrative client.'"[535] As a *New York Times* columnist explained, "Jeffrey Epstein … didn't act alone. Now we know in vivid detail who some of his financial enablers were: executives and bankers at Deutsche Bank."[536]

835.    Deutsche Bank's deliberate processing of transactions on behalf of known or suspected Iranian terrorist agents, operatives, and fronts illustrates DB's institutional effort to profit from anti-American terrorist finance. As previously described, the DB Defendants flouted the U.S. government's requests that they avoid doing business with Syndicate fronts. They also, however, flouted a similar U.S. request concerning business with IRGC fronts that advanced the Iranian terrorist project through the IRGC-QF and Iranian terrorist proxies like Lebanese Hezbollah, which was designated as an FTO in 1997. Through its Iran-related misbehavior from 2001 through 2016, Deutsche Bank reveals how far its senior management was willing to go to maximize DB profits from USD services to the highest-risk customers in the Former Soviet Union and the Middle East, regardless of the terrorist finance risk.

---

[532] Laabs, *Bad Bank*, at 236-38 (translated by Plaintiffs).

[533] *Id.* (translated by Plaintiffs).

[534] Paul Campos, *Massage at Epstein's*, Lawyers, Guns, and Money (Blog) (July 11, 2019), 2019 WLNR 21287461.

[535] *Id.*

[536] James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, International New York Times (July 20, 2020), 2020 WLNR 20112125.

836.     "By 2006," according to Mr. Enrich, "Deutsche had zapped nearly $1.1 billion

into Iran, Burma, Syria, Libya, and the Sudan, providing desperately needed hard currency to the

world's outlaw regimes and single-handedly eroding the effectiveness of peaceful efforts to

defuse international crises," and as a result:

> The hundreds of millions of dollars that Deutsche wired to Iranian banks provided
> vital funding … to pay for its terrorism. Soon Iraq was being ripped apart by
> violence. Roadside bombs detonated all over the country, targeting … the U.S.
> military forces that were trying to keep the peace. Much of the violence was the
> work of a terrorist group, Jaysh al-Mahdi, which had been armed and trained by
> Hezbollah, which had been bankrolled by Iran's Revolutionary Guard, which had
> been financed by Deutsche.[537]

837.     Each Deutsche Bank Defendant had the same knowledge of the nexus between

Iranian activity in Dubai and anti-American terror that was known to the DB Defendants, and

therefore, Deutsche Bank's long-standing support for IRGC terrorist strategy is revealing

because Deutsche Bank aided the IRGC and IRGC-QF despite knowing the above context and

that the IRGC and IRGC-QF were at all times described (correctly) by the U.S. government as

the world's worst sponsor of anti-American terrorism.

**B.      Standard Chartered Bank Knew It Was Aiding Terrorists**

**1.      Standard Chartered Bank Knew That It Operated As A Criminal
         Enterprise And Laundromat Until 2016**

838.     Since the 1980s, Standard Chartered Bank viewed conflict zones as business

opportunities for its business model, which differentiated the Bank from nearly every other

global financial institution. For example, Standard Chartered Bank was willing to operate in

Sierra Leone. As *Euromoney* put it: "Courage is definitely called for when operating in some

countries. [Standard Chartered Bank] in Sierra Leone is a good example. It is the only

---

[537] Enrich, *Dark Towers*, at 104-105.

international bank there and adds positively to the group's bottom line."[538] A Standard Chartered

Bank executive explained that SCB makes money *because of* risky environments:

> "*We make money because of the risk*," explain[ed the SCB executive] – that's
> risk with a capital R, "We used to have 13 branches, now we've only one left.
> Twelve have been bombed and shot to pieces and are of no use to anyone, but
> that's the cost we've taken on board. We're still on the ground. With a quick lick
> of paint, people put money with us and we make a profit."[539]

839.     As one industry observer explained, Standard Chartered Bank's "considerable

interest" in "searching out opportunities in Afghanistan" accords with SCB's "history of showing

interest in countries that are experiencing upheaval and reconstruction" as shown by its status as

"the only foreign bank to continue operations in Sierra Leone throughout its civil war."[540] At all

relevant times, Standard Chartered Bank has viewed conflict zones as uniquely strong market

opportunities, since the U.S. Dollar is typically the currency of choice in conflict zones, and SCB

is the world leader in facilitating USD-denominated transactions in such environments.

840.     According to Dr. Kimberley L. Thachuk, "[c]onflict and postconflict zones []

serve as locales for the cross-pollination of extremist groups and organized crime."[541] Thus, "[i]t

is no coincidence that a wide range of terrorist sympathizers, criminals, veterans of conflicts, and

adventure seekers flock to conflict zones" such as "Afghanistan and Iraq" to seek to profit from

---

[538] Chris Cockerill, *Big Risk, Big Profit*, Euromoney (Sept. 1, 2000), 2000 WLNR 10574765.

[539] *Id*. (emphasis added).

[540] Fiona Haddock, *The Central Banker with a US$300 Budget*, Asiamoney (May 2, 2003), 2003
WLNR 18368142. In 1998, the Sierra Leone government seized the accounts of certain
foreigners who had provided critical support to the prior military *junta*, some at SCB. *See*
Reuters, *S. Leone Freezes Bank Accounts of "Collaborators"* (Apr. 21, 1998).

[541] Thachuk, *Terrorist Criminal Enterprises*, at 15.

"booming war economies" often controlled by "nimble strongmen" and "[i]nfamous gangsters such as … Sirajuddin [Haqqani]."[542]

841.     From the late 1980s through 2016, under Standard Chartered Bank's strategy to facilitate bulk USD activity regardless of the terrorist finance risk, SCB's constant proximity to reckless financial transactions was not a fortuity; it was the entire point. As each SCB Defendant knew, and the World Bank noted in 2009, it was an elementary fact of the global financial system that "[b]ecause of their crucial role in the financial system, any banks not having effective [counter-terrorist finance] programs are the ones most likely to be exposed to [terrorist finance] risks and hence can most easily be exploited by domestic and international criminals."[543] By recklessly providing essentially unregulated bulk U.S. Dollar services in terrorist hot zones around the world, often being in a near monopoly in such role, while deliberately taking steps to make life easier for money launderers, each Standard Chartered Bank Defendant knew its conduct would cause SCB accounts to regularly be used by money launderers working for terrorist organizations seeking to kill and maim. Standard Chartered Bank knew this risk and, until 2016, did not care. Plaintiffs suffered for their indifference.

842.     Standard Chartered Bank's enforcement history demonstrates its long-standing practice of operating as a Laundromat for anti-American terrorist financiers and logisticians. On December 10, 2012, Standard Chartered Bank entered a deferred prosecution agreement (or "DPA") with the United States Attorney's Office for the District of Columbia in connection with SCB's admitted terrorist finance activities in support of known and suspected fronts for Iranian

---

[542] *Id.*

[543] Pierre-Laurent Chatain, John McDowell, Cédric Mousset, Paul Allan Schott, & Emile van der Does de Willebois, The World Bank, *Preventing Money Laundering and Terrorist Financing; A Practical Guide for Bank Supervisors* at 7 (2009).

terrorist groups such as Hezbollah and the IRGC-QF. Standard Chartered Bank did so as part of a global resolution that also resolved potential charges brought by New York regulators.

843.    Also in 2012, the New York Department of Financial Services ("NYDFS") entered a Consent Order which labeled Standard Chartered Bank as a "rogue institution," and made clear that for "nearly a decade," Standard Chartered Bank "programmatically engaged in deceptive and fraudulent misconduct [] to move at least $250 billion … then covered up its transgressions." NYDFS concluded that "[Standard Chartered Bank's] actions left the U.S. financial system vulnerable to terrorists."[544] NYDFS determined that SCB London, SCB Dubai, and SCB New York, helped "finance terrorist groups"[545] and had "indisputably helped sustain a global threat to peace and stability."[546]

844.    NYDFS concluded that Standard Chartered Bank's identity as a "rogue institution" directly reflected the views of its leadership, which was openly contemptuous of the U.S. government's efforts to prevent terrorist finance:

> In short, [Standard Chartered Bank] operated as a ***rogue institution***. By 2006, even the New York branch was acutely concerned about the bank's [misconduct]. In October 2006, SCB's CEO for the Americas sent a panicked message to the Group Executive Director in London. "Firstly," he wrote, "we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are ... still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group." His plea to the home office continued: "[s]econdly, there is equally importantly potential of risk of subjecting management in US and London (*e.g.*. you and I) and elsewhere to personal reputational damages and/or serious criminal liability."

> Lest there be any doubt, ***SCB's obvious contempt for U.S. banking regulations*** was succinctly and unambiguously communicated by SCB's Group Executive Director in response. As quoted by an SCB New York branch officer, the Group

---

[544] NYDFS, *In re Standard Chartered Bank, New York Branch*, Consent Order, at 1, 2, 4 (Aug. 6, 2012) ("2012 Consent Order").

[545] *Id.* at 8.

[546] *Id.* at 22.

Director caustically replied: ***"You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."***[547]

845.    Standard Chartered Bank's Group Executive Director was a long-standing key player at SCB, having served as SCB's head of Finance, Corporate Treasury and Corporate Development, Head of Growth and Governance across Africa, Middle East, Pakistan, United Kingdom, Europe and the Americas, as well as SCB's Head of Risk, Group Special Asset Management, Legal and Compliance. From 2001 through 2016, SCB's "You F---ing Americans" mentality reflected the views of SCB management responsible for U.S., U.K., U.A.E., and Pakistan, and explained SCB's willingness to deal with other known enablers of anti-American terror, like the al-Qaeda, Haqqani Network, and Lashkar-e-Taiba agents and operatives favored by the Syndicate.

846.    Observers concluded that the "regulatory investigations" in 2012 collectively showed that "Standard Chartered [had] financed terrorism and laundered money."[548] NYDFS agreed: as recounted by its head two years later, when NYDFS fined Standard Chartered Bank the second of several times:

> "Money is the oxygen feeding the fire that is terrorism … ***Without moving massive amounts of money around the globe, international terrorism cannot thrive***," [Lawsky said.] Yet … some banks don't take monitoring of financial transactions seriously. Indeed, Lawsky accused [SCB] … of ***ignoring money laundering***, and [] the bank agreed to pay more than $300 million.[549]

847.    In 2019, Standard Chartered Bank admitted, in effect, that it was a terrorist finance recidivist when it resolved additional parallel charges brought by the Justice Department,

---

[547] *Id.* at 4-5 (emphasis added).

[548] Jonathan Shapiro, *Wall Street Deserves Some Slack*, Financial Review Capital (Aug. 8, 2012), 2012 WLNR 16603546.

[549] Kaja Whitehouse, *Banks May Pay Price for Hacks*, The Post-Crescent (May 23, 2015) (emphasis added), 2015 WLNR 15349257.

NYDFS, and the Manhattan DA. As summarized by Treasury, "[f]rom June 2009 until May 2014, SCB processed 9,335 transactions totaling $437,553,380 that were processed to or through the United States," "[a]ll of these transactions involved persons or countries subject to comprehensive sanctions programs administered by" OFAC, and "SCB Dubai processed USD transactions to or through [SCB New York] or other U.S. financial institutions on behalf of customers that sent payment instructions to SCB Dubai."[550] To resolve these allegations, Standard Chartered Bank paid $639 million as part of a federal settlement,[551] and $463.4 million as part of a parallel settlement with New York regulators,[552] or approximately $1.1 billion total.

848.    U.S. Attorney Jessie K. Liu of the District of Columbia announced the resolution with the United States, and publicly stated that: (1)"SCB undermined the integrity of our financial system and harmed our national security by deliberately providing" anti-American terrorist funders and supporters "with coveted access to the U.S. economy"; and (2) there was "no doubt" that Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai were "repeat corporate offenders with deficient compliance programs" that "subvert[ed] our national security" and deserved to pay the "steep price" represented by "[t]he financial penalty" against SCB of "[m]ore [t]han $1 Billion."

849.    When Standard Chartered Bank did the business that was eventually prosecuted in these regulatory actions, Standard Chartered Bank knew it was aiding fronts and operatives supporting Iran's Shiite terrorist proxies in Iraq, and Standard Chartered Bank knew it was

---

[550] U.S. Department of the Treasury, Press Release, *U.S. Treasury Department Announces Settlement with Standard Chartered Bank* (Apr. 9, 2019).

[551] *Id*.

[552] NYDFS, Press Release, *Department of Financial Services and Manhattan District Attorney Fine Standard Chartered $463.4 Million for U.S. Sanctions Violations* (Apr. 9, 2019) ("2019 NYDFS Press Release").

aiding similar agents and fronts who acted on behalf of al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba.

850. In 2019, NYDFS concluded that the practices pursued by SCB New York, SCB London, and SCB Dubai foreseeably risked Standard Chartered Bank assuming a role in terrorist finance activities by terrorist organizations.[553] Standard Chartered Bank therefore knew, at the time, that its actions risked assuming a role in terrorist finance activities.

851. NYDFS also found that the SCB London, SCB Dubai, and SCB New York followed reckless counter-terrorist finance compliance and risk management practices relating to USD-denominated transactions carried out in Dubai or on behalf of companies in Dubai.[554]

852. NYDFS also found that numerous SCB Dubai personnel knowingly undertook reckless financial practices while knowing that the transactions risked financing terrorism and did, in fact, potentially help terrorists. NYDFS found that SCB Dubai employees regularly helped customers process financial transactions even while the SCB Dubai employees knew the customers were engaged in criminal activities and using their Standard Chartered Bank accounts to further their criminal enterprise.[555]

853. NYDFS found further that Standard Chartered Bank continued to pursue its reckless provision of financial services through SCB Dubai even after regularly learning of

---

[553] *See, e.g.*, *id.* (NYDFS criticized SCB's "egregious activities," that "concealed illegal financial transactions," and stated that "[g]lobal financial institutions serve as the first line of defense against … the financing of terrorist activities and those that fail to foster a strong compliance culture [like SCB New York and SCB Dubai] will be held accountable").

[554] *See, e.g.*, *id.* (NYDFS found that their "investigation further revealed that the bank's compliance infrastructure in the UAE region was woefully inadequate" and "[c]ompliance staff were … unconcerned with U.S. sanctions regulations").

[555] *Id.* (NYDFS and Manhattan DA found that a "manager in [SCB] … advised [a] front company located in Dubai how to evade detection by changing its corporate name and then opening a new account").

specific counter-terrorist finance "red flags" between 2009 and 2014. Instead of rigorously investigating the counter-terrorist finance implications, Standard Chartered Bank did nothing other than try to punish people who raised concerns about its ongoing crimes.

854. By the 1980s, Standard Chartered Bank was a notorious Laundromat for terrorist financiers and logisticians, which reputation the Bank retained through 2016. Standard Chartered Bank knew it had this reputation.

855. From the late 1980s through 2016, Standard Chartered Bank and its subsidiaries and affiliates ordinarily disregarded red flags and provided financial services to customers, including obvious shell companies, as long as: (1) the customer initially routed their relationship through SCB Dubai, SCB Pakistan, or SCB Afghanistan; (2) the product offering concerned USD-denominated financial services to be provided from SCB New York under from SCB's commercial banking, wholesale banking, trade finance, correspondent banking, or other offerings; (3) Standard Chartered Bank had any way to maintain plausible deniability; and (4) the American, British, Emirati, and Pakistani government had not specifically instructed Standard Chartered Bank to end its relationship with the specific customer at issue (even then, SCB often refused to comply).

856. On information and belief, prior to at least 2016, Standard Chartered Bank never once ended any financial relationship with any al-Qaeda, Taliban (including Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, or D-Company operative on its own accord based on terrorist finance risk without prompting from a government first.

857. When the Bank of Credit and Commerce International ("BCCI") was publicly exposed in 1991 for operating a Laundromat catering to terrorist finance, and subsequently collapsed, "Standard Chartered Bank" was among the "international banks," who – "while

stunned at the seizure of [BCCI]" – quickly began "eyeballing its carcass" less than one month later "as a chance to strengthen their own positions."[556]

858.    As a self-proclaimed heir to BCCI's business and customer base in the Middle East,[557] Standard Chartered Bank, like BCCI, focused its laundering activities on emerging markets like Pakistan and the U.A.E., and committed much of the worst behavior in Dubai through its local branch, SCB Dubai. Indeed, this is another indication of SCB's operation as a Laundromat, as it assumed the mantle from BCCI, which had been notorious for, as the *Economist* put it, being the "laundromat of choice for" "terrorists" "for years."[558]

859.    As Standard Chartered Bank expanded its international operations throughout the 1990s, it consciously emulated BCCI's strategies as it sought to win as much U.S. Dollar-related business as possible from BCCI's customers even though Standard Chartered Bank understood that many of BCCI's customers were terrorists.

860.    In the early 2000s, Standard Chartered Bank intensified its commitment to acting as a U.S. Dollar Laundromat. While most global financial institutions with a significant presence in the U.S. – even the ones that had previously looked the other way towards suspicious activity – changed their ways and adopted rigorous measures to prevent terrorist finance from flowing through their accounts after 9/11, Standard Chartered Bank took a very different course. Even as most of their peers with large American presences had largely at least committed (in principle) to cleaning up their acts by 2009, Standard Chartered Bank's enforcement history shows that SCB

---

[556] Cotten Timberlake, Associated Press, *Banks Go After BCCI's Market Share*, Daily News (Aug. 2, 1991), 1991 WLNR 1152558 ("Timberlake, *Banks Go After BCCI's Market Share*").
[557] *Id.*
[558] The Economist, *Robert Morgenthau: The Long Arm of the Law* (Aug. 3, 2019), 2019 WLNR 23554946 ("Economist, *Robert Morgenthau*").

calculated that the general trend towards better counter-terrorist finance at large global banks offered a business *opportunity* for SCB to seize more USD market share by doubling-down on its Laundromat Strategy.

861.    Standard Chartered Bank brazenly broke the law even while publicly lecturing other companies on the importance of ethics. After Enron collapsed in 2002, for example, Standards Chartered Bank's "[G]roup [CEO] … [stated] there are moral lessons to be learned. 'Basically, you must ensure that your values and ethics are clear and stick to them even when you are under revenue pressure.'"[559]

862.    From the late 1980s through 2016, Standard Chartered Bank pursued an integrated global business model consistent with its "One Bank" operational strategy. As Standard Chartered Bank itself touted in its 2012 Annual Report, "[w]e think and operate as 'One Bank', supporting clients and customers by collaborating and creating synergies across our international network, businesses and functions."[560] As part of this approach Standard Chartered Bank "provide[d] seamless international service and offer[ed] a full suite of products" to corporate clients and SCB's "One Bank approach" was able to "draw[] on the full complement of [SCB's global] resources and capabilities."[561]

863.    "[T]hink[ing] and operat[ing] as 'One Bank,'"[562] SCB London worked intimately with regional headquarters – like SCB Dubai for Pakistan, Afghanistan and the Middle East – and direct local branches, like SCB New York, or subsidiaries, like SCB Pakistan. At all times

---

[559] Karina Robinson, *Cover Story: The Importance Of Being Good - The Enron Scandal Has Put The Spotlight Back On Ethics. Banks Can No Longer Ignore The Issue Of Social Responsibility And Those Which Do May Not Survive*, The Banker (Apr. 1, 2002), 2002 WLNR 4160010.

[560] SCB Annual Report 2012 at 4.

[561] *Id.*

[562] *Id.*

SCB London's strategy, as pursued by SCB Dubai, SCB Pakistan, SCB Afghanistan, and SCB New York, was to drive USD-denominated business activity towards SCB New York.

864.     Standard Chartered Bank pursued the Laundromat Strategy led by SCB's management in SCB London, but also vigorously supported and followed by SCB New York, SCB Dubai, SCB Pakistan and SCB Afghanistan. In doing so, it was following its "One Bank" approach, under which SCB made foreign branches of SCB, including SCB Dubai, SCB Pakistan, and SCB Afghanistan, follow the same set of global rules.

865.     Standard Chartered Bank's "One Bank approach" extended to their compliance and regulatory commitments. On October 7, 2004, Standard Chartered PLC, SCB London, and SCB New York executed a written agreement with the Federal Reserve Bank of New York (the "Reserve") and the New York State Banking Department (which subsequently became NYDFS),[563] "which identified several compliance and risk management deficiencies in the anti-money laundering and Bank Secrecy Act controls at SCB's New York Branch."[564] "The agreement required SCB to complete certain remedial actions, among them retaining a qualified independent consulting firm acceptable to the Reserve and [NYDFS] to conduct an historical review of account and transaction activity."[565] "The purpose of the review was to determine whether suspicious activity involving accounts or transactions at, by, or through [SCB New

---

[563] Written Agreement by and among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004), https://www.federalreserve.gov/boarddocs/press/enforcement/2004/20041008/attachment.pdf.

[564] NYDFS, *In re Deloitte Financial Advisory Services LLP*, Agreement, Factual Background ¶ 1 (June 18, 2013).

[565] *Id.*

York] was properly identified and reported in accordance with applicable suspicious activity reporting regulations ("Transaction Review").[566]

866.    From the late 1980s through 2016, Standard Chartered Bank's deliberate support of terrorist finance relied upon the various Standard Chartered Bank branches, subsidiaries, and affiliates generally following the same deliberately deficient Standard Chartered Bank policies and procedures with respect to combatting terrorist finance, and similar financial crime risks.

867.    Because Standard Chartered Bank's anti-money-laundering/counter-terrorist-finance controls in the United Kingdom set global standards across all of Standard Chartered Bank, including SCB New York, SCB Dubai, SCB Pakistan, and SCB Afghanistan, deliberate facilitation of terrorist finance and money laundering by through the conscious creation of SCB's Laundromat by the U.K. caused SCB New York, SCB Dubai, SCB Pakistan, and SCB Afghanistan to fall in line and knowingly or recklessly assume a role in the terrorist finance scheme at Standard Chartered Bank. And they did.

868.    From the late 1980s through 2016, Standard Chartered Bank's deliberate support of terrorist finance relied upon the use of local Standard Chartered Bank branches in high-risk jurisdictions, like SCB Dubai, SCB Pakistan, and SCB Afghanistan, serving as Standard Chartered Bank's point of entry for most high-risk customer relationships. This enhanced the plausible deniability for all Standard Chartered Bank parties, most importantly SCB London and SCB New York, by leveraging the intentionally deficient Standard Chartered Bank practices in local branches, most of all, at SCB Dubai, which at all relevant times served as Standard Chartered Bank's regional headquarters for the Middle East, Africa, and South Asia, including the U.A.E., Pakistan, and Afghanistan.

---

[566] *Id.*

359
**JA436**

869.     From the late 1980s through 2016, Standard Chartered Bank's scheme would not have been successful without the willing participation of SCB London and SCB New York. As set forth below, SCB London and SCB New York management and personnel regularly enabled obvious terrorist finance activities, and their failures – and practice of disregarding clear red flags – were the "secret sauce" to keeping the Strategy effective until 2016.

870.     At all relevant times, Standard Chartered Bank's senior management regularly complained about the supposed burden imposed by even Standard Chartered Bank's then-minimal window-dressing counter-terrorist finance efforts. For example, nearly two years *after* Standard Chartered Bank admitted it had engaged in serial criminal behavior that aided America's enemies, on August 6, 2014, the Bank's Asia CEO revealed Standard Chartered Bank's true attitude towards counter-terrorist finance in an interview with *Reuters*, complaining about the burden that counter-terrorist finance imposed on Standard Chartered Bank:

> Banks have been asked to play the role of policing anti money laundering. That's the real purpose of all these sanctions and surveillance systems and all that … We are supposed to police that our counterparties and clients are not money laundering, and if when we are policing we have a lapse, we don't get treated like a policeman who's had a lapse, we are treated like a criminal.[567]

871.     Standard Chartered Bank was "treated like a criminal" because it *was a criminal*. From the late 1980s through 2016, Standard Chartered Bank was a "rogue institution" that engaged in "programmatic[]" crimes (as NYDFS said in 2012) and a "repeat corporate offender" (as DOJ said in 2019)—not a good corporate citizen or a responsible global bank.

---

[567] Lawrence White, Edwina Gibbs, Tom Pfeiffer, & Steve Slate, Reuters News, *UPDATE 1-StanChart Exec: Banks Treated like 'Criminals' for Anti-Money Laundering Lapses* (Aug. 7, 2014). Though SCB subsequently attempted to clean up the SCB Asia CEO's statement, the original statement accurately reflects each SCB Defendant's attitude towards counter-terrorist finance at all relevant times.

872. Given Standard Chartered Bank's history as a "recidivist rule-breaker,"[568] one may infer that SCB concluded it was profitable to continue enabling terrorist finance through 2016, even after being partially exposed in 2012. As an industry analyst following Standard Chartered Bank concluded, "CRIME PAYS":

> There are [] $250 billion worth of transactions … in this [SCB] scandal. A slap on the wrist of $700 million would equate to less than .3 of 1% (.003) for dealing with the crowd that would like to see Israel obliterated. Are you kidding me? Is this a joke or what? What do you think the profit margins were in the business transacted by [SCB] with their friends in Iran? Certainly a LOT more than .003.[569]

873. Each of the SCB Defendants therefore knew that they operated a Laundromat, that they were facilitating criminal activity, and that terrorist finance was a likely result.

874. **SCB Pakistan.** From 2001 through 2016, SCB Pakistan's core line of business was facilitating USD-denominated transactions involving parties in Pakistan and/or the U.A.E., as backstopped by the USD clearing services provided by SCB New York. SCB Pakistan did so through both traditional conventional commercial banking as well as Islamic banking to offer Sharia-complaint products. During this time, SCB Pakistan occupied a dominant position in the Pakistani financial marketplace with respect to clearing USD transactions with "correspondent accounts" and other financial vehicles, by leveraging its relationship with the other Defendants, including SCB New York, and its self-proclaimed (and correct) status as Pakistan's one **only 'local foreign' bank**."[570]

---

[568] Yves Smith, *New York's Benjamin Lawsky Collects Scalps, Showing Regulators Can \*Gasp\* Regulate*, Naked Capitalism (October 7, 2014), 2013 WLNR 15172530.

[569] Larry Doyle, *Standard Chartered Scandal: Crime Pays*, Sense on Cents (Aug. 8, 2012), 2012 WLNR 16791952.

[570] Farooq Tirmizi and Farooq Baloch, *The Cluelessness of Standard Chartered's Pakistan Strategy*, Daily Pakistan Today (Oct. 9, 2017) (emphasis added), 2017 WLNR 31097483.

875.    Consistent with Pakistan's status as a key emerging market for Standard Chartered Bank, in 2006, Standard Chartered Bank acquired control of Union Bank, which was one of Pakistan's largest commercial banks at the time. Union Bank shared similar ownership as the notorious international money launderer bank, BCCI, and on information and belief, followed BCCI-like practices when SCB Pakistan acquired it. After its purchase of Union Bank, Standard Chartered Bank became "Pakistan's sixth largest banking group,"[571] and cemented its role as the dominant player in facilitating USD-denominated transactions and/or deals underpinned by a USD-denominated currency pair. Thereafter, SCB Pakistan became SCB's "10th largest profit contributor."[572]

876.    By 2008, SCB Pakistan had 174 branches in 39 cities, having grown from 115 branches in 22 cities the year prior. As a result, SCB Pakistan branded itself, and was known in the Pakistani marketplace, as "the country's only 'local foreign' bank."[573] By 2012, as Pakistan's *The Nation* declared that, "[a]s the largest international bank in the country," "Standard Chartered [was] now truly a part of the social fabric of [Pakistan]."[574]

877.    SCB Dubai controlled SCB Pakistan. As two analysts explained, in Pakistan, "[t]he central problem with [SCB's "One Bank"] approach [was] that even as it market[ed] itself as the 'local' global bank in the markets it serves in, it appear[ed] to have shied away from

---

[571] Daily Mail (UK), *Standard's Union* (Aug. 10, 2006), 2006 WLNR 13818473.

[572] The Banker, *Standard Chartered Bank: The World's Most Desirable Player?* (Sept. 1, 2006), 2006 WLNR 16731979.

[573] Farooq Tirmizi and Farooq Baloch, *The Cluelessness of Standard Chartered's Pakistan Strategy*, Daily Pakistan Today (Oct. 9, 2017), 2017 WLNR 31097483 ("Tirmizi and Baloch").

[574] The Nation (Pakistan), *SCB Part of Country's Social Fabric* (Aug. 1, 2012), 2012 WLNR 16156614.

developing a truly localized institutional infrastructure."[575] "In Pakistan," Standard Chartered Bank's "One Bank approach" was "most sharply visible through what can only be described as the 'Dubai problem' … Instead of allowing each individual country division to do their own risk management, [SCB] adhere[d] to a single global set of risk management rules that - by definition – rel[ied] on a macroscopic view of the world that, too often, [did] not allow much room for discretion."[576] As a consequence, local decisions in one Standard Chartered Bank branch, *e.g.*, SCB Pakistan, often went "to the company's regional headquarters in Dubai for approval."[577]

878.  SCB Pakistan management and employees were keenly aware of the potential terrorist finance risk related to the USD transactions they facilitated, and often discussed it amongst themselves and with third parties. In early 2008, SCB Pakistan representatives attended a business conference in Karachi that was attended by U.S. government officials and representatives of other companies, where the group discussed the need for corporations to work with each other and the U.S. and Pakistani governments to reduce the risk of violence being aided by banks.

879.  On information and belief, from 2001 through 2016, SCB Pakistan also regularly conducted "sustainability reviews," in which SCB Pakistan closely examined the social, economic, and political trends impacting Pakistan. As part of this review process, SCB Pakistan regularly learned of the threat posed by Syndicate terrorist finance and logistics.

880.  From 2001 through 2016, SCB Pakistan consistently maintained branches and offered the full complement of Standard Chartered Bank financial services to customers

---

[575] Tirmizi and Baloch.

[576] *Id.*

[577] *Id.*

throughout Syndicate-controlled and contested areas of Pakistan, including Syndicate strongholds like Peshawar, Multan, Quetta, and Rawalpindi. SCB Pakistan's presence throughout Pakistan gave the Defendants the benefit of deep local knowledge on-the-ground in Pakistan combined with Standard Chartered Bank's capabilities and expertise as a global bank. According to SCB Pakistan, Standard Chartered Bank offered a unique value proposition that no other bank in Pakistan could match: SCB Pakistan's "nationwide" footprint effectively "combine[d] the Bank's deep local knowledge with its global expertise" to give Standard Chartered Bank an advantage over its competitors in Pakistan's financial services market.[578]

881.     Standard Chartered Bank relied upon its "deep local knowledge" of Pakistan to regularly issue reports concerning the effects of Syndicate activities on the Pakistani economy, including the ongoing threat of terrorist violence. For example, in July 2009, SCB Pakistan issued a public report that stated, in sum and substance, that the conflict with the Taliban had had a "devastating impact" on parts of Pakistan, and in May 2010, Standard Chartered PLC issued a report stating, in sum and substance, that foreign investment would decline in Pakistan because of the deteriorating security situation caused by the Taliban.

882.     SCB Pakistan also differentiated itself as the only global financial institution that offered Sharia-compliant banking services in the Pakistani market. As SCB Pakistan's CEO touted in 2013, "[SCB] Saadiq has retained a leadership position since 2004, as the only foreign bank in Pakistan that offers … sharia- compliant Islamic banking … services."[579] Because SCB

---

[578] Standard Chartered Bank (Pakistan) Limited, Press Release, *Pakistan Business News, Standard Chartered Saadiq Wins Islamic Bank of the Year in Pakistan Award by The Banker, an Affiliate of Financial Times - Press Release* (June 19, 2013).

[579] *Id.*

Pakistan employed Sharia law Pakistani expert employees, SCB Pakistan had a detailed understanding of the Syndicate, al-Qaeda, and the Taliban, including its Haqqani Network.

883.    SCB Pakistan knew that it and Standard Chartered Bank were operating a laundromat that was facilitating terrorist finance.

884.    **SCB Dubai.** In 2006, the head of SCB Dubai's Compliance Office told a senior U.S. official in the U.A.E. that Standard Chartered Bank's compliance office vigorously reviews of all SCB Dubai transactions in the U.A.E. SCB Dubai thus facilitated Syndicate financial activity even though Standard Chartered Bank's personnel in the U.A.E. were keenly aware of the elevated terrorist finance risk in the U.A.E.

885.    In 2019, American and British regulators documented SCB Dubai's reckless counter-terrorist finance practices through 2016 when they announced a new round of penalties against Standard Chartered Bank. As NYDFS found, "[i]n light of these supposed enhancements [to SCB's compliance policies], the Bank determined that it would continue servicing customers in jurisdictions that posed ***substantial risks*** for ensuring compliance with U.S. sanctions laws, including the UAE."[580] Standard Chartered Bank did so, even though, "as a general matter, the Bank's ***compliance infrastructure in the UAE region was woefully inadequate***."[581] "Client-facing and compliance staff were … ***unconcerned with complex U.S. sanctions regulations***."[582] "Thus, the Bank's [] ***controls at the Dubai branch were no match for even unsophisticated evasion efforts***."[583]

---

[580] NYDFS, *In re Standard Chartered Bank, and Standard Chartered Bank, New York Branch, Consent Order Under New York Banking Law §§ 39 and 44*, at ¶ 41 (Apr. 9, 2019) (emphasis added) ("2019 Consent Order").

[581] *Id.* at ¶ 42 (emphasis added).

[582] *Id*. (emphasis added).

[583] *Id.* at ¶ 43 (emphasis added).

886.    Standard Chartered Bank paid lip service to counter-terrorist finance practices while continuing "business as usual" at SCB Dubai. As NYDFS determined, "[a]dditional investigation undertaken by [NYDFS] since 2013 … has determined that, from 2008 through 2014, a still notably inadequate [] compliance function, both at the Bank's Home Office and its Dubai branch, allowed for the processing of an additional $600 million in USD payments that violated regulations issued by" the Treasury Department's Office of Foreign Assets Control ("OFAC"), "and thus resulted in violations of New York laws and regulations as well."[584] NYDFS's investigation showed that "[a] *large majority* of these $600 million in *illegal USD payments transited through the New York Branch* – several dozen occurring as late as 2014."[585]

887.    SCB Dubai managers, employees, and agents regularly colluded with terrorist financiers, including on information and belief one or more of the Syndicate fronts, operatives, or agents identified in this Complaint, to help terrorist financiers evade U.S. and U.K. anti-money-laundering/counter-terrorist-finance controls in order to specifically route U.S. Dollars from SCB New York to terrorists through SCB Dubai and SCB Pakistan through transaction that were specifically designed to enable U.S. Dollars to flow from SCB New York to known or suspected terrorist agents, operatives, and fronts without detection by U.S. and U.K. investigators.

888.    SCB Dubai's systemic terrorist finance was directly enabled by the knowing or reckless conduct of Standard Chartered Bank, including SCB London and SCB New York, both of which knew of, or were willfully blind to, years of obviously suspect transactions flowing through SCB Dubai and yet continued to process SCB Dubai's transactions for terrorists.

---

[584] *Id.* at ¶ 5.

[585] *Id.* at ¶ 6 (emphasis added).

889. Standard Chartered Bank, including SCB New York and SCB London, enabled SCB Dubai's systemic, and vast, terrorist finance activities through 2015 with actual knowledge of what was happening at SCB Dubai. For example, from 2009 through 2015, Standard Chartered Bank's own compliance monitoring reviews of SCB Dubai repeatedly flagged the extreme terrorist finance risk posed by SCB Dubai's activities.

890. Consistent with their status as "repeat corporate offenders" who were part of a "rogue institution," Standard Chartered Bank entities, including nearly all the SCB Defendants, played a role in many of the largest laundering and financial scandals:

- **DOJ (Swiss Bank Tax Scandal)**. In 2015, DOJ settled with Standard Chartered Bank (Switzerland) SA in connection with DOJ's Swiss Bank Program; SCB Switzerland "agree[d] to pay the sum of $6,337,000 as a penalty to [DOJ]" based on DOJ's findings that "[b]y establishing and maintaining [] accounts, [SCB] provided assistance to certain U.S. Persons in evading their U.S. tax obligations," and "provided account statements and other documentation to the account holder which contained only the account number in order to further insure the secrecy of the identity of the account holder."

- **NYDFS (ForEx Scandal).** In 2019, NYDFS "fined [SCB] $40 million for attempting to rig transactions in foreign exchange markets between 2007 and 2013"; "the investigation by [NYDFS], as well as an internal review by [SCB], found that bank traders used a range of illegal tactics to maximize profits," and "[SCB] admitted that it failed to implement effective controls over its foreign exchange business, which is conducted at [SCB London] and in other global financial centers, including at [SCB New York]."[586]

- **India.** In 1994, India fined SCB 342 million rupees (about $11 million then), for its involvement in a money laundering scheme that was the then-largest financial scandal in Indian history; one observer called SCB's misconduct "reckless in the extreme."[587] In 2020, "India's anti-money laundering [] agency Enforcement Directorate (ED) ... fined

---

[586] NYDFS, Press Release, *DFS Fines Standard Chartered Bank $40 Million For Attempting To Rig Foreign Exchange Transactions* (Jan. 29, 2019).

[587] Swamy Aiyar, *How Greedy Bankers Fuelled a Bull Run that Couldn't Last*, Australian Financial Review (June 9, 1992), 1992 WLNR 5461605.

[SCB] INR1bn ($13.6m) for foreign exchange rule breaches during a local bank deal,"[588] which "mark[ed] one of the [India's] biggest penalties slapped on an overseas lender."[589]

- **Japan.** In 2004, Japan's Financial Services Agency ("FSA") announced that it would "punish [SCB's] Tokyo branch for Banking Law violations that helped a criminal group launder funds" by SCB's failure "to properly check customer identification and to produce transaction records," and the FSA found that SCB "management did not respond appropriately to voluntarily improve compliance."[590]

- **Singapore.** In 2017, Singapore fined SCB's Singapore branch $5.2 million for playing a key role in facilitating the money laundering at issue in the 1MDB scandal, which was the largest financial scandal in Malaysian and Singaporean history and one of the largest criminal money laundering scandal in world history.

- **Nigeria.** In 2018, Nigeria's central bank fined [SCB] 2.4 billion naira ($7.8 million) in connection with SCB's role in a disputed $8.1 billion on behalf of the notorious South African telecom company, MTN Group, which was recklessly aiding the Nigerian terrorist group Boko Haram while SCB was helping MTN.

- **Kenya.** In 2019, Kenya announced that SCB was under investigation for helping aid the laundering of at least $10 million that was looted from Kenya's National Youth Service over a two-year period. As was reported at the time, Kenyan investigators "believe[d] senior officials at [SCB] … quietly allowed some of the key suspects in the … looting … to move large sums of money undetected."[591] In February 2020, SCB resolved the matter and paid a fine to the Kenyan government.

891.    Moreover, Standard Chartered Bank is also directly involved in several of the other largest "dirty money" cases ever, continuing SCB's pattern of being close to nearly every major USD-related financial scandal in emerging markets since the 1990s, including:

- **Angolan Kleptocracy.** In the 1990s and 2000s corrupt leaders of the Angolan government looted billions from the Angolan treasury, behavior for which "Standard

---

[588] Retail Banker International, *Standard Chartered Hit with $13.6m Fine for Lapses in 2007 India Deal* (Sept. 9, 2020).

[589] United News of India, *ED Slaps Rs 100 Fine on Standard Chartered Bank for FEMA Violations* (Sept. 11, 2020).

[590] Xinhua Economic News, *Japan to Punish Standard Chartered for Involvement in Money Laundering* (Feb. 20, 2004).

[591] Brian Wasuna, *How Five Banks in Kenya Cleaned Dirty Money*, East African (Kenya) (Feb. 8, 2019), 2019 WLNR 4105196.

Chartered [was] making itself part of the problem" by "helping the notoriously corrupt Angolan government," and being "complicit[] in corruption."[592]

- **Odebrecht.** Standard Chartered Bank played a central role in facilitating the money laundering activity at the heart of the Odebrecht scandal, which DOJ called "the largest foreign bribery case in history." In the scandal, criminals used foreign bank accounts, including SCB accounts, to move hundreds of millions of dollars to pay bribes to government officials on behalf of the Brazilian construction company Odebrecht.

- **World Cup.** In 2015, the U.S. government alleged that Standard Chartered Bank accounts were used to launder some of the key bribes paid in connection with the FIFA bribery scandal concerning the World Cup, the largest scandal in sports history.

- **Gupta.** On information and belief, Standard Chartered Bank is currently under investigation relating to the Gupta money laundering and bribery scandal in South Africa, one of the largest financial scandals in South African history, in which SCB accounts were used, in part, to help facilitate hundreds of millions of alleged bribes to South African officials by a family of oligarchs, the Guptas. In 2019, U.K. lawmaker Lord Peter Hain alleged that Standard Chartered Bank is "directly culpable" for helping the Guptas conceal their illicit activities through a network of bank accounts and shell companies, stated that SCB is "up to their neck in this," and explained that SCB facilitated Gupta's money laundering scheme "because of course the corporates concerned, including the banks, were making money out of it."[593] Like it did with the Syndicate terrorists, SCB helped administer a "laundromat" for Gupta.[594]

892.    Like most of the al-Qaeda- and Haqqani Network-related transactions here, the scandals at issue in the preceding paragraphs often involved the same SCB London, SCB Dubai, and/or SCB New York management teams, whom in nearly all instances enabled massive criminal schemes involving hundreds of millions, if not billions, of U.S. Dollars being moved in an open and egregious manner that would have been obvious to Standard Chartered Bank with

---

[592] David Pallister, *Alarm Bells Sound Over Massive Loans Bankrolling Oil-Rich, Graft-Tainted Angola; UK's Standard Chartered Bank Criticised for its Leading Role in $2.35bn Deal*, Guardian (June 1, 2005), 2005 WLNR 27534760.

[593] BBC, *Banks Facilitated South Africa Corruption Under Zuma, Says Peter Hain* (Nov. 18, 2019).

[594] Financial Mail (South Africa), *The Enablers* (Feb. 6, 2020), 2020 WLNR 3665081.

the account data to which it had access. Simply put, the pattern is indicative of Standard Chartered Bank's Laundromat Strategy.

893. Standard Chartered Bank has regularly acted in a manner consistent with its Laundromat scheme. The totality of Standard Chartered Bank's conduct compels the conclusion that SCB consciously chose to serve as a Laundromat for terrorist financiers. In addition to the allegations above, Plaintiffs offer the following cross-cutting examples that corroborate activity as a Laundromat rather than a responsible financial institution:

894. **SCB's Enforcement History.** A litany of terrorist finance-related enforcement matters resulted in Standard Chartered Bank paying nearly $3 billion to regulators on several continents. Such matters include, but are not limited to, those in the chart below and show that SCB's "One Bank approach" included a decades-long institutional commitment to facilitating terrorist finance as a part of the Standard Chartered Bank business model:

| Date | Regulator | SCB Payment | Quote from Regulator |
|---|---|---|---|
| 8/6/2012 - 8/14/2012 | NYDFS | $340M | "[SCB's] willful and egregious violations of the law … left the U.S. financial system *vulnerable to terrorists*.[595] … For nearly a decade, SCB *programmatically engaged in deceptive and fraudulent misconduct* in order to move at least $250 billion *through its New York branch*… Motivated by greed, SCB acted for at least ten years without any regard for the legal … and *national security consequences* of its … actions." |
| 12/10/2012 | DOJ, FBI | $227M | "For years, [SCB] *deliberately violated U.S. laws*. The [U.S.] expects a *minimum standard* of behavior from all … that enjoy the benefits of the U.S. financial system. [SCB]'s conduct was *flagrant and unacceptable*." |
| 12/10/2012 | OFAC | $132M | "We remain committed to … ensur[ing] that the U.S. financial system is protected from … this type of *illicit financial behavior*." |

---

[595] All emphases in this table are supplied.

| Date | Regulator | SCB Payment | Quote from Regulator |
|------|-----------|-------------|----------------------|
| 12/10/2012 | Federal Reserve | $100M | "The orders address **unsafe and unsound practices** … as well as insufficient oversight of its compliance program…." |
| 12/10/2012 | Manhattan DA | $113.5M | "[SCB's] case[] … send[s] a strong message about the need for transparency in international banking, and ultimately contribute to the ***fight against … terror financing.***" |
| 8/19/2014 | NYDFS | $300M | "If a bank fails to live up to its commitments, there should be consequences. That is particularly true in an area as ***serious as anti-money-laundering compliance, which is vital to helping prevent terrorism.***" |
| 8/5/2016 | South African Central Bank | R30 million, equal to $220,000 | "Spot inspections revealed ***weak measures to combat money laundering and the financing of terrorism***." |
| 3/19/2018 | Monetary Authority of Singapore | S$5.2 million, equal to $3.95M | "The penalties were for breaches of MAS' anti-money laundering and ***countering the financing of terrorism*** (AML/CFT) requirements." |
| 4/9/2019 | NYDFS | $180M | "Global financial institutions serve as the first line of defense against … the ***financing of terrorist activities*** and those that ***fail to foster a strong compliance culture*** will be held accountable." |
| 4/9/2019 | Manhattan DA | $292M | "The investigation … showed that ***high-level SCB officials knew*** of specific compliance deficiencies and risks that allowed the criminal conduct to occur, but were slow to address these issues." |
| 4/9/2019 | OFAC | $639M | "Today's settlement resolves OFAC's investigation into apparent violations of a number of U.S sanctions programs, including those relating to ***Burma, Cuba, Iran, Sudan, and Syria***." |
| 4/9/2019 | DOJ, FBI | $292M | "SCB and the individuals whose charges were unsealed today undermined the integrity of our financial system and ***harmed our national security***. … The financial penalty announced today leaves no doubt that ***repeat corporate offenders*** with deficient compliance programs will pay a steep price. When bank employees and customers conspire to … ***subvert our national security***, we will bring them to justice no matter where they reside or operate." |

| Date | Regulator | SCB Payment | Quote from Regulator |
|------|-----------|-------------|----------------------|
| 4/9/2019 | Federal Reserve | $164M | "[F]rom December 2012 to December 2014, while subject to the [Reserve's] Orders, [SCB] personnel engaged in ***unsafe and unsound practices***." |

895.    "But for a bank, regulatory fines are simply a cost of doing business."[596] "If the anticipated profits exceed the likely costs, the bank will continue to break the rules."[597] "And this is exactly what SCB has done."[598]

896.    Standard Chartered Bank's 2012 resolutions with NYDFS, DOJ, and the Manhattan DA were widely understood as being a response to SCB's deliberate facilitation of terrorist finance. As one British financial publication described, Standard Chartered Bank was "accused by US authorities of breaking money laundering rules … [relating to] Iranian 'terrorists.'"[599] The *Telegraph* reported with the two-part headline: "Standard Chartered was 'Rogue Bank that Aided Terrorism'" and "Shock Money-Laundering Allegation by US Regulator Involves $250bn for Iran."[600] The *Daily Mail* concurred with the headline: "*British Bank's Links to Global Terror; US Accuses Standard Chartered of Laundering Billions for Iran and Hezbollah*" and reported that "US authorities suspect the Iranian banks [aided by Standard

---

[596] Frances Coppola, *Standard Chartered Bank's Long History Of Financial Crime*, Forbes (Apr. 10, 2019).

[597] *Id.*

[598] *Id.*

[599] Jonathan Russell, *'The City Welcomes Foreign Investment Like No Other Place on Earth. Unfortunately, It is Also Threatening to Bring London Down'*, Financial Management (London, UK) (Oct. 1, 2012), 2012 WLNR 23156178.

[600] Louise Armitstead, *Standard Chartered was 'Rogue Bank that Aided Terrorism'; Shock Money-Laundering Allegation by US Regulator Involves $250bn for Iran*, Telegraph Online (UK) (Aug. 13, 2012), 2012 WLNR 18261654.

Chartered Bank] also funded terrorist and militant groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad."[601]

897.    Indeed, Standard Chartered Bank's anti-American intent was so blatant that when an SCB executive later asserted that it "had no willful act to avoid sanctions," DOJ forced Standard Chartered Bank to confirm, again, that it had willfully committed crimes, and SCB apologized for the executive's contrary statement.

898.    **SCB's Disregard of Treasury Department Warnings.** Standard Chartered Bank operated its Laundromat from 9/11 through at least 2016 even while knowing that the U.S. government was concerned that SCB's reckless practices could enable anti-American terrorists, including al-Qaeda, the Taliban, and the Haqqani Network. A few weeks after 9/11, the *Daily Mail* reported that "[a]ccounts at British bank[] … Standard Chartered [were] believed to be coming under scrutiny by US authorities for possible links to Osama Bin Laden and other terrorists."[602]

899.    From 2007 through 2010, the Treasury Department's Undersecretary for Terrorism and Financial Intelligence, Stuart Levey, visited with global financial institutions to inform them about the terrorist finance risks associated with permissive banking practices. On information and belief, in 2007 and/or 2008, and again in 2009 and/or 2010, Undersecretary Levey advised Defendants, including but not limited to, SCB New York, SCB London, and SCB Dubai, of the risk that agents, operatives, and/or fronts acting on behalf of al-Qaeda, the Haqqani

---

[601] James Salmon, *British Bank's Links to Global Terror; US Accuses Standard Chartered of Laundering Billions for Iran and Hezbollah*, Daily Mail (UK) (Aug. 7, 2012), 2012 WLNR 16714292.

[602] Daily Mail, *Bush Terror Cash Probe Includes UK Banks* (Sept. 25, 2001), 2001 WLNR 2648143.

Network, and other al-Qaeda affiliate members of the Syndicate were using, or could use, banks to support anti-American terrorist attacks.

900.     **SCB's Implicated In-House Attorneys and Compliance Officers.** From 2001 through 2016, Standard Chartered Bank's systemic terrorist finance was enabled by crooked in-house attorneys and compliance officers at SCB London, SCB New York, and SCB Dubai. As one law professor wrote, Standard Chartered Bank's behavior represented "[y]et another Shakespearean banking tragedy opened [], with [SCB] starring … as the villainous rogue," in which NYDFS's "order put[] [SCB]'s senior attorneys and compliance officers at the heart of the … scheme, even when outside counsel advised otherwise."[603]

901.     At global banks, "today's in-house counsel are often profit centres, fonts of wisdom on how to avoid accounting rules, cut taxes and maintain the secrecy of dubious practices. One reason for the recent wave of abuses at big banks is that their in-house lawyers have been more focused on speed and profit than on right and wrong."[604] "As recent debacles at … [Standard Chartered Bank] demonstrate, employees of big global banks increasingly lack a moral compass. Some general counsels and compliance officers do provide ethical guidance. But many are facilitators or loophole instructors, there to show employees the best way to avoid the law. ***Not even mafia lawyers go that far***; unlike many bankers, mobsters understand the value of an impartial consigliere who will tell them when to stop."[605]

902.     **SCB's Intentionally Deficient Counter-Terrorist-Finance Compliance Policies and Programs.** As a global bank headquartered in the United Kingdom, Standard

---

[603] Frank Partnoy (Professor of Law and Finance at the University of San Diego), *True Villains of the StanChart Tragedy*, Business Spectator (Aug. 9, 2012).

[604] *Id.*

[605] *Id.* (emphasis added).

Chartered Bank was required under U.K. law to establish and maintain appropriate and risk sensitive policies to minimize the risk of SCB being used by those seeking to finance terrorism or launder money.

903.    From 2001 through 2016, under Standard Chartered Bank's Laundromat Strategy, SCB London deliberately designed SCB's anti-money laundering (or "AML") and counter-terrorist finance (or "CTF") policies to promote the reckless processing of USD transactions in most instances regardless of the terrorist finance risk. SCB London enabled the Strategy by setting all AML and CTF policy for every Standard Chartered Bank branch, affiliate, and subsidiary, including SCB Dubai, SCB New York, SCB Pakistan, and SCB Afghanistan, and by regularly causing practices, decisions, and relationships that facilitated laundering.

904.    SCB London has previously admitted that it is responsible for the terrorist finance violations at, among other places, SCB New York and SCB Dubai. For example, after NYDFS fined Standard Chartered Bank the second of four times (in August 2014), SCB London admitted that it "accept[ed] responsibility for and regret[ted] the deficiencies in the anti-money laundering transaction surveillance system at its New York branch" and its "high-risk small- and medium-business clients in its UAE divisions."[606]

905.    **SCB's Practice of Ignoring, and Retaliating Against, Terrorist Finance Whistleblowers.** From 2012 through 2016, Standard Chartered Bank was also aware of credible terrorist finance allegations by whistleblowers, which further alerted each SCB Defendant to its role in al-Qaeda's and the Haqqani Network's transnational terrorist enterprises, and their

---

[606] Ben Protess and Chad Bray, *Caught Backsliding, British Bank is Fined; Standard Chartered Faces $300 Million Penalty for Falling Foul of 2012 Deal*, International New York Times (Aug. 20, 2014), 2014 WLNR 22902512.

response pattern corroborates the SCB Defendants' continued operation as a Laundromat for terrorist financiers through 2016.

906.     The Standard Chartered Bank Defendants shared any terrorism-related allegations brought by any such whistleblowers amongst each other pursuant to SCB's "One Bank approach," and, by 2013, the SCB Defendants shared information with one another concerning of one or more whistleblowers whom: (1) were current and/or former SCB executives, managers, employees, or agents; and (2) had raised one or more concerns that SCB's practices risked enabling anti-American terrorism.

907.     Standard Chartered Bank had a policy of punishing those who raised questions and retaliating against anyone who was undeterred by such tactics, and employees of the SCB Defendants were threatened, harassed, and subjected to adverse employment consequences, including termination, when they raised concerns about potential terrorist finance at the bank. In at least several instances, one or more SCB Defendants retaliated against an SCB employee or agent who had raised terrorist finance concerns. In both instances, Standard Chartered Bank failed to act on the terrorist finance concern but did punish the person asking questions.

908.     **SCB's Use of Promontory to Conceal its Laundromat.** As further indication of the egregious nature of Standard Chartered Bank's misconduct, SCB even implicated Promontory Financial Group, LLC ("Promontory") in SCB's misconduct through acts that were designed to further conceal the operation of its Laundromat at SCB Dubai.

909.     On August 3, 2015, NYDFS issued a scathing report concerning its investigation of Promontory Financial Group, LLC ("Promontory"), a supposedly independent consultant

retained by Standard Chartered Bank purportedly to help SCB reduce the risk of terrorist

finance.[607] Among other things, NYDFS's investigation found that:

- "Promontory exhibited a lack of independent judgment in the preparation and submission of certain reports [relating to SCB] to [NYDFS] in 2010-2011."[608]

- A Senior Analyst at Promontory wrote that "[t]he most important thing is that we get to the end of the project without jeopardizing our relationship with [SCB] as a whole."[609]

- "There [were] numerous instances where Promontory, at the direction of [SCB] or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms, or otherwise make the reports more favorable to [SCB]," and more than one "instance of Promontory's efforts to remove red flags highlighting [SCB's] misconduct."[610]

- Promontory selectively emphasized a timeline that misleadingly suggested a trend of declining violations over time, while understanding that doing so makes it "appear[] to be a positive trend over time," which would "not be true with Dubai," and Promontory suspected that Standard Chartered Bank would "not want to show the timelines for Dubai," as SCB and SCB's counsel would view it as "painful information" for which Promontory could "expect strong pushback" from SCB and its counsel.[611]

- Standard Chartered Bank and Promontory took a cavalier view throughout, with Promontory personnel plotting to "make[] the Bank's case look better" in one instance, looking for "[b]ig wins" for SCB in another, working to "[s]often the language a bit" in another, and, when yielding to another substantive edit from SCB, "ultimately decided, '[l]et's do it. We've come this far, we might as well go for the three pointer.'"[612]

910. On August 18, 2015, Promontory resolved the matter with NYDFS.[613] Under the

agreement, Promontory: (1) acknowledged that "Promontory's actions in [its engagement for

SCB] did not meet [NYDFS's] current requirements for consultants performing regulatory

compliance work"; (2) made a $15 million "monetary payment" to NYDFS; and (3) promised to

---

[607] NYDFS, *Report on Investigation of Promontory Financial Group, LLC* (Aug. 3, 2015).

[608] *Id.* at 15.

[609] *Id.* at 6.

[610] *Id.* at 6-7.

[611] *Id.* at 9.

[612] *Id.* at 11-13.

[613] *See generally* NYDFS, *In re Promontory Financial Group, LLC*, Agreement (Aug. 18, 2015).

voluntarily abstain for six months from "any new engagements" that would require NYDFS to authorize the disclosure of certain confidential information.[614]

### 2. Standard Chartered Bank Knew That Its Clients Were Engaged In VAT Fraud, Money Laundering, And Contributing To Bombmaking

911. No later than the mid-2000s, Standard Chartered Bank knew its clients were engaged in money laundering. For example, SCB Dubai personnel affirmatively helped clients defeat anti-money-laundering safeguards designed to prevent terrorist finance.

912. From 2009 through 2016, like Deutsche Bank, *supra* § IV.A.3, Standard Chartered Bank knew about the Azizi Cell's VAT fraud and understood that it aided al-Qaeda.

913. As explained above, no later than 2011, Standard Chartered Bank knew Fatima and Pakarab supplied CAN fertilizer to the Haqqani Network for its bomb pipeline and relied upon SCB accounts to do so.

### 3. Standard Chartered Bank Knew It Was A Preferred Bank For Terrorist Financiers Based On Its History Of Enabling "Dirty Money" Transactions

914. Standard Chartered Bank's knowing terrorist finance and facilitation of al-Qaeda's and the Haqqani Network's CAN fertilizer bomb campaign comports with similar decisions made by the same SCB global leadership, regional and country managers during the same time at issue in this case. As NYDFS concluded in 2012, through its "programmatic" misconduct, "[i]n short, Standard Chartered Bank *operated as a rogue institution*," and "left the U.S. financial system vulnerable to terrorists." Seven years later, U.S. Attorney Liu branded the SCB Defendants "repeat corporate offenders."

---

[614] *See generally id*.

915.     Consistent with Standard Chartered Bank's "You F----ing Americans" attitude towards counter-terrorist finance from 2001 through 2016, Standard Chartered Bank executives prioritized Standard Chartered Bank's profits over all else and pursued revenue regardless of terrorist finance risk and routinely facilitated anti-American terrorists' transactions worldwide since the 1990s, and aided terrorists on four continents:

- **The Americas.** Standard Chartered Bank International (Americas) Ltd. and StanChart Securities International Inc. provided substantial financial services to key narcoterrorist operatives acting on behalf of the designated Colombian terrorist group, the "FARC."[615]

- **Europe/Former Soviet Union.** Standard Chartered Bank facilitated transactions with Russian bank Sberbank, doing so even after Ukraine credibly accused Sberbank of "funding terrorism in … Ukraine" based upon "evidence for the accusation of sponsoring terrorism [that was] convincing," including that Sberbank had "launder[ed] money for separatists."[616] In 2020, the U.K. "Office of Financial Sanctions [] imposed on [SCB] its largest ever fine of £20.4 million in a 'most serious case'" based upon Standard Chartered Bank's violations of Russian sanctions over "an extended period of time, leading to [SCB] repeatedly" breaking U.K. law.

- **Africa.** In 2016, South Africa's central bank fined Standard Chartered Bank's branch in South Africa "after spot inspections revealed weak measures to combat … the financing of terrorism."[617]

- **The Middle East.** In at least thirteen (13) separate instances, American or British regulators and/or prosecutors determined that SCB London, SCB New York, and/or SCB Dubai engaged in misconduct that facilitated terrorist finance activities in the Middle East, collectively fining Standard Chartered Bank nearly $3 billion.

- **South Asia.** Standard Chartered Bank accounts were used in 2006 earthquake relief fundraising by al-Qaeda affiliate, Lashkar-e-Taiba ("LT"), and on information and belief, SCB Pakistan and SCB London transacted more than $10,000 in USD currency exchanges on behalf of a sham charity established by LT.

---

[615] *See generally Stansell et al. v. Revolutionary Armed Forces of Colombia (FARC), et al.*, No.: 8:09–CV–2308–RAL–MAP, 2011 WL 13176719 (M.D. Fla. Sept. 19, 2011) (order permitting ATA plaintiffs who were injured in terrorist attacks by FARC to collect on FARC assets in accounts at the identified SCB entities).

[616] Martin Nunn, *Could the City Become an Unwitting Funder of Putin's Terror?*, Independent Online (UK) (Apr. 18, 2014), 2014 WLNR 10524602.

[617] Reuters, *UPDATE 1-South Africa's Central Bank Fines Banks $2.5 Mln for Weak Anti-Laundering Measures* (Aug. 5, 2016).

- **Southeast Asia.** The Monetary Authority of Singapore ("MAS") fined Standard Chartered Bank's Singapore branch about $4 million, in March 2018, "for breaking … terrorism financing rules."[618]

916.    Standard Chartered Bank's knowing and deliberate processing of transactions on behalf of known or suspected Iranian terrorist agents, operatives, and fronts illustrates Standard Chartered Bank's institutional effort to profit from anti-American terrorist finance. For example, then-Representative (now Senator) Chris Van Hollen stated that "Standard Chartered Bank" was a global "financial institution[] that knowingly facilitate[d] transactions for the terror group Hezbollah" and had "knowingly help[ed] Hezbollah fund its terror operations by concealing billions of dollars in transactions with its Iranian sponsor."[619]

917.    Moreover, in providing USD services to Iranian terrorist fronts, including IRGC-QF and Hezbollah, "recidivist rule-breaker [SCB] … persisted … against the stern warnings of its outside counsel."[620] As an example of Standard Chartered Bank's duplicity, NYDFS and the Manhattan DA found that SCB Dubai – enabled by other SCB London and SCB New York – continued egregious banking practices that facilitated terrorist finance through 2014. In so doing, NYDFS and the Manhattan DA "found that both a senior U.S. sanctions compliance officer, and a senior U.K. sanctions compliance officer utterly failed to take steps to ensure that transactions from Iran were blocked after bank staff discovered dozens of clients … Instead, the two executives proceeded in a 'business-as-usual fashion.'"[621]

---

[618] James Booth, *Standard Chartered Fined Over Terror Finance Breach*, City AM (Mar. 20, 2018), 2018 WLNR 8605412.

[619] Robert Tilford, *"Some of the World's Most Powerful Banks are Knowingly Helping Hezbollah Fund its Terror Operations" Says Rep. Van Hollen*, Ground Report (May 18, 2015), 2015 WLNR 14539788.

[620] Yves Smith, *New York's Benjamin Lawsky Collects Scalps, Showing Regulators Can *Gasp* Regulate*, Naked Capitalism (October 7, 2014), 2013 WLNR 15172530.

[621] 2019 NYDFS Press Release.

### 4. Standard Chartered Bank Knew It Regularly Disregarded Terrorist Finance Red Flags Recognized By Others

918. Standard Chartered Bank's knowing intent to process transactions that it knew posed an extreme risk of routing terrorist finance or supplies to al-Qaeda and the Haqqani Network is demonstrated by its history of disregarding terrorism red flags noted by others.

919. Standard Chartered Bank also regularly facilitated USD transactions for high-terrorist-finance risk customers or counterparties even **after**: (1) the U.S. government asked Standard Chartered Bank to end its relationship; (2) an American jury determined the customer aided terrorist finance; and/or (3) Standard Chartered Bank learned that others in the financial services marketplace had ceased doing business with the same person based upon concern that the provision of financial services to the person could aid the person's terrorist agenda:

- **National Iranian Tanker Company.** On information and belief, in 2007 or 2008, Undersecretary Levey specifically warned the Defendants not to provide financial services to potential IRGC fronts involved in the movement of supplies, dual-use goods, and petroleum products, including the National Iranian Tanker Company ("NITC"), which was at all times an IRGC-QF front. Even after the U.S. asked Standard Chartered Bank in 2007 or 2008 and SCB admitted wrongdoing in 2012, however, SCB Dubai continued to provide USD services to NITC through at least 2014, on information and belief processing millions in USD-denominated transactions for the IRGC-QF's benefit through its front, NITC. On information and belief, when the U.S. designated the IRGC as an FTO in April 2019, NITC's activities formed a substantial basis for the IRGC's designation, as the U.S. government has concluded that "NITC has [] played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah."[622]

- **Arab Bank.** Even though SCB promised to stop doing business with high-risk terrorist finance customers, it continued processing tens of millions of dollars in Arab Bank transactions through 2014. Even after a federal jury in this District ruled for plaintiffs in their landmark ATA trial victory against Arab Bank, SCB continued funding millions of dollars' worth of transactions with wire references including classic red flags raised in the trial such as "charities," "donations," "support" or "gifts." In so doing, Standard Chartered Bank knew, as SCB itself documented, that terrorists' "illicit activities" were foreseeably being financed "under the guise of charity."

---

[622] U.S. Department of the Treasury, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force* (Oct. 26, 2020).

920. Just like with Fatima, with National Iranian Tanker Company and Arab Bank, Standard Chartered Bank was told one of its competitors declined a financial relationship with an SCB customer based upon terrorism red flags and SCB continued the suspect relationship.

**C.  Danske Bank Knew It Was Aiding Terrorists**

**1.  Danske Bank Knew That It Operated As A Criminal Enterprise And Laundromat Until 2017**

921. Danske Bank knew in 2007 that the Estonia branch was a laundromat. It was pointed out to Danske Bank by regulators, and Danske Bank investigated. Danske Bank chose to keep operating the laundromat, and to aggressively grow the laundromat, rather than to reform, in the face of being confronted with the evidence of its own ongoing bad acts.

922. Danske Bank knew it was operating a laundromat because the amount of money it laundered in Estonia was nearly 10 times Estonia's gross domestic product.

923. Danske Bank knowingly operated the laundromat, and it knew that its banking practices in Estonia, and therefore its own banking practices there, were designed to facilitate financial crime and money laundering.

924. At all relevant times, when Danske Bank knowingly operated its laundromat, Danske Bank did so while knowing that criminals and terrorists would use the Danske Bank laundromat to perpetrate financial crime and to finance terrorism.

**2.  Danske Bank Knew That Its Clients Were Engaged In Money Laundering, VAT Fraud, And Capital Flight, Which Danske Bank Knew Were Red Flags For Terrorist Finance**

925. Danske Bank set up its Estonia branch to be separate from the rest of the bank, so that the Estonia branch would not receive adequate oversight. This was designed to provide Danske Bank plausible deniability with regard to Danske Bank Estonia's actions.

926.     But Danske Bank still knew that Danske Bank Estonia was criminally laundering money because (1) in 2007, the Russian Central Bank told the Danish Financial Services Authority that Danske Bank Estonia was facilitating crime and money laundering with significant magnitude and regularity, and the Danish authorities passed that message on to Danske Bank; (2) throughout the scheme, the Estonia branch had many of nonresident customers who carried out such large volumes of transactions that it should have flagged the problem for Danske Bank's headquarters; (3) in 2012 Estonian regulator told Danske Bank "the relatively big concentration of the business relationships from risk countries in [the Estonia branch] is not accidental," and Danske Bank's board said that although the bank recognized there were "a number of high risk customers" the bank was confident in its controls;[623] (4) in 2013, Danske Bank's compliance group identified some of the Estonia branch clients as "our black-listed Russian customers;" (5) in 2013 a correspondence bank clearing dollar transactions for the Estonia branch ended its relationship with the branch; (6) in 2013, a whistleblower, an employee at the Estonia branch, reported to Danske Bank that Danske Bank knowingly continued to deal with a company that it knew had committed crime; (7) in 2014 Danske Bank's own internal auditors had found branch staff to have deliberately concealed the identities of suspicious clients from local authorities; (8) the massive profits Danske Bank generated out of the Estonia branch—10.7 percent of the overall Danske Bank profit—were not explainable, particularly in comparison to the overall allocation of assets to that branch—approximately 1 percent; and (9) throughout the scheme, the sheer number and volume of U.S. Dollar transactions flowing through Danske Bank New York should have raised red flags.

---

[623] Professional Wealth Management (PWM), *Danske scandal should lead to renewed scrutiny of new clients* (February 27, 2019), 2019 WLNR 6352499.

927.    Danske Bank has admitted that it believes employees of the Estonia branch assisted clients circumvent money-laundering controls.

928.    Additionally, a report by the firm hired by Danske Bank's board disclosed that Danske Bank ignored years of signals about problematic transactions at its Estonia branch, including a warning in 2007 about criminal activity involving substantial sums on a monthly basis. Nienke Palstra, an anti-money-laundering campaigner for Global Witness, a London-based nonprofit organization was reported to have said "[t]here is no way that senior management would not have noticed" the "sheer volume of the transactions" which "should have sounded alarm bells."[624]

929.    When the Estonia employee of Danske Bank blew the whistle on Danske Bank, he said, in relevant part, that "[t]he bank may itself have committed a criminal offence; The bank can be seen as having aided a company that turned out to be doing suspicious transactions (helping to launder money?); The bank has likely breached numerous regulatory requirements. The bank has behaved unethically; and There has been a near total process failure."

930.    It has been reported that Kilvar Kessler, the head of the Finantsinspektsioon, or Estonian Financial Supervision Authority (FSA), met with Danske Bank Estonia's CEO, Aivar Rehe, and when asked if Danske Bank's management in Denmark knew of the Estonia branch's facilitation of crime and money laundering, Rehe said "[o]f course they knew."[625] Rehe committed suicide in 2019.

---

[624] Wash. Post, *CEO of Danish Bank Quits Amid Investigation* (Sept. 20, 2018).

[625] Organized Crime and Corruption Reporting Project, *Newly Obtained Audit Report Details How Shady Clients from Around the World Moved Billions Through Estonia* (March 12, 2021).

### D. Placid Express Knew It Was Aiding Terrorists

931.     It is widely known, including, on information and belief, by Placid Express, that Khanani for over two decades laundered money for multiple terror and organized crime groups.

932.     At all relevant times, Placid Express knowingly allowed the Khanani MLO to transfer hundreds of thousands of dollars using Placid Express's facilities.

933.     At all relevant times, when Placid Express knowingly allowed the Khanani MLO to launder money, Placid Express did so while knowing that the Khanani MLO was assisting and providing resources to the Syndicate.

934.     By 2008, Placid Express understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al-Qaeda and the Taliban based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world, and regularly reported on by major media outlets.

935.     The nature, counterparties, and sheer volume of transactions Placid Express allowed the Khanani MLO to complete provided Placid Express general awareness that Placid Express was playing a role in overall illegal or tortious activity at the time.

936.     For example, the Khanani MLOs' transfers of U.S. Dollars using Placid Express were inherently illegal in and of themselves, so Placid Express knew of its role in an illegal activity.

937.     The nature, counterparties, and sheer volume of transactions Placid Express allowed the Khanani MLO to complete provided Placid Express general awareness that its customers were part of the Khanani money laundering organization.

938.     On information and belief, Placid Express executives and middle management knew that Placid Express processed transactions that represented money laundering by fronts, operatives, or agents of the Syndicate.

939.     Because Placid Express allowed notorious money launderers to use Placid Express to launder U.S. Dollars, it was foreseeable to Placid Express that Khanani would do so on behalf of and for the benefit of the Syndicate.

940.     Because Placid Express allowed the Khanani money laundering organization to launder U.S. Dollars using Placid Express, and it was widely known that Khanani acted for the benefit of the Syndicate, Placid Express was generally aware of its role in an overall illegal activity from which acts of international terrorist was a foreseeable risk.

941.     Khanani and the Khanani money laundering organization are closely intertwined with the Syndicate's violent terrorist activities. As such, Placid Express was generally aware that by providing U.S. Dollar transfer services to Khanani and the Khanani money laundering organization Placid Express was playing a role in unlawful activities from which the Syndicate's attacks were foreseeable.

942.     Placid Express knew its customers, and therefore it knew that it was giving assistance, not in an innocent or inadvertent way, to Khanani and the Khanani MLO, which were in turn working as agents for the Syndicate.

943.     At all relevant times, Placid Express knew, or was generally aware, that Khanani was a known agent of, and widely understood to launder money for, al-Qaeda, the Taliban, and the Haqqani Network.

944.     At all relevant times, Placid Express knew, or was generally aware, that Khanani's activities were likely related to Syndicate terrorist logistics or finance activity.

945.    The nature, counterparties, and sheer volume of transactions Placid Express

allowed the Khanani MLO to complete gave Placid Express knowledge that its clients were

engaged in illegal activity, including but not limited to the illicit transfer of funds.

**E.    Wall Street Exchange Knew It Was Aiding Terrorists**

946.    It is widely known, including, on information and belief, by Wall Street

Exchange, that Khanani for over two decades laundered money for al-Qaeda, the Taliban, and

other terrorist groups, by helping them conduct terrorist finance-related transactions that moved

their money and financed their operations.

947.    In just one example, Farzam Mehdizadeh, a Canadian agent of Khanani and

Khanani's money-laundering organization, was arrested in 2016 by the Royal Canadian Mounted

Police after a search of his car found hidden therein $1.3 million in cash. Thereafter, the

authorities searched Mehdizadeh's house and found evidence of international wire transfers via

Wall Street Exchange. Mehdizadeh was charged in 2017 on accusations he laundered $100

million in one year.

948.    Prior to April 2016, the Royal Canadian Mounted Police tracked Mehdizedeh as

he traveled from Toronto to Montreal eighty-one times. On information and belief, each of those

trips was done to launder money for Khanani and Khanani's money-laundering organization.

949.    Wall Street Exchange knew that Mehdizedeh was laundering money, and used

Wall Street Exchange to do so, for Khanani and the Khanani MLO.

950.    Wall Street Exchange therefore intentionally facilitated money laundering,

including for Khanani. A large volume of the money that Khanani was moving around the world

was being run through Wall Street Exchange.

951.    At all relevant times, Wall Street Exchange knowingly allowed the Khanani MLO

to transfer millions if not billions of dollars using Wall Street Exchange's facilities.

952.    At all relevant times, when Wall Street Exchange knowingly allowed the Khanani MLO to launder money, Wall Street Exchange did so while knowing that the Khanani MLO was assisting and providing resources to the Syndicate.

953.    The nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to complete provided Wall Street Exchange general awareness that Wall Street Exchange was playing a role in overall illegal or tortious activity at the time.

954.    For example, the Khanani MLO's transfers of U.S. Dollars using Wall Street Exchange were inherently illegal in and of themselves, so Wall Street Exchange knew of its role in an illegal activity.

955.    The nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to complete provided Wall Street Exchange general awareness that its customers were part of the Khanani MLO.

956.    On information and belief, Wall Street Exchange executives and middle management knew that Wall Street Exchange processed transactions that represented money laundering by fronts, operatives, or agents of the Syndicate.

957.    Because Wall Street Exchange allowed notorious money launderers to use Wall Street Exchange to launder U.S. Dollars, it was foreseeable to Wall Street Exchange that Khanani would do so on behalf of and for the benefit of the Syndicate.

958.    Because Wall Street Exchange allowed the Khanani money laundering organization to launder U.S. Dollars using Wall Street Exchange, and it was widely known that Khanani acted for the benefit of the Syndicate, Wall Street Exchange was generally aware of its role in an overall illegal activity from which acts of international terrorist was a foreseeable risk.

959.    Khanani and the Khanani money laundering organization are closely intertwined with the Syndicate's violent terrorist activities. As such, Wall Street Exchange was generally aware that by providing U.S. Dollar transfer services to Khanani and the Khanani money laundering organization Wall Street Exchange was playing a role in unlawful activities from which the Syndicate's attacks were foreseeable.

960.    Wall Street Exchange knew its customers, and therefore it knew that it was giving assistance, not in an innocent or inadvertent way, to Khanani and the Khanani MLO, which were in turn working as agents for the Syndicate.

961.    At all relevant times, Wall Street Exchange knew, or were generally aware, that Khanani was a known agent of, and widely understood to launder money for, al-Qaeda, the Taliban, and the Haqqani Network.

962.    At all relevant times, Wall Street Exchange knew, or were generally aware, that Khanani's activities were likely related to Syndicate terrorist logistics or finance activity.

963.    The nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to complete gave Wall Street Exchange knowledge that its clients were engaged in illegal activity, including but not limited to the illicit transfer of funds.

## V.    DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL

964.    As set forth below, Defendants' bombmaking assistance to the Syndicate was substantial and caused terror attacks. Defendants enabled al-Qaeda's and the Haqqani Network's transnational terrorist finance, and Standard Chartered Bank also aided the Haqqani Network's sourcing of the al-Qaeda's CAN fertilizer bomb supply pipeline. By aiding customers who were active terrorist operatives, agents, or fronts for al-Qaeda, the Haqqani Network, or another Syndicate member, Defendants supplied al-Qaeda, the Taliban, and Lashkar-e-Taiba financial

and explosive resources that enabled Syndicate terrorists to conduct thousands of CAN fertilizer bomb attacks against Americans in Afghanistan each year from 2011 through 2016.

### A. Defendants Provided Support Tailored To The Violence At Issue Here

965. Defendants' assistance was tailored to the specific violence at issue: Defendants provided U.S. Dollars which al-Qaeda and the Haqqani Network required to finance their terrorist campaign in Afghanistan.

966. In addition to the above, Standard Chartered Bank also provided tailored aid to al-Qaeda and the Haqqani Network through the CAN fertilizer it helped them source.

967. Defendants' Laundromat services were vital to enabling al-Qaeda and the Haqqani Network to convert their narcotics income into useable terrorist finance. For example, Rhoda Weeks-Brown, general counsel of the International Monetary Fund, explained the long-standing global recognition of the direct link between Laundromat activities in high-risk terrorist finance jurisdictions and "terrorism financing" needed for al-Qaeda to commit terrorist attacks:

> Money laundering is what ***enables criminals to reap the benefits*** of their crimes … dirty money … may be a ***source of funding for terrorism*** … Terrorist groups need money, lots of it, to compensate fighters and their families; buy weapons, food, and fuel; and bribe crooked officials … The IMF is committed to helping its members identify today's ***dirty money laundromats***—and close them down. The stakes have never been higher.[626]

968. Defendants' assistance also provided the terrorists with critical diversification advantages. Money laundering and the use of a network of fronts, agents, and operatives also strengthened al-Qaeda and Haqqani Network (and, through it, the Taliban) by allowing each group to diversify its income. For terrorists subject to crippling international sanctions,

---

[626] Rhoda Weeks-Brown, *Cleaning Up*, Business and Financial Times (Ghana) (June 11, 2019), 2019 WLNR 17821676 (emphasis added).

diversification was critical: it offered each group a degree of financial resiliency that made it less susceptible to American counter-terrorist-finance and counterinsurgency efforts.

969.    Defendants' provision of banking and remitter services to agents, operatives, and fronts for al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company enabled the efficient operation of their shared transnational terrorist enterprise as a firm as bin Laden had always envisioned. By doing so, Defendants helped each member of the Syndicate unlock the "firm"-related efficiency advantages made classic by Ronald Coase's theory of the firm. In their book, *The Future of Terrorism*, Walter Laquer and Christopher Wall explained:

> For terrorism to be a viable tactic, there needs to be an ***industrial effort*** behind the planning, recruiting, training, procurement of supplies and actual execution. This reality means that in many ways, groups like … [al-Qaeda] fall within the bounds of Ronald Coase's theory of the firm. Coase's theory, at its most basic level, argues that pricing in open markets rarely takes into account such transaction costs as information costs, trade, and enforcement of contracts that inflate the costs of trade. Coase argues that an entrepreneur who could organize a firm could ***reduce these costs***. Terrorist organizations have an incentive for organizing along these lines for the reasons outlined above, with the added caveat that they ***manufacture political violence***.[627]

970.    The litany of U.S. government designations related to the terrorists in this Complaint also confirm that every transaction that Defendants has with such persons necessarily aided the Syndicate because every U.S. government designation of a Syndicate-related terrorist reflected the U.S. government's official judgment that any transactions with the person aided the Syndicate's terrorist enterprise, and it was therefore impossible to separate the "good" money from the "bad" money.

971.    To ensure that al-Qaeda's CAN fertilizer bombing campaign could be pursued at a nationwide scale, and aggressive attack tempo, the Syndicate sought to maximize its financial

---

[627] Laquer and Wall, *Future of Terrorism*, at 209-210.

resources through every available channel. Transnational terrorist finance was a key financial force multiplier for the Syndicate, as it allowed Syndicate members to more efficiently, timely, and predictably move and redistribute the vast cash flows from the criminal proceeds amongst themselves. By strengthening the Syndicate's financial logistics chain, terrorist finance activities directly supported a greater pace of successful attacks against Americans.

972.     Defendants' Laundromat transactions with the Syndicate enabled an especially potent form of terrorist finance for it because Defendants facilitated a stream of terrorist finance that was entirely amongst criminals – Defendants, Khanani, and their counterparties – and therefore was easier to conceal, which is a core objective of any terrorist finance scheme. In 1999, Yossef Bodansky explained the enormous operational advantages such an outcome affords to Islamist terrorists like al-Qaeda and the Taliban:

> [al-Qaeda] networks locally obtain operational funds by selling drugs, [and] laundering money … The operations of these networks take place with extremely deep cover within the tangled web of organized crime, an environment that already goes out of its way to shield its activities from law enforcement []. This multiple-layered security significantly increases the likelihood that [al-Qaeda] will achieve surprise when they launch a … terrorist operation …[628]

973.     The Syndicate's ability to count on regular and predictable cash flow, as a result of its terrorist finance activities, increased the lethality of the CAN fertilizer bomb campaign. By ensuring the Syndicate's ability to regularly pay fighters who joined for financial rather than ideological reasons, predictable cash flows from terrorist finance allowed the Syndicate to maintain the large numbers of fighters, smugglers, and factory workers necessary to the entire CAN fertilizer bomb campaign. Moreover, regularized cash flows from criminal activities and money laundering helped ensure that al-Qaeda, the Taliban, and the Haqqani Network could

---

[628] Bodansky, *Bin Laden*, at 322.

keep the peace amongst their affiliates, and each other, so they could all concentrate on their shared jihad against the United States. By preventing fissures amongst the members of the terrorist mafia cartel that is the Syndicate, which could threaten the viability of al-Qaeda's joint venture in the first instance, terrorist finance activities were core to the Syndicate's ability to function smoothly and without rancor.

974.    The fusion of the Syndicate's opium revenue recycling with its terrorist campaign was complete. In 2004, "the outgoing CIA station chief in Kabul dispatched a message home warning of the growing link between the Taliban and the drug trade. 'His cable said there was a ***direct causal link*** between insurgent funding and the opium trade,' according to a U.S. official who saw the document. 'If we do not do something about this, he wrote, we will win the battle and lose the war.'"[629] As Senator Mark Warner explained in 2008, "the revenues from … poppy" "are recycled directly to the Taliban," who "then invests them in weapons and uses those weapons against our forces."[630]

975.    By 2009, there was a "consensus within the Pentagon and the US law enforcement community that fighting the opium trade would be critical to turning the tide in Afghanistan."[631] On February 3, 2009, Pentagon and NATO officials publicly recognized the fusion of terrorist finance, Taliban narcotics activity, and Syndicate attacks.[632]

---

[629] Peters, *Seeds of Terror*, at 191 (emphasis added).

[630] CQ-RollCall Political Transcriptions, *Senate Armed Services Committee Hearing on the Defense Authorization Request for Fiscal Year 2009* (Feb. 6, 2008), 2008 WLNR 32061678.

[631] Peters, *Seeds of Terror*, at 236.

[632] Gerry J. Gilmore, *Afghan Drug Operations Come Under Intensified Scrutiny, Spokesman Says*, American Forces Press Service (Feb. 3, 2009).

976. Similarly, a Pakistani columnist explained, "[i]ndividuals and companies involved in the schemes like the Russian and Azerbaijani Laundromats" "relied on European banks to" "transfer illicit funds," which likely enabled "serious crimes, including terrorism."[633]

977. Former U.S. government officials also publicly testified as to the fusion of Russian Mafia-related Laundromat activities with anti-American terror. For example, Heather A. Conley, formerly the Deputy Assistant Secretary of State for Eurasian Affairs, testified that "anti-money laundering measures" with a "specific focus on Russia" were linked to the prevention of "terrorism financing," and for that reason, "[i]t [was] time for the United States to close the Russian laundromat and its affiliated enabling services that operates within and outside the U.S. financial system."[634]

978. In 2019, the European Parliament reiterated the widespread understanding in Europe that a bank's decision to deliberately facilitate money laundering inextricably enables terrorist finance. Among other things, the "European Parliament … stresse[d] that":

- "money laundering … assume[d] various forms, and that the money laundered [could] have its origin in various illicit activities, such as corruption, arms and human trafficking, drug dealing, tax evasion and fraud, and [could] be used to finance terrorism";

- AML rules governing financial institutions directly "combat[ted] the laundering of money … to counter the financing of terrorist activities" and "note[d] that the [EU's] AML framework chiefly relie[d] on a preventive approach to money laundering, with a focus on the detection and the reporting of suspicious transactions";

- "tax haven regimes" that enabled terrorist finance "[were] also present in developing countries"; and

---

[633] Columnists from India and Pakistan, *World's Biggest Money Laundering Market* (Mar. 4, 2019).

[634] Testimony of Heather A. Conley, Former Deputy Assistant Secretary of State for Eurasian Affairs and Senior Vice President for Europe and Eurasia in the Center for Strategic and International Studies, *Senate Banking, Housing and Urban Affairs Committee Hearing on Russia Sanctions*, Financial Markets Regulation Wire (Sept. 6, 2018).

- the European Parliament "[r]eiterate[d] that intermediaries play[ed] a crucial role in facilitating … the financing of terrorism."[635]

**B.    The Amount Of Money, And Concealment Of The Same, Were Both Significant**

979.    As explained above, money is the lifeblood of terrorism—especially for al-Qaeda and its Syndicate allies. And as the United States explained in a criminal case targeting a member of the Syndicate, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."[636]

980.    Each Defendant routed at least several million dollars in terrorist finance to al-Qaeda, the Haqqani Network, and other Syndicate members from 2008 through 2016.

981.    Danske Bank likely routed tens of millions of U.S. Dollars to the Syndicate.

982.    Deutsche Bank and Standard Chartered Bank each routed, at least, tens of millions of U.S. Dollars to the Syndicate, and each likely routed more than $100 million to the Syndicate.

983.    Although al-Qaeda needed a large amount of money to sustain its terrorist campaign as a whole, each individual attack required less. Although estimates vary, the Taliban paid many of its rank-and-file fighters about $100 per month, while mid-level commanders made upwards of $350 per month. As for many of the IEDs that the Syndicate used against Coalition troops, a Pakistani security official estimated that they cost a mere $100 to make.[637]

984.    At those rates, even a single transaction that recycled $2,000 in laundered funds back to al-Qaeda or the Taliban could finance substantial insurgent violence: it could put ten

---

[635] European Parliament Report.

[636] Tr. of Arraignment, *United States v. Khan*, No. 11-cr-20331, Doc. 31, at 19 (S.D. Fl. 2011).

[637] *See* Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

fighters and a commander in the field for a month, and supply them with five IEDs. Or the Haqqani Network could spend its $2,000 to purchase about 65 bags of Fatima Group CAN Fertilizer, from which al-Qaeda bombmakers could convert enough of the fertilizer into ammonium nitrate to provide the explosive materials necessary for approximately 260 large CAN fertilizer bombs (designed by al-Qaeda to defeat an American armored vehicle) or 650 smaller CAN fertilizer bombs (designed by al-Qaeda to defeat American body armor). And Defendants regularly facilitated deals that were many orders of magnitude higher, including deals for Fatima Group CAN Fertilizer. Those payments materially strengthened the ability of al-Qaeda and the Taliban to finance and execute the attacks that killed and injured Plaintiffs.

985. From 2010 through 2016, the average cost of a Fatima- or Pakarab-based CAN fertilizer bomb IED was approximately $40, and the average cost of a suicide bomber detonating a CAN fertilizer bomb ranged from $100 to $2,000-$3,000 for the largest suicide VBIEDs. At such price points, the Defendants' annual facilitation of al-Qaeda, Taliban, and Haqqani Network terrorist finance activities through SCB New York accounts would have funded every bomb used to attack Plaintiffs in this case many times over.

986. Aside from the amount of money transmitted to al-Qaeda and its allies, Defendants' involvements in their respective Laundromats also secured al-Qaeda's terrorist finance scheme by legitimating the Laundromat transactions and thereby better concealing the schemes from detection. For example, Deutsche Bank's involvement ensured that its Russian Laundromat achieved scale and was concealed by the cover made possible by the Bank's size and global presence. As Catherine Belton, an investigative correspondent for *Reuters*, explained: "These funds were funneled through what must have seemed the perfect cover: one of the West's

biggest financial institutions, Deutsche Bank."[638] Indeed, Deutsche Bank's core value proposition to its Russian Laundromat-related customers, including the Syndicate, was the recognition by all to the transaction that the use of a "syndicate of banks led by Germany's Deutsche Bank" to conduct Russia-related financial transactions was an "attempt[] to lend" the transaction "legitimacy through the participation of Western institutions."[639]

987.   Defendants' massive money laundering operations also aided al-Qaeda and the Haqqani Network by obscuring their terrorist finance schemes. Simply put, Defendants engaged in so much financial crime, for so many criminals, that it made it harder for U.S. and European law enforcement to monitor the terrorist finance flowing through their Laundromats. As Mr. Kochan documented in 2005, a financial institution's Laundromat reflected "economics" that "exist[ed] in a universe without morals" that created a "free-for-all" in which "[t]errorism has thrived."[640] He explained:

> The seeds of terrorism are to be found in the black markets where terrorists trade their wares. … Banks are equally dubious policemen of the systems of markets and cash transmission. They pursue bottom lines of profit, often teaming up with criminal and corrupt elements in developing countries. It is extraordinary that governments ask these institutions to manage 'anti-money laundering systems' when the movement of money is a key profit center. …[641]

## C.   Defendants Had Culpable Mental States

988.   Defendants' behavior was especially culpable because Defendants occupied a sophisticated position in the international financial system and well knew that their operation as a Laundromat would attract terrorist financiers, including al-Qaeda agents, operatives, and fronts,

---

[638] Belton at 405.

[639] *Id.* at 289.

[640] Kochan, *The Washing Machine*, at 285-86.

[641] *Id.*

as well as the Russian Mafia (which Defendants knew served as al-Qaeda's agent for money laundering purposes). According to Ms. Belton, it was widely known in the banking industry that "organised-crime money men worked in loose affiliation: they created the schemes, and then they promoted it to everyone. 'Once you have such a vehicle you market it,' said Mark Galeotti, an expert on Russian black-cash schemes."[642]

989.    In 2019, the European Parliament issued a public report that "deplore[d] the fact that some [European] financial institutions and their related business models" – a direct reference to Defendants – "have actively facilitated money laundering" even though such European banks knew that the transactions contrary to the EU's rules against money laundering could foreseeably directly aid the "financing of terrorist activities."[643]

### 1.    Deutsche Bank Had A Culpable Mental State

990.    In a rare instance of widespread honesty at Deutsche Bank, the Bank's managers, employees, and agents regularly described DB Moscow's activities as Deutsche Bank's "Russian Laundromat" or Deutsche Bank's "Laundromat." For example, as reported by Mr. Enrich, when Deutsche Bank renewed its New York Laundromat in Russia in early 2011, "[p]articipants had uncreatively *dubbed the latest arrangement the Laundromat*, and Russian criminals … used it to wash their looted money out of Russia and into the European financial system."[644]

991.    One can draw a direct line between Deutsche Bank's criminal Laundromat culture and Deutsche Bank's mirror trades with Khanani that enabled Syndicate terrorist finance and logistics. As Ms. Belton reported: "The equities traders had *few qualms … about carrying out*

---

[642] Belton at 415.

[643] *Id.*

[644] Enrich, *Dark Towers*, at 197.

*the mirror trades.* 'Half of the daily trading volume was on the mirror trades,' said one trader …

*'It wasn't a big deal. It was something they openly talked about.*'"[645]

992.    Moreover, according to testimony in a Russian proceeding (as paraphrased by a journalist), "executives at Deutsche Bank in Moscow," including on information and belief Mr. Wiswell, met with co-conspirators in the Russian Laundromat, including but not limited to, owners of Promsberbank, and agreed to "continue the [Laundromat] schemes"—doubling down on terrorist finance—even after its "Russian Laundromat" had come under scrutiny.[646]

993.    Indeed, NYDFS Superintendent Maria T. Vullo determined that Deutsche Bank's conduct was especially culpable considering, among other things:

- "In today's interconnected financial network, global financial institutions must be ever vigilant in the war against money laundering and other activities that can contribute to" "international terrorism."

- "[Deutsche Bank's] Russian mirror-trading scheme occurred while [the Bank] was on clear notice of serious and widespread compliance issues dating back a decade. The offsetting trades here lacked economic purpose and could have been used to facilitate money laundering or enable other illicit conduct. …"

- "[DB Moscow and DB London] trades were routinely cleared through [DBTCA]. The selling counterparty was typically registered in an offshore territory and would be paid for its shares in U.S. dollars. At least 12 entities were involved, and none of the trades demonstrated any legitimate economic rationale."[647]

994.    Deutsche Bank admitted it acted with a culpable mental state. For example, Deutsche Bank's CEO admitted the Bank's mirror trading conduct was wrongful. Among other things, he stated he would (paraphrased) personally oversee the Bank's efforts to resolve the

---

[645] Belton at 406 (emphasis added).

[646] Belton at 406.

[647] NYDFS, Press Release, *DFS Fines Deutsche Bank $425 Million for Russian Mirror-Trading Scheme; The Bank Allowed Traders to Engage in a Money-Laundering Scheme Using "Mirror Trades" That Improperly Shifted $10 Billion Out of Russia* (Jan. 30, 2017).

legal issues raised by the mirror trading scandal, and admitted, with respect to the mirror trading scandal: "It's not our finest hour. We've clearly had a systems and control failure."

995.    The heavy involvement of Deutsche Bank's top management throughout the Laundromat magnifies Deutsche Bank's culpable mental state. Josef Ackermann, Hugo Bänziger, and Anshu Jain each played central roles in the development of, and operation of, Deutsche Bank's various criminal schemes. For example, Mr. Jain played an important role enabling the Russian Laundromat. From the late 1990s through 2015, Deutsche Bank's executive team led by Mr. Ackermann, Mr. Bänziger, and Mr. Jain followed mafia-like communications strategies that reflected their consciousness of guilt.

996.    Multiple third parties who extensively investigated Deutsche Bank, including Mr. Enrich and Mr. Laabs, concluded that Deutsche Bank programmatically embraced a strategy to serve high-risk customers regardless of the terrorist finance risk during the Ackermann/Bänziger/Jain era from the late 1990s until 2015, when they encouraged knowing terrorist finance if the Bank's executives, managers, and employees believed Deutsche Bank could: (a) earn a profit and (b) keep their terrorist finance a secret. According to Mr. Laabs, these Deutsche Bank executives promoted an excessive, "downright cult of risk" that "[u]ltimately "was all about making a profit, [and] never letting a business opportunity go by."[648]

997.    **Josef Ackermann** assumed a leadership position at Deutsche Bank in the late 1990s, as did two of his lieutenants, Mr. Bänziger and Mr. Jain. Working together, they formed an "iron triangle" of executive-level protection for the Laundromats terrorist financier customers, which facilitated the Laundromat's explosive growth beginning in the late 1990s. **[APPENDIX]**

---

[648] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 108 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

998. Indeed, throughout his time in the leadership ranks of Deutsche Bank, Mr. Ackermann adopted communications strategies more commonly associated with the Boss of a crime family than the CEO of a purportedly responsible good corporate citizen. Consider:

- Mr. Ackermann was notorious for what Deutsche Bank colleagues derisively called his "personal risk management" strategy, whereby he consciously avoided creating any contemporaneous written or electronic records of his conduct, decision-making, or communications, unless they were tightly scripted in a manner that permitted him to conceal what he wanted or delivered in a medium that he believed was not permanent (like a text message on his personal phone).

- Mr. Ackermann instructed his Deutsche Bank lieutenants that email discussions or other written memorialization of the Bank's risky schemes were, in Mr. Ackermann's words, "taboo," and that they should emulate his personal practice of communicating "virtually nothing" in writing, instead insisting that nearly all communications be oral or in-person.

- On the rare occasions when circumstances required him to memorialize his communications in real time (which he viewed as a threat), Mr. Ackermann followed a carefully calibrated strategy of that relied upon cryptic text messages (the content of which, by remaining cryptic, afforded plausible deniability), which he ordinarily sent on his personal phone (which allowed Mr. Ackermann to delete incriminating messages believing they would not be backed up on any Deutsche Bank system while also reducing the chance he lost control of his incriminating messages (*e.g.*., through a nosy Deutsche Bank whistleblower poking around a server).

- Mr. Ackermann touted an upside-down "don't shoot the messenger" policy to his lieutenants, which he made plain was ***not*** about constructively dealing with problems or rooting out wrongdoing, but instead, about giving Mr. Ackermann – who, by reputation, believed he could talk his way out of anything – enough information so that he could provide at least a "plausible" explanation and talk his way out of whichever scandal happened to be Deutsche Bank's latest.

- Mr. Ackermann aggressively promoted the financial institution equivalent of "might makes right" to financial crime and corporate governance issues, which lesson he and his lieutenants drew from Mr. Ackermann's own experience beating criminal charges as an individual defendant. As Mr. Ackermann stated at the time, "money means security and independence," and gives a person – or an organization like Deutsche Bank – "an unbelievable amount of autonomy" to do whatever they want to do.

- Mr. Ackermann "promoted" and "exemplified" a "culture" throughout Deutsche Bank, according to Mr. Laabs, in which its executives were encouraged to actively "sh[y] away from taking on more responsibility" when they understood that crimes like terrorist finance were afoot, thereby "drawing a protective wall between [the executive] himself,

the [potentially illegal] trades, and the decisions," in order to leave "as few fingerprints as possible" "so as to not be held responsible in the end."[649]

- Mr. Ackermann and Mr. Jain, his lieutenant (and later co-CEO), sometimes acknowledged the illicit nature of Deutsche Bank's schemes through the euphemisms and nicknames they used. For example, in discussions involving Mr. Ackermann, Mr. Jain, and one or more other Deutsche Bank personnel, the group referred to one or more Deutsche Bank personnel engaged in financial crime as a "guaranteed money maker" who needed to be "allowed to continue doing his or her work" during Deutsche Bank's "fight for survival" era from 2007 through 2012,[650] the same period when Deutsche Bank provided much of its substantial assistance to the Syndicate.

- While led by Mr. Ackermann (and later Mr. Jain) from 2000 through 2015, according to Mr. Laabs, Deutsche Bank "was only concerned with exhausting the rules" and developed an institutional practice of enabling and then concealing its rampant financial crime under Mr. Ackermann's simple embrace of willful blindness and corporate cover-up as a basic leadership strategy, in sum and substance: "If it was relatively easy to postpone problems … or to ***cover them up entirely***, then that's what was done."[651]

999. Mr. Ackermann's willingness to flaunt his tolerance for criminal risk was later demonstrated in 2002 – ironically in Germany and throughout the financial world – when Germany prosecutors charged him for criminal offenses relating to allegations that he approved bribes while serving on the supervisory board of a separate German company, Mannesmann (doing so less than a year after Deutsche Bank elevated Mr. Ackermann to CEO). "The case proved to be a public relations disaster for the bank and for Ackermann," Deutsche Bank admitted (emphasis added), and "confirmed the German public's suspicion of [him] as an arrogant foreigner when he ***flashed a two-finger Victory sign at the start of [his criminal] trial***":

---

[649] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 135 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

[650] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 410 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

[651] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 107 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs) (emphasis added).



1000.   Mr. Ackermann beat his first trial, but that does not mean he was innocent. German prosecutors had a good faith basis to charge Mr. Ackermann for bribery and would not have done so unless there was substantial evidence he had aided and abetted financial crimes. Indeed, in his second trial, Mr. Ackermann once again adamantly insisted he had done nothing wrong. "However," as Mr. Laabs noted, "when a witness who had previously supported the defendants began to falter, Ackermann and the others changed their minds," "pulled the ripcord," and "made an offer to the public prosecutor" to immediately settle the proceedings for a total of almost six million euros.[652] After prosecutors agreed, Mr. Ackermann's criminal case ended.

1001.   As Mr. Laabs reported, Deutsche Bank, Mr. Ackermann, and his lieutenants learned a powerful lesson from Mr. Ackermann's criminal litigation history, which they later "follow[ed] … many, many times" thereafter: pursue a lucrative, but illegal, scheme for as long as possible, protect the scheme by silencing whistleblowers and intimidating internal and external critics, deny any wrongdoing once allegations emerge, and continue doing so unless and until the evidence became so incontrovertible as to assure a likely disaster, when it would then

---

[652] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 272-73 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

guard maintain its overall Laundromat business model by simply "[p]aying a lot of money, making settlements, avoiding an admission of guilt" and moving onto the next scheme.[653]

1002.   **Hugo Bänziger** was a lieutenant of Mr. Ackermann's who originally came over with him from Credit Suisse and served as Deutsche Bank's Chief Risk Officer until March 19, 2012. In that role, Mr. Bänziger had an exacting understanding of Deutsche Bank's terrorist finance risks. His function at Deutsche Bank, however, was to protect the Laundromat(s) – and enable terrorism – by preventing ethical Bank personnel from discovering or disclosing its terrorist finance to outsiders—***not*** to prevent terrorism by stopping the Bank's personnel from serving terrorist customers in the first instance.

1003.   One way Mr. Bänziger operationalized Deutsche Bank's Laundromat was by conducting a bizarre and cultish training program designed to break down the Bank's compliance personnel and habituate them to being abused and following any command from their leaders (*i.e.*, Mr. Bänziger and, ultimately, Mr. Ackermann), all for the purpose of enabling those engaging in misconduct at the Bank to run roughshod over any attempts to shut them down. For example, as Mr. Enrich's investigation revealed,

> Bänziger was a risk expert, but he was out of control with his employees. Every executive who was in the running to become a managing director—a title awarded to thousands of employees—had to attend a weeklong Risk Academy, often held in dormitories in the German countryside. The goal was to instill military-style discipline … and it metastasized into a hazing ritual. … Attendees were subjected to sleep deprivation. Exercises were crafted to create *informationsflut*, or information overload, as Bänziger put it. One guest speaker arrived at a Risk Academy dinner expecting to encounter the testosterone-fueled antics of a typical banking retreat. Instead he saw row after row of sunken-eyed lawyers and risk managers. In many academy classes, pupils were reduced to tears. "We want people who can stand up and take abuse," Bänziger explained to a colleague.[654]

---

[653] *Id.* (translated by Plaintiffs).

[654] Enrich, *Dark Towers*, at 107.

1004.  Mr. Bänziger ran Deutsche Bank's "hazing" program to "abuse" the members of his compliance department not because he was sincerely trying (albeit through wildly improper means) to strengthen compliance at Deutsche Bank. Rather, Mr. Bänziger was using a classic strategy that is used by military organizations around the world to establish and enforce a chain of command – to "instill military-style discipline." While chains-of-command are ideal for a military, they are antithetical to a functioning corporate compliance department, the entire point of which is to encourage people with concerns to escalate them, ordinarily going *outside* the chain of command in doing so.

1005.  **Anshu Jain** was a lieutenant of Mr. Ackermann who led a key division (Global Markets). Mr. Jain has admitted that Deutsche Bank had engaged in rampant misconduct while at the same time trying to deflect personal responsibility for the crimes that occurred at Deutsche Bank. For example, he said, in sum and substance, that he did not have anything to do with any of Deutsche Bank's crimes, which he attempted to dismiss as the actions of a few rogue actors executing bad deals on Deutsche Bank's "lower decks."

1006.  Throughout his tenure, first as Mr. Ackermann's lieutenant, then as co-CEO, Mr. Jain "simultaneously demanded more and more from the traders – more sales, more profit, more margin. That was hammered into them in meetings, at lectures, at weekend seminars."[655] "However," as Mr. Laabs explained, "more margin and more turnover [] also meant always more risk with riskier products in riskier markets - in Russia, for example."[656]

1007.  As a leader, Mr. Jain followed a deliberate strategy of being willfully blind to all financial crime risk, including terrorist finance. "Above all else," according to Mr. Laabs, "[Mr.]

---

[655] *Id.* at 167-68 (translated by Plaintiffs).

[656] *Id.* (translated by Plaintiffs).

Jain was a shrewd politician, so it's likely that he simply kept the inconvenient truth" of
Deutsche Bank's financial crimes "away from himself. [Mr. Jain] deliberately didn't care about
the details, because that's what ends up causing the most trouble."[657]

1008.  German regulators also confirmed Deutsche Bank's culpable state of mind. On
May 23, 2015, Frauke Menke, a top official at Germany's lead financial regulator, BaFin, sent a
letter to Deutsche Bank's Management Board in which she castigated the Bank. BaFin's
investigation was prompted by, among other things Deutsche Bank's VAT fraud and mirror trade
schemes, and Ms. Menke wrote to Deutsche Bank to providing written confirmation of BaFin's
conclusion that Deutsche Bank (including Mr. Jain personally) deliberately presided over a built-
to-fail compliance system that was designed to facilitate financial crime (the "May 23, 2015,
BaFin Letter"). In the May 23, 2015, BaFin Letter, Ms. Menke informed Deutsche Bank:

- "[O]verall, the [Ernst & Young] report disclose[d] major misconduct by various traders
  of Deutsch Bank, and by at least one member of the management of [DB London], [and]
  … major failures by members of the Management Board or Group Executive
  Committee";

- Deutsche Bank's financial crimes were the direct result of "a business and organizational
  environment" at Deutsche Bank "which was favourable to [financial crimes] or even
  made [financial crimes] possible in the first place";

- "[i]t appear[ed]," "that [Deutsche Bank's misconduct was] a manifestation of part of the
  culture that [was] possibly still characteristic to [the Bank], *i.e.* to prefer hiding, covering
  up, or entirely negating problems instead of addressing them openly and actively in order
  to prevent similar issues in the future";

- financial crimes regularly occurred at a Deutsche Bank division because "[t]he focus in
  the [] division was clearly on the business figures and not on compliance by the
  employees" and Deutsche Bank's executives, including its co-CEO, "Mr. Jain," "were
  aware of and tolerated the fact that [a Deutsche Bank trader] regularly" broke banking
  industry rules designed to prevent financial crimes;

- "the failures with which Mr. Jain [was] charged to be serious" because "[t]hey
  display[ed] improper management and organization of the business;"

---

[657] *Id*. at 260-61 (translated by Plaintiffs).

- "two internal investigations" at Deutsche Bank that had been conducted by Bill Broeksmit and Deutsche Bank's Business Integrity Review Group ("BIRG"), "were not completely independent, not comprehensive and did not go deep enough," and that the "BIRG found nothing" even though it "was supposed to look for fraud" and there was fraud to be found anywhere one looked; and

- Deutsche Bank's misconduct was long-standing and noted a June 2008 phone call between Mr. Ackermann (then-CEO) and Mr. Jain (then-head of Global Markets), in which Mr. Ackermann expressed "his anger about 'cultural deficits' in [Deutsche Bank's Global Markets] divisions which he said he would no longer tolerate because this unnecessarily endangered the reputation of the bank."

1009.   Deutsche Bank's efforts to spin the media surrounding Ms. Menke's investigation also showed their culpability. In her letter, Ms. Menke was also "enraged," according to Mr. Laabs, by Deutsche Bank's suggestion to the German press that the German investigations of the Bank had been completed and that BaFin had cleared the Bank's management.[658] As Mr. Laabs recounted: "That was a typical chess move by Deutsche Bank: control the narrative in the media, regardless of what the truth really looks like."[659]

### 2.      Standard Chartered Bank Had A Culpable Mental State

1010.   Standard Chartered Bank had a culpable mental state. Among other things, Standard Chartered Bank acted as a "rogue institution," got caught, and then broke the law for years thereafter, earning it the moniker of a "repeat corporate offender[]" by U.S. Attorney Liu.

1011.   Standard Charted Bank's retaliation against whistleblowers also demonstrated its intent to seek profit rather than prevent terrorist finance or even follow basic compliance norms.

### 3.      Danske Bank Had A Culpable Mental State

1012.   Danske Bank had a culpable mental state because Danske Bank was told directly that its Estonian Laundromat was facilitating criminal activity, including money laundering, in

---

[658] *Id.* at 510 (translated by Plaintiffs).

[659] *Id.* (translated by Plaintiffs).

2007, and rather than shut the Laundromat down, Danske Bank laundered at least another $233 billion over the next nine years. The sheer magnitude of that money laundering leads to the inference that Danske Bank knew it was participating in criminal activity.

1013.   Danske Bank's employees knew and participated in the criminal activity, including by helping criminal clients evade anti-money laundering and know your customer laws and regulations. Danske Bank thereby had a culpable mental state.

1014.   Because Danske Bank was told time and again, even after 2007, via regulators and whistleblowers, that it was facilitating and participating directly in financial crime, and because Danske Bank knew that facilitating money laundering on the scale that it did, over the time period that it did, and in the geographic areas in which it did, made it inevitable that Danske Bank was facilitating terrorist finance, leads to the inference that Danske Bank had a culpable mental state.

### 4.   Placid Express Had A Culpable Mental State

1015.   Placid Express had a culpable mental state because it knew that Khanani and the Khanani MLO was using Placid Express facilities to launder money, including for the Syndicate, and it allowed him to do so on a large scale and over a long time.

### 5.   Wall Street Exchange Chartered Bank Had A Culpable Mental State

1016.   Wall Street Exchange had a culpable mental state because it knew that Khanani and the Khanani MLO was using Wall Street Exchange facilities to launder money, including for the Syndicate, and it allowed him to do so on a massive scale and over a long period of time.

### D.   Defendants Had A Close Relationship To The Tortfeasors

1017.   Each Defendant had close customer relationships to the relevant tortfeasors.

1018.    Deutsche Bank, through DB Moscow, went even further and affirmatively helped its criminal customers set up their own bespoke terrorist finance/money laundering facilities, such as Deutsche Bank's Russian Laundromat.

1019.    Standard Chartered also went even further and played an active role in the same logistical pipeline as the tortfeasor (*i.e.*, the Haqqani Network's CAN fertilizer sourcing).

### E.    The Duration Of Support Was Long

1020.    Deutsche Bank aided al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company for more than a decade.

1021.    Standard Chartered Bank aided al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company for nearly two decades.

1022.    Danske Bank aided al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company for nearly a decade.

1023.    Placid Express aided al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company since at least 2008.

1024.    Wall Street Exchange aided al-Qaeda, the Taliban, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company since at least 2008.

1025.    In Russia, Afghanistan, and Pakistan, there was no meaningful distinction between organized crime activities and Syndicate funding. For example, in 2017, Professor Rob McCusker, who previously consulted with the FBI, explained (as paraphrased in a press release) that Russian organized crime groups and Syndicate terrorists shared "the functional interconnection" between them "in service of terrorism by engaging in criminal activity and financing terrorism from proceeds of organised crime in which convergence [was] facilitated by

similar logistical and operational requirements and synergies produced by sharing common infrastructure, logistical corridors, safe havens and financial and money laundering networks."[660]

1026.   Professor McCusker explained the close partnership between every Syndicate member and the Russian Mafia ensure a robust opium/terrorist finance pipeline flowing between Russia and Afghanistan, and emphasized that the "nexus between terrorism and organised crime flourish[ed] in failed states."[661] Alluding to the Taliban's partnership with the Russian Mafia, he added there were "reports which indicate[d] how the Taliban maintain[ed] engagements in heroin trade for arms trade with members of the Russian organised crime," including through "Haqqani Network … involve[ment] in [the] procurement of precursor chemicals [for opium manufacturing]."[662]

## VI. DEFENDANTS' ASSISTANCE TO THE SYNDICATE HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES

### A. Deutsche Bank's Assistance To The Syndicate Had A Substantial Nexus To The United States

1027.   The Deutsche Bank Defendants' assistance to the Syndicate had a substantial nexus to the United States for at least two reasons: (1) the DB Defendants' conduct involved sending dollars from or through DB New York to Deutsche Bank accounts in Germany, Russia, Pakistan, or Dubai, or USD-linked currency exchanges at DB New York, to facilitate Syndicate logistics flow or terrorist finance; and (2) the DB Defendants' own acts were directed at the U.S. because they knew that their material support would aid terrorists targeting Americans.

---

[660] European Foundation for S. Asian Studies, *EFSAS Attends Side-Event on "Terrorism in South Asia" at UN HRC in Geneva*, Kashmir News Service (India) (Sept. 20, 2017).

[661] *Id.*

[662] *Id.*

1028.   With respect to the first nexus to the United States, every Deutsche Bank Defendant relied upon DB New York to facilitate its illegal conduct, and no DB Defendant could have supported the Syndicate without the close involvement of, and millions in USD-denominated transactions each year by, DB New York.

1029.   Deutsche Bank was, and is, a tightly integrated global financial institution in which the various branches functionally serve the same role: promote U.S. Dollar transactions through DBTCA.

1030.   According to Deutsche Bank, the Bank operated under a "one firm concept" under which it promoted a "single culture" focused around an "investment banking ethos," and the Bank followed a "matrix managerial structure" that was "deliberately built with overlapping constituencies and responsibilities with cross-cutting lines of business and control on a regional as well as functional basis."

1.   **Deutsche Bank's Laundromat Terrorist Finance Transactions For Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Had A Substantial Nexus To The United States**

1031.   Deutsche Bank's nexus to America keyed the operation of each Deutsche Bank Laundromat, including, but not limited to, its Russian Laundromat, Moldovan Laundromat, German Laundromat, Azeri Laundromat, and so on. Deutsche Bank and the Syndicate benefited from DBTCA's special leverage based upon its status as an American bank, connection to the U.S. financial system, strength of the U.S. Dollar, and use of U.S. personnel, entities, and functions, which maximized the terrorist finance that flowed to the Syndicate through Deutsche Bank's Laundromat transactions with Khanani and the Russian Mafia.

(i)   DBTCA converted the Syndicate's opium rubles into the U.S. Dollars, which aided the Syndicate networks that supported attacks against Americans in Afghanistan by equipping them with the "gold standard" of Syndicate terrorist finance, which enhanced the Syndicate's ability to conduct more attacks and kill more Americans.

(ii)     DBTCA simplified the Russian Laundromat scheme by leveraging the unique-to-U.S. benefit of currency pairing arrangements made possible only through the U.S. Dollar's status as the world' reserve currency, which facilitated the Syndicate's movement of its terrorist finance between cells and provided critical operational and logistical benefits that directly caused more terrorist attacks.

(iii)    DBTCA's connection to the U.S. financial system imbued the Syndicate's terrorist finance transactions through the Laundromat with the legitimacy of an American financial institution, which aided the Syndicate's ability to subsequently move its money through the financial system by, in effect, affixing a Deutsche Bank "seal of approval" on the U.S. Dollars that the Syndicate sources through Deutsche Bank's Laundromats.

(iv)     DBTCA cleared the "good commission" payments upon which Deutsche Bank, through DB Moscow, relied to incentivize the Deutsche Bank traders whose enthusiasm bore a direct, linear relationship with Syndicate terrorist finance—the more mirror trades through the Russian Laundromat, the more Syndicate terrorist finance and the more profit for Deutsche Bank.

Each U.S. link intensified the capabilities of al-Qaeda and its affiliates and aided the Syndicate's terrorist campaign against Americans in Afghanistan.

1032.   *First*, Deutsche Bank relied upon DBTCA's connection to New York to help the Syndicate (through Khanani and the Russian Mafia) illicitly transfer its Russian rubles outside of Russia, so that DBTCA could then upgrade the Syndicate's terrorist finance from Russian Rubles to U.S. Dollars. The Syndicate's ability to source precious U.S. Dollars from New York through DBTCA was the necessary step before the Syndicate could convert any of its Russian rubles into the U.S. Dollars it needed to fund its attacks in Afghanistan, as well as the transnational logistical and financial infrastructure and pipeline vital to the entire enterprise. DBTCA was essential to Deutsche Bank's Laundromat, according to Mr. Enrich, because it served as the "crucial holding company, through which almost all of [Deutsche Bank's] American businesses channeled their transactions."[663]

---

[663] Enrich, *Dark Towers*, at 187.

1033.  One hundred percent (100%) of Deutsche Bank's U.S. Dollar-denominated mirror trades and one-legged trades were routed through DBTCA in New York. No such trades could have occurred without DB Moscow or DB London reaching into the United States, through DBTCA, to extract the U.S. Dollars whose acquisition by Khanani and others like him was the whole point of Deutsche Bank's criminal scheme in the first instance. As NYDFS concluded:

> ***Every single one of the U.S. dollar payments*** involved in the mirror trading and one-legged trading activity discussed above ***flowed through DBTCA***. In total, payments exceeding ***$10 billion were transmitted from London and through New York*** as a result of the trading conduct facilitated by the scheme. Deutsche Bank thus caused ***New York State to become a key conduit in a long-running artifice involving highly suspicious financial activity***. Deutsche Bank has represented that it has been unable to identify the actual purpose behind this scheme. It is ***obvious***, though, that the scheme could have facilitated … potentially illegal objectives.[664]

1034.  Deutsche Bank's ability to access the U.S. Dollar through DB New York was essential to the operation of the Laundromat, including, but not limited to, every mirror trade scheme and every mirror trade made by Deutsche Bank, including, but not limited to, every Khanani-related mirror trade. Indeed, the entire point of the scheme was to acquire U.S. Dollars. As one commentator quipped, correctly, Deutsche Bank could have accurately advertised itself with the slogan: "Deutsche Bank Laundromat—Scrubbing Rubles Into Greenbacks."[665]

1035.  Indeed, Deutsche Bank specifically understood – and publicly touted – that the U.S. Dollar was the proverbial "gold standard" currency for global financial transactions in uncertain times, including those relating to Russia. The *Journal of Commerce*, for example, reported on this recognized feature of the currency market, sourcing it to a senior currency

---

[664] 2017 Consent Order ¶¶ 31-32 (emphases altered).

[665] Howie Klein, *You Have To Go To A Dead Language To Find The Best Definition Of Trumpism*, DownWithTyranny (July 31, 2017), 2017 WLNR 23572358.

analyst for Deutsche Bank Securities in New York.[666] Deutsche Bank was also correct: the U.S.

Dollar was always the world's reserve currency and the preferred currency during unstable times.

1036.   Moreover, when a wave of currency crises swept across the globe in the late

1990s, Deutsche Bank's chief economist, Dr. Ken Courtis, publicly lectured the American public

(among other audiences) regarding how the U.S. financial system, U.S. Dollar, and perception of

intrinsic American economic might was the key lubricant for financial transactions worldwide,

telling the audience that the U.S. government – not Deutsche Bank – needed to start acting like a

responsible stakeholder in the global community, and proclaimed that: "***It [was] time for the***

***Americans to stop telling us they [were] a superpower and start acting like one.***"[667]

1037.   *Second*, DBTCA's presence greatly simplified the Syndicate's terrorist finance

scheme. According to NYDFS, Deutsche Bank's "'mirror trading' scheme" "was simple and

effective" – "Deutsche Bank Trust Company of the Americas" "was the ***entity through which***

***the U.S. dollar payments flowed to the suspicious entities*** involved here,"[668] *i.e.*, the Khanani

MLO and the Russian Mafia. By simplifying the Syndicate's terrorist finance scheme, Deutsche

Bank concealed the Syndicate's terrorist finance (a vital goal for terrorist financiers) while

---

[666] Gordon Platt, *Dollar to Take "Safe Haven" Role as Confidence in World Economies Dips*, Journal of Commerce (August 24, 1998) ("With [] Russia's financial meltdown spreading to markets around the world …, analysts say the U.S. dollar will assume its traditional role as a 'safe haven' currency. … [A] senior currency analyst for Deutsche Bank Securities in New York, said the most clear indication of the dollar's safe-haven role was Friday's inversion of the yield curve …'It shows the attractiveness of U.S. asset markets as being a refuge from the international environment, and the dollar benefits from this,' [the Deutsche Bank currency analyst] said. 'Investors are attracted to the depth, breadth and safety of the U.S. markets[,]' [he added.]"), 1998 WLNR 1029946.

[667] *Quoted in* Peter Hartcher, *Who's In Charge Around Here?*, Australian Financial Review (Sept. 12, 1998) (emphasis added), 1998 WLNR 8230324.

[668] 2017 Consent Order ¶ 9. Khanani and the Khanani-related entities were one of the "suspicious entities" referenced in paragraph 9.

simultaneously increasing the overall economic power of the Syndicate through the efficiency gains promoted by DBTCA's involvement. Both amplified the Syndicate's terrorist might.

1038.   *Third*, Deutsche Bank personnel and functions in the United States, including but not limited to, in New York City and Jacksonville, Florida, played a role in providing the deficient compliance approvals that permitted the Syndicate's terrorist finance to flow unimpeded for years. Under Deutsche Bank policies and procedures, DB New York, including DBTCA, was responsible for independently verifying the bona fides of any transaction in which DB New York plays a role. On information and belief, from 2009 through 2016, DB New York personnel knew of terrorist finance "red flags" relating to Khanani, the Khanani MLO, Ahmed, the Ahmed Cell, Azizi, the Azizi Cell, and Russian Mafia-related transactions, and/or other activity by known or suspected fronts, agents, or operatives of al-Qaeda, the Taliban, the Haqqani Network, or their affiliates. Thus, DB New York not only facilitated the Fatima and Pakarab transactions and accounts for Syndicate agents, operatives, and fronts, which funded the Syndicate's terrorist campaign, DB New York also subjected each transaction to scrutiny based on DB policy and procedure, New York, and federal law, including OFAC regulations and U.S. terrorist designations. DB New York therefore played an essential role in both triggering the red flags these transactions raised and knowingly ignoring them to allow the transactions to proceed.

1039.   On information and belief, every transaction described above was reviewed and approved by Deutsche Bank compliance personnel in Jacksonville, Florida. For example, "[Deutsche Bank] had assembled an army of not-very-well-paid employees and contractors to sift through thousands of transactions a day that the bank was doing for clients all over the world.

The job of the workers was to sniff out potential money laundering or other financial crimes,"

including terrorist finance.[669] As Mr. Enrich recounted:

> Teams churned through dozens or case files a day, cross-checking client names against a series of databases to see if any obvious legal or reputational problems jumped out. Many did. "We had a ton of stuff that we knew was Russian," one employee recalls. "They'd be incorporated in one country and banking in another, but their address would be Russian. It was crazy." [Deutsche Bank] was moving many millions of dollars a day for these Russians, often via untraceable shell companies. … [M]any of Deutsche's Jacksonville employees and contractors were young, often a year or two out of local colleges, and [had] received scant training. …
>
> There were a couple of ways to handle [requests for the Jacksonville compliance department to approve transactions with a "risky client"]. One was to blacklist just about every murky client and to file a "suspicious activity report" with the Financial Crimes Enforcement Network, or FinCEN. That had the benefit of partly covering [Deutsche Bank's] backside, but it didn't stop the transactions from going through. Inside the Jacksonville offices' cubicle farms, some teams filed dozens of reports every day. Then a month or two later, another transaction would land on an employee's desk involving the same Russian-linked shell companies, and the employees would again file a suspicious activity report, and again nothing would happen. It was disheartening and confusing—why didn't Deutsche just stop doing business with these shady clients? (The answer, employees recognized, was that handling the transactions was profitable.)
>
> That was one approach. Other teams inside the Jacksonville complex adopted a different, simpler tactic: just wave everything through. That had the advantage of making it easier to meet the weekly and monthly quotas for clearing transactions through Deutsche's pipes. "The culture was to just close [complete] the transaction," another former employee explains.[670]

1040.  Deutsche Bank's ability to effectively function as a Laundromat depended upon

the regular support provided by Deutsche Bank managers, employees, agents, and lawyers who

supported Deutsche Bank's Laundromat from inside the United States. For example, Mr. Enrich

concluded that Deutsche Bank's activities in Jacksonville enabled the mirror scheme because the

---

[669] Enrich, *Dark Towers*, at 200.

[670] *Id.* at 200-01.

approaches taken by the Jacksonville office, as described above, "meant there were few restraints on ambitious envelope-pushing traders like Wiswell."[671]

1041.   Similarly, Deutsche Bank maintained an internal committee that was designed not to actually interdict terrorist finance and money laundering, but instead, to evaluate proposed transactions from a reputational risk-oriented perspective (hereinafter, the "Reputational Risk Committee"). Deutsche Bank's Reputational Risk Committee met every few weeks and consisted of Deutsche Bank executives, risk managers, and lawyers in the United States.

1042.   Senior Deutsche Bank executives based in the U.S. played a vital role throughout Deutsche Bank's provision of financial services to the Syndicate while Deutsche Bank was acting as a Laundromat for terrorist financiers. For example, senior DB New York and DBTCA executives regularly coordinated customer and market strategies with Deutsche Bank branches around the world by traveling to visit and direct customer-related decisions at local branches, including on information and belief, DB London, DB Moscow, and DB Dubai.

1043.   Close cooperation between DB New York, on the one hand, and Deutsche Bank, DB Dubai, and DB Moscow, on the other, was essential to the Syndicate's ability to use Deutsche Bank accounts to repatriate tens of millions in USD-related illicit income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1044.   At all relevant times, Deutsche Bank was one of the only global financial institutions that offered USD-denominated financial services to customers in Russia and throughout the Former Soviet Union, as well as to those in the U.A.E. As a result of Deutsche Bank's unique geographical footprint amongst global financial institutions, from 2001 through

---

[671] *Id.* at 201-02.

2016, it was only through DB New York (including DBTCA) that DB Moscow (and by extension, terrorist financiers like Khanani who needed to move money out of Russia) played an essential role in the Syndicate's terrorist finance strategy, as Deutsche Bank was the Syndicate's primary global financial institution partner for purposes of repatriating illicit income in the Former Soviet Union back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1045.   *Fourth*, DBTCA's connection to the U.S. financial system and status as a Wall Street bank imbued the Syndicate's Laundromat terrorist finance schemes with greater legitimacy, which made them more lethal. Deutsche Bank's connection to New York was essential to signifying its status as a major global player and thereby providing the legitimacy necessary to facilitate the terrorist finance in this case through DB New York's invocation of the credibility lent by the U.S. financial system.

1046.   *Fifth*, the U.S. nexus was essential to Deutsche Bank's ability to pay the "good commissions" that Deutsche Bank specifically intended to substantially increase the U.S. Dollar-denominated terrorist finance (and Deutsche Bank's associated profits) that flowed from DBTCA in New York to the Syndicate in Afghanistan, Pakistan, and the U.A.E. through transactions with Syndicate agents like Khanani and the Russian Mafia that were routed through Deutsche Bank's Russian Laundromat. Deutsche Bank relied upon DBTCA accounts in New York to clear the "good commissions" needed to incentivize its traders to maximize the volume of Syndicate terrorist finance coursing through the Laundromat. According to NYDFS, "[t]hese suspicious payments, too, were cleared through DBTCA in New York."[672]

---

[672] 2017 Consent Order ¶ 28.

2.   **Deutsche Bank's VAT-Fraud Terrorist Finance Transactions For Al-Qaeda And The Haqqani Network Had A Substantial Nexus To The United States**

1047.   **The Azizi Cell and the Ahmed Cell.** Deutsche Bank's operation of its New York Laundromat was equally vital to the Syndicate's ability to maximize the value its terrorists obtained through the terrorist finance generated by the Ahmed Cell and the Azizi Cell.

(i)   DBTCA converted the hundreds of millions of euros that the Syndicate stole from European governments through its VAT finance scheme U.S. Dollars, which aided the Syndicate networks that supported attacks against Americans in Afghanistan by equipping them with the "gold standard" of Syndicate terrorist finance, which enhanced the Syndicate's ability to conduct more attacks and kill more Americans.

(ii)   DBTCA's connection to the U.S. financial system imbued the Syndicate's terrorist finance transactions conducted through the Azizi Cell and the Ahmed Cell with the legitimacy of an American financial institution, which aided the Syndicate's ability to subsequently move its money through the financial system by, in effect, affixing a Deutsche Bank "seal of approval" on the U.S. Dollars that the Syndicate sources through Deutsche Bank's Laundromats.

(iii)   Deutsche Bank, the Azizi Cell, and the Ahmed Cell, repeatedly reached into the United States to advance the Syndicate's VAT fraud terrorist finance schemes.

Each U.S. link intensified the capabilities of al-Qaeda and its affiliates and aided the Syndicate's terrorist campaign against Americans in Afghanistan.

1048.   *First*, DBTCA was key to the Syndicate's ability to convert the VAT fraud-related euros stolen from European governments by the Azizi Cell and Ahmed Cell, into the U.S. Dollars that al-Qaeda and the Taliban demanded from their transnational fundraising to maximize the lethality of the Syndicate's terrorist campaign. The Azizi Cell and the Ahmed Cell both maximized the Syndicate's purchasing power by specifically, and exclusively, choosing to use U.S. Dollars – obtained from New York and routed through DBTCA – as the currency of choice for their value transfers from Europe, the Middle East, and Asia back to the Syndicate to support attacks against Americans in Afghanistan. Azizi, for example, has directly admitted that his ability to access U.S. Dollars, which he did through DBTCA, was crucial to the Syndicate's

VAT Finance Scheme. In an interview with law enforcement, Azizi specifically admitted that the Azizi Cell accomplished its "sharing" of "all amounts" of "the loot" through "transfer[s] in [U.S. dollars]" while, in contrast, "the amounts transferred in [British pounds] or [euros] were amounts that flow[ed] back into the fraud chain," *e.g.*., the funds needed to keep doing things like making the purchases in Europe that sustained the scheme.

1049.   *Second*, as with Deutsche Bank's Laundromats, DBTCA's U.S. nexus imbued the resulting U.S. Dollar transfers from Deutsche Bank to the Azizi Cell and Ahmed Cell with the legitimacy of an American financial institution, which enabled Syndicate terrorist finance by making it easier for Syndicate operatives to repatriate the U.S. Dollars that Deutsche Bank helped them source back to the Syndicate to use to attack Americans in Afghanistan.

1050.   *Third*, the Azizi Cell and the Ahmed Cell depended on the United States because both Cells used U.S. entities, persons, and official records to conceal the fraud and thereby enable them to obtain more reliably, and transfer to the Syndicate, the funds secured through Deutsche Bank's aid. In furtherance of the Syndicate's VAT finance efforts, Deutsche Bank, the Ahmed Cell, and the Azizi Cell reached into the United States to obtain additional aid for the Syndicate's VAT Finance Scheme beyond the U.S. Dollars routed to the Syndicate through DBTCA, including, but not limited to, one or more instances when Deutsche Bank personnel in London and/or Germany and one or both Cells:

- leveraged one or more U.S. residents, including but not limited to, a resident of California, in order to provide legitimacy to the scheme by acting as a "stand-in" (for Azizi and/or Ahmed) during legs of the carousel, which achieved the intended effect by helping cloak the fraud with the sophistication suggested by having a trans-Atlantic counterparty;

- leveraged one or more U.S. corporate entities, including but not limited to, Zenith Ltd. USA, in order to imbue the transactions with the legitimacy attached to American companies overseas, which achieved the affect Cells intended by helping cloak their fraud with the legitimacy of the U.S. financial and legal system; and

- regularly sent and received communications to and from the United States, including, but not limited to, one or more occasions when he communicated with persons inside the United States to instruct such person send a mailing from within the United States to outside the United States, in order to execute transactions necessary to facilitate the Syndicate's VAT Finance Scheme, which achieved the intended effect by allowing Azizi and/or Ahmed to execute the transactions necessary to the scheme.

1051.  Accordingly, the Deutsche Bank Defendants, through their use of DB New York, have purposefully availed themselves of (1) the United States' dependable and transparent banking system (which allows the Syndicate to transfer funds without fear of loss); (2) the U.S. Dollar as a stable and fungible currency (which permits the exchange of currencies essential to terrorist fundraising and terrorist finance); and (3) the predictable jurisdictional and commercial law of New York and the United States.

1052.  The second substantial nexus between Deutsche Bank's actions relevant to the claims herein and the United States is that the DB Defendants knew their actions targeted the United States by directly undermining U.S. foreign-policy interests in Afghanistan and jeopardizing the safety of American service members deployed there. When they decided to assist the Syndicate in repatriating millions of dollars in illicit criminal profits back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives, or lend Syndicate agents, operatives, and fronts Deutsche Bank's good name and legitimacy, the DB Defendants knew they were helping al-Qaeda, the Taliban, and the Haqqani Network conduct attacks designed specifically to influence U.S. policy by targeting American personnel.

1053.  By knowingly engaging in transactions for, and providing financial services to, members of the al-Qaeda Terror Syndicate, including the Taliban and the Haqqani Network, the Deutsche Bank Defendants provided substantial assistance to those groups, and caused the terror attacks that injured Plaintiffs.

**B.  Standard Chartered Bank's Terrorist Finance Routed To Al-Qaeda, The Haqqani Network, Lashkar-e-Taiba, and D-Company Through Its Laundromat Had A Substantial Nexus To The United States**

1054.   Defendants' support for the Syndicate relied on significant contacts with the United States. Most of the Syndicate's illicit activity, like the narcotics trade, was either USD-denominated, or dependent upon transactions backstopped by the U.S. Dollar as a currency pair or through a correspondent USD account. Thus, when the Syndicate made a concerted push to increase its use of sophisticated transnational terrorist finance strategies to fund its CAN fertilizer bombing campaign against Americans in Afghanistan, it required the willing support of a global financial institution with branches around the world and a demonstrated willingness to flout America's anti-terrorism agenda. Enter, Standard Chartered Bank.

1055.   Defendants' assistance to the Syndicate had a substantial nexus to the United States for at least two reasons: (1) the Defendants' conduct involved sending dollars from or through SCB New York to Standard Chartered Bank (or another bank's) accounts in Pakistan, Dubai, or Afghanistan, or USD-linked currency exchanges at SCB New York, to facilitate Syndicate logistics flow or terrorist finance; and (2) the Defendants' own acts were directed at the U.S. because they knew that their material support would aid terrorists targeting Americans.

1056.   With respect to the first nexus to the United States, every Defendant relied upon SCB New York to facilitate its illegal conduct, and no Defendant could have supported the Syndicate without the close involvement of, and millions in USD-denominated transactions each year by, SCB New York.

1057.   Standard Chartered Bank's official accounting currency was, and is, U.S. Dollars because most SCB business was, and is, USD-denominated and/or USD-linked.

1058.   Standard Chartered Bank's policies and procedures in place from at least 2001 through 2016, including those of SCB London, SCB New York, SCB Dubai, SCB Pakistan, and

SCB Afghanistan, required that Standard Chartered Bank branches, subsidiaries, and affiliates route USD-denominated transaction through SCB New York in most instances. Plaintiffs' belief is based upon, among other things: (1) Standard Chartered Bank documents that repeatedly reference routing business to SCB New York; (2) the standard practice in the financial services industry of routing USD-denominated transactions to the relevant bank's U.S. branch to capture the related transaction fees; and (3) Standard Chartered Bank' documented practice from 2001 through 2016 of processing billions of USD-denominated transactions through SCB New York that directly or indirectly benefited Iranian terrorist fronts, and the Defendants were consistently unable to avoid using their New York branch during the terrorist finance scheme given the centrality of U.S. Dollars.

1059.   Under Standard Chartered Bank policies and procedures, SCB New York was responsible for independently verifying the bona fides of any transaction in which SCB New York plays a role. On information and belief, from 2009 through 2016, SCB New York personnel knew of terrorist finance "red flags" relating to Fatima, Pakarab, Hisawi, Bout, Khanani, Bari, and Shadman, and/or other activity by known or suspected fronts, agents, or operatives of al-Qaeda, the Taliban, the Haqqani Network, or their affiliates. Thus, SCB New York not only facilitated the Fatima and Pakarab transactions and accounts for Syndicate agents, operatives, and fronts, which armed and funded the Syndicate's CAN fertilizer bomb campaign, SCB New York also subjected each transaction to scrutiny based on Standard Chartered Bank policy and procedure, New York, and federal law, including OFAC regulations and U.S. terrorist designations. SCB New York therefore played an essential role in both triggering the red flags these transactions raised and knowingly ignoring them to allow the transactions to proceed.

1060.   Regulators have concurred with this conclusion. For example, the "Hong Kong Monetary Authority [] blamed [SCB's] anti-money laundering failures on the bank's operations in New York," and observed the NYDFS's August 2014 Consent Order "reflect[ed] [SCB New York]'s failure in fully meeting the requirements imposed by the US authorities over transaction monitoring systems in the US."[673]

1061.   Each Defendant outside of New York also regularly depended upon U.S. relationships to provide the infrastructure necessary to process Standard Chartered Bank transactions. For example, SCB Pakistan and SCB Dubai have relied upon cloud-based services in the U.S. from Google and other providers to conduct their day-to-day activities.

### 1.    Standard Chartered Bank's Terrorist Finance Had A Substantial Nexus To The United States

1062.   Standard Chartered Bank's knowing or reckless support for the Syndicate's terrorist finance activities bore an equally strong nexus to the U.S. Like its facilitation of the Syndicate's CAN fertilizer bomb logistics, Standard Chartered Bank's support for Syndicate terrorist finance depended upon the close involvement of SCB New York, which regularly facilitated USD-denominated transactions in support of each Defendant's provision of financial services to, among other Syndicate assets, the world's most notorious terrorist arms dealer (the "Merchant of Death" Victor Bout), al-Qaeda's paymaster and 9/11 plotter (Mustafa Ahmed al-Hisawi), the "bank" for key Haqqani Network and Taliban leadership (Abdul Baqi Bari), a notorious Afghan warlord who was known for funding the Haqqani Network (Hikmatullah Shadman), and the Syndicate's Number 1 USD financier, a "James Bond Villain" whom law

---

[673] Global Banking News, *Hong Kong Monetary Authority Blames Standard Chartered's Anti-Money Laundering Failures on NY Unit* (Aug. 21, 2014).

enforcement considered "the number 1 international controller" for "terrorist funding … in the world" at the time (Altaf Khanani).

1063.   Standard Chartered Bank's ability – including that of each SCB Defendant – to leverage the U.S. nexus afforded by SCB New York was key to maximizing the potency of al-Qaeda and the Haqqani Network's transnational schemes to finance attacks against Americans because both groups' access to New York banks was essential to their agents' and operatives' abilities to clean illicit overseas terrorist income, *e.g.*., Taliban profits in Europe, so the money could be repatriated back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1064.   Standard Chartered Bank's connection to New York was essential to signifying its status as a major global player and thereby providing the legitimacy necessary to facilitate the terrorist finance in this case through SCB New York's invocation of the credibility lent by the U.S. financial system. As one industry analyst explained, in the context of NYDFS's 2012 interactions with Standard Chartered Bank, "[NYDFS] filed a blistering order … and threatened yanking [SCB's] New York license. That was a huge threat, since that would also mean [SCB] would lose direct access to dollar clearing services. It could in theory go through correspondents, but that would signal its end as an international player."[674]

1065.   Close cooperation between SCB New York, on the one hand, and SCB London, SCB Dubai, SCB Pakistan, and SCB Afghanistan, on the other, was essential to al-Qaeda and the Haqqani Network's ability to use Standard Chartered Bank accounts to repatriate tens of millions

---

[674] Yves Smith, *New York's Benjamin Lawsky Collects Scalps, Showing Regulators Can \*Gasp\* Regulate*, Naked Capitalism (October 7, 2014), 2013 WLNR 15172530.

in USD-related overseas income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1066.   Even after Standard Chartered Bank exited Afghanistan in 2012, SCB New York continued to be the leading gateway for USD-denominated transactions in Afghanistan through SCB New York's provision of USD correspondent services to SCB Afghanistan's successor (AIB), and SCB Pakistan continued to service customers in the Afghan market, while Standard Chartered Bank retained its status as the only global bank with a robust presence in Pakistan, a status which SCB retains to this day.

1067.   Standard Chartered Bank management practices show the close connection between SCB New York and other Standard Chartered Bank branches in Standard Chartered Bank's Laundromat Strategy. For example, on May 28, 2006, SCB Dubai announced the appointment of a new Senior Executive Officer for SCB Dubai, who had previously been "the Senior Group Representative at [SCB New York], where he was responsible for overseeing anti-money laundering strategy as [SCB] is a major USD clearer."[675]

1068.   SCB New York played a key – and illegal – role in both facilitating the illegal USD transactions at issue and covering up the broader programmatic terrorist finance scheme. SCB New York's interactions with Deloitte offer one example. After Standard Chartered Bank agreed with the Federal Reserve in 2004 to review its suspicious transactions, "[o]n October 27, 2004, Standard Chartered Bank formally engaged the predecessor entity of Deloitte FAS as its qualified independent consulting firm to conduct the Transaction Review."[676] "In early October

---

[675] AME Info - Company News, *Standard Chartered Appoints Senior Executive Officer for Dubai International Financial Centre* (May 28, 2006).

[676] NYDFS, *In re Deloitte Financial Advisory Services LLP*, Agreement, Factual Background ¶ 2 (June 18, 2013).

2005, Deloitte FAS finalized the draft Transaction Review report."[677] "One or more drafts of the Transaction Review report included a recommendation generally explaining how certain wire messages or 'cover payments' used by the Society for Worldwide Interbank Financial Telecommunication [SWIFT] message system could be manipulated by banks to evade money laundering controls on USD clearing activities and suggesting the elimination or restriction of such payments."[678] "***Based primarily on SCB's objection***, Deloitte FAS removed the recommendation from the written final report before the written report was submitted to [NYDFS]."[679]

1069.   Accordingly, the Defendants, through their use of SCB New York, have purposefully availed themselves of (1) the United States' dependable and transparent banking system (which allows the Syndicate to transfer funds without fear of loss); (2) the U.S. Dollar as a stable and fungible currency (which permits the exchange of currencies essential to terrorist fundraising, terrorist finance, and logistics purchases, including Fatima Group CAN Fertilizer); and (3) the predictable jurisdictional and commercial law of New York and the United States.

### 2.   Standard Chartered Bank's CAN Fertilizer Bomb Logistical Support For The Syndicate Had A Substantial Nexus To The United States

1070.   From 2009 through 2016, Fatima and Pakarab depended upon their relationship with the Defendants, including SCB New York, to reliably access U.S. Dollar markets in New York to facilitate their operations and international transactions, such as when a U.A.E. company contracts with Fatima or Pakarab for a 6- or 7-figure bulk purchase of Fatima Group CAN Fertilizer.

---

[677] *Id.* at ¶ 7.

[678] *Id.*

[679] *Id.* at ¶ 8 (emphasis added).

1071.   On information and belief, Fatima and Pakarab regularly denominated their Fatima Group CAN Fertilizer-related transactions in U.S. Dollars from 2001 through 2016.[680]

1072.   Fatima's and Pakarab's ability to price Fatima Group CAN Fertilizer in U.S. Dollars improved the effectiveness of the Syndicate's CAN fertilizer bomb campaign by ensuring price stability and avoiding wild price fluctuations that would otherwise occur if Fatima and Pakarab were forced to rely on another currency because, in Pakistan, petrochemical-related transactions were traditionally USD-denominated, as were natural gas sales. At all relevant times, petrochemical inputs and natural gas supplies were two of the most important elements to Fatima's and Pakarab's CAN fertilizer pricing, and therefore Fatima and Pakarab had an overwhelming economic interest in pricing Fatima Group CAN Fertilizer, directly or indirectly, based upon the U.S. Dollar to de-risk the cost of two of their most important inputs. From 2008 through 2016, the Syndicate was able to engage in "widespread smuggling" of the "Pakarab … fertilizer" for use in CAN fertilizer bombs "***because of the low price*** of [Pakarab] fertilizer in Pakistan."[681] If Fatima and Pakarab had been unable to rely on the U.S. financial system, they could not have maintained their stable low-cost prices, and the Syndicate could not have acquired, smuggled, and detonated as many CAN fertilizer bombs against Americans.

---

[680] Plaintiffs' belief is based upon, among other things, that: (1) one or more Fatima documents shared with prospective investors in 2010 represented that the price of certain Fatima products was "fixed" at a certain USD ratio; (2) fertilizer prices worldwide, and in Pakistan, are ordinarily pegged to the U.S. Dollar because of fertilizer's heritage in the petrochemicals family, which were ordinarily USD-denominated; and (3) Fatima and Pakarab specifically sourced their two greatest inputs – petrochemicals to convert into fertilizer, and natural gas to power their state-of-the-art facilities – in U.S. Dollars.

[681] PTI - The Press Trust of India Ltd., *Pak Accepts US Proposal to Dye Fertiliser Used in Making Bombs* (Oct. 6, 2011) (emphasis added).

1073.   From 2009 through 2016, Fatima and Pakarab depended upon access to the USD markets in New York to facilitate their cross-border transactions, such as when a U.A.E. purchaser contracts with Fatima or Pakarab to purchase $1 million of CAN fertilizer in bulk. During this time, Syndicate fronts, agents, and/or operatives regularly acquired Fatima Group CAN Fertilizer, directly or indirectly, through transactions facilitated by SCB New York.

1074.   On information and belief, Fatima and Pakarab each maintained an 8-figure USD facility through Standard Chartered Bank, which was serviced by SCB New York from 2009 through 2016. In January 2010, Fatima disclosed that it had an outstanding loan valued at 1.4 billion Pakistani Rupees with "Standard Chartered," which was approximately $16.5 million at then-existing exchange rates. On information and belief, this was a reference to Fatima and Pakarab accounts with SCB Pakistan, SCB Dubai, SCB London, and SCB New York, which Fatima and Pakarab maintained to facilitate USD-denominated transactions relating to Fatima Group CAN Fertilizer.

1075.   To facilitate Fatima's and Pakarab's deliberate supply of CAN fertilizer to Syndicate agents, operatives, and fronts from 2009 through 2016, Fatima and Pakarab depended upon USD correspondent accounts maintained by SCB New York to facilitate such purchases, including, but not limited to, foreign exchange and export finance. On information and belief, during this period, SCB New York facilitated at least $100,000 per month, and more than $1 million per year, in Fatima and Pakarab fertilizer sales to Syndicate agents, operatives, and fronts. On information and belief, most of these transactions were either processed directly through SCB New York or, alternatively, relied upon SCB New York to provide U.S. Dollars in the context of currency pairing between another bank and SCB Pakistan or SCB Dubai.

1076.  On information and belief, Fatima and Pakarab also relied upon SCB New York to facilitate the USD-denominated letters of credit that were necessary to ensure the smooth operation of Fatima's and Pakarab's fertilizer sales. SCB New York, SCB Dubai, and SCB Pakistan regularly facilitated letters of credit that enabled Taliban and Haqqani Network purchases of Fatima Group CAN Fertilizer from 2008 through 2016.

1077.  Fatima and Pakarab would not have been able to support the "unending supply" of Fatima Group CAN Fertilizer to Syndicate agents, operatives, and fronts, without the reliable and dependable USD-denominated banking services provided by SCB New York, as facilitated by SCB London, SCB Dubai, and SCB Pakistan through "currency pairs" that relied upon the stable USD banking services provided by SCB New York. Commercial banks transacting in currency pairs—*i.e.*, accepting funds in one currency and depositing them in another—typically choose a central currency to exchange into and out of. As Stanford Economics Professor Ronald McKinnon explained, "choosing one currency like the dollar to be the intermediary currency is the most natural way of economizing on foreign exchange transacting.[682] That is because it is far easier and less expensive to use a single central currency than it is to set up bilateral currency exchange markets for every possible currency pair (the example Professor McKinnon gives is that if a bank wished to trade 150 currencies all against each other, it could set up 149 markets if it used a central currency, as opposed to 11,175 markets if it created a separate market for each currency pair). The U.S. Dollar is by far the most common central currency.

1078.  Because the U.S. Dollar is by far the most common central currency, many Standard Chartered Bank transactions on behalf of Fatima, Pakarab, and al-Qaeda or Taliban

---

[682] Ronald McKinnon, *The World Dollar Standard and Globalization: New Rules for the Game?*, Stanford Ctr. for Int'l Dev., at 8-9 (Sept. 2003).

(including Haqqani Network) fronts, agents and operatives, involved USD transactions routed through SCB New York, even when the underlying transaction did not have any other currency or geographic nexus to the United States.

1079.   When Syndicate fronts, agents, and/or operatives acquired Fatima Group CAN Fertilizer, directly or indirectly, through transactions with Fatima and/or Pakarab that were facilitated by the Defendants, SCB New York's personnel, accounts, and funds were essential to the Defendants' ability to service Fatima and Pakarab business and therefore, to the Syndicate's continued operation of its CAN fertilizer bomb network.

1080.   From 2009 through 2016, SCB New York facilitated at least several million USD, per year, in Fatima and Pakarab sales of Fatima Group CAN Fertilizer to Syndicate fronts, operatives, and/or agents, which sales supplied the explosives for thousands of Syndicate CAN fertilizer bombs that were detonated in attacks against Americans in Afghanistan each year. Most of these transactions were either processed directly through SCB New York or, alternatively, relied upon SCB New York to provide U.S. Dollars in the context of currency pairing between another bank and SCB London, SCB Dubai, or SCB Pakistan.

1081.   From 2009 through 2016, SCB New York facilitated the USD-denominated letters of credit that were necessary to ensure the smooth operation of Fatima's and Pakarab's sales of Fatima Group CAN Fertilizer to Syndicate agents, operatives, and fronts. On information and belief, SCB New York regularly facilitated letters of credit that enabled Taliban and Haqqani Network purchases of Fatima Group CAN Fertilizer from Fatima and Pakarab.

1082.   Fatima and Pakarab would not have been able to serve as a reliable explosives supplier to the Syndicate or sell nearly as much Fatima Group CAN Fertilizer for as cheaply as it did to Syndicate agents, operatives, and fronts, without the reliable and dependable USD services

provided by SCB New York, as facilitated by the other Defendants. By substantially reducing

Fatima's and Pakarab's costs, access to SCB New York's USD accounts allowed Fatima and

Pakarab to maintain ultra-low Fatima Group CAN Fertilizer prices, causing more Syndicate

CAN fertilizer bomb attacks against Americans.

1083. The second substantial nexus between Standard Chartered Bank's actions relevant

to the claims herein and the United States is that the Defendants knew their actions targeted the

United States by directly undermining U.S. foreign-policy interests in Afghanistan and

jeopardizing the safety of American service members deployed there. When they decided to

enable the Haqqani Network's CAN fertilizer bomb logistics flow, permit the Haqqani

Network's corporate co-conspirators Fatima and Pakarab to continue to enable attacks, assist

al-Qaeda in repatriating millions of dollars in illicit criminal profits back to accounts controlled

by al-Qaeda and Haqqani Network agents and operatives and used to finance attacks against

Americans in Afghanistan, or lend Fatima, Pakarab, and Haqqani Network agents, operatives,

and fronts Standard Chartered Bank's good name and legitimacy, the SCB Defendants knew they

were helping al-Qaeda, the Haqqani Network, and their allies conduct attacks to influence U.S.

policy by killing and injuring American personnel.

1084. By knowingly engaging in transactions for, and providing financial services to,

members of the al-Qaeda Terror Syndicate, including the Taliban and the Haqqani Network, the

Defendants provided substantial assistance to those groups, and caused the terror attacks that

injured Plaintiffs.

### C.    Danske Bank's Assistance To The Syndicate Had A Substantial Nexus To The United States

1085. Almost all of the money that was laundered through the Danske Bank laundromat

ended up denominated in dollars, via transactions with U.S. correspondence bank accounts.

1086.   Danske Bank used the United States financial system to transact in U.S. Dollars and to facilitate cross-border transactions, including the transactions that facilitated the money laundering done by the Danske Bank laundromat.

1087.   Danske Bank has a wholly-owned subsidiary in New York, Danske Bank New York, which acts as Danske Bank's agent for foreign exchange transactions with non-U.S. customers of Danske Bank. Danske Bank New York maintains offices in New York, does business there, and did business there related to the Danske Bank laundromat, including helping Danske Bank Estonia launder money.

1088.   Close cooperation between Danske Bank New York, on the one hand, and Danske Bank Estonia, on the other, was essential to the Syndicate's ability to use Danske Bank accounts to repatriate tens if not hundreds of millions in USD-related illicit income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan from 2001 through 2016.

1089.   For transactions that were not fulfilled by Danske Bank New York, Danske Bank and Danske Banke Estonia both reached into the United States to transact illicit money laundering with other correspondent banks in the United States.

1090.   The Danske Bank Defendants' assistance to the Syndicate had a substantial nexus to the United States because their acts to launder funds, which facilitated terrorist finance, were directed at the U.S because they knew that their material support would aid terrorists targeting Americans.

1091.   Employees from Danske Bank's Estonia branch met in New York with Deutsche Bank employees regarding anti-money laundering issues. Danske Bank Estonia assured Deutsche Bank that it would be de-emphasizing its business with non-resident clients.

### D.   Placid Express's Assistance To The Syndicate Had A Substantial Nexus To The United States

1092.   Placid Express's support for the Syndicate relied on significant contacts with the United States, including but not limited to the fact that most if not all transactions at issue were USD-denominated, or dependent upon transactions backstopped by the U.S. Dollar as a currency pair or through a correspondent USD account.

1093.   Placid Express's conduct involved sending dollars from or through Placid Express's facilities in New York, so that U.S. Dollars could be sent to Placid Express's customers abroad.

1094.   Placid Express's acts were also directed at the U.S. because they knew that their material support would aid terrorists targeting Americans.

### E.   Wall Street Exchange's Assistance To The Syndicate Had A Substantial Nexus To The United States

1095.   Wall Street Exchange's support for the Syndicate relied on significant contacts with the United States, including but not limited to the fact that most if not all transactions at issue were USD-denominated, or dependent upon transactions backstopped by the U.S. Dollar as a currency pair or through a correspondent USD account.

1096.   Wall Street Exchange's conduct involved sending dollars from or through Wall Street Exchange's facilities in New York, so that U.S. Dollars could be sent to Wall Street Exchange's customers in Dubai.

1097.   Wall Street Exchange's acts were also directed at the U.S. because they knew that their material support would aid terrorists targeting Americans.

VII.   **THE SYNDICATE USED DEFENDANTS' ASSISTANCE TO COMMIT ATTACKS THAT KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE COMMITTED, PLANNED, AND AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK**

1098.   The Syndicate's terrorist campaign, for which Defendants provided material support, killed and injured Plaintiffs and their family members. Each of the acts of international terrorism described below was committed by the Taliban, including its Haqqani Network, or jointly committed by the Taliban and al-Qaeda. The express purpose of that terrorist campaign was to target U.S. citizens, like Plaintiffs and their deceased family members, to inflict injury felt in the United States and effect a change in U.S policy. In addition, al-Qaeda – a designated FTO at all relevant times – planned and authorized each of these attacks. *See supra* Part V.B.

1099.   The attacks that injured or killed Plaintiffs would have violated the laws of war if these terrorist groups were subject to it. The terrorists did not wear uniforms or otherwise distinguish themselves from civilians, conscripted children into committing attacks, targeted humanitarian workers, and engaged in widespread kidnapping and torture in order to intimidate their enemies.

1100.   A full list of the Plaintiffs, their nationality, and relationship to the injured persons below is attached hereto as Exhibit A. For those Plaintiffs below with family members who were injured or died as a result, each Plaintiff has experienced severe mental anguish, emotional pain and suffering, and the loss of their family member's society, companionship, and counsel.

**The Joshua Ashley Family**

1101.   Sergeant Joshua Ashley served in Afghanistan as a member of the U.S. Marine Corps. On July 19, 2012, Sgt Ashley was injured in an IED attack in Helmand Province, Afghanistan. Sgt Ashley died on July 19, 2012 as a result of injuries sustained during the attack.

1102.   The attack was committed by the Taliban.

1103.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1104.   Sgt Ashley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1105.   Sgt Ashley was a national of the United States at the time of the attack and his death.

1106.   As a result of the July 19, 2012 attack, Sgt Ashley was injured in his person and/or property. The Plaintiff members of the Ashley Family are the survivors and/or heirs of Sgt Ashley and are entitled to recover for the damages Sgt Ashley sustained.

**The Bradley Atwell Family**

1107.   Sergeant Bradley Atwell served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2012, Sgt Atwell was injured in a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan. Sgt Atwell died on September 15, 2012 as a result of injuries sustained during the attack.

1108.   The attack was committed by the Taliban.

1109.   Sgt Atwell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1110.   Sgt Atwell was a national of the United States at the time of the attack and his death.

1111.   As a result of the September 15, 2012 attack, Sgt Atwell was injured in his person and/or property. The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

### **The Thomas Baysore Jr. Family**

1112.   Staff Sergeant Thomas Baysore Jr. served in Afghanistan as a member of the U.S. Army. On September 26, 2013, SSG Baysore was injured in an insider attack in Paktia Province, Afghanistan. SSG Baysore died on September 26, 2013 as a result of injuries sustained during the attack.

1113.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1114.   SSG Baysore's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1115.   SSG Baysore was a national of the United States at the time of the attack and his death.

1116.   As a result of the September 26, 2013 attack, SSG Baysore was injured in his person and/or property. The Plaintiff members of the Baysore Family are the survivors and/or heirs of SSG Baysore and are entitled to recover for the damages SSG Baysore sustained.

**The Vincent Bell Family**

1117.   Staff Sergeant Vincent Bell served in Afghanistan as a member of the U.S. Marine Corps. On November 30, 2011, SSgt Bell was injured in an IED attack in Helmand Province, Afghanistan. SSgt Bell died on November 30, 2011 as a result of injuries sustained during the attack.

1118.   The attack was committed by the Taliban.

1119.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1120.   SSgt Bell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1121.   SSgt Bell was a national of the United States at the time of the attack and his death.

1122.   As a result of the November 30, 2011 attack, SSgt Bell was injured in his person and/or property. The Plaintiff members of the Bell Family are the survivors and/or heirs of SSgt Bell and are entitled to recover for the damages SSgt Bell sustained.

**The Darrik Benson Family**

1123.   Chief Petty Officer Darrik Benson served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SOC (SEAL) Benson was injured in an attack on a helicopter in Wardak Province, Afghanistan. SOC (SEAL) Benson died on August 6, 2011 as a result of injuries sustained during the attack.

1124.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1125.   SOC (SEAL) Benson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1126.   SOC (SEAL) Benson was a national of the United States at the time of the attack and his death.

1127.   As a result of the August 6, 2011 attack, SOC (SEAL) Benson was injured in his person and/or property. The Plaintiff members of the Benson Family are the survivors and/or heirs of SOC (SEAL) Benson and are entitled to recover for the damages SOC (SEAL) Benson sustained.

**Maggie Bilyeu**

1128.   Plaintiff Specialist Maggie Bilyeu served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SPC Bilyeu was injured in a suicide bombing attack in Parwan Province, Afghanistan. The attack severely wounded SPC Bilyeu, who suffers from injuries from shrapnel requiring 22 surgeries to her legs, breast and abdomen, an amputated left leg, and hearing loss requiring a hearing aid. As a result of the November 12, 2016 attack and her injuries, SPC Bilyeu has experienced severe physical and emotional pain and suffering.

1129.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1130.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1131.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1132.   The attack that injured SPC Bilyeu would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1133.   SPC Bilyeu was a national of the United States at the time of the attack, and remains one to this day.

**The Jeremie Border Family**

1134.   Staff Sergeant Jeremie Border served in Afghanistan as a member of the U.S. Army. On September 1, 2012, SSG Border was injured in a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan. SSG Border died on September 1, 2012 as a result of injuries sustained during the attack.

1135.   The attack was committed by the Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1136.   SSG Border's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1137.   SSG Border was a national of the United States at the time of the attack and his death.

1138.   As a result of the September 1, 2012 attack, SSG Border was injured in his person and/or property. The Plaintiff members of the Border Family are the survivors and/or heirs of SSG Border and are entitled to recover for the damages SSG Border sustained.

**The Francisco Briseño-Alvarez Jr. Family**

1139.    Specialist Francisco Briseño-Alvarez Jr. served in Afghanistan as a member of the U.S. Army National Guard. On September 25, 2011, SPC Briseño-Alvarez was injured in an IED attack in Laghman Province, Afghanistan. SPC Briseño-Alvarez died on September 25, 2011 as a result of injuries sustained during the attack.

1140.    The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1141.    On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1142.    SPC Briseño-Alvarez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1143.    SPC Briseño-Alvarez was a member of the U.S. Armed Forces at the time of the attack and his death.

1144.    As a result of the September 25, 2011 attack, SPC Briseño-Alvarez was injured in his person and/or property. The Plaintiff members of the Briseño-Alvarez Family are the

survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages SPC Briseño-Alvarez sustained.

### The Allan Brown Family

1145.    Sergeant First Class Allan Brown served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SFC Brown was injured in a suicide bombing attack in Parwan Province, Afghanistan. SFC Brown died on December 6, 2016 as a result of injuries sustained during the attack.

1146.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1147.    On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1148.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1149.   SFC Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1150.   SFC Brown was a national of the United States at the time of the attack and his death.

1151.   As a result of the attack, SFC Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of SFC Brown and are entitled to recover for the damages SFC Brown sustained.

1152.   As a result of the November 12, 2016 attack and SFC Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Brown's society, companionship, and counsel.

**The Christopher Brown Family**

1153.   Staff Sergeant Christopher Brown served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SSG Brown was injured in an IED attack in Kunar Province, Afghanistan. SSG Brown died on April 3, 2012 as a result of injuries sustained during the attack.

1154.   The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1155.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1156.   SSG Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1157.   SSG Brown was a national of the United States at the time of the attack and his death.

1158.   As a result of the April 3, 2012 attack, SSG Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

### The Daniel Brown Family

1159.   Plaintiff Hospitalman Daniel Brown served in Afghanistan as a member of the U.S. Navy. On March 9, 2012, HM1 Brown was injured in an grenade launcher attack in Helmand Province, Afghanistan. The attack severely wounded HM1 Brown, who suffers from neurological issues causing difficulty breathing and a decrease in cognitive functions. As a result of the March 9, 2012 attack and his injuries, HM1 Brown has experienced severe physical and emotional pain and suffering.

1160.   The attack was committed by the Taliban.

1161.   The attack that injured HM1 Brown would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1162.   HM1 Brown was a national of the United States at the time of the attack, and remains one to this day.

1163.   As a result of the March 9, 2012 attack and HM1 Brown's injuries, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering.

**The Nicholas Burley Family**

1164.   Specialist Nicholas Burley served in Afghanistan as a member of the U.S. Army. On July 30, 2013, SPC Burley was injured in an indirect fire attack in Logar Province, Afghanistan. SPC Burley died on July 30, 2013 as a result of injuries sustained during the attack.

1165.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1166.   SPC Burley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1167.   SPC Burley was a national of the United States at the time of the attack and his death.

1168.   As a result of the July 30, 2013 attack, SPC Burley was injured in his person and/or property. The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

**The David Cabrera Family**

1169.   Lieutenant Colonel David Cabrera served in Afghanistan as a member of the U.S. Army. On October 29, 2011, LTC Cabrera was injured in a suicide bombing attack in Kabul Province, Afghanistan. LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the attack.

1170.   The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1171.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1172.   On information and belief, the suicide bomber who detonated the bomb during the attack was: (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1173.   On information and belief, the device that the suicide bomber detonated during the attack was: (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban

terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1174.   LTC Cabrera's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1175.   LTC Cabrera was a national of the United States at the time of the attack and his death.

1176.   As a result of the October 29, 2011 attack, LTC Cabrera was injured in his person and/or property. The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

### The Christopher Campbell Family

1177.   Chief Petty Officer Christopher Campbell served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Campbell was injured in an attack on a helicopter in Wardak Province, Afghanistan. CPO Campbell died on August 6, 2011 as a result of injuries sustained during the attack.

1178.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1179.   CPO Campbell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1180.   CPO Campbell was a national of the United States at the time of the attack and his death.

1181.   As a result of the August 6, 2011 attack, CPO Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of CPO Campbell and are entitled to recover for the damages CPO Campbell sustained.

### **The Kevin Cardoza Family**

1182.   Specialist Kevin Cardoza served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Cardoza was injured in an IED attack in Kandahar Province, Afghanistan. SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the attack.

1183.   The attack was committed by the Taliban.

1184.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1185.   SPC Cardoza's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1186.   SPC Cardoza was a national of the United States at the time of the attack and his death.

1187.   As a result of the May 4, 2013 attack, SPC Cardoza was injured in his person and/or property. The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and are entitled to recover for the damages SPC Cardoza sustained.

**The Timothy Carner Family**

1188.   Plaintiff Specialist Timothy Carner served in Afghanistan as a member of the U.S. Army. On December 13, 2011, SPC Carner was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Carner, who suffers from an amputation of his left leg below the knee, right thigh injuries, a concussion, traumatic brain injury, and post-traumatic stress disorder. As a result of the December 13, 2011 attack and his injuries, SPC Carner has experienced severe physical and emotional pain and suffering.

1189.   The attack was committed by the Taliban.

1190.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1191.   The attack that injured SPC Carner would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1192.   SPC Carner was a national of the United States at the time of the attack, and remains one to this day.

1193.   As a result of the December 13, 2011 attack and SPC Carner's injuries, each member of the Carner Family has experienced severe mental anguish, emotional pain and suffering.

**The Chazray Clark Family**

1194.   Specialist Chazray Clark served in Afghanistan as a member of the U.S. Army. On September 18, 2011, SPC Clark was injured in an IED attack in Kandahar Province, Afghanistan. SPC Clark died on September 18, 2011 as a result of injuries sustained during the attack.

1195.   The attack was committed by the Taliban.

1196.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1197.   SPC Clark's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1198.   SPC Clark was a national of the United States at the time of the attack and his death.

1199.   As a result of the September 18, 2011 attack, SPC Clark was injured in his person and/or property. The Plaintiff members of the Clark Family are the survivors and/or heirs of SPC Clark and are entitled to recover for the damages SPC Clark sustained.

**The Jonathan Cleary Family**

1200.   Plaintiff Corporal Jonathan Cleary served in Afghanistan as a member of the U.S. Army. On May 6, 2012, CPL Cleary was injured in an IED attack in Paktia Province, Afghanistan. The attack severely wounded CPL Cleary, who suffers from an amputation of his right leg below the knee. As a result of the May 6, 2012 attack and his injuries, CPL Cleary has experienced severe physical and emotional pain and suffering.

1201.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1202.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1203.   The attack that injured CPL Cleary would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1204.   CPL Cleary was a national of the United States at the time of the attack, and remains one to this day.

1205.   As a result of the May 6, 2012 attack and CPL Cleary's injuries, each member of the Cleary Family has experienced severe mental anguish, emotional pain and suffering.

**The Timothy Conrad Jr. Family**

1206.   Sergeant Timothy Conrad Jr. served in Afghanistan as a member of the U.S. Army. On February 23, 2012, SGT Conrad was injured in an insider attack in Nangarhar Province, Afghanistan. SGT Conrad died on February 23, 2012 as a result of injuries sustained during the attack.

1207.   The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1208.   SGT Conrad's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1209.   SGT Conrad was a national of the United States at the time of the attack and his death.

1210.   As a result of the February 23, 2012 attack, SGT Conrad was injured in his person and/or property. The Plaintiff members of the Conrad Family are the survivors and/or heirs of SGT Conrad and are entitled to recover for the damages SGT Conrad sustained.

**The Ross Cox Family**

1211.   Plaintiff Staff Sergeant Ross Cox served in Afghanistan as a member of the U.S. Army. On November 15, 2011, SSG Cox was injured in an IED attack in Kandahar Province,

Afghanistan. The attack severely wounded SSG Cox, who suffers from loss of his left leg and suffered a serious right leg injury, left arm nerve damage, and hearing loss. As a result of the November 15, 2011 attack and his injuries, SSG Cox has experienced severe physical and emotional pain and suffering.

1212.   The attack was committed by the Taliban.

1213.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1214.   The attack that injured SSG Cox would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1215.   SSG Cox was a national of the United States at the time of the attack, and remains one to this day.

1216.   As a result of the November 15, 2011 attack and SSG Cox's injuries, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering.

**The Mitchell Daehling Family**

1217.   Specialist Mitchell Daehling served in Afghanistan as a member of the U.S. Army. On May 14, 2013, SPC Daehling was injured in an IED attack in Kandahar Province,

Afghanistan. SPC Daehling died on May 14, 2013 as a result of injuries sustained during the attack.

1218.   The attack was committed by the Taliban.

1219.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1220.   SPC Daehling's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1221.   SPC Daehling was a national of the United States at the time of the attack and his death.

1222.   As a result of the May 14, 2013 attack, SPC Daehling was injured in his person and/or property. The Plaintiff members of the Daehling Family are the survivors and/or heirs of SPC Daehling and are entitled to recover for the damages SPC Daehling sustained.

**The Devin Daniels Family**

1223.   Sergeant Devin Daniels served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SGT Daniels was injured in an IED attack in Helmand Province, Afghanistan. SGT Daniels died on August 25, 2011 as a result of injuries sustained during the attack.

1224.   The attack was committed by the Taliban.

1225.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1226.   SGT Daniels's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1227.   SGT Daniels was a national of the United States at the time of the attack and his death.

1228.   As a result of the August 25, 2011 attack, SGT Daniels was injured in his person and/or property. The Plaintiff members of the Daniels Family are the survivors and/or heirs of SGT Daniels and are entitled to recover for the damages SGT Daniels sustained.

**The James Darrough Family**

1229.   Sergeant James Darrough served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SGT Darrough was injured in a suicide bombing attack in Kabul Province, Afghanistan. SGT Darrough died on October 29, 2011 as a result of injuries sustained during the attack.

1230.   The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at

the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1231.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1232.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1233.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1234.   SGT Darrough's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the

attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1235.   SGT Darrough was a national of the United States at the time of the attack and his death.

1236.   As a result of the October 29, 2011 attack, SGT Darrough was injured in his person and/or property. The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

**The Joseph D'Augustine Family**

1237.   Staff Sergeant Joseph D'Augustine served in Afghanistan as a member of the U.S. Marine Corps. On March 27, 2012, SSgt D'Augustine was injured in an IED attack in Helmand Province, Afghanistan. SSgt D'Augustine died on March 27, 2012 as a result of injuries sustained during the attack.

1238.   The attack was committed by the Taliban.

1239.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1240.   SSgt D'Augustine's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1241.   SSgt D'Augustine was a national of the United States at the time of the attack and his death.

1242.   As a result of the March 27, 2012 attack, SSgt D'Augustine was injured in his person and/or property. The Plaintiff members of the D'Augustine Family are the survivors and/or heirs of SSgt D'Augustine and are entitled to recover for the damages SSgt D'Augustine sustained.

**The Jonathan Davis Family**

1243.   Staff Sergeant Jonathan Davis served in Afghanistan as a member of the U.S. Marine Corps. On February 22, 2013, SSgt Davis was injured in an IED attack in Helmand Province, Afghanistan. SSgt Davis died on February 22, 2013 as a result of injuries sustained during the attack.

1244.   The attack was committed by the Taliban.

1245.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1246.   SSgt Davis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1247.   SSgt Davis was a national of the United States at the time of the attack and his death.

1248.   As a result of the February 22, 2013 attack, SSgt Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

**The Joseph Deslauriers Family**

1249.   Plaintiff Master Sergeant Joseph Deslauriers served in Afghanistan as a member of the U.S. Air Force. On September 23, 2011, MSgt Deslauriers was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded MSgt Deslauriers, who suffers from the loss of both his legs above the knee and his left arm below the elbow. As a result of the September 23, 2011 attack and his injuries, MSgt Deslauriers has experienced severe physical and emotional pain and suffering.

1250.   The attack was committed by the Taliban.

1251.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1252.   The attack that injured MSgt Deslauriers would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1253.   MSgt Deslauriers was a national of the United States at the time of the attack, and remains one to this day.

1254.   As a result of the September 23, 2011 attack and MSgt Deslauriers's injuries, each member of the Deslauriers Family has experienced severe mental anguish, emotional pain and suffering.

**The Alberto Diaz Family**

1255.   Specialist Alberto Diaz served in Afghanistan as a member of the U.S. Army. On August 12, 2014, SPC Diaz was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Diaz, who suffered severe brain injuries and facial damage requiring complete right-side facial reconstruction, and also suffers from post-traumatic stress disorder, chronic fatigue syndrome, chronic pain, social anxiety, panic attacks, hearing loss and tremors. As a result of the August 12, 2014 attack and his injuries, SPC Diaz has experienced severe physical and emotional pain and suffering.

1256.   The attack was committed by the Taliban.

1257.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1258.   The attack that injured SPC Diaz would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1259.   SPC Diaz was a national of the United States at the time of the attack, and remains one to this day.

1260.   As a result of the August 12, 2014 attack and SPC Diaz's injuries, each member of the Diaz Family has experienced severe mental anguish, emotional pain and suffering.

### The Corey Dodge Family

1261.   Mr. Corey Dodge served in Afghanistan as a civilian government contractor working for DynCorp Free Zone. On August 22, 2015, Mr. Dodge was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the attack.

1262.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1263.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1264.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and

procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1265.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1266.   Mr. Dodge's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1267.   Mr. Dodge was a national of the United States at the time of the attack and his death.

1268.   As a result of the August 22, 2015 attack, Mr. Dodge was injured in his person and/or property. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

**The John Douangdara Family**

1269.   Petty Officer 1st Class John Douangdara served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Douangdara was injured in an attack on a helicopter in

Wardak Province, Afghanistan. PO1 Douangdara died on August 6, 2011 as a result of injuries sustained during the attack.

1270.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1271.   PO1 Douangdara's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1272.   PO1 Douangdara was a national of the United States at the time of the attack and his death.

1273.   As a result of the August 6, 2011 attack, PO1 Douangdara was injured in his person and/or property. The Plaintiff members of the Douangdara Family are the survivors and/or heirs of PO1 Douangdara and are entitled to recover for the damages PO1 Douangdara sustained.

### Robert Dove

1274.   Plaintiff Staff Sergeant Robert Dove served in Afghanistan as a member of the U.S. Army. On June 9, 2012, SSG Dove was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Dove, who lost his right arm below the elbow and right leg above knee, and suffered a traumatic brain injury, crushed pelvis, numerous soft tissue and shrapnel injuries, hearing loss, and multiple fractures of the left hand requiring 38 surgeries. As a result of the June 9, 2012 attack and his injuries, SSG Dove has experienced severe physical and emotional pain and suffering.

1275.   The attack was committed by the Taliban.

1276.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1277.   The attack that injured SSG Dove would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1278.   SSG Dove was a national of the United States at the time of the attack, and remains one to this day.

**The Curtis Duarte Family**

1279.   Lance Corporal Curtis Duarte served in Afghanistan as a member of the U.S. Marine Corps. On August 1, 2012, LCpl Duarte was injured in an IED attack in Helmand Province, Afghanistan. LCpl Duarte died on August 1, 2012 as a result of injuries sustained during the attack.

1280.   The attack was committed by the Taliban.

1281.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1282.   LCpl Duarte's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1283.   LCpl Duarte was a national of the United States at the time of the attack and his death.

1284.   As a result of the August 1, 2012 attack, LCpl Duarte was injured in his person and/or property. The Plaintiff members of the Duarte Family are the survivors and/or heirs of LCpl Duarte and are entitled to recover for the damages LCpl Duarte sustained.

**The Stephen Dunning Family**

1285.   Staff Sergeant Stephen Dunning served in Afghanistan as a member of the U.S. Marine Corps. On October 27, 2011, SSgt Dunning was injured in an IED attack in Helmand Province, Afghanistan. SSgt Dunning died on October 27, 2011 as a result of injuries sustained during the attack.

1286.   The attack was committed by the Taliban.

1287.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1288.  SSgt Dunning's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1289.  SSgt Dunning was a national of the United States at the time of the attack and his death.

1290.  As a result of the October 27, 2011 attack, SSgt Dunning was injured in his person and/or property. The Plaintiff members of the Dunning Family are the survivors and/or heirs of SSgt Dunning and are entitled to recover for the damages SSgt Dunning sustained.

### Carey DuVal

1291.  Plaintiff Captain Carey DuVal served in Afghanistan as a member of the U.S. Army. On August 24, 2014, CPT DuVal was injured in a suicide bombing IED attack in Nangarhar Province, Afghanistan. The attack severely wounded CPT DuVal, who suffered an amputation of his right hand, a broken right ulna, elbow, and humerus, a broken right femur, and loss of 20 percent of his right quadricep. As a result of the August 24, 2014 attack and his injuries, CPT DuVal has experienced severe physical and emotional pain and suffering.

1292.  The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1293.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack

Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1294.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1295.   The attack that injured CPT DuVal would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the detonation of a vehicle indiscriminately placed civilians at risk.

1296.   CPT DuVal was a national of the United States at the time of the attack, and remains one to this day.

### The Erich Ellis Family

1297.   Plaintiff Sergeant Erich Ellis served in Afghanistan as a member of the U.S. Marine Corps. On June 12, 2012, Sgt Ellis was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Sgt Ellis, who lost his right leg and suffered extensive, permanent damage to his left leg, right arm, and upper right leg as well as a traumatic brain injury. As a result of the June 12, 2012 attack and his injuries, Sgt Ellis has experienced severe physical and emotional pain and suffering.

1298.   The attack was committed by the Taliban.

1299.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1300.   The attack that injured Sgt Ellis would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1301.   Sgt Ellis was a national of the United States at the time of the attack, and remains one to this day.

1302.   As a result of the June 12, 2012 attack and Sgt Ellis's injuries, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering.

**The Robert Ellis Family**

1303.   Specialist Robert Ellis served in Afghanistan as a member of the U.S. Army. On June 18, 2013, SPC Ellis was injured in a rocket attack in Parwan Province, Afghanistan. SPC Ellis died on June 18, 2013 as a result of injuries sustained during the attack.

1304.   The attack was committed by the Taliban.

1305.   SPC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1306.   SPC Ellis was a national of the United States at the time of the attack and his death.

1307.   As a result of the June 18, 2013 attack, SPC Ellis was injured in his person and/or property. The Plaintiff members of the Ellis Family are the survivors and/or heirs of SPC Ellis and are entitled to recover for the damages SPC Ellis sustained.

### The Vincent Ellis Family

1308.   Private First Class Vincent Ellis served in Afghanistan as a member of the U.S. Army. On June 1, 2012, PFC Ellis was injured in a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost Province, Afghanistan. PFC Ellis died on June 4, 2012 as a result of injuries sustained during the attack.

1309.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1310.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1311.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked"

by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1312.   PFC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1313.   PFC Ellis was a national of the United States at the time of the attack and his death.

1314.   As a result of the June 1, 2012 attack, PFC Ellis was injured in his person and/or property. The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

**The Michael Elm Family**

1315.   Specialist Michael Elm served in Afghanistan as a member of the U.S. Army. On October 14, 2011, SPC Elm was injured in an IED attack in Khost Province, Afghanistan. SPC Elm died on October 14, 2011 as a result of injuries sustained during the attack.

1316.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1317.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1318.   SPC Elm's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1319.   SPC Elm was a national of the United States at the time of the attack and his death.

1320.   As a result of the October 14, 2011 attack, SPC Elm was injured in his person and/or property. The Plaintiff members of the Elm Family are the survivors and/or heirs of SPC Elm and are entitled to recover for the damages SPC Elm sustained.

**The Richard Essex Family**

1321.   Sergeant Richard Essex served in Afghanistan as a member of the U.S. Army. On August 16, 2012, SGT Essex was injured in an attack on a helicopter in Kandahar Province, Afghanistan. SGT Essex died on August 16, 2012 as a result of injuries sustained during the attack.

1322.   The attack was committed by the Taliban.

1323.   SGT Essex's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1324.   SGT Essex was a national of the United States at the time of the attack and his death.

1325.   As a result of the August 16, 2012 attack, SGT Essex was injured in his person and/or property. The Plaintiff members of the Essex Family are the survivors and/or heirs of SGT Essex and are entitled to recover for the damages SGT Essex sustained.

### The Garrett Fant Family

1326.   Specialist Garrett Fant served in Afghanistan as a member of the U.S. Army. On September 26, 2011, SPC Fant was injured in an IED attack in Helmand Province, Afghanistan. SPC Fant died on September 26, 2011 as a result of injuries sustained during the attack.

1327.   The attack was committed by the Taliban.

1328.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1329.   SPC Fant's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1330.   SPC Fant was a national of the United States at the time of the attack and his death.

1331.   As a result of the September 26, 2011 attack, SPC Fant was injured in his person and/or property. The Plaintiff members of the Fant Family are the survivors and/or heirs of SPC Fant and are entitled to recover for the damages SPC Fant sustained.

### The Thomas Fogarty Family

1332.    Staff Sergeant Thomas Fogarty served in Afghanistan as a member of the U.S. Army. On May 6, 2012, SSG Fogarty was injured in an IED attack in Paktia Province, Afghanistan. SSG Fogarty died on May 6, 2012 as a result of injuries sustained during the attack.

1333.    The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1334.    On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1335.    SSG Fogarty's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1336.    SSG Fogarty was a national of the United States at the time of the attack and his death.

1337.    As a result of the May 6, 2012 attack, SSG Fogarty was injured in his person and/or property. The Plaintiff members of the Fogarty Family are the survivors and/or heirs of SSG Fogarty and are entitled to recover for the damages SSG Fogarty sustained.

### The Michael Fox Family

1338.   Plaintiff Corporal Michael Fox served in Afghanistan as a member of the U.S. Marine Corps. On November 15, 2011, Cpl Fox was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Fox, who suffered an amputation below the left knee, an amputation of the right leg through the knee, left arm, wrist, and hand fractures, and a perforated eardrum. As a result of the November 15, 2011 attack and his injuries, Cpl Fox has experienced severe physical and emotional pain and suffering.

1339.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1340.   The attack was committed by the Taliban.

1341.   The attack that injured Cpl Fox would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1342.   Cpl Fox was a national of the United States at the time of the attack, and remains one to this day.

1343.   As a result of the November 15, 2011 attack and Cpl Fox's injuries, each member of the Fox Family has experienced severe mental anguish, emotional pain and suffering.

### **The Jason Gibson Family**

1344.   Plaintiff Staff Sergeant Jason Gibson served in Afghanistan as a member of the U.S. Army. On May 30, 2012, SSG Gibson was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Gibson, who suffered an amputation of the right index finger, a skin graft on the right forearm, and a bilateral hip disarticulation (amputated at hip on both sides lacking femurs). As a result of the May 30, 2012 attack and his injuries, SSG Gibson has experienced severe physical and emotional pain and suffering.

1345.   The attack was committed by the Taliban.

1346.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1347.   The attack that injured SSG Gibson would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1348.   SSG Gibson was a national of the United States at the time of the attack, and remains one to this day.

1349.   As a result of the May 30, 2012 attack and SSG Gibson's injuries, each member of the Gibson Family has experienced severe mental anguish, emotional pain and suffering.

**The William Gilbert Family**

1350.   Specialist William Gilbert served in Afghanistan as a member of the U.S. Army. On May 14, 2013, SPC Gilbert was injured in an IED attack in Kandahar Province, Afghanistan. SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the attack.

1351.   The attack was committed by the Taliban.

1352.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1353.   SPC Gilbert's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1354.   SPC Gilbert was a national of the United States at the time of the attack and his death.

1355.   As a result of the May 14, 2013 attack, SPC Gilbert was injured in his person and/or property. The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

**The Paul Goins Jr. Family**

1356.   Mr. Paul Goins Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Goins was injured in an IED attack in

Kabul Province, Afghanistan. Mr. Goins died on February 10, 2014 as a result of injuries sustained during the attack.

1357.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1358.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1359.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1360.   Mr. Goins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1361.   Mr. Goins was a national of the United States at the time of the attack and his death.

1362.   As a result of the February 10, 2014 attack, Mr. Goins was injured in his person and/or property. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

**The Jonathan Gollnitz Family**

1363.   Sergeant Jonathan Gollnitz served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SGT Gollnitz was injured in a suicide bombing attack in Logar Province, Afghanistan. SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the attack.

1364.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1365.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1366.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban

terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1367.   SGT Gollnitz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1368.   SGT Gollnitz was a national of the United States at the time of the attack and his death.

1369.   As a result of the September 26, 2012 attack, SGT Gollnitz was injured in his person and/or property. The Plaintiff members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

### The Brittany Gordon Family

1370.   Specialist Brittany Gordon served in Afghanistan as a member of the U.S. Army. On October 13, 2012, SPC Gordon was injured in an IED attack in Zabul Province, Afghanistan. SPC Gordon died on October 13, 2012 as a result of injuries sustained during the attack.

1371.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1372.   On information and belief, the bomb that the Haqqani Network detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Haqqani Network by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1373.   SPC Gordon's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1374.   SPC Gordon was a national of the United States at the time of the attack and her death.

1375.   As a result of the October 13, 2012 attack, SPC Gordon was injured in her person and/or property. The Plaintiff members of the Gordon Family are the survivors and/or heirs of SPC Gordon and are entitled to recover for the damages SPC Gordon sustained.

**The Douglas Green Family**

1376.   Specialist Douglas Green served in Afghanistan as a member of the U.S. Army. On August 28, 2011, SPC Green was injured in an IED attack in Kandahar Province, Afghanistan. SPC Green died on August 28, 2011 as a result of injuries sustained during the attack.

1377.   The attack was committed by the Taliban.

1378.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1379.   SPC Green's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1380.   SPC Green was a national of the United States at the time of the attack and his death.

1381.   As a result of the August 28, 2011 attack, SPC Green was injured in his person and/or property. The Plaintiff members of the Green Family are the survivors and/or heirs of SPC Green and are entitled to recover for the damages SPC Green sustained.

### The Travis Green Family

1382.   Plaintiff Gunnery Sergeant Travis Green served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2011, GySgt Green was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded GySgt Green, who lost both of his legs, suffered a traumatic brain injury and micro bleeds, and suffers from post-traumatic stress disorder. As a result of the September 15, 2011 attack and his injuries, GySgt Green has experienced severe physical and emotional pain and suffering.

1383.   The attack was committed by the Taliban.

1384.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1385.   The attack that injured GySgt Green would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1386.   GySgt Green was a national of the United States at the time of the attack, and remains one to this day.

1387.   As a result of the September 15, 2011 attack and GySgt Green's injuries, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering.

### The Kevin Griffin Family

1388.   Command Sergeant Major Kevin Griffin served in Afghanistan as a member of the U.S. Army. On August 8, 2012, CSM Griffin was injured in a suicide bombing attack in Kunar Province, Afghanistan. CSM Griffin died on August 8, 2012 as a result of injuries sustained during the attack.

1389.   The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1390.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1391.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda

bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1392.   CSM Griffin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1393.   CSM Griffin was a national of the United States at the time of the attack and his death.

1394.   As a result of the August 8, 2012 attack, CSM Griffin was injured in his person and/or property. The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

**The Jeremy Hardison Family**

1395.   Sergeant Jeremy Hardison served in Afghanistan as a member of the U.S. Army National Guard. On October 1, 2012, SGT Hardison was injured in a suicide bombing attack by an individual wearing an Afghan police uniform in Khost Province, Afghanistan. SGT Hardison died on October 1, 2012 as a result of injuries sustained during the attack.

1396.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1397.   On information and belief, the suicide bomber who detonated the bomb during the attack was: (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and

procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1398.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1399.   SGT Hardison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was improperly wearing the uniform of his enemy, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public market.

1400.   SGT Hardison was a national of the United States at the time of the attack and his death.

1401.   As a result of the October 1, 2012 attack, SGT Hardison was injured in his person and/or property. The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

**The Scott Harper Family**

1402.   Lance Corporal Scott Harper served in Afghanistan as a member of the U.S. Marine Corps. On October 13, 2011, LCpl Harper was injured in an IED attack in Helmand Province, Afghanistan. LCpl Harper died on October 13, 2011 as a result of injuries sustained during the attack.

1403.   The attack was committed by the Taliban.

1404.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1405.   LCpl Harper's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1406.   LCpl Harper was a national of the United States at the time of the attack and his death.

1407.   As a result of the October 13, 2011 attack, LCpl Harper was injured in his person and/or property. The Plaintiff members of the Harper Family are the survivors and/or heirs of LCpl Harper and are entitled to recover for the damages LCpl Harper sustained.

**Adam Hartswick**

1408.   Plaintiff Sergeant Adam Hartswick served in Afghanistan as a member of the U.S. Army. On May 14, 2013, SGT Hartswick was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT Hartswick, who suffered a double amputation above the knee, a traumatic brain injury, perforated eardrums, a broken hip, an amputation of his right index finger, a partial amputation of his right thumb, and muscle avulsion of the right

forearm. As a result of the May 14, 2013 attack and his injuries, SGT Hartswick has experienced severe physical and emotional pain and suffering.

1409.   The attack was committed by the Taliban.

1410.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1411.   The attack that injured SGT Hartswick would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1412.   SGT Hartswick was a national of the United States at the time of the attack, and remains one to this day.

**The Jay Henigan Family**

1413.   Mr. Jay Henigan served in Afghanistan as a civilian government contractor working for the CIA. On September 25, 2011, Mr. Henigan was injured in an insider attack in Kabul Province, Afghanistan. Mr. Henigan died on September 25, 2011 as a result of injuries sustained during the attack.

1414.   The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at

the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1415.    The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1416.    Mr. Henigan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1417.    Mr. Henigan was a national of the United States at the time of the attack and his death.

1418.    As a result of the attack, Mr. Henigan was injured in his person and/or property. The Plaintiff members of the Henigan Family are the survivors and/or heirs of Mr. Henigan and are entitled to recover for the damages Mr. Henigan sustained.

1419.    As a result of the September 25, 2011 attack and Mr. Henigan's injuries and death, each member of the Henigan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Henigan's society, companionship, and counsel.

**Kevin Honaker**

1420.    Plaintiff Lance Corporal Kevin Honaker served in Afghanistan as a member of the U.S. Marine Corps. On September 13, 2011, LCpl Honaker was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded LCpl Honaker, who lost his left leg above the knee, his right leg below the knee, and a finger on his left hand. As a result of the

September 13, 2011 attack and his injuries, LCpl Honaker has experienced severe physical and emotional pain and suffering.

1421.   The attack was committed by the Taliban.

1422.   On information and belief, the bomb that the Taliban detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1423.   The attack that injured LCpl Honaker would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1424.   LCpl Honaker was a national of the United States at the time of the attack, and remains one to this day.

**The Christopher Horns Family**

1425.   Private First Class Christopher Horns served in Afghanistan as a member of the U.S. Army. On October 22, 2011, PFC Horns was injured in an IED attack in Kandahar Province, Afghanistan. PFC Horns died on October 22, 2011 as a result of injuries sustained during the attack.

1426.   The attack was committed by the Taliban.

1427.   On information and belief, the bomb that the Taliban detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda

bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1428.   PFC Horns's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1429.   PFC Horns was a national of the United States at the time of the attack and his death.

1430.   As a result of the October 22, 2011 attack, PFC Horns was injured in his person and/or property. The Plaintiff members of the Horns Family are the survivors and/or heirs of PFC Horns and are entitled to recover for the damages PFC Horns sustained.

**The Justin Horsley Family**

1431.   Specialist Justin Horsley served in Afghanistan as a member of the U.S. Army. On July 22, 2012, SPC Horsley was injured in an IED attack in Logar Province, Afghanistan. SPC Horsley died on July 22, 2012 as a result of injuries sustained during the attack.

1432.   The attack was committed by the Haqqani Network, a part of the Taliban.

1433.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1434.   SPC Horsley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1435.   SPC Horsley was a national of the United States at the time of the attack and his death.

1436.   As a result of the July 22, 2012 attack, SPC Horsley was injured in his person and/or property. The Plaintiff members of the Horsley Family are the survivors and/or heirs of SPC Horsley and are entitled to recover for the damages SPC Horsley sustained.

**The Michael Hughes Family**

1437.   Mr. Michael Hughes served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Hughes was injured in an IED attack in Kabul Province, Afghanistan. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the attack.

1438.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1439.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons

supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1440.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1441.   Mr. Hughes's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1442.   Mr. Hughes was a national of the United States at the time of the attack and his death.

1443.   As a result of the 10, 2014 attack, Mr. Hughes was injured in his person and/or property. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

**The Eric Hunter Family**

1444.   Plaintiff Sergeant Eric Hunter served in Afghanistan as a member of the U.S. Army. On May 31, 2012, SGT Hunter was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded SGT Hunter, who lost his right leg and suffered from a severely injured left leg, post-traumatic stress disorder, and a traumatic brain injury. As a result

of the May 31, 2012 attack and his injuries, SGT Hunter has experienced severe physical and emotional pain and suffering.

1445. The attack was committed by the Taliban.

1446. On information and belief, the bomb that the Taliban detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1447. The attack that injured SGT Hunter would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk

1448. SGT Hunter was a national of the United States at the time of the attack, and remains one to this day.

1449. As a result of the May 31, 2012 attack and SGT Hunter's injuries, each member of the Hunter Family has experienced severe mental anguish, emotional pain and suffering.

**The Tyler Iubelt Family**

1450. Private First Class Tyler Iubelt served in Afghanistan as a member of the U.S. Army. On November 12, 2016, PFC Iubelt was injured in a suicide bombing attack in Parwan Province, Afghanistan. PFC Iubelt died on November 12, 2016 as a result of injuries sustained during the attack.

1451.  The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1452.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1453.  On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1454.  PFC Iubelt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack were unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1455.  PFC Iubelt was a national of the United States at the time of the attack and his death.

1456.   As a result of the November 12, 2016 attack, PFC Iubelt was injured in his person and/or property. The Plaintiff members of the Iubelt Family are the survivors and/or heirs of PFC Iubelt and are entitled to recover for the damages PFC Iubelt sustained.

**Bradley Ivanchan**

1457.   Plaintiff Corporal Bradley Ivanchan served in Afghanistan as a member of the U.S. Marine Corps. On June 13, 2012, Cpl Ivanchan was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Ivanchan, who suffers from bilateral amputation of both legs, traumatic brain injury, damage to his left hand, and other severe injuries. As a result of the June 13, 2012 attack and his injuries, Cpl Ivanchan has experienced severe physical and emotional pain and suffering.

1458.   The attack was committed by the Taliban.

1459.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1460.   The attack that injured Cpl Ivanchan would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1461.   Cpl Ivanchan was a national of the United States at the time of the attack, and remains one to this day.

**The Ryan Jayne Family**

1462.   Specialist Ryan Jayne served in Afghanistan as a member of the U.S. Army Reserve. On November 3, 2012, SPC Jayne was injured in an IED attack in Paktia Province, Afghanistan. SPC Jayne died on November 3, 2012 as a result of injuries sustained during the attack.

1463.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1464.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1465.   SPC Jayne's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1466.   SPC Jayne was a national of the United States at the time of the attack and his death.

1467.   As a result of the November 3, 2012 attack, SPC Jayne was injured in his person and/or property. The Plaintiff members of the Jayne Family are the survivors and/or heirs of SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

**Brian Jergens**

1468.   Plaintiff Sergeant Brian Jergens served in Afghanistan as a member of the U.S. Army. On August 7, 2011, SGT Jergens was injured in an IED attack in Uruzgan Province, Afghanistan. The attack severely wounded SGT Jergens, who suffered from the loss of both legs below the knee, the removal of his spleen, abdominal injuries, a cracked vertebra, a broken arm, and the loss of his ring finger on his left hand. As a result of the August 7, 2011 attack and his injuries, SGT Jergens has experienced severe physical and emotional pain and suffering.

1469.   The attack was committed by the Taliban.

1470.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1471.   The attack that injured SGT Jergens would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1472.   SGT Jergens was a national of the United States at the time of the attack, and remains one to this day.

**Terence Jones**

1473.   Plaintiff Specialist Terence Jones served in Afghanistan as a member of the U.S. Army. On February 7, 2012, SPC Jones was injured in an IED attack in Kandahar Province,

Afghanistan. The attack severely wounded SPC Jones, who suffered the loss of both legs, the partial loss of use of his left arm, and a partial penial amputation. As a result of the February 7, 2012 attack and his injuries, SPC Jones has experienced severe physical and emotional pain and suffering.

1474.   The attack was committed by the Taliban.

1475.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1476.   The attack that injured SPC Jones would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1477.   SPC Jones was a national of the United States at the time of the attack, and remains one to this day.

**The Alexis Kamerman Family**

1478.   Ms. Alexis Leigh Kamerman served in Afghanistan as a civilian educator with American University of Afghanistan. On January 17, 2014, Ms. Kamerman was injured in a complex attack involving a suicide bomber and gunmen in Kabul Province, Afghanistan. Ms. Kamerman died on January 17, 2014 as a result of injuries sustained during the attack.

1479.   The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1480.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1481.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1482.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1483.   Ms. Kamerman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, she was a civilian not taking part in hostilities and was killed while eating at a restaurant.

1484.   Ms. Kamerman was a national of the United States at the time of the attack and her death.

1485.   As a result of the attack, Ms. Kamerman was injured in her person and/or property. The Plaintiff members of the Kamerman Family are the survivors and/or heirs of Ms. Kamerman and are entitled to recover for the damages Ms. Kamerman sustained.

1486.   As a result of the January 17, 2014 attack and Ms. Kamerman's injuries and death, each member of the Kamerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Kamerman's society, companionship, and counsel.

### The Kevin King Family

1487.   Plaintiff Mr. Kevin King served in Afghanistan as a civilian professor teaching at American University of AFG. On August 7, 2016, Mr. King was kidnapped at gunpoint just outside the front gates of American University of Afghanistan. Mr. King was held hostage under deplorable conditions, beaten frequently, and denied adequate medical care for over three years before being released in a prisoner exchange on November 19, 2019. The attack severely wounded Mr. King, and he has suffered from severe caloric malnutrition, muscle atrophy, peripheral neuropathy, hypocalcemia, vitamin D deficiency, low bone mineral density, hyperparathyroidism, frostbite on feet and ankles, a weak bladder, and other physical injuries due to repeated beatings. As a result of the August 7, 2016 attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering.

1488.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1489.   On information and belief, the attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Syndicate's kidnapping operations in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.  Among other motivations, Sirajuddin Haqqani sought to kidnap Americans so that he would have a hostage to trade for key Haqqani Network leaders who were in U.S. custody, including, but not limited to, one or more members of the Haqqani family.

1490.   The attack that injured Mr. King would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian college professor not taking part in hostilities and was tortured during captivity, and the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1491.   Mr. King was a national of the United States at the time of the attack, and remains one to this day.

1492.   As a result of the August 7, 2016 attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

**The Edward Klein Family**

1493.   Plaintiff Major Edward Klein served in Afghanistan as a member of the U.S. Army. On October 22, 2012, MAJ Klein was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded MAJ Klein, who lost both legs above the knee, his

right arm, and three fingers on his left hand. As a result of the October 22, 2012 attack and his injuries, MAJ Klein has experienced severe physical and emotional pain and suffering.

1494.    The attack was committed by the Taliban.

1495.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1496.    The attack that injured MAJ Klein would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1497.    MAJ Klein was a national of the United States at the time of the attack, and remains one to this day.

1498.    As a result of the October 22, 2012 attack and MAJ Klein's injuries, each member of the Klein Family has experienced severe mental anguish, emotional pain and suffering.

**The Michael Knapp Family**

1499.    Sergeant Michael Knapp served in Afghanistan as a member of the U.S. Army. On May 18, 2012, SGT Knapp was injured in an indirect fire attack in Kunar Province, Afghanistan. SGT Knapp died on May 18, 2012 as a result of injuries sustained during the attack.

1500.   The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1501.   SGT Knapp's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1502.   SGT Knapp was a national of the United States at the time of the attack and his death.

1503.   As a result of the May 18, 2012 attack, SGT Knapp was injured in his person and/or property. The Plaintiff members of the Knapp Family are the survivors and/or heirs of SGT Knapp and are entitled to recover for the damages SGT Knapp sustained.

**Brandon Korona**

1504.   Plaintiff Sergeant Brandon Korona served in Afghanistan as a member of the U.S. Army. On June 23, 2013, SGT Korona was injured in an IED attack in Paktika Province, Afghanistan. The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below-knee amputation in 2017, a fractured right ankle, and a traumatic brain injury. As a result of the June 23, 2013 attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

1505.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1506.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1507.   The attack that injured SGT Korona would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1508.   SGT Korona was a national of the United States at the time of the attack, and remains one to this day.

**The Todd Lambka Family**

1509.   First Lieutenant Todd Lambka served in Afghanistan as a member of the U.S. Army. On August 1, 2012, 1LT Lambka was injured in an IED attack in Paktika Province, Afghanistan. 1LT Lambka died on August 1, 2012 as a result of injuries sustained during the attack.

1510.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1511.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1512.  1LT Lambka's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk

1513.  1LT Lambka was a national of the United States at the time of the attack and his death.

1514.  As a result of the August 1, 2012 attack, 1LT Lambka was injured in his person and/or property. The Plaintiff members of the Lambka Family are the survivors and/or heirs of 1LT Lambka and are entitled to recover for the damages 1LT Lambka sustained.

**The Jason Landphair Family**

1515.  Mr. Jason Landphair served in Afghanistan as a civilian government contractor working for Praetorian Standard Inc. On January 29, 2015, Mr. Landphair was injured in an insider attack in Kabul Province, Afghanistan. Mr. Landphair died on January 29, 2015 as a result of injuries sustained during the attack.

1516.  The attack was committed by the Taliban (including its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1517.  The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who

personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1518. Mr. Landphair's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1519. Mr. Landphair was a national of the United States at the time of the attack and his death.

1520. As a result of the January 29, 2015 attack, Mr. Landphair was injured in his person and/or property. The Plaintiff members of the Landphair Family are the survivors and/or heirs of Mr. Landphair and are entitled to recover for the damages Mr. Landphair sustained.

**The Brandon Landrum Family**

1521. First Lieutenant Brandon Landrum served in Afghanistan as a member of the U.S. Army. On May 4, 2013, 1LT Landrum was injured in an IED attack in Kandahar Province, Afghanistan. 1LT Landrum died on May 4, 2013 as a result of injuries sustained during the attack.

1522. The attack was committed by the Taliban.

1523. On information and belief, the bomb that the Taliban detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1524. 1LT Landrum's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1525. 1LT Landrum was a national of the United States at the time of the attack and his death.

1526. As a result of the May 4, 2013 attack, 1LT Landrum was injured in his person and/or property. The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages 1LT Landrum sustained.

**The David Lau Family**

1527. Plaintiff Sergeant First Class David Lau served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, SFC Lau was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings. As a result of the April 4, 2012 attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

1528. The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and t On information and belief, the suicide bomber who detonated the bomb during the attack was: (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics,

techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

1529.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1530.   The attack that injured SFC Lau would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1531.   SFC Lau was a national of the United States at the time of the attack, and remains one to this day.

1532.   As a result of the April 4, 2012 attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

**Eric Lund**

1533.   Plaintiff Sergeant Eric Lund served in Afghanistan as a member of the U.S. Army National Guard. On May 20, 2012, SGT Lund was injured in a complex attack involving two IEDs followed by small arms fire and rocket propelled grenades in Kandahar Province, Afghanistan. The attack severely wounded SGT Lund, who lost both of his arms above the

elbow, fractured his skull, broke his femur resulting in the loss of one inch of bone, broke his tibia, broke his back, and sustained a traumatic brain injury. As a result of the May 20, 2012 attack and his injuries, SGT Lund has experienced severe physical and emotional pain and suffering.

1534.   The attack was committed by the Taliban.

1535.   The attack that injured SGT Lund would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and indiscriminately placed civilians at risk.

1536.   SGT Lund was a national of the United States at the time of the attack, and remains one to this day.

**The Chase Marta Family**

1537.   Specialist Chase Marta served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SPC Marta was injured in an IED attack in Ghazni Province, Afghanistan. SPC Marta died on May 7, 2012 as a result of injuries sustained during the attack.

1538.   The attack was committed by the Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1539.    On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1540.   SPC Marta's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1541.   SPC Marta was a national of the United States at the time of the attack and his death.

1542.   As a result of the May 7, 2012 attack, SPC Marta was injured in his person and/or property. The Plaintiff members of the Marta Family are the survivors and/or heirs of SPC Marta and are entitled to recover for the damages SPC Marta sustained.

**The Ethan Martin Family**

1543.   Corporal Ethan Martin served in Afghanistan as a member of the U.S. Army. On August 7, 2012, CPL Martin was injured in an insider attack in Paktia Province, Afghanistan. CPL Martin died on August 7, 2012 as a result of injuries sustained during the attack.

1544.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1545.   CPL Martin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1546.   CPL Martin was a national of the United States at the time of the attack and his death.

1547.   As a result of the August 7, 2012 attack, CPL Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of CPL Martin and are entitled to recover for the damages CPL Martin sustained.

**The Wyatt Martin Family**

1548.   Specialist Wyatt Martin served in Afghanistan as a member of the U.S. Army. On December 12, 2014, SPC Martin was injured in an IED attack in Parwan Province, Afghanistan. SPC Martin died on December 12, 2014 as a result of injuries sustained during the attack.

1549.   The attack was committed by the Taliban.

1550.   On information and belief, the bomb that the Taliban detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1551.   SPC Martin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1552.   SPC Martin was a national of the United States at the time of the attack and his death.

1553.   As a result of the December 12, 2014 attack, SPC Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

**The Jose Martinez Hernandez Family**

1554.   Plaintiff Specialist Jose Martinez Hernandez served in Afghanistan as a member of the U.S. Army. On March 3, 2012, SPC Martinez Hernandez was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Martinez Hernandez, who suffered from the loss of both of his legs, the loss of his right arm, and a partial amputation of his left hand. As a result of the March 3, 2012 attack and his injuries, SPC Martinez Hernandez has experienced severe physical and emotional pain and suffering.

1555.   The attack was committed by the Taliban.

1556.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1557.   The attack that injured SPC Martinez Hernandez would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1558.   SPC Martinez Hernandez was a national of the United States at the time of the attack, and remains one to this day.

1559.   As a result of the March 3, 2012 attack and SPC Martinez Hernandez's injuries, each member of the Martinez Hernandez Family has experienced severe mental anguish, emotional pain and suffering.

### The Chester McBride III Family

1560.  Staff Sergeant Chester McBride III served in Afghanistan as a member of the U.S. Air Force. On December 21, 2015, SSgt McBride was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSgt McBride died on December 21, 2015 as a result of injuries sustained during the attack.

1561.  The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1562.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1563.  On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1564.  SSgt McBride's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1565.   SSgt McBride was a national of the United States at the time of the attack and his death.

1566.   As a result of the 21, 2015 attack, SSgt McBride was injured in his person and/or property. The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

**The Matthew McClintock Family**

1567.   Sergeant First Class Matthew McClintock served in Afghanistan as a member of the U.S. Army National Guard. On January 5, 2016, SFC McClintock was injured in a complex attack involving small arms fire in Helmand Province, Afghanistan. SFC McClintock died on January 5, 2016 as a result of injuries sustained during the attack.

1568.   The attack was committed by the Taliban.

1569.   SFC McClintock's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1570.   SFC McClintock was a national of the United States at the time of the attack and his death.

1571.   As a result of the January 5, 2016 attack, SFC McClintock was injured in his person and/or property. The Plaintiff members of the McClintock Family are the survivors and/or heirs of SFC McClintock and are entitled to recover for the damages SFC McClintock sustained.

**The Richard McEvoy Family**

1572.   Mr. Richard McEvoy served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. McEvoy was injured in a suicide bombing

attack in Kabul Province, Afghanistan. Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the attack.

1573.  The attack was committed by the Taliban (including its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1574.  The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1575.  On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1576.  On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1577.   Mr. McEvoy's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1578.   Mr. McEvoy was a national of the United States at the time of the attack and his death.

1579.   As a result of the August 22, 2015 attack, Mr. McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

### The Richard McNulty III Family

1580.   Private First Class Richard McNulty III served in Afghanistan as a member of the U.S. Army. On May 13, 2012, PFC McNulty was injured in an IED attack in Khost Province, Afghanistan. PFC McNulty died on May 13, 2012 as a result of injuries sustained during the attack.

1581.   The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1582.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1583.   PFC McNulty's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1584.   PFC McNulty was a national of the United States at the time of the attack and his death.

1585.   As a result of the May 13, 2012 attack, PFC McNulty was injured in his person and/or property. The Plaintiff members of the McNulty Family are the survivors and/or heirs of PFC McNulty and are entitled to recover for the damages PFC McNulty sustained.

**The Dale Means Family**

1586.   Lance Corporal Dale Means served in Afghanistan as a member of the U.S. Marine Corps. On November 18, 2012, LCpl Means was injured in an IED attack in Helmand Province, Afghanistan. LCpl Means died on November 18, 2012 as a result of injuries sustained during the attack.

1587.   The attack was committed by the Taliban.

1588.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1589.   LCpl Means's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1590.   LCpl Means was a national of the United States at the time of the attack and his death.

1591.   As a result of the November 18, 2012 attack, LCpl Means was injured in his person and/or property. The Plaintiff members of the Means Family are the survivors and/or heirs of LCpl Means and are entitled to recover for the damages LCpl Means sustained.

**The Michael Metcalf Family**

1592.   Private First Class Michael Metcalf served in Afghanistan as a member of the U.S. Army. On April 22, 2012, PFC Metcalf was injured in an IED attack in Ghazni Province, Afghanistan. PFC Metcalf died on April 22, 2012 as a result of injuries sustained during the attack.

1593.   The attack was committed by the Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1594.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1595.   PFC Metcalf's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1596.   PFC Metcalf was a national of the United States at the time of the attack and his death.

1597.   As a result of the April 22, 2012 attack, PFC Metcalf was injured in his person and/or property. The Plaintiff members of the Metcalf Family are the survivors and/or heirs of PFC Metcalf and are entitled to recover for the damages PFC Metcalf sustained.

**The Jonathan Metzger Family**

1598.   Staff Sergeant Jonathan Metzger served in Afghanistan as a member of the U.S. Army National Guard. On January 6, 2012, SSG Metzger was injured in an IED attack in Kandahar Province, Afghanistan. SSG Metzger died on January 6, 2012 as a result of injuries sustained during the attack.

1599.   The attack was committed by the Taliban.

1600.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1601.   SSG Metzger's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1602.   SSG Metzger was a national of the United States at the time of the attack and his death.

1603.   As a result of the January 6, 2012 attack, SSG Metzger was injured in his person and/or property. The Plaintiff members of the Metzger Family are the survivors and/or heirs of SSG Metzger and are entitled to recover for the damages SSG Metzger sustained.

**The Eugene Mills III Family**

1604.   Lance Corporal Eugene Mills III served in Afghanistan as a member of the U.S. Marine Corps. On June 22, 2012, LCpl Mills was injured in a sniper attack in Helmand Province, Afghanistan. LCpl Mills died on June 22, 2012 as a result of injuries sustained during the attack.

1605.   The attack was committed by the Taliban.

1606.   LCpl Mills's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1607.   LCpl Mills was a national of the United States at the time of the attack and his death.

1608.   As a result of the June 22, 2012 attack, LCpl Mills was injured in his person and/or property. The Plaintiff members of the Mills Family are the survivors and/or heirs of LCpl Mills and are entitled to recover for the damages LCpl Mills sustained.

### The Travis Morgado Family

1609.   Second Lieutenant Travis Morgado served in Afghanistan as a member of the U.S. Army. On May 23, 2012, 2LT Morgado was injured in an IED attack in Kandahar Province, Afghanistan. 2LT Morgado died on May 23, 2012 as a result of injuries sustained during the attack.

1610.   The attack was committed by the Taliban.

1611.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1612.   2LT Morgado's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1613.   2LT Morgado was a national of the United States at the time of the attack and his death.

1614.   As a result of the May 23, 2012 attack, 2LT Morgado was injured in his person and/or property. The Plaintiff members of the Morgado Family are the survivors and/or heirs of 2LT Morgado and are entitled to recover for the damages 2LT Morgado sustained.

### The Jedidiah Morgan Family

1615.   Plaintiff Corporal Jedidiah Morgan served in Afghanistan as a member of the U.S. Marine Corps. On June 20, 2012, Cpl Morgan was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Morgan, who suffered the loss of both legs above the knee and the loss of the use of his right hand (due to the loss of muscle and nerves which makes him unable to open it). As a result of the June 20, 2012 attack and his injuries, Cpl Morgan has experienced severe physical and emotional pain and suffering.

1616.   The attack was committed by the Taliban.

1617.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1618.   The attack that injured Cpl Morgan would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1619.   Cpl Morgan was a national of the United States at the time of the attack, and remains one to this day.

1620.   As a result of the June 20, 2012 attack and Cpl Morgan's injuries, each member of the Morgan Family has experienced severe mental anguish, emotional pain and suffering.

### The Sean Mullen Family

1621.    Warrant Officer Sean Mullen served in Afghanistan as a member of the U.S. Army. On June 2, 2013, WO1 Mullen was injured in an IED attack in Helmand Province, Afghanistan. WO1 Mullen died on June 2, 2013 as a result of injuries sustained during the attack.

1622.    The attack was committed by the Taliban.

1623.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1624.    WO1 Mullen's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1625.    WO1 Mullen was a national of the United States at the time of the attack and his death.

1626.    As a result of the June 2, 2013 attack, WO1 Mullen was injured in his person and/or property. The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.