# 23-132

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

◆◆◆

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY, TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER,

*(Caption continued on inside cover)*

On Appeal from the United States District Court
for the Eastern District of New York
(No. 1:21-cv-04400) (The Hon. Hector Gonzalez)

## BRIEF FOR APPELLEES

BRIAN T. FRAWLEY
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Danske Bank A/S*

DAVID G. JANUSZEWSKI
SHEILA C. RAMESH
SESI V. GARIMELLA
MILES WILEY
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3352

*Counsel for Deutsche Bank
Aktiengesellschaft and Deutsche
Bank Trust Company Americas*

JEFFREY B. WALL
JUDSON O. LITTLETON
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
(202) 956-7500

SHARON L. NELLES
ANDREW J. FINN
BRADLEY P. SMITH
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Standard Chartered Bank,
Standard Chartered PLC, and Standard
Chartered Bank (Pakistan) Limited*

PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FEDERICK C. BENSON, BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER, MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL, RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER, TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD, PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE, PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS, LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ, FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE, KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE, PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS, JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS, CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM, DONNA LEE ELM,

MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX,  MARION RUTH
HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH
HIS NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS
NEXT FRIEND, STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA
FOX, MICHAEL FESTUS FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH
HIS NEXT FRIEND, KARA GIBSON, KARA GIBSON, JESSICA ANNE BENSON,
JOANNA GILBERT, EMMITT DWAYNE BURNS, JANICE CARUSO, PAUL EDWARD
GOINS, III, PATRICIA GOINS, DANA RAINEY, L. C. D., BY AND THROUGH HIS
NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW GOLLNITZ, TYLER
GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK GORDON, ADRIAN
KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN CARACCIOLO,
SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY ANDERSON,
GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN,
DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY
HARDISON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA
HARDISON, SHEILA RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE,
ANGELA MARIE HARPER, BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM
SAMUEL HARTSWICK, ALEX HENIGAN, KEVIN HONAKER, LARRY D. HORNS,
TAMARA ELAINE HORNS, TIFFANY LOUISE HORNS, BENJAMIN HORSLEY,
SONGMI KIETZMANN, KATHLEEN LYNN ALEXANDER, DANIEL OWEN HUGHES,
PATRICIA SHIRLEY HUGHES, KRISTINE ANNE ZITNY, BETTY DARLENE
BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M. HUNTER, KENNA
HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT, SHELBY
IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT,
CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND,
CHARLOTTE LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE,
AYZIA J. JAYNE, PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT
FRIEND, KENT ALAN SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS,
TRENT LORNE SKEENS, Z. R. S., BY AND THROUGH HER NEXT FRIEND, KENT
ALAN SKEENS, BRIAN CHRISTOPHER JERGENS, TERENCE LONNIE JONES,
JOHN C. MCCARTHY, ALISON R. POHN, KEVIN KING, STEPHANIE ANN
MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY AND THROUGH HER
NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN LAMBKA,
JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR, MEREDITH
LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA
LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT
FRIEND MIRANDA LANDRUM, JAMES R. LANDRUM,  JANET LANDRUM,
MIRANDA LANDRUM, HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR.,

ALEXANDER LAU, DAVID WILLIAM HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G. MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L. MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK CHARLES MCEVOY, JANICE H. PROCTOR, LUANN VARNEY, SHANNON K. MCNULTY, JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J. METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS, NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L. OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS, TRACY ANNE HERRING, ADAN PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ, B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ, S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY, KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS W. PETERS, G.R.P., BY AND THROUGH HIS NEXT FRIEND, ASHLEY PETERS, CHRISTINE H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS, BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL

PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ, SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LeeAnn SCHMIDT, NATALIE SCHMIDT, PHILLIP J. SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY, LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS, GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS, LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE, GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY, FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN, NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE, CHRISTOPHER MICHAEL VAN ETTEN,

CATHERINE KIMBERLY VAUGHN KRYZDA, C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L. WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN, KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART LAMAR PERRY, AARON WILLIAM PRESCOTT,

*Plaintiffs-Appellants*,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST, KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R., BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY STRANGE, KEVIN WILLIAMS,

*Plaintiffs*,

–v.–

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY
AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC,
STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

*Defendants-Appellees*,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD
CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN
BRANCH, DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH,
PLACID NK CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE
LLC,

*Defendants*.

## CORPORATE DISCLOSURE STATEMENT

Standard Chartered PLC has no parent company, and no publicly held corporation owns 10% or more of its stock. Standard Chartered Bank is a subsidiary of Standard Chartered Holdings Limited, which operates as a subsidiary of Standard Chartered PLC. Standard Chartered Bank (Pakistan) Ltd. is a direct subsidiary of Standard Chartered Bank.

Deutsche Bank Aktiengesellschaft has no parent company, and no publicly held corporation owns 10% or more of its stock. Deutsche Bank Trust Company Americas is a subsidiary of Deutsche Bank Trust Corporation, which is a wholly owned subsidiary of DB USA Corporation, a holding company owned by Deutsche Bank Aktiengesellschaft.

Danske Bank A/S has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................1

COUNTERSTATEMENT OF THE ISSUES ........................5

COUNTERSTATEMENT OF THE CASE..........................6

    A.    Statutory Background ..............................................6

    B.    Plaintiffs' Allegations.............................................8

        1.    Standard Chartered Bank ...................................10

        2.    Deutsche Bank .................................................14

        3.    Danske Bank ...................................................15

    C.    Procedural History ...............................................16

SUMMARY OF ARGUMENT....................................................18

ARGUMENT ...................................................................23

I.    PLAINTIFFS FAIL TO STATE A CLAIM THAT THE BANKS AIDED AND ABETTED THE TERRORIST ATTACKS THAT INJURED THEM ...................................23

    A.    Plaintiffs Fail To Allege That The Banks Knowingly And Substantially Assisted The Particular Acts Of Terrorism That Harmed Plaintiffs ..............................................25

        1.    The ATA requires conscious, culpable conduct that aids particular terrorist acts....................................26

        2.    Plaintiffs do not allege that the banks consciously and culpably aided particular terrorist acts .......................32

        3.    *Halberstam*'s factors confirm that the banks did not consciously and culpably aid particular terrorist acts........40

B. Plaintiffs Fail To Allege That The Banks Were "Generally Aware" Of Their Role In Relevant Terrorist Activity ................. 44

  1. SCB defendants ..................................................... 48

  2. Deutsche Bank defendants .................................... 57

  3. Danske Bank defendants ...................................... 62

II. PLAINTIFFS FAIL TO STATE A CLAIM THAT THE BANKS AIDED AND ABETTED A BROADER RACKETEERING ENTERPRISE OF DISPARATE TERRORIST GROUPS .............................................................. 64

CONCLUSION ................................................................................ 66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arista Records, LLC* v. *Doe 3*,
604 F.3d 110 (2d Cir. 2010) ..................................................52

*Atchley* v. *AstraZeneca UK Ltd.*,
22 F.4th 204 (2022)..............................................................24

*Bernhardt* v. *Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) ..............................................45

*Bonacasa* v. *Standard Chartered PLC*,
2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023)................................57

*Halberstam* v. *Welch*,
705 F.2d 472 (D.C. Cir. 1983)........................................*passim*

*Henderson* v. *United States*,
568 U.S. 266 (2013)..............................................................27

*Honickman* v. *BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021)...........................................*passim*

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ......................................29, 35, 36, 52

*Landy* v. *FDIC*,
486 F.2d 139 (3d Cir. 1973) ..............................................30, 31

*Linde* v. *Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ................................................45

*Monsen* v. *Consolidated Dressed Beef Co.*,
579 F.2d 793 (3d Cir. 1978) ..............................................30, 31

*Ofisi* v. *BNP Paribas, S.A.*,
__ F.4th __, 2023 WL 4378213 (D.C. Cir. 2023) ......................40

*Rothstein* v. *UBS AG*,
708 F.3d 82 (2d Cir. 2013) ...................................................6

*Siegel* v. *HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019) .......................................*passim*

*Taamneh* v. *Twitter, Inc.*,
  343 F. Supp. 3d 904 (N.D. Cal. 2018) ........................................... 65

*Thorpe* v. *Housing Auth. of Durham*,
  393 U.S. 268 (1969) ............................................................................ 4

*Twitter, Inc.* v. *Taamneh*,
  143 S. Ct. 1206 (2023) ............................................................ *passim*

**Statutes**

18 U.S.C. § 2333(a) ................................................................................ 6

18 U.S.C. § 2333(d)(2) ................................................................. *passim*

Pub. L. No. 114-222, 130 Stat. 852 (JASTA) ............................. 6, 7, 8

**Other Authorities**

Federal Rule of Civil Procedure 8 ..................................................... 17

FDIC, *Risk Management Manual of Examination Policies* .................... 36

**INTRODUCTION**

Plaintiffs and their family members were the victims of heinous terrorist attacks committed by terrorist groups including al-Qaeda, the Taliban, and the Haqqani Network.  Those attacks represent the worst of humanity, and Standard Chartered Bank, Deutsche Bank, and Danske Bank unequivocally condemn them.  But just as unequivocally, those institutions did not aid and abet the attacks in violation of the Antiterrorism Act (ATA).  That statute reserves aiding-and-abetting liability for "truly culpable conduct," "lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions."  *Twitter, Inc.* v. *Taamneh*, 143 S. Ct. 1206, 1221, 1222 (2023).

That is precisely what plaintiffs are seeking here.  With all respect, their complaint is more a piece of sensationalist prose than a legal pleading.  They claim that al-Qaeda and other terrorist groups form a vast criminal network called the Syndicate, and that the defendant banks "worked with a number of other individuals and organizations who were, sometimes tangentially, involved with" the Syndicate.  S.A. 6-7.  As the district court observed, "[d]espite its length—173,603 words spread out over 596 pages and 2,045 paragraphs—the [c]omplaint is less a novel, and more a series of vignettes

describing a wide range of criminal activity." S.A. 10. In a thorough 61-page decision, the district court explained why none of those vignettes "sufficiently allege[s]" that the banks were "ever aware of any of these connections" or "substantially helped these criminal players." *Id.* (internal quotation marks omitted). The court thus dismissed the plaintiffs' claims across the board.

To be more specific, aiding-and-abetting liability under the ATA requires both that "the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity" from which the terrorist's "attacks were foreseeable," and "the defendant must *knowingly and substantially assist* the principal violation." *Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 494, 499 (2d Cir. 2021) (internal quotation marks omitted). Here, the district court held that the complaint does not adequately plead either element. It does not plead that the banks were generally aware of their own role in terrorist conduct that would foreseeably lead to the specific attacks at issue. And it does not plead that the banks consciously and materially assisted those attacks. The district court carefully parsed the complaint and correctly concluded that it does not make up in length what it lacks in substance.

That conclusion was right then, and it is undeniable now. After the district court's decision, the Supreme Court addressed the element of knowing

-2-

and substantial assistance in *Twitter*, and unanimously rejected claims less attenuated than the ones here in a decision that limits the scope of aiding-and-abetting liability under the ATA.  In *Twitter*, the plaintiffs were victims of a terrorist attack committed by ISIS at the Reina nightclub in Istanbul.  They sued social-media companies under the ATA, alleging that the companies had aided and abetted ISIS by knowingly allowing ISIS to use their platforms and recommendation algorithms in order to fundraise and radicalize new recruits. 143 S. Ct. at 1216.  In considering those kinds of claims, this Court has looked to the factors in *Halberstam* v. *Welch*, 705 F.2d 472 (D.C. Cir. 1983), which is what the district court did here.  *See* S.A. 16-18, 34-36, 45-47, 50-52; *Honickman*, 6 F.4th at 500-501.

The Supreme Court in *Twitter* made clear that the "legal framework" of *Halberstam* and the "elements and factors articulated" in that case are not a test in themselves.  143 S. Ct. at 1223, 1225.  They are relevant insofar as they answer the "fundamental question of aiding-and-abetting liability":  whether the defendants "consciously, voluntarily, and culpably participate[d] in or support[ed] the relevant wrongdoing."  *Id*. at 1230.  As the Court explained, that question carries two requirements.  First, the defendant's assistance must be "conscious and culpable"—that is, it must be conducted with the requisite

"scienter." *Id.* at 1222. Second, a defendant must have "participated in [the] wrongful act." *Id.* (alterations omitted). In other words, there must be a concrete "nexus" between the defendant's conduct and the specific terrorist attacks that injured the plaintiffs. *Id.* at 1225-1226.

*Twitter* clarifies the governing legal standard that applies to this case. *See, e.g.*, *Thorpe* v. *Housing Auth. of Durham*, 393 U.S. 268, 281 (1969) ("The general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision."). Applying that standard here, it is clear that plaintiffs' claims fail. Their complaint does not (and could not) plead that the banks consciously and culpably acted to aid the particular bombings at issue in Afghanistan in the early 2010s. Rather, plaintiffs' theory at bottom is that the banks should have been on notice that some of their non-terrorist customers were aiding terrorists, and the banks should have stopped providing services to those customers. That theory is at least one step removed from the claims that the Supreme Court rejected in *Twitter*, and the Court even used it as an example of what the ATA does not permit. *See* 143 S. Ct. at 1217-1218, 1222.

In the end, plaintiffs cannot satisfy any standard for aiding-and-abetting liability under the ATA: not this Court's previous standard that the district

court applied, and not the higher standard that the Supreme Court has now recognized. If they could, aiding-and-abetting liability truly would border on "boundless." *Twitter*, 143 S. Ct. at 1220. After all, plaintiffs' theory is not limited to banks or these attacks. Many of these plaintiffs have brought substantially similar complaints against a host of companies—from telecommunications providers to engineering companies—that have done business in parts of the world where terrorists are active. The ATA does not and should not penalize such companies for providing services in parts of the world where they are especially needed.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court correctly dismissed plaintiffs' aiding-and-abetting claims under the ATA for failure to adequately allege that defendants (i) knowingly and substantially assisted the perpetrators of the terrorist acts that injured plaintiffs or (ii) were generally aware of defendants' supposed role in any terrorist activity.

2.      Whether the district court correctly dismissed plaintiffs' claim that defendants may be held liable under the ATA for aiding and abetting a broader racketeering enterprise consisting of various terrorist groups, rather than specifically the attacks that injured plaintiffs.

## COUNTERSTATEMENT OF THE CASE

### A.    Statutory Background

The Antiterrorism Act (ATA) provides a private right of action for damages for U.S. nationals injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). As originally enacted in 1990, the ATA did not authorize liability for aiding and abetting acts of terrorism. *Rothstein* v. *UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013). In 2016, however, Congress enacted the Justice Against Sponsors of Terrorism Act (JASTA), which amended the ATA to include a form of secondary liability. Pub. L. No. 114-222, 130 Stat. 852. Under JASTA, when "an act of international terrorism" has been "committed, planned, or authorized" by an organization designated as a "foreign terrorist organization" (FTO) by the Secretary of State, injured parties may sue anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed" the terrorist act. Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (codified at 18 U.S.C. § 2333(d)(2)).

In JASTA's "Findings" section, Congress said that *Halberstam* v. *Welch*, 705 F.2d 472 (D.C. Cir. 1983)—a leading case interpreting the common law of civil secondary liability—"provides the proper legal framework for how such liability should function." 130 Stat. at 852. In *Halberstam*, a serial

-6-

burglar named Bernard Welch killed Michael Halberstam during the course of one of his break-ins. 705 F.2d at 474. Halberstam's estate sued Welch's live-in partner, Linda Hamilton, for aiding and abetting Welch's tortious acts. *Id.* Hamilton had been a critical and knowing participant in Welch's property crimes: she had kept the books, laundered the proceeds of his thefts, and falsified her tax returns to disguise the income. *Id.* at 475, 487-488.

The D.C. Circuit in *Halberstam* outlined three elements for civil aiding-and-abetting liability: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and "(3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. For the third element, the *Halberstam* court identified six factors that bear on whether a defendant's assistance was "knowing[] and substantial[]": (1) "the nature of the act assisted"; (2) the "amount of assistance" provided; (3) whether the defendant was "present at the time" of the primary tort; (4) the defendant's "relation to the tortious actor"; (5) the "defendant's state of mind"; and (6) the "duration of the assistance" provided. *Id.* at 483-484. Applying those elements and factors, the D.C. Circuit concluded that Hamilton's assistance was so

systematic that she had effectively assisted each of Welch's burglaries. *Id*. at 488. Because "violence and killing is a foreseeable risk" of burglary, Hamilton was also liable for assisting in Halberstam's killing. *Id*.

Earlier this year, the Supreme Court clarified the role that *Halberstam* should play in the JASTA analysis. In *Twitter* v. *Taamneh*, 143 S. Ct. 1206 (2023), the Court explained that JASTA incorporates the "legal framework" of *Halberstam*, but the "elements and factors articulated" in that case "should not be taken as inflexible codes" or treated "as a sequence of disparate, unrelated considerations without a common conceptual core." *Id.* at 1223, 1225, 1229. Instead, the Court explained, *Halberstam*'s framework is relevant to assessing the "fundamental question of aiding-and-abetting liability": whether the defendants "consciously, voluntarily, and culpably participate[d] in or support[ed] the relevant wrongdoing." *Id.* at 1230.

## B.   Plaintiffs' Allegations

Plaintiffs are Americans who were injured by terrorist attacks in Afghanistan between 2011 and 2016, or the family members of Americans who were injured or killed by such attacks. Plaintiffs allege that these attacks were carried out by a complex "international criminal network," which they label the "Syndicate." J.A. 79 (¶ 5). According to the complaint, various groups that

make up the "Syndicate"—such as al-Qaeda, the Taliban, the Haqqani Network, and Lashkar-e-Taiba, among others—committed the attacks. J.A. 512 (¶ 1098).

Plaintiffs allege that three foreign banks—Standard Chartered Bank (SCB), Deutsche Bank Aktiengesellschaft (Deutsche Bank AG), and Danske Bank A/S—and various of their affiliates aided and abetted those attacks.[1] In particular, as described below, plaintiffs allege that each of the defendant banks played a role in tax-fraud and money-laundering schemes run by members of the Syndicate. They also allege that SCB provided banking services to a fertilizer manufacturer, a small percentage of whose product was misused by the Syndicate to make bombs.[2] Plaintiffs do not allege that the defendants acted in concert. The complaint instead asserts disparate, largely

---

[1]  Plaintiffs also sued Placid NK Corporation and Wall Street Exchange LLC, but have not appealed the district court's dismissal of their claims against those defendants.

[2]  Plaintiffs also allege that the defendants violated the ATA by providing banking services to several other individuals and entities, such as Hikmatullah Shadman, Mustafa Ahmed al-Hisawi, Abdul Baqi Bar, Viktor Bout, the National Iranian Oil Company, and the National Iranian Tanker Company. The district court held that those allegations did not establish aiding-and-abetting liability under the ATA, *see* S.A. 29-30, 33-34, 40-42, and plaintiffs have abandoned those theories of liability on appeal. Br. 4-5 & n.1.

unrelated conduct by each defendant. *See* S.A. 10 (describing the complaint as "less a novel, and more a series of vignettes").

### 1. Standard Chartered Bank

On appeal, plaintiffs allege that Standard Chartered Bank (SCB) and its affiliates Standard Chartered PLC and Standard Chartered Bank (Pakistan) Limited—aided and abetted the relevant terrorist attacks in three primary ways.

*VAT-Fraud Allegations.* Plaintiffs allege that the SCB defendants provided banking services to individuals or entities who engaged in "terrorist financing VAT fraud schemes." J.A. 298 (¶ 473). Value-added tax, or "VAT," is a tax paid in Europe "at each step along a chain of distribution." J.A. 232 (¶ 281). VAT fraudsters move goods across national borders through sham businesses that issue fake invoices giving the false appearance that VAT was paid. J.A. 232-233 (¶ 282). The sham businesses then obtain "refunds" of the phony VAT from various European governments. *Id.* The complaint alleges that the Syndicate raised substantial funds through VAT fraud. J.A. 232 (¶ 280).

In particular, plaintiffs allege that from 2008 to 2015, the SCB defendants in some way "facilitate[d]" VAT fraud by an individual named

Samir Azizi, who raised significant funds for the Syndicate by purchasing mobile phones in the United States and then sending them to Afghanistan through Europe and Dubai. J.A. 232-233, 274, 281, 299 (¶¶ 282, 410, 420-421, 475-476). Plaintiffs vaguely aver that the SCB defendants provided Azizi with financial services by "ma[king] available" a company called Fairfax Partners Ltd. that purportedly served as a "vital cog[]" in his scheme." J.A. 299 (¶¶ 475, 476). The complaint does not elaborate on what "making available" means or any connection between Fairfax and the attacks at issue.

*Money-Laundering Allegations*. Plaintiffs also allege that from 2008 through 2016, the SCB defendants "provided" unspecified "financial services" to two entities in the United Arab Emirates: Al Zarooni Exchange and Mazaka General Trading. J.A. 294 (¶ 458). Plaintiffs allege that these entities were "fronts" for Altaf Khanani, an individual who laundered money for the Syndicate. J.A. 231, 294-295 (¶¶ 277, 460-463). According to the complaint, Al Zarooni and Mazaka had accounts at "SCB London and SCB Pakistan," which were used to "facilitate USD-denominated transactions." J.A. 294-295 (¶¶ 461-462).

The complaint asserts without elaboration that the SCB defendants "knew of SCB's role" in Khanani's money laundering by 2008, based on

-11-

Khanani's "global reputation as a suspected money launderer." J.A. 296, 297 (¶¶ 464, 468). Plaintiffs also allege that an employee at Standard Chartered Bank, Dubai learned by 2012 that the SCB defendants' provision of services to Khanani "fund[ed] Syndicate terrorists," though the complaint says nothing about any particular activity, including the attacks at issue in Afghanistan. J.A. 297 (¶ 467). Plaintiffs further allege that in 2013 an unspecified "whistleblower" found "many SCB transactions post-2008 on behalf of Al-Zarooni Exchange." J.A. 298 (¶ 472) (alterations omitted). The complaint does not specify the basis of the whistleblower's alleged knowledge.

*Fertilizer-Company Allegations.* Plaintiffs also point to the SCB defendants' banking relationship with two Pakistani fertilizer companies, Fatima Fertilizer Company Ltd. and Pakarab Fertilizers Ltd. Fatima and Pakarab manufactured calcium ammonium nitrate (CAN) fertilizer, a legitimate agricultural product commonly used in Pakistan. *See* J.A. 308 (¶ 509). According to the complaint, around 1% of the CAN fertilizer produced by Fatima and Pakarab during the relevant period indirectly made its way into the hands of terrorists in Afghanistan, who misused the fertilizer to build homemade roadside bombs, also called improvised explosive devices (IEDs). J.A. 308, 310-311 (¶¶ 508, 513-515).

-12-

The complaint does not allege that Fatima or Pakarab directly supplied the Syndicate with fertilizer or that any SCB defendant provided banking services to Fatima or Pakarab that were unlawful. Instead, it alleges that fertilizer dealers (not Fatima or Pakarab) sold some CAN fertilizer to persons with "links to . . . insurgents," initiating a long chain of distribution that ended with al-Qaeda and Syndicate terrorists. J.A. 210, 310-311 (¶¶ 392, 513-515). Plaintiffs do not allege that SCB participated in this chain; instead, they allege that the SCB defendants provided Fatima and Pakarab with "foreign exchange and export finance services" and "letters of credit." J.A. 306, 507-508 (¶¶ 505, 1076, 1081).

According to the complaint, the use of Fatima's and Pakarab's CAN fertilizer in IEDs in Afghanistan was "a matter of widespread public knowledge no later than September 1, 2011," when media outlets began to report on the connection. J.A. 311 (¶ 514). Plaintiffs further allege that a representative of the Department of Defense met with executives at SCB's New York office in January 2013 to discuss the use of Fatima fertilizer in IEDs in Afghanistan. J.A. 306, 317-318 (¶¶ 505, 529). Plaintiffs allege that the official encouraged SCB executives at that meeting to stop providing any financial services to Fatima and Pakarab, and told the executives "that Fatima and

Pakarab had repeatedly refused to cooperate with American efforts" to do more to prevent the misuse of their fertilizer products. J.A. 317-318 (¶ 529).

### 2. Deutsche Bank

Plaintiffs likewise allege that Deutsche Bank AG and Deutsche Bank Trust Company Americas aided and abetted the relevant attacks by playing a role in VAT-fraud and money-laundering schemes.

*VAT-Fraud Allegations.* Plaintiffs allege that the Deutsche Bank defendants provided banking services to VAT fraudster Azizi. According to the complaint, "Azizi used Deutsche Bank accounts," and Deutsche Bank "made . . . accounts available to the fraudulent companies" that Azizi used to commit his fraud. J.A. 275, 276 (¶¶ 413, 415) (citation omitted). Apparently based on those banking services, the complaint alleges that the Deutsche Bank defendants "facilitated the regular delivery of thousands, if not tens of thousands," of cell phones that Azizi used to commit VAT fraud. J.A. 281 (¶ 421). Plaintiffs also allege "[o]n information and belief" that the Deutsche Bank defendants played an unspecified role in a different VAT fraud cell operated by another individual, Imran Yakub Ahmed. J.A. 285 (¶ 431).

*Money-Laundering Allegations.* Plaintiffs also allege that the Deutsche Bank defendants provided banking services to customers engaged

in money-laundering schemes. They assert that between 2000 and 2016, Deutsche Bank AG "operated its own Russian Laundromat" that was "custom buil[t]" for Khanani and the Russian Mafia to convert rubles from Russian opium sales into U.S. dollars. J.A. 257, 258 (¶¶ 354, 356). In a footnote, the complaint avers that "[p]laintiffs believe discovery is likely to reveal that Khanani directly or indirectly aided" the "Russian Laundromat." J.A. 258 n.283 (¶ 356 n.283). The complaint also alleges without further explanation that the Deutsche Bank defendants used a Frankfurt-based "laundromat" to raise funds for the Syndicate. J.A. 259 (¶ 359). Plaintiffs further allege that unidentified Syndicate "operatives" worked "hand-in-hand" with unnamed "Deutsche Bank personnel" to "defraud European governments." J.A. 259-260 (¶ 360).

### 3. Danske Bank

Finally, plaintiffs allege that Danske Bank engaged in similar conduct.

*VAT-Fraud Allegations.* According to the complaint, Danske Bank "set up an account" for unspecified "VAT fraudsters" who were "later convicted." J.A. 322-323 (¶ 547). Plaintiffs further allege that in 2009 and 2010, a payment platform called Swefin facilitated VAT fraud and processed payments for customers through a Danske Bank account. J.A. 322-323 (¶¶ 546-553). And

the complaint alleges that in 2016, an unidentified Lithuanian individual controlled a Danske Bank account that received or transferred proceeds from VAT fraud. J.A. 324 (¶ 557). The complaint further asserts that "[t]hese types of VAT fraud schemes have been linked to terrorist finance," and that "VAT fraud in Denmark," where Danske Bank is based, "accounted for approximately $12 million in terrorist finance." J.A. 324-325 (¶¶ 558-560).

*Money-Laundering Allegations*. Plaintiffs also allege that Danske Bank "operat[ed] a laundromat out of its Estonia branch" from 2007 to 2016, which Khanani used to fund al-Qaeda and the Haqqani Network. J.A. 319, 320 (¶¶ 534, 539). To support that theory, the complaint asserts that a "customer of Danske Bank's Estonia branch" traded with an entity called Mazaka that was later linked to Khanani. J.A. 320 (¶ 538); *see* J.A. 321 (¶ 540); S.A. 27.

## C. Procedural History

In August 2021, plaintiffs filed their original complaint. J.A. 1. That document was 590 pages long, prompting the district court to direct plaintiffs "to file a more succinct amended complaint." S.A. 4-5. In February 2022, plaintiffs filed the operative corrected amended complaint, which at 595 pages is even longer than their original filing. J.A. 66, 77-78. The operative complaint pleads two counts of ATA violations: aiding and abetting terrorist

attacks directly, and aiding and abetting the Taliban and al-Qaeda's broader "racketeering" enterprise.  J.A. 667-671.

The defendant banks moved to dismiss plaintiffs' amended complaint. In December 2022, the district court granted the banks' motions and dismissed the action with prejudice.  S.A. 1-61.  The court began by observing that the complaint's "irrelevant factual allegations and unclear definitions regarding the parties involved" "appear[] to fail" Federal Rule of Civil Procedure 8, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  S.A. 9 n.6.  Ultimately, however, the court did not decide whether plaintiffs' prolix complaint flunks Rule 8, because it determined that plaintiffs' claims fail on the merits.  *Id.*

With respect to plaintiffs' aiding-and-abetting claim, the district court held that the complaint does not adequately plead either "general awareness" or "knowing and substantial assistance."  S.A. 60.  The court first concluded that the complaint does not plead that the defendant banks were sufficiently aware of the alleged connections between the services that they provided to non-terrorist customers and the terrorist attacks at issue.  *See* S.A. 21-34, 37-45, 47-50.  The court next considered the six *Halberstam* factors and concluded that plaintiffs had failed to allege that the banks provided "knowing

-17-

and substantial assistance" to the attacks.  S.A. 34-36, 45-47, 50-52.  In particular, the court emphasized the significant attenuation between the banks' alleged conduct and the attacks, as well as the complaint's vagueness about the amount and type of assistance the banks supposedly provided.  *Id.*

The district court then turned to plaintiffs' second claim that the banks are liable under the ATA for aiding and abetting the broader terrorist "enterprise" or "campaign" of al-Qaeda and the Taliban, as opposed to specific terrorist attacks.  S.A. 60-61.  Agreeing with the other courts to have considered similar claims, the district court rejected plaintiffs' theory as inconsistent with the statutory text, which provides for aiding-and-abetting liability for "an injury arising from *an act* of international terrorism."  S.A. 60 (citation omitted).  The court thus concluded that plaintiffs' second claim "is not a valid theory of liability under the ATA."  S.A. 61.[3]

## SUMMARY OF ARGUMENT

I.    The district court correctly dismissed plaintiffs' first claim, which asserts that the banks aided and abetted the terrorist attacks that injured

---

[3] The district court concluded that granting plaintiffs leave to amend again would be "futile."  S.A. 61 n.38.  As the court explained, plaintiffs had already amended their complaint in an attempt to cure "the same deficiencies the court identifies in this order," so there was no basis to allow them another bite at the apple.  *Id.*

them.  The court concluded that the plaintiffs had failed to plead two of the elements of aiding-and-abetting liability under the ATA:  that the defendants were "generally aware" of their role in relevant terrorist activity, and that the defendants "knowingly and substantially assisted" the injurious attacks.  The correctness of that conclusion has since been confirmed by the Supreme Court's decision in *Twitter, Inc.* v. *Taamneh*, 143 S. Ct. 1206 (2023), which raises the standard for pleading aiding-and-abetting claims under the ATA above what this Court previously required.

A.  1.  In *Twitter*, the Supreme Court unanimously rejected claims that social-media companies had aided and abetted ISIS's attack on the Reina nightclub in Istanbul by allowing their platforms to be used by ISIS to fundraise and to radicalize new recruits.  The Ninth Circuit (like this Court) had measured the companies' "knowing and substantial assistance" by looking to six factors drawn from *Halberstam* v. *Welch*, 705 F.2d 472 (D.C. Cir. 1983).  The Supreme Court explained that the "framework" of *Halberstam* and the "elements and factors articulated" in that case are not a test in themselves. *Twitter*, 143 S. Ct. at 1223, 1225.  Instead, courts should focus on "the fundamental question of aiding-and-abetting liability:  Did defendants

consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" *Id.* at 1230.

The Supreme Court proceeded to clarify what that standard requires. First, a defendant's alleged conduct must be "conscious and culpable." *Twitter*, 143 S. Ct. at 1222. Plaintiffs must show that defendants participated in the relevant attack "as something that they wished to bring about," or "sought by their action to make it succeed." *Id.* at 1226 (internal quotation marks and alterations omitted). In *Twitter*, for example, it was not enough that the social-media companies knew that ISIS used their platforms, because they had not acted with the intent to bring about the Reina attack. *Id.* at 1231. Aiding-and-abetting liability under the ATA requires affirmative misconduct, and not merely inaction or nonfeasance, so that "mostly passive actors like banks" are not "liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 1222.

Second, there must be a concrete "nexus" between the defendant's alleged conduct and the specific attack that injured the plaintiffs. *Twitter*, 143 S. Ct. at 1225-1226. It is not enough for an ATA plaintiff to allege that a defendant gave "assistance to [the terrorist group's] activities in general." *Id.* at 1229. Without a definable connection between the defendant's assistance

and the specific injurious act, plaintiffs face a "drastically increase[d] . . . burden" to establish that the defendant "so systemically and pervasively assisted" a terrorist group that the defendant "could be said to aid and abet every single attack" that the group committed. *Id.* at 1228-1229.

2. Plaintiffs cannot satisfy either of those requirements. Plaintiffs do not and could not plausibly allege that the terrorist attacks in Afghanistan that injured them are something the banks "wished to bring about" or "sought by their action to make . . . succeed." *Twitter*, 143 S. Ct. at 1223, 1226. Plaintiffs also fail to allege the requisite nexus between any of the banks' alleged conduct and the specific attacks that injured them. And just as in *Twitter*, at bottom plaintiffs' theory revolves around the banks' failure to stop bad actors from using their services. In fact, the claims in this case are even more attenuated than the claims in *Twitter* because plaintiffs do not allege that any terrorists actually used the banks' services directly.

3. *Twitter* demonstrates that courts need not march through the *Halberstam* factors when, as here, the complaint so clearly flunks the "conceptual core" of aiding-and-abetting liability. 143 S. Ct. at 1223. But considering those factors here only confirms the correctness of the district court's decision. Several factors are not satisfied because the complaint fails

to connect the customers' bank transactions with the injurious attacks. *Halberstam*, 705 F.2d at 487-488. Other factors do not support liability because plaintiffs have alleged that the defendants provided arm's-length banking services that were generally available to the public.

B. Plaintiffs' failure to adequately plead conscious, culpable, and concrete assistance to particular acts of terrorism is sufficient to resolve this case. But as the district court concluded, plaintiffs also fail to allege that the banks were "generally aware" of their role in the relevant terrorist activity. Plaintiffs have not adequately pleaded what this Court's cases require: that the banks were aware before the relevant attacks that their customers were so closely connected to terrorism that banking services to those customers would have a role in illegal activity from which the attacks were foreseeable. *See Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021).

II. The district court also correctly dismissed plaintiffs' second claim, which seeks to hold the banks liable for aiding and abetting a broader terrorist "enterprise" and not merely the attacks that injured them. That theory of liability is inconsistent with the text of the ATA, which provides that "for an injury arising from *an act* of international terrorism," a secondary tortfeasor may be liable for assisting the primary tortfeasor in committing "*such an act*

-22-

of international terrorism." 18 U.S.C. § 2333(d)(2) (emphases added). The theory is also flatly foreclosed by *Twitter*, which held that it is "not enough" to aid and abet "a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 143 S. Ct. at 1223-1224.

## ARGUMENT

As the district court correctly concluded, both of plaintiffs' claims fail under the ATA. Plaintiffs' claim for aiding and abetting the terrorist attacks that injured them fails because their complaint does not allege that defendants consciously and culpably participated in the relevant attacks. Nor does it allege that defendants acted with general awareness of their participation in the terrorist scheme responsible for those attacks. Plaintiffs' second claim for aiding and abetting a broader terrorist enterprise fails because that is not a valid theory of liability under the ATA.

## I. PLAINTIFFS FAIL TO STATE A CLAIM THAT THE BANKS AIDED AND ABETTED THE TERRORIST ATTACKS THAT INJURED THEM.

The district court correctly dismissed plaintiffs' claim for aiding and abetting acts of international terrorism. This Court has identified three elements of aiding-and-abetting liability under the ATA: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury"; "(2) the

defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and "(3) the defendant must *knowingly and substantially assist* the principal violation." *Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (internal quotation marks omitted). Here, the district court properly determined that plaintiffs had failed to adequately plead the second and third elements: general awareness and knowing and substantial assistance.[4]

The passage of time has only confirmed that result. Since the district court issued its opinion, the Supreme Court clarified in *Twitter, Inc.* v. *Taamneh*, 143 S. Ct. 1206 (2023), that the requirements for pleading aiding-

---

[4] The first element also requires that the "act of international terrorism" have been "committed, planned, or authorized" by an organization designated as a "foreign terrorist organization" (FTO) by the Secretary of State. 18 U.S.C. § 2333(d)(2). The district court "assume[d] without deciding" that the D.C. Circuit had correctly interpreted the statute in *Atchley* v. *AstraZeneca UK Ltd.*, 22 F.4th 204 (2022), which "gave the terms 'planned' and 'authorized' the broadest possible reading." S.A. 20. The court did not need to decide that question, because plaintiffs' complaint failed to satisfy the other two elements of liability. *Id.* The defendants in *Atchley* have petitioned the Supreme Court to grant certiorari, vacate, and remand the D.C. Circuit's decision in light of *Twitter*. *See* Petition for Certiorari at 13, *AstraZeneca UK Ltd.* v. *Atchley*, No. 23-9 (U.S. June 30, 2023). In the event that this Court reverses the decision below and holds that plaintiffs have satisfied the other elements, it should remand for the district court to address whether plaintiffs have adequately pleaded that all of the attacks at issue were committed, planned, or authorized by designated FTOs.

and-abetting liability are even more demanding than this Court's precedents previously recognized. Specifically, the Court explained that the ATA generally requires conscious, culpable conduct that substantially aids a particular terrorist act. *Id.* at 1223. Applying *Twitter*'s guidance is the easiest path to affirming the judgment below, because it is clear that plaintiffs' complaint does not plead that the banks culpably aided the particular terrorist attacks at issue. Nor does the complaint adequately plead that the banks were generally aware of their role in terrorist activity, as the district court concluded.

### A. Plaintiffs Fail To Allege That The Banks Knowingly And Substantially Assisted The Particular Acts Of Terrorism That Harmed Plaintiffs.

The ATA imposes civil liability on "any person who aids and abets, by knowingly providing substantial assistance," to "an act of international terrorism." 18 U.S.C. 2333(d)(2). That language invites two questions: "First, what exactly does it mean to 'aid and abet'? Second, what precisely must the defendant have 'aided and abetted'?" *Twitter*, 143 S. Ct. at 1218. The *Twitter* Court explained that the first question turns on whether the defendants "consciously and culpably participated in a tortious act," and the second turns on whether the defendants' participation "aided and abetted the act of

international terrorism that injured the plaintiffs." *Id.* at 1225 (alterations and internal quotation marks omitted). Here, the answer to both of those questions is plainly no. Considering the *Halberstam* factors, as the district court did, only confirms that plaintiffs have failed to allege that the defendant banks knowingly and substantially assisted terrorist attacks in Afghanistan in the 2010s.

### 1. The ATA requires conscious, culpable conduct that aids particular terrorist acts.

In *Twitter*, the plaintiffs were victims of a terrorist attack committed by ISIS at the Reina nightclub in Istanbul. They sued social-media companies under the ATA, alleging that the companies had aided and abetted ISIS by knowingly allowing ISIS to use their platforms and recommendation algorithms in order to fundraise and radicalize new recruits. 143 S. Ct. at 1216. The Supreme Court distilled the "conceptual core" of aiding-and-abetting liability: that a defendant "consciously and culpably participated in a wrongful act so as to help make it succeed." *Id.* at 1223 (internal quotation marks and alterations omitted). Applying that standard, the Court unanimously concluded that the plaintiffs had failed to state a claim. *Id.* at 1231.

The Supreme Court explained that the "conceptual core" of aiding-and-abetting liability, and the text of the ATA, carries two requirements. First, a

plaintiff must allege that the defendant's conduct amounted to "*conscious, voluntary, and culpable participation* in another's wrongdoing." *Twitter*, 143 S. Ct. at 1223 (emphasis added). Second, there must be a connection between that culpable conduct and "*the commission of the actionable wrong—* here, an act of international terrorism." *Id*. at 1224 (emphasis added). In other words, there must be a sufficient "nexus" between the defendant's conduct and the terrorist attacks that injured the plaintiffs. *Id*. at 1225. *Twitter* supplies the governing standard for aiding-and-abetting liability in this case. *See*, *e.g.*, *Henderson* v. *United States*, 568 U.S. 266, 271 (2013) (appellate courts apply law in effect at the time).

a. The first component of aiding-and-abetting liability under *Twitter* is that the defendant must have "consciously and culpably participated in a wrongful act." 143 S. Ct. at 1223 (alterations and internal quotation marks omitted). Both at common law and under the text of the ATA, the defendant must have provided "knowing and substantial assistance to the primary tortfeasor." *Id*. at 1222. The Court observed that those requirements traditionally "work[ed] in tandem, with a lesser showing of one demanding a greater showing of the other." *Id*. "[L]ess substantial assistance required more scienter before a court could infer conscious and culpable assistance.

And, vice versa, if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Id.* (citation omitted).

The Court further explained that to show *knowing* assistance, plaintiffs must plausibly plead that the defendants participated in the relevant attack "as something that they wished to bring about," or "sought by their action to make it succeed." *Twitter*, 143 S. Ct. at 1226 (internal quotation marks and alterations omitted); *id.* at 1223 ("The phrase 'aids and abets' in §2333(d)(2), as elsewhere, refers to a *conscious, voluntary, and culpable* participation in another's wrongdoing.") (emphasis added). In *Twitter*, for example, it was not enough that the social-media companies allegedly "knew" that ISIS members used their platforms to further their terrorist goals. *Id.* at 1226. Plaintiffs had not alleged that the companies intended to aid or bring about the Reina nightclub attack. *Id.* at 1231 ("[P]laintiffs have failed to allege that defendants intentionally provided any substantial aid to the Reina attack.").

The Supreme Court explained that the Ninth Circuit had erred in treating the scienter requirement for knowing and substantial assistance as a "carbon copy" of the general-awareness element. 143 S. Ct. at 1229. The former is a more specific showing that evaluates "the defendants' state of mind

with respect to their actions and the tortious conduct," "not the same general awareness that defines *Halberstam*'s second element." *Id.* Like the Ninth Circuit, this Court has previously collapsed the distinction between knowing assistance and general awareness. *See Honickman*, 6 F.4th at 500 (explaining that the "knowing" component does "not require [a defendant] to 'know' anything more about [the primary tortfeasor's] unlawful activities than what she knew for the general awareness element"); *Kaplan* v. *Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (tying the "knowing" subelement to the "general awareness" element).

The Supreme Court also explained that aiding-and-abetting liability traditionally requires "culpable misconduct," not merely "omissions, inactions, or nonfeasance." *Twitter*, 143 S. Ct. at 1221. The Court distinguished between "affirmative conduct" in support of terrorism and "passive assistance" such as a "failure to stop" terrorists from using the defendant's services. *Id.* at 1227. Aiding-and-abetting liability attaches only to affirmative conduct, such as "inducing, encouragement, soliciting, or advising the commission of the offense." *Id.* at 1221. In *Twitter* itself, the plaintiffs' theories rested "less on affirmative misconduct and more on an alleged failure to stop ISIS from using these platforms." *Id.* at 1227. The plaintiffs had not alleged, for example, that

the defendants "gave ISIS any special treatment or words of encouragement" that induced the Reina attacks. *Id.* at 1226.

In language that fits this case like a glove, the Supreme Court noted that a defendant's lack of affirmative misconduct is relevant because aiding-and-abetting law has long recognized that "mostly passive actors *like banks*" should not be "liable for all of their customers' crimes by virtue of *carrying out routine transactions*." 143 S. Ct. at 1222 (emphases added). After all, "if aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods or services." *Id.* at 1221. The Court warned against such "expansive" theories of liability, which "would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Id.* at 1228.

It is not a coincidence that the Supreme Court gave an example involving banks. The Court's emphasis on affirmative misconduct—like active encouragement or solicitation of the terrorist attacks that injured the plaintiffs—has deep roots in the common law, and in particular in aiding-and-abetting cases against banks for assisting their customers' fraud. The Court in *Twitter* favorably cited two such cases: *Monsen* v. *Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978), and *Landy* v. *FDIC*, 486 F.2d 139,

163 (3d Cir. 1973). In *Monsen*, the bank could be held liable because it had "actively encouraged" its customer's fraud, 579 F.2d at 802, whereas in *Landy* there was no allegation that the defendants had "proposed to bring about" their customers' scheme, 486 F.2d at 164. The ATA simply reflects that common-law tradition in requiring affirmative misconduct for aiding-and-abetting liability.

b. The second component of aiding-and-abetting liability under *Twitter* is that the defendant must have culpably participated in "the tort for which plaintiffs seek to impose liability." 143 S. Ct. at 1230. The Supreme Court explained that the ATA virtually always requires a concrete "nexus" between the defendant's supposed assistance and "the act of international terrorism that injured the plaintiffs." *Id.* at 1225. It is not enough for an ATA plaintiff to allege that a defendant gave "assistance to [the terrorist group's] activities in general." *Id.* at 1229. Without a definable connection between the defendant's assistance and the specific injurious act, plaintiffs face a "drastically increase[d] . . . burden" to establish that the defendant "so systemically and pervasively assisted" a terrorist group that the defendant "could be said to aid and abet every single attack" that the group committed. *Id.* at 1228-1229. *Twitter*'s nexus requirement is more demanding than what

this Court's precedents previously required. *See Honickman*, 6 F.4th at 499 ("[K]nowing and substantial assistance to the actual injury-causing act . . . is unnecessary.").

### 2. Plaintiffs do not allege that the banks consciously and culpably aided particular terrorist acts.

Plaintiffs fail to satisfy either of the requirements for aiding-and-abetting liability that the Supreme Court clarified in *Twitter*. They have not pleaded that the banks' alleged conduct was conscious and culpable, and they have not pleaded that the banks culpably participated in the specific terrorist attacks at issue. These are not mere foot faults. It is obvious from what plaintiffs do plead that the banks here did not "consciously, voluntarily, and culpably participate in or support the relevant wrongdoing." *Twitter*, 143 S. Ct. at 1229-1230. Plaintiffs are seeking to hold the banks liable for providing "generally available" and legitimate services that terrorists allegedly benefited from and for "fail[ing] to stop" the terrorists from doing so. *Id.* at 1230. Those kinds of allegations cannot be the basis for aiding-and-abetting liability under the ATA.

a. First, plaintiffs have not pleaded that the banks consciously and culpably aided terrorists. They do not (and could not) allege that the terrorist attacks at issue were something the banks "wished to bring about" or "sought

by their action to make . . . succeed." *Twitter*, 143 S. Ct. at 1222, 1226. Plaintiffs have never alleged that the banks acted with the knowledge or intention of helping al-Qaeda or the Haqqani Network carry out these attacks. Instead, plaintiffs' theory of scienter has always been the one that *Twitter* expressly rejected: that the banks were *indifferent* to their customers' supposed connections to terrorist groups. *See, e.g.*, J.A. 356 (¶ 658) ("Plaintiffs allege that Defendants did not *care* about Syndicate terrorist finance risks.") (emphasis in original); J.A. 427 (¶ 841) ("Plaintiffs suffered for [SCB's] indifference."). Under *Twitter*, that is not enough to show "culpable participation." 143 S. Ct at 1227.

Plaintiffs insist that the banks need not be "one in spirit" with terrorists—for example, if they "seek only financial gain but pursue it with a *general awareness* of aiding some type of tort or crime." Br. 7, 35 (emphasis added). *Twitter* is clear that the provision of knowing assistance is distinct from the requirement that defendants be generally aware of their role in terrorist activity. *See* 143 S. Ct. at 1229. Plaintiffs must plead and prove that the banks affirmatively sought to assist the commission of the specific attacks at issue (or at the least, the commission of some closely related tort that foreseeably resulted in the specific attacks, in the sense that the murder in

*Halberstam* was the foreseeable result of a nighttime burglary). *Id.* In *Twitter*, it was not enough that the plaintiffs alleged that the social-media companies were "largely indifferent" to ISIS and profited from its content. *Id.* at 1217, 1227. The key point was that the companies "lack[ed any] intent to support ISIS" by inducing or encouraging its tortious conduct. *Id.* at 1230. The same is true here: plaintiffs do not (and could not) allege that the banks culpably or affirmatively induced, encouraged, solicited, or advised al-Qaeda or the Haqqani Network to harm anyone. *See id.* at 1221.

Plaintiffs also fail to allege that the banks affirmatively assisted terrorists. As in *Twitter*, the "allegations here rest less on affirmative misconduct and more on passive nonfeasance," or an "alleged failure to stop [terrorists] from using [the banks' services]." 143 S. Ct. at 1227. For example, plaintiffs allege that the banks "made . . . accounts available to . . . fraudulent companies." Br. 19 (citation omitted). That is just another way of saying the banks failed to stop those companies from using their services and were "agnostic as to the nature of the content" of their clients' businesses, which the *Twitter* Court rejected as a basis for liability. 143 S. Ct. at 1227. Plaintiffs' complaint boils down to the banks' failure to prevent (non-terrorist) customers from using generally available services—such as U.S. dollar currency

exchange or trade financing—in ways that might have aided (terrorist) third parties.

Of course, the plaintiffs in *Twitter* similarly asserted that social-media companies "supplied generally available virtual platforms that ISIS made use of." 143 S. Ct. at 1230. The assertion is no more powerful here than it was there. Just as in *Twitter*, plaintiffs point to no indication that the banks' alleged relationships with their non-terrorist customers (Azizi, Al Zarooni and Mazaka, or Fatima and Pakarab) were meaningfully different from their "arm's length, passive, and largely indifferent" relationships with other customers. *Id.* at 1227. And here, just as in *Twitter*, there is no allegation that the banks somehow favored terrorist objectives and acted to advance them. *Cf. Kaplan*, 999 F.3d at 850 (relying on allegations that the banks "gave the Customers special treatment," affirmatively granting them exemptions from limits on cash transactions that applied to other customers).

Although plaintiffs use sensationalist language to describe the banks' activities, their allegations concern routine, arm's length services that are available to others. Specifically, their allegations revolve around the maintenance of bank accounts, the provision of foreign-exchange services, and the processing of financial transactions. *See, e.g.*, J.A. 294-295 (¶¶ 461-462),

507-508 (¶¶ 1076, 1081), 322-323 (¶¶ 546-553). Those are common functions that banks perform for others, not special treatment. *See*, *e.g.*, FDIC, *Risk Management Manual of Examination Policies* § 11.1-2 (describing "currency exchange[] and funds management" as "common international banking products").

Plaintiffs repeatedly fight the idea that the services at issue are routine or common; they contend that even "acts that are neutral standing alone" must be "evaluated in the context of the enterprise they aided," and they emphasize the banks' supposed participation in money laundering. Br. 41 (quoting *Kaplan*, 999 F.3d at 865). But in *Twitter*, the Supreme Court identified the social-media platforms' conduct as "passive" and "routine," notwithstanding allegations that the platforms knowingly allowed ISIS to set up accounts that it used to recruit members and glorify horrific acts of terror. 143 S. Ct. at 1226. Here, plaintiffs allege that the banks allowed (non-terrorist) customers to set up accounts, and then those customers allegedly engaged in conduct that supported various terrorist activities directly or indirectly. Under *Twitter*, defendants' mere provision of banking services that are available to other members of the public cannot amount to aiding and abetting terrorism.

b.     Plaintiffs also fail to allege that the banks aided the *specific attacks* at issue.  *See Twitter*, 143 S. Ct. at 1223-1225.  Here, plaintiffs claim at most that the banks "provided substantial assistance to *the terrorist organizations behind the attacks*," not to the attacks themselves.  J.A. 668 (¶ 2031) (emphasis added).  And both the complaint and plaintiffs' opening brief repeatedly refer to the banks' alleged "assistance to the Syndicate" of various terrorist and criminal organizations writ large.  *See, e.g.*, Br. 29, 61, 63, 66.  *Twitter* expressly held that it is "not enough" to allege assistance to a "transcendent 'enterprise,'" as opposed to the specific tortious act.  143 S. Ct. at 1223-1224.

Judged under the correct standard, plaintiffs fail to allege the required "nexus" between the banks' alleged conduct and the specific terrorist attacks that injured them.  Start with plaintiffs' VAT fraud allegations.  Plaintiffs accuse the banks of playing some role in various VAT fraud schemes.  But they do not allege a connection between those fraud schemes and the specific terrorist attacks at issue here.  Instead, plaintiffs allege at most that relevant VAT fraud cells "funded the operations" of terrorist cells "*of the kind* that harmed the plaintiffs." Br. 53 (emphasis added).  Alleging that the defendants' customers engaged in fraud "of the kind" that can aid terrorists is not

sufficient. In *Twitter*, after all, the Court did not ask whether content on the social-media platforms had enabled or radicalized some terrorists. What mattered was that the "plaintiffs never allege[d] that ISIS used defendants' platforms to plan or coordinate" the *specific* "Reina attack." 143 S. Ct. at 1226. There is no allegation that any of the banks' services were used to plan or coordinate any attack.

The same is true for plaintiffs' other categories of supposed wrongdoing. Plaintiffs nowhere allege that the banks' alleged role in third parties' money laundering concretely assisted the injurious attacks. They do not allege, for example, that the attacks were committed with funds that were laundered with the supposed assistance of any of the banks. Likewise, with respect to the SCB defendants' alleged banking services to fertilizer companies, plaintiffs do not connect those services to any of the attacks in Afghanistan that injured plaintiffs. Indeed, plaintiffs do not even allege that the attacks were carried out using fertilizer products produced by the SCB defendants' alleged manufacturer customers, Fatima and Pakarab.[5]

---

[5] Plaintiffs cannot salvage their complaint by arguing that because money is fungible, any transaction could have theoretically funded acts of terrorism. Even before *Twitter*, *Honickman* squarely foreclosed that fungibility argument. *See* 6 F.4th at 498.

In other words, the claims in this case are even more attenuated than the claims in *Twitter*. There, the Court concluded that the connection was "highly attenuated" because there were no allegations "connecting the Reina attack with ISIS' use of the[] platforms." 143 S. Ct. at 1227. But at least in *Twitter*, there was no dispute that terrorists had used the social-media companies' services, even if not in direct connection with the Reina attack. Here, as the district court explained, plaintiffs do not allege that any foreign terrorist organization in the "Syndicate" actually used the banks' services at all. *See* S.A. 36, 46, 51. Instead, plaintiffs allege that the banks provided financial services to *non-FTO customers*—such as the alleged VAT fraudster Azizi, the currency exchanges Al Zarooni and Mazaka, or the fertilizer companies Fatima and Pakarab—and that *those entities* in turn provided funds or materials to terrorists. Plaintiffs' complaint is a degree removed from what the Supreme Court deemed insufficient in *Twitter*.[6]

---

[6] The attenuation of plaintiffs' theory is no accident. Many plaintiffs in this case have repurposed similar allegations against a host of defendants with attenuated connections to Afghanistan, from engineering companies to telecommunications providers. *See* Exhibits to Joint Mot. to Dismiss, *Schmitz v. Ericsson Inc.*, No. 22-cv-2317 (D.D.C. Mar. 20, 2023), ECF Nos. 44-11, 44-12, 44-13.

Because plaintiffs have not established "any concrete nexus between defendants' services and the [relevant] attack[s]," their claims fail unless they can allege "the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist attack." *Twitter*, 143 S. Ct. at 1228. Plaintiffs allege nothing close to that level of pervasive, systemic assistance. At best, they allege a hodgepodge of financial transactions around the world between various third parties using accounts maintained at the defendant banks. Those allegations do not remotely suggest that these banks provided such extensive assistance to foreign terrorist groups that they should be deemed responsible for every attack committed anywhere in the world by those groups.

### 3. *Halberstam*'s factors confirm that the banks did not consciously and culpably aid particular terrorist acts.

Because plaintiffs so obviously fail to plead conduct amounting to conscious, culpable participation in the relevant attacks, the Court may affirm on that basis alone. *Twitter*, 143 S. Ct. at 1223. It does not need to march through the *Halberstam* factors, just as the Supreme Court did not in *Twitter*. But considering those factors clearly confirms that the decision below is correct. *See Ofisi* v. *BNP Paribas, S.A.*, __ F.4th __, 2023 WL 4378213, at *6, 9 (D.C. Cir. 2023) (post-*Twitter* case applying *Halberstam* factors to reject

common-law aiding-and-abetting claim). As the district court explained, applying the *Halberstam* factors here, the banks did not knowingly and substantially assist the terrorist attacks at issue.

*Nature of the act encouraged.* This first factor asks "whether the alleged aid . . . would be important to the nature of the injury-causing act." *Honickman*, 6 F.4th at 500 n.17 (citing *Halberstam*, 705 F.2d at 484). The complaint does not allege in any specific way that the banks' alleged financial assistance to third parties was important to the injury-causing attacks. Obviously financial support is important to the operation of any organization, terrorist or otherwise, but the complaint does nothing to connect the non-terrorist customers' transactions at the banks with the attacks at issue in Afghanistan in the early 2010s. This factor does not support liability.

*Amount and kind of assistance.* The Supreme Court in *Twitter* explained that in assessing this factor, the Ninth Circuit "should have considered" that defendants' platforms "were generally available to the internet-using public." 143 S. Ct. at 1230. In this case, plaintiffs likewise focus on legitimate banking services that were generally available to the public, such as the maintenance of bank accounts, the provision of currency-exchange services, and the furnishing of letters of credit. *See* pp. 34-36, *supra*. More

-41-

fundamentally, plaintiffs do not even allege that any of the "assistance" the banks provided to customers through banking services actually assisted any of the relevant acts. This factor does not support liability.

*Presence at the time of the tort.* Plaintiffs concede (at 34) that the defendant banks were not present at any of the attacks. This factor is not dispositive, but it tends to make it less likely that the banks were actively, intentionally, and culpably participating in the attacks. This factor does not support liability.

*Relationship to the tortious actor.* *Twitter* instructs courts applying this factor to place weight on an "arm's-length" relationship between defendants and the attackers. 143 S. Ct. at 1229. Here, the link between the banks and the FTOs is highly attenuated. Indeed, the banks are not alleged to have provided services directly to any FTO, placing the banks a further step removed from the attacks than the social-media defendants in *Twitter*. Moreover, the banks' alleged relationships to the non-terrorist third parties they allegedly transacted with were themselves arm's-length banking services, like the maintenance of bank accounts or the processing of dollar-denominated transactions. This factor does not support liability.

*Defendants' state of mind.*  Plaintiffs do not (and could not) allege that the banks had any intent to assist the FTOs' reprehensible acts of terror. Plaintiffs repeatedly assert that the banks knew, or at least should have known, that the services they provided to non-terrorist customers were connected to terrorist activity.  *See, e.g.* Br. 47, 52.  As explained earlier, the same was true in *Twitter*, too.  *See* 143 S. Ct. at 1215 ("Defendants allegedly knew that ISIS was using their platforms but failed to stop it from doing so."); p. 28, *supra*.  That alleged knowledge was insufficient in *Twitter*, and it is likewise insufficient here.  This factor does not support liability.

*Duration of assistance.*  Finally, plaintiffs do not even allege direct assistance to any FTO that committed the relevant attacks, much less for any particular period of time.  Rather, they allege that the banks provided ordinary services to various non-terrorist customers over different time spans.  But of course that is the very nature of ordinary or routine services; offering those services to customers on a regular basis is what many companies do.  As this Court recognized in *Siegel* v. *HSBC N. Am. Holdings, Inc.*, duration thus cannot be divorced from the nature of the alleged assistance, and here those factors taken together do not support liability.  *See* 933 F.3d 217, 225 (2d Cir. 2019) (concluding that the "duration" factor did not support plaintiffs even

-43-

when the defendant bank "provided banking services" to its customer "for twenty-five years").

\* \* \*

*Twitter* clarified and raised the standard for plaintiffs to plead aiding-and-abetting liability under the ATA. Plaintiffs now must allege that a defendant consciously and culpably took steps to assist the specific terrorist attacks that injured them. Here, plaintiffs plainly have not alleged (and could not allege) that kind of conscious, culpable, and definable assistance. The six *Halberstam* factors confirm that conclusion, as the district court correctly held.

## B. Plaintiffs Fail To Allege That The Banks Were "Generally Aware" Of Their Role In Relevant Terrorist Activity.

Plaintiffs' failure to adequately plead conscious, culpable, and concrete assistance to specific acts of terror is sufficient to resolve this case. But the judgment below may also be affirmed on the ground that plaintiffs have not adequately pleaded that the banks were "generally aware of [their] role" in the attacks at issue. *Honickman*, 6 F.4th at 494. When as here a plaintiff claims that a defendant aided a foreign terrorist organization through an intermediary, the complaint must allege that "(1) [the defendant] was aware of [its customers'] connections with [the FTO] before the relevant attacks" and

-44-

"(2) [the defendant's customers] were *so closely intertwined with [the FTO's] violent terrorist activities* that one can reasonably infer" that the defendant was "generally aware" while it was providing services to those customers that it was playing a "role in unlawful activities *from which [the FTO's] attacks* were foreseeable." *Id.* at 501 (emphases added); *see Bernhardt* v. *Islamic Republic of Iran*, 47 F.4th 856, 867-868 (D.C. Cir. 2022) (relying on *Honickman* as providing the test for general awareness "[w]hen a plaintiff's ATA aiding and abetting claim depends on aid flowing through an intermediary").

Plaintiffs urge this Court to take a "lenient" approach to general awareness. Br. 32. They repeatedly argue that the banks were generally aware that providing financial services to their customers overseas "foreseeably risked terrorism." *See, e.g.*, *id.* at 48, 54, 63, 70. But that is not the test. As this Court has explained, the general-awareness inquiry demands more than awareness "of the organization's connection to *terrorism*" writ large. *Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 329-330 (2d Cir. 2018); *see* S.A. 14 (explaining that it is insufficient to allege the defendant's general awareness of its role "in an overall illegal activity that foreseeably risked *terrorism*") (citation omitted). Instead, the question is whether the defendant

was then aware of its role in "overall activity from which *the act that caused the plaintiff's injury* was foreseeable." *Honickman*, 6 F.4th at 496 (emphasis added).

That is not and should not be a lenient standard. As the Supreme Court recognized in *Twitter*, aiding-and-abetting liability is reserved for cases of "truly culpable conduct." 143 S. Ct. at 1221. *Honickman*'s standard carries two requirements that are critical here. First, the banks must have been generally aware that their provision of financial services could produce *the attacks at issue here—i.e.*, roadside bombings in Afghanistan in the early 2010s. This Court has held in the banking context that it is not enough even for a plaintiff to allege that a bank was aware that it was providing services that violate financial regulations. *See Siegel*, 933 F.3d at 225 (deeming insufficient allegations that "HSBC helped [another bank] violate banking regulations despite knowing that [the other bank] supported terrorist organizations"). Plaintiffs must plead that the banks were generally aware that their customer was "so closely intertwined with" an FTO's terrorist violence that, by simply providing financial services to the customer, the banks were playing a role in terrorist activity that foreseeably could have caused the particular attacks at issue. *Honickman*, 6 F.4th at 501.

Second, the timing of the defendants' supposed awareness also matters. Under *Honickman*, the banks must have "had the requisite general awareness *at the time* that [they] provided" the relevant assistance. 6 F.4th at 501 (emphasis added). Public sources dated after the relevant attacks cannot establish the requisite general awareness. *See id.* at 501-502 (concluding that the plaintiffs did not satisfy the general-awareness element in part because they relied on public sources that post-dated the relevant attacks). Relatedly, if a defendant stopped providing services to the customer connected to terrorism before the relevant attacks, that "makes it implausible under the circumstances" that the plaintiffs can show the necessary kind of awareness on the defendant's part. *Siegel*, 933 F.3d at 224.

Plaintiffs cannot satisfy either of *Honickman*'s requirements. They trot out one vague and unsubstantiated inference after another, all meant to show that these banks must have been generally aware that some of their customers financed, or sold products that made their way into the hands of, terrorist groups. But the question is whether the banks were aware that they were playing a role in terrorist activity linked to these specific attacks. Plaintiffs have not alleged that the banks had the requisite general awareness at all, let alone at the time when they allegedly provided financial services to VAT

fraudster Azizi, the currency exchanges Al Zarooni and Mazaka, or the fertilizer companies Fatima and Pakarab. Because plaintiffs' sprawling complaint asserts different theories for each of the defendant banks, we explain below why each of those theories fails.

### 1. SCB defendants

*VAT Fraud.* Plaintiffs have not alleged that the SCB defendants were generally aware of their role in the supposed VAT fraud, let alone that the VAT fraud foreseeably led to the relevant attacks. The complaint alleges that SCB "worked closely with Azizi" and his cell "to facilitate every aspect of the VAT fraud carousel" that Azizi operated. J.A. 299 (¶ 475). But plaintiffs never explain what that means, other than that the SCB defendants performed "trades" and dollar-clearing services. J.A. 299-300 (¶¶ 478-479). It is not remotely plausible that performing those routine services—whether for Azizi or some other customer—would have put the banks on notice that they were dealing with a fraudster involved in terrorism.

Moving from the implausible to the hopelessly vague, plaintiffs argue that SCB should have been aware that it was participating in fraud because it allegedly "made a company" called Fairfax Partners "available to Azizi," which is "not typical banking behavior." Br. 49. Neither in their complaint nor their

opening brief to this Court do plaintiffs offer any clue what they are talking about. Plaintiffs do not say *how* SCB supposedly "made available" Fairfax Partners to Azizi, and so it is impossible for this Court to surmise why that should be evidence of general awareness. Surely if more explanation would be helpful, plaintiffs would offer it. But even assuming they have saved something for their reply, nothing in their *complaint* pleads the requisite general awareness.

Plaintiffs argue that certain red flags make it plausible to infer that the banks were generally aware that they were playing a role in terrorism. Br. 49-50. For instance, plaintiffs emphasize that governmental authorities and public sources linked "VAT fraud schemes" to "Syndicate terrorists" as early as 2006. *Id.* at 49. But reports of a connection between *some* VAT fraud schemes and *some* "Syndicate" terrorists does not show that SCB was generally aware of *Azizi's* fraud—let alone that Azizi was connected to the terrorists responsible *for these attacks*. *See Honickman*, 6 F.4th at 496. Indeed, plaintiffs concede that Azizi's involvement in terrorist-linked VAT fraud was not the subject of public reporting until his arrest in 2015, when the SCB defendants stopped providing alleged services to him. Br. 50. Given that

fact, it is "implausible under the circumstances" that the banks were generally aware of their role in the relevant terrorist activity. *Siegel*, 933 F.3d at 224.

Plaintiffs contend that the SCB defendants nevertheless should have been aware that Azizi was funding FTOs because he was "a young Afghan national with no demonstrable means of support." Br. 50. That contention is jaw-dropping: plaintiffs believe that the banks should have treated *any young Afghan without obvious financial support as someone working with terrorists*. Not only is that theory implausible, it also would not establish that SCB was aware that Azizi was so intertwined with terrorists that by banking him SCB was undertaking a role in terrorist attacks. Plaintiffs argue that Azizi's dealings with cell phones were "the definitive red flag of all red flags," *id.* (citation omitted), but they do not point to any allegations that an SCB defendant was even aware of the cell-phone purchases, let alone their role in funding terrorism in Afghanistan.

*Money Laundering*. Plaintiffs allege that the SCB defendants "provided financial services" to Al Zarooni Exchange and Mazaka General Trading, which were allegedly "front" companies for Khanani, who in turn laundered money for al-Qaeda and the Haqqani Network. J.A. 294 (¶ 458). They do not elaborate on what transactions the SCB defendants provided for

Al Zarooni Exchange and Mazaka General Trading beyond "facilitat[ing] USD-denominated transactions." J.A. 294-295 (¶¶ 461-462). There is nothing unlawful or unusual about "facilitating [dollar]-denominated transactions" that would necessarily imply a role in terrorist activity. This is precisely why the Supreme Court in *Twitter* cautioned that "culpability of some sort is necessary to justify punishment of a secondary actor, lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." 143 S. Ct. at 1222 (alterations and internal quotation marks omitted). Nothing about processing dollar-denominated transactions means that the SCB defendants were even aware at the time that Al Zarooni or Mazaka was operating for the benefit of Khanani, let alone for the indirect benefit of an FTO.

None of plaintiffs' responses is persuasive. Plaintiffs emphasize (at 54) their allegation that an unnamed compliance employee at "SCB Dubai" learned by 2012 that SCB New York had been "carry[ing] out USD money-laundering transactions for the Khanani MLO." J.A. 296 (¶ 466). They also point to allegations that whistleblowers in 2013 concluded that SCB had "blood on its hands." Br. 54-55 (quoting J.A. 297 (¶ 469)). But as the district court explained, plaintiffs never allege that any of these employees actually

conveyed their information to any SCB defendant (and of course plaintiffs do not provide any details about how the information was conveyed). *See* S.A. 39. Even allegations submitted on information and belief require enough factual detail to support a plausible inference of general awareness. *See Arista Records, LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

Plaintiffs incorrectly argue (at 55) that their whistleblower allegations are at least as specific as the allegations that this Court deemed sufficient to establish general awareness in *Kaplan*. In *Kaplan*, the Court concluded that the defendant bank was generally aware that its customers were acting for the benefit of Hizbollah, "because Hizbollah repeatedly publicized those relationships on Hizbollah websites and in news media." 999 F.3d at 862. Although the allegations there were "lacking some details," *id.* at 864, they provided enough information about how the customers' relationships were made public in a way that would or should have come to the bank's attention. Here, by contrast, the complaint offers zero details about when or how the whistleblowers allegedly made the relevant information known to the SCB defendants—or if they even made it known to the SCB defendants at all.

Plaintiffs also contend (at 57) that they have alleged the SCB defendants' general awareness because *other* banks filed Suspicious Activity

Reports about Khanani. They add that SCB "had 'know your customer' obligations that would have exposed those connections," and that bankers "insist" on knowing the true beneficiary of their transactions. Br. 57. That argument is wrong on both the facts and the law. With respect to the facts, the complaint does not actually allege that the banks ran a "know your customer" search on Al Zarooni and Mazaka. And there is no allegation that SCB knew Al Zarooni or Mazaka was funding terrorism from which the relevant attacks were reasonably foreseeable.

With respect to the law, if merely pointing to the existence of "know your customer" obligations were sufficient to establish general awareness, then presumably any aiding-and-abetting claim against a bank would automatically satisfy that element. *But see Honickman*, 6 F.4th 487 (concluding that plaintiffs did not establish bank's general awareness); *Siegel*, 933 F.3d at 224-225 (same). Indeed, this Court held in *Siegel* that a bank's failure to follow regulations is *not* sufficient to establish general awareness. *Id.* at 225. Failing to meet a know-your-customer obligation may mean a regulatory penalty, but it cannot justify aiding-and-abetting liability because the bank does not know that it is playing any role in terrorist activity.

*Fertilizer Companies*.  Plaintiffs focus (at 38-45) on the fact that the SCB defendants had a banking relationship with two Pakistani fertilizer companies, Fatima and Pakarab.  First, plaintiffs do not dispute that Fatima and Pakarab were legitimate businesses producing a lawful product, CAN fertilizer.  Second, plaintiffs acknowledge that SCB provided routine services for Fatima and Pakarab, namely "foreign exchange and export finance services" and "letters of credit."  J.A. 306, 506 (¶¶ 505, 1075-1076).  Under *Honickman*—and certainly in the wake of *Twitter*—providing routine services to a legitimate business typically cannot demonstrate general awareness. *See Honickman*, 6 F.4th at 499; *Twitter*, 143 S. Ct. at 1221 ("[I]f aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer.").

To be sure, *Honickman* recognizes an exception.  Non-terrorist customers may nevertheless be "so closely intertwined" with "violent terrorist activities that one can reasonably infer that [the bank] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [FTO] attacks were foreseeable." 6 F.4th at 499 (citations omitted).  But plaintiffs have not plausibly alleged that Fatima

-54-

and Pakarab were so closely intertwined with al-Qaeda. The complaint does not even allege that Fatima and Pakarab were directly or deliberately providing their products to terrorists. Many companies manufacture products that can be misused by terrorists—from fertilizer and pipes to pressure cookers and household cleaners. That does not make those companies the alter egos of terrorist groups.

Plaintiffs misleadingly refer to "Fatima's continued provision of explosives to the terrorists" and its "deliberate practices relating to CAN fertilizer." Br. 39. But all they actually allege is that some Fatima products ended up in the hands of terrorists through a chain of distribution, *see* p. 13, *supra*, and Fatima did not take sufficient actions to stop the downstream misuse of its products by FTOs, *see, e.g.*, J.A. 314-315 (¶ 522) ("Fatima's corporate leaders know this is happening . . . but they have refused pleas to control the flow.") (emphasis omitted). That type of inaction would not usually be enough for aiding-and-abetting liability even if committed by the banks themselves. *See Twitter*, 143 S. Ct. at 1220-1221 ("[O]ur legal system generally does not impose liability for mere omissions, inactions, or nonfeasance."). It cannot possibly be enough to infer general awareness on the part of the banks,

simply because some of their customers were allegedly not diligent enough in preventing their lawful products from falling into terrorists' hands.

Plaintiffs argue that SCB had "reason to suspect that it was assuming a role in the Syndicate's terrorist activities." Br. 44. Plaintiffs emphasize that in 2011 "major Western media" allegedly "reported that Fatima was producing nearly all the CAN fertilizer used by the terrorists in their Afghanistan IED campaign." *Id.* at 38-39. And plaintiffs, joined by their amici, place great weight on their allegation that in 2013 a representative from the Department of Defense met with SCB defendants to discuss the misuse of Fatima products. Pls. Br. 39-40; *Bonacasa* Pls. Amicus Br. 9-11. Even taking all that as true, it only means that SCB was aware that some of its customers were making legitimate products that could be misused by terrorists. As the district court put it, "even if Standard Chartered was made aware of the fact that a small portion of Fatima and Pakarab's products was being misused— not by Fatima and Pakarab, but by other individuals after it had been purchased—that in and of itself is insufficient to establish that Standard Chartered was generally aware of the role it was playing in terrorist activities." S.A. 44.

Finally, plaintiffs and their amici seek support in *Bonacasa* v. *Standard Chartered PLC*, 2023 WL 2390718, at \*10-15 (S.D.N.Y. Mar. 7, 2023), an unpublished pre-*Twitter* decision that declined to dismiss similar allegations relating to SCB's banking services for Fatima. Pls. Br. 40, 45; *Bonacasa* Pls. Amicus Br. 4-7. As SCB has explained in a motion for reconsideration, *Bonacasa*'s reasoning (which is itself erroneous) does not survive *Twitter*. *See* Mot. for Recons., *Bonacasa* v. *Standard Chartered PLC*, No. 22-cv-3320 (S.D.N.Y. June 23, 2023), ECF No. 61. The district court here correctly did not reach the same result as *Bonacasa*, and neither should this Court.

## 2. Deutsche Bank defendants

As with the SCB defendants, plaintiffs try to establish the Deutsche Bank defendants' general awareness by piling inference upon inference. For both the alleged VAT fraud and alleged money laundering, plaintiffs fail to adequately allege that the purported schemers were Deutsche Bank customers or that the Deutsche Bank defendants were aware of their customers' connections to terrorism. That is not surprising. At the time of the attacks at issue, no public sources connected any of the Deutsche Bank defendants' alleged clients to terrorism. *See Honickman*, 6 F.4th at 501

(defendants must have "had the relevant general awareness *at the time* that [they] provided" the relevant assistance) (emphasis added).

*VAT Fraud.* Plaintiffs allege that "Azizi used Deutsche Bank accounts" to commit VAT fraud and that "[o]n information and belief" the Deutsche Bank defendants "knowingly aided . . . transactions with Ahmed and the Ahmed Cell." J.A. 275, 285 (¶¶ 413, 431). Notably, plaintiffs do not even allege that these VAT fraudsters—Azizi and Ahmed—were direct customers of Deutsche Bank. Plaintiffs also do not allege any facts demonstrating that the Deutsche Bank defendants were aware that they were facilitating the alleged frauds of these individuals, or that these individuals had connections to the FTOs that injured plaintiffs. Instead, plaintiffs allege that Deutsche Bank was involved in some VAT-fraud schemes, Br. 63, and that public sources "linked such fraud to terrorist financing in the 2000s," Br. 64. Again, unspecified links between fraud and terrorism do not establish that the Deutsche Bank defendants were generally aware of a role in terrorism linked to the *specific attacks* that injured plaintiffs. *See Honickman*, 6 F.4th at 494.

Plaintiffs also insist (at 64-65) that Deutsche Bank's behavior with respect to Azizi deviated from the norm, but their allegations do not support that theory. Plaintiffs make the conclusory allegation that Deutsche Bank

engaged in irregular transactions, *see* J.A. 274-276 (¶¶ 410-415), but they point only to routine actions like "processing transactions" that do not raise any inference of complicity with terrorism. Br. 65; *see* J.A. 96 (¶ 78). Plaintiffs also allege that Deutsche Bank received warnings from governmental officials about potential VAT fraud, *see* J.A. 275, 283-284 (¶¶ 411, 425-427), and raised internal concerns regarding certain transactions, *see* J.A. 393, 411, 415-416 (¶¶741, 791, 806-809). But plaintiffs draw no connection between these alleged warnings and Azizi or Ahmed, let alone any FTOs.

Plaintiffs also point to purported red flags that "made it at least plausibly foreseeable that Azizi's fraud was connected to the Syndicate." Br. 66. For example, they reiterate that Azizi's profile (including his Afghan nationality) and his transactions in mobile phones should have marked him as connected to terrorists. *Id.* All of these arguments fail for the same reasons given earlier. *See* pp. 48-50, *supra*.[7] And as the district court correctly held, cell phones "have a wide variety of other non-nefarious uses," and "the

---

[7] Plaintiffs also argue that the district court was too quick to dismiss their allegations about the Ahmed cell. Br. 66. But they do nothing to resuscitate that theory. They point to a few snippets of the complaint that talk about "carbon-related trades" executed by Deutsche Bank. J.A. 283 (¶ 425). And they highlight that an employee expressed concern about those trades. None of that shows a connection to the terrorist activities that led to these specific attacks.

[c]omplaint does not allege that . . . Deutsche Bank was involved in, or aware of, these cell phone purchases." S.A. 32.

*Money Laundering*. Plaintiffs allege that Deutsche Bank collaborated with the Russian mafia to launder money. Br. 67. According to plaintiffs, Deutsche Bank should have been aware that al-Qaeda would use the Russian scheme to move opium proceeds. *Id.* at 67-69. But under *Siegel*, a bank's awareness that it is helping non-terrorist customers violate the law is not itself sufficient to allege the general-awareness element of ATA liability. 933 F.3d at 225. In other words, it is a giant leap from aiding Russian mobsters with money laundering to aiding Afghan terrorists with bombings. As the district court explained, "[s]etting up a Laundromat in itself, even if illegal, is insufficient to establish Deutsche Bank's general awareness of its role in Syndicate terrorist attacks in Afghanistan." S.A. 23. "[H]aving any role" in global money laundering "is deplorable," but the ATA "only provides for civil liability where a plaintiff can establish general awareness of a defendant's role in the specific terrorist attacks which caused her injury." S.A. 24.

Plaintiffs also argue (at 68) that they have established the requisite general awareness through allegations that Khanani, a money launderer for the Syndicate, "used [Deutsche Bank's] Russian laundromat to move money."

In truth, the complaint fails to allege any non-conclusory facts tying Khanani to a "laundromat" run by a Deutsche Bank defendant.  Plaintiffs allege only that they *believe* that, through discovery, they will be able to establish that Khanani was connected to the Deutsche Bank defendants' alleged laundromats.  J.A. 258 (¶ 356 n.283).  That allegation plainly fails to satisfy plaintiffs' pleading burden.

Plaintiffs also try to establish general awareness by alleging that the Deutsche Bank defendants provided financial services to Al Zarooni Exchange and Mazaka General Trading, which allegedly were fronts for Khanani.  But plaintiffs fail to allege that the Deutsche Bank defendants were aware that these companies were fronts or otherwise connected to Khanani or the Syndicate.  Plaintiffs suggest (at 17) that the banks must have known about the connection between these "front" companies and Khanani because Khanani's son Obaid was a senior manager at Al Zarooni.  But the complaint does not allege that the defendants were actually aware of this information. The complaint thus fails to establish general awareness, as the district court correctly concluded.  *See* S.A. 27.

Finally, Plaintiffs try to establish Deutsche Bank's "general awareness" by pointing to allegations that Deutsche Bank participated in fraudulent

mirror trades.  Br. 21.  But as the district court correctly held, "[a]n allegation of financial improprieties, absent factual allegations which would permit the Court to infer Deutsche Bank was aware those improprieties were connected foreseeably to Syndicate attacks in Afghanistan, is insufficient to establish plausibly JASTA's "general awareness" element."  S.A. 23-24.

### 3.  Danske Bank defendants

*VAT Fraud.*  As the district court explained, the complaint does not allege "any specific connection" between Danske Bank accounts like the Swefin account and terrorist financing.  S.A. 49-50.  Instead it alleges only a historic connection between Swefin's *type* of financing and terrorist funding. *Id.*  Rather than stand behind their operative complaint, plaintiffs ask to amend it yet again to add allegations about a recent news article linking Swefin to al-Qaeda's operations in Afghanistan.  Br. 72.  But plaintiffs offer no explanation for how an article published years *after* Danske Bank's alleged transactions with Swefin could establish the bank's contemporaneous awareness, and they fail even to argue that the particular Swefin fraud at Danske Bank financed terrorism. *See Honickman*, 6 F.4th at 501.

*Money Laundering.*  Plaintiffs wrongly contend (at 70-72) that Danske Bank was generally aware that it was participating in money laundering that

funded terrorism. Plaintiffs ask this Court (at 71) to infer that Danske Bank was generally aware that its money-laundering failures had ties to terrorism because of the operation's "size" and because transactions took place in Estonia. According to plaintiffs, Estonia was allegedly "a key finance and logistics hub for transnational terrorist groups." Br. 71. Merely alleging that a bank processed transactions in a high-risk country does not satisfy plaintiffs' pleading burden to show the bank "knew or intended that those funds would be sent to [al-Qaeda] or to any other terrorist organizations." *Siegel*, 933 F.3d at 225.

Plaintiffs assert that a customer of Danske Bank transferred funds in 2014 to Mazaka General Trading. Br. 25-26, 71. But the complaint fails to allege that any public source alerted Danske Bank to a connection between Mazaka and Khanani, al-Qaeda, or the Haqqani Network before the 2014 transfers, and they plead no other transfers before or after 2014. Under *Honickman*, that temporal defect is fatal to plaintiffs' claims. *See* 6 F.4th at 502 (no general awareness where plaintiffs failed to allege that connections between bank customers and FTO were public knowledge at the time of the transactions). Plaintiffs try to argue that "a Dubai-based shell company choosing to bank with Danske's backwater Estonian branch" is inherently

suspicious.  Br. 71.  But once again, this Court cannot simply assume that any transaction in a high-risk area means the defendants were aware that they were playing a role in terrorist activities linked to these specific attacks.[8]

## II. PLAINTIFFS FAIL TO STATE A CLAIM THAT THE BANKS AIDED AND ABETTED A BROADER RACKETEERING ENTERPRISE OF DISPARATE TERRORIST GROUPS.

The district court correctly dismissed plaintiffs' second cause of action, which claims that the banks aided and abetted a broader terrorist "[c]ampaign, comprising a pattern of racketeering acts that included, but were not limited to, the attacks that injured plaintiffs."  Br. 73.  Plaintiffs' attempt to hold the banks liable for terrorist activity beyond the specific attacks that injured them is flatly inconsistent with the ATA's text.  The ATA provides that, "for an injury arising from *an act* of international terrorism," a secondary tortfeasor may be liable for assisting the primary tortfeasor in committing "*such an act* of international terrorism."  18 U.S.C. § 2333(d)(2) (emphases added).  As the

---

[8] Plaintiffs also contend (at 72) that Danske Bank's guilty plea "in a completely separate fraud case" shows its general awareness of its role in terrorist activities.  S.A. 48.  But as the district court correctly recognized, plaintiffs never "established a nexus linking the fraud in that case to the terrorist attacks" at issue in this case.  *Id.*  Plaintiffs' argument thus suffers from the same fundamental flaw as their other arguments.  A guilty plea in one fraud scheme does not amount to general awareness of a role in the terrorism linked to these specific attacks.  *See Honickman*, 6 F.4th at 496.

district court explained, "it would be quite unnatural to read" that language to mean "that the 'act' causing injury was not the particular attack in which a plaintiff was injured, but instead a collection of hundreds of attacks spanning [many] years." S.A. 60 (citation omitted). The court noted that the other courts to consider the question had agreed. *See id.* (citing *Atchley* v. *AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 212 (D.D.C. 2020), *rev'd on other grounds*, 22 F.4th 204 (D.C. Cir. 2022), *cert. pending*, No. 23-9 (U.S. June 30, 2023); *Cabrera* v. *Black & Veatch Special Projs. Corps.*, 2021 WL 3508091, at *25-26 (D.D.C. July 30, 2021)); *see also Taamneh* v. *Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018).

In addition to the text, Supreme Court precedent now squarely forecloses plaintiffs' RICO theory. In analyzing "what precisely a defendant must aid and abet" to establish aiding-and-abetting liability under the ATA, the Court in *Twitter* concluded that it is "not enough" to aid and abet "a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 143 S. Ct. at 1223-1224. Instead, a defendant must aid and abet "another person in the commission of the actionable wrong—here, an act of international terrorism." *Id.* *Twitter* thus distinguished between

assisting an "act of international terrorism" and assisting a broader campaign or enterprise, and concluded that the ATA covered only the former.

Plaintiffs argue (at 74) that "in *Halberstam* itself, the 'act assisted' was not the individual murder but the long-running 'burglary enterprise.'" But *Twitter* considered and rejected that argument, too. The Court explained that the defendant's role in the "illicit enterprise" in *Halberstam* was so systemic that she was liable for aiding and abetting "each and every burglary committed" by her partner, including the one that foreseeably led to Halberstam's death. 143 S. Ct. at 1224. The relevant "act" she assisted, however, remained the burglary of Halberstam's home, not the broader enterprise. *Id. Halberstam* thus does not save plaintiffs' atextual argument, nor do the other pre-JASTA cases plaintiffs cite (at 74). Plaintiffs cannot avoid the need to plead and prove that the banks aided and abetted specific terrorist attacks by claiming assistance to some broader terrorist enterprise.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

s/ Jeffrey B. Wall
_____

BRIAN T. FRAWLEY
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
frawleyb@sullcrom.com

*Counsel for Danske Bank A/S*

DAVID G. JANUSZEWSKI
SHEILA C. RAMESH
SESI V. GARIMELLA
MILES WILEY
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3352
djanuszewski@cahill.com

*Counsel for Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas*

JEFFREY B. WALL
JUDSON O. LITTLETON
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

SHARON L. NELLES
ANDREW J. FINN
BRADLEY P. SMITH
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Bank (Pakistan) Limited*

AUGUST 10, 2023

-67-

## CERTIFICATE OF COMPLIANCE

This Brief complies with Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,979 words.

This Petition also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 10, 2023

## CERTIFICATE OF SERVICE

I certify that on August 10, 2023, the foregoing Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system. I further certify that all parties required to be served have been served.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 10, 2023