# 23-132

## United States Court of Appeals
## for the Second Circuit

◆❚◆

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY,
TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER,

*(caption continued on inside cover)*

On Appeal from the United States District Court for the Eastern District
of New York, Case No. 1:19-CV-11876 (AKH)

**BRIEF OF THE INSTITUTE OF INTERNATIONAL BANKERS,
AMERICAN BANKERS ASSOCIATION,
BANK POLICY INSTITUTE,
THE CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA, EUROPEAN BANKING FEDERATION, AND
SECURITIES INDUSTRY AND FINANCIAL MARKETS
ASSOCIATION, AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

MARK G. HANCHET
ROBERT W. HAMBURG
BENJAMIN D. BRIGHT
  *Mayer Brown LLP*
  *1221 Ave. of the Americas*
  *New York, NY 10020*
  *(212) 506-2500*

ANDREW J. PINCUS
MARC R. COHEN
ALEX C. LAKATOS
  *Mayer Brown LLP*
  *1999 K Street NW*
  *Washington, DC 20006*
  *(202) 263-3000*

*Counsel for* Amici Curiae

PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FREDERICK C. BENSON, BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER, MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND, AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL, RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER, TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD, PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE, PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS, LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ, FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE, KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE, PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS, JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS, CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM, DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH HIS NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS NEXT FRIEND, STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, MICHAEL FESTUS FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH HIS NEXT FRIEND, KARA GIBSON, KARA GIBSON, JESSICA ANNE BENSON, JOANNA

GILBERT, EMMITT DWAYNE BURNS, JANICE CARUSO, PAUL EDWARD GOINS, III, PATRICIA GOINS, DANA RAINEY, L. C. D., BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW GOLLNITZ, TYLER GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK GORDON, ADRIAN KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY ANDERSON, GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN, DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY HARDISON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA HARDISON, SHEILA RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER, BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM SAMUEL HARTSWICK, ALEX HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY LOUISE HORNS, BENJAMIN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M. HUNTER, KENNA HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT, SHELBY IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT, CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND, CHARLOTTE LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE, PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT FRIEND, KENT ALAN SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS, TRENT LORNE SKEENS, Z. R. S., BY AND THROUGH HER NEXT FRIEND, KENT ALAN SKEENS, BRIAN CHRISTOPHER JERGENS, TERENCE LONNIE JONES, JOHN C. MCCARTHY, ALISON R. POHN, KEVIN KING, STEPHANIE ANN MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY AND THROUGH HER NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN LAMBKA, JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR, MEREDITH LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT FRIEND MIRANDA LANDRUM, JAMES R. LANDRUM, JANET LANDRUM, MIRANDA LANDRUM, HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR., ALEXANDER LAU, DAVID WILLIAM HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G. MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L. MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK CHARLES MCEVOY, JANICE H. PROCTOR,

LUANN VARNEY, SHANNON K. MCNULTY, JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J. METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS, NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L. OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS,  TRACY ANNE HERRING, ADAN PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ, B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ, S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY, KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS W. PETERS, G.R.P., BY AND THROUGH HER NEXT FRIEND, ASHLEY PETERS, CHRISTINE H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS, BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ, SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J.

SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY, LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS, GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS, LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE, GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY, FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN, NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE, CHRISTOPHER MICHAEL VAN ETTEN, CATHERINE KIMBERLY VAUGHN KRYZDA, C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L. WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN, KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART LAMAR PERRY, AARON WILLIAM PRESCOTT,

*Plaintiffs-Appellants*,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST, KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R., BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY STRANGE, KEVIN WILLIAMS,

*Plaintiffs*,

–v.–

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

*Defendants-Appellees*,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN BRANCH, DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH, PLACID NK CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE LLC,

*Defendants*.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* The Institute of International Bankers has no parent corporation, and no publicly held corporation owns more than ten percent of its stock.

*Amicus Curiae* The American Bankers Association is a non-profit corporation. It has no parent corporation, and no publicly held corporation owns more than ten percent of its stock.

*Amicus Curiae* the Bank Policy Institute is a nonprofit, tax-exempt organization incorporated in the District of Columbia. It has no parent corporation, and no publicly held corporation owns more than ten percent of its stock.

*Amicus Curiae* the Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia. It has no parent corporation, and no publicly held corporation owns more than ten percent of its stock.

*Amicus Curiae* the European Banking Federation is a nonprofit, tax-exempt organization incorporated in the Belgium. It has no parent corporation, and no publicly held corporation owns more than ten percent of its stock.

*Amicus Curiae* The Securities Industry and Financial Markets Association is a non-profit corporation. It has no parent corporation, and no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT......................i

TABLE OF AUTHORITIES.................................................iv

INTEREST OF *AMICI CURIAE*...........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................6

ARGUMENT ...........................................................10

I.    *Twitter* Adopted A More Demanding Pleading Standard For
      JASTA's "Knowingly Providing Substantial Assistance"
      Element Than The Test Previously Applied By This Court. .......10

      A.    *Twitter* Disapproved The Standard Previously Applied
            By This Court. .........................................11

      B.    A Plaintiff Must Plausibly Allege That A Defendant
            "Consciously, Voluntarily, and Culpably Participate[d]
            In" The Terrorist Attack That Injured The Plaintiff. .........16

II.   Plaintiffs Bear A Particularly Heavy Burden When
      Asserting JASTA Aiding-And-Abetting Claims Against
      Legitimate Businesses. ......................................19

      A.    *Twitter* Requires Allegations Supporting A Plausible
            Inference Of Highly Culpable Conduct For Claims
            Against Legitimate Businesses............................21

      B.    "Know Your Customer" Standards Provide No Basis
            For Subjecting Banks To More Expansive Aiding-And-
            Abetting Liability. ....................................25

III.  Reversal Would Inflict Serious Harm On Legitimate
      Businesses And U.S. Foreign Policy Interests. ...........34

CONCLUSION .........................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atchley* v. *AstraZeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022)............................................................ 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................ 36

*Berman v. Morgan Keegan & Co.*,
455 F. App'x 92 (2d Cir. 2012) ............................................................ 27

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute &*
*Shareholder Derivative Litig.*,
2015 WL 71562 (S.D. Fla. Jan. 6, 2015) ............................................ 20

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021)........................................................ *passim*

*IIT, an Int'l Inv. Tr. v. Cornfeld*,
619 F.2d 909 (2d Cir. 1980) ............................................................ 30

*Kaplan* v. *Al Jazeera*,
2011 WL 2314783 (S.D.N.Y. June 7, 2011) ...................................... 21

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) .................................................. 7, 8, 11, 16

*Monsen v. Consol. Dressed Beef Co.*,
579 F.2d 793 (3d Cir. 1978) ............................................................ 33

*Peled v. Netanyahu*,
2017 WL 7047931 (D.D.C. Oct. 16, 2017)......................................... 20

*Pittman by Pittman v. Grayson*,
149 F.3d 111 (2d Cir. 1998) ............................................................ 30

*PLB Invs. LLC v. Heartland Bank & Tr. Co.*,
2021 WL 492901 (N.D. Ill. Feb. 9, 2021) ......................................... 27

iv

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007), *aff'd* 349 F. App'x
    637 (2d Cir. 2009)................................................................ 30

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ................................................. 6

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) ............................................. 35

*Twitter v. Taamneh*,
    143 S. Ct. 1206 (2023)............................................... *passim*

*United States v. Gill*,
    748 F.3d 491 (2d Cir. 2014) ............................................. 11

*Weiss v. Nat'l Westminster Bank, PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006).............................. 26

*Wildman v. Deutsche Bank Aktiengesellschaft*,
    2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022)................... 7

*Woods v. Barnett Bank of Ft. Lauderdale*,
    765 F.2d 1004 (11th Cir. 1985) ....................................... 33

*Woodward v. Metro Bank of Dallas*,
    522 F.2d 84 (5th Cir. 1975) ....................................... 32, 33

## Statutes and Regulations

18 U.S.C. § 2331 ................................................................. 1

18 U.S.C. § 2333(d) ............................................................ 1

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 (2016)......................... 6

31 C.F.R. § 1010.230......................................................... 27

31 C.F.R. § 1020.220......................................................... 27

## Other Authorities

Tracey Durner & Liat Shetret, Global Ctr. on Coop. Security/Oxfam, *Understanding Bank De-Risking and its Effects on Financial Inclusion* (2015), https://tinyurl.com/y3r99hdn ............................................................. 37

*Economic and Financial Reconstruction in Iraq: Hearing before the Senate Banking Subcommittee on International Trade and Finance* (Feb. 11, 2004), https://bit.ly/45dPRow .............. 38

FATF, *FATF takes action to tackle de-risking* (Oct. 23, 2015), https://tinyurl.com/yyot5v83 ............................................................. 37

FATF, *International Standards on Combating Money Laundering and the Financing of Terrorism and Proliferation: The FATF Recommendations* (Feb. 2023) ................... 26

FATF, *Outcomes FATF Plenary, 22-24 February 2023* (Feb. 24, 2023), https://www.fatf-gafi.org/en/publications/Fatfgeneral/outcomes-fatf-plenary-february-2023.html ............................................................. 26

FFIEC, *BSA/AML Examination Manual – BSA/AML Risk Assessment* (2020), https://bsaaml.ffiec.gov/docs/manual/03_BSAAMLRiskAssessment/01.pdf ...................................................... 27

Press Release, U.S. Dep't of Treasury, The United States and Iraq Sign Loan Guarantee Agreement (Jan. 5, 2017), https://bit.ly/43ToFKD ............................................................. 38

Alan Sykes, *Corporate Liability for Extraterritorial Torts Under the Alien Tort Statute and Beyond: An Economic Analysis*, 100 Geo. L.J. 2161 (2012) .................................................... 35

U.S. Dep't of Treasury, *The Department of the Treasury's De-risking Strategy* (2023), https://home.treasury.gov/system/files/136/Treasury_AMLA_23_508.pdf ............................................. 37

## INTEREST OF *AMICI CURIAE*[1]

The Institute of International Bankers (IIB) is the only national association devoted exclusively to representing and advancing the interests of banking organizations headquartered outside the United States that operate in the United States. The IIB's membership consists of internationally-headquartered banking and financial institutions from over 35 countries. In the aggregate, IIB members' U.S. operations hold more than $5 trillion—or one-fifth—of this country's total banking assets; provide one-third of small-business loans; and finance more than one-third of infrastructure projects. The IIB frequently appears before this and other federal courts as *amicus curiae* in cases that raise significant legal issues related to banking, including those involving the scope of the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* (ATA), as amended by the Justice Against Sponsors of Terrorism Act (JASTA), codified at 18 U.S.C. § 2333(d).

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, person, or entity other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

The American Bankers Association (ABA) is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its over one million employees. ABA members provide banking services in each of the fifty states and the District of Columbia. The ABA's membership includes all sizes and types of financial institutions, including very large and very small banking operations.

The Bank Policy Institute is a nonpartisan public policy, research and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States. The Institute produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues. Issues of focus include capital and liquidity regulation, anti-money-laundering, payment systems, consumer protection, bank powers, bank examination, and competition in the financial sector.

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The European Banking Federation is the voice of the European banking sector, uniting 32 national banking associations in Europe that together represent some 3,500 banks—large and small, wholesale and retail, local and international—employing about 2.6 million people.

The Securities Industry and Financial Markets Association (SIFMA) is the leading trade association for broker-dealers, investment banks, and asset managers operating in the U.S. and global capital markets. On behalf of the industry's nearly 1 million employees, SIFMA advocates for legislation, regulation and business policy, affecting retail

and institutional investors, equity and fixed income markets and related products and services. SIFMA serves as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. SIFMA also provides a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

*Amici* and their members have a strong interest in the proper interpretation of the ATA, which, if construed too broadly, would threaten businesses with liability for engaging in legitimate, non-culpable conduct. Congress enacted the civil liability provisions of the ATA to enable U.S. citizens who are victims of terrorism to hold accountable the terrorists who engage in those horrific acts, as well as the individuals or entities intimately involved in supporting those acts. That is a laudable and important goal.

Banks engaged in international transactions are among the most frequent targets of JASTA claims—but these claims are asserted against other legitimate businesses as well. It is therefore important to *amici*

that federal courts faithfully apply the prerequisites for aiding-and-abetting liability recognized by the Supreme Court in its recent *Twitter v. Taamneh* decision. *Amici* submit this brief to explain the standard recognized in *Twitter* and the adverse consequences that would result from a broader liability standard.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* strongly condemn all acts of terrorism. Individuals and organizations that commit these heinous acts, and others who participate in them, should be brought to justice and required to compensate their victims. But Plaintiffs-Appellants (Plaintiffs) did not sue those parties; rather, they are seeking to impose aiding-and-abetting liability on financial institutions based on an impermissibly expansive interpretation of the ATA—the very construction that the Supreme Court rejected in *Twitter v. Taamneh*, 143 S. Ct. 1206 (2023).

Congress enacted the ATA to provide U.S. victims of terrorism with a cause of action to obtain compensation for their injuries. The ATA initially limited liability to those who committed acts of international terrorism. *Rothstein v. UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013). Congress amended the law in 2016 by enacting JASTA, which imposes liability on those who aid and abet, or conspire with, persons who commit acts of international terrorism that were committed, planned, or authorized by a designated foreign terrorist organization. Pub. L. No. 114-222, 130 Stat. 852 (2016).

6

Plaintiffs are U.S. nationals injured by terrorist attacks committed in Afghanistan between 2011 and 2016 and family members of U.S. citizens injured or killed in those attacks. Rather than suing the various groups that committed the attacks, Plaintiffs filed this lawsuit against Defendants-Appellees (Defendants)—three banks—alleging that Defendants provided services to customers who allegedly gave various forms of support to a terrorist group. Plaintiffs contend that the banks are liable under the ATA for aiding and abetting the attacks.

Applying the standards laid out by this Court in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), the district court correctly dismissed the complaint because Plaintiffs failed to adequately plead the "general awareness" and "knowingly providing substantial assistance" elements of a JASTA aiding-and-abetting claim. *Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 WL 17993076, at *6-7 (E.D.N.Y. Dec. 29, 2022).

After the district court issued its decision, the Supreme Court decided *Twitter*—announcing a significantly more stringent standard for pleading the knowing and substantial assistance element than the test

applied by this Court in *Kaplan* and *Honickman*. Indeed, the Supreme Court explicitly rejected determinations by the Ninth Circuit identical to this Court's pre-*Twitter* JASTA jurisprudence.

The *Twitter* Court held that JASTA aiding-and-abetting claims require plausible allegations that the defendant "consciously, voluntarily, and culpably" participated in the terrorist attack that injured the plaintiff. 143 S. Ct. at 1230. The Court characterized that standard as demanding "truly culpable conduct." *Id.* at 1221.

The Supreme Court's analysis in *Twitter* was animated by the concern that legitimate businesses providing generally available services could unjustifiably be ensnared by an overbroad liability test. The Court therefore set a particularly high bar for plaintiffs seeking to assert JASTA aiding-and-abetting claims against legitimate companies, such as the claim in this case. Because such claims virtually always rest on alleged conduct remote from the terrorist act, the Court required allegations supporting a plausible inference of a high level of culpability—that the defendant took action to ally itself with the terrorist attack or the terrorist's goals.

Plaintiffs here have pointed to banks' "know your customer" standards, but those standards cannot fill the gap in their claim, for multiple reasons. *Twitter* makes clear that knowledge that some customers may be using a defendant's services to provide aid to terrorists is not sufficient to satisfy the "knowingly providing substantial assistance" standard—that standard requires allegations supporting a plausible inference that a legitimate company allied itself with the terrorist act or the terrorist goals.

Reversing the district court's dismissal would not only run directly counter to *Twitter* and its common-law underpinnings, but also discourage legitimate financial institutions from providing access to critical banking services around the world, thereby harming the global economy and undermining U.S. foreign policy goals. An overbroad liability standard would impose onerous litigation costs on banks that provide even remote services, such as U.S. dollar clearing, and those that do business in developing regions of the world, where financial institutions play a critical role in providing economic stability and security and help in the fight against international terrorism. Faced with the threat of sprawling and expensive litigation, banks may be motivated

to withdraw from those parts of the world, thereby increasing the risks of terrorism.

The Court should prevent these perverse consequences, implement the standard for liability recognized in *Twitter*, and affirm.

## ARGUMENT

### I. *Twitter* Adopted A More Demanding Pleading Standard For JASTA's "Knowingly Providing Substantial Assistance" Element Than The Test Previously Applied By This Court.

The plaintiffs in *Twitter* alleged that Twitter, Facebook, and Google aided and abetted ISIS in its 2017 attack at an Istanbul nightclub. 143 S. Ct. at 1215. The Supreme Court held insufficient the complaint's allegations that the companies provided communication services directly to ISIS users (allowing ISIS to recruit, fund-raise, and spread terrorist propaganda) and served that terrorist content to other users. *Id.* at 1230-31.

In reaching that conclusion, *Twitter* comprehensively addressed the pleading standard for JASTA's "knowingly providing substantial assistance" element. The Supreme Court rejected the principles

10

previously applied by this Court in *Kaplan* and *Honickman* and specified a different, much more stringent standard.[2]

## A. *Twitter* Disapproved The Standard Previously Applied By This Court.

The Ninth Circuit's interpretation of JASTA's "knowingly providing substantial assistance" element in its decision in *Twitter* closely resembled this Court's JASTA aiding-and-abetting precedents. The Supreme Court's explicit rejection of the Ninth Circuit's approach requires this Court to revise its standard. *See, e.g.*, *United States v. Gill*, 748 F.3d 491, 502 n.8 (2d Cir. 2014) ("[I]f 'there has been an intervening Supreme Court decision that casts doubt on our controlling precedent,' one panel of this Court may overrule a prior decision of another panel. The intervening decision need not address the precise issue decided by the panel for this exception to apply.") (internal quotation marks and citations omitted).

---

[2] *Amici* agree with Defendants that the district court correctly held that the complaint fails to plausibly allege facts supporting a plausible inference satisfying JASTA's "general awareness" element, *see* Def. Br. 44-64, but focus their submission on the "knowing and substantial assistance" element.

*First*, the Supreme Court held that JASTA's requirement of "knowing" provision of substantial assistance is separate from, and more demanding than, the "general awareness" element of a JASTA aiding-and-abetting claim. It is "designed to capture the defendant's state of mind with respect to their actions and the tortious conduct . . . not the same general awareness that defines *Halberstam*'s [general awareness] element." 143 S. Ct. at 1229. The Court specifically criticized the Ninth Circuit for "analyz[ing] the 'knowing' subelement as a carbon copy of the antecedent element of whether the defendants were 'generally aware' of their role in ISIS' overall scheme." *Id.*

This Court has applied the same approach as the Ninth Circuit, holding that "[t]he 'knowledge component'" of a JASTA aiding-and-abetting claim is satisfied "[i]f the defendant knowingly—and not innocently or inadvertently—gave assistance. . . . It d[oes] not require [defendant] to 'know' anything more . . . than what [it] knew for the general awareness element." *Honickman,* 6 F.4th at 499-500 (quoting *Kaplan,* 999 F.3d at 864).

The Supreme Court held instead that "knowingly providing substantial assistance" requires allegations supporting a plausible

inference of "conscious, voluntary, and culpable participation in another's wrongdoing"—stating that liability should be "cabin[ed]" to cases of "truly culpable conduct." *Id.* at 1221, 1223.

*Second*, *Twitter* held that the "knowing" and "substantial assistance" prongs must be considered "in tandem" to determine whether the "truly culpable conduct" standard is satisfied. "[L]ess substantial assistance require[s] more scienter" to "infer conscious and culpable assistance" and "if the assistance were direct and extraordinary then a court might more readily infer conscious participation in the underlying tort." 143 S. Ct. at 1222. "[T]he more attenuated the nexus [between the defendants' conduct and that terrorist act], the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 1230.

The Ninth Circuit erred by "separat[ing] the 'knowing' and 'substantial' subelements" rather than "'consider[ing] [them] relative to one another' as part of a single inquiry designed to capture conscious and culpable conduct." 143 S. Ct. at 1229.

This Court, like the Ninth Circuit, has addressed "knowing" and "substantial assistance" as analytically independent requirements. *See Honickman*, 6 F.4th at 499-500.

*Third*, the Supreme Court recognized *Halberstam*'s "articulat[ion of] six factors to help determine whether a defendant's assistance was 'substantial.'" 143 S. Ct. at 1219. But it rejected the Ninth Circuit's assessment of those factors as "a sequence of disparate, unrelated considerations without a common conceptual core." *Id*. at 1229. The Court explained that "[t]he point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Ibid*.

This Court has likewise addressed each of the "substantial assistance" factors in isolation without identifying the overarching question that the factors were designed to answer. *See Honickman*, 6 F.4th at 499-500.

*Fourth*, *Twitter* rejected the Ninth Circuit's "fram[ing of] the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general." 143 S. Ct. at 1229. Rather, a defendant "must have

aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong—here, an act of international terrorism." *Id.* at 1224. And, although the Court left open the possibility that a defendant could be found liable for serial attacks by a terrorist principal, it made clear that this would require a showing of "pervasive, systemic, and culpable assistance," such as where defendants "intentionally associated themselves with [a terrorist organization's] operations or affirmatively gave aid that would assist each of [the] terrorist acts" and "formed a near-common enterprise" with the terrorist group. *Id.* at 1228.

This Court, like the Ninth Circuit, had held that "knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman*, 6 F.4th at 499.

*Fifth*, the Supreme Court generally addressed *Halberstam*'s role in assessing JASTA aiding-and-abetting claims. The Court acknowledged that Congress identified the *Halberstam* case in JASTA's prefatory language, but criticized the Ninth Circuit for "hav[ing] understood JASTA's approval of *Halberstam's* 'legal framework' as requiring it to hew tightly to the precise formulations that *Halberstam* used." 143 S.

15

Ct. at 1223. Rather, courts should "ascertain the 'basic thrust' of *Halberstam*'s elements and determine how to 'adap[t]' its framework" to the facts of a particular case by keeping in mind "the common law of aiding and abetting upon which *Halberstam* rested and to which JASTA's common-law terminology points." *Id.* at 1220.

This Court's decisions in *Honickman* and *Kaplan* employed an approach similar to the Ninth Circuit, focusing exclusively on *Halberstam*'s text without considering its common-law underpinnings. *See Honickman*, 6 F.4th at 499-501; *Kaplan*, 999 F.3d at 865-66.

In sum, *Twitter* squarely rejected the test previously applied by this Court to determine whether a complaint satisfied JASTA's "knowingly providing substantial assistance" element. We next discuss the different, more stringent standard that *Twitter* adopted.

**B.  A Plaintiff Must Plausibly Allege That A Defendant "Consciously, Voluntarily, and Culpably Participate[d] In" The Terrorist Attack That Injured The Plaintiff.**

The Supreme Court held that JASTA's "knowingly providing substantial assistance" element imposes two related requirements. The first addresses "what exactly does it mean to 'aid and abet'" and the

second concerns "what precisely must the defendant have 'aided and abetted'"? *Twitter*, 143 S. Ct. at 1218.

To satisfy the first requirement, a complaint must plausibly allege that the defendant "abetted the underlying tort through conscious, 'culpable conduct.'" 143 S. Ct. at 1222. The defendant must have "consciously and culpably 'participate[d] in' a tortious act in such a way as to help make it succeed." *Id*. at 1225; *see also id*. at 1221 ("[C]ourts have long recognized the need to cabin aiding-and-abetting liability to *truly culpable conduct*") (emphasis added).

That is a demanding standard. The defendant's actions must "'have been calculated and intended to produce'" the tort, or the complaint must allege "some 'culpable conduct' and 'some degree of knowledge that [the defendant's] actions are aiding the primary violator.'" 143 S. Ct. at 1222.

Second, the defendant must "have aided and abetted the act of international terrorism that injured the plaintiff[]." 143 S. Ct. at 1225. That requires a "nexus between the alleged assistance and the terrorist act." *Id*. "The focus must remain on assistance for the tort for which the plaintiffs seek to impose liability." *Id*. at 1230.

17

Otherwise, the complaint must support a plausible inference "that defendants so systemically and pervasively assisted [a terrorist group] that defendants could be said to aid and abet every single . . . attack." 143 S. Ct. at 1228. Any such claim must be supported by an elevated level of culpability, akin to the agreement required to establish conspiracy liability. *Id.* at 1225; *see also id.* at 1228 (claims failed where plaintiffs failed to allege that "defendants and ISIS formed a near-common enterprise" or "intentionally associated themselves with ISIS' operations"); *id.* at 1230 ("[I]f a plaintiff's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise.").

In sum, the complaint must plausibly allege that the defendants "culpably 'associate[d themselves] with'" the terrorist attack that injured the plaintiffs, "'participate[d] in it as something that [they] wishe[d] to bring about,' or sought 'by [their] action to make it succeed.'" 143 S. Ct. at 1226 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949).[3]

---

[3] The Supreme Court reserved the question of *who* a defendant must be alleged to have aided and abetted in the commission of the terrorist act that injured the plaintiff—the individual who carried out the attack,

18

## II. Plaintiffs Bear A Particularly Heavy Burden When Asserting JASTA Aiding-And-Abetting Claims Against Legitimate Businesses.

The Supreme Court in *Twitter* expressed particular concern that overbroad aiding-and-abetting liability could entrap innocent, legitimate businesses. "[I]f aiding-and-abetting liability were taken too far," the Court warned, "then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." 143 S. Ct. at 1221.

The Court's concerns are well founded. Very few ATA cases are brought against the individuals or groups that planned, committed, or directly supported the attacks injuring the plaintiffs. Rather, virtually all of these claims target legitimate companies, resting on attenuated liability theories asserting that goods or services provided to customers in conflict-ridden areas of the world somehow assisted a terrorist

---

"some subgroup of [terrorist] operatives," or the terrorist group—stating that the absence of the required nexus to the terrorist act made it unnecessary to decide that question. 143 S. Ct. at 1225 n.12. Similarly, there is no need for this Court to address that issue in this case given the absence of allegations supporting a plausible inference of the required nexus.

organization and thereby aided and abetted a terrorist act. And they have ensnared numerous companies in multiple economic sectors.

Banks have been a particular target for these lawsuits. As in this case, claims are asserted by a large number of plaintiffs alleging that the bank defendant had one or more customers with ties to entities or governments that supposedly funded terrorist groups and that the provision of banking services to those customers therefore aided and abetted the terrorist acts committed by those groups.[4]

JASTA actions also have been filed against energy companies, defense contractors, pharmaceutical companies, agricultural businesses, charitable foundations, media and social media, and telecommunications companies.[5] These claims often rest on attenuated theories that the

---

[4] Cases pending in lower courts in this Circuit include *Averbach v. Cairo Amman Bank*, No. 19-cv-004 (S.D.N.Y. filed Jan. 1, 2019); *Bonacasa v. Standard Chartered PLC*, No. 22-cv-3320 (S.D.N.Y. filed Apr. 22, 2022); *Freeman v. HSBC Holdings PLC*, No. 18-cv-7359 (E.D.N.Y. filed Dec. 26, 2018); *Schansman v. Sberbank of Russia PJSC*, No. 19-cv-2985 (S.D.N.Y. filed Apr. 4, 2019); *Singer v. Bank of Palestine*, No. 19-cv-006 (E.D.N.Y. filed Jan. 1, 2019); *Bowman* v. *HSBC Holdings PLC*, No. 19-cv-2146 (E.D.N.Y. filed Apr. 11, 2019).

[5] *E.g., Atchley* v. *AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022) (pharmaceutical companies); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litig.*, 2015 WL 71562 (S.D. Fla. Jan. 6, 2015) (agricultural businesses); *Peled v. Netanyahu*, 2017 WL 7047931

20

businesses provided services or money alleged to have in some way supported terrorist activity.

To avoid subjecting innocent companies to the burdens of litigation, and potential unjustified liability, the Supreme Court required plaintiffs to satisfy a high standard when asserting an aiding-and-abetting claim against a legitimate business, as we next discuss.

### A. *Twitter* Requires Allegations Supporting A Plausible Inference Of Highly Culpable Conduct For Claims Against Legitimate Businesses.

In holding that JASTA aiding-and-abetting liability must be reserved for "truly culpable conduct," the Supreme Court emphasized the especially exacting test that applies when such claims are asserted against legitimate businesses.

*First*, such claims will virtually never be able to allege a direct link between the defendant's alleged assistance and the tort injuring the plaintiff. Legitimate companies do not directly aid terrorist acts.

---

(D.D.C. Oct. 16, 2017) (foundation); *Kaplan* v. *Al Jazeera*, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) (media company); *Twitter*, *supra* (social media companies); *Schmitz v. Ericsson Inc.*, No. 22-cv-2317 (D.D.C. filed Aug. 5, 2022) (telecommunications).

Rather, like the present case, these claims typically allege the provision of services asserted to have an attenuated link to support that is alleged to reach the terrorist group. "[T]he more attenuated the nexus" between the defendant's alleged conduct and the act of international terrorism at issue, the Supreme Court stated, "the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." 143 S. Ct. at 1230.

In other words, plaintiffs must show that the alleged aider and abettor intended to aid the terrorist's cause and did so by providing substantial aid. *See also* 143 S. Ct. at 1229 (stating that "plaintiffs' failure to allege any definable nexus between the defendants' assistance and that attack . . . at minimum—drastically increases their burden to show that defendants somehow consciously and culpably assisted the attack").[6]

*Second*, the provision of generally available commercial services cannot satisfy the "truly culpable conduct" standard—even if the

---

[6] To hold a defendant "liable for all the torts of [a terrorist] enterprise, then a showing of pervasive and systemic aid is required," 143 S. Ct. at 1230—which in turn requires culpability akin to a conspiracy claim, *id.* at 1225. *See also* page 18, *supra*.

defendant is alleged to know that its services are being used to benefit a terrorist group. 143 S. Ct. at 1230 (holding insufficient allegations that the defendants "supplied generally available" commercial services that the terrorist group "made use of" and that "defendants failed to stop [the terrorist group] despite knowing it was using" those services).

The Supreme Court explained that "a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them. That conclusion would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability moorings." 143 S. Ct. at 1229.

The *Twitter* plaintiffs' claim failed because they did not allege that the defendants engaged in any "act of encouraging, soliciting, or advising the commission of the [terrorist] attack," 143 S. Ct. at 1227, or that the defendants "gave [the terrorist group] any special treatment or words of encouragement," *id*. at 1226. Those are essential factual allegations needed to support an aiding-and-abetting claim against a legitimate business.

The Court confirmed that conclusion in explaining the Ninth Circuit's errors in applying the *Halberstam* substantiality factors. With respect to the factor relating to "the amount and kind of assistance," the Ninth Circuit erred by failing to consider that the services involved "were generally available." 143 S. Ct. at 1229. And when considering the factors relating to "the defendants' relationship to [the terrorist group] and the defendants' state of mind," the Ninth Circuit "should have given much greater weight to defendants' arm's-length relationship with [the terrorist group] . . . and their undisputed lack of intent to support [the terrorist group]." *Id*. at 1229-30.

In sum, because legitimate businesses that are the targets of JASTA aiding-and-abetting claims typically offer generally available services on a commercial basis to their customers, and because the provision of such services is virtually always remote from acts of international terrorism, *Twitter* requires that a claim based on the provision of such services must be supported by plausible allegations supporting an inference of a high degree of culpability. And the Court gave specific examples of the allegations that suffice: encouragement to the terrorist act that injured the plaintiff; "encouraging, soliciting, or

24

advising" with respect to that terrorist act; or singling out the terrorist group, or those aiding it, for special services, not available to other customers, that facilitated the support for the terrorist act.

**B.** **"Know Your Customer" Standards Provide No Basis For Subjecting Banks To More Expansive Aiding-And-Abetting Liability.**

Plaintiffs' pre-*Twitter* opening brief broadly relies on "know your customer" (KYC) rules to allege that Defendants had the requisite scienter to state a JASTA aiding-and-abetting claim. *See* Appellant Br. 50 ("[B]anks have access to more than just public sources. Banks are subject to rigorous 'know your customer' rules and can review those customers' transactions."); *id.* at 57 (SCB "had 'know your customer' obligations that would have exposed [terrorist] connections").

*Twitter* precludes Plaintiffs' attempt to satisfy the "truly culpable conduct" required for aiding-and-abetting liability by pointing to KYC requirements.

To begin with, Plaintiffs fundamentally misunderstand KYC requirements. The Financial Action Task Force (FATF), an intergovernmental organization established by the G7 Nations to combat money laundering, recommends international banking standards

including those banks' KYC obligations.  *See Weiss v. Nat'l Westminster Bank, PLC*, 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006).  The FATF continually updates its KYC, anti-money laundering (AML), and counter-terrorist financing (CFT) standards, most recently in February 2023.  *See* FATF, *Outcomes FATF Plenary, 22-24 February 2023* (Feb. 24, 2023), https://www.fatf-gafi.org/en/publications/Fatfgeneral/outcomes-fatf-plenary-february-2023.html.

Under the current standard, banks must (1) "[i]identify[] the customer and verify[] that customer's identity using reliable, independent source documents, data or information"; (2) "tak[e] reasonable measures to identify the identity of the beneficial owner"; (3) "obtain[] information on the purpose and intended nature of the business relationship"; and (4) "[c]onduct[] ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer."  FATF, *International Standards on Combating Money*

*Laundering and the Financing of Terrorism and Proliferation: The FATF Recommendations* 14-15 (Feb. 2023) (FATF 2023).[7]

These standards do not impose any requirement that banks investigate every aspect of their customers' identities, much less that banks review the *activities* of those customers or of the customers' *customers*, or constantly scour the internet for any reference to those customers, credible or otherwise.

The focused obligations imposed by these standards explain why courts refuse to infer knowledge of customers' wrongdoing based on allegations referring to them. *E.g.*, *Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95-96 (2d Cir. 2012) (unpublished) (broker's "'Know Your Customer' obligations are, standing alone, far from sufficient to support a strong inference that it had actual knowledge of . . . fraud" where plaintiffs failed to "identify any particular monitoring obligation"); *PLB Invs. LLC v. Heartland Bank & Tr. Co.*, 2021 WL 492901, at *5, *9 (N.D.

---

[7] These recommendations are then implemented by national regulators. FATF 2023 at 7; *see, e.g.*, 31 C.F.R. § 1020.220; *id.* § 1010.230. The specific actions that a bank should take with respect to a particular customer may vary depending on relevant facts and circumstances. *See* FFIEC, *BSA/AML Examination Manual – BSA/AML Risk Assessment* (2020), https://bsaaml.ffiec.gov/docs/manual/03_BSAAMLRiskAssessment/01.pdf.

27

Ill. Feb. 9, 2021) (holding that defendant banks' "discharge of their know your customer, BSA, and due diligence duties . . . do[es] not allow the Court to infer that PNC and Heartland had actual knowledge of the fraud.").

More fundamentally, such arguments fall short of satisfying JASTA's "knowingly providing substantial assistance" element for several additional reasons.

*First*, to the extent a plaintiff alleges that, as a result of KYC standards or otherwise, a defendant had knowledge of a customer's connections to a terrorist group, that knowledge by itself is insufficient—as the Supreme Court made clear in *Twitter*. The Court credited allegations that the social-media defendants knew that ISIS users were on their platforms, "knew that ISIS was uploading [terrorist] content" to those platforms, and "knew they were playing some sort of role in ISIS' enterprise." 143 S. Ct. at 1225-26. But that was not enough to plausibly allege that the defendants consciously, voluntarily, and culpably participated in the terrorist attack that injured the plaintiffs. What is required—as already discussed (at 21-25)—are allegations supporting a plausible inference that the defendant knew that *its* actions were

28

supporting the terrorist attack that injured the plaintiff or gave the terrorist group special treatment indicating that the defendant was supportive of its aims.

*Second*, a plaintiff might assert that a defendant's alleged failure to comply with regulatory standards is sufficient to satisfy the "knowing and substantial assistance" element. In that situation, however, the plaintiff's own allegations make clear that the defendant lacks knowledge that its services were in some way benefiting a terrorist group—the speculative claim is that the defendant *did not, but would have,* learned relevant information if it had engaged in the specified conduct.[8]

Nor does the Supreme Court's statement that the *Twitter* plaintiffs' claims "might have more purchase if they could identify some independent duty in tort that would have required defendants to remove ISIS' content," 143 S. Ct. at 1227, support a JASTA claim based on alleged KYC non-compliance.

Numerous courts have recognized that KYC standards (and other regulatory requirements) do not create tort duties—and failure to comply

---

[8] As explained above, *see* pages 25-28, *supra*, there is no basis for a contention that proper application of KYC requirements would result in discovery of the relevant information.

29

with such standards therefore does not constitute substantial assistance triggering aiding-and-abetting liability. *See, e.g.*, *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007), *aff'd* 349 F. App'x 637 (2d Cir. 2009) (unpublished) (bank allegedly "failed to comply with domestic and international bank secrecy, know-your-customer, and anti-money laundering laws, decrees, and regulations. However, even if true, such violations of law do not elevate . . . actions into the realm of 'substantial assistance.'"); *IIT, an Int'l Inv. Tr. v. Cornfeld*, 619 F.2d 909, 915, 927 (2d Cir. 1980) (accounting firm "failed to insure that full and correct financial information was provided," but "inaction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act"); *Pittman by Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998) (no aiding-and-abetting liability even when airline acted "contrary to its own prescribed procedures").

Those common-law decisions apply fully in this context. The Supreme Court explained that, in applying JASTA, courts can and should look to common-law decisions addressing the standard for aiding-and-abetting claims because JASTA's express incorporation of "common-law terms 'brin[g] the old soil' [of common law decisions] with them." 143 S.

Ct. at 1218; *see also id.* at 1220 (relying on "the common law of aiding and abetting upon which *Halberstam* rested and to which JASTA's common-law terminology points").

Moreover, the Supreme Court went on to state that "[e]ven if there were such a [tort] duty here, it would not transform defendants' distant inaction into knowing and substantial assistance that could establish aiding and abetting the [terrorist attack at issue]." 143 S. Ct. at 1228. That same conclusion applies to claims based on a bank's alleged failure to comply with regulatory standards.

Of course, if a complaint plausibly alleged that a defendant ignored regulatory requirements *only* with respect to customers using bank services to support terrorist attacks, then the case could implicate one of the factors that the *Twitter* Court found relevant: singling out terrorist-related customers for special treatment not available to other customers. *See* page 23, *supra.* Such an allegation, depending on others in the complaint, could help a plaintiff satisfy *Twitter*'s "truly culpable conduct" standard.

*Third*, Plaintiffs may try to argue that *Twitter*'s analysis does not apply to banking services, asserting that banks' processing of

31

transactions constitutes "affirmative" conduct different in kind from what the *Twitter* Court termed the social media companies' "failure to act." 143 S. Ct. at 1227.

Such a distinction would make no sense: the social media companies processed their customers' posts using the systems put in place to serve their customers generally, and that is precisely what banks do for their customers. The Supreme Court itself made clear that *Twitter*'s analysis applies to banks by citing with approval common-law decisions requiring proof of culpability "lest *mostly passive actors like banks* become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id*. at 1220, 1222 (emphasis added).

The common-law aiding-and-abetting decisions cited with approval in *Twitter* further demonstrate that claims against banks are subject to the analysis that the Court applied to the *Twitter* defendants. For example, the Court cited (143 S. Ct. at 1222) *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975), in which the Fifth Circuit dismissed a complaint alleging that a bank aided and abetted fraud. In *Woodward*, the bank allegedly was put "on notice" of the principal violator's precarious financial condition based on, among other things, the

principal's financial statement and the frequent insufficient funds notices on the principal's account. *Id.* at 97-98. Despite these warning signs, the bank maintained its relationship with the principal and, at one point, a bank employee met with the plaintiff and the principal at the bank to facilitate the plaintiff's loan to the principal. *Id.* at 88-89. That knowledge was not enough to plead an aiding-and-abetting claim against the bank, the Fifth Circuit held, absent plausible allegations that the bank consciously helped its customer in the commission of the fraud.

By contrast, the cases cited by the Supreme Court in which an aiding-and-abetting claim was upheld involved active encouragement and transactions providing unique assistance to the principal—satisfying the general standard specified by the Court for claims against legitimate businesses. 143 S. Ct. at 1222 (citing *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793 (3d Cir. 1978) (bank liable for aiding and abetting where it knew of illicit actions and also "demanded" and "actively encouraged" principal's conduct, *id.* at 802) & *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004 (11th Cir. 1985) (bank liable for aiding and abetting when it engaged in "atypical business actions" that "played a

substantial role in assisting [the principals] to perpetrate the fraud," *id.* at 1012)).

These cases draw the very same line as *Twitter*: requiring allegations demonstrating a bank acted with a high degree of culpability.

In sum, KYC standards do not come close to bridging the chasm between the provision of legitimate commercial services and consciously, voluntarily, and culpably participating in acts of international terrorism.

## III. Reversal Would Inflict Serious Harm On Legitimate Businesses And U.S. Foreign Policy Interests.

Holding the complaint here sufficient, and allowing this action to proceed, would have significant adverse consequences for the availability around the world of U.S. dollar-based banking services, as well as other categories of goods and services—and therefore harm the global economy and U.S. foreign policy interests.

*First*, banks operating in and outside the United States would be subject to suit involving funds transfers and U.S. dollar clearing transactions even though, when banks, including U.S. dollar clearing banks, process such transactions, they virtually never are accused of dealing with terrorist organizations, but rather with other banks or legitimate businesses through which support allegedly reaches terrorist

34

groups; are not aware that the transactions assist such organizations; and therefore do not knowingly provide substantial assistance to the commission of terrorist acts. As this Court has previously observed, ATA defendants would be improperly subjected to aiding-and-abetting liability for providing banking services to legitimate enterprises, often other banks, even when they "had little reason to suspect that [they were] assuming a role in . . . terrorist activities." *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019).

Setting aside the prohibitive cost of conducting deep-dive, multi-level diligence on every counterparty (and their downstream counterparties), in many areas of the world it would be practically impossible to eliminate counterparty risk, given the small-scale and insular nature of markets in developing countries and conflicting views of the legitimacy of businesses, charities, or humanitarian groups that operate in the same region.

*Second*, adopting such an expansive view of aiding-and-abetting liability would subject legitimate businesses to unwarranted, costly, and invasive discovery. The discovery burdens for defendants facing ATA claims are particularly onerous, because the relevant conduct often

"occurs in a foreign country with an undeveloped legal system that does not, or cannot, cooperate with discovery or in a country with a government that is hostile to the litigation and associated discovery." Alan Sykes, *Corporate Liability for Extraterritorial Torts Under the Alien Tort Statute and Beyond: An Economic Analysis*, 100 Geo. L.J. 2161, 2190-91 (2012).

These discovery burdens "will push cost-conscious defendants to settle even anemic cases." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). The pressure to settle even meritless claims is particularly acute in the ATA context because the mere pendency of claims can inflict significant reputational harm on companies by branding them as "supporters of terrorism" complicit in horrific attacks on the American citizens, including military servicemembers. Indeed, enterprising plaintiffs may seek to publicly associate responsible banks with terrorism simply to increase the pressure to settle.

*Third*, faced with onerous and impracticable diligence obligations and large litigation expenses, along with potential exposure to treble damages and reputational risk, banks and other businesses may be forced to "de-risk." De-risking occurs when businesses stop providing

services to certain regions or clients, including those with legitimate and pressing needs, because the threat of liability and expensive, drawn-out litigation is simply too great. Failing to give effect to Congress's limitations on ATA liability would dramatically increase de-risking activity as banks and other businesses seek to eliminate potential exposure to burdensome and reputation-threatening litigation, however meritless.

According to the FATF, de-risking "is having a significant impact in certain regions and sectors."[9] A 2023 Department of Treasury report warned that "[d]e-risking undermines several key U.S. government policy objectives by driving financial activity out of the regulated financial system," thereby rendering monitoring for illicit activities more difficult and increasing money laundering and terrorist financing risks.[10]

---

[9] FATF, *FATF takes action to tackle de-risking* (Oct. 23, 2015), https://tinyurl.com/yyot5v83.

[10] U.S. Dep't of Treasury, *The Department of the Treasury's De-risking Strategy* 36 (2023) (*2023 Strategy*), https://home.treasury.gov/system-/files/136/Treasury_AMLA_23_508.pdf; *see also* Tracey Durner & Liat Shetret, Global Ctr. on Coop. Security/Oxfam, *Understanding Bank De-Risking and its Effects on Financial Inclusion* 19 (2015), https://tinyurl.com/y3r99hdn (withdrawal of legitimate financial institutions may "encourage entities to move into less regulated

De-risking also "has the potential to push countries to seek closer relationships with geopolitical competitors and cause significant macroeconomic damage to regions of U.S. foreign policy interest."[11]

De-risking could result in particularly perverse and significant harm in regions and countries (such as Iraq) in which banks are promoting stability by delivering financing for much-needed products, services, healthcare, or infrastructure.[12]  Banks may be deterred from assisting in war or post-war zones, areas of governmental instability, or countries facing humanitarian crises, given the possibility that the goods or services may fall into the wrong hands, or that the downstream recipients may be accused of supporting terror.

---

channels, thus reducing transparency and limiting monitoring capacities").

[11]  *2023 Strategy* at 38.

[12]  Indeed, the U.S. government has invested substantially in Iraq and encouraged the provision of services to that country.  See, *e.g.*, *Economic and Financial Reconstruction in Iraq: Hearing before the Senate Banking Subcommittee on International Trade and Finance*, (Feb. 11, 2004) (testimony of Earl Anthony Wayne, Ass't Secretary for Economic and Business Affairs), https://bit.ly/45dPRow; Press Release, U.S. Dep't of Treasury, The United States and Iraq Sign Loan Guarantee Agreement (Jan. 5, 2017), https://bit.ly/43ToFKD.

Depriving governments and populations of key partners in the fight against terrorism and important financing for promoting public health, humanitarian aid, good governance, and economic growth does nothing to help the victims of terror or further the Anti-Terrorism Act's goals. Rather, it has the opposite effect, making it easier for terrorists to operate. This Court should prevent these adverse consequences by applying the standards adopted in *Twitter* to affirm dismissal of the complaint here.

## CONCLUSION

The district court's judgment dismissing the action should be affirmed.

Dated: August 17, 2023         Respectfully submitted,

/s/ *Andrew J. Pincus*
Andrew J. Pincus
Marc R. Cohen
Alex C. Lakatos
  *Mayer Brown LLP*
  *1999 K Street NW*
  *Washington, DC 20006*
  *(202) 263-3000*

Mark G. Hanchet
Robert W. Hamburg
Benjamin D. Bright
  *Mayer Brown LLP*
  *1221 Ave. of the Americas*
  *New York, NY 10020*
  *(212) 506-2500*

*Counsel for* Amici Curiae

40

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 29.1(c) because it contains 6,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point type for text and footnotes.

Dated:      August 17, 2023

/s/ *Andrew J. Pincus*
Andrew J. Pincus

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2023, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants. I further certify that all parties required to be served have been served.

Dated:     August 17, 2023

/s/ *Andrew J. Pincus*
Andrew J. Pincus