# No. 23-132

## United States Court of Appeals for the Second Circuit

JONATHAN L. ASHLEY, III, JONATHAN LEIGH ASHLEY, IV, JORDAN T. ASHLEY, TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER, PAMELA E. ALEXANDER BELL, JAMES BELL, ANDREA ROE, FEDERICK C. BENSON, BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER, MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISENO GUTIERREZ, LUIS BRISENO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, MICHEAL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, AUGUST WILDMAN, CORBIN CABRERA,

*(caption continued on inside cover)*

Appeal from the United States District Court
Eastern District of New York (No. 1:19-cv-11876-AKH)

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Tejinder Singh
Geoffrey P. Eaton
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
202-629-3530
tejinder@sparacinopllc.com
geoff.eaton@sparacinopllc.com

*Attorneys for Plaintiffs-Appellants*

DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M. G. C., BY AND THROUGH HIS
NEXT FRIEND, AUGUST WILDMAN, R. X. C., BY AND THROUGH HIS NEXT FRIEND,
AUGUST WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE
MARTINEZ, J D PROSSER, GLORIA DIANE TRELFA, CYNTHIA CAROL CAMPBELL,,
RAMIRO CARDOZA, JR., RAMIRO CARDOZA, SR., MARIA CARDOZA, BRITTANI MARIE
CARNER, T. M. C., BY AND THROUGH HIS NEXT FRIEND, TIMOTHY NORMAN CARNER,
TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO
D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN
CLEARY, B. C., BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD,
PEYTON COONEY, A. C., BY AND THROUGH HIS NEXT FRIEND, NICOLE COX, BRENNAN
COX, H. C., BY AND THROUGH HER NEXT FRIEND, NICOLE COX, NICOLE COX, ROSS
COX, ANTHONY D'AUGUSTINE, JENNIFER D'AUGUSTINE, NICOLE D'AUGUSTINE,
PATRICIA D'AUGUSTINE, MICHELE KULESA, BRENDA DAEHLING, KAYLA MARIE
DAEHLING, KIRK W. DAEHLING, HEATHER FRANCES DANIELS, JAMES L. DANIELS,
LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES
DARROUGH, C. D., BY AND THROUGH HIS NEXT FRIEND, HELENA DAVIS, HELENA
DAVIS, JOSEPH ROGER DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ,
FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D., BY
AND THROUGH HIS NEXT FRIEND, KAYLA N. DIAZ, N. J. D., BY AND THROUGH HER NEXT
FRIEND, KAYLA N. DIAZ, B. C. D., BY AND THROUGH HIS NEXT FRIEND, KELLI DODGE,
KELLI DODGE, P. A. D., BY AND THROUGH HER NEXT FRIEND, KELLI DODGE,
PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, SARAH PETERS-DUARTE,
INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF CURTIS JOSPEH DUARTE, JOSEPH
DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS,
JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA
MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS,
CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM,
DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION
RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C. F., BY AND THROUGH HIS
NEXT FRIEND, STEPHANIE JANE FISHER, K. F., BY AND THROUGH HIS NEXT FRIEND,
STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, MICHAEL FESTUS
FOX, JASON WAYNE GIBSON, Q. G., BY AND THROUGH HIS NEXT FRIEND, KARA
GIBSON, KARA GIBSON, JESSICA ANNE BENSON, JOANNA GILBERT, EMMITT DWAYNE
BURNS, JANICE CARUSO, PAUL EDWARD GOINS, III, PATRICIA GOINS, DANA RAINEY,
L. C. D., BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW
GOLLNITZ, TYLER GOLLNITZ, CEDRIC DONSHAE GORDON, SR., CEDRIC FRANK
GORDON, ADRIAN KIE-ALUN SHERROD, CONCHETTA MICHELL DIAZ, KRISTIN
CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY
ANDERSON, GLENDA GREEN, JULIE GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN,

DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, JERRY HARDISON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERESA HARDISON, SHEILA RISTAINO, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER, BRIAN HARPER, JOSEPH TROY HUSLEY, JR., ADAM SAMUEL HARTSWICK, ALEX HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY LOUISE HORNS, BENJAMIN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER, II, JOEY J. HUNTER, SR., ERIC M. HUNTER, KENNA HUNTER, NICHOLAS WALTER ROBINSON, IV, MICHAEL IUBELT, SHELBY IUBELT, V. I., BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT, CHARLOTTE LOQUASTO, J. A. L., BY AND THROUGH HIS NEXT FRIEND, CHARLOTTE LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE, PAUL ELMER JAYNE, G. A. S., BY AND THROUGH HIS NEXT FRIEND, KENT ALAN SKEENS, KENT ALAN SKEENS, SHERRY A. SKEENS, TRENT LORNE SKEENS, Z. R. S., BY AND THROUGH HER NEXT FRIEND, KENT ALAN SKEENS, BRIAN CHRISTOPHER JERGENS, TERENCE LONNIE JONES, JOHN C. MCCARTHY, ALISON R. POHN, KEVIN KING, STEPHANIE ANN MILLER, EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K., BY AND THROUGH HER NEXT FRIEND, ABBY KNAPP-MORRIS, BRANDON KORONA, BRIAN LAMBKA, JORDAN LAMBKA, DOUGLAS A. LANDPHAIR, JEAN S. LANDPHAIR, MEREDITH LANDPHAIR, B.R.L., BY AND THROUGH HER NEXT FRIEND, MIRANDA LANDRUM, LONDON JACINDA BELEL, G.B.L., BY AND THROUGH HIS NEXT FRIEND MIRANDA LANDRUM, JAMES R. LANDRUM, JANET LANDRUM, MIRANDA LANDRUM, HOLLY LAU ABRAHAM, LEROY WINGKIT LAU, JR., ALEXANDER LAU, DAVID WILLIAM HAALILIO LAU, HAMIDE LAU, K.L., BY AND THROUGH HIS NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, M.L., BY AND THROUGH HER NEXT FRIEND, DAVID WILLIAM HAALILIO LAU, VIVIAN PERRY, MICHELLE LEE RAUSCHENBERGER, JAMMIE JOANN SMITH, ERIC DANIEL LUND, KARYN STONE MARTA, LAWRENCE MARTA, TAYLOR MARTA, BOB SURPRENANT, KRISTIE SURPRENANT, BRIAN M. MARTIN, CATHERINE G. MARTIN, ELIZABETH A. MARTIN, JULIE K. MARTIN, JOSE LUIS MARTINEZ HERNANDEZ, LISETH MARTINEZ-ARELLANO, CHESTER R. MCBRIDE, SR., ANNIE L. MCBRIDE, ALEXANDRA DORIAN MCCLINTOCK, D.C.M., BY AND THROUGH HIS NEXT FRIEND, ALEXANDRA DORIAN MCCLINTOCK, GEORGE B. MCCLINTOCK, JOYCE PATRICIA PAULSEN, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK CHARLES MCEVOY, JANICE H. PROCTOR, LUANN VARNEY, SHANNON K. MCNULTY, JOHN MEANS, KIMBERLY METCALF, CLARENCE JOSEPH METCALF, JEREMY J. METZGER, THERESA KARLSON, ANNA MARIA BANZER, ANDREA KESSLER, SOFIA KESSLER, ERIC MORGADO, JOSE ALBERTO MORGADO, CONNOR ALEXIAN PLADECK-MORGADO, ANNA MORGAN, JEDIDIAH DANIEL MORGAN, MIRIAM A. MULLEN, NANCY MARIE MULLEN, WILLIAM J. MULLEN, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, WILLIAM ANTHONY

MURACH, WILLIAM R. NEVINS, DERRICK ANTHONY DAVIS, DONALD EDWARD
NEWMAN, SR., AMANDA NEWMAN, MARY R. HAMMERBACHER-NICHOLS, BRANDON
NICHOLS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, MONTE DOUGLAS NICHOLS,
NICOLE ANN ROBLES, BRUCE K. NICHOLS, JEANNE M. NICHOLS, M.G.N., BY AND
THROUGH HER NEXT FRIEND, BRUCE K. NICHOLS, ADOLF OLIVAS, CHRISTA L.
OSBORN, CREIGHTON DAVID OSBORN, KADE M. OSBORN, KATLYN M. OSBORN, JULIA
OTT, NANCY R. WILSON, ROBIN ELIZABETH AKERS, TRACY ANNE HERRING, ADAN
PEREZ, ANTHONY PEREZ, DEBRA ANN PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ,
B.M., BY AND THROUGH HIS NEXT FRIEND, DARILYN PEREZ, RICARDO J. PEREZ-
RAMOS, DARILYN PEREZ, A. P., BY AND THROUGH HER NEXT FRIEND, DARILYN PEREZ,
S. P., BY AND THROUGH HER NEXT FRIEND, RICARDO J. PEREZ-RAMOS, G.W.P., BY AND
THROUGH HIS NEXT FRIEND, JULIANNE GOOD PERRY, JULIANNE GOOD PERRY,
KATHLEEN PERRY, L.R.P., BY AND THROUGH HER NEXT FRIEND, JULIANNE GOOD
PERRY, STEWART LAMAR PERRY, ASHLEY PETERS, DEBORAH JEAN PETERS, DENNIS
W. PETERS, G.R.P., BY AND THROUGH HIS NEXT FRIEND, ASHLEY PETERS, CHRISTINE
H. PHILIPS, S.N.P., BY AND THROUGH HER NEXT FRIEND, CHRISTINE H. PHILLIPS,
BETHANY ROSE WESLEY, JOHN TERRY PITTMAN, SR., IDA BELLE PITTMAN, JACOB
RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH
L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G.
MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE
PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER
PROVOST, LONA L. BOSELY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER
REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, VICTORIA
JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN,
SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND,
MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS,
RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ,
SR., K. R., BY AND THROUGH HER NEXT FRIEND, MELISSA RODRIGUEZ, MELISSA
RODRIGUEZ, BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R.
ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN,
CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS,
COLLEEN WHIPPLE, A. L. S., BY AND THROUGH HIS NEXT FRIEND, NATALIE SCHMIDT,
BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J.
SCHMIDT, SHEESHTA MARIE PERRY, A.M.S., BY AND THROUGH HER NEXT FRIEND,
TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, A.R.S., BY AND
THROUGH HER NEXT FRIEND, TAMMIE SUE SCHOONHOVEN, DEBORAH FERN
SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA SCHWALLIE, SAMUEL
ROBERT SHOCKLEY, SUZI L. FERNANDEZ, SPENSER J. FERNANDEZ, JORDAN L. SIBLEY,
LOWELL BRENT SIBLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FORREST
B. SIBLEY, G.S., BY AND THROUGH HIS NEXT FRIEND, GEORGANNE M. SIERCKS,

GEORGANNE M. SIERCKS, JOAN M. SMEDINGHOFF, MARK T. SMEDINGHOFF, MARY
BETH SMEDINGHOFF, REGINA C. SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN MARIE
HURNBLAD SPARKS, GARRY LEE SPARKS, JANE SPARKS, ZACHARY DOUGLAS SPARKS,
LISA MARTINUSEN, MARIE SENTINA MIELKE, ANNETTE SPEHAR, JACOB LOUIS
SPEHAR, LUKE SPEHAR, PATRICK SPEHAR, MITCHELL L. STAMBAUGH, CHARLES
WESLEY STRANGE, III, CHARLES WESLEY STRANGE, KATELYN MARIE STRANGE,
GARRETT LAYNE FUNK, JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS, TRECIA BROCK
HOOD, WENDY SHEDD, FREDDIE DEWEY SUTTON, HARRIETT SUTTON, SUMMER
BREANNE SUTTON, DIANE TIMONEY, GREGORY TIMONEY, RYAN GREGORY TIMONEY,
FREDERICK ALLEN TOLON, ESTA SMITH, JIMMY SMITH, EMILY TORIAN, JOE TORIAN,
NATHAN EWELL TORIAN, BRITTANY TAYLOR TOWNSEND, KEVIN TRIMBLE,
CHRISTOPHER MICHAEL VAN ETTEN, CATHERINE KIMBERLY VAUGHN KRYZDA,
C.C.V., BY AND THROUGH HER NEXT FRIEND, CATHERINE KIMBERLY VAUGHN
KRYZDA, R.C.V., BY AND THROUGH HIS NEXT FRIEND, CATHERINE KIMBERLY VAUGHN
KRYZDA, ROBERT MARTIN KAHOKULANI VICKERS, JR., ROBERT MARTIN
KAHOKULANI VICKERS, SR., HORTENSE KAINOA WAINANI VICKERS, K.N.V., BY AND
THROUGH HIS NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.E.F.V., BY AND
THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, K.M.G.V., BY
AND THROUGH HER NEXT FRIEND, HORTENSE KAINOA WAINANI VICKERS, MARK
MATTHEW KALEINANI VICKERS, MARY JANE VICKERS, VANCE MARSHALL
KELIIOLANI VICKERS, MAKAHEA XHELILI, MICHELLE JOY KAPUNAHELEOKALANI
YARBOROUGH, BARRY WELCH, LORRIA WELCH, ZACKARY WELCH, JEFFREY L.
WHITE, SR., KYLE WHITE, MICHAEL WHITE, PAULA K. WHITE, MICHELLE CAROLINA
ROTELLI, MARTHA CAROLINA SMITH, THOMAS ELMER WICKLIFF, BRIAN ANTHONY
WILLIAMS, CLARENCE WILLIAMS, JR., ABRILL RENEE WILLIAMS, SAMANTHA
SHERVON WILLIAMS, TALISA SHERVON WILLIAMS, MONA G. BETZEN, CODY
WORLEY, GREGORY W. WORLEY, JAMES WAYNE WORLEY, MARK G. WORLEY, BAILY
ZIMMERMAN, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, DANIEL LEE BROWN,
KRISTINA BROWN, DANIEL EDWARD STAMPER, JR., CAMERON JAY STUART, KATY
STUART, ADRIANA WAKELING, SETH WAKELING, ERIK SPARKS, WILLIAM MICHAEL
BURLEY, LISA DESLAURIERS, A.T.P., BY AND THROUGH HER NEXT FRIEND, STEWART
LAMAR PERRY, AARON WILLIAM PRESCOTT,

     Plaintiffs - Appellants,

ADAM DAEHLING, SAMANTHA DAEHLING, G. F., BY AND THROUGH HIS NEXT FRIEND
ERICA FOX, A. G., BY AND THROUGH HER NEXT FRIEND JULIE GREEN, E. G., BY AND
THROUGH HER NEXT FRIEND JULIE GREEN, T. G., BY AND THROUGH HER NEXT FRIEND
JULIE GREEN, J. H., BY AND THROUGH HIS NEXT FRIEND ERIC. M. HUNTER, K. H., BY
AND THROUGH HER NEXT FRIEND ERIC M. HUNTER, L.A.E.L.B., BY AND THROUGH HER

NEXT FRIEND, NATASHA BUCHANAN, NATASHA BUCHANAN, S.L.L.B., BY AND THROUGH HER NEXT FRIEND NATASHA BUCHANAN, SPENCER DANA PROVOST, KATRINA M. REEVES, H. R., BY AND THROUGH HER NEXT FRIEND RANDY RISTAU, D.R., BY AND THROUGH HIS NEXT FRIEND, MELISSA RODRIGUEZ, RODZIE ERFREN RODRIGUEZ, C.E.S., BY AND THROUGH HER NEXT FRIEND, CHARLES WESLEY STRANGE, KEVIN WILLIAMS,

      Plaintiffs,

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S,

      Defendants - Appellees,

DEUTSCHE BANK UK, DEUTSCHE BANK AG, NEW YORK BRANCH, STANDARD CHARTERED BANK LIMITED, STANDARD CHARTERED BANK, DUBAI MAIN BRANCH, DANSKE MARKETS INC., DEUTSCHE BANK AG, DUBAI BRANCH, PLACID NK CORPORATION, DBA PLACID EXPRESS, WALL STREET EXCHANGE LLC,

      Defendants.

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

REPLY BRIEF ..........................................................................................1

  I.   Defendants Systematically Mischaracterize Plaintiffs' Allegations.............3

  II.  Defendants' Arguments About "Knowing and Substantial Assistance" Are Wrong...................................................................10

      A.  *Twitter* Did Not Overrule This Court's JASTA Precedents ...............10

      B.  Defendants' Contentions That They Were Passive, and Their Transactions Routine, Ignore the Complaint ......................................17

      C.  Defendants' Contention That Their Conduct Did Not Assist Particular Attacks Is Misplaced...........................................................21

      D.  Defendants' Arguments About the *Halberstam* Factors Are Unpersuasive. ...................................................................................25

  III.  Defendants' "General Awareness" Arguments Are Wrong ......................25

      A.  Standard Chartered Bank ................................................................25

      B.  Deutsche Bank.................................................................................29

      C.  Danske Bank....................................................................................30

  IV.  A Terrorist Campaign Constitutes an "Act of International Terrorism" Under the Statutory Definition ................................................................31

CONCLUSION.........................................................................................32

i

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
   219 F.3d 519 (6th Cir. 2000) .................................................................19

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022) ..................................................................3

*Boim v. Holy Land Found. for Relief and Dev.*,
   549 F.3d 685 (7th Cir. 2008) .................................................................32

*Bonacasa v. Standard Chartered PLC*,
   2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) ......................................26

*Deem v. DiMella-Deem*,
   941 F.3d 618 (2d Cir. 2019) .................................................................10

*FDIC v. First Interstate Bank of Des Moines, N.A.*,
   885 F.2d 423 (8th Cir. 1989) ................................................................18

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ..................................................................31

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) .................................................... 11, 12, 16, 19, 31

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ..................................................... 15, 16, 17

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
   808 F.3d 144 (2d Cir. 2015) .................................................................11

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021) ................................. 3, 5, 7, 10, 15, 16, 17, 20, 28, 29

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) .................................................................20

*Monsanto v. United States*,
  348 F.3d 345 (2d Cir. 2003)..................................................................11

*Monsen v. Consolidated Dressed Beef Co.*,
  579 F.2d 793 (3d Cir. 1978)................................................................18

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ...................... 1, 11, 12, 13, 14, 15, 16, 17, 18, 21, 22, 23, 24

*United States v. Kozeny*,
  667 F.3d 122 (2d Cir. 2011)................................................................28

*Woods v. Barnett Bank of Ft. Lauderdale*,
  765 F.2d 1004 (11th Cir. 1985) ..........................................................19

## Other Authorities

S. Rep. No. 102-342 (1992) ..................................................................24

U.S. Dep't of State, *Country Reports on Terrorism 2015* (2016) ............8

## REPLY BRIEF

Defendants engaged in systematic criminality—including providing unlawful services to financiers and money launderers for al-Qaeda and other terrorists murdering Americans in Afghanistan. SCB[1] also financed those same terrorists' suppliers of explosive materials. By knowingly providing substantial assistance to the terrorist Syndicate's financing and bombmaking efforts, defendants aided and abetted unlawful acts. The attacks that injured plaintiffs and their loved ones were a foreseeable risk of those acts, making defendants liable for them under this Court's precedents and settled common-law principles.

After the opening brief (OB) was filed, the Supreme Court decided *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), holding that JASTA aiding-abetting requires plaintiffs to show that defendants engaged in conscious, culpable behavior that substantially assisted either acts of terrorism that injured the plaintiffs, or other unlawful acts that foreseeably risked those acts of terrorism. The *Twitter* plaintiffs sought to impose liability on businesses for passive nonfeasance, *i.e.*, failure to stop terrorists from abusing social media platforms. The Court explained that such conduct could only support liability upon a heightened showing of scienter and substantiality—which the plaintiffs failed to make.

---

[1] Undefined abbreviations have the same meaning as in the opening brief.

1

*Twitter* is consistent with this Court's precedents and does not support affirmance because defendants did not passively provide routine financial services; they actively broke laws together with their terrorist-related customers. Indeed, defendants were fined billions, and their employees criminally charged. Thus, unlike *Twitter*, the question is not whether defendants are liable for passive, non-culpable behavior that incidentally benefited terrorists. Instead, the question is whether defendants are liable for the foreseeable risks of providing active, culpable assistance to terrorists and their known agents, which allowed the terrorists to access tens of millions of dollars and enough explosive materials to create tens of thousands of IEDs and suicide bombs annually. The answer is an easy "yes."

The opening brief explained each defendant's liability, detailing defendant-specific allegations and the district court's erroneous rejection of them. OB37-73. Defendants' response (RB) mischaracterizes plaintiffs' allegations to downplay defendants' culpability. Because defendants' arguments are rooted in those factual mischaracterizations, we address them first. We then explain that: defendants' assistance was "knowing and substantial," *contra* RB25-44; defendants were "generally aware" of their role in unlawful acts, *contra* RB44-64; and terrorist racketeering enterprises can be "acts of international terrorism," *contra* RB64-66.

2

## I.     Defendants Systematically Mischaracterize Plaintiffs' Allegations

Plaintiffs showed how the district court repeatedly mischaracterized or refused to credit plaintiffs' well-pleaded allegations. OB30-31, 41-45, 49-52, 59-61, 64-66, 68-69, 71-72. Tellingly, defendants never defend the court's misreading of the complaint. But like the district court, defendants ignore inculpatory allegations and spin others in their favor—violating basic pleading rules and necessitating reversal. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021); *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 228 (D.C. Cir. 2022).

1. First, defendants assert that plaintiffs' allegations "concern routine, arm's length services." RB35. Defendants misleadingly suggest that plaintiffs merely allege that some criminals opened accounts and transferred a few bucks—which defendants simply failed to catch. Actually, plaintiffs allege that defendants deliberately established financial "laundromats" to attract criminal business. *See, e.g.*, JA261-65, 288-94, 319-22 (¶¶366-72, 444-57, 533-45). Terrorists and their criminal allies flocked to these laundromats to access financial networks (especially U.S. dollar networks), which defendants knew were key to the Syndicate's ability to attack Americans in Afghanistan. JA115-25, 334-53 (¶¶127-56, 601-52). Indeed, for decades, authoritative sources alerted defendants that the crimes at issue here directly enabled Syndicate attacks. *See, e.g.*, JA330-60 (¶¶591-667). By participating in those unlawful acts, defendants "assumed an active operational role

3

in al-Qaeda and its Syndicate affiliates," JA260 (¶362); *see also* JA281, 299-300, 306-07 (¶¶420, 475-79, 505), engaging in "a constant stream of affirmative actions … far outside what [banks] routinely did (or are allowed to do)," JA412 (¶795).

For example, Syndicate fundraiser Azizi described DB as his "willing financial partner" in VAT fraud. JA275 (¶414). DB's "involvement afforded key operational benefits to the terrorists' VAT fraud schemes." JA276 (¶415). Thus, DB not only provided accounts; it executed unlawful trades; hid traces of money laundering; used its reputation to shield transactions from scrutiny; rejected compliance concerns ("[b]ecause we're that greedy," JA275 (¶411)); and accelerated transfers to increase illicit profits. *See* JA276 (¶415); OB19-21. This prompted warnings from compliance officers and regulators, followed by fines and criminal charges. OB20; JA275, 283-84 (¶¶411-12, 425-27). Prominent authorities, including the Financial Action Task Force, explicitly linked VAT fraud to Syndicate terrorism before the alleged transactions here. OB49. These "illicit transactions directly aided Syndicate cells operating in the Afghanistan and Pakistan border regions," JA280 (¶418), by providing both money and logistical aid (cell phones) that Syndicate terrorists used in attacks. JA280-82 (¶¶419-24). SCB generally had the same information and took the same steps as DB, plus providing a shell company. OB13-14; JA299-300 (¶¶475-79). And Danske, along with DB, assisted a separate VAT fraud scheme run by the Ahmed cell. OB19, 26. Had defendants stolen millions of

4

dollars and handed that money to terrorists—nobody would dare describe those activities as "routine." In fact, that is what defendants did: They actively helped terrorists steal millions from European governments and repatriate those funds to Afghanistan for use in terrorist attacks. The fact that defendants used bank transactions instead of cruder means doesn't change how fundamentally unusual and corrupt their actions were.

Defendants' money-laundering transactions were equally atypical. Indeed, this Court held in *Kaplan* that money laundering is not routine banking. *See* 999 F.3d at 858. Defendants' laundering was even more flagrant than the misconduct in *Kaplan*. DB's mirror trades had no legitimate justification; their only purpose was to create "stashes of black cash" for criminals, JA392 (¶739), including the Syndicate's top money launderer, the Khanani MLO. OB20-22. Indeed, DB built its "laundromat" in *direct collaboration* with launderers for the Solntsevskaya Group, *i.e.*, the Russian mafia, JA238-39, 403-05 (¶¶299, 765-772), which DB knew served as an al-Qaeda agent for opium laundering and weapons supply, JA238-42, 409-10 (¶¶298-311, 786-87). DB knew these services were not routine; indeed, it called them a "Laundromat," JA269 (¶389), and charged a premium for them, JA392-93 (¶740). DB's actions resulted in substantial penalties. JA476 (¶993 n.647).

SCB and Danske's laundering transactions—which likewise benefited the Khanani MLO, VAT fraud cells, and other terrorist agents—were similarly non-

routine. Their purpose was to conceal the flow of dirty money, contrary to banks' duty to prevent such obfuscation. JA289-93, 295-98, 319-22 (¶¶447-56, 463-72, 533-45). They also involved tremendous volumes of suspicious transactions from high-risk regions that defendants knew had a reputation for Syndicate-related terrorist finance. *See* JA140-44 (¶¶196-204) (notorious Syndicate-related red flags relating to Afghanistan, Pakistan, and the U.A.E.); JA147-50 (¶¶211-18) (same for Russia); JA158-60 (¶¶239-45) (Estonia). Both SCB and Danske incurred massive penalties for their crimes, JA430 (¶848); OB25, and NYDFS confirmed that "[SCB] operated as a rogue institution" that "left the U.S. financial system vulnerable to terrorists," JA290 (¶449).

SCB's relationship with Fatima was not routine, either. Fatima was not an ordinary company; it was being controlled by ISI elements seeking to ensure an unending supply of explosive materials for the Syndicate. JA312-16 (¶¶518-24). As SCB knew based on media reports, Fatima was the Syndicate's principal supplier of CAN—a material so dangerous that Afghanistan banned its importation, and Coalition forces seized it on sight. JA309-10 (¶¶510-12). Thus, "no later than 2011, [SCB] knew Fatima … supplied CAN fertilizer to the Haqqani Network for its bomb pipeline and relied upon SCB accounts to do so." JA455 (¶913).

Against that backdrop, SCB was one of Fatima's "major bankers," providing eight-figure facilities that enabled bomb-related transactions. JA316 (¶¶526); JA506

6

(¶1074). SCB also financed specific transactions by Syndicate agents and fronts—even though such transactions raised "terrorist finance 'red flags,'" JA500 (¶1059), and even *after* SCB received direct warnings that it was facilitating terrorism. OB11-12; JA146-47, 316-18, 499-500, 504, 506-09, 668, 671 (¶¶210(iv), 525-27, 529-31, 1058, 1070, 1075-83, 2031, 2041). SCB thus "knowingly assumed an operational role in [] al-Qaeda's CAN fertilizer bomb campaign." JA306 (¶505). That's not routine.

Independently, in the context of defendants' criminal enterprise, even common banking activities are not "routine." Indeed, it is well-established that common banking acts cease to be routine when provided in atypical circumstances. *See infra* pp.18-20 (citing authorities). Here, defendants' knowing use of typical banking operations to commit or facilitate unlawful acts was not innocent—but instead a means by which defendants concealed unlawful activity. *See* JA139-40, 376-79, 473-74 (¶¶193-95, 711-16, 986-87).

2. Second, defendants describe their customers as non-terrorist. *E.g.*, RB4, 17, 21, 34-36, 39, 41-43, 54, 60. If defendants mean that their customers were not bombers, that is irrelevant because the law does not limit liability to assistance rendered directly to attackers. *See, e.g.*, *Kaplan*, 999 F.3d at 866. If defendants suggest that plaintiffs allege no known connection between defendants' customers and terrorists, they are wrong. VAT fraudsters Azizi and Ahmed were both

7

"polyterrorist operatives or agents for al-Qaeda and the Haqqani Network," conducting fraud schemes to finance those organizations' attacks in Afghanistan. JA234 (¶287). "Altaf Khanani," the head of the Khanani MLO, "was a Syndicate member," JA119 (¶139), who served al-Qaeda and the Taliban, including Sirajuddin Haqqani, JA218-32 (¶¶247-79), a key organizer of the attacks here, *see infra* p.23.

Plaintiffs also allege "a complete 'fusion' between terrorist groups like the Syndicate and transnational organized crime groups like the Russian Mafia." JA120 (¶139). Thus, the Solntsevskaya Group collaborated with al-Qaeda terrorists to launder opium profits for, and supply weapons to, the Syndicate. *See* OB22-23. Defendants assert that "it is a giant leap from aiding Russian mobsters with money laundering to aiding Afghan terrorists with bombings." RB60. Authoritative sources, however, draw a "*direct causal link* between [Afghan] insurgent funding and the opium trade" no later than 2004, JA470 (¶974), and the U.S. State Department confirmed—in a statutorily mandated report to Congress—that "the illicit trafficking of opiates . . . destined for the Russian Federation and Eastern Europe was the predominant funding mechanism for Afghan-based terrorist activity" such that "[d]rug trafficking in the region [was] inextricably tied to terrorism," U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 262 (2016); *see also* JA148-50, 238-42, 258-59, 374-75, 408-10, 467-72, 487 (¶¶215-18, 298-311, 355-58, 706-08, 783-

89, 967-78, 1026) (additional well-sourced allegations alerting defendants to causal connection between Russian mafia's laundering and Syndicate terrorism).

Defendants claim that "[t]he complaint does not even allege that [SCB customers] Fatima and Pakarab were directly or deliberately providing their products to terrorists," RB55, but members of Congress publicly described Fatima as a "pseudo-terrorist organization" helping "create havoc and chaos in Afghanistan and thwart the U.S. efforts there" by deliberately supplying CAN to terrorists for IEDs and suicide bombs. JA315 (¶523); *see also* JA506-09 (¶¶1075-82) (alleging that Fatima created a "deliberate supply of CAN fertilizer to Syndicate agents, operatives, and fronts"); JA208, 315-17 (¶¶386, 523-28) (additional allegations that Fatima deliberately supported the Syndicate).

Indeed, media outlets alerted defendants by 2011 that Fatima's CAN was widely used in Syndicate IEDs. OB11, 38-39. In 2012, Congressmen publicly stated that Fatima's refusal "to do anything" (even at the U.S. government's expense) about this carnage showed that Fatima was *intentionally* aiding "the ISI" and "Haqqani Network" to "to kill American soldier[s]," JA313 (¶519); and "[t]errorism experts" publicly observed the "nexus between rogue ISI hostility towards the [U.S.] and Fatima's … refusal to change their intentional practices relating to Fatima Group CAN Fertilizer," JA313 (¶520). In January 2013, senior U.S. military officials traveled to SCB's New York offices to plead with SCB to stop enabling the

9

Syndicate's Fatima-bomb pipeline—showing how SCB's assistance to Fatima enabled terrorist attacks. OB11-12, 38-40. In sum, defendants' customers were at least as "closely intertwined" with the Syndicate's terrorist activities as the investment companies and charity in *Kaplan*. 999 F.3d at 860.

These are just some of defendants' mischaracterizations. When plaintiffs' *actual* allegations are read holistically in the light most favorable to plaintiffs, they show that defendants willfully moved (or helped others illegally move) tens of millions of dollars and tons of explosive materials to Syndicate terrorists in Afghanistan who used those resources to attack Americans. Under *Twitter* and this Court's precedents, such allegations plead aiding and abetting.

## II. Defendants' Arguments About "Knowing and Substantial Assistance" Are Wrong

### A. *Twitter* Did Not Overrule This Court's JASTA Precedents

Plaintiffs argued that this appeal is controlled by *Kaplan*, which held that a bank that laundered money for purported charitable and financial institutions allegedly affiliated with Hezbollah could be liable for aiding and abetting Hezbollah's rocket attacks. Defendants and their *amici* suggest that *Twitter* overruled *Kaplan*. But defendants do not identify any "clear statement" in *Twitter* that presents a "conflict, incompatibility, or inconsistency" with *Kaplan*, *Deem v. DiMella-Deem*, 941 F.3d 618, 624 (2d Cir. 2019)—much less a "fundamental"

conflict that could justify ignoring circuit precedent (as opposed to mere "tension," which would not). *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 153-57 (2d Cir. 2015); *see Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003) (following circuit precedent despite "tension" with Supreme Court decision).

To the contrary, *Twitter* reinforces *Kaplan* and establishes why liability is appropriate here. Defendants' spin on *Twitter* (RB25-32) ignores important aspects of the Supreme Court's holding as well as distinctions between *Twitter*, on the one hand, and *Kaplan* and this case, on the other.

1. *Twitter* held that JASTA aiding-abetting "refers to a conscious, voluntary, and culpable participation in another's wrongdoing." 598 U.S. at 493. To determine whether the defendant's conduct was culpable enough to warrant liability, *Twitter* adopted a sliding scale, considering the "knowledge and substantial assistance components … relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Id.* at 503-04 (quotation marks omitted). Thus, "less substantial assistance require[s] more scienter," and "vice versa." *Id.* at 492. The Court also embraced the six-factor approach to substantial assistance in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), clarifying that those factors holistically aim to "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify" liability. 598 U.S. at 504.

11

The wrongdoing the defendant assists need not be an act of terrorism—"[a]s *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were a 'foreseeable risk' of the intended tort." *Twitter*, 598 U.S. at 496 (quoting *Halberstam*, 705 F.2d at 488). Thus, defendants who aid unlawful acts are liable for acts of terrorism that are foreseeable risks of the acts assisted. For example, a defendant may be "liable for all of [a terrorist] group's actions or perhaps some definable subset of terrorist acts" if it provided "routine services … in an unusual way" or sold unusually "dangerous wares" to the group. *Id.* at 502. Alternatively, "pervasive, systemic, and culpable" assistance to a terrorist organization, resembling what the defendant provided in *Halberstam*, could constitute "aiding and abetting each [of the organization's] terrorist act[s]." *Id.* The key point is that JASTA does not require a "strict nexus between [the defendant's] assistance and [a specific terrorist] attack." *Id.* at 494. Although "a close nexus" is helpful, "more remote support can still constitute aiding and abetting in the right case." *Id.* at 496.

Defendants incorrectly suggest that *Twitter* establishes a binary proposition: Assistance must either reach the specific terrorist act that injured the plaintiff, or be so systemic and pervasive that it aids all of an organization's attacks. RB31-32. This ignores *Twitter*'s confirmation that defendants are liable for the foreseeable risks of unlawful acts they assist, even if those acts are not themselves terrorism—and that defendants who provide "aid to a known terrorist group" may be liable for a

"definable subset of terrorists acts," even if not all of them. 598 U.S. at 496-97, 502. This Court should reject defendants' attempts to erase the middle ground the Supreme Court expressly recognized.

2. *Twitter*'s facts are also important to understanding its meaning. The Court sought to "ascertain the 'basic thrust' of *Halberstam*'s elements and determine how to 'adap[t]' its framework" to "new facts" involving "world-spanning internet platforms." 598 U.S. at 488. As Justice Jackson explained, the resulting decision was "narrow in important respects," including that it "properly rests on the particular allegations" at issue, such that "cases presenting different allegations … may lead to different conclusions." *Id*. at 507 (Jackson, J., concurring).

The *Twitter* allegations fell into two buckets. The plaintiffs principally alleged that social-media companies were liable for aiding a single ISIS attack because they "failed to stop ISIS" from misusing their "generally available virtual platforms." 598 U.S. at 505. The plaintiffs "never allege[d] that ISIS used defendants' platforms to plan or coordinate" the attack, and "concede[d] that defendants attempted to remove at least some ISIS-sponsored accounts and content" when made aware of it. *Id*. at 498 & n.13. The plaintiffs also identified "no duty that would require … communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends." *Id*. at 501. Nevertheless, they

13

argued that the defendants "took insufficient steps to ensure that ISIS supporters and ISIS-related content were removed from their platforms." *Id*. at 498.

The Court deemed these allegations insufficient, noting that "both tort and criminal law have long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance," especially absent any duty to act. *Twitter*, 598 U.S. at 500. Imposing liability for passive nonfeasance would thus require "a strong showing of assistance and scienter." *Id*. Any other result "would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them." *Id*. at 503. Because the plaintiffs failed to articulate any "nexus between the assistance and the" attack or even show "any sort of affirmative and culpable misconduct that would aid ISIS," this first set of allegations failed. *Id*. at 505.

The Court applied a different analysis to allegations that Google "shared advertising revenue with ISIS." 598 U.S. at 505. There, the Court did not require heightened scienter or nexus with the attack—because active assistance is different in kind from passive nonfeasance. Rather, the Court affirmed dismissal because the plaintiffs "allege[d] nothing about the amount of money that Google supposedly shared." *Id*. Because the amount could have been *de minimis*, *e.g.*, "only $50," the Court held that "[w]ithout more," plaintiffs had not "plausibly alleged" substantial assistance. *Id*. at 505-06.

14

3. *Twitter* is consistent with this Court's precedents. Most importantly, *Twitter*'s facts are easily distinguished from cases like *Kaplan* in which this Court upheld liability. None of the alleged misconduct in *Twitter* was independently criminal like the money laundering at issue in *Kaplan* or plaintiffs' allegations here. Unlike the social media companies in *Twitter*, banks like the one in *Kaplan* and defendants here are legally required to stop money laundering and terrorist finance. And unlike *Twitter*, neither *Kaplan* nor this case involves mere passive nonfeasance or insubstantial sums (*e.g.*, $50). Consequently, recognizing liability in *Kaplan* and here poses no threat to the lawful business of ordinary banks (or communications providers, or any other industry)—but is instead fully consistent with *Twitter*'s emphasis on conscious, culpable behavior that assists unlawful acts.

*Twitter* also validates this Court's construction of JASTA. Just as *Twitter* emphasized foreseeability as a middle ground between the defendants' strict-nexus argument and the plaintiffs' broad enterprise-liability theory, 598 U.S. at 495-96, 502, so does this Court, explaining that foreseeability is "central … to JASTA aiding-and-abetting." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496-97 (2d Cir. 2021). Thus, under *Twitter* and this Court's precedents, allegations "involving aid to a known terrorist group would justify holding a secondary defendant liable for all" or "some definable subset" of the group's terrorist acts in some circumstances, but not others. *Twitter*, 598 U.S. at 502; *see also Kaplan*, 999 F.3d at 860 (whether

15

"knowingly providing material support to an FTO" constitutes aiding and abetting requires a "fact-intensive" inquiry).[2]

    *Twitter* also criticized the Ninth Circuit for conflating the "knowing" part of JASTA's third element with the "general awareness" element. 598 U.S. at 503. Contrary to defendants' argument (RB28-29), this Court's precedents do not replicate that error. Instead, *Kaplan* explained that the "knowledge component" of the third element "'is designed to avoid' imposing liability on 'innocent, incidental participants,'" 999 F.3d at 864 (quoting *Halberstam*, 705 F.2d at 485 n.14). Thus, *Kaplan* held that *in addition to* general awareness, plaintiffs must show that "the defendant knowingly—and not innocently or inadvertently—gave assistance." *Id*.; *Honickman*, 6 F.4th at 499-500. In other words, this Court recognizes that the "knowing" part of "knowing and substantial assistance" focuses on the defendant's consciousness of its own actions and their relation to the tortious conduct, while "general awareness" focuses on the defendant's consciousness of the primary tortfeasor's actions—which is exactly how *Twitter* applied those elements. *See* 598 U.S. at 504 (explaining that the "knowing" part of the inquiry is "designed to capture

---

    [2] Although this Court previously considered foreseeability in connection with general awareness, *Twitter* considered it separately. That doesn't mean conflict. As *Honickman* acknowledged, "it is more important that courts do not skip foreseeability altogether rather than apply it at a precise stage of the JASTA aiding-and-abetting analysis." 6 F.4th at 497 n.10.

the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act).").

*Twitter* also criticized the Ninth Circuit for treating *Halberstam*'s six factors "as a sequence of disparate, unrelated considerations without a common conceptual core," which caused the court to "elide[] the fundamental question of aiding-and-abetting liability: Did defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" *Twitter*, 598 U.S. at 504-05. This Court, however, applies the *Halberstam* factors holistically "on a case-by-case basis." *Honickman*, 6 F.4th at 500; *Kaplan*, 999 F.3d at 856. And the results of this Court's cases plainly embody the fundamental question posed by the Supreme Court. The Court should accordingly reaffirm its JASTA precedents. As explained in the opening brief, those precedents dictate reversal.

## B. Defendants' Contentions That They Were Passive, and Their Transactions Routine, Ignore the Complaint

Defendants argue that they only passively provided routine services analogous to the social media services in *Twitter*, and therefore did not consciously and culpably aid terrorists. RB32-36. That ignores plaintiffs' allegations that defendants actively pursued unusual and culpable (often criminal) transactions.

Urging otherwise, defendants repeatedly emphasize (RB1, 20, 30, 51) one sentence from *Twitter* stating that "'[c]ulpability of some sort is necessary to justify

17

punishment of a secondary actor,' lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." 598 U.S. at 491 (quoting *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978)). But this does not mean that all bank activities for customers are "routine"—or that "routine" transactions can never support liability.

In fact, *Twitter* approvingly cites cases holding otherwise. For example, under *Monsen*, even "inaction … may provide a predicate for liability where the plaintiff demonstrates that the aider-abettor consciously intended to assist in the perpetration of a wrongful act." 579 F.2d at 800. Moreover, "the requirement of knowledge may be less strict where the alleged aider and abettor derives benefit from the wrongdoing." *Id*. at 799 (quotation marks omitted). In that circumstance, "proof that the alleged aider-abettor had general awareness that his role was part of an overall activity that is improper" shows "conscious involvement in impropriety or constructive notice of intended impropriety." *Id*. (quotation marks omitted).[3] Under those standards, defendants' active criminal behavior (*e.g.*, "laundromats"), from which they derived massive financial benefit, are culpable.

---

[3] *See also FDIC v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423, 431 (8th Cir. 1989) (knowledge requires only that defendant "had a general awareness of its overall role in [tortfeasor's] scheme," and "such knowledge could come through circumstantial evidence, including facts available to [defendant's] employees").

Defendants also ignore *Twitter*'s reliance on *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004 (11th Cir. 1985), which held a bank liable for aiding and abetting a massive fraud when its only misconduct was that an employee recklessly signed a letter vouching for the fraudsters' character without first "probing more deeply into [their] operations." *Id*. at 1012. *Woods* explained that when a "method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability"—whereas transactions performed "in the ordinary course of business" require "stronger evidence of complicity." *Id.* at 1009-10 (quotation marks omitted). Applying that test, *Woods* reasoned that although banks commonly write references for customers, it was not common to do so without conducting diligence. That *un*common transaction was sufficient to support an inference of scienter—even though the employee "may not have known of all the details of the primary fraud." *Id*. at 1012.

*Twitter*'s embrace of *Woods* shows that even ordinary banking tasks, done without specific intent to facilitate a tort, can independently support liability when performed under atypical circumstances—echoing *Halberstam*'s admonition that acts that are "neutral standing alone … must be evaluated in the context of the enterprise they aided." 705 F.2d at 488. More recent cases citing the same common-law authorities agree. *E.g.*, *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536-37 (6th Cir. 2000) (affirming aiding-abetting liability against bank for

19

fraud when bank provided a four-day loan to customer—even though such loans were "lawful" and "commonplace," the bank did not know how the customer would use the loan to fraudulently obtain a bond, and the loan was not "necessary" to the scheme). *Woods* also underscores that banks have affirmative duties to inquire into their customers' activities that social media companies do not. *E.g.*, *Kaplan*, 999 F.3d at 849 (banks are required "to know their customers," "perform due diligence," and "not provide banking services to terrorist organizations"); JA354-58 (¶¶655-63) (defendants knowingly violated similar diligence requirements).

Defendants' conduct was even more culpable than the banks held liable in *Monsen*, *Woods*, and *Kaplan*. Here, as in *Kaplan*, plaintiffs allege that defendants actively enabled transactions that were both atypical *and illegal*. *See supra* pp.3-7. Such conduct easily supports liability under *Kaplan*. 999 F.3d at 858. At a minimum, this Court's precedents hold that whether financial services are "routine" is a "question[] of fact for a jury to decide." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018). The Court accordingly cannot simply ignore plaintiffs' well-pleaded allegations and decide this question in defendants' favor as a matter of law.

But even if the Court ignores plaintiffs' allegations that defendants' transactions were not routine, that wouldn't foreclose liability; it may only require greater allegations of scienter and assistance. Plaintiffs made such allegations here. Defendants' conduct allowed the Syndicate to access tens of millions of dollars, and

20

SCB also directly facilitated Fatima "sales [that] supplied the explosives for thousands of Syndicate CAN fertilizer bombs that were detonated in attacks against Americans in Afghanistan each year." JA508 (¶¶1080). For most of this conduct, defendants and/or their employees were found criminally liable, meeting the highest scienter standards. With respect to SCB's transactions for Fatima, public reports and personal entreaties from high-ranking U.S. officials alerted SCB that its actions led to terrorist attacks. Defendants' hands-on participation in Syndicate finance and logistics was nothing like the "arm's length, passive, and largely indifferent" relationship between social media companies and their billions of users in *Twitter*. 598 U.S. at 500. It was a much closer fit with *Twitter*'s examples of culpable conduct, including providing "routine services … in an unusual way" or selling "dangerous wares … to a terrorist group." *Id*. at 502. By any measure, plaintiffs allege sufficient culpability here.

## C. Defendants' Contention That Their Conduct Did Not Assist Particular Attacks Is Misplaced.

Defendants argue that plaintiffs fail to plead defendants assisted the specific terrorist attacks that injured them. RB37-40. But *Twitter* rejected a "strict nexus" requirement between assistance and specific attacks. 598 U.S. at 497. In fact, plaintiffs' allegations satisfy *Twitter* in two independent ways.

21

*First*, defendants' support was sufficiently "pervasive, systemic, and culpable" to justify liability for each of the terrorist attacks that injured plaintiffs. *Twitter*, 598 U.S. at 502. *Twitter* held that a defendant could be liable for "all of [a terrorist] group's actions or perhaps some definable subset of terrorist acts" when, for example, a "provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." *Id*.

Here, defendants provided assistance worth tens (if not hundreds) of millions of dollars via a deliberate multi-year pattern of unlawful transactions that helped the Syndicate generate income through criminal schemes (*e.g.*, VAT fraud), convert revenue from criminal activities (*e.g.*, drug sales) into U.S. dollars, and repatriate those dollars to Afghanistan to fund Syndicate terrorist attacks. *See* OB8-9. Defendants describe this as a "hodgepodge of financial transactions" and blithely assert that they cannot be responsible for every terrorist attack. RB40. But if the Court credits plaintiffs' allegations, as it must, then defendants routed enough money to the Syndicate to fund every attack in this case many times over. JA472-73 (¶¶ 979-85). And they did so through highly unusual transactions that deviated from norms of responsible banking, with criminal intent. That is enough to render defendants liable for each Syndicate attack in Afghanistan that injured plaintiffs.

Similarly, SCB's assistance to Fatima qualifies as pervasive and systemic vis-à-vis IED and suicide attacks because Fatima's CAN fertilizer was a "dangerous ware[]," that not only foreseeably risked attacks, *Twitter*, 598 U.S. at 502, but was in fact responsible for 90% of American IED casualties in Afghanistan, JA311 (¶515).

*Second*, the attacks that injured plaintiffs were a foreseeable risk of the unlawful activities defendants aided. *See, e.g.*, OB49 (VAT fraud); OB58-61 (assisting Khanani); OB68-71 (laundering Syndicate opium money for Russian mafia). That is all *Twitter* requires. *See* 598 U.S. at 496. Indeed, plaintiffs' linkages are specific. For example, laundering kingpin Khanani acted as both a "tax" payer and personal financier to Sirajuddin Haqqani, a high-ranking member of both al-Qaeda and the Haqqani Network, such that all of defendants' assistance to Khanani necessarily augmented Sirajuddin's ability to kill Americans in Afghanistan, JA219-22, 228-30, 362-63 (¶¶252-54, 271-74, 674), while Sirajuddin played a key role organizing anti-American terrorist violence there, JA125-36, 205, 209, 213, 216-17 (¶¶157-86, 376, 389-90, 401, 407-08), including many attacks on plaintiffs, *e.g.*, JA513, 515, 517 (¶¶1103, 1119, 1131) (illustrative examples).

Similarly, plaintiffs allege that the Azizi Cell's proceeds "directly funded the operations of joint al-Qaeda-Haqqani Network-Lashkar-e-Taiba cells in Afghanistan" that attacked and harmed many plaintiffs. *See, e.g.*, JA156, 514, 547-

48 (¶¶236, 1112-13, 1308-09, 1315-16) (illustrative examples). Plaintiffs'

allegations were supported by, *inter alia*, German prosecutors' statements to the U.S.

government—which a federal judge considering Azizi's extradition found

credible—and evidence obtained from a joint al-Qaeda/Haqqani Network hideout

near the Afghanistan/Pakistan border. JA235-36 (¶¶291-93).

Plaintiffs' allegations suffice under *Twitter* because they identify conscious,

culpable behavior that foreseeably risked the attacks that injured plaintiffs. Just as

*Twitter* rejected a requirement for a "strict nexus between the alleged assistance and

the terrorist act," 598 U.S. at 497, this Court should similarly reject defendants'

suggestion that plaintiffs must allege "that the attacks [that injured plaintiffs] were

committed with funds that were laundered with the supposed assistance of any of

the banks," RB38. Indeed, defendants' rule would render JASTA a dead letter in

nearly all al-Qaeda-related terror-finance and logistics cases because—given

al-Qaeda's opacity and the fungibility of money, bullets, and bombs—unless such

terrorist supplies were stamped "made in Iran" or derived from Fatima CAN, it is

usually impossible to show al-Qaeda's exact source of funds, bullets, or bombs used

to commit an attack in Afghanistan. Requiring such a showing would be absurd

given Congress's stated objective to "interrupt, or at least imperil, the flow of

money" "at any point along the causal chain of terrorism." S. Rep. No. 102-342, at

22 (1992).

**D. Defendants' Arguments About the *Halberstam* Factors Are Unpersuasive.**

Plaintiffs addressed *Halberstam*'s six factors in detail, showing why each form of defendants' assistance was independently substantial enough to support liability. OB33-36, 45-47, 51-53, 61-62, 66-67, 70, 73. Defendants blitz through these factors and deny, in conclusory fashion, that they support liability. RB40-44. This warrants no further response other than to note that essentially all of defendants' arguments are based on mischaracterizations addressed *supra* pp.3-10.

## III. Defendants' "General Awareness" Arguments Are Wrong

Each defendant acted with general awareness that it was playing a role in unlawful activity from which the attacks that injured plaintiffs were foreseeable. Defendants' responses lack merit.

**A. Standard Chartered Bank**

Plaintiffs' opening brief led with SCB's assistance to Fatima. OB38-45. Burying this topic, SCB distorts plaintiffs' allegations beyond recognition. RB54-57. Under SCB's telling, Fatima is a legitimate company with no ties to terrorism. But plaintiffs allege that Fatima deliberately and directly sold CAN to agents, operatives, and fronts for al-Qaeda and the Haqqani Network. Plaintiffs further allege that Congressmen and media reports repeatedly alerted SCB about Fatima's nature. To underscore the point, plaintiffs detail how high-ranking U.S. military

25

officials explicitly drew a direct link between SCB's activities and terrorists' bomb attacks targeting Americans in Afghanistan. *See supra* pp.9-10. That is more than enough to allege general awareness. *See Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718, at *10-13 (S.D.N.Y. Mar. 7, 2023) (finding general awareness on indistinguishable facts).

SCB's arguments about Syndicate VAT fraud (RB48-50) also fail because the Syndicate could only convert VAT fraud into acts of terrorism with "the willing involvement of corrupt western banks." JA412 (¶795); *see also* JA413-16 (¶¶797-809) (providing details). Thus, plaintiffs do not allege "that SCB should have been aware that it was participating in fraud," *contra* RB48; plaintiffs allege that SCB *actually knew* Azizi was perpetrating VAT fraud and participated willingly, including by providing a shell company for the scheme. *See* OB48-49. SCB was accordingly at least generally aware that it was playing a role in unlawful activity.

Terrorist attacks in Afghanistan were a foreseeable risk of that activity. SCB concedes that public sources alerted defendants that Syndicate VAT fraud cells financed terrorist violence in Afghanistan. RB49. SCB nevertheless insists that there was not enough information connecting *Azizi's* VAT fraud to terrorism—but that ignores plaintiffs' factual allegations identifying multiple terror-finance-related red flags specific to Azizi, including his unusual patterns of account activity, young age, high-risk nationality and transaction geographies, and high-risk business (*i.e.*, a

26

small company exporting cell phones to Afghanistan, a known indicator of terrorist finance). OB50-51. Thus, contrary to SCB's assertion, plaintiffs do not "believe that the banks should have treated any young Afghan without obvious financial support as someone working with terrorists"; but plaintiffs do allege that anybody *who was carrying on a multi-million dollar VAT fraud* that raised any such red flags identified above (let alone, all of them) was foreseeably financing terrorism. SCB cannot wave those allegations away at the pleading stage.

SCB's arguments about money laundering are equally weak. Again, SCB pretends that plaintiffs merely allege that SCB unwittingly carried out routine transactions for the Khanani MLO, when in fact plaintiffs allege that SCB willfully helped the latter launder money as part of a highly culpable scheme. OB53-56. In this regard, SCB elides the key point of plaintiffs' allegations about at least three whistleblowers who reported SCB's dealings with Khanani. The point is not that SCB needed whistleblower reports to recognize that it was doing something wrong; it is that SCB reacted by retaliating against the whistleblowers and continuing its business with Khanani—which reinforces the inference that SCB *always* knew that it was helping the Khanani MLO, and *always* did so willingly. OB54-56.

SCB's whistleblower knowledge is also relevant for an independent reason: Evidence "that others with access to the same sources of information available to [the defendant] were able to figure out [an unlawful] scheme" can show the

27

defendant's guilty knowledge. *United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011). If such evidence suffices at a criminal trial, then similar allegations easily satisfy plaintiffs' pleading burden here. Thus, allegations that SCB's agents and employees with access to SCB's data were able to spot the Khanani transactions support an inference that SCB did, too—which is all this Court's precedents require. *See Kaplan*, 999 F.3d at 865. Indeed, *Kozeny* applies with full force to DB's and Danske's dealings with the Khanani MLO as well because plaintiffs allege that DB and Danske had similar Khanani-related data as SCB.

SCB's other money-laundering arguments (RB52-53) principally repeat the district court's flawed reasoning, which plaintiffs already addressed. OB54-61. New, however, is SCB's suggestion that it may never have performed "know your customer" diligence on the Khanani fronts, and so may have lacked actual knowledge of those customers' nature. But plaintiffs allege that SCB *did* know its customers, including these Khanani fronts, *see, e.g.*, JA294-98, 356, 364-65 (¶¶461-72, 657, 678), and are entitled to the reasonable inference that SCB performed customary diligence. Moreover, even if SCB ignored its own policies and failed to conduct any diligence on Khanani's fronts notwithstanding the massive sums they were sending to notorious terrorist hotspots, that would be strong evidence of SCB's willful blindness, *i.e.*, scienter. In any event, it suffices to allege the existence of information that would make banks aware of their customers' nature; plaintiffs need

not allege (much less prove) that the banks actually reviewed that data. *See Kaplan*, 999 F.3d at 865.

## B. Deutsche Bank

Plaintiffs' allegations regarding DB's complicity in Syndicate VAT fraud are highly specific. Azizi himself identified DB as his "willing financial partner" and DB bankers were arrested for their role in VAT fraud. DB's insistence that plaintiffs do not allege "facts demonstrating" DB's awareness that it "facilitat[ed] the alleged frauds" is not credible. RB58. The links between Azizi's fraud and the attacks that injured plaintiffs are described *supra*, and are equally strong vis-à-vis DB.

DB also willfully laundered money; indeed, DB itself described its schemes as a "Laundromat." JA269 (¶389). DB established its Russian laundromat in collaboration with the Solntsevskaya Group, *i.e.*, the Russian mafia, to move billions of dirty dollars, including substantial opium profits that flowed back to al-Qaeda and the Haqqani Network. OB20-23. DB attempts to downplay the links between the Russian mafia and Syndicate terrorism, but plaintiffs plead them clearly. OB22-24; *supra* pp.8-9. Moreover, anybody using DB's mirror-trading scheme was necessarily identifying himself as a money launderer—and bankers carrying out the scheme would have learned the identities of their customers to protect their own safety. OB16-17, 20-23. Plaintiffs thus plausibly allege that DB knew the nature of its laundromat customers, including their ties to the terrorists who injured plaintiffs.

29

### C. Danske Bank

Danske pleaded guilty to fraud in connection with its operation of one of the largest money-laundering operations in history through its Estonia branch, forfeiting approximately $2 billion. OB25. Any bank that knowingly did that was at least generally aware that it was participating in illegal activity. The only question is whether the attacks that injured plaintiffs were a foreseeable risk of Danske's gargantuan criminal operation. They were.

Terrorist fundraisers, including Khanani fronts and VAT fraud cells, moved their ill-gotten funds through Danske, OB25-26, in part because Estonia was a key—and notorious—conduit for Afghan opium and associated revenues, JA158-60 (¶¶239-45). Danske's Russian customers were also notorious conduits for Syndicate drug money. *See* JA147-50 (¶¶211-18). More broadly, the entire international financial community knew that anti-American terrorists in Afghanistan were funding their attacks using money laundered through complicit banks—because the U.S. government and our closest allies told them so after 9/11. *E.g.*, JA109-14, 115-22, 142-43 (¶¶112-21, 127-34, 136-44, 201-02). When Danske welcomed launderers, it knowingly invited terrorist financiers, too.

Danske contends that plaintiffs fail to specifically allege that Danske knew that various transactions assisted the specific attacks that injured plaintiffs. RB62-64. But as discussed above, JASTA does not require such granularity. Indeed, in

30

*Halberstam*, it was not necessary that the defendant even knew that she was assisting burglaries—let alone that murder would occur. 705 F.2d at 488. Similarly here, it is enough that Danske knew it was laundering money (as admitted in its guilty plea), at a scale (billions in USD), in or related to high-terrorist-finance-risk geographies (Estonia and Russia), with customers that raised red flags for Syndicate terrorist finance (*e.g.*, Khanani)—because Syndicate terrorist attacks are a "foreseeable risk" of those unlawful acts. *Id*.

## IV. A Terrorist Campaign Constitutes an "Act of International Terrorism" Under the Statutory Definition

Defendants have no good answer to the contention that an "act of international terrorism" need not be the specific attack that injured plaintiffs, but can also be a broader terrorist campaign. They repeat the district court's reasoning, RB64-65, but ignore the statutory text, which strongly supports plaintiffs, OB74-75.

*Twitter* did not hold otherwise because those plaintiffs "conceded the act of international terrorism they allege is the [single] Attack," and not any broader campaign. *Gonzalez v. Google LLC*, 2 F.4th 871, 909 (9th Cir. 2021). Accordingly, *Twitter* never considered the scope of the term "act of international terrorism." Instead, *Twitter* merely held that *when* the alleged "act of international terrorism" is a specific attack, defendant must aid and abet that attack or another unlawful act that foreseeably risked that attack. But it did not hold that *only* attacks can *ever* qualify

31

as "acts of international terrorism," and that result is foreclosed by precedents (which *Twitter* did not overrule) holding that providing financial assistance to terrorists can qualify. *See, e.g.*, *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc). Because aiding a racketeering enterprise constitutes conscious, culpable behavior assisting wrongdoing, *Twitter* supports plaintiffs' position. The district court incorrectly held otherwise.

## CONCLUSION

This Court should reverse the decision below.

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Geoffrey P. Eaton
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
Tel: 202-629-3530
tejinder.singh@sparacinopllc.com
geoff.eaton@sparacinopllc.com

September 29, 2023

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit established by this Court's Rule 32.1 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6995 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


/s/ Tejinder Singh
Tejinder Singh

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2023, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.

/s/ Tejinder Singh
Tejinder Singh