# No. 23-132

## United States Court of Appeals for the Second Circuit

JONATHAN L. ASHLEY, III, ET AL.,

*Plaintiffs-Petitioners,*

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, ET AL.,

*Defendants-Respondents.*

Appeal from the United States District Court for the Eastern District of New York (No. 1:21-cv-04400-HG-RML) (Hon. Hector Gonzalez, J.)

**BRIEF OF AMICI CURIAE FORMER POLITICAL BRANCH OFFICERS AND OFFICIALS IN SUPPORT OF PETITIONERS**

Daniel Woofter
RUSSELL & WOOFTER LLC
1701 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
(202) 240-8433
dhwoofter@russellwoofter.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................ii

IDENTITY AND INTEREST OF AMICI CURIAE ...................................1

ARGUMENT ...........................................................................................3

   I.  The panel's decision violates *Fuld*'s command to defer to political branch determinations about what causes terrorist violence ...........................................................................................3

  II.  The panel's foreseeability analysis violates *Twitter*. ......................10

CONCLUSION ......................................................................................12

# TABLE OF AUTHORITIES

## Cases

*Fuld v. Palestine Liberation Org.*,
  606 U.S. 1 (2025).................................................................2, 3, 10

Halberstam v. Welch,
  705 F.2d 472 (D.C. Cir. 1983) ..............................................10

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010)......................................................................3

*Jesner v. Arab Bank, PLC*,
  584 U.S. 241 (2018)...............................................................3, 4

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)......................................................3, 10, 11

*United States v. Bagcho*,
  151 F. Supp. 3d. 60 (D.D.C. 2015) .........................................9

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)..................................................................4

## Statutes

Implementing Recommendation of the 9/11 Commission Act of 2007,
  § 2041(b)(2),
  22 U.S.C. § 7511 note...............................................................5

Intelligence Reform and Terrorism Prevention Act of 2004 § 7104(b),
  22 U.S.C. § 7511 note...............................................................4

8 U.S.C. § 1189(a)...........................................................................6

21 U.S.C. § 1904(b) .........................................................................6

22 U.S.C. § 7511(2) .........................................................................4

22 U.S.C. § 7511(3) .........................................................................4

## Rules

Fed. R. App. P. 29(b)(2)...................................................................3

# Other Authorities

Exec. Order No. 13,224,
  66 Fed. Reg. 49079 (Sept. 27, 2001) ....................................................... 6

Fin. Action Task Force,
  *FATF Report: Emerging Terrorist Financing Risks* (Oct. 2015) ............ 7

Ninth Rep. of the Analytical Support and Sanctions Monitoring Team,
  U.N. Doc. S/2009/245 (May 13, 2009) ..................................................... 9

Rep. of the Analytical Support and Sanctions Monitoring Team,
  U.N. Doc. S/2007/677 (Nov. 29, 2007) ..................................................... 9

Rep. of the Analytical Support and Sanctions Monitoring Team,
  U.N. Doc. S/2015/79 (Feb. 2, 2015) ......................................................... 9

Rep. of the Comm. of Experts on Afghanistan,
  U.N. Doc. S/2001/511 (May 22, 2001) ..................................................... 9

S.C. Res. 1333 (Dec. 19, 2000) ..................................................................... 8

Seventh Rep. of the Analytical Support and Sanctions Monitoring Team,
  U.N. Doc. S/2016/842 (Oct. 5, 2016) ........................................................ 9

U.S. Dep't of Def.,
  *Report on Progress Toward Security and Stability in Afghanistan*
  (Apr. 2014) ................................................................................................. 6

U.S. Dep't of Def.,
  *Report on Progress Toward Security and Stability in Afghanistan*
  (Jan. 2009) ................................................................................................. 5

U.S. Dep't of Def.,
  *Report on Progress Toward Security and Stability in Afghanistan*
  (June 2008) ................................................................................................ 5

U.S. Dep't of Def.,
  *Report on Progress Toward Security and Stability in Afghanistan*
  (Nov. 2013) ................................................................................................. 6

U.S. Dep't of Treasury,
  National Terrorist Financing Risk Assessment (Aug. 24, 2015) ........... 7

Press Release, U.S. Dep't of Treasury,
*Treasury Targets Taliban Shadow Governor of Helmand Afghanistan
as Narcotics Trafficker* (Nov. 15, 2012)...................................................7

The White House,
*National Strategy for Combating Terrorism* (Feb. 1, 2003)...................5

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

For at least a quarter century, a "chorus of government, media, and expert sources" has connected al-Qaeda and Taliban opium revenue to terrorist attacks against American servicemembers and civilians. *See* Pet. 13-14 (citing JA330-90). Amici curiae are former Executive Branch officials and officers who have long observed and worked to disrupt this well-recognized narco-terrorism nexus:

- **Andrew M. Fialdini**, Senior Intelligence Officer, Defense HUMINT, Defense Intelligence Agency, U.S. Department of Defense; former Chief of Counterterrorism, Iraq Survey Group, Baghdad.

- **Hon. Mary Beth Long**, Assistant Secretary of Defense for International Security Affairs (2007-2009).

- **Michael J. Mullaney**, Chief of the Counterterrorism Section, National Security Division, U.S. Department of Justice (2006-

---

[1] No party or party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than the amici curiae or their counsel contributed money intended to fund the preparation or submission of this brief.

2018); Principal Deputy Chief, Counterterrorism Section, U.S. Department of Justice (2003-2005).

- **Steven W. Pelak**, Principal Deputy Chief and then Acting Chief of the Counterespionage Section, National Security Division, U.S. Department of Justice (2007-2013); National Coordinator for Export Control/Sanctions Enforcement, National Security Division, U.S. Department of Justice (2007-2013); District Coordinator, Anti-Terrorism Advisory Council (2001-2007).

- **Hon. Robert J. Sander**, 23rd General Counsel of the Department of the Navy (2019-2021); Principal Deputy General Counsel of the Army and Senior Official Performing the Duties of the General Counsel of the Army (2018-2019).

The panel concluded that the complaint fails to plausibly connect terrorist violence to laundered terrorist drug money. *See* Op.47-50. Amici write to share their informed perspective that the panel's conclusion is utterly wrong as a matter of fact and common sense; disobeys *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 19, 22 (2025), which commands utmost deference to the political branches' uniform

determinations establishing the narco-terrorism nexus; and violates *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488-91 (2023), which holds that knowingly assisting terrorists' illegal conduct makes defendants liable for foreseeable consequences. *See* Fed. R. App. P. 29(b)(2) (authority to file brief by leave of court).

## ARGUMENT

### I. THE PANEL'S DECISION VIOLATES *FULD*'S COMMAND TO DEFER TO POLITICAL BRANCH DETERMINATIONS ABOUT WHAT CAUSES TERRORIST VIOLENCE.

The Supreme Court's recent decision in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), could not be clearer: The judiciary may not "cavalierly interfere with the political branches' 'delicate judgments' on matters of foreign affairs," *id.* at 19 (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 273 (2018)), because "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy," *id.* at 22 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010)). When "the Executive and Congress have spoken with one voice," as here, their conclusion receives "the strongest of presumptions and the widest latitude of judicial interpretation." *Ibid.* (quoting

3

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)); *see also Jesner*, 584 U.S. at 273 (Kennedy, J., opinion, joined by Roberts, C.J., and Thomas, J.) ("If Congress and the Executive were to determine that corporations should be liable for violations of international law, that decision would have special power and force because it would be made by the branches most immediately responsive to, and accountable to, the electorate.").

For over two decades, Congress and the Executive have agreed that drug money laundered through international banks finances terrorism against Americans. Congress sounded this alarm in 2002, declaring that the United States must "fight the production and flow of illicit narcotics" to prevent Afghanistan from becoming "a source for international terrorism." 22 U.S.C. §§ 7511(2)-(3). By 2004, the legislature concluded that "ending the cultivation, production, and trafficking of narcotics" was essential to preventing Afghanistan "from relapsing into a sanctuary for international terrorism." Intelligence Reform and Terrorism Prevention Act of 2004 § 7104(b), 22 U.S.C. § 7511 note. Shortly thereafter, Congress directed the President to address "the narcotics crisis in Afghanistan" specifically "to reduce the ability of the Taliban and al Qaeda to finance

their operations through the opium trade." Implementing Recommendation of the 9/11 Commission Act of 2007, § 2041(b)(2), 22 U.S.C. § 7511 note.

The Executive Branch has mapped the entire pipeline from poppy to violence. Not long after 9/11, the White House warned that drug trafficking generates "vast sums of money for . . . terrorist organizations" that, once "[l]aundered through the international financial system," provide "virtually untraceable funds" ensuring "a steady supply of weapons and cash . . . for terrorist organizations worldwide." The White House, *National Strategy for Combating Terrorism*, at 22 (Feb. 1, 2003). The Bush Administration thus declared that "[b]reaking the nexus between drugs and terror is a key objective in our war on terrorism." *Ibid.*

The Department of Defense (DOD) has long documented this nexus in granular detail, reporting that "93 percent of the world's opium originates in Afghanistan,"[2] with "[n]arcotics traffickers provid[ing] revenue and arms to the Taliban,"[3] and confirming that "[n]arcotics

---

[2] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* 93 (Jan. 2009).

[3] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* 69 (June 2008).

continued to play an integral role in financing the insurgency."[4] The threat was deemed so serious that DOD established the Afghanistan Threat Finance Cell in 2008—a joint operation led by the Drug Enforcement Administration, Treasury Department, and DOD—specifically "to identify and disrupt sources of insurgent and terrorist funding in Afghanistan." U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan*, at 98 (Nov. 2013).

Treasury has turned these findings into executive action that leaves no doubt about the narcotics-terrorism nexus.[5] When the Department designated the Taliban as "narcotics traffickers," it documented "direct involvement of senior Taliban leadership" in trafficking that finances "their acts of terror and violence," disclosing Taliban decrees that require "all measures, including planting improvised explosive devices (IEDs)" to protect poppy harvests because—in the Taliban's own words—"funds

---

[4] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* 81 (Apr. 2014).

[5] The Secretary of State designates Foreign Terrorist Organizations under 8 U.S.C. § 1189(a), while Treasury designates Specially Designated Global Terrorists under Executive Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 27, 2001), and narcotics kingpins linked to terrorism under 21 U.S.C. § 1904(b). These coordinated designations enable comprehensive sanctions against terrorist financing networks.

from the poppy harvest will permit the Taliban to survive." Press Release, U.S. Dep't of Treasury, *Treasury Targets Taliban Shadow Governor of Helmand Afghanistan as Narcotics Trafficker* (Nov. 15, 2012). Treasury's 2015 Risk Assessment documented "Taliban-owned heroin" being transported "to the United States to be sold for the financial benefit of the Taliban." U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment* at 28 (Aug. 24, 2015). As the Financial Action Task Force reported, "out of the total 2011/2012 budget of the Taliban of USD 400 million—one third was raised from the poppy trade." Fin. Action Task Force, *FATF Report: Emerging Terrorist Financing Risks*, at 16 (Oct. 2015).

Treasury has also emphasized that money laundering is central to terrorism's success. Former Assistant Treasury Secretary Juan Zarate explained that "the classic financial weaponry of anti-money-laundering strategies" formed the core tools to "disrupt Al Qaeda's operations." JA348. Accordingly, shortly after 9/11, the White House "'ordered America's banks to disclose information . . . on suspected money laundering that might be used to provide financing to terrorists,'" recognizing the "foreseeably close nexus between [anti-money-

7

laundering] violations . . . and al-Qaeda and/or Taliban finance." *See* JA110 (citation omitted). Treasury warned that terrorist groups "used conventional banks to transfer money to underwrite their global terrorist activities," JA113 n.41 (cleaned up), with banks serving as "nodes of illicit financing" where "the dirty money of suspect actors mixed to access the international financial system," JA383. Secretary Zarate's conclusion was unequivocal: Banks that launder money for criminals inevitably serve terrorists. *See ibid.* ("Where there [was] a transnational network of concern, there [was] likely also a bank . . . serving as a facilitator of that activity.").

The international community reached identical conclusions even before 9/11. In December 2000, the U.N. Security Council concluded that "the Taliban benefits directly from the cultivation of illicit opium" and "these substantial resources strengthen the Taliban's capacity to harbour terrorists." S.C. Res. 1333, at 2 (Dec. 19, 2000). "Funds raised from the production and trading of opium and heroin are used by the Taliban to buy arms and other war material, and to finance the training of

terrorists,"[6] with Taliban revenues reaching "$250 million and $470 million" from opium in 2008 alone.[7] The Taliban systematically taxes "the poppy trade, usually at ten per cent,"[8] while serving as "major guarantors for the trafficking of raw opium and heroin out of Afghanistan."[9] By 2016, the connection had become so obvious that Afghan officials concluded "there was no longer a dividing line between narcotics and terrorism."[10]

Under the much higher criminal law standard, federal prosecutors have proven this nexus beyond reasonable doubt. Haji Bagcho was sentenced to life imprisonment for using drug proceeds to provide "money, weapons, and supplies" to Taliban commanders to "support jihad" against western troops. *United States v. Bagcho*, 151 F. Supp. 3d. 60, 65 (D.D.C. 2015); *see also* U.N. Doc. S/2015/79 (Feb. 2, 2015), *supra*, at ¶ 13.

---

[6] Rep. of the Comm. of Experts on Afghanistan, at 12, U.N. Doc. S/2001/511 (May 22, 2001).

[7] Ninth Rep. of the Analytical Support and Sanctions Monitoring Team, ¶ 13, U.N. Doc. S/2009/245 (May 13, 2009).

[8] Rep. of the Analytical Support and Sanctions Monitoring Team, ¶ 21, U.N. Doc. S/2007/677 (Nov. 29, 2007).

[9] Rep. of the Analytical Support and Sanctions Monitoring Team, ¶ 20, U.N. Doc. S/2015/79 (Feb. 2, 2015).

[10] Seventh Rep. of the Analytical Support and Sanctions Monitoring Team, ¶ 16, U.N. Doc. S/2016/842 (Oct. 5, 2016).

9

Yet faced with these overwhelming determinations from every level of government and the international community, the panel somehow concluded that alleging their informed conclusions was insufficient to plausibly show a "discernable nexus" between terrorist drug money and terrorist violence. Op.49. The panel's refusal to give any deference to the contrary, decades-long view of Congress and the Executive Branch violates *Fuld* on its own terms. As we explain next, it is wrong regardless.

## II. THE PANEL'S FORESEEABILITY ANALYSIS VIOLATES *TWITTER*.

The panel's refusal to defer to political branch determinations in violation of *Fuld* leads directly to its second fundamental error: rejecting plaintiffs' well-pleaded foreseeability allegations in violation of the standards governing civil JASTA claims. The Supreme Court has adopted *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as providing the framework for civil aiding-and-abetting under JASTA, making clear that defendants are liable for the foreseeable consequences of the unlawful acts they knowingly assist. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 485-93 (2023). While the panel acknowledged this standard, Op.49, it disregarded the mountain of evidence that makes obvious the violent consequences of laundering drug money in Afghanistan.

When banks knowingly launder billions in Taliban drug proceeds, the consequences are not just foreseeable—they are inevitable. Yet the panel dismissed the corpus of political branch conclusions as a "fungibility theory" that cannot survive under *Twitter*. *See* Op.47-49. This fundamentally misreads the decision. The Supreme Court never suggested that fungibility arguments are categorically barred even when defendants knowingly assist illegal activity with foreseeable violent consequences. On the contrary, the Court emphasized that providing assistance to illegal conduct—as opposed to legitimate activities—alters the balance. *See Twitter*, 598 U.S. at 491-92. When defendants knowingly facilitate criminal enterprises controlled by terrorists, they cannot shroud themselves in *Twitter* and claim surprise when those proceeds lead to terrorist violence against Americans.

## CONCLUSION

The Court should grant the petition and reverse.

Respectfully submitted,

Daniel Woofter
RUSSELL & WOOFTER LLC
1701 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
(202) 240-8433
dhwoofter@russellwoofter.com

September 10, 2025

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit established by Fed. R. App. P. 29(b)(4) because this document contains 1,964 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point NewCenturySchlbk LT Std font.

*/s/ Daniel Woofter*
Daniel Woofter

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.

/s/ Daniel Woofter
Daniel Woofter